IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Nancy E. Lewen,                    )
                                   )
            Plaintiff,             )      No. 1:17 CV 00148
vs.                                )
                                   )
                                   )
Pennsylvania Soldiers and Sailors Home, *et al.*   )
                                   )      Magistrate Judge Susan Paradise Baxter
            Defendants,            )

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**Preliminary Injunction Standards.**

FRCP Rule 65 (a)(1) provides: "*Notice*. The court may issue a preliminary injunction only on notice to the adverse party."

To obtain a preliminary injunction, the moving party must show as a prerequisite (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. In addition, the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974).

A district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two. See, e.g., *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975) "While the burden rests upon the moving party to make [the first] two requisite showings, the district court should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *In re*

*Arthur Treacher's Franchisee Lit.*, 689 F.2d 1137, 1143 (3d Cir. 1982); *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990)

"In order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm. Additionally, the district court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest." (citations omitted)); *Campbell Soup Co. v. Conagra, Inc.*, 977 F. 2d 86, 90-91 (3d Cir. 1992); *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) "A District Court . . . balances these four factors to determine if an injunction should issue." *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015).

## I. REASONABLE PROBABILITY OF SUCCESS ON THE MERITS IN THE LITIGATION

Injunctive relief is an "extraordinary remedy and should be granted only in limited circumstances." *Kos Pharmaceuticals v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Plaintiff has a strong likelihood of success on the merits because defendants' actions infringe upon core constitutional rights such as the right to privacy, the right to personal beliefs, the right to autonomy and the right to due process of law and equal protection under the law. In Titan Tire Corp. v. Case New Holland, Inc., the U.S. Court of Appeals clarified factors and standards of review for evaluating preliminary injunctions. "This decision process, which requires the court to assess the potential of a 'clear and convincing' showing in the future, but in terms of what is 'more likely than not' presently, rests initially in the capable hands and sound judgment of the trial court....we reiterate that the 'clear and convincing' standard regarding the challenger's evidence applies only at trial on the merits, not at the preliminary injunction stage. The fact that, at trial on the merits, the proof of invalidity will require clear and convincing evidence is a consideration for the judge to take into account in assessing the challenger's case at the preliminary injunction stage; it is not an evidentiary burden to be met preliminarily by the challenger. *Titan Tire Corp. v. Case New Holland, Inc.* 566 F.3d 1372 (2009)

## A.  CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S LIKELIHOOD TO SUCCEED ON THE MERITS

There is no dispute of material fact on the following issues:

1)      At all relevant times, Plaintiff has been involved in legal proceedings against Pennsylvania state agencies following a termination from civil service employment in March 2016.

2)      Almost one year into the legal proceedings, now retired Attorney Stephen J. Bushinski, counsel for Defendant Department of Military and Veterans Affairs, noticed that the Plaintiff was demonstrating signs and symptoms of acute mental anguish and emotional distress.  Attorney Bushinski then contacted the Bureau of Professional and Occupational Affairs to petition the Pennsylvania Board of Nursing to have the Plaintiff's practical nursing license suspended pending a psychiatric evaluation.

3)      On January 31, 2017, the Pennsylvania Board of Nursing Probable Cause Committee members Suzanne Hetricks, Linda A. Kerns and Sherri Luchs  temporarily suspended the Plaintiff's nursing license, "in accordance with Section 17.1.(a)of the Practical Nurse Law, Act of March 2, 1956, P.L. (1955) 1211, ("Act"), 63 P.S. § 667.1(a),". **Exh. P-1, Exh. P-2**

4)      The Plaintiff could not attend hearing on the matter in Harrisburg, Pennsylvania, (for financial reasons,) but did submit written testimony for the hearing. **Exh P-3**

5)      Hearing was held on the matter on February 24, 2017 before Hearing Officer Christopher K. McNally, and the temporary suspension of the Plaintiff's nursing license was ordered to continue, "in no event longer than 180 days from January 31, 2016....as required by 63 P.S.  § 667.1(a)." **Exh. P-4**

6)      Plaintiff did attend the Psychiatric evaluation in Pittsburgh. At some point afterward, the Psychiatrist contracted by the Board gave his written opinion to the Board that the Plaintiff is "unable to practice practical nursing with reasonable skill and safety without ongoing psychiatric treatment."

7)      On August 5, 2017 the Plaintiff mailed a petition to the Board of Nursing for reinstatement of her nursing license. **Exh. P-5**

4

8)    On August 8, 2017 the Bureau of Professional and Occupational Affairs filed "Order to Show

Cause," offered the Plaintiff a  "Consent Agreement," agreeing among other things, to waive her

Constitutional rights in exchange for the "possible" reinstatement of her nursing license.  **Exh. P-6**

9)    Plaintiff did not sign the consent agreement, but did respond.  **Exh. P-7**

10)   Hearing on the matter was then scheduled for November 20, 2017. **Exh. P-8**

11)   Plaintiff's nursing license was then reinstated without restriction, without a hearing on the

matter, by the chairperson of the Board of Nursing and the Commissioner of the Bureau of Professional

and Occupational Affairs, with the exclusion of the probable cause committee, on September 15, 2017.

12)   The reinstatement was 227 days after the nursing license was temporarilty suspended. **Exh. P-9**

13)   There was no evidence submitted at any time that the Plaintiff had practiced unsafe nursing, had

committed any crimes, had committed any wrongdoing in violation of nursing laws or rules, was

addicted to drugs or alcohol, or was mentally incompetent.

14)   "Disciplinary History" remains on the Plaintiff's Pennsylvania nursing license record, in the

NURSYS national database and possibly other national nursing license databases, in spite of the fact

that th Plaintiff committed no wrongdoing or unsafe nursing practice. **Exh. P-10, P-11**


**B. LEGAL ARGUMENTS IN SUPPORT OF CERTAIN CLAIMS**

CLAIM ONE- FIRST AMENDMENT

        The Plaintiff's nursing license was suspended in large part because of her belief in God and

manifestation of a "hyperspiritual" coping mechanism during a time of acute mental stress.   The

Plaintiff contends that her mental health began to break down after the Civil Service appeal hearing

when Attorney Bushinski "ran the show," and Commissioner David Zurn failed to provide her with the

opportunity to testify or present evidence.  Over a several month period, the Plaintiff informed Attorney

Bushinski that she was an overcomer of domestic violence and had first been diagnosed with a stress

disorder by a US Air Force psychiatrist in the 1980's.   Even if the legal proceedings were not the cause of the breakdown in the Plaintiff's mental health,  she began experiencing symptoms of "hyperspirituality and increased psychic awareness."   The petition to suspend her nursing license alleged, in part,  that the Plaintiff was incompetent to practice safe nursing because her emails to Attorney Bushinski were on a theme of "good vs evil," and referenced such things as ghosts, evil magicians, and communication with God and God's army.

In her written testimony to the Board of Nursing in February 2017, the Plaintiff explained that her psychological coping mechanism during times of stress is to draw comfort from God.   This spiritual emergency phenomena is recognized in DSM 5 in the "Phase of Life" category and coded as V62.89.  (ICD-9-CM V62.89  ICD-10-CM-Z65.8.)   This religious persecution against the Plaintiff was discriminatory towards her as a Christian.   There are numerous Bible verses that reference ghosts, evil magicians, God and God's army.  For example, 1 Samuel 28, when Saul talks with Samuel's ghost. Ezekiel 1:4-28 which describes a spiritual battlefield and God's throne,  which is called "The Chariot of the Lord."  The Book of Haggai, Chapter 2, refers to the "Lord of Heaven's Armies."  Exodus 7:11 speaks of the Prophet Moses vs "evil magicians."  The Plaintiff testified to the Board of Nursing that she is spiritually gifted and enlightened in the same way as was the founder of modern nursing, Florence Nightingale.  The Plaintiff made reference to Florence Nightingale's  "mystical" writings.

Florence Nightingale mentioned "hearing the voice of God" on atleast four occasions in her writings.  For example, in Embley Park in February 1837 Florence Nightingale claimed to receive a calling from God; she wrote "God has spoke to me and called me to His service."  (see https://britishheritage.com/florence-nightingale/)

The Plaintiff did imply in emails to Attorney Bushinski that she had been "called by God" to advocate as a whistleblower on behalf of the elderly residents at the Pennsylvania Soldiers and Sailors Home.   Regardless of the cause, this breakdown in the Plaintiff's mental health, and subsequent

6

"spiritual emergency," was not in violation of any rules or laws. The Plaintiff was not even using her nursing license at the time, and certainly never practiced unsafe nursing. There was no evidence submitted at any time proving that the Plaintiff committed unsafe nursing practice or any wrongdoing. The Defendants "disciplined" the Plaintiff and temporariliy suspended her nursing license for no other reason than for being spiritually gifted in the same way that the founder of modern nursing was spiritually gifted. The Defendants published sensitive mental health information without the Plaintiff's permission, which remains published indefinitely. Mental illness is nothing to be ashamed of, but retaining an unwarranted "disciplinary history" on the Plaintiff's nursing license record implies that the Plaintiff committed some wrongdoing and violates the Plaintiff's First Amendment rights.

The First Amendment protects several basic liberties and cherished values— freedom of religion, speech, press, petition, and assembly. The U.S. Supreme Court has struggled to determine what exactly constitutes protected First Amendment rights. In essence, the First Amendment guarantees the right to personal beliefs, personal autonomy, or the right to choose whether or not to engage in certain acts or have certain experiences. First Amendment Rights Against Invasion of Privacy and Right to Personal Autonomy are Closely Tied to Pennsylvania Defamation of Character, Libel, Slander Laws- (see CLAIM FIVE)

CLAIM TWO- FOURTEENTH AMENDMENT

Temporarily suspending a nursing license for longer than 180 days is clearly in violation of Pennsylvania law. Even assuming that the stated reasons for the original temporary nursing license suspension were factually accurate, which they were not, the Plaintiff was denied due process of law and equal protections under the law by the Defendants in violation of the Plaintiff's Fourteenth Amendment rights. The "rule of law" means that Americans are governed by laws and facts. In the United States, a person is considered *innocent until proven guilty*. The US Constitution guarantees every citizen *"due process of law,"* and *"equal protection under the law."* As a US Citizen, and a

7

Pennsylvania nurse, the Plaintiff had the legal right to be presumed to be mentally competent and capable of practicing nursing with reasonable skill and safety...*unless proven otherwise.*

The Bureau of Professional and Occupational Affairs did not provide any evidence to meet the burden of proof that the Plaintiff was unable to practice practical nursing with reasonable skill and safety. The Due Process Clause of the 14th Amendment states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." In support of this motion, the Plaintiff is offering documentary evidence which clearly shows that the Plaintiff was deprived of "life, liberty, or property," without due process of law and equal protection of the law.

**Fourteenth Amendment Right to Procedural Due Process** protects individuals from the coercive power of government by ensuring that adjudication processes, under valid laws, are fair and impartial. Such protections, for example, include sufficient and timely notice on why a party is required to appear before a court or other administrative body, the right to an impartial trier of fact and trier of law, and the right to give testimony and present relevant evidence at hearings.

**Fourteenth Amendment Right to Substantive Due Process:** In United States constitutional law, Substantive Due Process is a principle allowing courts to protect certain fundamental rights from government interference, even if procedural protections are present or the rights are not specifically mentioned elsewhere in the US Constitution. Courts have identified the basis for such protection from the due process clauses of the Fifth and Fourteenth Amendments to the Constitution, which prohibit the federal and state governments from depriving any person of "life, liberty, or property, without due process of law." Substantive due process protects individuals against policy enactments that exceed the limits of governmental authority: courts may find that an enactment is not law and cannot be enforced as such, regardless of whether the processes of enactment and enforcement were actually fair.

8

Substantive due process demarcates the line between acts that courts hold are subject to government regulation or legislation and acts that courts place beyond the reach of governmental interference. (*Williams, Ryan. (2010.)*)

In examining whether (or not) a challenged government action violates an individual's substantive Due Process, the first step is to determine whether the right at issue is a "fundamental" right, i.e., one that is either "deeply rooted in this Nation's history and tradition, or implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were sacrificed." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

There can be no reasonable dispute that the rights asserted by the Plaintiff in this case---the right for her suspended nursing license to have been reinstated after 180 days as provided for by law, and the right to a clean nursing license record—is a "fundamental" right under the Fourteenth Amendment.

CLAIM FIVE- DEFAMATION OF CHARACTER; LIBEL, SLANDER IN VIOLATION OF PA. CONS. STAT. §§ 8341-8345.

Defendants are maintaining a "disciplinary history" in the Plaintiff's Pennsylvania nursing record in spite of the fact that there was absolutely no evidence of unsafe nursing practice, nursing law or rule violations, alcohol or drug addiction or mental incompetency at any time.

In the United States, federal defamation law is closely tied to the First Amendment. Pennsylvania defamation laws adhere to federal standards. The Supreme Court of Pennsylvania has held that "individuals have a constitutional right to privacy in their home addresses under Article 1, Section 1 of the Pennsylvania Constitution" and that individuals have a right to "informational privacy" which may not be violated unless this right is outweighed by a public interest favoring disclosure. *Pennsylvania State Education Association v. Commonwealth*, 2016 Pa. 2337, 2016 WL 6087684, (2016). (*PSEA*) In *PSEA*, the Court held that in identifying rights to informational privacy under the Pennsylvania Constitution, it applies the broader array of rights granted to citizens under Article 1,

Section 1, which is entitled "Inherent rights of mankind:" All men are born and equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. Pa. Const. Art. 1, § 1  The Court explained that Article 1, Section 1 of the Pennsylvania Constitution provides even "more rigorous and explicit protection for a person's right to privacy" than does the United States Constitution. Under the prior Right to Know Act, 65 P.S. §§ 66.1-66.4 (repealed, effective January 1, 2009) ("RTKA"), the Court had on three occasions ruled that certain types of information implicated the right to privacy under Article 1, Section 1 of the Pennsylvania Constitution, and thus required a balancing to determine whether the right to privacy outweighs the public's interest in dissemination. See *Sapp Roofing Company, Inc. v. Sheet Metal Workers' International Association*, 552 Pa. 105, 713 A.2d 627 (1998) *Pa. State Univ. v. State Employees' Retirement Board*, 935 A.2d 530 (Pa. 2007); *Tribune-Review Publ. Co. v. Bodack*, 961 A.2d 110 (Pa. 2008).  Based on this precedent, the Court concluded that the right to informational privacy is guaranteed by Article 1, Section 1 of the Pennsylvania Constitution, and may not be violated unless outweighed by a public interest favoring disclosure. In the *PSEA* case, the Court concluded that the balancing test established in *Sapp Roofing*, *Penn State* and *Bodack* applied and found that there was no public interest in procuring personal information about private citizens.

Pennsylvania courts invoke a statutory definition of Defamation of Character found in 42 Pa. Cons. Stat. §§ 8341-8345.  It has been observed that the cause of action for invasion of privacy "'is not one tort, but a complex of four.'" *Vogel v. W.T. Grant Co.*, 458 Pa. 124, 129 n. 9, 327 A.2d 133, 136 n. 9 (1974).  These four consist of (1) intrusion upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life; and (4) publicity placing a person in false light. This tort is defined at Restatement (Second) of Torts §§ 652A-E as follows:

**652A. General Principle**

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
(2) The right of privacy is invaded by:

    (a) unreasonable intrusion upon the seclusion of another, as stated in 652B; or
    (b) appropriation of the other's name or likeness, as stated in 652C; or
    (c) unreasonable publicity given to the other's private life, as stated in 652D; or
    (d) publicity that unreasonably places the other in a false light before the public, as stated in 652E.

**652B. Intrusion upon Seclusion**

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

**652C. Appropriation of Name or Likeness**

One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.

**652D. Publicity Given to Private Life**

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

    (a) would be highly offensive to a reasonable person, and
    (b) is not of legitimate concern to the public.

**652E. Publicity Placing Person in False Light**

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

    (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
    (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

    To constitute a tortuous invasion of privacy an act must "`cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Hull v. Curtis Publishing Co.*, 182 Pa.Super. 86, 99, 125 A.2d 644, 646 (1956), quoting *Smith v. Doss*, 251 Ala. 250, 252-253, 37 So. 2D 118, 120-121

11

(1948).  An action for invasion of privacy will ordinarily be an adequate remedy for highly offensive conduct which unreasonably interferes with another's right to be left alone. *Cf. Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc.*, 344 Pa.Super. 367, 496 A.2d 840 (1985).

There is an ongoing an intrusion upon the Plaintiff's seclusion, publicity given to her private life without her consent, and publicity placing her in a false light.   Defendants clearly violated the Plaintiff's First Amendment right to privacy when they falsely published a "disciplinary" history against the Plaintiff's nursing license in spite of the fact that Plaintiff had broken no rules, committed no crimes, and had at no time met the legal definition of "mentally incompetent."

Having a disciplinary history implies that the Plaintiff did something wrong as a nurse.   No evidence was ever submitted showing that the Plaintiff did anything wrong as a nurse.  The impacts of discipline by a board of nursing are numerous, and even have repercussions on licenses held in other states.   Difficulty in getting hired for a nursing job is one of those impacts. Unfortunately, employers view discipline as a bona fide restriction of the license due to history of some poor judgment or unsafe nursing practice and therefore do not hire the potential employee.

The Defendant's actions in creating a disciplinary history on the Plaintiff's nursing record has caused the Plaintiff much mental suffering, shame and humiliation in addition to reputational harm. These defendants furthermore violated the Plaintiff's First Amendment right to personal autonomy by forcing her to see a psychiatrist and attempting to force her to sign a Consent agreement agreeing to waive her constitutional rights.

"Truth" is an absolute defense against defamation. See *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and *Time Inc. v. Hill,* 385 U.S. 411 (1967). Consequently, a plaintiff has to provide convincing evidence of a defamatory statement's falsity in order to prove defamation.   Proving falsity of the publication is a simple matter.  The Plaintiff was not even using her nursing license at the time

that the Defendant's suspended it.  There simply was no evidence provided whatsoever that the Plaintiff was "mentally incompetent," or "unable to practice nursing with reasonable skill and safety."

## CLAIM SIX- INFLICTION OF MENTAL ANGUISH/ HUMILIATION

The Plaintiff has held nursing licenses in three states since 1995, and has never had any disciplinary history.  The Plaintiff has always had good job performance reviews, even in her last nursing job at the Pennsylvania Soldiers and Sailors Home prior to being terminated.  **Exh. P-12**

In an email sent by the Plaintiff to the Defendants by way of Deputy Attorney General Michael Kennedy on September 27, 2017 the Plaintiff offered to settle.   That offer was ignored. **Exh. P-13**

The Plaintiff has, and currently is, suffering much mental anguish and humiliation over the suspension of her nursing license and the unwarrented disciplinary history.

Emotional distress damages are available even where the plaintiff has not sought medical treatment.  A Medical testimony, although relevant, is not necessary. . . . the plaintiff's own testimony may be sufficient to establish humiliation or mental distress.  *Williams v. TWA*, 660 F. 2d 1267 (8th Cir. 1981). See also *Hammond v. Northland Counseling Center*, 218 F.3d 866 (8th Cir. 2000); *Ross v. Douglas County*, Nebraska, 234 F. 3d 391 (8th Cir. 2000).  The Eighth Circuit has held that a plaintiff's own testimony may be adequate to support such an award and the testimony of family and friends is also probative. *Kucia v. Southeast Arkansas Community Action Corp.*, 284 F. 3d 944, 947 (8th Cir. 2002) (plaintiff's own testimony enough); *Morse v. Southern Union Co.*, 174 F. 3d 917, 925 (8th Cir. 1999) (affirming $100,000 emotional distress award where family members corroborated plaintiff's testimony); *Kim v. Nash Finch Co.*, 123 F. 3d 1046, 1065 (8thCir. 1997) ( award of $100,000 affirmed where plaintiff, his wife and his son testified regarding anxiety, sleeplessness, stress, depression, high blood pressure, headaches and humiliation).

CLAIM NINE- DISABILITY DISCRIMINATION. FAILURE TO ACCOMMODATE

By "disciplining" the Plaintiff for experiencing a breakdown in her mental health, the Defendants have discriminated against and failed to accommodate the Plaintiff.

Title II, §§12131—12134, prohibits any public entity from discriminating against "qualified" persons with disabilities in the provision or operation of public services, programs, or activities. The Act defines the term "public entity" to include state and local governments, as well as their agencies and instrumentalities. §12131(1). Persons with disabilities are "qualified" if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." §12131(2). Title II's enforcement provision incorporates by reference §505 of the Rehabilitation Act of 1973, 92 Stat. 2982, as added, 29 U.S.C. § 794a which authorizes private citizens to bring suits for money damages. 42 U.S.C. § 12133.

Under Pennsylvania law, a judicial hearing is required to determine "mental incompetency." Generally, someone may be considered incompetent if through either physical or mental defect the individual lacks the ability to handle his/her affairs. This is adjudicated through the courts and the individual believed to be incompetent has the right to produce evidence of competency. There is a presumption that the individual is mentally competent and the burden of proof is on the petitioner to rebut the presumption.   No evidence was ever submitted to prove that the Plaintiff had been declared "mentally incompetent" in any judicial competency proceedings.

## II.   IRREPARABLE HARM

When First Amendment rights are burdened, there is a presumption of irreparable harm.  The reason for the presumption is self-evident.   "It is well established that '[t]he loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Am.*
*Broad. Cos., Inc. v. Wells*, 669 F. Supp. 2d 483, 489 (D.N.J. 2009) (*quoting Elrod v. Burns*, 427 U.S.
347, 373 (1976); *see also Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs*, 802
F. Supp. 1223, 1237 (D.N.J. 1992)). "Furthermore, when an alleged constitutional right is involved,
most courts hold that no further showing of irreparable injury is necessary." *Bonnell v. Lorenzo*, 241
F.3d 800, 809 (6th Cir. 2001).

## III.   HARM TO PLAINTIFF OUTWEIGHS HARM TO THE DEFENDANTS

The Plaintiff is experiencing actual and continuing harm to her professional and personal
reputation as a direct result of unwarranted "disciplinary history." The balance of harms test will most
often be met once a First Amendment plaintiff demonstrates a likelihood of success on the merits.
*American Civil Liberties Union v. Johnson*, 194 F.3d at 1163 (10th Cir. 1999.)

The balance of harms tips in favor of the Plaintiff.  Now that her nursing license is reinstated,
the Plaintiff is seeking a nursing position, but has not even been able to land a new nursing job, most
likely because of having to explain the embarrassing and humiliating  "disciplinary history" against her
nursing license, in addition to already having to explain the termination from her last nursing position.

## IV.   PUBLIC INTEREST

Plaintiff can satisfy the "public interest test" because the unwarranted disciplinary history on
her record, burdens her First Amendment rights.  Injunctions blocking state action that would otherwise
interfere with First Amendment rights are consistent with the public interest. *Elam Constr. v. Reg.*
*Transp. Dist.*  129 F. 3d 1343, 1347 (10th Cirs. 1997)  "The public interest...favors plaintiffs' assertion
of their First Amendment rights." *Utah Licensed Beverage Ass'n. v. Leavitt*, 256 F. 3d at 1076.

## V.   INADEQUATE LEGAL REMEDY

The Board of Nursing has ruled in at least one other case that there is no remedy under their
laws or rules to expunge the disciplinary record. **See Page 2, paragraph 2 Exh. P-12**

## VI.    BOND REQUIREMENT SHOULD BE WAIVED

FRCP 65(c), provides: "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

The Third Circuit recognized two categories of exceptions to this general rule. See *Temple Univ. v. White*, 94 1 F.2d 201, 219-20 (3d Cir. 1991). First, the Third Circuit provided that a district court in deciding whether to require a bond should first examine "the equities of potential hardships to the parties." Id. at 220. "Atleast in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant.'" Id. At 219. Certainly the risk of financial loss stemming from the injunction to the enjoined party, and the ability of the applicant to pay a bond are factors in this balancing of equities. Id. at 219-20 (noting that the equities of the case– applicant's near financial insolvency and that enjoined party would be required to pay additional funds to the applicant regardless of the issuance of a bond, and thus could recoup any excessive payment by withholding future funds– "weighed in favor of waiving the bond requirement."); see also E*lliot v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) (failure to make findings regarding the financial hardships that a bond requirement would impose constitutes reversible error); *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2D 304, 322 (E.D. Pa. 2007) (addressing the "risk of harm" to enjoined party in relation to issuance of a bond). Second, a "district court should consider the impact that a bond requirement would have on enforcement of an important federal right or public interest in order to prevent undue restriction of them." *Temple Univ.*, 941 F.2d at 220.

The relief that the Plaintiff is seeking does not involve costs or damages, but is for the Defendants to be enjoined to expunge the Plaintiff's nursing license record to remove history of defamatory "discipline" that the Plaintiff does not deserve and no evidence supported.

16

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that this Court enter a preliminary injunction against Defendants Pennsylvania Bureau of Professional and Occupational Affairs and Pennsylvania Board of Nursing (BON).   Plaintiff seeks preliminary injunctive relief for expungement of the defamatory and unwarranted disciplinary action history against her Pennsylvania Licensed Practical Nurse license as though the temporary suspension never occurred.

Dated: October 28, 2017


Respectfully submitted,

*Nancy E. Lewen*   10/30/2017
Nancy E. Lewen, pro se, Plaintiff
3342 West 12th Street
Erie, PA 16505

17