COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF STATE

BEFORE THE STATE BOARD OF NURSING

* * * * * * * * *

COMMONWEALTH OF PENNSYLVANIA,      *

BUREAU OF PROFESSIONAL AND         *

OCCUPATIONAL AFFAIRS,              * Docket No.

      Complainant              * 0148-51-17

   Vs.                             * File No.

NANCY COOK LEWEN, LPN,             * 17-51-00519

      Respondent               *

* * * * * * * * *

HEARING TRANSCRIPT

* * * * * * * * *

BEFORE:   CHRISTOPHER MCNALLY, Esquire

          Hearing Examiner

HEARING:  Friday, February 24, 2017

          1:29 p.m.

LOCATION: Pennsylvania Department of State

          2601 North Third Street

          Harrisburg, PA  17106

WITNESSES: Stephen J. Bushinski

          Reporter: Danielle Obert

Any reproduction of this transcript is prohibited

without authorization by the certifying agency.

2

1                    A P P E A R A N C E S

2

3  T'RESE M. EVANCHO, ESQUIRE

4  Prosecuting Attorney

5  Commonwealth of Pennsylvania

6  Department of State

7  P.O. Box 69521

8  Harrisburg, PA  17106

9       Counsel for Complainant

10

11 NONE PRESENT

12       For The Respondent

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                         I N D E X

2

3    DISCUSSION AMONG PARTIES                    5 -    6

4    OPENING STATEMENT

5         By Attorney Evancho                    7 -    9

6    DISCUSSION AMONG PARTIES                    9 - 16

7    WITNESS: STEPHEN J. BUSHINSKI, ESQUIRE

8    DIRECT EXAMINATION

9         By Attorney Evancho                   16 - 34

10   EXAMINATION

11        By Hearing Examiner                   34 - 41

12   DISCUSSION AMONG PARTIES                   41 - 44

13   CLOSING STATEMENT

14        By Attorney Evancho                   44 - 45

15   DISCUSSION AMONG PARTIES                        45

16

17

18

19

20

21

22

23

24

25

```
                                                              4
1                    E X H I B I T S

2

3                                      Page         Page

4  Number        Description         Identified   Admitted

5  Commonwealth:

6  Exhibit 1   1/30/17 Petition for Immediate

7              Temporary Suspension     10           11

8  Exhibit 2   1/31/17 Order of Temporary

9              Suspension and Notice

10             Of Hearing               11           11

11 Exhibit 3   2/7/17 Answer from

12             Respondent               11           12

13 Exhibit 4   Copy of LPN License and

14             2/2/17 Letter from

15             Respondent               12           16

16 Exhibit 5   1/10/17 Email from Nancy

17             Lewen to Stephen Bushinski 26          27

18 Exhibit 6   1/1/17 Email  from Nancy

19             Lewen to Stephen Bushinski 28          29

20 Exhibit 7   9/10/16 Email from Nancy

21             Lewen to Stephen Bushinski 30          31

22

23

24

25
```

5

1                  P R O C E E D I N G S

2    ------------------------------------------------------

3              HEARING EXAMINER:

4              Good afternoon.  My name is Christopher

5    McNally.  I'm the Hearing Examiner assigned to this

6    matter, which is the Commonwealth of Pennsylvania,

7    Bureau of Professional and Occupational Affairs versus

8    Nancy Cook Lewen, LPN.  Docket Number 0148-51-2017,

9    File Number 17-51-00519.

10             On February 3, 2017, the Prothonotary

11   issued a Notice of Hearing for this date and time.

12   This is a hearing on an Order of Temporary Suspension

13   that was issued on January 31st, 2017.  And the

14   Respondent did file, on February 10th, 2017, a

15   response to that Order of Temporary Suspension as well

16   as the Petition for an Immediate and Temporary

17   Suspension.

18             And the Respondent did write in her

19   response that she is --- quote, I am unable to

20   personally attend any future hearings on this matter,

21   period.  I am not represented by an attorney, period.

22   And it appears to have her signature, and again, that

23   was filed on February 10th, 2017.  And the attorney

24   for the Commonwealth also received a copy of that.

25             She did include her return address of

6

1   3342 West 12th Street, Erie, Pennsylvania, 16505.  And

2   that is also the address that appears on the envelope,

3   the return address that appears on the envelope, in

4   which the Respondent's Answer was mailed to the

5   Prothonotary.  And that's the same address that was on

6   the Notice of Hearing.

7                And then thereafter, on February 16th,

8   after the Notice of Hearing was issued, the Respondent

9   filed a document that she's titled Acknowledgement of

10  Notice of Preliminary Hearing, and in which she states

11  that she takes this matter very seriously, but for

12  financial reasons I am unable to attend the

13  preliminary hearing in Harrisburg.  And among other

14  statements, but critically for purposes of this

15  hearing, she has confirmed again that she is not able

16  to attend the preliminary hearing today.

17                So accordingly, while we would normally

18  agree to at least delay and allow the Respondent an

19  additional 15 minutes or so to appear and testify, or

20  otherwise respond, since we've received two written

21  statements from the Respondent that she is not able to

22  attend the hearing --- she did not ask for permission

23  to testify by telephone and did not ask for a

24  continuance.  Therefore, we are going to proceed right

25  now.

7

1          So Counsel, if you would like to
2  proceed?
3               ATTORNEY EVANCHO:
4               Yes.  Thank you.
5               HEARING EXAMINER:
6               And identify yourself.
7               ATTORNEY EVANCHO:
8               T'rese Evancho for the Commonwealth.  On
9  January 31, 2017, the Commonwealth petitioned the
10 State Board of Nursing's Probable Cause Screening
11 Committee to issue an order immediately and
12 temporarily suspending the license of Respondent,
13 Nancy Cook Lewen, who is licensed as a practical nurse
14 in the Commonwealth.
15              The Commonwealth petitioned the Probable
16 Cause Screening Committee to issue this Order because
17 the Commonwealth determined that Ms. Lewen was a clear
18 and present danger to the public health and safety
19 based on a voluminous amount of emails that Ms. Lewen
20 had provided to Attorney Stephen Bushinski of the
21 Department of Military and Veterans Affairs.
22              Ms. Lewen was terminated from employment
23 at Pennsylvania Sailors and Soldiers Home, which is a
24 care facility run by the Department of Military and
25 Veterans Affairs.  Ms. Lewen appealed that

8

1  termination, which led her to Attorney Stephen

2  Bushinski, as Mr. Bushinski was the attorney that

3  represented the Department in the termination appeal

4  hearing and subsequent hearings with Ms. Lewen.

5              Initially, the emails to Attorney

6  Bushinski by Ms. Lewen dealt with the pending legal

7  matters.  Eventually, these emails took on a bizarre

8  and disturbing tone, as Ms. Lewen began to reference

9  things as ghosts and talking to ghosts and harnessing

10  the power of these ghosts.  Much of it was aimed

11  toward Mr. --- or excuse me, Attorney Bushinski.  She

12  references talking to God and God's army.  She

13  references at some point some sort of involuntary

14  commitment regarding to, relating to her mental

15  health.

16              Also in these emails, she seems to track

17  down tragic or catastrophic events and essentially

18  decipher them and find meaning in them that relates

19  back to her mental health and her experiences.  It was

20  because of the content of these emails that the

21  Commonwealth felt compelled to file this Petition for

22  Immediate Suspension because these raise the serious

23  issue of a severe mental instability that makes Ms.

24  Lewen unsafe to practice practical nursing unless her

25  license was suspended.

9

1          The Board's Probable Cause Screening
2  Committee certainly found that the evidence that was
3  shown to them that was alleged in the Petition for
4  Immediate Suspension was adequate, that Ms. Lewen is a
5  clear and present danger because the Board's Probable
6  Cause Screening Committee did order the immediate and
7  temporary suspension of Ms. Lewen's license.
8          As such, today is a preliminary hearing
9  for the Commonwealth to show that there is prima facie
10  evidence to support the preliminary --- excuse me, the
11  temporary and immediate suspension of Ms. Lewen's
12  license, which the Commonwealth will show today
13  through the testimony of Attorney Bushinski.  Thank
14  you.
15                    HEARING EXAMINER:
16          All right.  Now, would you either like
17  to call your first witness or any documents you wish
18  to offer at this time?
19                    ATTORNEY EVANCHO:
20          Yes.  Thank you.  First, the
21  Commonwealth would like to request that official
22  notice be taken of the State Board of Nursing's
23  records, which indicate that Respondent is licensed as
24  a practical nurse in Pennsylvania with a license
25  number of PN152006L, that her nursing license was

10

1   issued on July 26th, 1999 and is set to expire on June

2   30, 2018, and finally, that her address on file with

3   the Board is 3342 West 12th Street, Erie, Pennsylvania

4   16505.

5                    HEARING EXAMINER:

6                    Thank you.  The Board and I will take

7   official notice of all the records of the State Board

8   of Nursing, as well as any documents and information

9   on file with the Prothonotary at this agency, as well

10  as we will admit for --- without attaching copies to

11  the transcript, but by reference to the documents

12  filed with the Prothonotary, any admissions that are

13  contained in the Respondent's Answers to the Petition.

14                   ATTORNEY EVANCHO:

15                   Thank you.  And the Commonwealth

16  actually intends to introduce now some of these

17  filings.  So may I have permission to approach?

18                   HEARING EXAMINER:

19                   Yes.

20                   ATTORNEY EVANCHO:

21                   Thank you.  At this time, the

22  Commonwealth is presenting what has been marked as

23  Exhibits C-1, C-2, and C-3.

24                   (Whereupon, Commonwealth Exhibit 1,

25                   1/30/17 Petition for Immediate Temporary

11

1          Suspension, was marked for

2          identification.)

3          (Whereupon, Commonwealth Exhibit 2,

4          1/31/17 Order of Temporary Suspension

5          and Notice of Hearing, was marked for

6          identification.)

7          (Whereupon, Commonwealth Exhibit 3,

8          2/7/17 Answer from Respondent, was

9          marked for identification.)

10          HEARING EXAMINER:

11          And Exhibit C-1 is admitted.  That is

12     the Petition for Immediate Temporary Suspension.

13          (Whereupon, Commonwealth Exhibit 1,

14          1/31/17 Petition for Immediate Temporary

15          Suspension, was admitted.)

16          HEARING EXAMINER:

17          Exhibit C-2 is the Order of Temporary

18     Suspension and Notice of Hearing, and that is

19     admitted.

20          (Whereupon, Commonwealth Exhibit 2,

21          1/31/17 Order of Temporary Suspension

22          and Notice of Hearing was admitted.)

23          HEARING EXAMINER:

24          And Exhibit C-3 is admitted as the

25     Respondent's Answer or response to the Petition and

12

1   Order for Immediate Temporary Suspension.

2                    (Whereupon, Commonwealth Exhibit 3,

3                    2/7/17 Answer from Respondent, was

4                    admitted.)

5                    ATTORNEY EVANCHO:

6                    Thank you.  And the Commonwealth

7   respectfully asks that official notice be taken of any

8   admissions contained in C-3.

9                    HEARING EXAMINER:

10                   Thank you.

11                   ATTORNEY EVANCHO:

12                   Thank you.  And also, I would like to

13  introduce a document that has been marked as Exhibit

14  C-4.

15                   (Whereupon, Commonwealth Exhibit 4, Copy

16                   of LPN License and 2/2/17 Letter from

17                   Respondent, was marked for

18                   identification.)

19                   ATTORNEY EVANCHO:

20                   This is a letter that was sent from Ms.

21  Lewen, and it was addressed to myself and the Nursing

22  Board members.  Attached to it was her license, which

23  are copies of here.  And also, I made a copy of the

24  envelope that this was received in.

25                   The Commonwealth at this time would

13

1  attest that this has come from Ms. Lewen as the return

2  envelope has a return address of 3342 West 12th

3  Street.  It looks like Erie is covered out by the

4  certified mail, but it has a ZIP Code of 16505.  And

5  it's just a subsequent letter from Ms. Lewen.

6              HEARING EXAMINER:

7              Do you have the originals?

8              ATTORNEY EVANCHO:

9              I do have the originals.  Would you like

10  to see them?

11              HEARING EXAMINER:

12              Yes, please.

13              ATTORNEY EVANCHO:

14              There it looks like she has attached to

15  it her licenses and then the envelope is attached to

16  the back.

17              HEARING EXAMINER:

18              Just for the record, if I remember

19  correctly, the typical procedure for a returned

20  license is that the Board takes that document, the

21  original; is that right?

22              ATTORNEY EVANCHO:

23              Yes.  And we had just not given it to

24  the Board yet.  And we were just waiting for this

25  hearing.

14

1               HEARING EXAMINER:

2               And then ultimately it's destroyed; is

3  that right?

4               ATTORNEY EVANCHO:

5               To be honest, I am not sure what happens

6  to that licensee.  I don't know because if this is not

7  upheld I believe that the suspension then is no longer

8  in effect.

9               HEARING EXAMINER:

10              Right.

11              ATTORNEY EVANCHO:

12              I don't know if they would reissue a new

13  one or return that.

14              HEARING EXAMINER:

15              All right.  But in any event, we are not

16  going to use the original license certificate and

17  wallet card because the proper procedure is that it's

18  kept with the State Board of Nursing.  So the document

19  that has been offered is a true and correct copy of

20  the original and therefore is admissible.

21              As for the letter itself, I do want to

22  point out that upon my examination of the letter, the

23  signature is in black ink, but judging from the

24  impression, it is handwritten and appears to be

25  consistent with the signature that appears on the

15

1 Respondent's other documents that she has filed with

2 the Prothonotary.  It is very similar, as well as the

3 handwriting on the envelope, the original envelope, is

4 also similar to what purports to be the Respondent's

5 handwriting on the other documents.

6 So it's up to you, Counsel, but I would

7 suggest that the originals of the letter be made, be

8 admitted into evidence and attached to the transcript,

9 because they do note some indicia of --- that it's

10 actually written by the Respondent herself.

11 ATTORNEY EVANCHO:

12 And the Commonwealth does not object to

13 this.  These have obviously been filed in the

14 Prothonotary.  We would only have gotten a copy

15 anyway.  So I will just attach the original license

16 and the envelope to my copy of the letter.  And I will

17 provide the original to the Court Reporter.

18 HEARING EXAMINER:

19 All right.

20 ATTORNEY EVANCHO:

21 Thank you.  At this time, the

22 Commonwealth would request that Exhibit C-4 be

23 admitted into evidence and that official notice be

24 taken of any admissions containing therein.

25 HEARING EXAMINER:

1          All right.  And C-4 is admitted.

2          (Whereupon, Commonwealth Exhibit 4, Copy

3          of LPN License and 2/2/17 Letter from

4          Respondent, was admitted.)

5          ATTORNEY EVANCHO:

6          Thank you.  At this time I would like to

7   call Attorney Bushinski to the stand.

8          HEARING EXAMINER:

9          Mr. Bushinski, if you would please come

10  forward and raise your right hand?

11  --------------------------------------------------------

12  STEPHEN J. BUSHINSKI, ESQUIRE, HAVING FIRST BEEN DULY

13  SWORN, TESTIFIED AS FOLLOWS:

14  --------------------------------------------------------

15          HEARING EXAMINER:

16          Please be seated.

17  DIRECT EXAMINATION

18  BY ATTORNEY EVANCHO:

19  Q.   Good afternoon, Attorney Bushinski.

20  A.   Good afternoon.

21  Q.   Can you state and spell your name for the record?

22  A.   My name is Stephen J. Bushinski.  Stephen is

23  spelled S-T-E-P-H-E-N.  Middle initial J.  Last name

24  B-U-S-H-I-N-S-K-I.

25  Q.   Thank you.  Are you employed?

1  A.   I'm employed by the Commonwealth of Pennsylvania,

2  Department of Military and Veterans Affairs.

3  Q.   And what is your position there?

4  A.   I am the Senior Assistant Chief Counsel in their

5  Office of General Counsel.

6  Q.   And what type of duties do you perform in your

7  role as Assistant Chief Counsel?

8  A.   Well, I provide legal representation to the

9  Department as a whole, but primarily my work involves

10  work with six state veterans' homes that are

11  administered by the Department of Military and

12  Veterans Affairs.

13  Q.   Are you acquainted with the Respondent in this

14  matter, Ms. Lewen?

15  A.   Yes, I am.

16  Q.   And how did you become acquainted with Ms. Lewen?

17  A.   In my role as Assistant Chief Counsel with the

18  Department of Military and Veterans Affairs, I am

19  often called on to represent the Department.  The

20  Department's acronym is the D-M-V-A, and that's how

21  I'll refer to it.

22       I'm often called to represent the DMVA in labor

23  matters.  On March 16 of --- or March 14th, rather, of

24  2016, the Pennsylvania Soldiers and Sailors Home,

25  which is a state veterans home operated by DMVA in

18

1  Erie, Pennsylvania, fired Ms. Lewen for a number of

2  acts of misconduct.

3      Ms. Lewen was a civil service employee in her

4  position as a licensed practical nurse, and as such

5  she had rights of appeal to the Commonwealth of

6  Pennsylvania's State Civil Service Commission.  After

7  she was fired, she probably filed an appeal with the

8  State Civil Service Commission, and she also made

9  applications for unemployment compensation benefits

10  through the Bureau of Unemployment Compensation.

11      Both of these actions are separate actions, but I

12  was called on to represent the Pennsylvania Soldiers

13  and Sailors Home in both actions.

14  Q.   Both of those actions that you just referenced,

15  have they been concluded with Ms. Lewen?

16  A.   Yes, they have.  Her appeal was denied by the

17  State Civil Service Commission on or about December

18  8th of 2016.  She filed for reconsideration of their

19  decision, but the State Civil Service Commission

20  denied her request for reconsideration on or about

21  January 11, 2017.

22      She had not appealed the State Civil Service

23  Commission's adjudication of December 8th, 2016 to the

24  Commonwealth of Pennsylvania Court of Common Pleas, so

25  she is now without recourse as far as an appeal goes.

19

1  So the State Civil Service Commission action is

2  completely finished.

3      Her actions before the Workers; Comp --- or I'm

4  sorry, the Unemployment Compensation authorities, that

5  terminated much earlier.  That wrapped up in favor of

6  the Pennsylvania Soldiers and Sailors Home.  I believe

7  it was in August of 2016.  So those two actions are

8  done.

9  Q.  Are there any other actions pending that you are

10  representing the Department and Ms. Lewen is on the

11  opposing side?

12  A.  Yes.  There is one other action.  In August, I

13  believe, of 2016, Ms. Lewen filed a charge of

14  discrimination against the Pennsylvania Soldier's and

15  Sailor's Home with the United States Employment Equal

16  Opportunity Commission, the EEOC.

17      As is the general case, she also cross filed with

18  the Pennsylvania Human Relations Commission.  So the

19  EEOC takes the lead in cases like this, where she

20  initially filed with them.  That action is still

21  pending, and it is not expected to resolve until

22  sometime later this year.

23  Q.  Thank you.  So you became acquainted with Ms.

24  Lewen with these pending legal matters.  Can you tell

25  the Board and the Hearing Examiner about the

20

1  interactions that you had with Ms. Lewen.

2  A.   Yes, I can.  The first contact I had with Ms.

3  Lewen, I believe, was telephonic.  She called me

4  sometime in late March of 2016 to discuss discovery

5  requests that she made to the State Civil Service

6  Commission.  That was the only phone call I ever had

7  with her.

8       My method of proceeding when I'm dealing with pro

9  se litigants is I prefer to receive their

10  communications in writing, and I told Ms. Lewen that

11  during our telephone conversation.  So we had one

12  telephone conversation, and that was the only time I

13  spoke to her by telephone.

14       After that, she proceeded to communicate with me

15  by letter, which were very few, and mostly by email.

16  And the primary way we communicated since, say, early

17  April of 2016 to the present is by email.

18       Also, I had some in-person communication with her

19  when we had the State Civil Service Commission hearing

20  on June 13, 2016 and the unemployment compensation

21  hearing on June 24th of 2016.

22  Q.   Can you describe the history of the emails that

23  Ms. Lewen has sent to you?

24  A.   Yes, I can.  At first her emails were what one

25  would normally expect out of somebody who you were

1  having a legal matter, a legal dispute, with.  The

2  tone of her emails was rather angry, but the tone was

3  rational, entirely rational.  She would discuss how

4  she didn't do the things that the Pennsylvania

5  Soldiers and Sailors Home had fired her for.  She

6  would discuss settling the case, and she would discuss

7  procedural matters such as discovery, witnesses,

8  things of that nature.

9      She did send one or two emails that were also

10  threatening in some manner, threatening violence more

11  or less.  And she continued in this vein from early or

12  late March of 2016 'til about July of 2016.

13      So the first phase of her emails, they were

14  pretty much entirely rational.  I had no reason to

15  suspect that I was not --- that I was dealing with

16  somebody who was not rational.  But then in July

17  something happened.  I don't exactly know what, but

18  something happened.  The tone of her emails changed.

19  She became irrational and started sending me things

20  that can best be described as having no basis in

21  reality.

22      For instance, she claimed to be in communication

23  with her dead mother's ghost, and the spirit of Diana

24  Windsor, the former late Princess of Wales.  She

25  thought that I had communication with Prince Harry of

22

1  the English royal family, and also with Pope Francis.

2  And of course, I don't have communication with any of

3  these people.

4      That's the kind of stuff she started sending me

5  in July.  This stuff made me think, these emails made

6  me think I was dealing with somebody who was suffering

7  some sort of mental delusion, but I couldn't be sure.

8  One of the striking things about Ms. Lewen is she

9  considers herself to be an attorney as well as many

10  other things.  And I thought that she was kind of

11  trying to confuse me or trying to lay a foundation for

12  some sort of weird insanity defense or something like

13  that.

14      So I didn't really know what I was dealing with.

15  But that's how the emails went from July to say

16  October.  They were strange.  They made me think that

17  I was possibly talking to somebody who was --- who had

18  a mind that was diseased, but I could not be sure.

19  And of course, you know, other people who reviewed

20  them as well could not be sure either.  None of us are

21  psychiatrists or anything like that, and we don't have

22  her in front of us.

23      In October of 2016, things changed yet again.

24  Her emails became darker, more threatening.  She began

25  to --- her delusions began to seem more severe.  She

23

1  began to state that there were 2,500 ghosts at the

2  Pennsylvania Soldiers and Sailors Home in Erie, ghosts

3  of dead veterans that she talked to, and that these

4  ghosts were very angry at the way that I had treated

5  her when I had defended the actions of the

6  Pennsylvania Soldiers and Sailors Home.  And that

7  these ghosts were coming to do me harm, to kill me.

8  In one email, she said they were going to eat my

9  flesh, all sorts of dire predictions.

10      Besides the ghosts of the Pennsylvania Soldiers

11  and Sailors Home, there were another 20,000 she had on

12  tap at a placed called Lovell Place, which was where

13  the unemployment compensation hearing took place up in

14  Erie on June 24.  They were also angry at me, and they

15  were eventually going to come and get me.

16      In addition to the ghosts, God was also angry at

17  me and he was going to do me harm as well.  So we had

18  all these threatening things, very obviously

19  impossible performance, very improbable.

20      But again, her tone had changed.  I wasn't the

21  only one she threatened in these emails.  I mean, she

22  also extended her threats to other people at the

23  Pennsylvania Soldiers and Sailors Home and also even

24  mentioned the State Civil Service Commission.

25      So she continued on like that making these

24

1  threats, sending me these emails and we, quite

2  frankly, did not know what to make of this stuff. It

3  was strange, but we didn't know if she really believed

4  all these things or if she was doing this for some

5  nefarious purpose of her own.

6      But then in December of 2016, out of the clear

7  blue, she sent me, attached to her emails, some

8  medical documents from an involuntary medical

9  commitment that she had in the State of New York.  I

10 believe it was in the year 2010, though I'm not quite

11 sure if that memory is accurate.  But she just sent me

12 this stuff, and it had diagnoses on it and it showed

13 that she had been admitted for a week and that her

14 discharge summary indicated that she was delusional.

15     So she had been involuntarily committed.  When I

16 got these emails, of course, --- or when I got those

17 records, I took further action at that point.

18 Q.  How frequent had Ms. Lewen emails been to you?

19 A.  Well, at first, when they started back in 2016,

20 I'd get a couple a week.  They began to increase in

21 frequency as the litigation went on.  And then by

22 July, I was getting a couple every day.  I mean,

23 sometimes on the weekend --- I think I counted one

24 time as much as 36 on one weekend back in the fall.

25     I mean, she just kept on sending me these emails

25

1  and just kept bombarding me with this stuff.  So they

2  were very frequent.  She is a very faithful

3  correspondent.

4  Q.   Does Ms. Lewen continue to email you?

5  A.   Yes.  I got one from her as recently as

6  yesterday.

7  Q.   To kind of put a point on it, between January

8  28th, 2017 at 11:38 a.m. and January 30th, 2017 at

9  5:39 p.m., how many emails did Respondent send you,

10  Ms. Lewen send you?

11  A.   I believe she sent 19 or more.

12  Q.   And what are the natures --- what is the nature

13  of Ms. Lewen's emails to you?

14  A.   Well, again, lots of threats.  She keeps telling

15  me my death is imminent, that I'm not long for the

16  world.  She wants to talk to my wife to give her

17  advice on dating at an older stage of her life after

18  I'm dead, things of that nature.

19      It's just bizarre stuff.  I mean, she does a lot

20  with these threats, but she also does something that I

21  call the earthquake messages.  She apparently has some

22  sort of website that goes to a geological website and

23  it lists all the earthquakes that are happening in the

24  world with latitude and longitude.  And these

25  earthquake messages, she construes every earthquake as

26

1  a direct communication from God to say that she is

2  right in what she is doing and that I'm wrong.

3     And she says things like God confirmed by means

4  of this earthquake at latitude such and such, and then

5  she goes to great lengths and explains the meaning of

6  the place thing --- and things like that.  It's all

7  really bizarre stuff.  I can't begin to follow it all,

8  and after a while they're rather tiresome.  I just

9  stopped reading them a long time.  So that's basically

10  what they're all about.

11  Q.  Thank you.  I'm going to hand you a document that

12  has been marked as Exhibit C-5.

13                    (Commonwealth Exhibit 5, 1/10/17 Email

14                    from Nancy Lewen to Stephen Bushinski,

15                    was marked for identification.)

16                    ATTORNEY EVANCHO:

17                    Your Honor, may I have standing

18  permission to approach?

19                    HEARING EXAMINER:

20                    Yes.

21                    ATTORNEY EVANCHO:

22                    Thank you.  I will also provide that to

23  the Hearing Examiner and the Court Reporter.

24  BY ATTORNEY EVANCHO:

25  Q.  Attorney Bushinski, will you identify this

1  document?

2  A.   Yes.   This is an email that Ms. Lewen sent to me

3  on Tuesday, January 10, 2017 at 5:24 p.m.

4  Q.   And is this a true and correct copy of that email

5  that you received?

6  A.   It is.  I have not altered it in any way.

7  Q.   And looking at the email address on Exhibit C-5,

8  is this the same email address used by Ms. Lewen when

9  she began corresponding with you and which you called

10  a rational phase?

11  A.   Yes, it is.

12             ATTORNEY EVANCHO:

13             Your Honor, at this time the

14  Commonwealth would move that Exhibit C-5 be admitted

15  into evidence.

16             HEARING EXAMINER:

17             C-5 is admitted.

18             (Whereupon, Commonwealth Exhibit 5,

19             1/10/17 Email from Nancy Lewen to

20             Stephen Bushinski, was admitted.)

21  BY ATTORNEY EVANCHO:

22  Q.   Attorney Bushinski, is this email typical of the

23  types of emails that you've received from Ms. Lewen?

24  A.   Absolutely.  She talks about fire her.  She finds

25  meaning in this fire and connects it somehow to her

28

1  case and my conduct.  And then I believe she also has

2  --- I don't know if you have the earthquake messages

3  in this one.  But yeah, this is quite typical.  She

4  even talks about her involuntary admission to the

5  psychiatric hospital, I think, in this one.  In that

6  respect, it's not typical.  But yes, this is quite

7  typical of her emails.  She references Princess Diana

8  who apparently she speaks to.

9  Q.   Thank you.  I'm going to hand you

10 another document that has been marked as Exhibit C-6.

11                    (Whereupon, Commonwealth Exhibit 6,

12                    1/1/2017 Email from Nancy Lewen to

13                    Stephen Bushinski, was marked for

14                    identification.)

15 BY ATTORNEY EVANCHO:

16 Q.   Can you identify this document?

17 A.   This is the email that Ms. Lewen sent to me on

18 Sunday, January 1, 2017 at 10:16 a.m.

19 Q.   And is this a true and correct copy of the email

20 that you received?

21 A.   It is.  I have not altered this email in any way.

22 Q.   And again, looking at the email address in this

23 Exhibit C-6, is this the same email address that Ms.

24 Lewen used when you were corresponding with her at

25 what you've described as the rational period?

1    A.   Yes.   This is the same email address.

2                      ATTORNEY EVANCHO:

3                      At this time, the Commonwealth would

4    move for Exhibit C-6 to be admitted into evidence.

5                      HEARING EXAMINER:

6                      C-6 is admitted.

7                      (Whereupon, Commonwealth Exhibit 6,

8                      1/1/17 Email from Nancy Lewen to Stephen

9                      Bushinski, was admitted.)

10                     ATTORNEY EVANCHO:

11                     Thank you.

12   BY ATTORNEY EVANCHO:

13   Q.   And again, Attorney Bushinski, is this email

14   typical of the types of email that you have received

15   from Ms. Lewen?

16   A.   Yes.   This is one of them that I characterize as

17   an earthquake message.   As you see, I think in the

18   third or fourth paragraph, she starts out, yesterday

19   there were more than 100 earthquakes, et cetera.   And

20   she goes on to explain what the place names of the

21   locations of earthquakes mean.   And there's also

22   ghosts mentioned in this to some extent.   Typical

23   email.

24   Q.   Thank you.   And lastly, I'm going to hand you

25   what has been marked as Exhibit C-7.

30

1          (Whereupon, Commonwealth Exhibit 7,

2          9/10/16 Email dated 9/10/2016 from Nancy

3          Lewen to Stephen Bushinski, was marked

4          for identification.)

5    BY ATTORNEY EVANCHO:

6    Q.   Can you identify this document Attorney

7    Bushinski?

8    A.   Yes.  This is an email that Ms. Lewen sent to me

9    on September 10, 2016 at 1:57 p.m.

10   Q.   And you acknowledge receiving this email?

11   A.   I do.

12   Q.   And is this a true and correct copy of the email

13   that you received?

14   A.   Yes.  It is.

15   Q.   And again, looking at that email address in

16   Exhibit C-7, is this the same email address that Ms.

17   Lewen used when she was corresponding with you,

18   emailing you, in what would have been termed her

19   rational period?

20   A.   Yes.  That's the same email address.

21          ATTORNEY EVANCHO:

22          At this time, the Commonwealth would

23   move that Exhibit C-7 be admitted into evidence.

24          HEARING EXAMINER:

25          C-7 is admitted.

31

1                    (Whereupon, Commonwealth Exhibit 7,

2                    9/10/16 Email from Nancy Lewen to

3                    Stephen Bushinski, was admitted.)

4    BY ATTORNEY EVANCHO:

5    Q.   Thank you.  And again, Attorney Bushinski, is

6    this email typical of the types of emails that you

7    have received from Ms. Lewen?

8    A.   Yes.  She references things that are beyond

9    rational comprehension.  Like she talks about a 555

10   gate which I have no idea what she's talking about

11   there.  She talks about a letter to Jim Carrey, which

12   I believe is an actor, which if I'm right, I think he

13   died recently or something.  It has all sorts of

14   strange things in it.

15   Q.   Thank you.  Have you ever discussed the emails

16   with the Respondent or replied to them?

17   A.   I would reply to her emails when they were

18   rational, certainly.  During the early phase of our

19   email correspondence from, say, March to July, we'd

20   communicate that way quite a bit.  And we would

21   discuss things that were pertinent to the litigation.

22        Even after July, I would sometimes get an email

23   from her that was perfectly rational and, of course, I

24   would reply to that as best as I could.  I never would

25   reply to any of the strange things that she would say

32

1  because quite frankly, I didn't know how to do that.

2  So I would just not do that.

3  Q.   When was it that --- do you recall the last time

4  you responded to Ms. Lewen?

5  A.   I think my last response to her was in December

6  of 2016.

7  Q.   Can you estimate a total number of emails that

8  you received from Ms. Lewen?

9  A.   There are well over 100.  I would say anywhere

10  from 100 to 250.  For a period of time back in

11  September and October, I didn't even keep copies of

12  them.  They were so tiresome to read that when they

13  would just come in, I would quickly glance at them and

14  if they had nothing rational in them, I would just

15  delete them.  So there were many that I didn't keep

16  copies of.  But I would say between 100 to 250 easily.

17  Q.   And how would you categorize the subject or

18  information that Ms. Lewen talks about in these

19  emails?

20  A.   Most of the time it was just plain nonsense.

21  Again, she would talk about the ghosts.  She would

22  talk about how they're coming to get me.  She would

23  talk about how I wronged her.  She would talk about

24  how people at the Pennsylvania Soldiers and Sailors

25  wronged her and ghosts were probably going to get

33

1  them, too.  Typical stuff.  Her communications just

2  made no sense.

3  Q.  Did you ever feel threatened by any of her

4  emails?

5  a.  Well, her emails did cause a lot of consternation

6  and concern.  Back in the rational period, as I refer

7  to it as, back in May of 2016, she set a couple emails

8  that, honestly, had people thinking that she was going

9  to commit an act of violence if she didn't get her way

10  in settlement.

11      These emails were so outrageous that we actually

12  sent them off to the District Attorney of Erie County

13  for investigation.  It caused so much concern that the

14  Pennsylvania Soldiers and Sailors Home took extra

15  steps in security.  And even at the Department of

16  Military and Veterans Affairs, extra steps and

17  security were taken because it was thought that she

18  would perhaps do some violence on the personnel at

19  Department headquarters.

20  Q.  So how did your Department essentially --- I

21  mean, just sort of to clarify and wrap it up, how did

22  your Department clarify or classify these emails?  How

23  did they treat them?

24  A.  They caused a great deal of confusion at first.

25  Again, we didn't know what we were dealing with here.

34

1  We didn't know if these --- if she was --- if these

2  emails were really the product of somebody who was

3  mentally deranged, or if she had some weird purpose of

4  her own.

5      As I said, she always thought of herself as being

6  a lawyer, and we thought she was maybe laying some ---

7  kind of like some groundwork for a weird sort of

8  insanity defense of some sort.  There were concerns at

9  times that she was going to come down and do violence

10 to different people.  There were concerns that she was

11 going to do violence to herself.

12     But again, we just couldn't figure it out.  Well,

13 it wasn't until we got the medical records that we

14 kind of knew for sure that we were dealing with a

15 person who was not in full possession of her mental

16 faculties.

17                    ATTORNEY EVANCHO:

18               I have no further questions.  Thank you,

19 Attorney Bushinski.

20                    HEARING EXAMINER:

21               Attorney Bushinski, did you ever meet

22 Ms. Cook (sic) in person?

23 A.   Ms. Lewen?

24                    HEARING EXAMINER:

25               Ms. Lewen.

1 A.   Yes, Your Honor, I did.  I met her twice in

2 person, first at the hearing on the State Civil

3 Service Commission Appeal.  That was on June 13th of

4 2016 up at Erie.  We actually had the hearing held at

5 the Pennsylvania Soldiers and Sailors Home.

6      The Civil Service Commission sent up a Hearing

7 Officer to conduct the hearing.  So that's when I

8 first met Ms. Lewen.  And it was a hearing much like

9 this except that, you know, everybody was there.  The

10 examination of witnesses, Cross Examination, things of

11 that nature.

12      I then met her again about two weeks later on

13 June 24th of 2016 when we had a Hearing before

14 Unemployment Compensation Referee Jennifer Fisher.

15 This was held at Lovell Place in Erie.  It was a

16 factory that was converted into administrative

17 offices.  And again, that was an adversarial hearing

18 and Ms. Lewen came in, testified, examined witnesses,

19 things of that nature.

20                     HEARING EXAMINER:

21                     And so you had the opportunity to

22 observe her, ---

23 A.   Yes.

24                     HEARING EXAMINER:

25                     --- meaning the Respondent?  Did she

36

1  exhibit or express anything similar to what she put in

2  her emails during either of these hearings?

3  A.   Well, at the June 13, 2016 hearing, she did not.

4  She was perfectly rational during all that time.

5  There was no strange behavior.  At the June 24th

6  hearing, on the other hand, she did at one point liken

7  herself to Jesus cleansing the temple in her actions

8  towards, first off, the Pennsylvania Soldiers and

9  Sailors home.  That was the only thing that was any

10  way remotely odd about her behavior.

11               HEARING EXAMINER:

12               And was this in reference to her claim

13  that --- it appears that she has claimed that she was

14  advocating for her patients in the hospital.  Is that

15  what she meant by cleansing?

16  A.   Exactly.  Yes.

17               HEARING EXAMINER:

18               And did you say that the Civil Service

19  Commission proceeding is concluded?

20  A.   Yes, it is.  That's completely done.

21               HEARING EXAMINER:

22               And that resulted in an adverse decision

23  against Ms. Cook?

24  A.   That's correct.  The State Civil Service

25  Commission denied her appeal of her termination.  That

37

1   action is completely over.

2                    <u>HEARING EXAMINER:</u>

3                    And can you tell us what the findings

4   were with respect to affirming the termination of her

5   employment?

6   A.   Yes, I can.  Ms. Lewen was fired for, I think, a

7   number of different things.  One of which was she had

8   other threats of workplace violence.  The Commission,

9   I believe, found that the --- our witnesses, the

10   witnesses of the Pennsylvania Soldiers and Sailors

11   home were credible, and that the Commission believed

12   that she did utter these threats.

13       She was also fired for having sexually harassed

14   another employee up there.  The State Civil Service

15   Commission found that we met our burden in proving

16   that as well.  She was also fired for having used

17   Commonwealth of Pennsylvania information technology

18   resources to effectuate her sexual harassment and

19   workplace violence activities.

20       That's a violation of the Commonwealth of

21   Pennsylvania's information technology policy.  You

22   can't use IT resources to bully people or threaten

23   people or sexually harass them.  That alone is

24   sufficient to result in termination.

25       The Commonwealth --- the Civil Service Commission

38

1  found that we had met our burden and proved that as

2  well.

3      And she also engaged in some acts of intimidation

4  towards the wife of the person she sexually harassed.

5  And the State Civil Service Commission found that we

6  had met our burden of proving that as well.

7                    HEARING EXAMINER:

8               And also her unemployment compensation

9  claim has also resulted in an adverse decision for

10 her?

11 A.   That is correct.  There was four different levels

12 that that proceeded on, and she lost at each of those

13 levels.

14                    HEARING EXAMINER:

15              What were the grounds or what

16 conclusions did the Bureau of Unemployment

17 Compensation make with respect to her Claim?

18 A.   Exactly the same as the State Civil Service

19 Commission.  I put on all the same evidence and almost

20 all the same witnesses at the unemployment

21 compensation hearing as I did at the State Civil

22 Service Commission hearing.  There was only one or two

23 witnesses that were different.

24      So again, workplace violence, sexual harassment

25 of another employee, bullying and intimidation which

39

1  falls under the rubric of workplace violence, and also

2  misuse of the Commonwealth's IT resources.  All of

3  these things, the referee, Jennifer Fisher, found that

4  we had sustained our burden on them.

5               HEARING EXAMINER:

6               And in Exhibit C-3, I believe there is a

7  reference to --- that the Respondent made a statement

8  to the effect of --- she certainly says that she's had

9  a past diagnosis of posttraumatic stress disorder.

10 Did she at any time in the prior proceedings or in

11 your presence indicate or admit to that type of

12 impairment or diagnosis?

13 A.  I don't believe she said anything about that at

14 either the Civil Service Commission hearing or the

15 unemployment compensation hearing.  But she did raise

16 that issue of the post-traumatic stress disorder as

17 the basis of her complaint to the Equal Opportunity

18 Commission, that action that is still outstanding.

19               HEARING EXAMINER:

20               And she filed that as a matter of record

21 in that proceeding?

22 A.  Yes.

23               HEARING EXAMINER:

24               Did she at any time in your --- when you

25 were physically present, did you ever hear her state

40

1  or indicate that she had or was experiencing a

2  psychotic breakdown?

3  A.   No.

                    HEARING EXAMINER:

5                    Did she ever indicate she was

6  experiencing symptoms of depression or anxiety?

7  A.   The only thing she ever said was during the Civil

8  Service Commission.  She said to somebody else that

9  the hearing was grueling.

                    HEARING EXAMINER:

11                    On page five of Exhibit C-3, ---.

12 A.   Your Honor, I don't think I have that in front of

13 me.

                    ATTORNEY EVANCHO:

15                    Oh, I apologize.  No, he was not

16 provided with that.  But I can certainly facilitate

17 that.

18 A.   Page five, Your Honor?

                    HEARING EXAMINER:

20                    Yes, the last paragraph, beginning in

21 the third line, it states I informed him that I did

22 have a psychotic breakdown in 2010 during stressful

23 legal proceedings when an unethical attorney and Judge

24 assisted my ex-husband to commit interstate child

25 custody interference, child support evasion and fraud.

41

1  Did you recall her ever informing you of that?

2  A.   No, not in those words and certainly not --- she

3  did not inform me --- as I recall, she did not inform

4  me that she had a psychotic breakdown.  She did

5  describe the legal proceedings which I think were

6  custody proceedings in the State of Florida.  But I

7  don't recall her ever saying that she told me that she

8  had a psychotic breakdown.

9             HEARING EXAMINER:

10            And was the description of these custody

11 proceedings in person or was this again by email?

12 A.   This was by email.  She actually described

13 several times the custody proceedings, and the lawyer

14 who was opposing her had the misfortune to die a few

15 weeks later on.  And she attributed that to her

16 intervention somehow.

17            HEARING EXAMINER:

18            The attorney for husband or the ---?

19 A.   The husband, yeah.  And she would always imply

20 that I was going to suffer an identical fate.

21            HEARING EXAMINER:

22            I don't think I have any other questions

23 for you, Attorney Bushinski.  Ms. Evancho, is there

24 anything else you'd like to ask?

25            ATTORNEY EVANCHO:

42

1          I do not have anything else.  Thank you.

2               HEARING EXAMINER:

3          I would like to --- does the

4    Commonwealth have a copy of the written adjudication

5    in either the Civil Service Commission or the

6    unemployment compensation hearing?

7               ATTORNEY EVANCHO:

8          The Commonwealth was provided with one

9    of those.  May I have a moment to ---?

10              HEARING EXAMINER:

11         Sure.

12              ATTORNEY BUSHINSKI:

13         I think we both had the Civil Service

14   Commission adjudication.  I can also provide Referee

15   Fisher's Decision and Order any time you need it.

16              ATTORNEY EVANCHO:

17         Okay.  Great.  Your Honor, the

18   Commonwealth had one.  Unfortunately, I'm having a

19   hard time locating it.

20              HEARING EXAMINER:

21         You don't need to give it to me right

22   now, but I would like you to supplement the record

23   because the --- if there's a final Adjudication even

24   by an Administrative Agency, that any Findings of

25   Fact, any Conclusions that they make may have some

1  bearing and may have some preclusive effect on this

2  proceeding.  We may be able to use them as --- you

3  know, if the Respondent has litigated a question of

4  whether she has, for example, engaged in threats of

5  workplace violence that ---.  I realize that the

6  principal allegations on which your petition was based

7  were these emails, but essentially, it is the risk of

8  harm and the existence of some impairment and the

9  likelihood of some --- or the possibility of some type

10  of physical violence that --- if that has already been

11  decided, it may be helpful, I would assume.

12                    ATTORNEY EVANCHO:

13                    Then would we ask if the record could

14  stay open, and we will supply --- again, the

15  Commonwealth was in possession of one of those, but

16  Attorney Bushinski will be able to provide the

17  Commonwealth with --- we'll just get two copies of

18  both, and I'll supplement the record with that.

19                    HEARING EXAMINER:

20                    Yes.  Sure.  Great.  Thank you.

21                    ATTORNEY EVANCHO:

22                    I'll just file them with the

23  Prothonotary then?

24                    HEARING EXAMINER:

25                    Yes.

44

1                    ATTORNEY EVANCHO:

2               Okay.

3                    HEARING EXAMINER:

4               All right.  Anything else?

5                    ATTORNEY EVANCHO:

6               The Commonwealth has nothing further and

7    rests.  Thank you.

8                    HEARING EXAMINER:

9               All right.  And since this is --- these

10   are adjudicated matters, usually I do a Memorandum

11   Decision on these Orders of Temporary Suspension.  But

12   if I do that this afternoon, I would not be able to

13   specifically cite them, but I'll reference those

14   adjudications for findings that she did, in fact, make

15   threats of workplace violence.

16               And all right.  Anything further?  Would

17   you like to make a closing statement?

18                    ATTORNEY EVANCHO:

19               Yes.  Just briefly, Your Honor.  The

20   purpose of today's hearing was to show that there was

21   prima facie evidence to support the immediate

22   temporary suspension of Respondent's license.

23               The Commonwealth had demonstrated and

24   met that burden based on the testimony of Attorney

25   Bushinski that we heard today and the evidence that

45

1  was admitted into the record.  Based on all of that,

2  the prima facie burden has been met, and the

3  Commonwealth has demonstrated that Ms. Lewen is a

4  clear and present danger to the Commonwealth if she is

5  to have a current license at this time.

6              And as such, the Commonwealth requests

7  that this Order by the Probable Cause Screening

8  Committee be upheld and bound over.  Thank you.

9              HEARING EXAMINER:

10             Thank you very much.  We'll adjourn.

11  And that'll be it.  Thanks.

12

13              * * * * * * * *

14         HEARING CONCLUDED AT 2:22 P.M.

15              * * * * * * * *

16

17

18

19

20

21

22

23

24

25

46

1                         CERTIFICATE

2        I hereby certify that the foregoing proceedings,

3   hearing held before Examiner McNally was reported by

4   me on 02/24/2017 and that I, Danielle Obert, read this

5   transcript, and that I attest that this transcript is

6   a true and accurate record of the proceeding.

7

8        _____

9                         Danielle Obert,

10                        Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25