# DEFENDANT - SMF

# EXHIBIT 1



**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW**
ROOM 1116, LABOR & INDUSTRY BUILDING
651 BOAS STREET
HARRISBURG, PA 17121-0750

| Phone: 717-787-5122 | www.dli.pa.gov | Fax: 717-787-6125 |
|---|---|---|

## TRANSCRIPT OF TESTIMONY

| | |
|---|---|
| **CLAIMANT** | Nancy E. Lewen |
| **SS NUMBER** | 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 |
| ~~APPEAL NUMBER~~ | ~~16-09-C-9100~~ |
| **DATE OF HEARING** | June 24, 2016 |
| **PLACE OF HEARING** | Erie, PA |
| **HEARING BEFORE:** R | Jennifer Fisher, Referee |

**APPEARANCES:**

| | | |
|---|---|---|
| Claimant | C | Nancy E. Lewen |
| Employer's Attorney | EL | Stephen Bushinski |
| Employer Witnesses | EW1 | Brian Skinner |
| | EW2 | Barbara Raymond |
| | EW3 | Barry Blasic |

*Auxiliary aids and services are available on request to individuals with disabilities.*
*Equal Opportunity Employer/Program*



EXHIBIT D

NANCY E. LEWEN                16-09-C-6123                              1

R      This hearing is the result of Appeal Number 16-09-C-6123
       filed in the Unemployment Compensation claim of Nancy E.
       Lewen.  Today's hearing is being held in the Erie,
       Pennsylvania Referee's office.  The date today is June 24th,
       2016 and the time is currently 9:41 a.m.  My name is
       Jennifer Fisher.  I'm a Pennsylvania Unemployment
       Compensation Appeals Referee.  I have been assigned by the
       Board of Review to conduct today's hearing in order to take
       testimony and evidence regarding the issues.  I will then
       issue a written Decision.  Today's proceedings are being
       recorded and that recording will become the official record
       for today's hearing.  I'd like to begin by identifying
       parties present for the hearing today.  I'd like you to
       please state first and last names and spell both for the
       record.  I'll start with the Claimant.

C      Nancy Lewen, N-A-N-C-Y, L-E-W-N, L-E-W-E-N, sorry.

R      That's all right.  What's your current mailing address, Ms.
       Lewen?

C      [redacted]

R      Thank you.  Do you have any other witnesses or
       representatives for the hearing today?

C      No, I do not.

R      Okay.  For the Employer, sir.

EW1    Brian Skinner, B-R-I-A-N, S-K-I-N-N-E-R.

R      What's your title with the Employer, Mr. Skinner?

EW1    Human Resources Analyst.

R      And the mailing address, please.

EW1    560 East 3rd Street.

R      16507?

EW1    Yes.

R      Thank you.  We have Employer Counsel today?

EL     Yes, ma'am.

R      Okay.  If you could state and spell both names for the
       record, sir.

EL     My first name is Stephen, S-T-E-P-H-E-N, my last name is
       Bushinski, B-U-S-H-I-N-S-K-I.

R      And your mailing address for the record, Mr., Attorney
       Bushinski?

EL     It's a long one.

R      Okay.

NANCY E. LEWEN                 16-09-C-6123                          2

EL     Commonwealth of Pennsylvania, Department of Military and
       Veterans Affairs, next line would be Attention: Office of
       Chief Counsel, next line Building 7-36, Fort Indiantown Gap,
       last line Annville, A-N-V-I-L-L-E, PA, 17003-5002.

R      Okay.  And for one more time, Attention who?
EL     Office of Chief Counsel.

R      Okay.  Thank you.  Do you have, who else do you have today,
       Attorney Bushinski?  Both additional witnesses or a witness,
       observer?  What do you have?
EL     We have two, I have two additional witnesses.

R      Okay.  Why don't we, ma'am, start with you?
EW2    Barbara Raymond, B-A-R-B-A-R-A, R-A-Y-M-O-N-D.

R      And your title with the Employer, Ms. Raymond?
EW2    Commandant.

R      Thank you.  And sir?
EW3    ~~~~~~~~~~~~~~~~~~~~~~~

R      And your title, Mr. Blasic?
EW3    LPN.

R      Thank you.  Are there any other witnesses or representatives
       for the Employer today, Attorney Bushinski?
EL     No, ma'am.

R      Okay.  The law requires that all testimony be taken under
       oath, if you'd all please raise your right hands for me.

PARTIES DULY SWORN

R      Thank you.  I'd like to remind you of the rights that you
       have at the hearing today.  All parties have the right to
       present testimony and evidence and calling, question
       witnesses.  That includes the cross-examination of adverse
       witnesses.  All parties also have the right to be
       represented by an attorney or other advocate.  Are you aware
       of your rights at the hearing today, Ms. Lewen?
C      Yes, I am.

R      Thank you.  Is the Employer, Attorney Bushinski?
EL     Yes, ma'am.

R      Thank you.  The issue for the hearing today, we have three
       issues.  They fall under sections 402(b), 402(e) and Section
       3 of the Pennsylvania Unemployment Compensation law.  All
       three sections deal with the nature of the separation from

the employment.  Section 402(b) would cover a voluntary
separation or a quit.  In that case the issue is whether the
Claimant had cause of a necessitous and compelling nature to
voluntarily separate from the employment.  402(e) would
cover a discharge.  In that case the issue is whether the
Claimant committed willful misconduct in connection with the
work leading to discharge or suspension.  Section 3 would
deal with whether the Claimant's separation from the
employment was due to non-work-related conduct which was the
result of the Claimant's own fault.  Now, in this case the
Agency issued a Determination that was mailed April 27th of
this year in which they denied benefits under Section
402(e).  That was for waiting week ending March 26, 2016.
The Claimant filed a Petition for Appeal to that
Determination which was received by mail in an envelope with
the postmark of May 2nd, making it a timely filed Appeal.
The file and Exhibits therein were available for review
prior to the hearing today.  For the record, Exhibit #1 is a
Certification of Documents form.  2 is a three-page Internet
Initial Claims form.  This would be the information provided
by Mr. Lewen at the time she filed her claim over the
Internet.  3 is two pages, Record of Oral Interview
documenting a phone call between the Claimant and the Agency
on April 18th of this year.  4 is an Employer Questionnaire.
5 is a memo on Employer letterhead.  It's addressed to Billy
Jo Arnold from Brian Bender (phonetic).  The date on that is
April 1, 2016.  The subject is Nancy Lewen.  6 is a letter
on Employer letterhead dated March 14th, 2016.  It appears to
be addressed to Ms. Lewen.  It appears for some reason we
only have the first page of that letter, so I don't see a
signature or any of the remaining pages of that for some
reason.

EL      Ma'am, I believe that's the Termination Letter and I will be
        able to provide a copy of that on my direct examination of
        Mr. Blasic.  It'll be a complete copy.

R       Okay.  Thank you.  7 is two pages, printouts of email chains
        between the Agency and the Employer requesting and
        exchanging information regarding the separation issue.  8 is
        a three-page, appears to be an Employer policy, information
        memorandum.  The subject is workplace violence and workplace
        bullying prevention policy.  9 is a Management Directive,
        Commonwealth of Pennsylvania Governor's office.  Subject is
        Workplace Violence.  That has four pages.  10 is a Policy
        Acknowledgment Summary Printout.  11 is an email printout
        from, appears to be from Ms. Lewen to Mr. Blasic.  The date
        on this is March 2nd, 2016.  12 appears to be a printout of
        an email dated March 1, 2016.  It appears to be from Ms.
        Lewen to Mr. Blasic.  13, again, an email, this is from Ms.

|     |     |
|-----|-----|
|     | Lewen to Mr. Blasic. This one is dated February 6, 2016. 14 is three pages, appears to be a... |
| C   | It's excerpts of Facebook messages. |
|     |     |
| R   | Okay. Thank you. For the record, that was Ms. Lewen. We have excerpts of Facebook messages, Exhibit #14. Exhibit 15 is a Lewen PDC Minutes dated March 7, 2016. 16 is four pages, similar document, Lewen PDC minutes dated March 10, 2016. 17 is a Commonwealth Employee Witness statement. This appears to be from Cathy Wilcox (phonetic). The date on the second, on the back page is February 25, 2016. 18 also appears to be an email printout. This is dated March 4, 2016 from Mr. Blasic to, it says Wilcox (inaudible). That would be that, is that Cathy Wilcox? |
| EW1 | Yes, ma'am. |
|     |     |
| R   | Okay. 19 is a Commonwealth Employee Witness Statement. Appears to be from a Ray, is that Ham (phonetic)? |
| EW1 | That's correct. |
|     |     |
| R   | and that one is dated March 9, 2016. 20 is the next 11 pages. Are these also Facebook exchanges, Ms. Lewen? |
| C   | Yes, excerpts. |
|     |     |
| R   | Excerpts from Facebook messages? |
| C   | Yes. |
|     |     |
| R   | Okay. |
| C   | Mr. Bushinski and I both have like the complete set of Facebook messages to submit. |
|     |     |
| R   | Okay. All right. My numbering is slightly off here. 21 is the Employer's Notice of Application. This is the Commonwealth form. 21A I'll mark as a printout of the Claim Record here. This is a regular UC claim. Application for Benefits date is March 20th, 2016. This particular copy was printed on May 5th of this year. 22 is the Determination that's under appeal regarding today. 23 is the Petition for Appeal initiated by the Claimant. That has four pages total. The third and fourth pages are photocopies of the envelope in which the Appeal was received. Also in the file we have documents marked as Referee Exhibits. Referee Exhibit #1 is the Notice of Hearing scheduling today's hearing. Referee 2 is a Report of Telephone Call on Hearings. This was a request for copies of the file Exhibits by the Employer, which was granted. Referee 3 is a Report of Telephone Call on Hearings. This was arrangements, calls initiated by my clerical staff to arrange a time for today's hearing, a date and time. Referee 4 is a Desk Memorandum containing additional |

information. This is just the Employer requesting
additional times for the scheduling of today's hearing.
Referee 5 is a List of Issues arising in Appeals
proceedings. Referee 6 is an assistance postcard and
Referee 7 is a translation document. Those are the
documents that we have so far in the file today. Ms. Lewen,
do you have any objection to any of those documents being
entered into the record?

C    No, I don't.

R    Attorney Bushinski, any objections?
EL   No objections, ma'am.

R    Okay. They are entered as marked. Just briefly I'll
explain the procedure we'll follow today before we get to
everyone's testimony. I am going to begin by asking Ms.
Lewen a few background questions about her employment with
the Military and Veterans Affairs. After I get that
background information on the record we'll move to
testimony. Now the Agency ruled under Section 402(e) of the
law finding that this was a discharge imitated by the
Employer. Because they, that's how they found I'll begin
with the Employer's testimony first today. At that time
Attorney Bushinski can have each Employer Witness offer his
or her testimony to explain what happened here leading to
Ms. Lewen's discharge. After each of them has completed
their testimony, Ms. Lewen will be provided an opportunity
to cross-examine them, meaning she can ask them any
questions she might have for them about their testimony.
After that we'll switch and proceed in the reverse. Then
Ms. Lewen can offer her testimony to explain what happened
to her leading to the separation from her perspective. And
Attorney Bushinski will then likewise be provided an
opportunity to cross-examine or question Ms. Lewen about her
testimony. I may ask additional questions of each of you as
you testify. After everyone completes their testimony and
has nothing further to tell me we'll conclude the hearing.
I will issue a Decision in writing. You'll receive that in
the mail within about a week. Do you have any questions
about procedures or anything else at all, Ms. Lewen?

C    Not at this time.

R    Okay. Attorney Bushinski, any questions?
EL   Yes, one or two.

R    Sure.
EL   Ma'am, the, you mentioned the reasons for the Appeal and one
of them was the 402(e), for the workplace misconduct. I
also filed an, I filed an Appeal of the Determination saying
that we're also proceeding under Section 3 of the Act for,

you know, non-workplace conduct as a basis for termination. You didn't mention that, so that's why I'm bringing it to your attention now.

R Yes. When I went through the issues at the beginning we have Section 402(b), Section 402(e) and Section 3 are all notice for today's hearing and I can consider all three sections in issuing my Decision.

EL Okay. One other question.

C I heard you say that.

R Okay.

C And my letter says that. I have a letter that says that.

R Okay.

EL I possibly missed that. One other question, ma'am. It's been a long time since I did a UC hearing. As far as marking the, of the Exhibits goes, how do you want us to, the Commonwealth's Exhibits to be marked?

EL Okay.

R E1, E2.

EL Got it.

R All right. Any other questions, Attorney Bushinski?

EL No, ma'am.

R Okay. We'll go ahead and get started then. A few background questions for you, Ms. Lewen. The Claim Record shows that you began employment there in September 2014. Does that sound about right?

C Yes.

R And it has a last day actually worked of March 4th of this year.

C No, it was March 2nd of this year.

R What was your position or job title as of March 2nd?

C LPN.

R Were you full-time at the end or part-time?

C At the end I was full-time.

R What was your final rate of pay, roughly?

C 20.91 or something like that.

R $20.91 per hour, roughly?

C Yes, plus dollar shift differentials (inaudible) my shift.

| | |
|---|---|
| R | Okay. So the base was roughly 20. |
| C | It's somewhere around it, yeah. |

| | |
|---|---|
| R | Okay. All right. Thank you. That's all the background questions that I have. |
| C | Okay. |

| | |
|---|---|
| R | Attorney Bushinski, you can go ahead with your first witness whenever you're ready. |
| EL | All right. Ma'am, I will call Mr. Barry Blasic. |

| | |
|---|---|
| R | Okay. If we could have Mr. Blasic come on up to the desk so he is a little closer to my recorder up here, please. Why don't, yeah, Mr. Skinner, why don't we, if you don't mind. |
| EL | I'm sorry. I went out of order. I'm calling Mr. Skinner first. |

| | |
|---|---|
| R | Okay. |
| EL | I'm sorry. |

| | |
|---|---|
| R | All right. |
| EL | I'm getting ahead of myself. |

| | |
|---|---|
| R | Okay. |
| EL | Yeah. Mr. Skinner, I'm calling him first to make it more clear exactly where the case is going. |

| | |
|---|---|
| R | Okay. |
| EL | Mr. Skinner would you state your name for the record? |
| EW1 | Brian Skinner, B-R-I-A-N, S-K-I-N-N-E-R. |

| | |
|---|---|
| EL | What is your position or who, by whom are you employed? |
| EW1 | Department of Military and Veterans Affairs, the Soldiers' and Sailors' Home. |

| | |
|---|---|
| EL | That's the Pennsylvania Soldiers' and Sailors' Home? |
| EW1 | Yes. |

| | |
|---|---|
| EL | And that's here in Erie? |
| EW1 | Yes. |

| | |
|---|---|
| EL | And how long have you been employed? |
| EW1 | Almost five years. |

| | |
|---|---|
| EL | And your position is? |
| EW1 | Human Resources Analyst. |

NANCY E. LEWEN                16-09-C-6123                          8

EL    Now let's talk about Ms. Nancy Lewen.  As the Human
      Resources Analyst do you know when she was first hired at
      the Pennsylvania Soldiers' and Sailors' Home?

EW1   Yes.

EL    And some point in time in 2016 was she suspended?

EW1   Yes.

EL    I'm showing you what I have marked as Employer's Exhibit #1,
      E1?

R     Yes.

EL    Okay.  I don't know why I'm using A.  And would you please
      identify this for the record, please.

EW1   This is the confirmation of her suspension pending
      investigation letter that was delivered to her on March 2nd.

EL    Now, one of the things that Ms. Lewen had talked about in
      her Appeal was she disagreed with the date that, her final
      date of employment at the Pennsylvania Soldiers' and
      Sailors' Home.  Can you possibly speak to that issue now
      because it's a minor issue that you can clear up rather
      quickly?

EW1   Yeah.  That was just a typo.  When our Human Resources
      Analyst at Fort Indiantown Gap filled out the UC paperwork
      on the UC45 form she indicated it was, last date worked was
      3/4 and in the additional documents she attached, the
      discharge for rule violation questionnaire, she did mark it
      as March 1st, which was the correct date.  So the March 4th,
      was a typo.

EL    Okay.  So Ms. Lewen was correct in that aspect of her Appeal
      as for termination date goes?

EW1   She said March 2nd today, but it was March 1st was her last
      day of work.

C     It says March 2nd on the (inaudible) sheet.

R     Hang on, Ms. Lewen.  Well, you'll have a chance to question
      Mr. Skinner.

C     Okay.  I'm sorry.

R     We can only have him at this point.

C     I'm sorry.  I'm sorry.

R     Okay.  Just for purposes of procedure-wise, you can talk at
      this point...

C     I'm sorry.

R     ...only if you have a legal objection.

C     Okay.  I'm sorry.  I apologize.

R      That's all right.
EL     Okay.  So she is correct in what she says in her Appeal as
       far as the date of the actual...
EW1    That the date was wrong.  March 1st was the last day she
       worked.  March 2nd was the date she was deemed for
       suspension.

EL     Okay.  Thank you.
EW1    Um-hum.

EL     I'm showing you what I have marked as Employer's Exhibit #2.
       Can you please identify this document for the record?
EW1    This is her termination letter that was sent to her on March
       14th.

EL     Okay.  Now, if you look there is writing on both sides of
       this document.
EW1    Um-hum.

EL     Okay.  I believe this was the document that Referee Fisher
       was talking about that was incomplete in her packet.  This
       is the complete termination letter?
EW1    Yes.

EL     All right.  Let's talk a little bit about the termination
       letter.  The second paragraph of the termination letter
       lists a number of policies that Pennsylvania Soldiers' and
       Sailors' Home says that Ms. Lewen violated.  Is that
       correct?
EW1    Correct.

EL     In your role as a Human Resources Analyst at the
       Pennsylvania Soldiers' and Sailors' Home are you familiar
       with each of these policies?
EW1    Yes.

EL     Okay.  In order to move this along a little quickly, I'm
       going to hand you various policies.  I'm going to ask you to
       identify them for the record.  This one is marked as
       Employer's Exhibit #3.

R      And just for the record, Attorney Bushinski is also passing
       copies of the documents to the Referee as well as to Ms.
       Lewen.
EL     Can you identify what this document is for the record?
EW1    It's the DMVA Standards of Conduct and Work Rules.

NANCY E. LEWEN                  16-09-C-6123                         10

EL      Now, briefly would you explain to the Referee what are the
        VA Standards, the DMVA Standards of Conduct and Work Rules
        for?

EW1     They are the work rules that are generals that apply to all
        the employees. It's not, doesn't cover every situation, but
        it does cover most of them.

EL      The second paragraph of the DMVA Standards of Conduct and
        Work Rules, does that impose a requirement on employees to
        know about other policies and follow those policies?

EW1     Yes, it does.

EL      I'm handing you what I have marked as Employer's Exhibit #4.
        Would you pass that up? Now, before I ask you about this
        policy, there are various policies in effect at the
        Department of Military and Veterans Affairs and throughout
        the Commonwealth of Pennsylvania governing things like
        sexual harassment and workplace violence, are there not?

EW1     Yes, there are.

EL      Showing you what has been marked as Employer's Exhibit #4
        (sic). Can you identify that document for the record?

EW1     This is the Executive Order from the governor's office from
        2002. It's the prohibition of sexual harassment in the
        Commonwealth.

EL      Is Ms. Lewen obligated to follow that, those, the
        requirements of that document as an employee of Pennsylvania
        Soldiers' and Sailors' Home?

EW1     Yes.

EL      Showing you what I have marked as Employer's Exhibit #5.
        Would you pass that up to the Referee? Please identify that
        document for the record.

EW1     This is the Management Directive 505.3, the prohibition of
        sexual harassment in Commonwealth work settings.

EL      Now, Referee Fisher, this may already be in the record as
        one of those documents that you went over in the beginning,
        but I figure I'd submit it anyway because it's easier for me
        to keep track of it this way.

R       That's fine. In fact, I, this looks a little bit different
        than the document that was in the file, so that's fine.

EL      Well, you may actually see another document coming that...

R       Is it a duplicate, an actual duplicate?

EL      (inaudible).

R       That's all right.

NANCY E. LEWEN                16-09-C-6123                        **11**

EL    Right.  I'm showing you, Mr. Skinner, what has, I have
      marked as Employer's Exhibit #6, if you'd pass that up to
      the Referee and if you would take a moment to glance at that
      document.

EW1   This is the posting that we place.  It's the prohibition of
      sexual harassment.

EL    And does this apply to all employees of the Department of
      Military and Veterans Affairs?

EW1   Yes.

EL    And would that have applied to Ms. Lewen in her capacity as
      a Licensed Practical Nurse?

EW1   Yes.

EL    All right.  Moving off of sexual harassment policies, I'm
      going to show you what I have marked as Employer's Exhibit
      #7, if you'd pass that up to the Referee.  Would you
      identify that document for the record, please?

EW1   Okay.  This is the (inaudible) Policy Information Memorandum
      on workplace violence and workplace (inaudible) Prevention
      Policy.

EL    What's a PIM?

EW1   Policy Information Memorandum is the policy that is
      distributed by the Agency.

EL    So that is the Department of Military and Veterans Affairs
      Policy?

EW1   Yes.

EL    And that would apply to Ms. Lewen as well?

EW1   Yes.

EL    I'm showing you what I've marked as Employer's Exhibit #8,
      if you'd pass that up to the Referee.  Can you identify this
      document for the record?

EW1   This is the Management Directive from the governor's office
      covering workplace violence.

EL    And you'll be glad to know this is the last document that
      I'm going to have you identify.  I've marked this as
      Employer's Exhibit #9, if you would pass that up to the
      Referee.  Can you identify this document for the record?

EW1   This is the Management Directive covering the Commonwealth
      of Pennsylvania Information Technology Acceptable Use
      Policy.

EL    All right.  So these are the various policies that were
      referred to in the termination letter of March 14th, 2016?

EW1     Yes.

EL      And is it PSSH's position that Ms. Lewen violated these
        policies?

EW1     Yes.

EL      Okay.  We're not going to go into the specifics of how she
        violated them right now, but the Referee can actually look
        at these at, when she is considering the case and read them
        after she hears all the testimony.  But I just want to ask
        you in general terms why did the Pennsylvania Soldiers' and
        Sailors' Home terminate Nancy Lewen?  Let's start with her
        treatment of Barry Blasic first.

EW1     For sexual harassment of Mr. Blasic.

EL      PSSH is saying that she sexually harassed Mr. Blasic?

EW1     Yes.

EL      Is PSSH saying anything else in regard to Mr. Blasic?  Did
        she violate the workplace violence policy in regard to Mr.
        Blasic?

EW1     Oh, yes, I'm sorry.  Yes, she did.

EL      Does PSSH allege that she did anything else as far as
        violating the workplace violence policy?

EW1     Yes, she did.  She also made references to (inaudible).

EL      Okay.  You're going to have to speak up some.  I want to
        make sure that...

EW1     Sorry.

EL      ...recorder hears all this.  You are fairly soft-spoken so
        point your body in that direction when you answer and speak
        up fairly well.  Now, how about the IT Usage Policy?  Does
        the Pennsylvania Soldiers' and Sailors' Home consider that
        she violated that policy at all?

EW1     Yes, she did.

EL      How did she do that?

EW1     She used the, used her work email to send an inappropriate
        email to another employee.

EL      Okay.  So that's in general terms why we, why the
        Pennsylvania Soldiers' and Sailors' Home terminated Ms.
        Lewen?

EW1     Yes.

EL      All right.  I'll ask you one thing about workplace violence.
        When one thinks of workplace violence when normally thinks

of an act of physical violence.  Is workplace violence
limited only to physical violence?

EW1    No.  Workplace violence is also any behavior directed
towards another employee or employees that could be
intimidated, threatening, humiliating or affecting their
psychological well-being.

EL     Okay.  I want to talk to you about a pre-disciplinary
conference that was conducted in this case.  Now, first of
all, so we understand the terms, can you explain to the
Referee what a PDC is?

EW1    A pre-disciplinary conference is an investigation into
allegations that an employee may have violated a policy.
This is the investigatory process.

EL     Now, is that your routine thing to do is to conduct a PDC
for an employee accused of misconduct?

EW1    Yes, it's routine for everyone.

EL     Was a PDC conducted for Nancy Lewen in regard to the
allegations against her?

EW1    Yes.

EL     One or more?

EW1    There was two.  We did the PDC on March 7th and then we
reconvened with additional questions for clarification on
March 10th.

EL     Was Ms. Lewen present for the PDC?

EW1    Yes.

EL     Was she represented by a union representative?

EW1    Yes.

EL     Were you present for the PDC?

EW1    Yes.

EL     Now, during the PDC I want to, I want you to focus on one
issue.  Did during the PDC Ms. Lewen state something about
getting a gun and coming back into PSSH and shooting people?

EW1    Yes, she did.  At the second PDC she did, they questioned
her on the first PDC about it, but during the second PDC for
clarification they did ask her if she made that statement
that she was going to bring a gun to shoot people and she
did admit to yes, she did.

C      Now, is this a proper for me to object?  Is, do I say
object, I object?

R      Okay.  On what grounds?

C      On he is not, he is taking it out of context of what I said.

R      Okay.

C      He is not pertaining to what I said.

R      I can't sustain a legal objection on that ground, but it's something that you can question him on when you have an opportunity to question him.

C      Okay.

R      And then when it's your turn to testify you can explain further.

C      Okay.

R      Right now the only type of objection I could sustain would be a legal objection such as relevance or foundation.

C      (inaudible).

R      If you just disagree with what he is saying or how he is characterizing it, that's something you have to question him on...

C      Okay.

R      ...and then explain to me when you testify.

C      Okay.  Thank you.

R      You're welcome.

EL     Okay.  Mr. Skinner, let me go back and ask the question again because I'm afraid that Ms. Lewen's objection here broke the flow of your answer.  Did she at any point in time during the PDC conducted on March 10th of 2016 state anything about going out and getting a gun and coming back in and shooting people?

EW1   Yes, she did.

EL     Do you remember exact words or as exact as you can remember?

EW1   As I recall it was they questioned her after our investigation, but we had witness statements saying that she did say that after an incident with her Supervisor.  She was questioned on it and the first thing she said was yes, I did say that.  And then she went on to explain the circumstances under which she said that.

EL     Was it fair to say she admitted making that threat?

EW1   Yes.

EL     Did this statement cause you any sort of concern?

EW1   Absolutely.

EL     What kind of concern did it cause you?

EW1     She, after she had mentioned that in addition to everything
        else that was going on, in addition to she had made
        references to bloodshed elsewhere.  It was cause for
        concern.

EL      Did it cause you to fear for the physical safety of
        personnel at the Pennsylvania Soldiers' and Sailors' Home?
EW1     Yes, it did, absolutely.

EL      Let's go back to Mr. Barry Blasic.  PSSH accuses Ms. Lewen
        of sexually harassing Mr. Blasic.  What was Mr. Blasic's job
        at the Pennsylvania Soldiers' and Sailors' Home?
EW1     LPN, Licensed Practical Nurse.

EL      Did Mr. Blasic and Ms. Lewen have cause to work together at
        anytime?
EW1     They did.  I couldn't speak to how many, how often they
        worked together or how many times they crossed paths, but
        yes, they did.

        possibility that they could have, would have been assigned
        to work together at anytime?
EW1     Yes, it's certainly possible.

EL      I would like to ask you to define for the Referee what the
        term hostile work environment means in relation to sexual
        harassment claims?
EW1     A hostile work environment is like I mentioned earlier.
        It's behavior towards someone that is just so pervasive and
        repeated that it just creates a humiliating, intimidating
        now threatening environment to that person to the point
        where it's absolutely affecting their psychological being
        and their ability to do their job.

EL      There is one last question I want to ask you.  I want to
        clarify for the Referee because it'll become important at a
        later point in time during the hearing the chain of command
        involving Ms. Lewen.  Ms. Lewen is an LPN, correct?
EW1     Correct.

EL      Now, does she have a Supervisor?
EW1     Correct, yes.

EL      And who was her Supervisor?
EW1     I believe it was Ray Ham.

EL      And Ray Ham, what's his position at the Pennsylvania
        Soldiers' and Sailors' Home?
EW1     Registered Nurse Supervisor.

EL    All right.  Nothing further.

R     Okay.  I just want to follow up briefly, Mr. Skinner.  So the policies that you've identified here for the record, how are employees made aware of those policies?

EW1   Through the on-boarding process and through, during orientation process and during (inaudible).

R     Can you tell me what that entails briefly?

EW1   The on-boarding process?

R     Any of the processes that would be involved in them reviewing the documents, the policies, signing off on them, how does it work?

EW1   Okay.  They are signed off on electronically during the on-boarding process before they're hired.  They are reviewed during orientation and they're signed off upon hire as well and they're also reviewed annually during annual training.

R     how does your disciplinary procedure work?  Is it progressive or does it depend on circumstances?

EW1   It is progressive, but it is also depending on circumstances.  If the circumstances warrant a discipline outside a normal progression, then that's what we certainly do.

R     Do the policies state specifically, I haven't read them obviously, that a disciplinary action up to and including discharge upon first offense is permissible?

EW1   Yes, it does.  Yes, it is.  In the workplace violence policy it does mention there is a zero tolerance policy in the Commonwealth for workplace violence.

R     Okay.  Ms. Lewen, do you have any questions for Mr. Skinner?

C     No, other than like the, this idea I wanted to clarify the context of what that was.

R     Okay.  Do you want to ask him a question about that or do you just want to wait and tell me yourself?

C     I'll just wait and tell you myself.

R     Okay.  Attorney Bushinski, are you moving the admission of the Employer Exhibits so far, Exhibit E1 through E...

EL    E9, I believe.

R     ...9?

EL    Before I do that, ma'am, you had brought up a point that I forgot to ask Mr. Skinner on.

NANCY E. LEWEN                    16-09-C-6123                            17

R     Sure.
EL    If I may just continue on my direct?

R     Yes.
EL    Mr. Skinner, I am going to show you what I have marked as
      Employer's Exhibit #10.  Can you identify this document for
      the record?  Pass that (inaudible).
EW1   This is the employee sign-off of the Standards of Conduct
      and the Work Rules after they're gone over with the employee
      after they've been hired.

EL    Now does that document, does that bear Nancy Lewen's name
      and signature?
EW1   Yes, it does.

EL    And the date that she signed it?
EW1   Yes, it does.

EL    So is it fair to say that this document shows that Nancy
      Lewen had received the DMVA Standards of Conduct and Work
      Rules?
EW1   Yes, it does.

EL    I'm showing you what I have marked as Employer's Exhibit
      #11.  Can you identify that document for the record, please?
EW1   This is the IT Resource Acceptable Use Policy User Agreement
      that's signed off by the employee when they receive the
      policy.

EL    Does that document bear Ms. Lewen's signature?
EW1   Yes, it does.

EL    And last I'm showing you what has been marked as Employer's
      Exhibit #12.  Can you identify what this document is for the
      record, please?
EW1   This is a list of the LSO or eLearning web-based training
      courses that the employee has taken and completed.

EL    Now I noticed this doesn't provide any proof of any
      signature or anything like that.  Let me ask you this.  In
      the course of your job as a Human Resources Analyst for the
      Pennsylvania Soldiers' and Sailors' Home do you have access
      to the electronic training records of employees?
EW1   Yes, I do.

EL    Is this Ms. Lewen's training record?
EW1   Yes, it is.

NANCY E. LEWEN                16-09-C-6123                        18

EL      Now, do, does all training at the Pennsylvania Soldiers' and
        Sailors' Home involve, you know, somebody signing off saying
        I've had the training?
EW1     Yes.  Actually all training there is a sign off.

EL      Okay.  But what about this?
EW1     For this one it's electronic sign off, I guess.  There is an
        acknowledgment at the end of every course.

EL      Okay.  I guess I should have phrased my question
        differently.  In this case this shows that Ms. Lewen had
        training discrimination and sexual harassment prevention at
        some point in time.  I think in October of 2014.  Is that
        correct?
EW1     Yes.

EL      Now would she have actually signed a document saying that
        she got that training or was this record, is this printout
        what, the record of her having got the training?
EW1     If you look at the (inaudible) says 100% learning objectives
        access and objectives achieved.  If you do not sign, click
        the sign off at the end that you've acknowledged everything
        it will not give you 100%.  So you do have to click that to
        get the 100%.

EL      So if that 100% is not there, say it was just blank would
        that mean that the employee has not completed the training?
EW1     Correct.  That means they did not sign, they did not click
        the last button.

EL      Thank you.
EW1     Um-hum.

EL      Nothing further.

R       Okay.  Moving E1 through E12?
EL      Yes, ma'am.

R       Okay.  Ms. Lewen, you have been provided copies of all the
        Employer documents.  E1 is the suspension letter.  Do you
        have any objection to that being entered today?
C       No.

R       E2 is the complete copy of the discharge letter, which was
        partially in the file already.  Do you have any objection to
        that being entered today?
C       No, I do not.

R       Okay.  Then we've got I believe E3 through E9 were the
        various policies.  Any objection to any of those?

NANCY E. LEWEN                    16-09-C-6123                              19

C      No, I don't.

R      And E10, 11 and 12, the sign off acknowledgment forms of the
       policies and trainings.  Any objection to those?
C      No.

R      E1 through E12 are entered without objection.  All right.
       Any other questions for Mr. Skinner, Attorney Bushinski?
EL     No, ma'am.

R      Ms. Lewen?
EL     No.

R      Okay.  You're next witness then, Attorney Bushinski?
EL     Barry Blasic.

R      Okay.
EL     Ma'am, before I begin my direct examination, Ms. Lewen and I
       had some discussions concerning the Facebook messages that
       passed between her and Mr. Blasic.  We had this discussion
       outside.  Ms. Lewen has kindly provided me with a copy of
       the Facebook messages that passed between the two of them.
       She had done this some time ago and she even numbered the
       pages and also the lines on the document so that...

R      Numbered lines?
EL     ...it would be easy to refer to it.  Anyway, as the Facebook
       messages will appear in her case as well as mine we thought
       that we would enter the Exhibit as a joint Exhibit.  Is that
       correct, Ms. Lewen?
C      Yes.

EL     And Ms. Lewen, I, has represented to me that these are all
       Facebook messages.  They are complete except for the fact
       that she is not able to, was not able to provide me with
       printouts of the various links or anything like that that
       she sent to Mr. Blasic.  And most of them are unimportant.

R      Okay.
EL     But anyway, if Ms. Lewen has, agrees, I'd like, I would like
       to mark this as a joint Exhibit and enter it into the
       record.

R      Okay.  Why don't we then mark it, Ms. Lewen, that's
       consistent with your...
C      Yes, um-hum.

R      Okay.  So why don't we mark that then as E13/C1 for Claimant
       1 and Employer 13?
EL     Okay.

NANCY E. LEWEN                16-09-C-6123                        20

R       And Ms. Lewen, this is, in fact, you have a copy for Ms.
        Lewen, Attorney Bushinski?
EL      I do.

R       We'll give her just a second to take a look at that and make
        sure that is the document that she had prepared and
        provided.
EL      E13/C1.
C       I believe this is the document, but again, just like I said
        in the civil service (inaudible) hearing in the document
        that I had sent to Mr. Bushinski certain things come out
        highlighted and his copy in the record I highlighted...

R       (inaudible).
C       ...didn't come out highlighted.

R       Okay.  Do you...
C       But as far as the content of it, I believe it, I mean I
        haven't read word-for-word, but I believe it is the same.

R       Okay.  Actually do see some highlighting in the packet here.
        It's just very light, but you can see some.
C       Oh, you can?

R       Yes.  For instance, I'm just looking through.  If you look
        at page 21 I can see some lines that are clearly...
C       See, on mine that doesn't show.

R       Okay.  It just might be the quality of the photocopy for
        that.
C       Possibly.  (inaudible).

R       If I look at your (inaudible)...
C       Yeah, look at my page (inaudible).

R       I can see the highlighting on my copy if you're satisfied
        with that.  So page 21, I see highlighted...
C       Okay.

R       ...lines two, three, four, six, seven, 12 through 16...
C       Yeah.

R       ...23...
C       Yes.

R       ...24, 25.  Okay.  So I can see the highlighting.
C       Okay.

R       It's very light on my copy.

NANCY E. LEWEN                16-09-C-6123                        21

C       For some reason my copy it doesn't come out highlighted, but
        (inaudible).

R       All right.  So you want to move the admission of this
        document as well then, Ms. Lewen?
C       Yes, um-hum.

R       And Ms., Attorney Bushinski as well?
EL      Yes, ma'am.

R       All right.  And no objections from either party then I
        presume?
EL      No.
C       No.

R       Okay.  All right.  E13, Claimant 1 is entered.
EL      Just to go back to the issue of highlighting, the
        highlighting was Ms. Lewen's highlighting.  I'd ask actually
        that you'd disregard the highlighting because, you know,
        it's really not important.  But I'm not really too exercised
        over the matter one way or the other.  Ms. Lewen, I'm sure
        in her case will point you to the, any important, things
        that she finds important.

R       Okay.
C       Can I interject something right now?

R       Sure.
C       The things that are highlighted is where I had told Mr.
        Blasic when I had filed complaints with the Department of
        Health and the state Attorney General's office regarding
        elder abuse.  And it was also some things that I had told
        him about long-term care regulations.

R       Okay.
C       It is relevant in my opinion.

R       Okay.  That's something you can tell me during your
        testimony and then the copy I have I can see the
        highlighting so...
C       Okay.

R       ...I will consider or not consider it in my discretion as I
        review the documents and issue my Decision.
C       Okay.

R       Okay.  All right.  Attorney Bushinski, go ahead when you're
        ready.
EL      Thank you.  Mr. Blasic, will you state your name for the
        record?

NANCY E. LEWEN                16-09-C-6123                          22

EW3 ·       Yes.  I'm Barry Blasic, B-A-R-R-Y, B-L-A-S-I-C.

EL          And by whom are you employed?
EW3         Commonwealth of Pennsylvania, Department of Military and
            Veterans Affairs, Pennsylvania Soldiers' and Sailors' Home,
            Erie, Pennsylvania.

EL          What is your work address?
EW3         560 East 3rd Street, Erie, PA, 16507.

EL          And what is your position at the Pennsylvania Soldiers' and
            Sailors' Home?
EW3         A Licensed Practical Nurse.

EL          As a Licensed Practical Nurse for the Pennsylvania Soldiers'
            and Sailors' Home have you ever had occasion to work with
            Nancy Lewen?
EW3         Yes.

EL          How long had you known Ms. Lewen?

EL   ·      And was that from, in September of 2014?
EW3         Yes.

EL          All right.  Let's talk about the sexual harassment case, you
            know, that's at issue here.  In 2015, did you and Nancy
            Lewen begin to correspond using the social media entity
            known as Facebook?
EW3         Yes, we did.

EL          Whose idea was it to start corresponding via Facebook?
EW3         Ms. Lewen's.

EL          And what type of correspondence are we talking about here?
            Are we talking about Facebook messages?
EW3         Initially, it was just friend request and then public posts
            and comments regarding those posts.  But then it went on to
            the private messages on Facebook Messenger.

EL          Well, you've seen what the, you have before you what has
            been marked as Employer's Exhibit 13, Claimant's Exhibit #1.
EW3         Yeah.

EL          That is a record of the Facebook messages that passed
            between you and Ms. Lewen.
EW3         Correct.

EL          Now, have you had a chance to review them prior to the
            ·hearing today?

EW3    Yes, I have.

EL    And do you agree that those are the complete Facebook messages that passed between you and Ms. Lewen, minus things like links and stuff like that?

EW3    Yes, I do.

EL    Let's talk about the content of those Facebook messages. Do those Facebook messages show that Ms. Lewen had importuned you for dates?

EW3    Yes.

EL    Specifically, tell the Referee specifically to what she was asking you to do.

EW3    To go to the Cleveland Museum of Art.

EL    Did she provide you with any sexual, sexually suggestive references in the Facebook posts?

EW3    Yes.

EL    What type of references are we talking about here?

EW3    Primarily they would be posts or links for different sexual positions from a Men's Health link, Men's Health magazine, I believe.

EL    All right. I'm going to show you what I have marked as Employer's Exhibit #14. Would you pass that up to the Referee? Now we're talking about sexually suggestive links. I would like to ask you, well, first of all, let me ask you. What is this document?

EW3    This shows excerpts of the Facebook messages that would include images and some of the links.

EL    Where did you get this?

EW3    I printed this off from my home computer, from my laptop.

EL    Did you alter or change these images in any way when you printed them off?

EW3    No, I did not.

EL    All right. I want to refer you as, when we're talking about sexually suggestive links, I want to refer you to about the fifth page from the back. Let me know if you're there.

EW3    I have it, yes.

EL    All right. Now we're, just we identify this for the record, this was an email from Nancy Lewen dated February 23rd at 7:23 a.m. Is that correct?

EW3    (inaudible) 7:19.

EL      7:19 a.m.  I'm going to point to the, for the Referee's
        benefit to show exactly what, where the date and the time
        was.  I'm pointing up to the top part of the top right-hand
        portion of the email and it's there, but it's very, very
        faint.

R       Okay.
EL      Is that the, is that one of the emails that, or Facebook
        posts that Ms. Lewen had sent to you?
EW3     Yes.

EL      And is that one of the links that she had sent to you?
EW3     Yes.

EL      And you opened that link?
EW3     No, I, it was, I received it just like, as it is here.

EL      So it just appeared as is?  You didn't have to do anything?
EW3     No, not at all.

EL      [inaudible] for the record, this shows a picture of a man performing
        cunnilingus on a female?
EW3     Yes.

EL      All right.  Going to the next page, this is February 23rd,
        7:23 a.m.  Are you there?
EW3     Yes.

EL      And again, would you state for the record what that link
        shows?
EW3     Again, it shows Men's Health magazine link showing another
        sexual position entitled lazy man.

R       Which page is that?
EW3     The very next one after that (inaudible).

R       Okay.
EL      All right.  One more.

R       Oh, the, that's, okay.  I see.  I'm sorry.  I went back the
        other -- okay.
EL      Okay.  Let's talk about one more and we'll move off the
        subject.  The next page shows a message dated February 23rd
        at 7:27 a.m.
EW3     Yes.

EL      And for the record, what does that show?
EW3     Again, another Men's Health link with a sexual position
        entitled the cat.

EL      Now did Ms. Lewen send you other types of links in the same vein?
EW3     Yes.

EL      Many?
EW3     A few more.  Probably at least three more.

EL      Now did you welcome these sort of links?
EW3     No, I did not.

EL      Did Ms. Lewen make any professions that she, in her Facebook messages that she loved you?
EW3     Yes, she did.

EL      Numerous professions of love?
EW3     Yes, numerous.

EL      Now we won't try the Referee's patience and actually go through each one.  She is going to have the Exhibit and she can, and look for herself, you know, for the Exhibits.  So just so we're clear on this.  When Ms. Lewen made these professions of love to you was that sort of thing welcome to you?
EW3     No, it was not.

EL      Sometime in January of 2016, did you stop responding to Ms. Lewen's Facebook messages?
EW3     Yes.

EL      When did you do that, if you can remember?
EW3     I don't recall specifically.

EL      Was it early January of 2016?
EW3     Yes, I believe it was during the first week or so of January 2016.

EL      Just so the Referee can is clear on this.  From August of 2015 when you first started messaging Ms. Lewen on Facebook, when you both started messaging each other to January of 2016, you responded to some of her Facebook messages?
EW3     Correct.

EL      Now in January of 2016, there came a time when you stopped responding?
EW3     Yes.

EL      Explain to the Referee why you stopped responding to the email or Facebook messages in January of 2016.  Tell her what happened.

EW3     Primarily the reason was that we had talked about this
        Cleveland Museum of Art trip.  I had talked to her regarding
        the fact that I was not interested in having any kind of a
        relationship at that time as I am going through a divorce
        and tried to explain that to her and that again, I wasn't
        looking for any type of relationship.  After having said
        that though we corresponded some more and she said that we
        could go to the museum on a day trip as, purely as friends,
        which I agreed to.  And shortly after that she responded
        that she was very happy or glad that I decided to go on a
        date.

EL      Okay.  Had you actually decided that, in your mind were you
        agreeing to go on a date with Ms. Lewen?
EW3     No.

EL      Did you give her any indication that you were going to go on
        a date with Ms. Lewen?
EW3     No.

EL      So in January of 2016, you stopped responding to her
        Facebook messages?  Is that correct?
EW3     Yes.

EL      Did she continue to send messages to you?
EW3     Yes.

EL      And how many did she send, in general terms?
EW3     A lot.

EL      Did these messages, did she continue to make professions of
        love?
EW3     Yes.

EL      Did she continue to ask you to go on a date?
EW3     Yes.

EL      Now, you never went on a date with Ms. Lewen?
EW3     No.

EL      How did it feel, how did these make you feel that she kept
        sending you messages asking you to go on a date and making
        professions of love?
EW3     Very uncomfortable.

EL      Now you worked with Ms. Lewen at some point in time, right?
EW3     Yes.

EL      And you both worked in the same facility?
EW3     Yes.

NANCY E. LEWEN                16-09-C-6123                           27

EL       Did, at some point in time did you explain to Ms. Lewen that
         these attentions were unwelcome?
EW3      Yes.

EL       Tell us when that happened.
EW3      It happened at work one evening when she relieved me from my
         shift.  I tried to explain to her how I felt about it.  I
         tried to be diplomatic about it that we were not on the same
         page and we were not interested in the same things as far as
         relationship status.  And I thought that that would be the
         end of it.

EL       Okay.  After you had this meeting with her and you told her
         this did she continue to send you Facebook messages?
EW3      Yes.

EL       Were they in the same vein as far as being sexually
         provocative, professions of love, things of that nature?
EW3      Yes.

EL       And did she send you a lot of them?
EW3      Yes, she did.

EL       Did this affect your ability to do your work in any way?
EW3      Yes, it did.

EL       Tell the Referee how it affected your ability to work.
EW3      It caused me extreme bouts of anxiety, difficulty sleeping,
         difficulty concentrating, concerns for my safety.

EL       Did you miss any work as a result of her attentions?
EW3      Yes, I did.

EL       Did it cause you to wish, to want to avoid her at work?
EW3      Yes.

EL       I want to refer you to a specific message in Employer's
         Exhibit 13, Claimant's Exhibit #1.  If you would go to page
         12, lines 16 to 27.  Would you read that lines 16 to 27,
         just the first five lines?
EW3      I was stalking you this morning for about ten seconds on my
         way out the door.  OMG.  Barry, that was long enough you
         sexy thing you.  Honest to God, from the first time I ever
         saw you sick I have always thought that you have the most
         sexiest sick voice I have ever heard in my entire life.  If
         you were my sweetheart I would have immediately had the,
         that pressure cooker whipped out and some deliciously
         healing homemade chicken noodle soup right in your mouth
         faster than your runny nose could have ran away hid from me.

EL      All right.  Stop.  How did that message make you feel?  Were
        you embarrassed by it?
EW3     Yes.

EL      Did it make you feel any other way?
EW3     Uncomfortable.

EL      Do you consider that Nancy Lewen was sexually harassing you
        when she made this, sent this message to you?
EW3     Yes.

EL      All right.  Let's talk about the events of February 29th,
        2016.  On February 29th of 2016, did you block Nancy Lewen
        from sending you Facebook messages?
EW3     Yes, I did.

EL      Now referring to Employer's Exhibit 13, Claimant's Exhibit
        #1, is that the very first message that's on page one?
EW3     Yes, it is.

EL      Why did you block Nancy Lewen from sending you Facebook
        messages?
EW3     Because of the quantity and the frequency of the messages.
        It was just a, it was frustrating and it was overwhelming.

EL      How did you block her?  Explain to the Referee how you
        actually prevented her from sending you more Facebook
        messages?
EW3     You can go into your settings on Facebook and select people
        to block from contacting you.

EL      How did Ms. Lewen react to you blocking her on Facebook?
EW3     The next day I received an email from Ms. Lewen indicating
        that she was disappointed that I had blocked her on Facebook
        and had written an email or penned a letter that she was
        going to send to my estranged wife.

EL      All right.  I'm handing you what I have marked as Employer's
        Exhibit #15, if you would pass the original up to the
        Referee.  Take a moment to look at that.  Is that the email
        that Nancy Lewen had sent to you on March 1st of 2016?
EW3     Yes, it is.

EL      But that's the Facebook message, right?
EW3     No.

EL      So, she actually had your email address as well?
EW3     Yes.

EL      And your email address is, that is your personal email
        address?
EW3     Yes.

EL      Okay.  I just want to ask you just a few questions
        concerning this particular email.  At the time that all this
        was going on were you in the process of being divorced?
EW3     Yes.

EL      Are you divorced now?
EW3     No.

EL      Some divorces are perfunctory things, some are not.  Some
        are really highly contested, some are hostile, some have a
        lot of problems.  Would you characterize, how would you
        characterize your divorce for the Referee?
EW3     Difficult, not amicable at all.

EL      Now Ms. Lewen's letter of, email of March 1st, 2016, that
        contains a letter that she sent to your wife.  Am I correct?

EL      And that letter is dated February 29th of 2016?
EW3     Yes.

EL      The body of that letter is in the March 1st email?
EW3     Yes.

EL      Did your wife and Ms. Lewen, had they ever met?
EW3     No.

EL      Did your wife know Ms. Lewen in any way?
EW3     No.

EL      They weren't friends?
EW3     No.

EL      So Ms. Lewen just sent this to your wife out of the blue?
EW3     Yes.

EL      Let's talk about a couple things that's said in the email.
        Second line of the email says if you feel the need to file
        an official sexual harassment complaint against me I would
        completely understand.  Do you see that?
EW3     Yes.

EL      Now you, again, let me ask the question.  Do you feel that
        Ms. Lewen had sexually harassed you?
EW3     Yes.

NANCY E. LEWEN                16-09-C-6123                          30

EL      In the third paragraph Ms. Lewen states that by the time you
        read this email it'll be too late to stop me from mailing a
        letter to your ex-wife.  Do you see that?
EW3     Yes, I do.

EL      How do you feel about Nancy Lewen having sent a letter to
        Mrs. Blasic when you were in the midst of a very unfriendly
        divorce?
EW3     I felt that it was extremely unnecessary and that, well,
        frustrating, angry, intimidated.

EL      Let me talk just one or two more things about this email
        because, or this letter because the Referee has the letter
        and she can read it in, at her leisure when making the
        Decision.  In the body of the letter, which is dated
        February 29th, 2016 to Mrs. Blasic, to your wife, this is the
        very day that you blocked Nancy Lewen on Facebook, she says
        to him and I think it's in the fourth paragraph.  He is
        looking for casual sex with no strings attached.  Excuse me,
        but there is something not quite ethical about a dad using a
        couple of pictures, a picture of a couple teenager boys
        while marking himself online for a booty call.  Now she was
        referring to the fact that you have pictures of your sons
        posted on the, on a social media account, right?
EW3     Yes.

EL      How does it make you feel that she is saying that you were
        using that to attract women to have sex with?
EW3     It irritates me.

EL      She also goes on to state in the letter that she looked up
        your address and your phone number and found out that your
        wife lives there and she says in the letter it took five
        minutes of sleuthing on the Internet to learn that your
        minor son is Gavin and your minor daughter's name is Ivy.
        How do you, how does it make you feel, how did that make you feel
        knowing that he (sic) was searching the Internet for such
        personal information about you and your family?
EW3     Initially upset and then after thinking about it for a while
        I became kind of distressed and I find it kind of scary.

EL      Were you concerned for your family's personal safety?
EW3     Absolutely.

EL      One more.  In the next to the last paragraph Ms. Lewen
        states to your wife that you don't, maybe he, meaning you,
        doesn't care at this point if some rapist shows up at the
        door and rapes you since he has primary custody anyway so
        the kids are safe.  How do you feel about being
        characterized in this manner?

NANCY E. LEWEN                16-09-C-6123                        31

EW3     Again, it's frustrating and it angers me.  (inaudible).

EL      What was Mrs. Blasic's reaction to this letter?
EW3     She was extremely upset.

EL      Could you be a little bit more full in your answer?
EW3     She questioned me as to why I was providing her personal
        information to somebody which I had not done that.  And
        again, this being, the relationship between my wife and I
        with this divorce being kind of a, I don't know if hostile
        is the accurate word, but it certainly is not amicable.
        This did not help any of it at all.  She was extremely,
        extremely upset.

EL      Now in the email to you Ms. Lewen says that she was sending
        this letter to your wife.  Am I right?
EW3     Yes.

EL      I'm showing you what I have marked as Employer's Exhibit
        #16.  Can you identify what this document is for the record?
EW3     This is an email to me from Ms. Lewen regarding a tracking
        number for the letter to my wife that she mentioned in the
        previous email.  This is from my work email.

EL      Okay.  And that's important.  Now the from line says it's
        from Nancy Lewen?
EW3     Yes.

EL      This is from her work email as well, is that not correct?
EW3     That is correct.

EL      And that was a email from her work email to you stating that
        the letter, this was the tracking number and that letter had
        been delivered?
EW3     Yes.

R       Attorney Bushinski, I appreciate the attempt to streamline
        the process, but if you could ask less leading questions,
        please.
EL      I will.

R       Thank you.
EL      I only have one more Exhibit, ma'am.

R       Okay.
EL      Did you bring Ms. Lewen's actions to the attention of anyone
        at the Pennsylvania Soldiers' and Sailors' Home?
EW3     I did.  I told a coworker.

NANCY E. LEWEN                16-09-C-6123                        32

EL      I'm showing you what I have marked as Employer's Exhibit
        #17.  Can you identify that document for the record?
EW3     This is a statement that I made and includes some excerpts
        of the Facebook Messenger messages that I provided to the
        Home.

EL      Now they are not all Facebook messages though, right?
EW3     Let's see here.  It does also refer to the email and the
        letter that she was sending to my wife.

EL      Well, is it fair to say that your language is in there as
        well, explain to PSSH what had happened here?
EW3     Yes.

EL      Is this how you notified PSSH what was going on between you
        and Ms. Lewen?
EW3     No, this is not.

EL      How did you do that?
EW3     I, in fact, didn't notify them regarding what was going on.
        I, when I received the email and the letter, the copy of the
        letter that she was sending to my wife I shared it with a
        coworker and that coworker took it to the administration.

EL      But these are your words here?
EW3     Yes.  This is a statement that I made and provided.

EL      And who did you provide it to, if you remember?
EW3     Not specifically.  I would think that I provided this to HR.

EL      HR, do you mean human resources?
EW3     Yes, I do.

EL      Would that be Mr. Skinner?
EW3     Yes.

EL      All right.  I have no further questions.

R       All right.  So I just want to follow up briefly, Mr. Blasic.
        So when you received the email March 2nd on your work email
        that included the tracking number to the letter to your ex,
        or your estranged wife, that's when you disclosed what was
        going on to a coworker?
EW3     No, actually it was the same day that I received the email I
        shared that with a coworker.

R       The March 1st email?
EW3     Yes.

R        Okay.  And then the coworker went and reported it to
         someone?
EW3      Yes.

R        And then the Employer approached you to get information from
         you about what had been happening?
EW3      Yes.

R        Okay.  And that's when you authored E17, provided them with
         that information?
EW3      Correct.

R        Okay.  All right.  Ms. Lewen, do you have any questions for
         Mr. Blasic?
C        Yes, I do.  The, I had never seen this in the civil service,
         but I agree that this happened.  Would you read on page...

R        Okay.  You're referring to...
C        These (inaudible).

R        ...Employer...
C        The ones that have the pictures that he provided...

R        14.
C        ...today.  Yes.  On this one that's dated 2/23, I believe,
         the one that's under the sexual position, closed for
         business.  Do you see that one?  Men's Health and it says
         closed for business.
EW3      Yes.

C        Could you read the paragraph above that beginning with the
         Ray?
EW3      Where it says Ray agreed?

C        Yes, yes.  Could you just read that?
EW3      Ray agreed with me that going up the chain of command
         pattern is his immediate Supervisor.  Furthermore, Tim
         Horvath's (phonetic) next step up is Barb Raymond.  Nancy
         Flanagan (phonetic) has no authority to advise Tim Horvath
         to take urinals away from men on Unit C and no authority to
         give any input at all on that unit.

C        Okay.  I asked him to read that just for the sake of asking
         you when you do look at these later on, could you please
         read through little things that I have written?  Like don't
         just think that I was sending him pictures of sexual
         positions.  If you could please read what I wrote.

R        Okay.  That's something you can just tell me about during
         your testimony then.

C      Okay.  All right.  Barry, as far as your call offs, would
you say that your call offs frequency increased or decreased
after I began to message you on Facebook?  Would...

EW3   After you began to message me on Facebook?  I don't think
there was any change until, in my frequency of call offs
until, into January.

C      And your, and in January your call offs increased or
decreased?

EW3   (inaudible) there was an increase.

C      After the custody hearing as well because I know, I
(inaudible) this might be leading you a bit.

R      You can ask a leading question on cross-examination.  That's
okay.

C      Okay.  I know that prior to the custody when Jenny was being
so vicious with you about fighting, you know, not allowing
you to see the kids and whatnot...

EL    I will have to object to that because, you know, it assumes
facts that are not in the record.

C      Okay.  Well, I won't go...

R      Keep it...

C      I won't go.  All right.

R      I, that's okay.  I can assist Ms. Lewen in asking the
question.  So I'll ask the question and then I'll follow up
with Ms. Lewen after the answer and see if I am getting at
what she was getting at.  Let me ask a few questions, Mr.
Blasic.  There was reference during your testimony that the
behavior or the conduct of Ms. Lewen impacted your
attendance at work in some way.  Can you tell me about that?
How did it impact you?  Did...

EW3   I was already having some anxiety over what was going on
between us with the messages, the sexual content and again,
compounded by the issues of divorce, custody and the
upheaval that goes along with that.  Excuse me.  But after
taking the time to kind of go back over a lot of this
information that's included here and realizing it was a lot
more serious I think than I initially thought it was because
there, because of the sheer volume of the messages that I
was receiving I really didn't read all of them.  I didn't
give a lot of credence to them initially and I didn't pay a
lot of attention to them.  And then I went back and started
to actually look at them and that was when I saw the
reference to the workplace violence issue and that was, that
caused me a great deal of anxiety at that time.

R .    What was that?  I am not sure what you're referring to.
EW3    It was a message that Ms. Lewen had sent to me regarding a
       conversation and between her and two of the Supervisors
       where she stated that she had been yelled at by one of the
       Supervisors and admitted to a second Supervisor that she had
       a previous diagnosis of PTSD and that sometimes when people
       with PTSD are yelled at they might go out to their car and
       get a gun and return and shoot someone.

R      This was in a Facebook message to you?
EW3    Yes.
C      (inaudible).

EL     49.
C .    49.

EL     If I may direct your attention, Referee Fisher, page 49,
       line five through 23.

R      And for the record that's joint Exhibit E13 and C1.
··     ·That·s correct.·

R      Okay.  So what happened after that then after you were
       reviewing these messages and you saw that, Mr. Blasic, that
       caused you said additional concern, what happened as far as
       the impact on your work performance or your attendance, if
       anything?
EW3    . After Ms. Lewen was suspended on that, I want, I believe it
       was that same day.  It would be March 2nd. ·

R      Okay.
EW3    That as I was proceeding through my day trying to do my work
       I would be stopped by coworkers who were asking me, you
       know, what's going on because they knew, everybody knew
       there was a lot of rumors flying around and everything and
       people were stopping me and asking me all sorts of
       questions.  It was incredibly stressful.  It was making it
       difficult for me to get my work done.  I, at that time, was
       unable to concentrate on the things that I was trying to do
       because of the frequent distractions.  And on that day I had
       to request to leave work early because of the anxiety and
       the stress.  And I had after that point probably, not 100%
       sure if it was three or four call offs that were directly
       related to anxiety for, I had applied for the FMLA, Family
       Medical Leave Act, you know, for personal health reasons,
       anxiety, et cetera and was given the approval from my family
       doctor and you know, put in the paperwork for that.  But
       that was prior to this.  But it was after that point after
       the suspension that my anxiety increased dramatically.

NANCY E. LEWEN                16-09-C-6123                              36

R       Okay.  And so I think as Ms. Lewen was trying to ask you the
        last question there I think she was getting at were you
        having anxiety due to your own personal circumstances as
        well with the impending divorce and custody issues?

EW3     Yes.

R       Okay.  So it was kind of a combination of...

EW3     Yes.

R       ...everything.  Okay.  Was that kind of the question you
        were getting at, Ms. Lewen?

C       Yes.

R       Okay.  Any others?

C       Yes, I have several more.  Could you have talked to possibly
        Ray, Scott, a Supervisor and had our schedules, you know,
        like arranged so that we, we hardly saw each other anyway.
        But do you think that you had to go to the extreme of having
        me fired or do you think you could have had just had our
        schedules...

EW      Objection.  It assumes several facts that are not in the
        record, you know.  He didn't have her fired and she is
        testifying at this point.

R       I'll sustain it.  I don't think that Mr. Blasic can respond
        to that question.

C       Okay.

R       Another question?  I, you know what I will though, the first
        part of the question I think is appropriate, so I'll
        rephrase it.  With the understanding that you've already
        testified, you never reported the conduct at all, Mr.
        Blasic.  Would it have been possible for you to go to Ray or
        what was the other individual?

C       Scott.

R       Scott?

C       A Supervisor in other words.

R       A Supervisor with your concerns prior to the coworker
        disclosing the issue.

EW3     I certainly could have.

C       Okay.  My next question is would you tell me about the day
        that you had on December the 25th on Unit B?  Briefly.  Do
        you remember that day?

EW3     Yes.

C       Could you just, was it, just say, was it a good day or a bad
        day and how many nurses were on that unit that day?

NANCY E. LEWEN                    16-09-C-6123                          37

EW3     There was one nurse on the unit that day.

C       Which was?
EW3     For first shift and that was me.

C       Okay.  Was it a good day?
EW3     No, it was a very busy and hectic day.

C       Okay.  On page 47 then do you recall us having this Facebook
        Messenger conversation about inadequate staffing and I tried
        to explain to you how that works?
EL      I'm going to object again at this point, Referee Fisher.  I
        understand that Ms. Lewen is not an attorney, but this has
        no relevance to an act of misconduct on the part of, on her
        part.

R       All right.  As far as the relevance of this, Ms. Lewen, I
        understand that you're going to offer testimony when you
        testify...
C       Yeah.

R       ...that a number of your messages to Mr. Blasic may have
        been work-related.  And I don't know that the Employer is
        disputing that at all.
C       Right.

R       I want to focus on the reason that they have given for the
        discharge, which were some of the other messages that they
        feel were inappropriate.
C       Okay.  I could rephrase.  Just in general without reading
        all this because it was quite a few of them, but do you
        agree or disagree that a lot of these Facebook messages were
        about my complaint to the Department of Health, my complaint
        to the state Attorney General's office and about
        regulations?  Yes or no, do you agree that, or you can, we
        can go through and read it if you'd like.
EW3     I would say no, I don't agree that a lot of them were.
        Several of them were.  There were many references to, but
        out of, I'm not even sure how many messages that were here,
        51 pages of messages and I know that roughly 25 of those
        messages during that time frame were from me.  You did make
        references to the things that you're talking about, but I
        wouldn't categorize it as the majority of them by any means.

C       That's it.

R       Okay.  Any redirect at all, Attorney Bushinski?
EL      Ms. Lewen, I asked you a question about her making
        complaints to the Department of Health and the Office of
        Attorney General and she stated that she had mentioned

NANCY E. LEWEN                16-09-C-6123                          38

|       |                                                                        |
|-------|------------------------------------------------------------------------|
|       | these, that she had made these complaints to you in these messages. Is that correct? |
| EW3   | Yes.                                                                   |

| EL  | Okay. Let me ask you this. Did you report to anyone in your chain of command that Ms. Lewen had made complaints to the Department of Health or the Office of Attorney General? |
| EW3 | No, I did not. |

| EL | Nothing further. |

| R | Any other questions for Mr. Blasic, Ms. Lewen? |
| C | No, that's it. |

| R  | Okay. Thank you. Your next witness, Attorney Bushinski. |
| EL | All right. My last witness would be Barb Raymond. |

| R  | Oh, you know what. Are you moving the admission of E14 through believe it was 17, Attorney Bushinski? |
| EL | Yes, ma'am, I am. |

| R  | Okay. |
| EL | We'll put our admission into the record. |

| R | Okay. Ms. Lewen, you have copies, you've been provided copies of E14, 15, 16 and 17. I think a couple of those are actually already in the file and are duplicates, but in any event do you have any objection to any of those being entered today? |
| C | No, I don't. |

| R   | E14 through 17 are entered. You can go ahead whenever you're ready, Attorney Bushinski. |
| EL  | Ma'am, would you state your name for the record? |
| EW2 | Barbara Raymond, R-A-Y-M-O-N-D. |

| EL  | And by whom are you employed? |
| EW2 | The Commonwealth of Pennsylvania, Pennsylvania Soldiers' and Sailors' Home, Department of Military and Veterans Affairs in Erie, Pennsylvania. |

| EL  | What is your position at the Pennsylvania Soldiers' and Sailors' Home? |
| EW2 | I'm the Commandant of the Pennsylvania Soldiers' and Sailors' Home. |

| EL | And well, when you say Commandant, for those of us who are unfamiliar with military terms, can you explain in layman's language what the Commandant is? |

NANCY E. LEWEN                16-09-C-6123                          39

EW2     Yes, absolutely.  I'm the Administrator of the facility.  I
        supervise the entire campus of approximately 263 employees.
        Our budget and all of our campus facilities and our, I am in
        charge of their resident care for our 207 approximate
        veterans and their spouses.

EL      As the Commandant of the Pennsylvania Soldiers' and Sailors'
        Home are you the person ultimately responsible for the
        disciplining of employees?
EW2     Yes, I am.

EL      In regard to Ms. Nancy Lewen's case, she was fired on March
        14th of 2016, right?
EW2     On or about that, correct, yes.

EL      Now when you were making the decision to fire her did you
        consider whether any form of lesser discipline like say a
        suspension or a reprimand would have served the purpose of
        disciplining her?
EW2     Yes, sir, we did, I did consider that.

EL      And what was the reason why you did not go with a lesser
        form of discipline other, rather than firing her?
EW2     I felt the grievous nature of the threats to Mr. Blasic and
        really in my facility as a whole were such that Ms. Lewen
        needed to be terminated for the acts that were going on.

EL      Okay.  You've heard Ms. Lewen's questions to Mr. Blasic
        about the Department of Health and the Office of Attorney
        General.  Ms. Lewen had stated that she had made complaints
        to the Department of Health and the Office of Attorney
        General.  So, had you been aware that she had made
        complaints to the Department of Health or the Office of
        Attorney General prior to firing her on March 14th of 2016?
EW2     No, we did not know that until after.  And we actually found
        out, I found out after by Ms. Lewen's verbal communication
        with you in an email that you, Mr. Bushinski sent to me.

EL      So is it fair to say that her complaints to Department of
        Health and Office of Attorney General were not a factor in
        your decision to terminate her?
EW2     That is correct.

EL      Nothing further.

R       Okay.  Ms. Lewen, do you have any questions for Ms. Raymond?
C       Not at all.

R       Okay.  Anything else at all from the Employer, Attorney
        Bushinski?

NANCY E. LEWEN                16-09-C-6123                        40

EL      No, ma'am.

R       Okay.  All right.  Is everyone good to just continue on with
        Ms. Lewen's testimony?  Does anybody need a brief recess
        before we begin with that?
EL      I do not.

R       Ms. Lewen?
C       No, I can continue on.

R       All right.  Then let's go ahead and move to the Claimant's
        testimony.  Ms. Lewen, you've heard the Employer's testimony
        about what happened here.  Go ahead and tell me from your
        perspective what happened.
C       I believe that I was very kind to Mr. Blasic when he was
        going through his divorce, a very messy divorce with a very
        nasty ex-wife.  I tried my best to raise his self-esteem
        because he definitely needed it.  She had emasculated him.
        And I think that the Employer is using Mr. Blasic as a pawn
        in an act of retaliation to fire me because I reported
        situations of elder abuse and neglect to the Department of
        Health and to the state Attorney General's office.  As far
        as the gun goes, what I had said was my daughter works with
        state rep. Pat Harkins' wife, Michelle Harkins.  Off the
        record last fall she had told me that there was such a
        history of administrative (inaudible)...
EL      Objection.

R       (inaudible) statement.  Is it, what, on what grounds is...
EL      Hearsay.

R       All right.  I have to hear the statement first and then I'll
        rule.  So go ahead and make the, give your testimony, Ms.
        Lewen, and then pause so I can rule.
C       Okay.  What I have said several times including at the PDC
        meeting was that I had a history of advocating against
        violence, against domestic violence, against bullying,
        against violence in general.  I had said that with that
        culture of administrative bullying one of these days
        somebody, not me, I have never threatened to go outside my
        vehicle and get a gun, ever did I threaten to go out and get
        a vehicle, get a gun out of my vehicle.  What I said was one
        of these days they're going to bully the wrong person and
        that person will go out to their vehicle, get a gun and come
        in and shoot people.  That's what happens.  People go
        postal.

R       Okay.  Hang on one second.  Still have the hearsay
        objection, Attorney Bushinski?

EL     Well, she rephrased her question and it doesn't exist
       anymore, so.

R      Okay.  Right.  So withdrawn?
EL     Right.

R      Okay.  Thank you.  Go ahead, Ms. Lewen.
C      So as far as that, that's where I was coming at with the gun
       threat.  Other than that I would just like to submit as
       evidence my performance reviews and my attendance record.  I
       have two different performance reviews.  I guess like I,
       maybe I have them stapled together or maybe I didn't bring
       that along.  Oh, here is the other one.

R      Are these your most two recent EPRs?
C      Yes.  Yeah, it's the two, only ones that I've ever had
       there.

R      Okay.
C      Here is a copy.

R      Do you have a copy for Attorney Bushinski as well?
C      Yes, I do.

R      Great if you'd pass a copy to me and a copy to him as well.
C      Okay.  There is one for you.

R      Thank you.
C      Here is one for you.  Here is one, this is from 3/27/15 to
       6/30/15.  That other one was from 9/29/14 to 3/27/15.

R      Okay.  So I will mark these, well, more recent one, the
       March 27 through June 30, 2015 as Claimant's 2 and the
       September 29, 2014 through March 27, 2015 as Claimant's 3.
       And copies have been passed over to Attorney Bushinski.
       Okay.
C      And we don't have to read them now or anything.  Just when
       you're reviewing the case if you would just read my
       performance evaluations.  And then I also have my attendance
       record.  And on here I've made little handwritten notes
       because some of these days that I had taken off it was
       because I was told to take, I had accumulated too much time
       and they told me to take off, holiday, personal days, stuff
       like that.  But I've actually only called off sick three
       times and I'm just, because I'm just explaining that's what
       the handwritten...

R      Okay.  So this is your handwriting on this printout?
C      Yes.

R       Okay.  We'll mark this attendance printout as Claimant's 4.
        And Attorney Bushinski has been passed a copy of that as
        well.

C       Okay.  I also have two references from my previous job.
        This was not long-term care.  This was in home care
        (inaudible) services.  I have the letter of reference from
        the, my previous Supervisor and then a letter of reference
        from the father of the little boy who I cared for.  He was a
        little (inaudible) patient.  Like I said, it was totally not
        long-term care, but it was, it's, that's from the father.
        And then this is from my direct Supervisor.

R       Okay.  We'll mark the letter from the father as Claimant's 5
        and the recommendation from the Supervisor as Claimant 6.
        Attorney Bushinski, you've got copies of both there.

EL      I do, ma'am.

R       Okay.

C       Now this isn't a good copy, but this is also what I received
        from that company.  It was when I received the employee of
        the month.

R       Okay.  We'll mark the certificate as Claimant's 7.  Attorney
        Bushinski has been passed a copy of that as well.

C       I think that's it as far as any testimony.  I just wanted to
        make that very clear about the gun that I never, ever, in
        fact, I even have history of, as far as going against
        violence, I once filed a U.S. District Court (inaudible)
        just for the whole purpose of bringing an active (inaudible)
        violence to the attention of the District Attorney Jack
        Denari.  I go to the extreme when it comes to advocating
        against violence because I am an overcomer of domestic
        violence years ago.  That's where the PTSD diagnosis comes
        from.  I was a military wife overseas in a very violent
        marriage and that's where that comes from.  And I never,
        ever threatened to bring a gun to that facility.  I
        advocated against bullying, administrative bullying.  That's
        where that comes from.

R       All right.  Anything else at all, Ms. Lewen?

C       No.

R       Okay.  Attorney Bushinski, Claimant's 2 and Claimant's 3,
        the EPRs, any objections?

EL      Yes, ma'am, I do.  I mean I don't really want to be
        difficult for Ms. Lewen here. I understand that she is not
        an attorney and though all this has to be very distressing
        for her, you know, to do this.  But the fact of the matter
        is the Employee Performance Reviews don't really have
        anything to do with this case.  We're not, we didn't

terminate her because she was doing her job poorly.  We're
not saying that at all.  So I can't see how this could
possibly be relevant to the, to this particular case.

R       Okay.  As far as the relevance objection, I understand the
        objection.  I'm going to allow the documents, overrule the
        objection and afford them the weight I deem appropriate in
        issuing my Decision.  Claimant's 4, the Attendance...

EL      Same objection, ma'am.  Again, I don't mean to be difficult
        and I understand.  I'm sympathetic to Ms. Lewen that she
        doesn't do this or anything like that, but it's really, it's
        just not relevant.

R       Okay.  And what about Claimant's 5, 6 and 7, the letters of
        reference or recommendation and the certificate?

EL      Again, ma'am, the same objection.

R       Okay.  I am going to note the objection to all Claimant
        documents, overrule.  I'll allow the documents and give them
        the weight I deem appropriate in issuing my Decision.

C       I have one more thing I forgot to tell you.  I wanted to
        submit this.  This was a letter from Mr. Bushinski dated May
        10th and in it I had requested to receive a statistical
        analysis printout of all of the nurses' computer usage, you
        know, they were saying inappropriate technology usage.  And
        I wanted to have a graph of some sort showing my usage
        compared to the other nurses and he denied that.  And then
        in here somewhere it does say we want you to know that no
        one, something in the lines of you are the only one that's
        ever been disciplined for this.  Somewhere it says that.  I
        wish I would have highlighted, but somewhere in here it says
        that.  It says you were the only one who has ever been...

R       Okay.  I can review the documentation.

C       Okay.  If you would?

R       Sure.  We'll mark this...

EL      That's C8?

R       ...Claimant's 8.  And Ms. Lewen has passed a copy to
        Attorney Bushinski.  Any objections to that one?

EL      No.  Actually that's, I agree that's relevant.

R       All right.  Claimant's 8 is entered.  Claimant's 2 through 7
        are also entered with the Employer objection noted for the
        record.  Okay.  Any further testimony or evidence, Ms.
        Lewen?

C       You know what?  Yeah, I am going to go, I wasn't going to do
        this, but I will.  After we had gotten our annual survey
        last year and we had 11 deficiencies the plan of correction

by the administration was to educate and discipline all of
the nurses.  And what they tried to accuse me of was neglect
of duty, which is a very serious offense.  And I replied
with the statement saying how actually this contributory
neglect on the part of the facility because the night in
question I didn't usually even work on that unit.

R    Hang on for one second.
C    Okay.

R    What are you talking about here?
C    With the evidence to support my claim of retaliation, I
     think that they considered me to be a troublemaker and they
     needed to get rid of me.  So again, like I said, they used
     Mr. Blasic as a pawn in this situation.  They, you know,
     took the few Facebook messages, manipulated them, took them
     out of context and bam, all of a sudden I'm accused of
     workplace violence.  What I'm saying is this is when, you
     know, we got cited.  We got a lot of deficiencies and...

R    What is that document that you have right there?
C    This was a statement that I, this was the discipline that
     we, all the nurses were disciplined.

R    And when?  What's the date on that?
C    It says December 14th.

R    Of 2015?
C    Um-hum.

R    Yes?
C    Following...

R    Is that a yes for the record?
C    Yes.  It was following this, we had gotten cited by the
     Department of...

R    Okay.  I don't want to go too far down this road, Ms. Lewen.
C    Okay.

R    I understand that your position is that...
C    We, you know what?  I would...

R    ...(inaudible).
C    (inaudible).

R    But I don't need to go into too much...
C    Okay.

R    ...to the underlying allegations.

C    I don't, I won't even go there then.  That's, I wasn't going
     to (inaudible).

R    Let's go to your right to offer the evidence if you'd like
     to, but I just don't want to go too...
C    All right.  I won't.  Okay.

R    I do need to focus on the reasons that the Employer has
     given for the discharge.
C    Okay.

R    If you believe that the discharge was retaliatory, I think
     you've made that clear on the record.  If you have evidence
     that you want to offer for the record I'll take it, but I
     don't want to get into too much detail as far as that.
C    I'll submit this if Mr. Bushinski doesn't object.  Do you
     object?

R    Well...
EL   I haven't seen it yet.
C    Okay.

R    All right.  So this is the, what is, this is the discipline
     action that was given to the nurses in December following?
C    Following this complaint from, the Department of Health had
     come in and given us a lot of -- oh, wait, no, that was
     following the November, that, I take that back.  This is
     from when I filed this.  They, this, it was following this
     one.

R    Okay.  So you had contacted the Department of State and....
C    No, they came in for their annual survey.

R    The annual inspection.
C    Yes, that was their routine annual survey.  They came in.

R    Okay.  But what's this next document that you just handed
     me.  Is it the result of their instruction?
C    That was the result, right.  And then...

R    So this is their document?
C    Right.

R    Okay.  So I am going to mark the Disciplinary Action Request
     as, think is Claimant's 9.  And that includes, this, the
     second two pages of that, I'm sorry, the last two pages of
     that document there, is that your written statement then?
C    Yes.  But I had said that I didn't feel that I was guilty of
     neglect of duty.  I felt that it was contributory in fact on
     the part of the facility.

NANCY E. LEWEN                16-09-C-6123                              46

R       Okay.  And then I'll mark the result of the inspection from
        the state as Claimant's 10.  Attorney Bushinski, you've got
        both of those.  And you're offering these solely for the
        purpose of your allegation that this was a retaliatory
        discharge for your statement here on your other complaint?
C       Yes.  It's, I think, like I said, I think they sort of
        branded me a troublemaker after, at beginning.  This was the
        deficient, we got four more deficiencies on the complaint
        that I filed with the Department of Health.

R       Now you're handing me another document.  This is a different
        one?
C       Yes, that's a different one.

R       What's this?
C       That's following the complaint that I had made to the...

R       Okay.  So you filed a complaint when?
C       In early December.

R       And then this is the result of their investigation following
        your complaints?
C       Right.

R       All right.  We'll mark this one as Claimant's 11.  And why
        is it that you feel that they knew you were the one that
        filed the complaint?  Is that all...
C       Because the Facebook message, I believe that Mr. Blasic
        turned in, I believe, I, he sits there and he says he didn't
        tell them.  I think (inaudible).  I think he had a high
        call-off rate.  He saved his own skin by telling them that I
        had made these reports.  I think that he was just bailing
        his own self out with this, pinning it on me, you know.
        That's my own opinion.

R       Okay.  Attorney Bushinski, you've got Claimant's 9, 10 and
        11.
EL      Yes, and I understand the purpose that she is, you know,
        submitting these documents to prove that or in support of
        her claim that, retaliation, so I cannot have any objection
        on it.

R       Okay.  I'll allow Claimant's 9 through 11.  They are entered
        without objection.  Anything else, Ms. Lewen?
C       No, I don't think so.

R       Okay.  Cross?
EL      Before I cross, ma'am, I just have one procedural question.
        Will you be allowed me to make a closing statement?

R  Depends on how much time we have left.
EL  Okay.  I kind of (inaudible).

R  Most likely.
EL  Okay.  Thank you.  And I'll try to keep everything brief.

R  Okay.
EL  Okay.  Ms. Lewen, you said that you were being kind to Mr.
  Blasic because he was going through a very messy, nasty
  divorce.  Is that true?
C  Yes, it is.

EL  You have to answer so that the, that...
C  Yes.

R  Rather than nodding.
C  Okay.  Yes.

EL  Let's talk about your kindness to Mr. Blasic briefly here.
  I want to just ask you some questions about this system that
  you wrote to Mr. Blasic's wife on March the 1st or I'm sorry,
  on February 29th of...
C  Yes.

EL  ...2016.  Excuse me, whenever I can find my copy.
C  I know.  There's so much stuff.

EL  Too much stuff on here.
C  Okay.  It'd E15, it's Exhibit E15.

EL  Okay.  You're 50 years old, right?
C  Yes.

EL  And you've been married and divorced now yourself three
  times.
C  I sure have.

EL  Okay.  So when you were being kind to Mr. Blasic were you
  being kind to him when you sent him this email of March 1st
  of 2016?
C  I believe that I was being, gosh, what adjective do I want
  to use?  I was thinking protectively for his wife.  I have
  had told Barry, I had given Barry the online dating sites and I
  said be careful.  Don't put any personal information because
  they're sickos on there, you know, there's men who pose as
  women, child predators, you know.  Just be careful.  And...

EL  So you were doing this out of kindness to Mrs. (sic)
  Blasic's wife?

C       I was doing, I wrote this letter to her for her safety because I didn't bring the, remember I gave you the, as evidence in the civil service hearing I gave his profile to you that showed where he clearly had his name and his email address where if you just took those two pieces of information and knew that he lived in Erie, you could find out his address, work, you know, the marital home, everything. And if you just put that in you can find out he's got a teenage daughter. He's got a son, probably a single woman living there all alone. I was looking out for her safety. I don't care, I don't, I'm a victim of adultery in my first marriage. I know how adultery hurts. But at the same token, and I know how nasty that woman was to him. I realize that. By the same token, she is still a human being. It's still the mother of his children and I was concerned that he was jeopardizing her safety. And that's why I wrote the letter.

EL.    Well, this was all written to her out of kindness and for concern for her safety?

C      I was concerned for her safety, yes.

EL    Okay. Well, you know, the timing thing has me a little bit suspicious of what you just said, Ms. Lewen. Okay. This letter that you wrote was written on February 29th of 2016. Is that not correct?

C      Yes, it is.

EL    And that was after Mr. Blasic had blocked you on Facebook?

C      Right.

EL    Now for a period from August of 2015 through February 29th of 2016, you had been pursuing Mr. Blasic on Facebook. You had been sending him messages that had romantic overtures and you said that you loved him. Is that correct?

C      Yes, um-hum.

EL    You had sent him sexually suggestive websites.

C      Yes.

EL    Is that correct?

C      Yes, it is.

EL    You had asked him on dates?

C      Yes, I did.

EL    And he never accepted your dates?

C      Well, he didn't accept the word date. He did agree to go with me, but as long as it wasn't a date. He agreed to go with me to the Cleveland Museum of Art as long as it wasn't

a date, as long as it, we were just going, but not actually on a date.

EL     Okay. So he never, it's fair to say then that he never responded to your romantic overtures at all?

C     No, he did not.

EL     Okay. Now he actually sat down and told you back in January of 2016 that he wasn't interested in a romantic relationship with you, correct?

C     Correct.

EL     But still you persisted.

C     Yes, I did.

EL     You still sent him Facebook messages.

C     Yes, I did.

EL     You still asked him out on dates after that.

C     Yes, I did.

EL     You sent him sexually suggestive sites.

C     Yes, I did.

EL     You did all of that even though he told you he just plain wasn't interested.

C     Yes.

EL     Now on February 29th though he did something more. He stopped you from corresponding with him on Facebook, correct?

C     Correct.

EL     This made you angry.

C     It made me concerned that he didn't take my, rather than just do what I suggested to him he blocked me. It's like kill the messenger. I was trying to tell him he needed to look out for her safety regardless of what she did to him and he, and he killed the messenger.

EL     Are you telling me or...

C     I wasn't, I was about as angry as Jesus when Jesus cleansed the temple in the Bible. I was angry like that.

EL     Okay.

C     But angry isn't the same thing as violence.

EL     Oh, I understand that, Ms. Lewen. Okay. You were angry.

C     Yes.

NANCY E. LEWEN                16-09-C-6123                              50

EL       And in the spirit of anger you wrote this letter to Mrs.
         Blasic.
C        In a spirit of anger and protection to let her be aware of
         how he was exposing her like that.

EL       Well, you know, the freezing of your letter and your email
         is the thing that makes me kind of skeptical about what
         you're saying here.  You're a pretty good writer I noticed.
C        Yes.

EL       Yeah, you write a lot.
C        Yeah.

EL       You have a good command of the English language.  I will
         give you that.
C        Thank you.

EL       Now when you wrote these words you didn't make mistakes in
         your choice of words.
C        I hope not because if I did I'm sure you'll get me on it

EL       Oh, I'm sure I'll mention it.  Okay.  So let's see.  You
         agree that you sexually harassed him.  If you feel the need
         to file an official sexual harassment complaint against me I
         would completely understand.  You knew that you were
         sexually harassing him.
C        I was being sarcastic with that.

EL       Your...
C        And if you read the next sentence somewhere where, what did
         I say right after that?  I don't have it highlighted like
         you do, but what did it say right after that?

EL       Well...
C        I'm...

EL       ...did you say the words if you feel the need to file an
         official sexual harassment complaint against me I would
         completely understand?
C        I did say that and I was, I meant I sarcastically because
         then the next sentence I said was I'm quite certain that if
         you just wanted to complain unofficially about me you could
         talk to Ray about it and he would be willing to unofficially
         fix the schedule so that our paths would never cross.  He
         sort of owes me a favor anyway.

EL       Well, here is where I have a problem with this, Ms. Lewen.
         Okay.  I think that you did this out a spirit of
         vindictiveness.  Let's take a look at some of your other
         words.  These are words in your writing.  By the time you

NANCY E. LEWEN                16-09-C-6123                          51

read this email it will be too late to stop me from mailing
a letter to your ex-wife expressing my concern for her
safety. You wrote those words, right?

C      Yes, I did.

EL    Now you just got done telling me that maybe Barry could have
handled things in a different way by going to his
Supervisor. Did you have to send this letter to Mrs.
Blasic?

C      And...

EL    Could you have handled it a different way?
C      You know, in hindsight, you're correct. I could have given
it a day or whatever. I was, I did feel a sense of urgency
for her safety.

EL    Um-hum.
C      But I could have, I admit, I could have given it a few days
to let him handle it himself.

EL    This kind of thing happens to you a lot. You did the same
thing, you sent the same kind of letter to Matt Lawrence
(phonetic) last year in the year 2015.
C      It was not the same. In that situation I was briefly, I
dated Matt and we barely knew each other and the man is
asking me if I would take his three teenage daughters bra
shopping because his ex-wife was supposedly so incompetent
that she couldn't take his daughters bra shopping. So I did
write a letter to her and say, you know, you need to be
aware of the fact that your ex-husband is on the Internet
barely, you know, we hadn't even seen each other in person
yet and he is asking a strange woman who may have actually
been a man, he is asking a strange woman to take his
daughters bra shopping. And I felt his ex-wife needed to be
aware of that. It's their mother.

EL    Okay. Ms. Lewen, I'd like you to refer to Employer's
Exhibit 13, Claimant's Exhibit #1, page five. On February
27, 2016, line 15, one thing I did do last year was sternly
lecture Matt and almost kicked his ass for telling too much
about his teenage daughters to strange women on the Internet
and then you continue on. I, line 21, I knew when I wrote
the letter that it would piss Matt off, but by the same
token I do notice that he no longer mentions his kids'
genders and ages on his online dating profile. So you sent
a similar letter to another guy.
C      To his wife, yes, um-hum.

EL    Okay. So to the wife, another guy?
C      Right.

EL     Okay.  Let's go back to the same page, line 11.  Every time
       I hear this song I have a fond memory of Matt and the look I
       can imagine he had on his face two months later when he got
       a copy in the email of the letter I sent to his wife on
       behalf of his daughters who I never met.
C      Right.

EL     You did the same thing to another guy last year.
C      I did.  I admit to it.  I did.  And I really honestly I
       could care less if it pissed Matt off.  He needed put in his
       place.  And when I said kick his ass I didn't mean that I
       was going to actually commit physical violence against Matt
       Lawrence.  It was figuratively.

EL     So you're the ultimate arbiter in who gets these letters.
       You didn't know Matt's wife, but you sent her a letter.
       You've been sending her all sorts of nasty stuff.
C      It wasn't nasty at all.  It was a letter of concern for her
       daughters.

EL     Well, you sent this letter to Jennifer Blasic.  You didn't
       know Jennifer Blasic.
C      I knew of her, but I didn't actually know...

EL     That's right.  You knew of her, but you had never met her.
C      No.

EL     You were never friends with her.
C      No.

EL     Now you are 50-years-old and you've been married and
       divorced three times.
C      Right.

EL     Were those experiences pleasant for you getting divorced?
C      Each one was different.

EL     Were they pleasant?
C      Each in their own way, no, none of them were pleasant.

EL     Okay.  Do you think that it was a pleasant experience for
       this woman, Barry Blasic's wife, Jennifer Blasic, to get a
       letter clear out of the blue from some woman she never met,
       never knew and saying these things in there?
C      I doubt that it was pleasant for her.

EL     It had to be unpleasant.
C      Right.

EL      And you had to know that when you wrote that letter. You're
        not dumb. You're experienced.
C       I (inaudible) well, I guess I haven't mentioned I suspected
        that because of my kindness that I was demonstrating to
        Barry not just in the messages, but publicly on Facebook I
        did suspect that she was, she had committed adultery and...

EL      You don't know that.
C       Well, supposedly. According to Barry, I don't think, you're
        right, I don't know that. According to Barry...

EL      But even if she committed adultery does that give you the
        right to send her a letter like this?
C       Well, what I'm saying is I can imagine she might have been
        extremely angry because of the fact that I think she was
        suspecting that Barry and I were committing adultery.

EL      Um-hum. You understood that when you wrote this that this
        thing was wrong to send.
C       No, I didn't.

EL      Okay. Let's talk about this statement here. This is the,
        in the second paragraph of your letter to Mrs. Blasic. I
        have read and understand the Pennsylvania criminal statute
        involving harassment and stalking, 18 Pa. CSA...
C       Right.

EL      ...2709.
C       Right.

EL      Who starts out a letter like that?
C       Someone who might think that a man might turn around and
        accuse me of harassing him by sending a letter to his ex-
        wife.

EL      Or possibly an ex-wife?
C       Well, yeah, possibly an ex-wife.

EL      Nobody starts a letter like that unless they figure they're
        treading (inaudible) close...
C       I...

EL      ...to a criminal act.
C       No, I don't think it was treading, I think it was sensitive
        ground. I don't think it was a, that I felt like I was, I
        was letting them know that I, this is not, this, it doesn't
        fall under the definition of harassment.

EL      Um-hum. Okay. In your, now, you're a wordsmith. You say
        to Mrs. Blasic in other words he is looking for casual sex

with no strings attached.  Excuse me, but there is something not quite ethical about a man using a couple of teenage boys while marking himself online for a booty call.  Now Mrs. Blasic at the time was going through a very nasty divorce with her husband.  Still is going on from what I understand.

C     Right.

EL    It's not an amicable divorce.  How do you think that this made her feel coming from a woman that she has never met saying that her husband or her estranged husband is putting this kind of thing out online simply for the purpose of getting sex?

C     I would hope that it would make her feel concern for her children because prior to that point, honestly, (inaudible) the comments that Barry's dad made on Facebook, I don't think the woman cared too much about her children.  And I would hope that maybe she would have a little bit more concern for her children at this point.

EL    You heard Mr. Blasic talk about the reaction for, from Mrs. Blasic, so that I think that he would disagree with you. Here is the thing that gets me, too, about this letter. Okay.  You spent a lot of time on this thing preparing this thing.  It took five minutes of sleuthing on the Internet to learn that your minor son is Gavin and your minor daughter's name is Ivy.  I even found a public picture of Ivy from Go Erie from when she was a cute little blond eight-year-old. I also found many public pictures of you, some of which could be construed as sexually provocative to a rapist.

C     Right.

EL    You said that to terrorize her.

C     No, I didn't.  I said that out, as long as she doesn't, she shouldn't put those type of pictures online publicly accessible.  She is asking for it.  I'm sorry.

EL    She's asking for it.

C     Yes, she is.

EL    You're the person that makes the decision that this woman is asking for it for putting pictures of herself online, which probably just about everybody in this room has done?

C     Afterwards she removed the picture, so apparently she took it to heart.  And afterwards, Barry changed his Plenty of Fish profile, so apparently he took it to heart, too.

EL    Maybe she removed her pictures because she was afraid of you cyber stalking her some more.  Isn't that a possibility?

C     It, I guess it's a remote possibility that she was afraid of me.

EL    Okay.  I think you will agree that these are not the type of
      men who you would appreciate showing up in your bedroom in
      the middle of the night to have forced sex with you or your
      daughter having been led there by your ex-husband's
      cheapness and stupidity with online dating.  That's your
      statement.  Those are your words.
C     Right.

EL    Now are you telling me with a woman with your experience,
      three divorces yourself, 50-years-old with your command of
      English language that you had not sent, that you had made
      those statements just out of concern for her safety?  I
      submit that you did that to terrorize her and to kick over
      the...
C     No.

EL    ...hornets' nest in this divorce.
C     No, I didn't.  I did it because I was concerned for her
      safety.  And also like I said, I truly believe also that she
      was threatening Barry about like counter, is it called
      counter alleging adultery?  It's, that affects the alimony
      decision in Pennsylvania divorces and she saw how kind I was
      public, many people saw how kind I was to him on Facebook
      publicly of some of our notions at work, our, a couple of
      the guys that live in the personal care unit.  They all saw
      how kind I was to him on Facebook publicly.  His parents saw
      it.

EL    Ms. Lewen, when this is all done the Referee is going to
      look at this letter and she is going to look at all the
      other testimony and then it's going to be for her to decide
      whether you did this out of kindness for Mr. Blasic or as I
      contend that you did this out of spite and revenge because
      he blocked you and will not have a relationship with you.
      Let's talk about the gun.  You said you had a history of
      advocating against violence and that you had even filed a
      district court case concerning violence against somebody.
C     Right.

EL    Is that your case against Edinboro State University?
C     Yes, it is.  And Chief Thomas Nelson, now retired.

EL    And during, in that case was not the facts of that case that
      you had a gun at Edinboro...
C     Yes.  Yes.  I...

EL    Let me finish my question.
C     Okay.  Is the facts of the case not that you had a gun at
      Edinboro University and that the authorities at Edinboro

University confiscated that gun from you and actually had
you leave Edinboro...

C        Yes.

EL       ...University because of that?

C        Yes. What had happened there, that was when I was going
         through my second divorce. I had gone to grad school. I
         had attempted to go to grad school and I have a .22 target
         shooting revolver in my possession that I had had for 15
         years. And I had purchased it in Denton, Texas. It was not
         registered. It's not required to be registered, et cetera.
         So I showed up. I had driven from Texas to Pennsylvania,
         left my husband that I still loved, but he was an alcoholic.
         I left him in Texas, went to grad school. And I had
         contacted, I asked, there was another student there who was
         an expert on guns and whatnot. I still had to get my room.
         I had to, I was in a rental car. I had to get my room, my
         books. I had so, you know, figure out (inaudible) my class
         schedule, everything for grad school. I had a lot on my
         mind. So I said could you please find out for me what I
         need to do to keep, to store this gun safe. I'm going to be
         living in the dorms. I know I can't store it safely in the
         dorms. His name was Storm Fox (phonetic) and he is deceased
         now. He died in a car accident a few years ago, but he
         said, sure, I will. So he found out for me. And an
         officer, can't think of what his name was, but an officer
         showed up at my dorm room and he said I understand that you
         have a gun in your possession that you would like to keep
         safe. And I said yes, I do, thank you, you know. So I had
         bullets also, a gun and bullets separate in proper storage
         and, you know. So anyway, we go to the police, the campus
         police office and he gave me a receipt for it and
         (inaudible) he drove me over, he put me, you know, drove me
         down, dropped me back off. He was a real nice guy, gave me
         a receipt for the gun and everything seemed to be squared
         away. It was stored the way that they store guns. So I'm
         putting my things away in my room and in the meantime I, my
         ex-husband in Texas is harassing me. He's trying to, he
         called one of my professors and accused him of having an
         affair with me. That's why I had left. It wasn't to go to
         grad school. It was to have an affair with a 55-year-old,
         fat, fat old man, professor, you know, like just anything
         other than he is an alcoholic and I'm leaving him finally
         after all those years. So anyway, I'm putting all things
         away and that night it was almost close to midnight another
         police officer came to my dorm room and said I need for you
         to come with me down to the campus police office because
         Chief Nelson would like to talk to you. So I went in and I
         never expected what was about to happen with the campus
         police Chief, Chief Thomas Nelson and an administrator named

(inaudible).  Absolutely, Nelson screamed at me, threatening
me, telling me I had committed felonies, I was going to lose
my nursing license and go to jail for 20 years, all this.
For an hour that man screamed at me, called me names.  When
I was telling him he was wrong.  I need to have this gun
registered and he was wrong on that.  No, no, no, you know,
and all this stuff about crossing interstate lines and stuff
and he didn't know what he was, he was telling me wrong.  He
either didn't know what he was talking about or he was lying
if he did know.  So I survived that and they, and what they
did was they had me just withdraw, not to say that, I signed
a statement that (inaudible), he even misspelled my name,
but he had this statement typewritten up and he had me sign
it and say that I was withdrawing.  And later on some things
had happened at Edinboro.  One was involving a...

EL      I'll object at this point to her answer.  I mean it's going
        a little far afield.

C       Okay.  I'll just, I'll sum it up by saying that some things
        happened that I felt that Chief Nelson's possibly corrupt
        behavior needed to be brought to the attention of the
        District Attorney Jack Denari.  I knew when I filed my U.S.
        District Court case...

R       Okay.  I think you've answered the question.

C       Okay.

R       I'll come back to you for additional testimony if you think
        there is anything else relevant that...

C       Do you think there is anything?  I...

R       Well...

C       ...I mean I don't even see how any of this is relevant,
        but...

R       Okay.  Well, at this point we've heard the answer.  Let's
        move on.

EL      Okay.  I just have a few and I'm done.

R       Sure.

EL      All right.  So you're not a violent person and you would
        never do anything with a gun.  Page 49 of the joint Exhibit,
        Employer's Exhibit #13, Claimant's Exhibit #1, line five,
        this is an email message that you wrote December 7th, 2015 to
        Barry Blasic.  I had a nice heart-to-heart talk with Lay
        (phonetic) last night and gave him some food for thought.
        At one time I actually had a diagnosis of PTSD from being
        married to a bully a few decades ago.  I don't associate
        with violent bullies anymore, so it's really not a problem
        these days when somebody in the workplace, someone flips

NANCY E. LEWEN                16-09-C-6123                        58

out, screams at me and calls me stupid.  So I mentioned to
Lay last night that my brain sort of shut down the other
morning.  I told him I don't plan to work, file a workplace
violence complaint, but next time he just stands there with
no balls and watches a bully scream at a person with PTSD
that person may go out to their vehicle and return with a
gun and shoot him as well as her.  You wrote that.

C        Yes, I did.

EL       And you were talking about yourself.
C        I was not talking about myself.

EL       Well, who is the person then with...
C        A person.

EL       ...PTSD?
C        A, look in the news.  A person with PTSD.  I mean
         particularly statistics would show a young male with PTSD
         could be very likely to inflict an act of violence following
         an act of violence.  When you get screamed at for no reason
         that's how a lot of these young males respond.

EL       So your testimony still is that you're not a violent person?
C        I'm not a violent person.  I do get angry.  I get angry
         over, particularly over violence, but no, I am not a violent
         person at all.

EL       Okay.  Let's go to page 48, line 18.  I don't plan on
         leaving.  I also like gray for the most part.  My first
         marriage was a long time ago.  The point I was trying to
         make to him is you just might not know a person's history or
         what can of worms you may be opening when you start
         screaming at somebody unprovoked and calling them belittling
         names.  I told him, this is line 21, I told him flat out
         that if he ever dares to scream at me and call me names for
         just being a prudent nurse I will kick his ass.  I am
         capable of fighting violence with violence if I choose to.
C        Right.  But as a civilized person I chose not to with Deb.

EL       But you threatened to kick Ray Ham's ass.
C        Figuratively, yes, because he stood there and he watched a
         Supervisor scream at me just because I walked into the wrong
         place at the wrong time wanting a physician's order on
         behalf of a patient whose skin was in jeopardy of breaking
         down.  And she screamed at me and she told me the reason why
         was because I was in the wrong place at the wrong time.  She
         had meant to scream at Ray and I just happened to walk in.
         She apologized.  She self-reported to Cathy Wilcox and that
         was it.  And the point that I was trying to make was one day
         it's going to happen to the wrong person.

EL The word figuratively unfortunately does not appear anywhere in your email.

C No, it was, it didn't appear in my email, but I'm just telling you do you think that I really truly could kick Ray's ass physically?

EL Ray Ham is your Supervisor, right?

C Yes.

EL In your own words you threatened to kick his ass.

C Figuratively.

EL Let's talk about last thing, Claimant's Exhibit #8, the May 10th, 2016 letter from me to you.  Going to the second page, the passage that you were referring to that you were struggling to find is in regard to your request for the dates that PSSH had disciplined employees for violating its IT Usage Policy as I stated above, you are the only person who was disciplined for a violation of the IT Policy during the period September 29, 2014 through March 2nd, 2016.

C Right.

EL Is that what you were looking for?

C That's what I was looking for.

EL Do you think that PSSH had terminated you for surfing the Net?

C You clarified to me that they didn't.  It was because I sent that postal tracking number to Barry.

EL Okay.  Thanks.

C And the reason I sent that to Barry because I know his ex-wife has a history of snapping on him and I was afraid that maybe she might show up at work and he was working that day. That's why I sent it through his work email.  I knew he was working that day.

EL And you used your own work email to send it?

C Yes, I did.

EL Okay.  I have nothing further, Referee.

R Okay.  Ms. Lewen, anything further at all from yourself?

C No.

R Attorney Bushinski; anything further from the Employer other than closing?

EL Other than closing?  Yes, I do have one.  Okay.  I'd like to recall Ms. Raymond to the stand, very briefly.

NANCY E. LEWEN                16-09-C-6123

R       Sure.
EL      You're still under oath.
EW2     Yes, sir.

EL      I'm showing you what has been marked as Claimant's Exhibit
        #9. And for the record, that is the Disciplinary Action
        Request for Nancy Lewen.
EW2     Correct.

EL      Ms. Lewen as testified here that she thinks that the reason
        she was fired is because you fired her in retaliation for
        whatever that particular incident did.
EW2     Absolutely not. Absolutely not. Several of our nurses
        received discipline in relation to this particular incident
        of neglect of one of our veterans.

EL      When you were making the decision to terminate Ms. Lewen,
        did this enter into the picture at all?
EW2     No, absolutely not.

EL      Now C10 and C11 are reports from Department of Health. Can
        you tell me, when a person makes a complaint to the
        Department of Health are they typically done anonymously?
EW2     I never made a complaint to the Department of Health, so I
        don't know how the complainer makes the report. What I know
        is when the Department of Health comes in to investigate it
        is always anonymous.

EL      Did you see these prior to, these Exhibits prior to
        terminating Ms. Lewen on March the 14th, 2016?
EW2     These Exhibits themselves, no, I wrote the plan of
        corrections for these...

EL      Okay.
EW2     ...deficiencies.

EL      Did you have any idea that Ms. Lewen was the person who made
        the complaint?
EW2     No, absolutely not.

EL      Did Barry Blasic ever mention anything to you?
EW2     No, he did not.

EL      Nothing further.

R       Any questions for Ms. Raymond on that testimony, Ms. Lewen?
C       No.

R      Okay. Anything further at all from the Employer, Attorney
       Bushinski?

EL     Other than close, no.

R      Anything new from the Claimant, Ms. Lewen?
C      No.

R      Okay. I will allow both parties to make a brief closing
       statement to summarize their position here today. Because
       the Employer went first with testimony, we'll allow them to
       go last. Ms. Lewen, is there anything you'd like to state
       in closing today? It's not necessary, but you can if you'd
       like.

C      Just that I feel that my termination really didn't have much
       to do with Barry Blasic. I think it was an act of
       retaliation and that they used Barry Blasic as a pawn.

R      All right., Thank you. Attorney Bushinski, closing.
EL     Yes, ma'am.· I'll try to be brief. Referee Fisher, I
       recognize the sensitivity of some of the information coming

into the record here today. We have Nancy Lewen's Facebook
messages to Barry Blasic and I am sympathetic to her that,
you know, this has caused her a great deal of embarrassment
to have this kind of stuff come into the record. I don't
want to do this. I don't want to put this in the record. I
mean I don't have any desire to embarrass this woman. But
the fact is I had to put it in the record because it
establishes the case. And while it causes Ms. Lewen's
embarrassment and I regret that, there is not much that I
can really do about that. This case is pretty simple. You
have sexual harassment against Barry Blasic. All I ask you
to do is read the documents that we provided and read the
Facebook messages from Nancy Lewen. When you read those
Facebook messages you will see that she relentlessly pursued
Barry Blasic over a period, it was about from August of
2015, started off slower then, but you know, it really
picked up speed in January of 2016. It's all there. I mean
the importuning for the dates, the sexually suggestive
websites are referenced there and you have some of them from
the other Exhibit that Mr. Blasic had sponsored. It's clear
that she was pursuing this man. When it comes down to it
this case is a lot about unrequited love, you know. She
developed an attachment for Barry Blasic. It pains me to
say this in her presence here, but she developed an
attachment for this man and he, it was not returned. We
don't choose who we love or we don't love. Barry Blasic is
under no obligation to return her affections if he didn't
feel that way. And if you look at these messages, one of
the most remarkable things is what you don't see in these
messages. Barry Blasic conducted himself like a complete

gentleman during the course of this Facebook correspondence.
You will not see one message in there from him that reviles
her, calls her, you know, a name or anything like that. You
won't see anything at all bad for him. He simply tried to
deflect and tried to duck what she was doing. He didn't
want to get involved with her. And you know, that's nothing
bad against him. It's just the way it happens sometimes.
In January Ms. Lewen thought that he agreed to go on a date.
That wasn't what he agreed to at all in his mind, so he
stopped talking to her on Facebook. Later on he sat her
down at the Pennsylvania Soldiers' and Sailors' Home and
said look, we're not on the same page here. We're not on
the same sheet of music. I don't have this romantic
interest in you. Now, that should have been the end of it.
It really should have at that point in time. She should
have just backed off at that time and you know, licked her
wounds and just proceeded on from there. We can't choose to
make people love us if they don't want to love us. And she
should have recognized that, but she didn't. She persisted
after that. She kept sending him requests for dates. It's
all in here and I ask that you read it. She kept
importuning him for dates to the Cleveland Museum of Art,
the Falling Water, to the Serpent's Mound in Ohio. It's all
in there. And she kept sending him sexually suggestive
sites after he had told her I'm not interested. February
29th, Barry Blasic has enough. This stuff is getting to him.
You heard what he said that it was affecting him. It
affected his work. It affected him on a lot of different
levels, you know. He was concerned about his personal
safety. He decided to block her on Facebook on February 29th
of 2016. That enraged her. She was mad. You've heard her
testify that she was mad. She then in what I contend is a
spirit of petty revenge wrote a letter to Mrs. Blasic
because she couldn't attack Barry Blasic anymore. She
couldn't influence him. He didn't want to be bothered, so
she had to go after somebody vulnerable and she knew how to
do that because she had done it before to a previous lover
and it's all in here. So on February 29th, she writes this
horrible letter to Mrs. Blasic and she says things in there
that should never have been said. She is an experienced
woman. She is 50-years-old. She has married and divorced
three times. She knows the pain of divorce. She's
educated. She's got a great command of the English
language. I've very rarely seen a layperson have her
command of the English language. She is excellent. She
knew exactly what she was communicating when she
communicated to Mrs. Blasic. I ask you to read that letter
and I want you to use your own personal experiences in life.
You, too, have experience. You, too, know what, have
education and it's for you to decide when you read that

letter. Did she really have Mrs. Blasic's best interests at
heart by saying the things she did and the way she said
them? It's my position that she did not, that she did that
as an act of revenge. And when you think about the timeline
when she wrote it, it all becomes clear. She was mad at
Barry Blasic. She had to strike at one person that she
could strike at, so she struck at his wife. It was a
horrible thing for her to do. Sexual harassment is what
occurred between August and February 29th, out of work
conduct. She did this by means of her Facebook messaging.
It had, however, a nexus, a connection to work. It caused
this man, Barry Blasic, to feel anxiety, caused him to miss
work because of the nature of what she had sent, the
sexually suggestive materials, the importuning for dates,
the professions of love. And he tried to do the right thing
by her and say okay, I'm not interested. Now she makes much
of that, you know, that he basically could have gone and
gotten somebody else involved in the thing and tried to
smooth things over that way, but consider Mr. Blasic's
position. He is the one that's the victim of sexual
harassment. Most victims of sexual harassment, be they male
or female, really don't want to spread it around, spread the
language around. They don't want people to know. Barry
Blasic was not ever going to go and talk to his Supervisors
about this thing on an informal basis unless he absolutely
had to talk about it. And then after he read those emails
that she had sent and saw the email December 7th, when she
went out and threatened to get a gun and shoot somebody,
well, you know, he considered that his personal safety was
at risk. So you have the Section 3 act, which is what I'm
saying, the sexual harassment that occurred out of work that
had a connection to work. Then you have the workplace act,
which was her act of using her Commonwealth email system to
send him a tracking number saying see, Barry, I sent this
letter to your wife. There is nothing you can do about it.
She didn't actually say that, but...

C        (inaudible).

EL       ...words to that effect. And you know she used her
         Commonwealth resources to do that, to drive the final nail
         in his coffin. That is one of the acts that we contend is
         workplace violence, bullying, intimidating. Workplace
         violence isn't all just physical. It could be threats. It
         could be intimidation and that was an act of intimidation in
         furtherance of the sexual harassment act. It is also, I
         want to be clear on this why we contend she violated the
         Commonwealth's workplace or Commonwealth's Information
         Technology Usage Policy. The policy is there. Please read
         it. It says that they cannot be used, the IT resources
         cannot be used to harass or intimidate people. It's all in

the policy. And she used her Commonwealth IT resources to
intimidate him, you know. She sent that final nail, put the
final nail in his coffin by sending him that message. And
you heard his reaction to it all, you know. You saw that he
was upset by it. He testified that he was upset by it. You
saw what he submitted to somebody showing her excerpts and
how she, and he writes in there how he was upset by it.
Please read that and it will make sense. Now, in regard to
the threat of workplace violence, Ms. Lewen says she is not
a violent person. I beg to disagree. She likes to
threaten. She did that, if you look at the email on
December 7th, the PTSD email, she is clearly referring to
herself in there. But then look at the email she sent to
Ray Ham where she says that she was being sarcastic.
Sarcasm and joking don't come through on emails. Okay. We
got to go kind of what's in the printed word. And on one
email, December 7th, she says if somebody screams at me
again, a person with PTSD, go, you know, that person is
going to go out and get a gun and come and shoot the place
up. I'm paraphrasing. Other email she sends December 7th,
2016 to Barry Blasic, I told Ray Ham I'm going to kick his
ass if he does something. Ray Ham is her Supervisor. By
her own words she said that she threatened him. So that is
where the in, at work conduct comes into play. The evidence
comes from her own mouth. You've heard her agree that this
is a full and complete record of the messages, the Facebook
messages between us. There is no question about their
authenticity and even their admissibility. Those were her
words and her words are verbal acts, which are before you
and which you can see. Referee Fisher, again, it pains me
to bring in Ms. Lewen's personal life and expose it to the
public, to the people here in court, expose it to you, you
know. I know this has got to be horrible for her. And I'm
not saying that she is a bad person. For all I know she is
a very good person. But sometimes good people do bad
things. And what PSSH is saying is that in February and
March of 2016, and in December 2015, she made threats
against, you know, of workplace violence, she sexually
harassed Barry Blasic and she engaged in an act of
intimidation against him by writing that horrible, horrible
letter to his wife. I think that we've sustained our burden
of proof that her firing was based on misconduct and she
should be, her Appeal should be denied.

R      All right. Thank you. We'll go ahead and conclude the
       hearing at this point in time. I will review the testimony
       and evidence that's been presented, apply the law to the
       facts in this case and issue a written Decision. Like I
       said, you'll receive that in the mail within about a week or

NANCY E. LEWEN            16-09-C-6123                    65

so.  The time is 11:57 a.m. and the record for this hearing
is closed.  Thank you all for participating today.

I hereby certify that, to the best of my ability, the
foregoing is an accurate transcript of the testimony given
in the hearing held by the Referee in conjunction with the
above captioned case.

Pamela Hicks, Transcriber
DIAZ TRANSCRIPTION SERVICES
August 2, 2016