IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY E. LEWEN | : | Civil Action No. 1:17-cv-148 SBP |
| Plaintiff, | : | Judge Susan Paradise Baxter |
| | : | |
| v. | : | |
| | : | |
| BARBARA RAYMOND | : | |
| Defendant. | : | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

AND NOW, comes Defendant by and through her counsel who respectfully submit this Memorandum of Law in Support of her Motion for Summary Judgment.

## I.    INTRODUCTION

This case arises from a former Licensed Practical Nurse's (hereinafter "LPN") chagrin over her termination from Pennsylvania Soliders' and Sailors' Home (hereinafter "PSSH"). Nancy Lewen, Plaintiff, has sued Barbara Raymond, Commandant at PSSH, insisting her termination had nothing to do with her violations of Commonwealth of Pennsylvania and Department of Military and Veterans Affairs (hereinafter "DMVA") employee policies and everything to do with statements she made to the Pennsylvania Department of Health (hereinafter "DOH") and the Pennsylvania Office of Attorney General (hereinafter "OAG") along with corresponding Facebook messages.

This case plays out in Facebook messages and other documents written by Plaintiff. The record contains a complete written record of Plaintiff's sexual harassment, of her coworker Barry Blasic (hereinafter "Blasic") and other intimidating, threatening, and inappropriate conduct

towards other coworkers and her chain of command.  Ultimately, her conduct was so egregious, Defendant was left no choice but to end Plaintiff's employment.

Plaintiff's printed words provide the framework against which her alleged protected speech must be examined.  Despite her contentions in the complaint of sounding the alarm of elder abuse and neglect along with staffing issues at PSSH, it is evident from her writings in their entirety that her speech was used vindictively toward Defendant and other coworkers whom "disciplined" and instructed her on nursing practices.  The undisputed record establishes (1) Plaintiff's speech, in light of its content, form, and context, did not implicate a matter of public concern; (2) her speech was likely to cause and did in fact cause disruption at PSSH, and the Pickering balancing test accordingly "weighed in favor" of Defendant; and (3) Defendant would have pursued the same course of action even in in the absence of any protected activity.

Further, Plaintiff has produced no evidence corroborating any of her accusations in the Complaint.  She continues to speculate that Defendant knew of her alleged protected speech without offering any evidence to prove such.  Plaintiff's belief that she can say anything, couch it as protected speech, and avoid any consequence is simply incorrect.  Accordingly, Defendant now moves for summary judgment on all claims in the Complaint and incorporates the Defendant's Concise Statement of Undisputed Material Facts herein.

## II.   PROCEDURAL HISTORY

Plaintiff initiated a civil rights action by filing a Complaint on June 8, 2017 [ECF. No. 4]. Plaintiff subsequently filed an Amended Complaint [ECF. No. 25] and a Second Amended Complaint [ECF. No. 31]; the latter of which is the operative Complaint in this case.  A Motion to Dismiss was filed [ECF. No. 60] and an Order was entered [ECF. No. 68].  The motion was

denied as to Plaintiff's First Amendment freedom of speech and retaliation claims against Defendant; however all other claims were dismissed.  Id.  Defendant now moves for summary judgment on these remaining claims.

### III.    STANDARD OF REVIEW

The function of summary judgment is to avoid trial where it is unnecessary and would only cause delay and expense.  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. den'd, 429 U.S. 1038 (1977).  A summary judgment motion must be granted unless the plaintiff designates specific facts indicating a genuine issue of material fact for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Fed.R.Civ.P. 56; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).

"A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'"  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986)), cited in Wiest v. Tyco Elecs. Corp., No. 15-2034, 2016 WL 386088, F.3d (3d Cir. Feb. 2, 2016)

Evidence that is "merely colorable" or "not significantly probative" will not defeat the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).   "When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party," so long as the evidence "so favors" the movant that "no reasonable juror" could render a verdict against it. In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig., 683 F.3d 462, 471(3d Cir. 2012). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party" who

"must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Wiest, No. 2016 WL 386088, at *9 (3d Cir. Feb. 2, 2016) (quoting Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir.2006)). If the non-moving party fails to present evidence sufficient to establish an "element essential to that party's case, and on which that party will bear the burden of proof at trial", summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV.   ARGUMENT

A. First Amendment

Plaintiff brings claims against Defendant in her individual capacity for a violation of her First Amendment right to freedom of speech and for retaliation for her exercise of her free speech rights under the First Amendment.  Plaintiff contends that she engaged in various forms of protected speech, which fit into four broad categories:

1. Facebook Messages - Department of Health
2. Facebook Messages -Pennsylvania Attorney General's Office
3. Complaint to Pennsylvania Office of Attorney General
4. Plaintiff's Commonwealth Employee Witness Statement/EEOC Letter

Plaintiff has rested her case solely on assertions without more.  In contrast, the record fully supports Defendant's position, and as such, Plaintiff's claims must fail as a matter of law.

1. <u>Defendant Can Prove that Plaintiff Would Have Taken the Same Action Even if the Speech Had not Occurred.</u>

To frame Defendant's position, a logical place to start is to understand dynamics and personalities at PSSH. That is why it makes sense to first explain why Plaintiff was terminated from her nursing job.

To begin, Plaintiff and Blasic were co-workers and LPNs at PSSH.  (SMF at 12).  In August of 2015, Plaintiff friend requested Blasic on Facebook.  (SMF at 13).  They

communicated privately through Facebook messages.  (SMF at 14).  Plaintiff's messages to Blasic, at first, were innocuous and not sexually charged.  However, in October of 2015, Plaintiff made her first attempt to interest Blasic in an intimate relationship.  (SMF at 15).  A review of the Facebook messages show from October forward, Plaintiff importuned Blasic for dates, sent him links to sexually-explicit websites, made sexual advances by referencing her breasts and buttocks and favored sexual positions, suggested he should move in with her, described sexual experiences, and said on multiple occasions she loved him.  Id.

On January 9, 2016, Blasic, in person, confronted Plaintiff to let her know he was not interested in a relationship – he thought this would be enough.  (SMF at 20).  His last Facebook message to her was on January 16, 2016.  (SMF at 19).  Yet, despite these overtures, Plaintiff sent Blasic 154 Facebook messages from January 16, 2016 – February 29, 2016.  (SMF at 21).  Most of the Facebook messages were laden with sexual content.  It was on February 29, 2016 that Blasic reached out to Plaintiff to let her know that the one-sided relationship had become such a distraction he had no choice but to block her.  (SMF at 15, last message).

What resulted was Plaintiff composing a letter to Blasic's wife the very day he blocked her describing his "dangerous" online dating habits.  (SMF at 16, Exhibit 30).  Plaintiff did not know his wife and knew they were in a contentious divorce.  (SMF 24 and 25).  A copy of the letter was emailed to Blasic on March 1, 2016.  (SMF at 17, Exhibit 11).  On March 2, 2016, Plaintiff informed Blasic that she had mailed the letter to his wife.  Id.  This notice was done using her work email and sending it to Blasic's work email.  (SMF at 18).

The language used in the letter is illustrative that she used this letter to harass Blasic and his wife and stir up animosity between them.  This letter caused Blasic great anxiety, stress, and

interfered with his ability to work.  (SMF at 27).  On at least one occasion, the anxiety and discomfort was so great he requested to go home from work.  Id.

The letter to Blasic's wife was the impetus that began the investigation into Plaintiff. Specifically, Blasic shared the letter with a co-worker who alerted administration.  (SMF at 28). Defendant learned of the letter and contacted the Human Resource Analyst who is responsible for investigating allegations of misconduct.  (SMF at 44-47).  On March 7, 2016, Blasic wrote a statement outlining Plaintiff's sexual harassment and providing some of the Facebook messages. (SMF at 45, Exhibit 30).  He made clear to administration that after he told Plaintiff he did not want this, the harassment continued.  Id.

After opening this investigation, administration learned of two other alarming allegations. Specifically, on December 7, 2015, Plaintiff told Blasic "she had been yelled at by one of the supervisors and admitted to a second supervisor (Hamm) that she had a previous diagnosis with PTSD and that sometimes when people with PTSD are yelled at they might go out to their car and get a gun and return and shoot someome."  (SMF at 42, 43).  In February of 2016, administration learned Plaintiff was confronted about this statement and she confirmed that dayshift supervisors need to be careful "because anyone else could go to their vehicle and return with a gun and shoot them."  (SMF at 43).

They also learned that she engaged in a bizarre act of harassment and bullying toward Hamm.  On or about February 20, 2016, Hamm informed Plaintiff she was not in compliance with distribution of medication to her patients.  (SMF at 33).  As such, on February 21, 2016, Plaintiff handed Hamm an approximately four page gender discrimination complaint, containing serious allegations, that in her own words she knew Hamm could defend.  (SMF at 34-36).  She laughed in his face when he read the serious allegations and later laughed by herself recalling

Hamm's reaction. (SMF at 38). Hamm felt intimidated and bullied by the letter because he knew it was not true. (SMF at 39). Plaintiff also knew these allegations were not true because in a letter to the EEOC after her termination she stated that she was joking and it was a creative writing piece. (SMF at 40, 41).

The PDC hearing focused on these three serious issues that had come to the attention of Defendant. Plaintiff admitted that she had said and done all of these things but that she was being "informative," that she was not "intimidating," that "you have to know context," and that she did not think she acted "inappropriately." In fact, even in her complaint when referencing why she was fired she says "alleged egregious" conduct. Still to this day, Plaintiff adamantly believes her conduct was appropriate – "Defendants contend Plaintiff was terminated for the 'allegedly' egregious behavior." See Complaint, Paragraph 4.

This undisputed evidence shows that Defendant identified multiple legitimate reasons for Plaintiff's termination as set forth in her termination letter. (Exhibit 15). While at the time of Plaintiff's suspension/termination, Defendant was not aware of the entirety of Facebook messages that came to light after Plaintiff's termination, she had Blasic's statement where he provided Facebook messages illustrating Plaintiff's over the top flirting, sexual innuendos, and preferred sexual positions. Defendant also knew Blasic told Plaintiff "no" but the conduct not only continued but ramped up. Defendant, as Commandant, had a right to expect that Plaintiff should be able to work efficiently and cooperatively with other LPNs, including Blasic. But Plaintiff, by her actions towards Blasic, made it impossible for them to work together. Plaintiff's off-duty and on-duty conduct towards Blasic caused him a great deal of emotional stress and anxiety. In effect, Plaintiff diminished her own efficiency as an employee by making it impossible for her to work with another employee when necessary. The record is also clear it

impacted Blasic at work.  Blasic had to leave work early which undoubtedly affected PSSH's operations.  Presumably, it cost PSSH money because they would have paid him for sick leave.  Plaintiff's conduct caused rumors and other co-workers to ask Blasic what happened.  They also expressed concern for his personal safety and that of his ex-wife and children.  Further, as Plaintiff knew "sexual harassment is a violation of federal and state law and the Commonwealth Policy."  (SMF at 8).

Regarding Hamm, as Plaintiff's supervisor he should be able to provide medical guidance to ensure patients are properly cared for.  Simply correcting Plaintiff on the medication pass policy should not have triggered Plaintiff's response.  He felt intimidated and bullied by her when she handed him an accusatory letter she knew to be false.  Instead of taking care of patients and managing other nurses, Hamm's focus had to shift toward Plaintiff and the false accusations launched at him.  In this instance and when Plaintiff had threatened Hamm that if she ever was "bullied" that a person with PTSD could go to their car obtain a gun and shoot him and her up – Hamm first-hand witnessed Plaintiff's volatile reactions.

Notwithstanding the impact her conduct directly had on Blasic and Hamm, her conduct directly impacted PSSH as a whole.  Plaintiff on multiple occasions indicated that supervisors better be careful because anyone could obtain a gun in their car and shoot them.  This statement alarmed everyone she stated it to.  Hamm stated to Plaintiff that he was happy she did not take those actions.  (SMF at 43).  Blasic in rereading the communications felt a great deal of anxiety when he read her statement regarding workplace violence.  (SMF at 29).  To allow an employee, who suffers PTSD, who stood by this statement from December 7, 2015 through March 10, 2016, to continue to work as a nurse defies any common sense.  In this day in age where mass

shootings are regular headline news, Defendant only had one choice but to terminate Plaintiff because the alternative risked the safety and lives of others.

The undisputed evidence supports that each of the three allegations, standing alone, were sufficient to justify Plaintiff's termination.  To say Defendant did not have justification for firing Plaintiff would place Defendant in a Catch 22.  If Defendant did not fire Plaintiff, she opened the door to other lawsuits, for example, allowing sexual harassment in the workplace.  In addition, her conduct created such a hostile work environment it would be nearly impossible to work with or supervise Plaintiff because of her volatile and vindictive behavior.

The record reveals that Plaintiff's termination letter listed five workplace policy violations, all of which she had knowledge of.  (SMF at 61, 6).  Although all of Plaintiff's conduct plays out in black print that she authored, she continues to take no responsibility.  How can an employer keep an employee who takes no responsibility and is dismissive of egregious conduct?

 In sum, Defendant has produced adequate evidence that her termination would have resulted even if the alleged protected speech had not occurred.  Defendant had multiple legitimate other grounds justifying ending Plaintiff's employment.

2.  <u>Plaintiff Cannot Show Defendant Had Knowledge of her Alleged Protected Speech.</u>

Nothing of record connects consideration of Plaintiff's expression to Defendant's decision to end Plaintiff's employment.  Speech which the alleged retaliating party does not know about cannot support a retaliation claim.  <u>See</u>  <u>Ambrose</u> v. <u>Twp. of Robinson</u>, 303 F .3d 488, 493 (3d Cir. 2002)("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."); <u>Allen</u> v. <u>Iranon</u>, 283 F .3d 1070, 1076 (9th Cir. 2002) (holding in First

Amendment retaliation case that "[i]n order to retaliate against an employee for his speech, an employer must be aware of that speech.").

The speech Plaintiff alleges is protected occurred over Facebook messages with Blasic, an anonymous complaint to DOH, a complaint to OAG, and a letter she wrote about Hamm. The Facebook messages were private conversations with Blasic. The only Facebook conversations provided to Defendant were those included in Blasic's witness' statement which did not include any mention of DOH and OAG complaints. The undisputed record shows Brian Skinner, Human Resource Analyst, received messages from Blasic spanning "the last ten days or so". (SMF at 25). He received the Facebook messages on March 2, 2016. Plaintiff's Facebook messages referencing the complaints she made to DOH and OAG occurred on January 26, 2016, January 28, 2016, and February 2, 2016. Thus, a liberal reading "of ten days or so," shows he was not in possession of these specific messages. This is supported from Defendant's April 20, 2016 email, over a month after Plaintiff was terminated, when she wrote she had just learned Plaintiff had filed complaints with DOH and OAG. (SMF at 76). In fact, she went on to state that she had assumed it was the daughter of a patient who had made the anonymous complaint not Plaintiff. Id. Further a review of the State Civil Service Commission hearing shows that Plaintiff provided the entirety of the Facebook messages as an exhibit and stated the other side –meaning PSSH—did not have a complete set. (SMF at 78). And finally, Defendant, Blasic, Hamm, and other key employees to Plaintiff's termination, testified under oath that they had no knowledge Plaintiff made complaints to DOH and OAG prior to termination. (SMF at 73-77).

Plaintiff cannot make the argument that her name was disclosed during the inspection because the Affidavit of Susan Williamson, Director Division of Nursing Care Facilities at

DOH, asserted that the name of a complainant is confidential, unless they state otherwise – which Plaintiff did not.  (SMF at 80).  The name is not shared with the facility during the inspection and at no point in time is it public information.  Id.  As for Plaintiff's OAG complaint, she was interviewed by OAG in June of 2016 and Defendant was interviewed in August 2016 well after her termination.  (SMF at 23 and 24).

Plaintiff argues temporal proximity between her complaints and termination provide an adequate basis for the conclusion that this "whistleblower retaliation" for reporting elder abuse, elder neglect, and quality of care issues to DOH and OAG was the actual reason for her termination.  (ECF. 31, Page 3, Paragraph 5).  The Third Circuit recognized in Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir.2000), that suggestive timing is relevant to causation in Title VII retaliation cases.   In Rauser v. Horn, 241 F .3d 330, 334 (3d Cir. 2001) the Court held that an inmate's First Amendment retaliation case in support of the proposition that "suggestive temporal proximity" is a factor to establishing a causal link between protected conduct and retaliatory action.

> Furthermore, other courts of appeals have more explicitly recognized the relevance of temporal proximity in First Amendment retaliation cases. See Nethersole v. Bulger, 287 F.3d 15, 18 (1st Cir.2002); Gorman–Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554–55 (2d Cir.2001); Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1056 (6th Cir.2001), petition for cert. filed, 70 U.S.L.W. 3669 (U.S. Apr. 15, 2002) (No. 01–1548); Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir.2000); Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir.2002). But see Wagner v. Wheeler, 13 F.3d 86, 91 (4th Cir.1993); Butler v. City of Prairie Vill., 172 F.3d 736, 746 (10th Cir.1999).

Ambrose v. Township of Robinson, Pa., 303 F .3d 488, 494 (2002).

However, these cases listed above found temporal proximity to be relevant in establishing that protected activity was a substantial or motivating factor for retaliation. None of these cases indicate that temporal proximity can be used to establish that an employer was aware of

the protected conduct in the first place. Consequently, Plaintiff's "temporal proximity" argument does not establish Defendant's knowledge. Plaintiff's attempt to make this connection on temporal proximity alone is insufficient. She has offered no evidence on this point, and on this basis alone, the case should be dismissed.

3. Plaintiff's First Amendment Free Speech Claim Fails Because the Expressions were not a Matter of Public Concern.

Public employee's First Amendment rights are limited by the Government's countervailing interest in efficient workings of public services. DeRitis v. McGarrigle, 861 F .3d 444, 452 (3d Cir. 2017). A public employee's "speech is protected by the First Amendment only (1) if he spoke 'as a citizen (and not as an employee),' (2) if his speech involved 'a matter of public concern,' and (3) if his employer lacked an 'adequate justification' for treating him differently from the general public, based on a balancing of his and his employer's interests under Pickering v. Board of Education, 391 U.S. 563," (1968). DeRitis v. McGarrigle, 861 F .3d at 452 (reversing denial of summary judgment, Munroe v. Central Bucks Sch. Dist., 805 F .3d 454, 466 (3d Cir. 2015). Even if a public employee speaks on a matter of public concern, his speech is not protected unless the employee's interest in expressing himself on the matter outweighs the government's interest in promoting the efficiency of its public services. See Pickering v. Board of Education, 391 U.S. 563, 568 (1968). A Court must determine whether an employee's speech addresses a matter of public concern by the "content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-148 (1983). The Third Circuit Court of Appeals has stated that speech on a matter of public concern "generally addresses a social or political concern of the community" or "relate[s] to broad social or policy issues." Borden v. Sch. Dist. Of Twp. Of E. Brunswick, 523 F .3d 153, 169-170 (3d Cir. 2008).

However, speech expressing a personal grievance limited to the "day-to-day minutiae" of employment does not address a matter of public concern and does not benefit from First Amendment protection.  De Ritis v. McGarrigle, 861 F .3d 444, 455 (3d Cir. 2017).  Even if it "brush[es] … against a matter of public concern" by virtue of the employee's public employment,  speech that addresses only the employee's own problems expresses only a "personal grievance" and does not receive First Amendment protection.  Miller v. Clinton Cty., 544 F .3d 542, 551 (3d Cir. 2008).

As stated previously, Plaintiff's alleged protected speech fit into four categories.  The undisputed record reveals Plaintiff, while speaking as a citizen, was expressing a personal grievance limited to the "day-to-day minutiae" at PSSH specifically her dissatisfaction of management and her chain of command.

a.  Facebook Messages Concerning Anonymous DOH complaint

Plaintiff claims her private Facebook messages relating to her anonymous complaint to DOH were a form of protected free speech.  On January 26, 2016 in a Facebook message, from Plaintiff to Blasic she stated that "[t]hey plan to come in on dayshift hours this week and they don't expect to find an unlawful staffing shortage.  I did name names of where the quality of care problem lies, initials BR and NF."  (SMF at 65).  Then on January 28, 2016 in a Facebook message from Plaintiff to Blasic she stated, "I read the email from Tom B. about DOH coming in yesterday and not finding anything wrong yesterday.  I also just got the phone call from DOH inspector explaining how they didn't find anything wrong yesterday.  I didn't think that they would find anything wrong yesterday. It's going to be fun to sit back now and watch how this unfolds."  (SMF at 66).

Defendant acknowledges that quality care and staffing issues on their face are matters of public concern.  But that is not the standard in determining whether the speech is a matter of public importance.  These statements must be viewed in the context of the entire record.  In Miller the Court held, "[w]e cannot 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed.  Our inquiry must also consider the form and circumstance of the speech in question." Miller v. Clinton, 544 F .3d 542, 549 (2008).

Here, Plaintiff construes "public concern" too broadly.  Reviewing the cases where courts have found that speech implicates a matter of public concern reveals that Plaintiff's claims sound in quite a different key.  Precedent suggests that speech touches a matter of public concern if it "relate[s] to broad social or policy issues," Sanguigni v. Pittsburgh Bd. Of Public Educ., 968 F.2d 393, 397 (citing Rankin and Givhan); "implicate[s] the discharge of public responsibilities by an important government office, agency, or institution," Id. 397-398 (citing Connick and Pickering); "seeks to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials," Holder v. City of Allentown, 987 F .2d 188, 195 (3d Cir. 1993); or "relate[s] primarily to the way in which a government office [i]s serving the public." Sanguigni, 968 F .2d at 398 (citing Czurlanis).  Matters of public concern traditionally address official misconduct, abuse of office, neglect of official duties; by contrast, issues of personal workplace-related concern include complaints about workplace management and other issues "that are articulated solely because of their personal effect on the employee."  See Holder v. City of Allentown, 987 F .2d 188, 195 (3d Cir. 1993); Garcia, 438 Fed. Appx. At 703-704.  In sum, the content of these types of speech goes to the core of the First Amendment because they add to the debate on matters of public importance.

Plaintiff's statements on January 26, 2016 and January 28, 2016 did not address such high-minded issues of public importance.  First, the content of the speech are vague.  At the outset, it is unclear how Plaintiff can argue simply using the words "staffing shortage" and "quality of care problem" is a public concern when no inference can be drawn as to what this speech touches on, i.e. how can it be said that these Facebook messages <u>add</u> to the debate of matters of public importance when her speech is ambiguous.

That said, and more importantly, a review of the two Facebook messages together show that Plaintiff knew they would not find anything wrong which leads to the conclusion that she did not believe that the information she passed along was true.  She was also asked by an OAG Agent what laws or statutes she believes PSSH violated and she could not provide any.  In further support, Plaintiff had conversations with Blasic where she stated, "you're wrong about 'inadequate staffing' because they do provide 4.0 nursing hours per patient per day, when it is actually only required of them by law to provide 2.7 nursing hrs per patient per day."  (Exhibit 9, Page 47).  Thus, this speech cannot bring light to actual or potential wrongdoing because Plaintiff does not believe it.  Again, how can a statement <u>add</u> value to a debate when the speaker does not believe it to be true?

However, notwithstanding the above, when reviewing all of the Facebook messages, the content, form, and context of these two messages, show that this speech was a personal grievance and used in retaliation. The undisputed evidence shows Plaintiff was motivated by personal animus she had towards administration, including Defendant.  Plaintiff expressed that any discipline she ever received was at the hands of administration.  She confirmed these feelings on June 17, 2016, when she stated, administration responds to deficiencies cited by the Inspectors, as being the staff's fault and disciplines the staff.  (SMF at 66).  On December 7, 2015, Plaintiff

disclosed to Blasic that she was "up in arms" over the PDC she recently received and does not believe that PDCs should be given for state citations. (SMF at 81). She then received another PDC in January of 2016 where she received a written reprimand. (SMF at 83). From the record before the court, it is clear Plaintiff does not handle any sort of criticism well, and an inference can be drawn that this upset her based on her past reaction to her earlier PDC and her reaction to previous workplace constructive criticism and rejection.

Thus, it is clear Plaintiff had deep seeded animosity towards Defendant and her speech was used to air this personal grievance. Plaintiff expressed on multiple occasions that she disagreed with Defendant's management of the workplace, including staffing, PDCs, and sexual relationships of patients. Plaintiff has a history of vindictive conduct. For example, after Blasic's rejection she mailed a vindictive letter to his ex-wife; after a co-worker "yelled at her" she referenced getting a gun in the parking lot and shooting someone; and after Hamm corrected her passing of medication she wrote a letter with serious allegations against him. So even though she knew by her admissions that there was no founded basis for her allegations she was determined to raise an issue anyway and attach Defendant's name to it. Had she really cared about these issues, the chain of command should have been utilized. The Court has stated self-interest and animus may indicate the speech involves a private dispute rather than an issue of public concern. See Connick, 461 U.S. at 148 but, as was pointed out in Rode v. Dellarciprete, 845 F .2d 1195, "complete reliance on [the speaker's] motivation for speaking is inappropriate." Id. at 1201; see also Versarge v. Clinton, 984 F .2d 1359, 1365 (3d Cir. 1993)(motivation is only one factor to consider).

And finally, this speech occurred privately with a person she loved and wanted to have conversation with. These Facebook messages were restricted to the two of them; therefore, they

lack a "public mien".  <u>Compare</u> <u>Swineford</u> v. <u>Snyder Cty. Pa.</u>, 15 F .3d 1258 1272 (3d Cir.

1994)(characterizing complaints to commissioners, the press, and finally several investigatory

agencies as having a "public mien" and thus touching on matters of public concern

distinguishing complaints made only to a fellow staff members).

Based on the arguments above, when considering the statements content, context and

form, Plaintiff's speech was expression used to air her personal grievance towards Defendant.

Again, while Plaintiff's messages on their face appear to brush on a matter of public concern, it

does not convert her personal grievance into protected speech.

b. Facebook Messages Concerning Complaint Made to OAG

Plaintiff argues that the speech set forth in a Facebook message to Blasic on February 2,

2016 stating, "I filled out a Pennsylvania elder abuse complaint form and mailed it to Harrisburg

along with a two page typewritten factual letter. I didn't do it anonymously.  Even as I type this,

my complaint is in Harrisburg on its way to the Attorney General.   I strongly suspect that Barb

Raymond never did the mandatory reporting for the involuntary deviate sexual intercourse that

was committed against (name redacted) over a year ago.  There's a 12 year statute of

limitations."   (SMF at 64).

Defendant again concedes that this Facebook message on its face appears to address a

matter of public importance.  But again viewing the content, form and context of this speech

demonstrates that it was nothing more than frustration with management.  This Facebook

message references the complaint she made to OAG.  This complaint was investigated on June

17, 2016, when Plaintiff was questioned by a Special Agent from OAG.  (SMF at 66).  During

questioning, Plaintiff admitted the DOH complaint was the exact same complaint she filed with

OAG.  Id.  For the same reasons referenced in section a *supra*, how can a statement <u>add</u> value to a debate when the speaker does not believe it to be true?

In further support of this position, the analysis of Plaintiff's motivation by personal animus and the lack of "public mien" in section a *supra* are incorporated herein.

c. Complaint to OAG

The letter in its entirety demonstrates with clarity Plaintiff's frustration with management and workplace issues rather than touching on matters of public importance.  The framework outlined previously in section a *supra* set the stage for the complaint made to OAG and is incorporated herein.

Specifically, Plaintiff had a pre-disciplinary hearing on January 10, 2016, and on February 1, 2016, she wrote a complaint to OAG where Defendant's name appears three times in a two page letter, again showing her personal grievance with Defendant.  (SMF at 65, Exhibit 22).

Plaintiff's disagreement with policies regarding sexual relationships shines through the letter.  This is further supported by an email Plaintiff wrote where she described suggested intimacy policy guidelines at PSSH and indicated patients should have a dedicated room where they could have sexual encounters.  (SMF at 78).   However, despite what Plaintiff wanted, PSSH had a policy in place on how staff was to handle sexual relationships between residences and patients.  (SMF at 67).  Speech that expresses differing views of how a workplace should operate does not rise to the level of public concern.   In sum, the letter was intended to air her personal grievance with Defendant, and thus, should not be afforded First Amendment Protection.

d. Commonwealth Employee Witness Statement/EEOC Letter

Plaintiff saying that the letter she wrote pertaining to Hamm was protected speech does not make it so.  Calling the statement in the letter protected speech falsely captures the essence of what was written.  The facts pertaining to this particular speech mirror those in the <u>Miller</u> case.  In <u>Miller</u>, the Court considered whether a letter written by an adult probation officer to the president judge of the court rose to the level of constitutionally protected speech.  544 F .3d at 546-551.  The Court acknowledged that Miller's statements that the county probation office was being run ineffectively and that her supervisors called probation clients "scum" clearly referred to issues of public concern.  However, the statements must be viewed in context to the letter in its entirety.  The letter focused on Miller's private grievances as an employee and the statements about the office's ineffective operations and the supervisor's comments were collateral to the main points of her complaint.  <u>Id</u>.  She clearly stated her reason for writing – specifically she was up with her supervisor and could no longer work under her.  <u>Id</u>.  The minor references to an issue of public concern could not be read as anything other than a multi-facet personal gripe.

<u>Miller</u>, like Plaintiff, wrote a four paged typed written letter where her recent disdain for Hamm was on full display.  (SMF at 36, Exhibits 16, 20).  She was critical of Hamm and supervision as a whole, had conflicting opinions with operations and how PSSH should be run.  <u>Id</u>.  Plaintiff, like <u>Miller</u>, wrote a letter that when read in its entirety focused on her grievances with Hamm.  There is one section of the four paged typed letter that references Pennsylvania Assisted Living Regulations – Direct Care Staffing.  <u>Id</u>. at Page 3.  She stated that "[o]ne staff member should never be left alone on the unit for such an extended period of time, in my opinion…"  <u>Id</u>.  It is clear Plaintiff from this statement that she has a differing opinion about staffing then her superiors which goes to how PSSH operates, i.e. nothing more than day to day

minutiae.  However, even if this statement "brushed" on a matter of public importance it was collateral to the overall tone and purpose of the letter – to express her dissatisfaction with Hamm.

In addition, timing is important with this particular letter.  Plaintiff wrote it and handed it to Hamm a day after Hamm explained to Plaintiff the proper way to pass out medication. Again, Plaintiff was unable to handle instruction and reacted in a volatile way, by writing a letter with serious allegations that she knew were not true because she wanted to personally intimidate and harass Hamm.  She felt pleasure watching his reaction because she was getting back at him. As stated earlier, personal animus is a factor for the court to consider when evaluating the issue of public concern.

And finally, Plaintiff has stated multiple times that the letter was a joke and a creative writing style document.  (SMF at 41).  In Plaintiff's complaint she admitted again she was joking but that she raised safety and discrimination concerns, and thus, this is protected speech.  This statement is an incredulous statement to make and goes to her credibility.  We are supposed to extract what is real and what is a joke?  It is hard to imagine how the letter raises issues of public importance in light of all of the above.  For these reasons, the speech in this letter is not protected under the First Amendment.

4. <u>Even if Defendant did terminate Plaintiff based on her speech, such termination would have been legal and justifiable.</u>

Even assuming Plaintiff's version of events is correct – that she was terminated for exercising her First Amendment rights – she is still not entitled to recovery. Defendant has an interest in promoting efficiency of public services it performs to veterans and their spouses through its employees. <u>See</u> <u>Pickering</u> v. <u>Board of Education</u>, 319 U.S. 563, 568 (1968).  This has given rise to the <u>Pickering</u> test which holds that "[s]o long as employees are speaking as citizens

about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Where an employee demonstrates that his or her speech was the impetus behind an adverse employment action, the burden then shifts to the government -- here, to Defendants -- to "make a substantial showing of *likely* interference".  Jeffries v. Harleston, 52 F .3d 9, 13 (2d. Cir. 1995).

Employers have an interest in "promoting workplace efficiency and avoiding workplace disruption."  McGreevy v. Stroup, 413 F .3d 359, 363 (3d Cir. 2005).  The government need not show the existence of an actual disruption if it established that disruption is likely to occur because of the speech.  Id. at 992 & n. 7.   While the inquiry varies given the nature of the speech at issue, courts typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprise's regular operations.  See, e.g., id. at 991.  "The balancing we must undertake is fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest."  Miller, 544 F .3d at 548.

Here, it is beyond challenge Plaintiff's speech pertaining to DOH and OAG complaints, if considered a matter of public concern (which it is not), the weight of the statements were lacking given the context, content, and form.  When DOH conducted site visits, it required staff at the facility to comply with their requests on little to no notice.  (SMF at 79, Exhibit 28).  Specifically, PSSH staff had to pull a roster, provide information about patients, and turn over policies to DOH.  Id.  After conducting their visit, DOH met with the Administrator to review potential findings.  Id.  Depending on the complaint this process took the Administrators,

Director of Nursing, Assistant Director of Nursing, and other staff members away from day to day duties and patient care. Id. Thus, Plaintiff's speech pertaining to DOH, directly interfered with regular operations at PSSH on allegations she knew did not hold weight. In addition, DOH has an important responsibility to the public and it was a waste of their resources and time to investigate a complaint that Plaintiff knew was not substantial.

That said, the same holds true for her speech pertaining to the OAG complaint. While the investigation occurred subsequent to her termination, Defendant was on notice that a nurse made allegations against her. She was on notice that Plaintiff had referred her to OAG and she was being questioned by an agent. In place at PSSH was a chain of command to direct and issues or concerns. Yet instead of going through the chain of command, she went directly to the criminal division at OAG. While Plaintiff did not directly report to Defendant, Defendant oversaw all nurses and maintained order by ensuring laws, regulations, and policies were being followed. By taking the vindictive step of making a criminal report, it impaired the chain of command in place that was essential for all communications, most importantly those that ensured resident care in a timely fashion. (Exhibit 28, Paragraph 3).

That aside, Plaintiff's false allegations directed at Hamm caused him to be intimidated and bullied by someone he supervised. As Plaintiff's supervisor he should be able to provide medical guidance to ensure patients are properly cared for. Simply making a correction should not have triggered this response. Her conduct had a detrimental impact on a relationship she had with a supervisor and prevented him from supervising her.

Finally, when looking Plaintiff's speech in their entirety shows her speech had/has the potential for a detrimental impact on close working relationships. The undisputed record shows

that her chain of command did take the time to sit with her over issues, yet, she went to these extreme measures on matters with relatively low strength on the issue of public concern. Clearly, this speech when balanced against the employer's interest of effectively caring for residents weighs in favor of PSSH.

Plaintiff's job required significant public contact (i.e. with the residents), and thus Defendant's interest in curtailing speech that affected its operations was great. What she did was posed an unequivocal threat to the effective operations of PSSH, and any adverse employment action taken by Defendant was entirely justified.

5. Plaintiff has Failed to Demonstrate the Requisite Casual Nexus Between her Purportedly Protected Activity and Alleged Retaliation.

To state a First Amendment retaliation claim, a public employee must demonstrate (1) that the First Amendment protects his activity, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009). "The first factor is a question of law; the second factor is a question of fact." Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006). If the plaintiff satisfied these two elements, the burden shifts to the defendants to show that the same action would occur if the speech had not occurred. See Green v. Phila. Hous. Auth., 105 F .3d 882, 885 (3d Cir. 1997).

Even if Plaintiff's expressions were protected (which they are not – see supra Section 3 & 4), her First Amendment retaliation claim must fail because the evidentiary record shows, beyond challenge, that Plaintiff has not met her burden of showing causation. Her argument is premised on "facts" that are not supported in the record. Plaintiff makes much to do over the temporal proximity between her termination and the complaints she made to DOH and OAG and referenced in Facebook messages. However, she conveniently ignores that during this same time

period she violated the Commonwealth of Pennsylvania and DMVA employee policies that she had knowledge of and that violations could result in termination.  Specifically, she sexually harassed, intimidated, bullied, and threatened more than one co-worker and violated the IT acceptable use policy.  This behavior occurred on multiple dates over a significant time period. The conduct was alarming and egregious.  Yet, this is dismissed by Plaintiff as a cover up on Defendant's part.  The irony in this argument is these acts of sexual harassment, intimidation, bullying, and other violations occur in her Facebook messages that she has authenticated as accurate and complete.  They occur in emails that belong to her.  It is bold of her to say Defendant is hiding behind this and couching it a certain as a guise to get rid of her, when it is all there, and the seriousness of her conduct shines through.

Finally, as previously addressed above, Plaintiff's perception of her conduct as being "taken out of context", or "you have to know me", "I was being informative", that she was there to help Blasic, or that she was reporting serious violations of patient care are simply that of her perception and not facts.  The record makes clear that Blasic and Hamm did not share her sentiments.  In fact, it caused great stress and anxiety for Blasic that he was completely distracted by it.  Plaintiff cannot simply rely upon her personal perceptions to defeat Defendant's Motion, and yet she offers nothing more than that.  See Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F .3d 238, 252 (3rd Cir. 1999).  Having failed to produce any competent evidence of a casual nexus between her purportedly protected activity and Defendant's allegedly retaliatory actions, her claim fails as a matter of law.

## V.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Honorable Court grant their Motion for Summary Judgment and dismiss Plaintiff's Amended Complaint with prejudice.

Respectfully Submitted,

/s/Anna Zalewski
Deputy Attorney General
Mezzaine Level
1251 Waterfront Place
Pittsburgh, PA 1522
azalewski@attorneygeneral.gov

Dated: June 10, 2020                    *Counsel for Defendant*