# DEFENDANT - SMF

# EXHIBIT 8

BEFORE THE STATE CIVIL SERVICE
COMMISSION

\* \* \* \* \* \* \* \* \*

IN RE: NANCY E. LEWEN vs. DEPARTMENT

OF MILITARY VETERANS AFFAIRS

Appeal No. 28947

\* \* \* \* \* \* \* \*

BEFORE:      David Zurn,

Hearing Officer

HEARING:     Monday, June 13, 2016

9:33 a.m.

LOCATION:    Pennsylvania Soldiers' and

Sailors' Home

Conference Room, 2nd Floor

560 East Third Street

Erie, PA   16507

Reporter: Shannon C. Fortsch

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

```
1              A P P E A R A N C E S

2

3    NANCY LEWEN, PRO SE

4        FOR APPELLANT

5

6    STEPHEN J. BUSHINSKI, ESQUIRE

7    Office of Chief Counsel

8    Department of Military and Veterans

9    Affairs

10   Building 7-36

11   Fort Indiantown Gap

12   Annville, PA  17003-5002

13       COUNSEL FOR APPOINTING AUTHORITY

14

15   ALSO PRESENT:

16   DENISE STOVALL

17

18

19

20

21

22

23

24

25
```

3

1        INDEX TO COMMISSION EXHIBITS

2                    IDENTIFIED & ADMITTED

3    A    3/2/16 Letter                8

4    B    3/14/16 Letter               10

5    C    Appeal Request Form          10

6    D    5/5/16 Notice of Public

7         Hearing                      11

8    D-1  Appellant's UPS Proof

9         of Delivery                  12

10   D-2  Appointing Authority's

11        UPS Proof of Delivery        12

12   D-3  Notice of Public

13        Hearing                      13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    I N D E X   T O   W I T N E S S E S

2    DIRECT   CROSS   REDIRECT   RECROSS

3    FOR - APPOINTING

4    AUTHORITY:

5    Bryan

6    Bender    22      85      - - -        - - -

7    Barry

8    Blasic    88     121     132           - - -

9    Brian

10   Skinner  136     - - -    - - -        - - -

11   Raymond                              .

12   Hamm     147     162     - - -        - - -

13   Kathleen

14   Wilcox   172     179     - - -        - - -

15

16   FOR - APPELLANT:

17   None

18

19

20

21

22

23

24

25

5

INDEX TO EXHIBITS

IDENTIFIED   ADMITTED

FOR - APPOINTING

AUTHORITY:

1 - Facebook Posts            18       86

2 - 3/7/16 E-mails &

    Facebook Posts            35       86

3 - Standard of Conduct

    & Work Rules              45       86

4 - Governor's Office

    Prohibition of Sexual

    Harassment Executive

    Order                     46       86

5 - Governor's Office

    Sexual Harassment

    Management Directive 48            86

6 - DMVA Prohibition of

    Sexual Harassment    48            86

7 - DMVA Workplace Violence

    & Bullying Prevention

    Policy                    48       86

8 - Governor's Office

    Workplace Violence

    Management Directive 48            86

6

<u>INDEX TO EXHIBITS</u> (cont'd)

<u>IDENTIFIED</u>  <u>ADMITTED</u>

<u>FOR - APPOINTING</u>

<u>AUTHORITY:</u>

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 9 - | Governor's Office | | | |
| | IT Acceptable Use | | | |
| | Management | | | |
| | Directive | | 49 | 86 |
| 10 - | 2/6/16 E-mail | | 97 | 133 |
| 11 - | 3/2/16 E-mail | | 105 | 133 |
| 12 - | 3/2/16 E-mail | | 109 | 133 |
| 13 - | 12/15/15 Letter | | 138 | 146 |
| 14 - | 2/14/16 Written | | | |
| | Reprimand | | 138 | 146 |
| 15 - | Training Course | | | |
| | Log | | 141 | 146 |
| 16 - | Standard of | | | |
| | Conduct & Work | | | |
| | Rule Signature | | 140 | 146 |
| 17 - | IT Employee | | | |
| | Agreement | | 143 | 146 |
| 18 - | Ms. Lewen's | | | |
| | Written | | | |
| | Statement | | 151 | - - - |

7

1              INDEX TO EXHIBITS (cont'd)

2                        IDENTIFIED   ADMITTED

3    FOR - APPOINTING

4    AUTHORITY:

5    19 -  Commonwealth of

6          Pennsylvania

7          Witness

8          Statement        155        170

9    20 -  Ms. Lewen's

10         Facebook Page    176        188

11

12

13   FOR - APPELLANT:

14    1  - Facebook Posts    19          86*

15    2  - Dating Site

16         Profile          127        133

17

18

19

20

21

22

23

24

25    *Exhibit Not Attached

8

P R O C E E D I N G S

------------------------------------

HEARING OFFICER:

1  
2  
3           Good morning all.  My
4  name is David Zurn.  I'm a Hearing
5  Officer for the State Civil Service
6  Commission.  I'm a previous
7  Commissioner and I get my standing from
8  that.  So bear with me.  I don't have a
9  lot of these cases of late, so we'll
10 try to move this through as
11 expeditiously as possible.  We'll open
12 the hearing in the appeal of Nancy
13 Lewen versus the Department of Military
14 and Veterans Affairs.
15               (3/2/16 Letter --
16               produced, marked for
17               identification and
18               admitted into evidence as
19               Commission Exhibit A.)
20         HEARING OFFICER:
21               And the Commission will
22 put on as Commission Exhibit A a letter
23 dated March 2, 2016 addressed to Ms.
24 Lewen advising her of being suspended

9

1  pending investigation from her

2  permanent Civil Service licensed

3  practical nurse position at the

4  Pennsylvania Soldiers' and Sailors'

5  Home effective March 2 of 2016.

6          The letter goes on to

7  explain that in addition to the aspects

8  of returning her property and so on

9  that she not be permitted on the

10  grounds of Pennsylvania State ---

11  Pennsylvania Soldiers' and Sailors'

12  Home until explicit permission is

13  granted by the Commonwealth or human

14  resource officer.

15          The letter also goes on

16  to explain that Ms. Lewen has certain

17  rights and responsibilities under this

18  aspect including the right to appeal to

19  the State Civil Service Commission

20  signed by Barbara L. Raymond,

21  Commandant Pennsylvania Soldiers' and

22  Sailors' Home on behalf of the

23  Honorable Anthony J. Carrelli,

24  Brigadier General, Pennsylvania Air

25  National Guard, Acting Adjutant

10

1    General.

2                    (3/14/16 Letter --

3            produced, marked for

4            identification and

5            admitted into evidence as

6            Commission Exhibit B.)

7            HEARING OFFICER:

8            Commission Exhibit B is a

9    letter dated March 14, 2016 advising

10   Ms. Lewen that he is being --- she is

11   being terminated from her position as a

12   permanent Civil Service licensed LPN at

13   the Pennsylvania Soldiers' and Sailors'

14   Home.  Again, the letter goes on to

15   explain Ms. Lewen's rights and

16   responsibilities under this including

17   the aspect of the right to appeal this

18   to the State Civil Service Commission.

19                    (Appeal Request Form --

20           produced, marked for

21           identification and

22           admitted into evidence as

23           Commission Exhibit C.)

24           HEARING OFFICER:

25           Commission Exhibit C is

11

1    the appeal request form from Ms. Lewen

2    in which she appeals both her

3    suspension, her pending investigation

4    and her suspension, that she gets

5    reinstated to her position and

6    expungement of all records, which

7    includes full back pay.

8                    Ms. Lewen also states

9    some reasons claiming discrimination,

10   but there is not sufficient explanation

11   here that the Commissioners determine

12   that this Commission --- this hearing

13   will be heard under 951(a) only.

14                   (5/5/16 Notice of Public

15                   Hearing -- produced,

16                   marked for identification

17                   and admitted into

18                   evidence as Commission

19                   Exhibit D.)

20                   HEARING OFFICER:

21                   And Commission Exhibit D

22   is a notice of public hearing dated May

23   5, 2016, scheduling notice is sent to

24   Ms. Lewen and the Department of

25   Military and Veterans Affairs advising

12

1   both parties the hearing has been

2   scheduled for today's date, Monday,

3   June 13th, 9:30 a.m. here in the

4   Pennsylvania Soldiers' and Sailors'

5   Home, conference room on the second

6   floor.

7                    The issue to be heard are

8   Ms. Lewen's suspension pending

9   investigation and removal from her

10  position as a licensed practical nurse

11  regular status.   And the hearing will

12  be held under 951(a) where the burden

13  of proof rests with the Appointing

14  Authority.

15                    (Appellant's UPS Proof of

16                    Delivery -- produced,

17                    marked for identification

18                    and admitted into

19                    evidence as Commission

20                    Exhibit D-1.)

21          HEARING OFFICER:

22          Commission Exhibit D-1 is

23  a UPS proof of delivery to Ms. Lewen.

24                    (Appointing Authority's

25                    UPS Proof of Delivery --

Sargent's Court Reporting Service, Inc.
(814) 536-8908

13

1    produced, marked for

2    identification and

3    admitted into evidence as

4    Commission Exhibit D-2.)

5    HEARING OFFICER:

6        And Commission Exhibit

7    D-2 is a similar notice from UPS

8    advising the Veterans Affairs of

9    today's hearing.

10       (Notice of Public Hearing

11       -- produced, marked for

12       identification and

13       admitted into evidence as

14       Commission Exhibit D-3.)

15    HEARING OFFICER:

16        Commission Exhibit D-3 is

17    the required notice of public hearing

18    advising the public of today's hearing.

19    The Commission will recognize Steven J.

20    Bushinski.  I'll get that straight

21    sooner or later.  Bushinski, Esquire

22    representing the Department of Military

23    and Veterans Affairs.  And, Ms. Lewen,

24    you are representing yourself; is that

25    correct?

14

1    MS. LEWEN:

2    Right.

3    HEARING OFFICER:

4    The burden is under - - -

5    is for the Department of Military and

6    Veterans Affairs and as such we're

7    going to ask Mr. Bushinski to please

8    start his hearing.

9    ATTORNEY BUSHINSKI:

10   Thank you, Mr. Zurn.  Mr.

11   Zurn, before I get into the substantive

12   part of my hearing I would like to talk

13   to you about a possible joint exhibit

14   that Ms. Lewen and I would introduce.

15   Many of the allegations that were

16   lodged against Ms. Lewen, the evidence

17   was in the nature of posts on social

18   media site, Facebook.

19   And while I had several

20   of these posts they were provided to me

21   by one of my witnesses who will testify

22   today.  Ms. Lewen has pointed out that

23   the record was rather incomplete.  We

24   didn't have everything and she

25   expressed concerns that the posts that

Sargent's Court Reporting Service, Inc.
(814) 536-8908

15

1   I was able to provide would be taken

2   out of context and I agree with her.   I

3   mean, we need to have a complete and

4   full record.

5              So Ms. Lewen obligingly

6   printed out all Facebook posts that she

7   had in her conversations with the

8   witness whose name is Barry Blasic.

9   And she provided them to me and she

10  even numbered the pages and very ---

11  also provided numbers on the side to

12  --- so that we could make easy

13  reference to particular parts of the

14  Facebook posts.

15              So I've discussed this

16  with Ms. Lewen and I think that she

17  would probably be agreeable that we

18  enter the Facebook posts, the complete

19  record of them, as a joint exhibit.   I

20  believe that she will agree that they

21  are authentic, that they are complete.

22  She hasn't altered them in any way,

23  shape or form and they're best evidence

24  possible of Facebook posts.

25              MS. LEWEN:

16

1      Yes, I do.  That's what I

2  have here.  I mean, just in case you

3  hadn't, I brought them.

4           ATTORNEY BUSHINSKI:

5       So if that's agreeable

6  to ---.

7           HEARING OFFICER:

8       If it's agreeable to both

9  parties to bring it in in that form,

10 certainly the Commission will take it

11 in in that form.  And you want to mark

12 that as a joint exhibit?

13           ATTORNEY BUSHINSKI:

14      That's correct.  Let me

15 show it to Ms. Lewen first so she sees

16 that I'm showing --- I would be

17 entering the complete exhibit and I've

18 altered nothing as well because I copy

19 --- I haven't had a chance to go over

20 this with her at this --- prior to the

21 hearing.

22           MS. LEWEN:

23      Actually, what I'm not

24 seeing in your copy is the highlighted

25 parts where I had referenced

Sargent's Court Reporting Service, Inc.
(814) 536-8908

17

1    making ---.

2                    ATTORNEY BUSHINSKI:

3                    They didn't copy well.

4    You would actually see them if you

5    looked real close.  They're slightly

6    shaded, but during the hearing I'm sure

7    that you can, you know, point to them

8    directly and emphasize it yourself.

9    Simply put, yellow highlighting doesn't

10   copy well.

11                   MS. LEWEN:

12                   Yeah.  I had mine done by

13   Staples and it came out like this

14   (indicating), but it came out.

15                   ATTORNEY BUSHINSKI:

16                   Yes.  I prefer to

17   introduce mine because I don't want to

18   emphasize any particular part of the

19   Facebook posts and --- is that

20   agreeable?

21                   MS. LEWEN:

22                   As long as it's on there,

23   yeah.  Yes.

24                   ATTORNEY BUSHINSKI:

25                   I will represent that it

18

1  is complete in form that Ms. Lewen had

2  given to me.

3                MS. LEWEN:

4        I trust you.  I believe

5  you.

6                HEARING OFFICER:

7        All right.  Thank you.  I

8  appreciate it, Ms. Lewen, that you

9  agree to this.  Shall we mark that

10 Exhibit AA-1?

11               ATTORNEY BUSHINSKI:

12       AA-1?

13               HEARING OFFICER:

14       Yes.  And perhaps you are

15 going to bring this forth as your first

16 exhibit, Ms. Lewen?

17               MS. LEWEN:

18       Yes.  We had e-mailed

19 about ---.

20               HEARING OFFICER:

21       So then let's mark it

22 AA-1 and AP-1.

23               (Facebook Posts --

24       produced and marked for

25       identification as

Sargent's Court Reporting Service, Inc.
(814) 536-8908

19

1    Appointing Authority

2    Exhibit Number 1.)

3    (Facebook Posts --

4    produced and marked for

5    identification as

6    Appellant Exhibit Number

7    1.)

8    ATTORNEY BUSHINSKI:

9    And AP-1.

10   HEARING OFFICER:

11   Just that both parties

12   are agreeable to this exhibit.

13   ATTORNEY BUSHINSKI:

14   Very good.

15   HEARING OFFICER:

16   Okay.

17   ATTORNEY BUSHINSKI:

18   All right.  I'm just

19   going to mark this quickly so that I

20   can give Ms. Lewen a copy.

21   HEARING OFFICER:

22   It's a lot of hearsay.

23   As long as you agree on it being made a

24   part of the record we're going to put

25   it in.

20

**ATTORNEY BUSHINSKI:**

Here's your copy.

**MS. LEWEN:**

I had actually filed a motion to suppress this hearsay and they denied it. I have a copy of that here. The Commission denied it, but then --- .

**HEARING OFFICER:**

Well, this is agreeable between both parties and --- .

**MS. LEWEN:**

It's agreeable as long as a complete record is submitted.

**HEARING OFFICER:**

Exactly that, yes.

**ATTORNEY BUSHINSKI:**

Mark all of them like this AA-1 and AP-1. All right. I'll call my first witness, Mr. Bryan Bender.

**MR. BENDER:**

Sir, where would you like me to sit?

**HEARING OFFICER:**

21

1    I'm going to have you sit

2 up there, but I'm going to ask you to

3 stand for just a moment, Mr. Bender.

4 Would you raise your right hand, sir?

5 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6 BRYAN BENDER, HAVING FIRST BEEN DULY

7 SWORN, TESTIFIED AS FOLLOWS:

8 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9    HEARING OFFICER:

10    Thank you.  Please be

11 seated, Mr. Bender.  And for the

12 record, your name, spelling your last

13 name?

14 A.    My name is Bryan Bender,

15 B-R-Y-A-N, B-E-N-D-E-R.

16    HEARING OFFICER:

17    And, Mr. Bender, you're

18 employed by the State - - -?

19 A.    Yeah, Department of Military and

20 Veterans Affairs.

21    HEARING OFFICER:

22    Veterans Affairs, yes.

23 And your position, sir, is?

24 A.    I'm a HR Analyst 3.

25    HEARING OFFICER:

—

22

1    You're specifically here
2  at Soldiers' and Sailors' Home?
3  A.    No, I work out of Fort
4  Indiantown Gap in Annville,
5  Pennsylvania in our headquarters
6  office.
7          HEARING OFFICER:
8          Okay.  All right.  Thank
9  you, Mr. Bender.  And do you have a
10  working title?
11 A.    Labor Relations Analyst.
            HEARING OFFICER:
12          Okay.  Thank you.  You
13 may proceed, Mr. Bushinski.
14          ATTORNEY BUSHINSKI:
15          Thank you, Mr. Zurn.
16
17 DIRECT EXAMINATION
18 BY ATTORNEY BUSHINSKI:
19 Q.    Mr. Bender, let's talk briefly
20 about the duties of a Labor Relations
21 Analyst.  In the course of your duties
22 as a Labor Relations Analyst with the
23 Department of Military and Veterans
24 Affairs are you sometimes called upon
25 to investigate allegations of employee

23

1   misconduct?

2   A.      Yes.

3   Q.      Do you sometimes review

4   recommendations for the imposition of

5   discipline from the state veterans'

6   homes operated by the Department of

7   Military and Veterans Affairs?

8   A.      Yes, I do.

9   Q.      And do you also actually take

10  part in the decision making process as

11  to the imposition of discipline in

12  particular cases?

13  A.      Yes, I do.

14  Q.      Let's talk a little bit about

15  DMVA so the Commission knows exactly

16  the nature of our organization.  Is the

17  Department of Military and Veterans

18  Affairs an instrumentality of the

19  Commonwealth of Pennsylvania?

20  A.      Yes, it is.

21  Q.      And does DMVA --- which is the

22  acronym for Department of Military and

23  Veterans Affairs.  Does DMVA operate

24  veterans' homes in the Commonwealth of

25  Pennsylvania?

24

1    A.       Yes, six of them.

2    Q.       Are personnel who work at these

3    state veterans' homes, are they

4    considered to be employees of the

5    Commonwealth of Pennsylvania?

6    A.       They are.

7    Q.       And they're also considered to

8    be employees of that particular state

9    veterans' home?

10   A.       Yes.

11   Q.       All right.  So it's permissible

12   to say that or it's proper to say that

13   they're both DMVA employees and

14   employees of the state veterans' home?

15   A.       That would be correct.

16   Q.       And the Pennsylvania Soldiers'

17   and Sailors' Home where we are situated

18   now, that is a state veterans' home

19   operated by DMVA?

20   A.       Yes, it is.

21   Q.       Do you know when Nancy Lewen was

22   first hired at PSSH?

23   A.       I do not know the exact date,

24   but I want to say it was around

25   September of 2014.

25

1   Q.      And what was the position she

2   occupied at PSSH?

3   A.      It would be a licensed practical

4   nurse or LPN.

5   Q.      In March of 2016, did PSSH

6   contact you about allegations of

7   misconduct against Ms. Nancy Lewen?

8   A.      Yes, they did.

9   Q.      Who was it at PSSH that

10  contacted you about these allegations?

11  A.      It would have been the

12  Commandant, Barbara Raymond, and the HR

13  Analyst here, Brian Skinner.

14  Q.      Can you please describe for the

15  record what the allegations were ---

16  what allegations were made against Ms.

17  Lewen?  What did they say she did

18  wrong?

19  A.      Ms. Raymond had called both

20  myself and the chief of our division,

21  Kim Keiser (phonetic), and discussed an

22  incident that occurred between Ms.

23  Lewen and Mr. Blasic regarding an

24  e-mail that was sent to him during his

25  duty to his Commonwealth e-mail

26

1  regarding a tracking number of a letter

2  that was sent to his wife.

3  Q.      Let me interrupt you there.   You

4  said Mr. Blasic.   Who is Mr. Blasic?

5  A.      Mr. Blasic is a Commonwealth

6  employee of PSSH and DMVA.   He would

7  also be a licensed practical nurse here

8  at the home.

9  Q.      Can you continue?

10  A.      We discussed the investigation.

11  It was initially brought to our

12  attention through the e-mail that was

13  sent to him with the tracking number

14  and through that there was background

15  information provided and some open

16  discussion that brought the Facebook

17  messages and also private e-mails into

18  it.   Also a copy of the letter that was

19  sent to his wife.

20  Q.      Mr. Blasic's wife?

21  A.      Yeah, Mr. Blasic's wife.   It was

22  brought to our attention and read

23  thoroughly at the time as well.   That

24  was the initial conversation that

25  started the ball rolling for our whole

27

1    investigation.

2    Q.      Well, as a result of that

3    conversation did you find it necessary

4    to suspend Nancy Lewen from her job as

5    an LPN?

6    A.      Yes.  So on that particular day

7    it was decided that the severity of

8    everything that was going on and the

9    nature of the misconduct that was going

10   on between Ms. Lewen and a co-worker

11   warranted suspension pending

12   investigation so that we could further

13   look into these allegations.  And also

14   remove any potential conflicts for

15   hostile work environment from

16   continuing.

17   Q.      I believe this has already been

18   introduced by Mr. Zurn as Commission

19   Exhibit A, which is the March 2nd,

20   2016 ---.

21              HEARING OFFICER:

22              Excuse me.  You have

23   Appellant's copies, AP-1 and AA-1,

24   hanging up over there (indicating) and

25   I'd ---

28

1          ATTORNEY BUSHINSKI:

              Oh, I'm sorry.

2          HEARING OFFICER:

3               --- like to make sure

4 that we had one for the court reporter

5 and I would like to have one.

6          ATTORNEY BUSHINSKI:

7               Please send him the

8 original.

9          HEARING OFFICER:

10               Just got sort of stuck

11 there.  Okay?  I apologize.

12          ATTORNEY BUSHINSKI:

13               No problem, sir.  The

14 original down to Mr. Zurn and we'll get

15 you a copy for the Commission.

16          HEARING OFFICER:

17               So this is Commission

18 Exhibit A.  It's not necessary that

19 Commission ---.

20          ATTORNEY BUSHINSKI:

21               All right.

22          HEARING OFFICER:

23               And the court reporter

24 does have those.  Okay?  Commission

25

29

1   exhibits are all here.  You're free to

2   move them with the witness, that's

3   fine.

4                    ATTORNEY BUSHINSKI:

5                    Okay.

6   BY ATTORNEY BUSHINSKI:

7   Q.        Well, Mr. Bender, will you take

8   a moment to examine that document which

9   has been marked --- introduced as

10  Commission Exhibit Number A?

11  A.        Okay.

12  Q.        Now, is that the letter that you

13  sent to Ms. Lewen suspending her?

14  A.        Yes, this is the suspension

15  pending letter.

16  Q.        After PSSH suspended Ms. Lewen

17  did you continue to conduct an

18  investigation into the allegations

19  against her?

20  A.        Yes, that's correct.

21  Q.        And what actions did you take to

22  investigate the allegations?  What did

23  you do?

24  A.        Once we had the initial

25  conversation and we decided it was

1    appropriate to suspend pending
2    investigation, the investigation,
3    obviously, continued and that is when
4    we started going through the evidence
5    that was presented to us by Mr. Blasic.
6         And by going through that
7    evidence we determined different people
8    that we would have to talk to either
9    interview to gather more information.
10   We started looking into other
11   allegations.  There was something that
12   came forth throughout the investigation
13   also that was in regards to like a
14   harassment letter that was supposedly
15   written towards the supervisor.  So we
16   investigated that as well.
17        Then obviously going through the
18   different policies, looking at the
19   different policies that applied to this
20   particular incident, again, talking
21   with the police, looking at the
22   evidence, particularly the Facebook
23   posts, the e-mails, the letter to the
24   wife, the letter that was written
25   towards the supervisor.

31

1  Q.     And as far as Ms. Lewen's status

2  at this time she was under suspension?

3  A.     Yes, she was not permitted in

4  the facility at that time.

5  Q.     Is it typical to suspend

6  somebody under certain circumstances

7  such as this?

8  A.     Yes.  Yes, it is.  We would

9  typically suspend pending

10 investigation.  Any time that it

11 involves co-workers, especially hostile

12 work environment, workplace violence,

13 sexual harassment, resident abuse,

14 those types of situations.

15 Q.     So your act of suspending her

16 was by all means unusual?

17 A.     No, not at all.

18 Q.     Now, let me ask you this

19 question.  After you conducted your

20 investigation did you convene what is

21 called a PDC for Ms. Lewen?

22 A.     Yes.  And for the record a PDC

23 is an acronym that we use for a

24 pre-disciplinary conference.

25 Q.     What's the purpose of conducting

32

1   a PDC?

2   A.      A PDC is part of like the due

3   process and the just cause of an

4   employee.  What it is is when you're

5   conducting an investigation, obviously,

6   there is alleged actions or an accused

7   perpetrator.  The PDC is a chance to

8   have those questions answered, so the

9   questions that we have we are going to

10  then ask the accused or the alleged.

11          And it is also an opportunity

12  for them to present their side of the

13  story and provide anything that they

14  feel relevant at that time, you know,

15  to their case.

16  Q.      And is this a standard type of

17  practice at the PDC for these

18  circumstances?

19  A.      Yes, a PDC must always occur.

20  Q.      Did you conduct more than one

21  PDC with Ms. Lewen?

22  A.      We ended up reconvening the PDC.

23  The initial PDC would have been

24  conducted on March 7th and then it was

25  reconvened again on March 10th.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

33

1  Q.      Were you present for the PDCs?

2  A.      I was present via telephone.

3  Q.      Was Ms. Lewen entitled to union

4  representation at the PDC?

5  A.      Yes, she was.

6  Q.      Is that standard practice to

7  allow somebody who is accused of

8  misconduct to have union

9  representation?

10  A.      Someone who is represented by

11  the union, yes.

12  Q.      And was Ms. Lewen represented by

13  union?

14  A.      Yes, she was represented by

15  AFSCME.

16  Q.      Was her union representative

17  there?

18  A.      Yes.

19  Q.      At both PDCs?

20  A.      Yes.

21  Q.      What was the result of the first

22  PDC?  You said that was conducted on

23  March 7, 2016.  Did you investigate

24  further?

25  A.      Yes.  Based on the questions

34

1   that were asked, the answers that were

2   provided and any information that was

3   presented to us at that time, we

4   continued to look into the matters that

5   she brought to our attention.  Based on

6   some of the answers that were provided

7   to us, it actually led us to look down

8   different avenues of the investigation.

9           You know, some parts of the

10  investigation that we might have looked

11  at we looked into a little bit further.

12  I don't remember exact details of it,

13  but there might have actually been

14  different avenues that we went

15  completely leading us to reconvene the

16  PDC at a later date.

17  Q.      I'm going to show you an exhibit

18  as soon as Mrs. Stovall's done marking

19  it.  I'm showing you what I have had

20  marked as Appointing Authority ---.

21              HEARING OFFICER:

22          We have one for the court

23  reporter?

24              MS. STOVALL:

25          Absolutely.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

35

1    BY ATTORNEY BUSHINSKI:

2    Q.      I'm showing what I had marked as

3    Appointing Authority Exhibit Number 2.

4                   (3/7/16 E-mails &

5                   Facebook Posts --

6                   produced and marked for

7                   identification as

8                   Appointing Authority

9                   Exhibit Number 2.)

10   BY ATTORNEY BUSHINSKI:

11   Q.      Can you take a look at that

12   document?

13   WITNESS COMPLIES

14   A.      Okay.

15   BY ATTORNEY BUSHINSKI:

16   Q.      Did you see that document when

17   you were conducting your investigation

18   into the allegations against Ms. Lewen?

19   A.      Yes, this was actually something

20   that came out during the investigation.

21   It would have been around the same time

22   as the PDC.

23   Q.      And who provided that document

24   to PSSH?

25   A.      This would have been provided by

36

1    Mr. Barry Blasic.

2    Q.        And this document contains some

3    excerpts of Facebook posts from Ms.

4    Lewen to Mr. Blasic?

5    A.        That is correct.  It is his

6    typed wording or statement in the very

7    beginning at the top of page one and

8    also on the last page at the very

9    bottom that would be Mr. Blasic's

10   statement.  And then everything in

11   between looks to be excerpts from

12   Facebook posts or messages.

13   Q.        Now, is this how Mr. Blasic

14   initially complained to you of Ms.

15   Lewen's conduct?

16   A.        The initial was he came to us,

17   expressed everything to us.  I believe

18   he showed us a lot of the Facebook

19   posts, private e-mails, a letter to his

20   wife and then this was him putting it

21   in writing for us.

22   Q.        All right.  As a result of your

23   investigation after the March 7th, 2016

24   PDC, did you conclude that it was

25   necessary then to have a follow-up PDC?

37

1    A.       Yes.  Yes, we did.

2    Q.       And when did that take place?

3    A.       The follow-up took place three

4    days later.  It would have been March

5    10th of 2016.

6    Q.       Was Ms. Lewen present for a

7    second PDC?

8    A.       Yes, she was.

9    Q.       That's the one on March 10,

10   2016?

11   A.       Correct, sir.

12   Q.       And did she have union

13   representation at the second PDC?

14   A.       Yes.

15   Q.       After you got done conducting

16   the PDCs, the two PDCs, and you got

17   done conducting your investigation, did

18   you reach a conclusion as to whether

19   the allegations against Ms. Lewen had

20   any basis in fact?

21   A.       Yes.

22   Q.       What was your conclusion?

23   A.       Our conclusion that she was

24   definitely --- our conclusion was that

25   she was guilty of violations of the

38

1   sexual harassment, the workplace

2   violence, the IT user agreement.

3   Stemming from our own internal policies

4   also ranging to Commonwealth policy.

5   Q.      Did you discuss your conclusion

6   with the Commandant of PSSH, which is

7   Ms. Barbara Raymond?

8   A.      Yes, I did.

9   Q.      As Commandant, she's the head

10  person up here?

11  A.      Yes, she would be the person who

12  is in charge of this facility.

13  Q.      Did you discuss your conclusions

14  with any of your supervisors at the

15  Department of Military and Veterans

16  Affairs at Fort Indiantown Gap?

17  A.      Yes, I did.

18  Q.      When you were having these

19  discussions with Ms. Raymond and with

20  your supervisors at Fort Indiantown

21  Gap, was the level of discipline to

22  impose on Ms. Lewen discussed?

23  A.      Yes.

24  Q.      Did everyone agree that it was

25  appropriate to fire her?

39

1   A.      Yes, they did.

2   Q.      Mr. Bender, I want to talk to

3   you a little bit about progressive

4   discipline, the concept of progressive

5   discipline.  Are you familiar with the

6   concept of progressive discipline

7   insofar as it relates to employee ---

8   imposing discipline on employees?

9   A.      Yes.

10  Q.      What's meant by the term

11  progressive discipline?

12  A.      Progressive discipline just

13  shows that within the Commonwealth and

14  I mean, even outside of the

15  Commonwealth at some places, that there

16  is a progression that can be followed

17  when there are certain infractions.

18  For an example I would use something

19  basic like time and attendance.

20      If somebody has trouble coming

21  to work or they don't show up, being

22  late, that kind of thing, you know, you

23  start off with warning the employee and

24  work your way up through like an oral

25  reprimand, written reprimand.   And

40

1   there are also suspension levels; level

2   one being a suspension and level two

3   being a suspension with final warning

4   and then ultimately termination.

5   Q.    All right.  Is progressive

6   discipline something that must be

7   followed in every case?

8   A.    No, every case is different

9   based on the circumstances of every

10   case and also the egregiousness of the

11   infractions at hand determine what the

12   level of discipline starts at and where

13   it ends up, or whether or not you need

14   to follow progressive discipline.

15   Q.    Well, when you discuss the level

16   of discipline to impose on Ms. Lewen

17   with the Commandant and with your

18   supervisors at the Department of

19   Military and Veterans Affairs, was

20   there any discussion as to imposing a

21   lesser form of discipline on her, say,

22   like a suspension rather than a

23   termination?

24   A.    I'm not going to say that it

25   wasn't discussed because likely when

41

1  we're --- discussion when we're raising

2  to the level we're looking at

3  termination, especially based on the

4  particular incident at hand, we will

5  also always look at other levels of

6  discipline, too, until we come to a

7  conclusion of what we feel is the most

8  appropriate action.

9  Q.      All right.  So in Ms. Lewen's

10  case why were the lesser forms of

11  discipline suspension --- suspension,

12  suspension with a warning, why were

13  they rejected?

14  A.      It was based on the incident at

15  hand, the egregiousness of it, the fact

16  of the hostile work environment, the

17  harassment, the intimidation and

18  bullying.  You know, those things

19  coupled together it just --- it created

20  such a disturbance in the workplace

21  that we felt as a whole that it was

22  within our best interests to part ways.

23  Q.      So PSSH fired Ms. Lewen on March

24  14th of 2016?

25  A.      That is correct.

42

1    Q.        And how did they notify her that
2    she was fired?
3    A.        I wrote a letter and I would
4    send it out here to the home.  It is
5    reviewed and then signed by the
6    Commandant and then mailed to the
7    employee.
8    Q.        So she was notified by letter?
9    A.        Yes.
10                  ATTORNEY BUSHINSKI:
11              All right.  If I may have
12   a moment, sir.  I just want to make
13   sure that I'm not confusing anybody
14   with marking the same exhibit twice.  I
15   want to be able to show him --- Mr.
16   Zurn already has this.
17                  MS. STOVALL:
18              This was AA --- the joint
19   exhibit.
20                  ATTORNEY BUSHINSKI:
21              It's a joint exhibit, so
22   I think it's ---
23                  MS. STOVALL:
24              The Commission exhibit.
25                  ATTORNEY BUSHINSKI:

Sargent's Court Reporting Service, Inc.
(814) 536-8908

43

1   --- Commission Exhibit

2   Number ---.  I'm sorry.  It's

3   Commission's Exhibit Number, what, B?

4                    HEARING OFFICER:

5                    B.

6                    MS. STOVALL:

7                    Yeah.

8                    ATTORNEY BUSHINSKI:

9                    Marked as Commission's

10  Exhibit Number B.  Mr. Zurn already has

11  that.  I just want to be able to show

12  that to Ms. Lewen what I'm talking

13  about and also give it to Mr. Bender so

14  that he can identify that because we're

15  going to talk about policies there.

16  And so he's going to need to have that

17  in his hand.

18                    MS. STOVALL:

19                    Mr. Zurn get the original

20  again?

21                    ATTORNEY BUSHINSKI:

22                    He's got that.

23                    MS. STOVALL:

24                    He has that one.  Okay.

25  And would you like one?  Okay.  There's

1    one for you.

     ATTORNEY BUSHINSK

2    Okay.  Very good.   Thank

3

4    you.

5    MS. STOVALL:

     Very good.

6    ATTORNEY BUSHINSKI:

7    All right.

8

9    BY ATTORNEY BUSHINSKI:

10   Q.      Mr. Bender, would you take a

     moment to examine that letter which has

11   moment to examine that letter which has

12   been already introduced by Mr. Zurn

13   into the record as Commission's Exhibit

14   Number B.

15   A.      Okay.

16   Q.      Did you write that letter?

17   A.      Yes, sir, I did.

18   Q.      In the letter you were very

19   explicit as to why PSSH fired Ms.

20   Lewen.  You list I think seven policies

21   that PSSH accused Ms. Lewen of having

22   violated.  I believe those policies are

23   listed in the second full paragraph of

24   the letter?

25   A.      Yes, that is correct.

45

1   Q.      In your position as a Labor

2   Relations Analyst with the Department

3   of Military and Veterans Affairs are

4   you familiar with each of those

5   policies listed in the second paragraph

6   of the March 14th termination letter

7   introduced as Commission's Exhibit

8   Number B?

9   A.      Yes, I am.

10  Q.      Since DMVA has alleged that Ms.

11  Lewen violated these policies it's

12  going to be necessary to discuss each

13  of them briefly, so the first thing I'm

14  going to do though to try to speed

15  things up is to introduce --- have you

16  look at the policies and sponsor them

17  for the record.

18              ATTORNEY BUSHINSKI:

19              So mark this as the next

20  AA.

21              (Standards of Conduct &

22              Work Rules -- produced

23              and marked for

24              identification as

25              Appointing Authority

46

Exhibit Number 3.)

MS. STOVALL:

AA.    Okay.

ATTORNEY BUSHINSKI:

Mr. Zurn gets the

original one.  It's been awhile, Mr.

Zurn, since I did this as well, so

that's why I'm ---.

HEARING OFFICER:

Okay.   Fine.

ATTORNEY BUSHINSKI:

Now, mark this exhibit

next in order.

MS. STOVALL:

Four.

(Governor's Office

Prohibition of Sexual

Harassment Executive

Order -- produced and

marked for identification

as Appointing Authority

Exhibit Number 4.)

BY ATTORNEY BUSHINSKI:

Q.       While Ms. Stovall's marking

exhibits, Mr. Bender, what I'm going to

47

1    do is I'm going to hand you an exhibit

2    so that you can take the opportunity to

3    look at them and answer the questions

4    that I'm going to pose once everything

5    is marked and the copy's distributed.

6    A.      Okay.

7                    MS. STOVALL:

8            Mr. Zurn.  Any more?

9                    ATTORNEY BUSHINSKI:

10           That's it.

11                   MS. STOVALL:

12           Okay.

13   BY ATTORNEY BUSHINSKI:

14   Q.      Mr. Bender, I've handed you what

15   I had marked as Appointing Authority's

16   Exhibit Number 3, Appointing

17   Authority's Exhibit Number 4,

18   Appointing Authority's Exhibit Number

19   5, Appointing Authority's Exhibit

20   Number 6, Appointing Authority's

21   Exhibit Number 7, Appointing

22   Authority's Exhibit Number 8 and

23   Appointing Authority's Exhibit Number

24   9.

25                   (Governor's Office Sexual

Sargent's Court Reporting Service, Inc.
(814) 536-8908

48

1    Harassment Management

2    Directive -- produced and

3    marked for identification

4    as Appointing Authority

5    Exhibit Number 5.)

6    (DMVA Prohibition of

7    Sexual Harassment --

8    produced and marked for

9    identification as

10   Appointing Authority

     Exhibit Number 6.)

11   (DMVA Workplace Violence

12   & Bullying Prevention

13   Policy -- produced and

14   marked for identification

15   as Appointing Authority

16   Exhibit Number 7.)

17   (Governor's Office

18   Workplace Violence

19   Management Directive --

20   produced and marked for

21   identification as

22   Appointing Authority

23   Exhibit Number 8.)

24   (Governor's Office IT

25

49

1        Acceptable Use Management

2        Directive -- produced and

3        marked for identification

4        as Appointing Authority

5        Exhibit Number 9.)

6    BY ATTORNEY BUSHINSKI:

7    Q.      Do you have each of these

8    policies?

9    A.      Yes, sir.

10   Q.      Now, you had a period of time to

11   look over them while we were having

12   these documents marked, so I would like

13   to ask you in regard to Appointing

14   Authority's Exhibit Number 3 can you

15   please identify this document for the

16   record?

17   A.      Yes.  This is the current

18   Department of Military and Veterans

19   Affairs standard of conduct work rules.

20   Q.      Now, was this policy in effect

21   when Ms. Lewen was employed at

22   Pennsylvania Soldiers' and Sailors'

23   Home?

24   A.      Yes.

25   Q.      Looking at Appointing

50

1    Authority's Exhibit Number 4, can you
2    identify this document for the record?
3    A.      Yes.   This is the Commonwealth
4    of Pennsylvania's executive order on
5    the prohibition of sexual harassment in
6    the Commonwealth.
7    Q.      Going to the next document,
8    which is marked Appointing Authority's
9    Exhibit Number 5, can you identify this
10   document for the record?
11   A.      Yes.   This is the Commonwealth
12   of Pennsylvania management directive
13   also on the prohibition of sexual
14   harassment in Commonwealth work
15   settings.
16   Q.      Just so we're clear that's
17   management directive 505.30?
18   A.      That is correct.
19   Q.      Appointing Authority's Exhibit
20   Number 5.  Appointing Authority's
21   Exhibit Number 6, can you identify that
22   document for the record?
23   A.      Yeah.  This is the DMVA's policy
24   information memorandum on workplace
25   violence, workplace bullying prevention

51

1   policy.  And for the record, policy

2   information memorandum is shortened by

3   PIM if that helps you at all.

4   Q.      All right.  Are we on Appointing

5   Authority's Exhibit Number 6 or 7 with

6   that?

7   A.      I'm sorry.

8   Q.      Let's go back to Appointing

9   Authority's Exhibit Number 6.  I think

10  you got them out of order.  What is

11  Appointing Authority's Exhibit Number

12  6?

13  A.      This is the DMVA prohibition of

14  sexual harassment.

15  Q.      That's the policy for DMVA?

16  A.      Yes.

17  Q.      Now, Appointing Authority's

18  Exhibit Number 7, can you identify that

19  for the record?

20  A.      Yes, this would be the DMVA PIM

21  workplace violence and workplace

22  bullying prevention policy.

23  Q.      Appointing Authority's Exhibit

24  Number 8?

25  A.      This would be the Commonwealth

52

1  of Pennsylvania management directive

2  205.33 on workplace violence.

3  Q.    And Appointing Authority's

4  Exhibit Number 9?

5  A.    This is the Commonwealth of

6  Pennsylvania management directive

7  205.34.  It is the Commonwealth's

8  information technology acceptable use

9  policy.

10  Q.    All right.  In her capacity as a

11  Commonwealth of Pennsylvania employee,

12  an LPN at Pennsylvania Soldiers' and

13  Sailors' Home, was Nancy Lewen

14  obligated to comply with each of these

15  policies, which are introduced as

16  Appointing Authority's Exhibit Number 3

17  through Appointing Authority's Exhibit

18  Number 9?

19  A.    Yes, she would.

20  Q.    Were each of these policies in

21  effect at the Pennsylvania Soldiers'

22  and Sailors' Home at the time that

23  Nancy Lewen was employed by PSSH?

24  A.    Yes, they were.

25  Q.    Let's talk about the first

53

1    policy, the first document introduced,

2    which is Appointing Authority's Exhibit

3    Number 3.  Can you go to that document?

4    A.      Okay.

5    Q.      Now, this is the most general of

6    the policies that you listed in your

7    letter of March 14, 2016; correct?

8    A.      Yes.

9    Q.      Before we get into the specifics

10   of this policy, of the standards of

11   conduct and the work rules, I want to

12   refer you to the second paragraph of

13   the very first page of the standards of

14   conduct and work rules.  Are you there?

15   A.      Yes, sir.

16   Q.      Can you state briefly what

17   requirements of the language of the

18   second paragraph of the DMVA's

19   standards of conduct and work rules

20   imposes on the DMVA employees?

21   A.      Basically what --- that

22   paragraph breaks it down to the fact

23   that, you know, this does not limit

24   infractions to just this document and

25   that employees of the DMVA are also

54

1   subject to all Commonwealth policies as
2   well as internal policies of the DMVA.
3   Q.      So is it fair to state that this
4   policy imposes a requirement on DMVA
5   employees to obey all these other
6   policies that we have introduced today?
7   A.      Yes, that is correct.
8   Q.      Please refer to page four of the
9   DMVA standards of conduct and work
10  rules.
11  A.      Okay.
12  Q.      There's a section captioned
13  unauthorized behavior and there are
14  several prohibitions listed under that
15  section.  I'd like to ask you when you
16  made the decision to fire Ms. Lewen had
17  you considered Ms. Lewen violating
18  these prohibitions?  Let me talk about
19  them one at a time.  In regard to the
20  first prohibition, which in general
21  deals with workplace violence, do you
22  consider Ms. Lewen to have violated
23  this prohibition in any way?
24  A.      Yes.  Yes, I do.
25  Q.      Tell the Hearing Officer and the

1   Commission how you feel Ms.

2   violated that particular pr

3   A.        Well, the first proh

4   states any action which viol---

5   Department of Commonwealth workplace

6   violence policy.  Being that the

7   workplace violence policy is one of our

8   --- one of the items you have proposed

9   I'm sure we'll get into greater detail

10  of that, but it also goes on to say

11  including but not limited to bodily

12  harm, threatening, intimidating,

13  coercing or interfering with fellow

14  employees, supervisors, residents or

15  general public.

16          Throughout the investigation

17  this could, you know, take into account

18  the actions against Mr. Blasic both

19  inside and outside of work because even

20  the actions outside of work eventually

21  had led into the workplace.  A lot of

22  the conversations that were taking

23  place were in regards to work.

24          The actions that took place with

25  e-mail being sent to him, you know, had

1    a great effect.  It was considered
2    threatening; it was considered
3    intimidating.  It was also interfering
4    with that employee because it affected
5    his work.
6            There's also the fact that, you
7    know, her actions had created a hostile
8    work environment not just between her
9    and a co-worker, but the entire
10   workplace as a whole.
11   Q.      Well, let's talk about the
12   second prohibition, threatening,
13   intimidating and interfering with or
14   using abusive or profane language.  Is
15   it PSSH's position that Ms. Lewen
16   violated that prohibition as well?
17   A.      Yes.
18   Q.      And how did she do that?
19   A.      Again, it was the threatening
20   and intimidating nature of the
21   communications that were going back and
22   forth.  Well, I shouldn't even say back
23   and forth because the communication was
24   only going one direction.  It was
25   coming from Ms. Nancy Lewen going to

57

```
1    Mr. Barry Blasic.
2         You know, through the
3    investigation it was determined that
4    this was done in an effort to basically
5    retaliate against Mr. Blasic.  There
6    was certainly a motive here.  Ms. Lewen
7    was looking to date and I believe she
8    even made reference as far as to have a
9    relationship and maybe eventually
10   marrying Mr. Blasic.
11        It was our position that once
12   these communications got going both
13   ways that it had then became more of a
14   hostile conversation, which eventually
15   led to her taking action against Mr.
16   Blasic and using them to threaten and
17   intimidate.
18   Q.     Prohibition number ten prohibits
19   the reporting of false allegations or
20   statements; is that correct?
21   A.     Yes.
22   Q.     Now, is it PSSH's position that
23   Ms. Lewen violated prohibition number
24   ten?
25   A.     Yes.
```

58

1   Q.      How'd she do that?

2   A.      As I had stated earlier, during

3   our investigation it was determined

4   that there was --- I want to say it was

5   a letter that was written about her

6   supervisor, which would be Mr. Ray Hamm

7   if I'm correct.  In that document,

8   which she references in her Facebook

9   posts that --- her Facebook messages to

10  Mr. Blasic she talks about how she is

11  anticipating writing this and about how

12  she's going to add all these different

13  things in.

14          And then in turn she ends up

15  handing it over to Mr. Hamm and saying,

16  here, this is what I'm going to file

17  against you, read it.  Later in the

18  investigation through her own admission

19  she said that it was done as a joke or

20  that it was jokingly given to Mr. Hamm.

21  So that led us to make the

22  determination that the allegations were

23  not, indeed, true.

24  Q.      So basically this is for making

25  a false allegation of misconduct on the

59

1 part of another employee?

2 A.    Correct.

3 Q.    Let's refer to the last

4 prohibition, number 12, any acts of

5 retaliation against fellow employees,

6 supervisors, residents or the general

7 public.  Is it the position of the

8 Pennsylvania Soldiers' and Sailors'

9 Home that Ms. Lewen violated this

10 particular prohibition?

11 A.    Yes.

12 Q.    And how?

13 A.    Again, the retaliation.  Through

14 our investigation it was determined

15 that, you know, once Mr. Blasic had cut

16 off the communication tie or Ms. Lewen

17 got the message that he was not willing

18 to date her at that particular time,

19 that then led to acts of retaliation

20 against Mr. Blasic with a letter to his

21 wife, the e-mails that were sent to

22 him, the e-mail that was sent to his

23 Commonwealth e-mail with a tracking

24 number.

25        It is also our position that the

60

1   letter to Mr. Hamm in which she handed

2   him, which we feel is a means of

3   intimidation, was done in retaliation

4   as well because she was removed from a

5   unit.

6   Q.     All right.  Let's move on to the

7   next policy.  Appointing Authority's

8   Exhibit Number 4, executive order 2002-

9   4, prohibition of sexual harassment in

10   the Commonwealth.  Do you have that?

11   A.     Yes, sir.

12   Q.     All right.  Referring to

13   paragraph number two, subsection C,

14   which is I think on the second page.

15   Is it the position of the Pennsylvania

16   Soldiers' and Sailors' Home that Ms.

17   Lewen violated that particular

18   subsection of the executive order?

19   A.     Yes.  That section of the

20   executive order states such conduct has

21   the purpose or effect of unreasonably

22   interfering with an individual's work

23   performance or creating an intimidating

24   hostile or offensive work environment.

25   Q.     Now, when you're talking about

61

1  her violation of this particular

2  policy, this executive order, are we

3  talking about the sexual harassment of

4  Mr. Barry Blasic?

5  A.      Yes.

6  Q.      And Mr. Barry Blasic, that's a

7  fellow employee?

8  A.      Yes, Mr. Blasic is an LPN here

9  at the PSSH.

10  Q.      Explain to the Hearing Officer

11  and the Commission how did Ms. Lewen

12  violate this particular policy in

13  relation to Mr. Barry Blasic?

14  A.      Her actions on or about the

15  beginning of March when this was

16  brought to our attention towards Mr.

17  Blasic, again, were means of

18  intimidating him.  It affected his work

19  so much that I believe that he actually

20  had to go home after receiving some of

21  the communications from her.

22  Q.      That's intimidation, Mr. Bender.

23  What about sexual harassment?

24  A.      Well, it also creates a hostile

25  and offensive work environment because,

62

1  you know, Mr. Blasic has to work with

2  Ms. Lewen.

3  Q.      Well, what did she do?  What is

4  it that you allege she had done that

5  she sexually harassed Mr. Blasic is

6  what I'm asking?

7  A.      Oh, it would be --- I'm trying

8  to think of how ---.  She was seeking a

9  relationship with Mr. Blasic and, you

10 know, he did not reciprocate that.  And

11 then she then did these things in an

12 effort to get back at him.  Even the

13 context of the messages that were sent,

14 you know, they were sexually explicit.

15      The letter that was sent to the

16 wife, the e-mail that was sent to him,

17 it was all tied in due to the fact

18 that, you know, he was refusing to go

19 on a date.

20 Q.      All right.  Let's move on to the

21 next policy marked as Appointing

22 Authority's Exhibit Number 5.  Are you

23 there?

24 A.      Yes, sir.

25 Q.      And this is management directive

63

1  number 505.30, the prohibition of

2  sexual harassment in Commonwealth work

3  settings.  Is this really any different

4  than the executive order issued by the

5  Governor?

6  A.      No.  It's actually more of an

7  expansion of what the executive order

8  would be.  It goes into a little bit

9  greater detail.  Other than that, it

10 would maintain the same substance of

11 the executive order.

12 Q.      Now, is it PSSH's position that

13 Ms. Lewen violated the substance of

14 this management directive as well?

15 A.      Yes.

16 Q.      Let's go to the business of

17 workplace violence.  Oh, I'm sorry.  We

18 have one more sexual harassment policy.

19 Appointing Authority's Exhibit Number

20 6, prohibition of sexual harassment

21 dated February 12th, 2014.  And is that

22 the policy against sexual harassment

23 that's issued by the Department of

24 Military and Veterans Affairs?

25 A.      Yes, it is.

64

1   Q.      And is it PSSH's position that

2   Ms. Lewen violated that policy?

3   A.      Yes.

4   Q.      Again, by her treatment of Barry

5   Blasic?

6   A.      Correct.

7   Q.      So you have three sexual

8   harassment policies in here.

9   Essentially you have one that's an

10  executive order issued by the Governor

11  of the Commonwealth, you have a

12  management directive which is marked as

13  AA Number 5 and now you have a

14  prohibition of sexual harassment

15  Department of Military and Veterans

16  Affairs' policy which is marked as

17  AA-6?

18  A.      Correct.

19  Q.      And is it PSSH's position that

20  she violated each of these policies?

21  A.      Yes.

22  Q.      Basically by the same conduct

23  towards Barry Blasic?

24  A.      Yeah, it would all be the same

25  conduct.  All the policies kind of tie

65

1   off of one another.

2   Q.      Now, let's go into workplace

3   violence.  Let's talk about policy at

4   Appointing Authority's Exhibit Number

5   7.  That's the policy information

6   memorandum issued by the Department of

7   Military and Veterans Affairs dated

8   (sic) 09-008.  I'm going to invite your

9   attention to page two under the caption

10  --- under section caption inappropriate

11  workplace behavior.

12  A.      Okay.

13  Q.      Can you read that section into

14  the record, please?  It's very short.

15  A.      Inappropriate behavior includes

16  actions unacceptable for the workplace.

17  Inappropriate workplace behavior may

18  include attendance problems, decreased

19  productivity, inconsistent work

20  patterns, poor on the job

21  relationships, unusual/changed

22  behaviors, personal conflicts and

23  disruptive behavior and fighting.

24  Q.      Is it your position that Ms.

25  Lewen had violated the prohibitions of

66

1  this management directive, which is

2  marked as AA Number 7?

3  A.      Yes.

4  Q.      How?  How did she do that?

5  A.      Well, we have the disruptive

6  behavior.  While there was no fighting,

7  there was obviously very disruptive

8  behavior there because the

9  communication was being sent to Mr.

10 Blasic at work, which, again,

11 interrupted his day.  It took him off

12 the floor, eventually had him I believe

13 sent home or he went home under his own

14 wellbeing.

15         You had the personal conflicts,

16 the unusual or changed behavior, the

17 fact that, you know, you have a

18 co-worker now kind of lashing out at

19 another employee or another co-worker,

20 which then in turn leads to poor on the

21 job relationship.  Also, you know,

22 putting people in very tense

23 situations.  These people have to work

24 together.

25 Q.      Besides her actions towards Mr.

1   Barry Blasic, does PSSH cons[...]

2   actions towards anyone else v[...]

3   this management directive?

4   A.      Yeah.   This would also b[...]

5   into account with the situation [...]tween

6   Ms. Nancy Lewen and the supervisor, Mr.

7   Ray Hamm, again, stemming back from the

8   letter that was given to him by her

9   basically citing discrimination against

10  this very person.

11         She took it as far as to write

12  --- I believe it was a four-page

13  document of discrimination against a

14  supervisor, turns it over to the

15  supervisor and said, here, I want you

16  to read this.  And then even goes as

17  far as in her one-sided conversation

18  with Mr. Blasic to say that she found

19  herself giggling about it later in the

20  night with no witnesses.

21  Q.      Is it PSSH's position that the

22  document she provided to Mr. Hamm or

23  the complaint that she provided to him

24  were false?

25  A.      Yeah.   The investigation later

68

1  determined that the allegations made in
2  that letter were, indeed, not true.
3  Q.      I'd like to direct your
4  attention to the section captioned
5  bullying.  If you would, take a moment
6  to read that.
7  A.      Would you like me to read it out
8  loud?
9  Q.      Please.
10 A.      Okay.  Workplace bullying is
11 repeated, health-harming mistreatment,
12 verbal abuse or conduct which is
13 threatening, humiliating and/or
14 intimidating.  Bullying also includes
15 sabotage that interferes with work or
16 exploitation of a known physiological
17 (sic) or physical vulnerability.
18 Workplace bullying can lead to
19 instances of workplace violence.
20 Q.      Does PSSH consider that Ms.
21 Lewen engaged in an act of workplace
22 bullying at all?
23 A.      Yes.
24 Q.      And who was that directed
25 against?

69

1    A.      It would have been directed
2    towards the supervisor, Mr. Ray Hamm.
3    It could also be directed --- it was
4    actually determined it was also
5    directed towards Mr. Barry Blasic as
6    well.
7    Q.      In regard to Mr. Blasic, Ms.
8    Lewen's actions involving Mr. Blasic
9    involved to a great extent the posting
10   of messages on Facebook and the sending
11   of e-mails from her private account to
12   Mr. Blasic's private account; correct?
13   A.      Yes.
14   Q.      In other words, many of her
15   actions were from --- were off duty
16   conduct?
17   A.      Yeah, a lot of it was.
18   Q.      Well, I'd like to invite your
19   attention to the language in the
20   section captioned violence.  Does this
21   policy, this PIM 09-008, does that
22   discuss acts of workplace violence that
23   occurred away from the workplace?
24   A.      It does.  If I could draw your
25   attention down it looks like, I want to

70

1  say around the sixth line.  It says,

2  incidents of workplace violence may

3  occur at or away from the workplace.

4  Q.      So this policy encompasses

5  conduct that is --- that occurs away

6  from the facility as well as in the

7  facility.  Is that fair to say?

8  A.      Yes.

9  Q.      Very good.  Okay.  Thank you.

10  Let's move on to the next exhibit,

11  which is management directive number

12  205.33 marked as Appointing Authority's

13  Exhibit Number 8.  In making the

14  decision to fire Ms. Lewen did PSSH

15  consider that Ms. Lewen had violated

16  the provisions of management directive

17  205.33?

18  A.      Yes, we did.

19  Q.      I'd like to invite your

20  attention to page two of the management

21  directive, subparagraph C.

22  A.      Okay.

23  Q.      This is the subsection captioned

24  inappropriate workplace behavior?

25  A.      Correct.

71

1   Q.      Is it PSSH's position that Ms.

2   Lewen violated this particular

3   subsection of management directive

4   205.33?

5   A.      Yes, it is.

6   Q.      And in what way?

7   A.      It would be in the same way that

8   I just spoke to about the policy

9   information memorandum.  Again, the

10  unusual change in behavior, the

11  personal conflict or on the job

12  relationships and the substantive

13  behavior.

14  Q.      All right.  Let's talk about the

15  subsection marked violence.  Take a

16  moment to review that.  PSSH isn't

17  saying that Ms. Lewen actually

18  committed an act of physical violence

19  against anybody; is that correct?

20  A.      No, it's not.

21  Q.      What is PSSH saying in regard to

22  this subsection?

23  A.      This would be further into the

24  sentence there where it cites the

25  emotional harm to an individual or the

72

1   threat of such harm to individual or

2   the property.  Again, you know, there

3   was great emotional harm dealt to Mr.

4   Blasic through this whole thing.  Also

5   to the supervisor, Mr. Ray Hamm, and

6   also through her comments that were

7   made.

8          So prior to the PDC and during

9   the PDC and then even after the PDCs

10  had been concluded threatening

11  workplace violence to not just a

12  person, but the entire facility.  And

13  if I remember correctly there were ---

14  during the PDC or ---.

15         I want to say it was during the

16  PDC she even went as far as to say

17  that, you know, I pray for PSSH, I fear

18  that there may one day be bloodshed at

19  PSSH.  Just very off color remarks.

20  There were comments that were made both

21  in a message, in an e-mail and it was

22  also made in person to the director of

23  nursing who would be Ms. Kathy Wilcox

24  in reference to someone going out to

25  their car in the parking lot, getting a

73

1  gun, coming back in here and shooting

2  somebody.

3       These comments were made

4  multiple times, which led to great fear

5  within the facility, not just with the

6  workers but also with the management.

7  Q.     All right.  Let's talk about the

8  last policy, which is marked as

9  Appointing Authority's Exhibit Number

10  9.  This is management directive 205.34

11  and it is the Commonwealth of

12  Pennsylvania information technology

13  acceptable use policy.  Now, let me ask

14  you this.  Did PSSH fire Nancy Lewen

15  for surfing the internet?

16  A.     No.

17  Q.     It was something more serious;

18  correct?

19  A.     Yes.  The IT policy is just a

20  portion of the investigation.

21  Q.     Now, this policy's a little

22  confusing, okay, so --- because there's

23  actually two things tacked onto it.

24  There is the initial management

25  directive, which goes from page one

74

1    through six, and then I don't know
2    exactly how this works, but then
3    there's another section that starts
4    after page six that's captioned
5    Commonwealth acceptable use standards
6    for information technology IT
7    resources.   Are you there, please?
8    A.       Yes.
9    Q.       All right.
10   A.       If I can clear it up just for
11   the record.   What it is is there's the
12   management directive and within the
13   Commonwealth the management directives
14   sometimes have what they call
15   attachments or enclosures much like our
16   internal policies do.   This would be
17   considered the first enclosure attached
18   to this particular management
19   directive.
20   Q.       All right.   Inviting your
21   attention to page two of this second
22   section, subparagraph E.
23                    HEARING OFFICER:
24             I'm sorry, Mr. Bushinski.
25   I'm having difficulty.

75

1    ATTORNEY BUSHINSKI:

2    Okay.

3    MS. STOVALL:

4    In about here

5    (indicating).

6    A.    Yeah.  The first six pages are

7    the actual policy and then ---.

8    MS. STOVALL:

9    Yeah, after page six

10   you'll see page one of nine and it's

11   right --- it's attached.  You know,

12   it's a little ---.

13   HEARING OFFICER:

14   Page one and page two?

15   MS. STOVALL:

16   Do you want me to find it

17   for you?  Here, I'll show you.

18   ATTORNEY BUSHINSKI:

19   Inexplicably, Mr. Zurn,

20   for some reason the --- instead of

21   going --- continuing on after page six

22   they decided ---.

23   HEARING OFFICER:

24   Thank you.

25   ATTORNEY BUSHINSKI:

76

1        I don't quite understand

2   it.

3        HEARING OFFICER:

4        Thank you very much.

5        MS. STOVALL:

6        You're welcome.

7        HEARING OFFICER:

8        There's another page one

9   of one, too.

10  A.      Yeah, there's two --- it can be

11  a confusing policy.  There's two

12  attachments to it.

13  BY ATTORNEY BUSHINSKI:

14  Q.      Okay.  So, just so we make sure

15  it's clear for the record, going to

16  page two of the second section,

17  subparagraph E, are you there?

18  A.      Yes, sir.

19  Q.      Can you please read that for the

20  record --- read that into the record

21  because it's very brief.

22  A.      All right.  Authorized users may

23  not purposely engage in activity that

24  may harass, threaten or abuse others,

25  degrade the performance of IT

77

1   resources, deprive an authorized user

2   of access to an IT resource or obtain

3   extra IT resources beyond those

4   allocated or circumvent the IT resource

5   security measures.

6   Q.      So that Mr. Zurn and the

7   Commission is clear, tell Mr. Zurn and

8   the Commission exactly what --- how

9   PSSH considers that Ms. Lewen violated

10  this subsection.

11  A.      This would have been done

12  through the e-mail that was sent from

13  her e-mail to Mr. Blasic's Commonwealth

14  e-mail.

15  Q.      Her e-mail?  Her work e-mail or

16  her private e-mail?

17  A.      I want to say to the best of my

18  recollection it would be her workplace

19  e-mail to his workplace e-mail.

20  Q.      And what did that e-mail

21  contain?

22  A.      This would have been the e-mail

23  that was sent to Mr. Blasic telling him

24  that the letter had been sent to his

25  wife and it provided a tracking number

78

1  for him to go and look at it.

2  Q.      All right.  So the letter, which

3  will be discussed later, is a letter to

4  Mr. Blasic's wife, was sent by Ms.

5  Lewen?

6  A.      Yes, it was a letter that was

7  sent by Ms. Lewen.

8  Q.      And she used her Commonwealth

9  e-mail resources to tell him that she

10 sent that letter to his wife?

11 A.      Yes.

12 Q.      And that's what we're saying ---

13 that's why we're saying --- you're

14 saying that the PSSH is saying that she

15 violated this policy because of that?

16 A.      Yes, because in the

17 investigation it was determined that

18 this was done in a harassing or

19 threatening manner.

20 Q.      So let's get off the subject of

21 policies and talk about Ms. Lewen's

22 whistleblower claim.  Now, in her

23 appeal she said that PSSH discriminated

24 against her and that PSSH didn't have

25 just cause to terminate her, and also

1    that PSSH fired her because she
2    made a whistleblower law claim.
3             She's basically saying that she
4    made a complaint to a government agency
5    and PSSH found out about that and
6    that's why they fired her.  That's what
7    a whistleblower law complaint is all
8    about.
9    A.       Okay.
10   Q.       Now, during the period that you
11   were investigating the allegations
12   against Ms. Lewen from March 2nd, 2016
13   through March 24th, 2016, were you
14   aware that she had made complaints of
15   resident abuse or resident neglect to
16   the Commonwealth of Pennsylvania
17   Department of Health?
18   A.       No, not during our
19   investigation.
20   Q.       Did you know that prior to her
21   being fired?
22   A.       No.
23   Q.       Did you know that she had made a
24   complaint to the Commonwealth of
25   Pennsylvania Office of the Attorney

1   General?

2   A.      No, I did not know that.

3   Q.      So we're clear for the record,

4   let me restate that.  Did you know

5   prior to March 14th of 2016, the date

6   that Ms. Lewen was fired, that she had

7   made a complaint to the Commonwealth of

8   Pennsylvania Office of Attorney

9   General?

10  A.      No.

11  Q.      When making the decision to ---

12  as to what level of discipline to

13  impose upon her, was there --- did

14  Barbara Raymond state that Ms. Lewen

15  had made a complaint to the Department

16  of Health or to the Commonwealth of

17  Pennsylvania, Office of Attorney

18  General?

19  A.      No, she did not.

20  Q.      Did anyone make any such

21  statement, that she had made a

22  complaint to the Department of Health

23  or the Office of Attorney General?

24  A.      No, nobody did.

25  Q.      All right.  I want to direct

81

1   your attention back to the March 10th,

2   2000 (sic) PDC.  I want to ask you some

3   additional questions about this PDC.

4   Now, during the PDC that you conducted

5   on March 10th, 2016, did you

6   specifically ask Nancy Ms. Lewen

7   whether she had mentioned something

8   about going out and getting a gun and

9   shooting people at PSSH?

10  A.      Yes.  Yes, I did.

11  Q.      Did she admit to you that she

12  had made such a statement?

13  A.      Yes.

14  Q.      Can you remember her exact words

15  for the Commission and for Mr. Zurn?

16  A.      She had made reference to

17  herself as being someone diagnosed with

18  PTSD and she stated that --- I believe

19  it was another supervisor was yelling

20  at her when she went into the office

21  and she stated that you need to be

22  careful who you yell at because when

23  you yell at someone with PTSD that

24  person may very well go out to the car,

25  get a gun and come back in and shoot

82

1  him and her.

2  Q.      Was it clear to you that she was

3  talking of herself?

4  A.      As she referenced herself as a

5  person with PTSD within the same

6  sentence, yes, it was.

7  Q.      Did this statement cause you any

8  sort of concern?

9  A.      It caused me great concern.

10  Q.      Why?  What was the concern?

11  A.      Well, because, you know,

12  especially me not being here at the

13  facility I'm conducting these

14  investigations by phone.  So, you know,

15  that's the whole reason of us having a

16  central office.  It detaches us from

17  having, you know, knowledge of the

18  employee, which leads us to give like a

19  non-biased opinion when we're doing

20  these types of investigations.

21           Well, not knowing this person,

22  hearing these comments caused great

23  concern especially with all the

24  different things that you see in the

25  news, you hear about, you know, the

83

1    different protocols that we have in

2    place now.  And let's face it, today's

3    day and age it is a very serious

4    allegation.

5            This immediately caused great

6    concern for not just me, but the home

7    and the staff that I work with as well,

8    like, okay, is this woman capable of

9    inflicting any type of harm to not only

10   someone here, but also herself?

11   Q.      Let me go back to the March 7th

12   PDC, March 7th, 2016.  I want to ask

13   you a couple of questions about the

14   matter involving Mr. Ray Hamm.  Now,

15   during the course of that PDC, did you

16   tell Ms. Lewen that her actions

17   involving Mr. Ray Hamm, which she had

18   provided him with a complaint that she

19   alleges she was going to file, did you

20   tell her her actions were

21   inappropriate?

22   A.      Yes, we did.

23   Q.      How did she respond to that?

24   A.      She did not feel it was

25   inappropriate.  She just said, well, I

84

1   was just bringing it to his attention.

2   To which, you know, I responded --- and

3   also there were other people in the PDC

4   as well.  I know Ms. Kim Keiser was in

5   it who is one of my supervisors.

6          We both had questioned her then

7   on, you know, that is not like your

8   typical procedure for doing something

9   like this.  If you have a complaint you

10  may go talk to your supervisor or

11  something like that, but someone does

12  not typically write a four-page

13  discrimination complaint and then go

14  and hand it to somebody who they're

15  allegedly going to file it on.

16  Q.        At some point in time during

17  that conversation did Ms. Lewen state

18  to you that she did not sign the

19  discrimination complaint?

20  A.        Correct.  Yeah.  She made

21  reference when we brought it up that it

22  was inappropriate the way that she

23  handled it.  Her response to it was,

24  well, I never signed it anyway, so we

25  talked about it.

85

1    ATTORNEY BUSHINSKI:

2         All right.   Thank you.

3  No further questions, Mr. Zurn.

4    HEARING OFFICER:

5         Ms. Lewen, do you have

6  some questions of Mr. Bender?

7  CROSS EXAMINATION

8  BY MS. LEWEN:

9  Q.        I don't have prepared questions,

10  but you're saying that on --- in these

11  Facebook messages you definitely were

12  not aware of all of the content of it;

13  right?

14  A.        Initially no.  We were made

15  aware of them later.

16    MS. LEWEN:

17         Okay.  I don't ---.

18    HEARING OFFICER:

19         Okay.  Thank you very

20  much.

21    ATTORNEY BUSHINSKI:

22         All right.  Thank you,

23  Mr. Bender.

24    HEARING OFFICER:

25         Thank you, Mr. Bender.

86

1   Before we go, we have Joint Exhibit

2   AA-1 and AP-1 and we're going to enter

3   that as a part of the record.  You've

4   introduced a number of documents here,

5   Mr. Bushinski.  You do want those made

6   a part of the record?

                    ATTORNEY BUSHINSKI:

7

8        Yes, I move for their

9   admission into the record.

                    HEARING OFFICER:

10

11        Any objection, Ms. Lewen?

                    MS. LEWEN:

12

13        No.

                    HEARING OFFICER:

14

15        Made a part of the

16   record.  Thank you very much.  Thank

17   you, Mr. Bender.

                    ATTORNEY BUSHINSKI:

18

19        I call my next witness,

20   Mr. Barry Blasic.

                    HEARING OFFICER:

21

22        Good morning, Mr. Blasic.

23   I want you to stand for a moment,

24   please, and raise your right hand.

25   - - - - - - - - - - - - - - - - - - - - - - - -

87

1  BARRY BLASIC, HAVING FIRST BEEN DULY

2  SWORN, TESTIFIED AS FOLLOWS:

3  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4             HEARING OFFICER:

5             Thank you.  Please be

6  seated, Mr. Blasic.  And for the record

7  your name, spelling your last name.

8  A.      Barry Blasic, B-L-A-S-I-C.

9             HEARING OFFICER:

10            And, Mr. Blasic, you're

11  employed by the Soldiers' and Sailors'

12  Home; - - -

13  A.      Yes.

14            HEARING OFFICER:

15            - - - is that correct?  And

16  your position, sir?

17  A.      LPN.

18            HEARING OFFICER:

19            And you've been in that

20  position how long?

21  A.      Since December of 2011.

22            HEARING OFFICER:

23            Thank you.  You may

24  proceed.

25            ATTORNEY BUSHINSKI:

Sargent's Court Reporting Service, Inc.
(814) 536-8908

88

1              Thank you.

2  DIRECT EXAMINATION

3  BY ATTORNEY BUSHINSKI:

4  Q.    Mr. Blasic, when did you first

5  meet Nancy Lewen?

6  A.    Specifically I couldn't say.  It

7  was shortly after she was hired.

8  Q.    And did you first meet her at

9  work?

10 A.    Yes.

11 Q.    Have you ever been her

12 supervisor?

13         HEARING OFFICER:

14         Keep your voice up.

15         MS. STOVALL:

16         Keep your voice up or I'm

17 going to have you move here

18 (indicating).

19         HEARING OFFICER:

20         This is the most

21 important person in the room and she

22 wants to make sure she hears what you

23 have to say, Mr. Blasic.  Okay?

24 A.    Absolutely.

25         HEARING OFFICER:

89

1              Thank you, sir.

2    A.    No.

3    BY ATTORNEY BUSHINSKI:

4    Q.    All right.  Mr. Blasic, think

5    that you're back in the Army again and

6    you're talking to the sergeant.  So

7    let's do this a little --- we'll raise

8    our voices for both of us so the

9    stenographer can get all this.  Did at

10   some time you and Ms. Lewen work the

11   same shift?

12   A.    Yes.

13   Q.    And sometimes you did work

14   together?

15   A.    Yes.

16   Q.    In August of 2015, did you and

17   Nancy Lewen begin to communicate via

18   social media platform known as

19   Facebook?

20   A.    Yes.

21   Q.    How did it come about that you

22   began to communicate with Ms. Lewen on

23   Facebook?

24   A.    She sent a friend request to me

25   which I accepted.

90

Now, the contact that you had
.. her on Facebook is that what's
commonly known as Facebook messages or
4 posts?
5 A.      Yeah, that would be posts I
6 believe.
7 Q.      Now, perhaps some members of the
8 Commission are as poorly versed in
9 technology as I am.  Can you explain
10 exactly what a Facebook post is?  Is it
11 like an e-mail message?
12 A.      Not exactly.  It would be more
13 --- I would think an e-mail message is
14 a more one-on-one type of communication
15 where a Facebook post can be viewed by
16 multiple people.
17 Q.      Can a Facebook post be
18 restricted, could be viewed privately?
19 A.      I believe it could be, sir.
20 Q.      Your Facebook posts with Nancy
21 Lewen, were they private?
22 A.      They were posts that were public
23 and then there are messages that are
24 private.
25 Q.      Well, that's where you need to

91

ـlp me out, Mr. Blasic, because I

really don't know the difference

3  between a message and a post.  Okay?

4  So when we're talking about the

5  communications that you had with Ms.

6  Lewen are we talking that you had more

7  Facebook posts or messages?

8  A.       Messages.

9  Q.       Now, are messages like e-mails?

10  A.       Yes.

11  Q.       And can they be restricted so

12  that people who are e-mailing each

13  other --- messaging each other on

14  Facebook are the only persons seeing

15  those messages?

16  A.       That is correct.

17  Q.       Is that how you conducted your

18  correspondence with Nancy Lewen?

19  A.       Yes.

20  Q.       So the messages that you sent

21  back and forth to Nancy Lewen, those

22  were private?

23  A.       Yes.

24  Q.       They couldn't be seen by anybody

25  else?

92

1   A.      No.

2   Q.      All right.  Did you also

3   communicate with her by means of

4   regular e-mail at some time?

5   A.      Yes, I did.

6   Q.      Let's go back to the Facebook

7   messages and if I have the --- if I use

8   the wrong term, please correct me.  All

9   right?

10  A.      Yes.

11  Q.      How long did you communicate

12  with Nancy Lewen via Facebook?

13  A.      From August of 2015 'til the end

14  of February of this year, 2016.

15  Q.      Was there a period of time in

16  the month of January 2016 that you

17  stopped responding to Ms. Lewen's

18  Facebook messages?

19  A.      Yes.

20  Q.      Why did you stop responding to

21  her Facebook messages in January of

22  2016?

23  A.      Primarily because I felt that

24  her feelings towards me and my feelings

25  towards her were not the same.

93

1   Q.      Well, I know this is a little

2   bit difficult for you and you don't

3   want to embarrass anybody and you don't

4   want to embarrass yourself or you don't

5   want to embarrass Ms. Lewen, but we're

6   going to have to get into some

7   specifics here.  Okay?

8   A.      All right.

9   Q.      In her Facebook messages to you

10  in 2015 and 2016 was Ms. Lewen

11  importuning you for a romantic

12  relationship?

13  A.      Yes.

14  Q.      Was she asking you out on dates?

15  A.      Yes.

16  Q.      Where was she asking you to go

17  on a date say?

18  A.      Cleveland Museum of Art.

19  Q.      Did she ask you to go to the

20  Cleveland Museum of Art one time or

21  multiple times?

22  A.      Multiple times.

23  Q.      Now, is this why you stopped

24  responding to her e-mail messages ---

25  her Facebook messages in January of

94

1   2016?

2   A.        Not specifically, no.   The

3   reason that I stopped responding was

4   because I had agreed to go to the

5   museum with her and in her own words

6   merely as friends at that time.   And

7   shortly after that her response was

8   that she was very happy that I had

9   decided to go on a date.

10            And I was very put off by that,

11  so I believe it was right around that

12  time that I just stopped responding to

13  any of her communications.

14  Q.        All right.   So, again, you had

15  concluded that Ms. Lewen wanted to have

16  a romantic or sexual relationship with

17  you?

18  A.        Yes.

19  Q.        And that was because of the

20  content of her Facebook messages?

21  A.        Yes.

22  Q.        This is a hard question for you

23  to answer with her being in the room

24  here, but I'm about to ask you.   I have

25  to put it to you.   Have you ever wanted

1    to have a romantic or sexual
2    relationship with Nancy Lewen?
3    A.       No, I did not.
4    Q.       After you concluded that she
5    wanted to have this relationship with
6    you, at some point in time did you
7    actually sit down with her and tell her
8    that?
9    A.       Yes.
10   Q.       When did that happen?
11   A.       It was here at work on an
12   evening when she came to relieve me
13   when I was working on the Alzheimer's
14   unit, unit E.  And she came in, like I
15   said, to relieve me so that I could go
16   home.
17   Q.       What was her physical appearance
18   like?
19   A.       She had her hair done and she
20   was wearing makeup and lipstick, and
21   just more time spent getting ready than
22   normal for work.
23   Q.       Did you conclude that these
24   attentions, these extra attentions were
25   directed to you?

96

1  A.        Yes.

2  Q.        Now, you actually had a

3  conversation with her about a romantic

4  relationship?

5  A.        We did have a conversation at

6  that time when she came in to relieve

7  me and a lot of it was precipitated by

8  the communications, the previous

9  communications, and then also by the

10  fact of her appearance when she came

11  in.  It was very obvious that        to me

12  that she was, you know, trying to get

13  my attention in that way.

14         And I at that time attempted to

15  explain as diplomatically as possible

16  that that --- you know, she and I were

17  not on the same page.  And I was not

18  interested in a relationship.

19  Q.        All right.  Now, can you tell me

20  approximately what month this took

21  place?

22  A.        I want to say January of this

23  year.

24  Q.        After you had this conversation

25  with Ms. Lewen did she continue to send

97

1   you messages on Facebook?

2   A.      Yes.

3   Q.      In general terms how many did

4   she send you?

5   A.      A lot.  I couldn't say

6   specifically on any particular day, but

7   most of them were very innocuous.  It

8   wasn't until the end of February when I

9   received 20 or more messages on

10  Saturday and then somewhere in the

11  neighborhood of 40 or more messages on

12  Sunday of the last days of February

13  that I decided at that time that I just

14  was completely uncomfortable with the

15  situation as it was and it needed to

16  stop.  And I would block her.

17  Q.      Mr. Blasic, you're getting a

18  little ahead of me, but that's okay.

19  Okay?  I know that you're nervous here.

20  What I'd like to do is I would like to

21  ask you to take a look at the document

22  that I'm having marked as Appointing

23  Authority's Exhibit Number 10.

24              (2/6/16 E-mail --

25              produced and marked for

98

1    identification as

2    Appointing Authority

3    Exhibit Number 10.)

4    BY ATTORNEY BUSHINSKI:

5    Q.       Can you identify that document

6    for the record, please?

7    A.       I'm familiar with it.   I'm not

8    100 percent certain if this came as ---

9    I'm going to assume this was a Facebook

10   message, but I don't know for sure.

11   Q.       Well, this is a work e-mail

12   message.   Let me ask you this, Mr.

13   Blasic.   Okay?   This message that you

14   got on February 6th of 2016 was this

15   possibly as a result of the conference

16   you had with Ms. Lewen when you told

17   her that you weren't interested in a

18   romantic relationship with her?

19   A.       Is it possible?   Yes, it is

20   possible.

21   Q.       All right.   Thank you.   During

22   the month of January 2016, did Ms.

23   Lewen send you Facebook messages in

24   which she told you that she loved you

25   outright?

99

1   A.        Without looking at them

2   specifically I'm not 100 percent sure,

3   but probably.

4   Q.        Well, let's take a look at some

5   of them specifically.   I'm handing you

6   what has been introduced into the

7   record as a Joint Exhibit marked as

8   Appointing Authority Exhibit Number 1

9   and Appellant's Exhibit Number 1.

10  These are, as Ms. Lewen has already

11  agreed, Facebook messages that passed

12  between the two of you.

13            She provided them to us.  There

14  are quite a lot of them so that's why

15  it's taking a little bit of time for me

16  to get there.   I'm showing you what has

17  --- showing you page 32 of the exhibit

18  of Appointing Authority's Exhibit

19  Number 1, Appellant's Exhibit Number 1

20  lines 25 through 29.   Can you please

21  read that into the record?

22  A.        Twenty-five (25) through 29?

23  Q.        Right.

24  A.        If you don't need to move in as

25  refugees asap, I want you to know that

100

1    I love you and when I was sleep

2    deprived and giddy the other night in

3    my reddish lipstick it really turned me

4    on that you're still so faithful to

5    your marriage vows.

6            However, I strongly suspect that

7    if I served you some alcohol with a

8    date rape drug in it you could most

9    likely cheat on your wife, even though

10   you've been faithful for approximately

11   20 years or so.

12   Q.        Thank you.  Were other messages

13   suggestive that Ms. Lewen loved you?

14   Can you remember that?  If you can't,

15   we'll move on.

16   A.        I can't remember any specific

17   ones that --- but I'm quite sure that

18   there were.

19   Q.        All right.  That's fine.  Were

20   any of her Facebook messages sexually

21   suggestive at all?

22   A.        Yes.

23   Q.        In what way?

24   A.        At least two of them had links

25   or some screenshot, some link to

101

1    another website that was --- that

2    showed different sexual positions.

3    Q.      Did these messages, these

4    sexually suggestive messages, did they

5    make you feel uncomfortable in any way?

6    A.      Yes, they did.

7    Q.      I want you to go to page 12 of

8    the exhibit, line 16 through 27.

9    Starting at line number 16, would you

10   continue --- would you read that into

11   the record, please?

12   A.      I was stalking you this morning

13   for about ten seconds on my way out the

14   door.  OMG, Barry, that was long

15   enough, you sexy thing.  Honest to God,

16   from the first time I ever saw you sick

17   I've always thought that you had the

18   most sexiest sick voice I have ever

19   heard in my entire life.

20           If you were my sweetheart I

21   would have immediately had the pressure

22   cooker whipped out and some deliciously

23   healing homemade chicken noodle soup

24   right in your mouth faster than your

25   runny nose could have ran away and hid

102

1   from me.

2          During the impressively speedy

3   cooking time I would have carried you

4   to bed, stripped you to your undies,

5   slathered your entire body with Vicks

6   Vapo Rub and smashed your face into my

7   matronly bosom to feel your head to

8   test for fever.  Resistance on your

9   part would have been futile.

10         If you even opened up your mouth

11  to protest, I would have thrown a cough

12  drop in from my own personal stash of

13  Halls.  You're not my sweetheart

14  though.  And besides I'm working on

15  unit E this weekend, have no social

16  life at home and have some typing work

17  to do.  Sucks to be you, Barry.  Hope

18  you feel better.  Seriously, stay

19  hydrated.

20  Q.        Mr. Blasic, did this e-mail

21  message embarrass you?

22  A.        Yes.

23  Q.        Did all these e-mail --- I'm

24  sorry.  Did the Facebook messages

25  embarrass you is what I meant to say.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

103

1   Did this Facebook message and the

2   others sexually suggestive Facebook

3   messages, did they cause you to wish to

4   avoid Nancy Lewen at work?

5   A.      Yes, they did.

6   Q.      Do you feel that Nancy Lewen was

7   sexually harassing you by sending you

8   these sexually explicit Facebook

9   messages saying that she loved you,

10  saying that she was stalking you?

11  A.      Yes, absolutely.

12  Q.      Do you feel that you are the

13  victim of sexual harassment from Nancy

14  Lewen?

15  A.      I do.  I do, yes.

16  Q.      Thank you.  Very good.  We'll

17  move off the subject of sexual

18  harassment.  I know that's a very

19  uncomfortable subject to talk to you

20  about.  Let's talk about some of the

21  events of February of 2016.  At some

22  point in February of 2016, did you

23  block Nancy Lewen from sending you

24  Facebook messages?

25  A.      Yes, I did.

104

1    Q.       Now, referring you to Appointing

2    Authority's Exhibit Number 1,

3    Appellant's Exhibit Number 1 which you

4    have before you, is the message that

5    you sent to Nancy Lewen the very first

6    message on page one?

7    A.       Yes, it is.

8    Q.       Why did you send her this

9    message blocking her on Facebook?

10   A.       As I stated in the message, it

11   was just --- too many messages were

12   coming in.  It was too many references

13   to a relationship, things that I was

14   not interested in and it was just a

15   distraction.  You know, I already had

16   enough issues going on in my own life,

17   going through divorce and, you know,

18   teenage kids and trying to get custody

19   and all the other things that go along

20   with that.

21            And this just was compounding

22   all the anxiety and everything else

23   that went along with it.

24   Q.       Mr. Blasic, again, could you ---

25   you know, you must consider that I'm

105

1   technologically illiterate.  How do you

2   go about stopping her from sending you

3   Facebook messages?

4   A.      On Facebook you have settings

5   that you can go into and block people

6   that you have contacts with.

7   Q.      After you blocked Nancy Lewen on

8   February 29th of 2006, did she send you

9   an e-mail on March 1st of 2016

10   concerning your wife, Jennifer Blasic?

11   A.      Yes, she did.

12   Q.      Did that e-mail contain a copy

13   of a letter that Nancy Lewen wrote to

14   your wife?

15   A.      Yes, it did.

16   Q.      Mr. Blasic, I'm handing you what

17   has been marked as Appointing

18   Authority's Exhibit Number 11.

19                    (3/2/16 E-mail --

20                    produced and marked for

21                    identification as

22                    Appointing Authority

23                    Exhibit Number 11.)

24   BY ATTORNEY BUSHINSKI:

25   Q.      Will you take a moment to look

106

1   at that document?

2   WITNESS COMPLIES

3   BY ATTORNEY BUSHINSKI:

4   Q.      Mr. Blasic, is that --- the

5   document marked as Appointing

6   Authority's Exhibit Number 11 is that a

7   copy of an e-mail dated March 1st of

8   2016 sent to you by Nancy Lewen?

9   A.      Yes, it is.

10  Q.      Now, did you provide a copy of

11  this document to Mr. Bryan Bender or

12  anyone at PSSH?

13  A.      Yes, I did.

14  Q.      Did you alter this document in

15  any way or form as it was received by

16  you?

17  A.      No, no.

18  Q.      So is it fair to say that it is

19  a true and correct copy of the e-mail

20  sent to you by Nancy Lewen?

21  A.      Absolutely.

22  Q.      At the time you received this

23  e-mail from Nancy Lewen were you in the

24  process of being divorced from your

25  wife, Jennifer Blasic?

1   A.      Yes, I was.

2   Q.      Were you divorced from your

3   wife, Jennifer, at the time that she

4   sent this?

5   A.      No.

6   Q.      Are you divorced now?

7   A.      No, I'm not.

8   Q.      Did Nancy Lewen know that you

9   were in the process of being divorced

10  from Jennifer Blasic?

11  A.      Yes.

12  Q.      How did she know that?

13  A.      Probably because I told her.

14  Q.      You discussed this with her?

15  A.      Yes.  Yes, I discussed it with

16  many of my co-workers.  It was very

17  well known.

18  Q.      As to the letter that Ms. Lewen

19  wrote to your wife, do you know when

20  she sent that to your wife?

21  A.      It would have been on the date

22  of the e-mail, March 1st.

23  Q.      Or March 2nd?  Well, let's not

24  go there.  Let me withdraw that

25  question.  Okay.

108

1               ATTORNEY BUSHINSKI:

2                 Where is that now, the

3  next one?  Send that to Mr. Zurn.

4               MS. STOVALL:

5                 Yeah, he has it.

6  BY ATTORNEY BUSHINSKI:

7  Q.     I'm showing you what I've marked

8  as Appointing Authority's Exhibit

9  Number 12.

                (3/2/16 E-mail --

10

11             produced and marked for

12             identification as

13             Appointing Authority

14             Exhibit Number 12.)

15  BY ATTORNEY BUSHINSKI:

16  Q.     Can you identify this document

17  for the record?

18  A.     Yes, this is an e-mail that I

19  received.  I believe this is my work

20  e-mail, my Commonwealth e-mail with a

21  tracking number regarding the letter

22  that we were just discussing to my

23  wife.

24  Q.     So it's a tracking number?

25  A.     Yes.