# DEFENDANT - SMF
# EXHIBIT 8

109

1   Q.       Did you click on this link to

2   the USPS tracking ---?

3   A.       No, I didn't.

4   Q.       What did this tracking number

5   show?

6   A.       I'm assuming that it would show

7   the progress of the aforementioned

8   letter and where it was in the delivery

9   process.

10  Q.       You got this from Nancy Lewen?

11  A.       Yes.

12  Q.       And she sent it to your work

13  e-mail?

14  A.       Yes.

15  Q.       And basically she was showing

16  you that she had mailed this letter to

17  your wife, Jennifer Blasic?

18  A.       Yes.

19  Q.       The letter of March 1st of 2016

20  that's contained --- I'm sorry.  The

21  letter of February 29th, 2016 that's

22  contained in the e-mail of March 1st,

23  2016?

24  A.       Yes.

25  Q.       That's Appointing Authority's

110

1    Exhibit Number 11?

2    A.        Yes.

3    Q.        Do you know whether Mrs. Blasic

4    had ever received the February 29th,

5    2016 letter from Nancy Lewen?

6    A.        Yes, I do.

7    Q.        How do you know about it?

8    A.        Because she told me.

9    Q.        Mrs. Blasic told you?

10   A.        Yes.   Yes, my wife told me that

11   she had received it.

12   Q.        What was Mrs. Blasic's reaction

13   to having received such a letter from

14   Nancy Lewen?

15   A.        To say she was upset would be

16   putting it mildly.   She was not happy

17   at all.

18   Q.        Was she angry with you?

19   A.        Oh, yes.

20   Q.        Was she angry with Ms. Lewen?

21   A.        Yes.

22   Q.        And you were, as I recall, in

23   the process of being divorced?

24   A.        That's correct.

25   Q.        Is this divorce that was going

111

1   on between you and Mrs. Blasic, is this
2   one of those divorces that's a friendly
3   divorce where everybody just seems to
4   separate or is it one that's not so
5   friendly?
6   A.      It is not so friendly.
7   Q.      You have issues with custody,
8   and property and things of that nature?
9   A.      Yes.
10  Q.      Did this letter help that
11  divorce process at all?
12  A.      Certainly not.
13  Q.      Well, how do you feel about
14  Nancy Lewen sending this letter to your
15  wife?
16  A.      I was extremely upset.  It
17  caused me a great deal of anxiety.  I
18  was concerned that it was going to have
19  some kind of an adverse effect on our
20  custody hearing.  Yeah, it was not good
21  for me at all.
22  Q.      Let's talk about a couple of the
23  phrases that's contained in this letter
24  of February 29th that Ms. Lewen sent to
25  your wife.  In the fourth paragraph

112

1    down Ms. Lewen states to your wife,

2    excuse me, but there's something not

3    quite ethical about a dad using a

4    picture of a couple teenage boys while

5    marketing himself online for a booty

6    call.  Do you see that phrase?

7    A.        I'm sorry.  I don't see that,

8    no.  No.

9    Q.        You didn't see it?

10   A.        Yes.  I'm sorry.  I do see it,

11   yes.

12   Q.        How does that phrase make you

13   feel that Ms. Lewen accuses you of

14   using your children in order to get sex

15   from women?  You have to speak.

16   A.        Extremely irritated.

17   Q.        Are you angry about it?

18   A.        Yes, I am.

19   Q.        She also talks about --- she

20   goes on in this letter to post your ---

21   post an address for you, a phone number

22   and says in her letter, it took five

23   minutes of sleuthing on the internet to

24   learn that your minor son is Gavin and

25   your minor daughter's name is Ivy.  How

113

1   do you feel about the fact that she

2   went on the internet to find out the

3   names of your minor children?

4   A.      Extremely angry about the whole

5   situation.  It was just absolutely out

6   of line.

7   Q.      Did this cause you to have any

8   fear for their personal safety?

9   A.      Yeah, it did.  Absolutely.

10  Q.      You're familiar with the term

11  cyber stalking, Mr. Blasic?

12  A.      Yes.

13  Q.      Do you think that this was an

14  example of Ms. Lewen cyber stalking

15  you?

16  A.      Absolutely.

17  Q.      One of the things that Ms. Lewen

18  says in her letter is --- to Mrs.

19  Blasic, I think you will agree that

20  these are not the type of men who you

21  would appreciate showing up in your

22  bedroom in the middle of the night to

23  have forced sex with you or your

24  daughter having been led there by your

25  ex-husband's cheatness and stupidity

114

1  with online dating.  What do you think

2  the intent of Ms. Lewen was in saying

3  something like that to your wife?

4  A.        Intimidation.  It certainly was

5  --- it seems that it would have been

6  intended to frighten her, to cause her

7  to be angry with me, any number of

8  adverse reactions.

9  Q.        Well, the last phrase I want to

10  ask you about is this.  Okay?  It has

11  also occurred to me that maybe he

12  doesn't care at this point if some

13  rapist shows up at the door and rapes

14  you since he has primary custody

15  anyway, so the kids are safe.

16         How does it feel to you to have

17  Nancy Lewen tell your wife she thinks

18  that you don't care if somebody comes

19  to your wife's home and rapes her?

20  A.        Not good at all, no.

21  Q.        Are you outraged by this?

22  A.        Yeah.  I don't think I even have

23  words to express how it makes me feel.

24  It's just above and beyond ridiculous

25  that this even has taken place.

115

1   Q.      At some point after Ms. Lewen

2   sent this letter to you, this horrific

3   letter of February 29th, 2016, did you

4   bring this letter to the attention of

5   the Pennsylvania Soldiers' and Sailors'

6   Home?

7   A.      Not myself directly.

8   Q.      How did you do it?  How did it

9   come about that we got this letter?

10  A.      I shared with co-workers.

11  Q.      You shared it with co-workers.

12  Did they tell you to do anything with

13  the letter?

14  A.      Everybody that saw it had some

15  recommendation of what to do with it,

16  but as it turned out I didn't need to.

17  Somebody else brought it to the

18  attention of the administration.  I

19  didn't really have to do anything.

20          ATTORNEY BUSHINSKI:

21          Okay.  If I may have a

22  moment, Mr. Zurn.

23  BY ATTORNEY BUSHINSKI:

24  Q.      I'm showing you what has already

25  been introduced into the record as

Sargent's Court Reporting Service, Inc.
(814) 536-8908

116

1    Appointing Authority's Exhibit Number

2    2.  Would you take a moment to look at

3    that?

4    WITNESS COMPLIES

5    BY ATTORNEY BUSHINSKI:

6    Q.       Now, Mr. Blasic, this document

7    which has been marked as Appointing

8    Authority's Exhibit Number 2 and it

9    starts off March 7, 2016, did you

10   author this document?

11   A.       Yes, I did.

12   Q.       And eventually you provided this

13   to authorities at Pennsylvania

14   Soldiers' and Sailors' Home?

15   A.       Yes.

16   Q.       Going to the last page of the

17   document you stated that --- if you

18   could read the third paragraph that

19   says, I found this behavior unsettling.

20   Would you read that into the record,

21   please?

22   A.       I found this behavior

23   unsettling.  As I began to talk with

24   others they expressed concern for my

25   personal safety and that of my children

117

1    and ex-wife.  I realized this was far
2    more serious than I had initially
3    thought.  I began to look through older
4    messages Nancy Lewen had sent.
5         I found one dated December 7th,
6    2015 that made reference to getting a
7    gun from a vehicle in the parking lot
8    and shooting someone.  I immediately
9    forwarded this to my DON.
10   Q.      You had never actually sat down
11   and filed a formal written complaint
12   about sexual harassment from Nancy
13   Lewen; correct?
14   A.      That's correct.
15   Q.      This is your only written
16   complaint?
17   A.      Yes.
18   Q.      Did Ms. Lewen's actions affect
19   your ability to perform your job in any
20   way?
21   A.      Yes, it did.
22   Q.      How did that happen or how did
23   it affect your ability to perform your
24   job?
25   A.      Initially it was just a great

118

1  deal of discomfort on my part and then

2  it began to be increased anxiety,

3  difficulty concentrating at work, but

4  when this all started to come to a head

5  at work, the one day I came to work and

6  everybody --- it seemed like everybody

7  knew about it.

8         They all approached me as I

9  would be walking around trying to

10  perform my duties throughout the day.

11  Everyone would stop me, what's going

12  on, what's up with this and that,

13  asking questions.  I was not able to

14  really effectively get any of my work

15  done that day due to anxiety,

16  interruptions.

17         That particular day I ended up

18  asking if I could go home early, which

19  I did, and there were --- with all

20  these e-mails that I continued to

21  receive and it just kind of compounded

22  itself along those same lines.  Just

23  every time I turn around it's, you

24  know, more communications for no

25  particular reason causing anxiety,

119

1   frustration, et cetera.

2   Q.      So you did miss work because of

3   this?

4   A.      Yes, I did.

5   Q.      After she sent this letter, this

6   horrific letter to your wife, did she

7   continue to --- did she communicate

8   with you by e-mail?

9   A.      Yes.

10  Q.      Does she continue to communicate

11  with you by e-mail to this day?

12  A.      As recently as yesterday, yes.

13  Q.      Do you want this kind of e-mail

14  contact with her?

15  A.      No, I don't.

16  Q.      And these e-mails that you

17  receive after she was terminated, do

18  these cause you in any way to feel

19  anxious or in fear of your own personal

20  safety?

21  A.      Absolutely.

22  Q.      Has Ms. Lewen attempted to

23  communicate with your wife after she

24  was fired on March 14, 2014 --- 2016

25  rather?

120

1   A.      Other than that one letter I
2   don't believe so.
3   Q.      She hasn't sent additional
4   letters to your wife?
5   A.      Not that I can recall.
6   Q.      All right.  Thank you.  Last
7   thing I want to talk to you about, Mr.
8   Blasic.  Ms. Lewen alleges that the
9   Pennsylvania Soldiers' and Sailors'
10  Home fired her because she retaliated
11  against --- in retaliation rather for
12  the --- for her making complaints of
13  resident abuse and resident neglect to
14  the Department of Health and the Office
15  of Attorney General.
16          That's what she's claiming.  Do
17  you recall whether Ms. Lewen had ever
18  discussed making complaints to the
19  Department of Health and the Attorney
20  General's Office with you by means of
21  Facebook messages?
22  A.      Yes.
23  Q.      Did you ever tell anyone at the
24  Pennsylvania Soldiers' and Sailors'
25  Home that Ms. Lewen had made a referral

121

1  of resident abuse or resident neglect

2  to the Commonwealth of Pennsylvania,

3  Department of Health or the

4  Commonwealth of Pennsylvania, Office of

5  Attorney General?

6  A.     No.

               ATTORNEY BUSHINSKI:

7

8         Thank you.  No other

9  questions.

              HEARING OFFICER:

10

11       Ms. Lewen, your

12  opportunity to examine Mr. Blasic.

13  CROSS EXAMINATION

14  BY MS. LEWEN:

15  Q.     On my first night here at

16  Pennsylvania Soldiers' and Sailors'

17  Home you orientated me, if you remember

18  correctly.  Why did that happen and why

19  didn't the RN orientate me?  You don't

20  know?

21  A.     I have no idea.

22  Q.     Do you remember when I walked in

23  and I said hello to the RN who I was

24  supposed to report to and I said hello?

25  Do you remember what happened after

Sargent's Court Reporting Service, Inc.
(814) 536-8908

122

1    that when I introduced myself?

2    A.        No, I don't.

3    Q.        You don't recall me being

4    screamed at by the RN in charge that I

5    reported to and her telling me that she

6    was told she would never have to

7    orientate anyone ever again?  You don't

8    remember that?

                    ATTORNEY BUSHINSKI:

9                   Objection.  She's

10   testifying at this point.  I know Ms.

11   Lewen is not an attorney and she

12   doesn't understand the purpose of Cross

13   Examination, but right now she's

14   testifying rather than cross examining.

                    HEARING OFFICER:

15

16                  But it is a difficult

17   thing, Ms. Lewen.  Just ask the

18   questions.

19

                    MS. LEWEN:

20                  Okay.  I'll skip my

21   orientation.

22

                    HEARING OFFICER:

23                  Yeah, you'll have an

24   opportunity to testify on your own

25

Sargent's Court Reporting Service, Inc.
(814) 536-8908

123

1   behalf.  Right now we're just

2   questioning Mr. Blasic.

                    MS. LEWEN:

3                   Okay.

4                   HEARING OFFICER:

5                   Thank you.

6                   MS. LEWEN:

7                   Mr. Bushinski did allude

8   to the Facebook message that --- in

9

10  this one record regarding ---.

11  BY MS. LEWEN:

12  Q.        Do you recall the day in

13  December when I revealed to you about

14  my diagnosis of PTSD?  Do you recall

15  the circumstances of that?

16  A.        The only recollection I have

17  regarding your revelation of PTSD would

18  be from the messages that I have.

19  Q.        You don't remember what happened

20  that day earlier?

21  A.        Only what was in the message

22  that you ---.

23  Q.        You don't know what happened in

24  person and officially that day that

25  caused me to break down in tears?

124

1    A.        No.

2                    MS. LEWEN:

3                    I have another exhibit

4    later on from Kathy Wilcox's testimony

5    which does address that, so I'll just

6    --- if Barry doesn't remember, he

7    doesn't remember.

8    BY MS. LEWEN:

9    Q.        Are you aware that I'm an

10   overcomer of domestic violence?

11   A.        From the messages that you

12   shared, yes.

13   Q.        I think we became Facebook

14   friends last August when you were going

15   through your divorce.  Do you recall me

16   saying anything nice to you,

17   supportive?  Was it all threatening or

18   was it ---?

19   A.        No, it certainly wasn't all

20   threatening.

21   Q.        And was it all private or was it

22   public?  Do you recall me saying

23   anything publicly to you on Facebook

24   that was supportive of you?

25   A.        Nothing specific, but I'm not

125

1    saying that it didn't happen.

2    Q.        Did I ever publicly threaten you

3    on Facebook?

4    A.        I don't believe so.

5    Q.        Did I ever privately threaten,

6    other than threatening to make chicken

7    noodle soup for you when you were sick?

8    A.        I guess that would depend on how

9    you want to interpret your own

10   communications with me.

11   Q.        Do you recall posting --- I

12   don't want to use the word nasty.  Do

13   you recall posting anything not nice

14   about your wife publicly on Facebook?

                    ATTORNEY BUSHINSKI:

15

16                  Objection.  I can't see

17   how this could possibly be relevant in

18   any way.

                    HEARING OFFICER:

19

20                  Well, Ms. Lewen, where

21   are you going with this with regard to

22   Mr. ---?

                    MS. LEWEN:

23

24                  Because he's defending

25   his ex-wife, by the same token he was

126

1    very cruel to her last fall because she

2    committed adultery and that ended their

3    --- you know, I'll drop that as well.

           HEARING OFFICER:

4               Thank you.

5

6    BY MS. LEWEN:

7    Q.       How did you know about online

8    dating sites?

9    A.       Online dating sites are fairly

10   common knowledge.

11   Q.       Do you remember me giving you

12   several different online dating sites?

13   A.       I remember you mentioning online

14   dating sites and maybe thought that I

15   should make a profile, yes.

16   Q.       Correct.  And so you made this

17   one; right?

           ATTORNEY BUSHINSKI:

18              Objection.  She has to

19   introduce it as ---.

20            MS. LEWEN:

21              I have ---.

22            HEARING OFFICER:

23              Okay.  Well, let's ---.

24            MS. LEWEN:

25

127

1          Actually, I think I don't
2   have enough.  Well, I'll give you this,
3   but I do have four copies.

4          HEARING OFFICER:
5   Did you mark it with
6   anything?

7          MS. LEWEN:
8   I have.

9          HEARING OFFICER:
10  So we don't confuse it,
11  let's mark all the copies the same way.
12  We're going to mark them AP-2.

13                  (Dating Site Profile --
14                  produced and marked for
15                  identification as
16                  Appellant Exhibit Number
17                  2.)

18          MS. LEWEN:
19  And that's in the bottom
20  right hand corner?

21          HEARING OFFICER:
22  And wherever you want to
23  put it, just ---.

24          MS. LEWEN:
25  A?

128

HEARING OFFICER:

1

AP-2.

2

MS. LEWEN:

3

AP-2.

4

HEARING OFFICER:

5

Show the first one to

6

Counsel, please.

7

ATTORNEY BUSHINSKI:

8

Thank you.

9

BY MS. LEWEN:

10

Q.        I'd like to ask you why --- when

11

it asked personality type why are you

12

saying princess there?  Why do you

13

consider yourself to be a princess?

14

A.        I found it amusing.

15

Q.        And on the profession where it

16

says LPN superstar, why do you consider

17

yourself to be an LPN superstar?

18

A.        Again, found it amusing.

19

Q.        And why are you pointing out on

20

your online dating profile that you're

21

not a serial killer, ---

22

A.        Stalker, ---

23

Q.        --- stalker ---

24

A.        --- mentally unstable.

25

129

1   Q.        --- or mentally unstable?

2   A.        Again, because it amuses me.

3   Q.        You find it amusing.  Okay.  And

4   then here it does --- you did put your

5   e-mail address on here ---

6   A.        I did.

7   Q.        --- and your name, Barry?  No

8   one else did this for you?  You were

9   the one who put that?

10  A.        I was.

                    MS. LEWEN:

11                    That's all.

12

13  A.        No one else did that.  No one

14  else put my name on my own dating

15  profile.

                    HEARING OFFICER:

16                    Thank you.

17

18  BY MS. LEWEN:

19  Q.        You didn't do that to intimidate

20  your ex-wife or --- that was just

21  all ---?

                    MS. LEWEN:

22                    Okay.  All right.

23

24  A.        No.  No, I did not.

                    MS. LEWEN:

25

130

1    I'll just drop any

2    further.  I have my own opinions

3    regarding Barry's situation with his

4    ex-wife.  So I'll just drop any --- all

5    of that.

6    BY MS. LEWEN:

7    Q.      Let me ask you something.  How

8    often do you think we've --- we

9    originally worked together when I first

10   got hired here and for several months

11   after that ---.  I don't recall what

12   month you went to dayshift.  What month

13   did you go to dayshift?

14   A.      It was April of 2015.

15   Q.      So you're good.  From that time

16   April until March when I was

17   terminated, how often would you say

18   that we actually worked together in the

19   workplace?

20   A.      From the time that I went to

21   dayshift?

22   Q.      Right.

23   A.      Very infrequently because you

24   were on third shift.

25   Q.      Right.

131

1   A.      Correct?

2   Q.      Right.  When, in fact, we never

3   were --- would you say that we ever

4   worked together?  And the next

5   question ---.

6   A.      (Indicates no).

7                   MS. STOVALL:

8                   Yes or no?

9   A.      No.

10  BY MS. LEWEN:

11  Q.      And the next question would be,

12  how often do you think that we actually

13  even crossed paths during shift change

14  in the past 12 months until my

15  termination?

16  A.      I couldn't even guess.

17  Q.      Would you say less than five,

18  less than ten?

19  A.      I would say possibly ten.

20  Q.      In a period of a year?  I would

21  say probably five, but we'll agree on

22  that.  It's been less than ten times in

23  the past year that we've actually ever

24  even crossed paths for a few minutes,

25  let alone worked together; right?

132

1    A.        Certainly.

2                          MS. LEWEN:

3                I don't have any other

4    questions.

5                          HEARING OFFICER:

6                Thank you.

7                          ATTORNEY BUSHINSKI:

8                I have one on Redirect.

9    REDIRECT EXAMINATION

10   BY ATTORNEY BUSHINSKI:

11   Q.        Mr. Blasic, as an LPN of

12   Pennsylvania Soldiers' and Sailors'

13   Home you could be assigned at any time

14   to work with Ms. Lewen; isn't that

15   correct?

16   A.        Yes.

17                          ATTORNEY BUSHINSKI:

18                I have no other

19   questions.  Mr. Zurn, I would move for

20   the admissions of my exhibits.

21                          HEARING OFFICER:

22                We have 10, 11 and 12;

23   AA-10, 11 and 12?

24                          ATTORNEY BUSHINSKI:

25                Yes, Appointing

133

1   Authority's Exhibits 10, 11 and 12.

2                    HEARING OFFICER:

3            Any objection, Ms. Lewen?

4            MS. LEWEN:

5            No.

6            HEARING OFFICER:

7            Would you like to move

8   the --- your AP-2 in?

9            MS. LEWEN:

10           Yes, I would.

11           ATTORNEY BUSHINSKI:

12           I object.  I don't have

13  any objection as to its authenticity.

14  My objection is strictly as to its

15  relevance.

16           HEARING OFFICER:

17           And I'm going to note

18  your objection and I'm going to allow

19  this to be made a part of the record.

20           MS. LEWEN:

21           Thank you.

22           ATTORNEY BUSHINSKI:

23           Thank you.  Don't go out

24  of the --- okay?

25  A.      Okay.

134

**ATTORNEY BUSHINSKI:**

1
2       Mr. Zurn, can I ask for a

3  recess?

4       **HEARING OFFICER:**

5       I think that'd be a

6  wonderful aspect.  How many more

7  witnesses do you have?

8       **ATTORNEY BUSHINSKI:**

9       They're going to be

10  shorter, so I only have three more.

11  One is going to be very brief and they

12  will all be much shorter than Mr.

13  Blasic and Mr. Bender.

14       **HEARING OFFICER:**

15       Well, my question is

16  should we break at this point in time

17  and have some lunch or shall we finish

18  out your case?

19       **ATTORNEY BUSHINSKI:**

20       I would be quite happy to

21  continue to lunch if you are.  I would

22  like to have five minutes just to look

23  at my documents.

24       **HEARING OFFICER:**

25       Okay.  All right.  Let's

135

1  do it that way.  Ms. Lewen, is that

2  acceptable to you?

3  　　　　　　　MS. LEWEN:

4  　　　　　　　Yes.

5  　　　　　　　HEARING OFFICER:

6  　　　　　　　Okay.  So we'll just take

7  a five-minute break here and ---.

8  SHORT BREAK TAKEN

9  　　　　　　　HEARING OFFICER:

10  　　　　　　　Okay.  This is your next

11  witness?

12  　　　　　　　ATTORNEY BUSHINSKI:

13  　　　　　　　It is.

14  　　　　　　　HEARING OFFICER:

15  　　　　　　　Raise your right hand.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - -

17  BRIAN SKINNER, HAVING FIRST BEEN DULY

18  SWORN, TESTIFIED AS FOLLOWS:

19  - - - - - - - - - - - - - - - - - - - - - - - - - - -

20  　　　　　　　HEARING OFFICER:

21  　　　　　　　Please be seated.  For

22  the record your name?

23  A.　　　First name is Brian, B-R-I-A-N.

24  Last name is Skinner, S-K-I-N-N-E-R.

25  　　　　　　　HEARING OFFICER:

136

1          Just one?  Just one N?

2  Oh, two.  And you're employed here at

3  the Soldiers' and Sailors' Home?

4  A.     Yes.  I'm a Human Resources

5  Analyst 2.

6                 HEARING OFFICER:

7          How long have you been

8  here?

9  A.     Four and a half years.

10                HEARING OFFICER:

11         Thank you.

12                ATTORNEY BUSHINSKI:

13         Thank you, Mr. Zurn.

14  DIRECT EXAMINATION

15  BY ATTORNEY BUSHINSKI:

16  Q.     Mr. Skinner, as a Human

17  Resources Analyst 2 for Pennsylvania

18  Soldiers' and Sailors' Home, do you

19  have access to the personal records ---

20  the personnel records of PSSH's

21  employees?

22  A.     Yes.

23  Q.     Do you have access to records of

24  training kept on PSSH employees?

25  A.     Yes.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

137

1   Q.      And disciplinary records?

2   A.      Yes.

3   Q.      Are such records kept in the

4   normal course of business by someone

5   here at the Pennsylvania Soldiers' and

6   Sailors' Home?

7   A.      Yes.

8   Q.      All right.  Let's talk about

9   Nancy Lewen.  In regard to her, can you

10  tell me when she was first hired at

11  PSSH?

12  A.      September 29th, 2014.

13  Q.      And when was she fired?

14  A.      March 14th, 2016.

15  Q.      In regard to discipline imposed

16  on her, did PSSH impose any form of

17  discipline on her prior to her

18  termination of March 14th, 2016?

19  A.      Yes.

20                  ATTORNEY BUSHINSKI:

21                  Let me see the --- okay.

22  BY ATTORNEY BUSHINSKI:

23  Q.      Mr. Skinner, I'm showing you

24  what's been marked as Appointing

25  Authority's Exhibit Number 13.  Can you

Sargent's Court Reporting Service, Inc.
(814) 536-8908

138

1  identify for the record what that

2  document is?

(12/15/15 Letter --
produced and marked for
identification as
Appointing Authority
Exhibit Number 13.)

8  A.      This is an oral reprimand that

9  was issued to Ms. Lewen on December

10  15th of 2015?

ATTORNEY BUSHINSKI:

All right.   Thank you.

13  Next one?

MS. STOVALL:

Fourteen (14).

(2/14/16 Written
Reprimand -- produced and
marked for identification
as Appointing Authority
Exhibit Number 14.)

21  BY ATTORNEY BUSHINSKI:

22  Q.      I'm showing you what's been

23  marked as Appointing Authority's

24  Exhibit Number 14.  Can you identify

25  what this document is for the record?

139

1   A.       This is a written reprimand

2   issued to Ms. Lewen on February 24th of

3   2016.

4   Q.       Other than these reprimands

5   which are written and oral, did PSSH

6   impose any other sort of discipline on

7   Ms. Lewen other than her termination of

8   March 14th of 2016?

9   A.       No, she had no other discipline.

10  Q.       Thank you.   In the March 14th,

11  2016 termination letter that Mr. Bender

12  testified to there are a number of

13  policies referenced.   One of these

14  policies is the DMVA standards of

15  conduct and work rules.

                MS. STOVALL:

16              Next one?

17

18              ATTORNEY BUSHINSKI:

                This one here

19

20  (indicating).

                MS. STOVALL:
21
                Oh, that one?
22
                ATTORNEY BUSHINSKI:
23
                Are they out of order?
24
                ATTORNEY BUSHINSKI:
25

Sargent's Court Reporting Service, Inc.
(814) 536-8908

140

1      Yeah, you gave them to me

2  out of order.  Yep.

3      ATTORNEY BUSHINSKI:

4      All right.  We'll go out

5  of order and I'll clarify.  Okay?

6      MS. STOVALL:

7      All right.  All right.

8  Sixteen (16).

9      (Standard of Conduct &

10     Work Rule Signature --

11     produced and marked for

12     identification as

13     Appointing Authority

14     Exhibit Number 16.)

15 BY ATTORNEY BUSHINSKI:

16 Q.      I'm showing you what has been

17 marked out of order as Appointing

18 Authority Exhibit Number 16.  Can you

19 please identify what that document is

20 for the record?

21 A.      This is the acknowledgement that

22 the employee has gone over the

23 standards of conduct and work rules and

24 then signed off on it.

25 Q.      And does that document bear

141

1   Nancy Lewen's signature?

2   A.      Yes, it does.

3   Q.       And the date that she received

4   that document?

5   A.       December 20th of 2014.

6                    ATTORNEY BUSHINSKI:

7                    All right.   Let's go

8   back.

9                    MS. STOVALL:

                     Okay.   Fifteen (15).

10                   ATTORNEY BUSHINSKI:

11                   No, this was --- go to

12                   the one that we should have put in

13   before.

14

15                   MS. STOVALL:

16                   It was this.   It'd be 15.

17                   (Training Course Log --

18                   produced and marked for

19                   identification as

20                   Appointing Authority

21                   Exhibit Number 15.)

22                   ATTORNEY BUSHINSKI:

23                   Okay.   Fine.

24                   MS. STOVALL:

25                   There you go, Mr. Zurn.

142

BY ATTORNEY BUSHINSKI:

1

2   Q.      I'm showing you what has been

3   marked as Appointing Authority's

4   Exhibit Number 15.  This is the one

5   that was --- that I should have had

6   before.  Can you identify what this

7   document is for the record?

8   A.      This is her electronic, I would

9   call it training record for all the

10  courses she completed online.

11  Q.      Now, does anywhere on this

12  document show that she had training in

13  the acceptable use of the

14  Commonwealth's information technology

15  policy?

16  A.      Yes.

17  Q.      Is there any training on sexual

18  harassment?

19  A.      Yes.

20  Q.      And where would we find that she

21  had completed courses on sexual

22  harassment and on the Commonwealth's

23  acceptable use of information

24  technology?

25  A.      She completed the

143

1    discrimination, sexual harassment
2    prevention course on October 8th of
3    2014. And she completed security
4    awareness and acceptable use policy two
5    different dates. One was December 7th
6    of 2014. Then she completed again ---
7    which is an annual course. Did it
8    again on October 24th of 2014.

              ATTORNEY BUSHINSKI:
9                  All right. Thank you.
10
11   No other questions.
              HEARING OFFICER:
12                 Any questions of Mr.
13
14   Skinner?
              ATTORNEY BUSHINSKI:
15                 I'm sorry. I do have one
16
17   other question. I'm sorry, Mr. Zurn.
18   BY ATTORNEY BUSHINSKI:
19   Q.        I'm showing you what we --- has
20   been marked as Appointing Authority's
21   Exhibit Number 17.
22                 (IT Employee Agreement --
23                 produced and marked for
24                 identification as
25                 Appointing Authority

144

Exhibit Number 17.)

BY ATTORNEY BUSHINSKI:

Q.    Can you identify what this document is for the record?

A.    This is the IT resource acceptable use policy user agreement that the employee signs off on after they have read the IT acceptable use.

Q.    And is Ms. Lewen's signature on this document?

A.    Yes.

Q.    And she signed it when?

A.    On December 20th of 2014.

ATTORNEY BUSHINSKI:

Now I have no further questions, Mr. Zurn.

HEARING OFFICER:

Ms. Lewen, do you have any questions of Mr. Skinner?

MS. LEWEN:

I don't have questions for him, but I would like to submit as evidence my attendance record, my performance evaluations. Is now an appropriate time to do that?

Sargent's Court Reporting Service, Inc.
(814) 536-8908

145

**HEARING OFFICER:**

No.  I'm going to allow you to do that when it's your turn to testify, yes.

**MS. LEWEN:**

No, I don't have any questions for Mr. Skinner.

**HEARING OFFICER:**

Thank you, Mr. Skinner.

**ATTORNEY BUSHINSKI:**

Can you get Mr. Hamm?

**HEARING OFFICER:**

You have five exhibits. Do you want those made a part of the record?

**ATTORNEY BUSHINSKI:**

I do.  Where did we ---?

**MS. STOVALL:**

Thirteen (13), 14, 15 --- five of them, yeah.

**ATTORNEY BUSHINSKI:**

All right.  Starting with Appointing Authority's Exhibit Number 13 through Appointing Authority's Exhibit Number 17 I move for their

146

1    admission into the record.

2                          HEARING OFFICER:

3        Any objection, Ms. Lewen?

4    MS. LEWEN:

5        No.

6                          HEARING OFFICER:

7        Made a part of the

8    record.   And is this your next witness?

9                          ATTORNEY BUSHINSKI:

10       It is.

11                         HEARING OFFICER:

12       Can I ask you to stand

13   for a moment?

14   - - - - - - - - - - - - - - - - - - - - - - - - -

15   RAYMOND HAMM, HAVING FIRST BEEN DULY

16   SWORN, TESTIFIED AS FOLLOWS:

17   - - - - - - - - - - - - - - - - - - - - - - - - -

18                         HEARING OFFICER:

19       I didn't ask you to raise

20   your hand.

21   A.       I'm sorry.

22                         HEARING OFFICER:

23       I know you did.   For the

24   record, your name?

25   A.       Raymond Hamm, R-A-Y-M-O-N-D,

147

1   H-A-M-M.

              HEARING OFFICER:

2                   And, Mr. Hamm, you are

3

4   employed here at Soldiers' and Sailors'

5   Home?

6   A.   Yes.

              HEARING OFFICER:

7                   And your position, sir?

8

9   A.   Registered nurse supervisor.

              HEARING OFFICER:

10

11                  A nurse supervisor?

12  A.   Yes.

              HEARING OFFICER:

13

14                  And you've been with the

15  Soldiers' and Sailors' Home since when?

16  A.   2002.

              HEARING OFFICER:

17

18                  Thank you.   You may

19  proceed.

              ATTORNEY BUSHINSKI:

20

21                  Thank you, Mr. Zurn.

22  DIRECT EXAMINATION

23  BY ATTORNEY BUSHINSKI:

24  Q.   Mr. Hamm, would you please

25  explain the chain of command that

148

1   exists at the Pennsylvania Soldiers'

2   and Sailors' Home in --- as it existed

3   in regards to Nancy Lewen?  Who would

4   have been her supervisor and her

5   supervisor's supervisor?

6   A.      I believe her direct supervisor

7   was Caroline Williams, but I was also

8   supervising.  Ms. Caroline was a

9   part-time supervisor.  If there was any

10  concerns of any of us as supervisors

11  they would go to the ADON, and then to

12  the DON and then to the Commonwealth.

13  Q.      At times did you directly

14  supervise her?

15  A.      I would say I would, yes.

16  Q.      And had she not been fired would

17  you be directly supervising her at

18  times?

19  A.      I'm sorry?

20  Q.      Had she not been fired had ---

21  would there be occasions you would now

22  directly supervise her if she hadn't

23  been fired?

24  A.      Yes, I would be directly

25  supervisor right now as her --- I would

149

1   be, yes.

2   Q.      Now, have you known her since

3   she's been hired as PSSH?

4   A.      Yes.

5   Q.      Did you know her out of work at

6   all?

7   A.      No.

8   Q.      Do you have any out of work

9   contact with her at all?

10  A.      No.

11  Q.      I'm going to invite your

12  attention to February 21st of 2016.  On

13  that date February 21st, 2016, did

14  anything unusual occur between you and

15  Ms. Lewen?

16  A.      I believe that was the incident

17  regarding a paper that she handed me.

18  I'm sorry.

19  Q.      So what occurred?  What

20  happened?

21  A.      Well, I came in and she handed

22  me what she stated was a grievance

23  form, that she was going to hand in,

24  but wanted me to view it first.  So I

25  started looking it over and she started

150

1   laughing.

2   Q.      Let me interrupt you before you

3   continue on here.  Okay?  Where were

4   you when Ms. Lewen --- when this

5   happened?

6   A.      In the unity nurse's station.

7   Q.      Was there anybody else around?

8   A.      I don't think so, no.

9   Q.      So Ms. Lewen handed you a paper?

10  A.      Uh-huh (yes).

                HEARING OFFICER:

11              Is that a yes?

12

13  A.      Yes.  Sorry.

                HEARING OFFICER:

14              Thank you.

15

16  BY ATTORNEY BUSHINSKI:

17  Q.      And you stated she was laughing?

18  A.      Yes, she started laughing, so I

19  thought it was a joke and I said, is

20  this a joke?  And she said, no, it's

21  just the look on your face.

22  Q.      Mr. Hamm, I'm showing you what I

23  had marked as Appointing Authority's

24  Exhibit Number 18.

25              (Ms. Lewen's Written

151

Statement -- produced and
marked for identification
as Appointing Authority
Exhibit Number 18.)

BY ATTORNEY BUSHINSKI:

Q.      Can you identify that document
for the record, please?

                HEARING OFFICER:

Can I ask you just one
question?

                ATTORNEY BUSHINSKI:

Sure.

HEARING OFFICER:

Why is this paperclipped?

ATTORNEY BUSHINSKI:

Oh, I'm sorry.

HEARING OFFICER:

Excuse me.   The paperclip
is supposed to ---?

                ATTORNEY BUSHINSKI:

It should be stapled,
yes.

                HEARING OFFICER:

I get really disturbed
with the paperclip because papers fall

152

1   out of here.  The other thing is it's

2   got connected on to something else and

3   something else.

                ATTORNEY BUSHINSKI:

4           We're going to get a

5   stapler and staple it.

                HEARING OFFICER:

7           Can we do that?  I really

8   would appreciate that.  We're not

9   getting stapled into other stuff.

10

11  Okay?  Thank you.

                ATTORNEY BUSHINSKI:

12          Very good.  We'll get

13  that squared away, Mr. Zurn.

14

15  BY ATTORNEY BUSHINSKI:

16  Q.      Mr. Hamm, referring to that

17  document, Appointing Authority's

18  Exhibit Number 18, can you identify

19  what that document is for the record?

20  A.          This looks like the paper that

21  she handed me while ---.

22  Q.          So that was one of the documents

23  she handed you on February 21st of

24  2016?

25  A.          Yes.

153

MS. LEWEN:

1          Can I object to it?   Is

2    that appropriate?

3                    ATTORNEY BUSHINSKI:

4          Mr. Zurn is the person

5    you should direct your comments to.   I

6    really can't talk to you directly.

7                    HEARING OFFICER:

8          The nature of the

9    objection?

10                    MS. LEWEN:

11          I didn't hand this to Ray

12   that night.   They had obtained this

13   from my personal e-mail.   I had

14   e-mailed this from my home e-mail to my

15   work e-mail.   I never handed this to

16   Ray.   I have the one that I did hand to

17   Ray with me, which was on a witness

18   statement and ---.

19                    HEARING OFFICER:

20          This is AA-19.   Does that

21   look familiar?

22                    ATTORNEY BUSHINSKI:

23          That's the next one I was

24   going to introduce, ---

25

Sargent's Court Reporting Service, Inc.
(814) 536-8908

154

MS. LEWEN:

1   Right.

2   ATTORNEY BUSHINSKI:

3   --- Mr. Zurn.

4   MS. LEWEN:

5   What I object to is Mr.

6   Hamm says that he recognizes this, but

7   he shouldn't unless he accessed my

8   e-mail account without my permission.

9   I never gave ---.

10  A.      The content that I'm reading ---

11  I'm not paying attention to the

12  headlines or anything, but the content

13  within here, it's familiar.

14  MS. LEWEN:

15  Okay.  All right.

16  HEARING OFFICER:

17  Thank you.

18  A.      I was reading the content.

19  HEARING OFFICER:

20  Overrule your objection

21  and move on.  Thank you.

22  BY ATTORNEY BUSHINSKI:

23  Q.      Mr. Hamm, I'm going to show you

24  what has been marked as Appointing

25

155

1   Authority's Exhibit Number 19.

2                    (Commonwealth of

3                    Pennsylvania Witness

4                    Statement -- produced and

5                    marked for identification

6                    as Appointing Authority

7                    Exhibit Number 19.)

8   BY ATTORNEY BUSHINSKI:

9   Q.       Can you identify this document

10  for the record?

11  A.       Yes, I would agree that this was

12  likely the form that she handed me.

13  Like I said before, I was just reading

14  the content.

15  Q.       So you're agreeing with Ms.

16  Lewen that Appointing Authority Exhibit

17  Number 18 was something she did not

18  hand to you on February 21st, but that

19  she handed you Appointing Authority's

20  Exhibit Number 19?

21  A.       Yes.

22  Q.       That's a fair statement?

23  A.       Sure.

24  Q.       That's fine.   Were you surprised

25  when she handed you these documents?

156

1  A.     I was.

2  Q.     Did you read any part of them?

3  A.     I didn't read it all because at

4  some point --- I can't tell you at what

5  point I stopped, but I looked at her

6  and I said, you know, this isn't true.

7  And she shrugged her shoulders and

8  said, my word against yours.

9  Q.     At some point when you were

10 reading these documents did you ask her

11 whether she was joking?

12 A.     I did because she started

13 laughing and I said --- at first I

14 said, you know, because I thought we

15 got along pretty well up to that point.

16 I said, is this a joke?  And she said,

17 no, it's just the look on your face.

18 Q.     Did she say that in a laughing

19 manner?

20 A.     No.

21 Q.     You thought that this was

22 serious though?

23 A.     I thought it was serious.

24 Q.     In regard to the statements that

25 Ms. Lewen made in Appointing Authority

157

1    Exhibit Number 19, you considered these

2    statements to be true or do you

3    consider them to be false?

4    A.      I consider what she wrote up in

5    here false.

6    Q.      Did you tell her that her

7    statements were not true?

8    A.      Yes.

9    Q.      And did she respond to your

10   statement that these statements are not

11   true?

12   A.      Yes.  That's when she said, you

13   know, my word against yours.

14   Q.      I'm going to show you what has

15   been marked or introduced into the

16   record already --- if I can find it.

17                    ATTORNEY BUSHINSKI:

18                    If I may have a moment,

19   Mr. Zurn.  I'm trying to find my

20   exhibit.  Oh, here they are.  Too many

21   papers.

22   BY ATTORNEY BUSHINSKI:

23   Q.      I'm showing you what's already

24   introduced into the record as

25   Appointing Authority's Exhibit Number

158

1    1, Appellant's Exhibit Number 1.   This

2    is a joint document that has been

3    introduced into the record by agreement

4    of Ms. Lewen and myself.   Would you

5    refer to page 11 of this exhibit,

6    please?

7    A.      Okay.

8    Q.      Are you at page 11?

9    A.      Yes, sir.

10   Q.      All right.   Now, referring to

11   lines number 8 through 12.   Actually, 7

12   through 12.   Would you please read that

13   starting at number 7?

14   A.      Nancy Lewen, Monday, February

15   22nd, 2016 at 2:51 p.m.   I have a few

16   minutes to kill before ---.

17                   MS. STOVALL:

18                   Hold on.   You have to

19   speak up and slow down.

20   A.      Oh, I'm sorry.

21   BY ATTORNEY BUSHINSKI:

22   Q.      Let's stop there a second.   So

23   this is an e-mail from Nancy Lewen to

24   Barry Blasic on February 22nd, 2016.

25   Now, please start with number 8 and go

159

1   through number 12 slowly.

2   A.      I have a few minutes to kill

3   before I have to be at the school bus

4   stop.  I was just wondering how you

5   feel.  I feel like I honestly wouldn't

6   mind feeling how you feel sometime.  I

7   didn't feel that way last night with

8   Ray when he was mind blown and

9   defending himself against my

10  allegations and I was giggling in the

11  middle of the night with no witnesses.

12  I felt devious, no doubt, but really

13  don't feel like feeling Ray to see how

14  he felt.

15  Q.      Have you seen that e-mail at all

16  prior to today?

17  A.      (Indicates no).

18                  MS. STOVALL:

19                  Yes or no?

20  A.      No.

21  BY ATTORNEY BUSHINSKI:

22  Q.      Is that description of --- Ms.

23  Lewen's description of herself

24  accurate?  Was she giggling like that

25  during her encounter with you?

160

1   A.      Yeah, she was.  Yeah.

2   Q.      Did her demeanor and her

3   statement to you question her motives

4   in writing the witness statement?

5   A.      Yes, I was quite shocked by it.

6   Q.      What do you think that she was

7   doing by handing you these --- by

8   handing you that witness statement?

9   A.      I guess I can only surmise that

10  --- and this is just my personal

11  feeling that she was saying, you know,

12  look at all the things that I can write

13  up in here and all the things that I

14  could do, but I don't really know what

15  specifically it meant.

16  Q.      Do you feel like she was trying

17  to intimidate you at all by doing this?

18  A.      Yes.

19  Q.      Do you feel like she was trying

20  to bully you?

21  A.      Yes.

22  Q.      Did you report this meeting and

23  this document to anyone?

24  A.      It was pretty late in the

25  morning.  I'm sorry.  This document

161

1    itself, well, what she --- we had spent
2    some time discussing this because I
3    said, you know, if there really was
4    something --- I said, if there's
5    something really concerning you, I
6    said, you know, I would be willing to
7    work this out with you.
8         And so then she said, well, ---
9    she took that copy and held it and then
10   gave me a copy and said, this is for
11   you. And then I left the unit and then
12   I was late leaving home, and then I
13   popped my head into Kathy Wilcox's
14   office and said, Nancy did have some
15   concerns she said and I just went over
16   a couple of the things that I remember
17   at that time that she had wrote.
18   Q.    Mr. Hamm, Ms. Lewen is claiming
19   that the real reason that she was fired
20   from her job here at the Pennsylvania
21   Soldiers' and Sailors' Home was that
22   she had made a whistleblower complaint,
23   a complaint of resident abuse and
24   neglect to the Department of Health and
25   the Office of the Attorney General, the

162

1  Commonwealth of Pennsylvania.

2        She states that --- she's told

3  me that she made these statements to

4  Barry Blasic and Mr. Blasic has

5  testified to that effect, that she had

6  made some statements to him.  Did Barry

7  Blasic ever tell you that Nancy Lewen

8  had made complaints of resident abuse

9  or resident neglect to the Commonwealth

10 of Pennsylvania, Department of Health

11 or the Commonwealth of Pennsylvania

12 Office of the Attorney General?

13 A.        No.

14 Q.        Did anyone ever tell you that

15 Nancy Lewen had made such complaints?

16 A.        No.

17                ATTORNEY BUSHINSKI:

18                Nothing further.

19                HEARING OFFICER:

20                Do you have any questions

21 of Mr. Hamm, Ms. Lewen?

22                MS. LEWEN:

23                Just a couple.

24 CROSS EXAMINATION

25 BY MS. LEWEN:

163

1   Q.      Do you ever joke on the job,

2   Ray?

3   A.      Sure.

4   Q.      Yes?

5   A.      Yes.

6   Q.      And in the unsigned witness

7   statement that I gave you that night

8   did you feel like we had sort of

9   resolved it, that I had intended to

10  actually file a claim with the EEOC

11  against you or did you feel like we

12  just resolved it?

13  A.      I felt like we were going to

14  have --- we were going to get together

15  and try to find out what your concerns

16  were.  So if there was anything I could

17  do to avoid any grievances that I would

18  be all for that.

19  Q.      When I brought up in this four-

20  page document --- which I'm not going

21  to have anybody read right now, but in

22  the concerns that I had do you recall

23  me ever accusing ---?  Let me reword

24  that.

25          Do you recall what the

164

1  accusations that I was making had to do

2  with regulatory compliance issues and

3  fraud, the possibility of fraud, to do

4  with staffing?

5  A.      I remember you saying something

6  about staffing.

7  Q.      So it was very serious

8  allegations; correct?

9  A.      From what I read the things you

10  had on there as far as demeanor and

11  stuff like that, I didn't find any of

12  that to be true.  You did bring up a

13  couple of concerns about staffing and

14  stuff like that, which I would have

15  been more than willing to sit and talk

16  with you about.

17          And I believe I was stating that

18  as far as our numbers go, we have one

19  on one in that unit and that's really

20  all that I can do as far as that goes.

21  Q.      Do you believe --- in the best

22  of your knowledge of regulations do you

23  believe on the nightshift --- not on

24  the nightshift.  Do you believe in a

25  24-hour period that has 10 nursing

165

1  staff members on unit C is sufficient

2  to meet regulatory guidelines?  Did I

3  word that correctly?

4          ATTORNEY BUSHINSKI:

5          I'm going to object to it

6  however you worded it, okay, on the

7  basis of relevance.  It can't possibly

8  have any relevance to these

9  proceedings.

10          MS. LEWEN:

11          I believe it does because

12  that's what I was complaining of.  I

13  was complaining of the fact that they

14  were going against regulatory

15  guidelines.  I was calling it to the

16  attention of my supervisor who does

17  joke.  How do you bring it to the

18  attention of a supervisor that

19  administrators are attempting to pin

20  fraud on that supervisor?

21          ATTORNEY BUSHINSKI:

22          Mr. Zurn, I'm going to

23  object at this point.  Now she's

24  testifying and also, you know, I

25  understand Ms. Lewen is not an attorney

166

1   and she's not really familiar with the

2   etiquette that usually incurs in these

3   proceedings, but I really can't answer

4   her questions directly.   She needs to

5   make those kind of remarks to you and

6   not to me.

7                HEARING OFFICER:

8             Ms. Lewen, what is the

9   question you're asking Mr. Hamm?

10               MS. LEWEN:

11              My question for him is,

12  in his best knowledge of the applicable

13  regulations for the assisted living

14  facility, which is unit C, which is the

15  unit that's in this older building, in

16  his opinion according to the

17  regulations does he feel that 10

18  nursing staff members in a 24-hour day

19  --- 24-hour time period is sufficient

20  to meet regulatory guidelines.   That's

21  my question.

22               HEARING OFFICER:

23              Were you objecting to the

24  aspect that you were being overworked

25  by having not enough people?   Is that

167

1  what you're --- was that the nature of

2  what you had in this complaint that you

3  showed him?

4  MS. LEWEN:

5  I was suggesting that I

6  had overheard --- and it's hearsay.

7  HEARING OFFICER:

8  Overheard.

9  MS. LEWEN:

10  I had overheard that ---.

11  HEARING OFFICER:

12  You overheard that there

13  was something wrong?

14  MS. LEWEN:

15  Right.  And it was ---.

16  HEARING OFFICER:

17  And you were asking him a

18  question with regard to what you

19  overheard?

20  MS. LEWEN:

21  Right.  I was bringing it

22  into ---.

23  HEARING OFFICER:

24  In that case I'm going to

25  uphold the objection and ask you to go

168

1   on to another question, please.

                    MS. LEWEN:

2                   That's all.  No further

3

4   questions.

                    HEARING OFFICER:

5                   Thank you.

6                   ATTORNEY BUSHINSKI:

7                   I have nothing further.

8

9   Nothing on Redirect.

                    HEARING OFFICER:

10                  Thank you very much, Mr.

11

12  Hamm.

13  A.        Thank you.

                    HEARING OFFICER:

14                  Appreciate you being

15

16  here.

                    ATTORNEY BUSHINSKI:

17                  Now, as far as my

18

19  exhibits go and as far as Mr. Hamm's

20  concern we have AA-18, which Ms. Lewen

21  has properly objected to.  And I would

22  agree that that should not enter the

23  record.

                    HEARING OFFICER:

24                  Fine.  We will remove

25

169

1   that from the record.  Thank you.

2               ATTORNEY BUSHINSKI:

3               And Appointing

4   Authority's Exhibit Number 19 I move

5   for the admission of that to the

6   record.

7               HEARING OFFICER:

8               Any objection to 19?

9               MS. LEWEN:

10              No, sir.  I have the

11  witness statement of Ray Hamm that I

12  would like to submit.  I have copies.

13              HEARING OFFICER:

14              I'm going to allow you to

15  do that at --- a witness statement from

16  Mr. Hamm?

17              MS. LEWEN:

18              Uh-huh (yes).

19              HEARING OFFICER:

20              Did you want to question

21  him about that witness statement?  You

22  just lost your chance to do that

23  because ---.

24              MS. LEWEN:

25              Oh, I'm sorry.  I won't

170

1   submit it then.   That's okay.

                    HEARING OFFICER:

2       Okay.   All right.   AA-19,

3   no objection to that?

                    MS. LEWEN:

5       No.

                    HEARING OFFICER:

7       Made a part of the

8   record.   Thank you.

9                   ATTORNEY BUCHINSKI:

10      Kathy Wilcox is my next

12   witness.

                    HEARING OFFICER:

13      Good afternoon.   Would

15   you raise your right hand?

16   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17   KATHLEEN WILCOX, HAVING FIRST BEEN DULY

18   SWORN, TESTIFIED AS FOLLOWS:

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                    HEARING OFFICER:

20      Thank you.   Please be

22   seated.   And for the record your name,

23   spelling your name?

24   A.       Kathleen Wilcox,

25   K-A-T-H-L-E-E-N,  W-I-L-C-O-X.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

171

HEARING OFFICER:

And, Ms. Wilcox, you are employed here by the Soldiers' and Sailors' Home?

A.     Yes, I am.

HEARING OFFICER:

And your position?

A.     The Director of Nursing.

HEARING OFFICER:

And how long have you held that position?

A.     Approximately three and a half years.

HEARING OFFICER:

How long have you been here?

A.     Since 1988.

HEARING OFFICER:

You started when you were 12?

A.     Exactly.  Thank you.

HEARING OFFICER:

Maybe it was five.  Okay. Thank you.

A.     You're welcome.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

HEARING OFFICER:

1

You may proceed, Co

2

3   DIRECT EXAMINATION

4   BY ATTORNEY BUSHINSKI:

5   Q.      Ms. Wilcox, do you participate

6   or use the social media platform known

7   as Facebook?

8   A.      Yes, I do.

9   Q.      In February of 2016, did you

10  become aware of a Facebook post on

11  Nancy Lewen's Facebook page in which

12  she alleged that PSSH was

13  discriminating against her?

14  A.      Yes.  A staff member apprised me

15  of that post.

16  Q.      What did you do when you learned

17  about this post?

18  A.      I asked for a meeting with

19  Nancy.

20  Q.      Did you meet with her?

21  A.      Yes, I did.

22  Q.      On what date?

23  A.      That would be February 25th.

24  Q.      What did you discuss in the

25  meeting?

1   A.      The post and also her concerns

2   about her supervisor, Ray Hamm.

3   Q.      During the course of this

4   meeting February 25th, 2016, did Nancy

5   Lewen make any complaints to you about

6   Ray Hamm personally?

7   A.      No.  When we were having

8   discussion she said that she didn't

9   want to see Ray Hamm get into any

10   trouble.

11   Q.      She didn't make any complaint

12   about him mistreating her?

13   A.     No.

              ATTORNEY BUSHINSKI:

14        Let me see AA-19.

15

16   BY ATTORNEY BUSHINSKI:

17   Q.     I'm showing you what has been

18   marked and introduced into the record

19   as Appointing Authority's Exhibit

20   Number 19.  Can you identify that

21   document for the record, please?

22   A.      Commonwealth witness statement

23   written by Nancy Lewen.

24   Q.      Did Ms. Lewen give you that

25   document on February 25th of 2016?

174

1    A.      No, she did not.

2    Q.      How did you get it?

3    A.      Her supervisor Ray Hamm.

4    Q.      Did you read the document?

5    A.      I did.

6    Q.      Regarding the substance of the

7    documents, the allegations contained in

8    there, do you have an opinion as to

9    whether those allegations in that

10   document are true or false?

11   A.      I would say false.

12   Q.      Are they true in any way?

13   A.      No.

14   Q.      In regard to her presenting this

15   to Mr. Ray Hamm as a complaint or a

16   grievance are complaints or grievances

17   usually handled in this manner?

18   A.      No, they're not.  If a

19   supervisor and an employee cannot work

20   it out amongst themselves, then they go

21   up the chain of command, which would be

22   the assistant director of nursing or

23   myself.

24   Q.      All right.  During your meeting

25   with Ms. Lewen on February 25th of

175

1   2016, did she mention anything at all

2   about getting a gun and shooting people

3   at PSSH?

4   A.      She did not.  What she said was

5   that a dayshift supervisor had yelled

6   at her and asked if I --- if that

7   supervisor had told me.  And I had told

8   her I wasn't certain if that supervisor

9   had came in to tell me about what

10  happened.  Ms. Lewen then said that

11  they --- that she forgave her, forgave

12  the supervisor, but that the

13  supervisors would need to be careful

14  because anyone else could go to their

15  vehicle and return with a gun and shoot

16  them.

17  Q.      Did you think that she was

18  talking about herself when she said

19  anyone else?

20  A.      I wasn't certain, but I was

21  concerned enough to report that to my

22  boss, which is Barbara Raymond and

23  Brian Skinner.

24  Q.      Thank you.  I'm showing you what

25  has been marked as Appointing

176

1    Authority's Exhibit Number 20.

2                    (Ms. Lewen's Facebook

3                    Page -- produced and

4                    marked for identification

5                    as Appointing Authority

6                    Exhibit Number 20.)

7    BY ATTORNEY BUSHINSKI:

8    Q.        Take a moment to look at that,

9    please.  Are you familiar with that

10   document?

11   A.        Excuse me.  I am.

12   Q.        Is this document what is

13   commonly called screenshots of a

14   Facebook page?

15   A.        Yes.

16   Q.        Did you provide these documents

17   to the Pennsylvania Soldiers' and

18   Sailors' Home?

19   A.        I did because I was surprised

20   that they're from another employee that

21   this is on Facebook, all of the posts.

22   Q.        And how did these documents come

23   into your possession?  How did you get

24   them?

25   A.        I printed them from my computer

177

1     in my office.

2     Q.      Did you change or alter these

3     documents in any way, shape or form?

4     A.      No.  I wouldn't even know how.

5     Q.      I just want to refer --- ask you

6     to refer to the third page of the

7     document.  Maybe I'm wrong on the page.

8     Hold on a second.  Yes.  I'm talking

9     about the right thing.  This would be

10    the Facebook message --- I'm going to

11    point it to you.

12    A.      What page?

13    Q.      This would be third page.  I

14    have these front and back, so it would

15    be the third printed page.

16    A.      Right here (indicating)?

17    Q.      Right down there.

18    A.      Right here.

19    Q.      And does Ms. Lewen state in that

20    Facebook message that she said that she

21    admits the message I sent to Barry

22    Blasic while off duty could have been

23    construed as harassing?  Can you read

24    that?

25    A.      Yes.

178

1  Q.      Did you change or alter that

2  passage in any way?

3  A.      No, I did not.

4  Q.      Ms. Wilcox, Ms. Lewen claims

5  that PSSH had fired her in retaliation

6  for making complaints to the

7  Commonwealth of Pennsylvania,

8  Department of Health and the Department

9  of Pennsylvania Office of Attorney

10  General for resident abuse and/or

11  resident neglect.

12          She says that she made these

13  complaints --- she says rather she told

14  these things to Barry Blasic and

15  believes I think that Mr. Blasic passed

16  them on to the authorities of Soldiers'

17  and Sailors' Home.  Now, do you --- as

18  the Director of Nursing is Barry Blasic

19  effectively one of your subordinates?

20  A.      He is.

21  Q.      Did he ever have a conversation

22  with you in which he told you that

23  Nancy Lewen made complaints to the

24  Department of Health or the Office of

25  Attorney General?

179

1   A.        No, he did not.

2   Q.        Did anyone bring these --- did

3   anyone prior to March 14th of 2016 tell

4   you that Nancy Lewen had made

5   complaints to the Department of Health

6   or Office of Attorney General?

7   A.        No. When the Department of

8   Health comes in the building it's

9   anonymous.  The call is anonymous to us

10  and that's what they tell us when they

11  come in.

12            ATTORNEY BUSHINSKI:

13            Nothing further.

14            HEARING OFFICER:

15            Ms. Lewen, do you have

16  any questions of ---?

17            MS. LEWEN:

18            I just have one brief

19  question.

20            HEARING OFFICER:

21            Ask.

22  CROSS EXAMINATION

23  BY MS. LEWEN:

24  Q.        On this Facebook post ---?

25  A.        Are we back on page ---

180

1    Q.      Yeah.

2    A.      --- three?

3    Q.      On the one where I said I

4    admitted that it can be construed as

5    harassing.  Were you aware of what I

6    was talking about?  Because actually

7    what I was talking about was the

8    chicken noodle threat, the chicken

9    noodle soup threat.  I meant it in a

10   jokingly manner.  Were you aware of

11   that?

12   A.      Can you please repeat the

13   question?  Was I aware that ---?

14   Q.      Were you aware of what --- I

15   said, I admitted the message I sent to

16   Barry, that I sent while off duty,

17   could have been construed as harassing,

18   but surely that wouldn't be enough to

19   get me suspended from my job for

20   bullying, would it?  Were you aware of

21   what message I was talking about?

22   A.      Yes.

23   Q.      The chicken noodle soup threat?

                     HEARING OFFICER:

24                   Do you understand the

25

181

1    question, Ms. Wilcox?

2    A.      I don't know.

3                    HEARING OFFICER:

4                    If you don't know you can

5    say you don't know.

6    A.        Yeah, I don't know.

7                    MS. LEWEN:

8                    You had read it just a

9    little --- you had pointed it out to

10   Barry Biasic just a little bit ago from

11   the Facebook messages and you had read

12   it aloud where he was sick that one day

13   and I threatened him with chicken

14   noodle soup?

15                   ATTORNEY BUSHINSKI:

16                   Again, Mr. Zurn, I don't

17   think she understands that she needs to

18   direct her remarks to you.

19                   MS. LEWEN:

20                   I'm sorry, Mr. Zurn.

21   When I made this comment on Facebook I

22   was --- .

23                   HEARING OFFICER:

24                   You're explaining why you

25   made the comment?

182

1    MS. LEWEN:

2    Yeah.

3    HEARING OFFICER:

4    Ms. Wilcox says she

5    doesn't know what ---

6    MS. LEWEN:

7    Right.

8    HEARING OFFICER:

9    --- it was.

10   MS. LEWEN:

11   Because she wasn't aware

12   of what I was ---.

13   HEARING OFFICER:

14   So we'll go on from

15   there.  That's the end of your

16   question.  You will have an opportunity

17   to testify on your own behalf.

18   MS. LEWEN:

19   Right.  Okay.

20   HEARING OFFICER:

21   Okay?  Okay.  So if you

22   want to go to that on you're on behalf

23   you can tell the Court what your view

24   is of the situation.

25   MS. LEWEN:

183

1    Okay.

2    HEARING OFFICER:

3    Any other questions of

4    Ms. Wilcox?

5    BY MS. LEWEN:

6    Q.    When I had mentioned in that

7    four-page unsigned document that I gave

8    to Ray Hamm about the staffing

9    situation, did you think that I was

10   talking about the assisted living unit

11   or the skilled unit?

12   A.    It's not an assisted living

13   unit.  It's a personal care unit.

14   We're regulated under personal care,

15   regulation 2600.  Not assisted living

16   2800.

17   Q.    Well, see, then I wish we could

18   have just talked about this because I

19   was going by assisted living.

20   A.    Personal care.

21   MS. LEWEN:

22   I wish that we could have

23   really just talked about this.  I was

24   greatly --- I thought that they went by

25   assisted living regulations.

184

1  HEARING OFFICER:

2  Well, now you can

3  clarify, so ---.

4  MS. LEWEN:

5  Right.

6  BY MS. LEWEN:

7  Q.  So there was no actual fraud?

8  A.  That's why I had said that.

9  Q.  And then you had said PPD and I

10  thought you were ---.

11  MS. LEWEN:

12  I thought this whole

13  thing was showing that ---.  And I

14  brought the long term care regulation

15  all with me here to show that I know

16  how to calculate PPD for the skilled

17  side.  I wish that we could have just

18  talked about this.  I really do, but

19  --- and as far as the Facebook

20  posts ---.

21  HEARING OFFICER:

22  Do you have any further

23  questions of Ms. Wilcox?

24  MS. LEWEN:

25  Yes.

185

| | |
|---|---|
| 1 | HEARING OFFICER: |
| 2 | Please, direct your |
| 3 | questions to her. |
| 4 | BY MS. LEWEN: |
| 5 | Q.    Do you recognize this?  I have |
| 6 | copies of it. |
| 7 | A.    I do. |
| 8 | ATTORNEY BUSHINSKI: |
| 9 | I don't have that |
| 10 | document in front of me. |
| 11 | MS. LEWEN: |
| 12 | Right.  I have it here |
| 13 | for you. |
| 14 | HEARING OFFICER: |
| 15 | Just hold on now.  Do you |
| 16 | want to put this into the --- do you |
| 17 | want to put this in? |
| 18 | MS. LEWEN: |
| 19 | I would like to submit |
| 20 | this as evidence.  This is the Facebook |
| 21 | post that I made.  Oh, I guess I'll |
| 22 | have to ---. |
| 23 | HEARING OFFICER: |
| 24 | This is a Facebook page |
| 25 | when, and where, and what, and --- are |

Sargent's Court Reporting Service, Inc.
(814) 536-8908

186

1   you going to introduce this?

2              MS. LEWEN:

3        I'm sorry.

4              HEARING OFFICER:

5        Are you going to

6   introduce this ---

7              MS. LEWEN:

8        Yes, I am.

9              HEARING OFFICER:

10            --- for your own

11  testimony or do you have a question on

12  this particular thing of Ms. Wilcox?

13  Ms. Lewen, do you understand where you

14  are?  At this point in time you are

15  acting as your --- as an attorney.

16  Okay?  You are not Ms. Lewen.  You are

17  an attorney for Ms. Lewen.

18              You are to ask Ms. Wilcox

19  any questions.  Okay?  Are you going to

20  throw out pieces of paper and say does

21  she know something about this or --- is

22  that what you're planning to do?

23  BY MS. LEWEN:

24  Q.        Is this the post that you

25  referred to in your witness --- in your