# DEFENDANT - SMF

# EXHIBIT 10

AOL Mail - Message View

FW: Thank you and letter to Jennifer
From: barry blasio <br />
To: wilcoxamazon <br />
Date: Wed, Mar 2, 2016 7:50 am

Date: Tue, 1 Mar 2016 15:04:00 -0500
Subject: Thank you and letter to Jennifer
From:
To:

Barry-

Thank you for blocking me on Facebook. Since we hardly ever see each other at work, I'm sure that we can remain friendly and professional.  If you feel the need to file an official sexual harassment complaint against me I would completely understand. I'm quite certain that if you just wanted to complain unofficially about me you could talk to Ray about it and he would be willing to unofficially fix the schedule so that our paths would never cross. He sort of owes me a favor anyway.

I don't plan on contacting Matt.  Nine months later he's still looking for a wife and stepmother to help raise a little boy who is now six years old.  I'm not that crazy.

I remain concerned that you blew me off about putting your email address with your name on POF online dating site. I still need to put my shoes and coat on and grab my grandson from the school bus, but by the time you read this email, it will be too late to stop me from mailing a letter to your ex wife, expressing my concern for her safety.  I'm not too cheap to pay the $5.76 to send it Priority Mail.  I'll be mailing it from the Pony Express on West 8th Street.  Afterwards, if they has behaved himself, I may see if he'd like to go to Arby's on West 8th Street or if he'd rather go to McDonalds.  McDonalds will probably win. I have no idea what your current mailing address is, so I can't do you like I did Matt. Therefore, I cut and pasted my letter into the body of this email.  As enclosures, I printed out your POF page and three pages of the faces of registered sex offenders who live within a one mile radius of your former marital home.

Sorry it has to be this way.  No hard feelings. I know I have "issues."  Much of that comes from being a high IQ/highly sensitive gifted female empath. As a 100% logic driven high IQ male, Matt understood my issues.

I have no doubt that you can pick up woman on the internet who are a bit more normal and  aren't looking for anything serious.
Good luck.  Don't feel the need to reply.

Nancy -
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
02/29/2016
Dear Jennifer,

looking kids I don't even know.

I have read and understand the Pennsylvania criminal statute involving "harassment and stalking."  (18 Pa.C.S.A. § 2709).  My intention is solely to bring the mom hammer down upon Barry's head for something dangerous he is doing that I told him nicely he should not do, but instead he chose to ignore me and block me on facebook.

As you may know, Barry was, and still is, very hurt over the ending of your marriage. In a well meaning attempt to help get over the pain and anger and move on, I did a lot of talking to him. I even tried unsuccessfully to get him to go out with me and hopefully maybe even develop a relationship, knowing that I'm in a way different stage of my own adult dating life. I'm not the "casual sex" type. I showed him the online dating sites, where I have personally had success meeting decent college educated professional type men, none of whom were "the one," for me, but nevertheless were nice men. However, for every decent college professor or attorney or engineer that I've met, I've had to weed through a ton of losers. I clearly told Barry to be guarded against sickos and psychos.

I was thrilled a few weeks ago to see that he had made an online dating profile on the free dating site, "Plenty of Fish." I was proud of him for making that first very difficult step in moving on in life. My greatest wish for Barry is the hope that one day he will find a good new wife and stepmother to bring into your family as a welcome female co-parent, friend, wife and helpmate to him, acting as a loving surrogate mom to your little boy during Barry's periods of custody. My delight recently turned to dismay and anger. A few days ago, I noticed that rather than pay for the "upgrade," Barry was naive enough to provide his hotmail email address, which clearly shows his real name. Even worse, he has a picture of your sons with him on his profile picture, one of whom is clearly a minor. (Thank God, he didn't post a picture of your daughter on the online dating site!) He's "not looking for a relationship." (In other words, he's looking for casual sex with no strings attached.) Excuse me, but there's something not quite ethical about a Dad using a picture of a couple of teenage boys while marketing himself online for a booty call.

There are many sickos and psychos on dating sites. Male pedophiles and rapists pose as women, looking for prey. It's unbelievable the number of people who are stupid enough to post pictures of their children on online dating sites and enough information to lead a predator right to the front door of vulnerable and unsuspecting prey. I Googled "Barry Blasio." It comes up Barry J. Blasio 1136 East 34th St. Erie, Pa 16504. (814)802-4956 I bet he and Jennifer Gervasi Blasio at that address. I suspect Barry doesn't live there.

It took five minutes of sleuthing on the internet to learn that your minor son's name is Gavin and your minor daughter's name is Ivy. I even found a pubic picture of Ivy from GoErie from when she was a cute little blond 8 year old. I also found many public pictures of you, some of which could be construed as sexually provocative to a rapist. Just from a quick five minute internet search, I know that Ivy is approximately 16 years old and I know that her recently divorced mother is a very beautiful blond, probably living alone. FYI: There are 31 registered sex offenders in a one mile radius of your home.

I am enclosing the printout of the registered sex offenders who live in a one mile radius of your home, many of which were convicted on Tier 3 offenses such as rape and involuntary deviate sexual intercourse. If you look at the pictures, I think you will agree that these are not the type of men who you would appreciate showing up in your bedroom in the middle of the night or having forced sex with you or your daughter, having been led there by your ex-husband's "cheapness" and stupidity with online dating. Google it. I think you will find that I am not telling malicious lies. I am speaking truthfully and lovingly, through the voice of an experienced and very imperfect divorced mom, grandmother, sociologist and nurse. You and your kids' safety is none of my business, but as a female this weighs heavily on my heart, for no reason than because I care enough as a coworker friend to be concerned about Barry's children's safety... and the safety of their mother.

I can't help but wonder why Barry would ignore my concern. I have two theories. One theory is that he thinks that I'm just jealous because he's not interested in dating me. I have no "ulterior motives." While I do love Barry a whole lot as a coworker friend, I know that I'm probably about 100 pounds heavier than the type of woman Barry is looking for. It also occurred to me that maybe he doesn't care at this point if some rapist shows up at the door and rapes you...since he has primary custody anyway, so the kids are "safe." Regardless of what events happened that led to your divorce, the best gift a man can give to his children is to show respect and concern for their mother's safety.

Barry is a highly intelligent man, but he is naive when it comes to navigating the adult dating world. I'm more than happy to show some unsolicited tough love by bringing the mom hammer down on Barry's head as a voluntary advocate for your safety...regardless of the fact that you broke his heart. I personally know the pain of adultery. I also know that there are two sides to every divorce. Rather than look for casual sex, I personally think he should look for a good stepmother to step into the important support role that a committed and loving woman can play in the lives of children of divorce. Step-parenting requires commitment and long term selfless sacrifice. It won't happen overnight, but Barry is a good man and a nice guy. I'm sure he's confident a good woman who would love him enough to be willing to sign up and volunteer to help raise your kids to adulthood. In the meantime, while Barry's looking on the internet for casual sex, I would hate to see



AOL Mail - Message View

something bad happen to you, all because Barry is TOO CHEAP to pay for the safety of the upgrade on an online dating site. Feel free to show Barry this letter. Tell him I could care less at this point that he blocked me on Facebook and doesn't want to hold my hand.
*************************************

# DEFENDANT - SMF

# EXHIBIT 11

Blasic, Barry

| | |
|---|---|
| From: | Lewen, Nancy |
| Sent: | Wednesday, March 02, 2016 1:54 AM |
| To: | Blasic, Barry |
| Subject: | Post office tracking number |

Expected delivery date is Friday March 4, 2016.  (My birthday.)

Tracking #   95055215159260061000554

Link to USPS tracking---
>   https://tools.usps.com/go/TrackConfirmAction.action?tRef=fullpage&tLc=1&text28777=&tLabels=9505521515926061000554

1

EXHIBIT
u

# DEFENDANT - SMF

# EXHIBIT 12

Lewen PDC Minutes

March 7, 2016

Present: Brian Skinner, HR; Kathy Wilcox, DON; Erika Seese, HR; Nancy Lewen, LPN; Jodie Dickey, Union Representative

PDC convened at 1300

Q.  Describe your relationship with Mr. Barry Blasic.

NL:  Friends with him on the job.  We used to work together on the night shift and after his wife committed adultery and left him I began to offer words of encouragement off duty, online, on Facebook messenger or e-mail.  I tried to see if he would like to go on a date with me to the Cleveland Museum of Art.

Q.  How did you communicate with him?
NL:  On Facebook Messenger.

Q.  When did he correspond with you last on Facebook?
NL:  Gosh, I would say in January.  At that point he was interested in going to the Cleveland Museum of Art with me.  After that, I would say that he didn't respond with me.  So at that point, it was maybe one sided.  He had blocked me on Facebook.  Actually I had contacted him because he had signed up for an online dating profile.  I saw that he signed up and the information he gave, he wasn't careful, led to the address of the home where the children reside. There was correspondence last week.  Jokingly, I said, "Feel free to file a formal harassment complaint if you'd like to."  Never in a million years did I think that a state vehicle would pull up and serve me papers when I was babysitting my grandson.

Q.  Previously, you sent quite a few messages to him.
NL:  I know, I have sent him quite a bit of messages.

Q.  Did he ever respond?
NL:  In January, yes.  It was close to his court hearing.  The last thing he said was "Remind me".

NL showed a picture of a dog with flowers and a heart that was sent to her by Mr. Barry Blasic.

NL:  I admit to that, I sent messages and it was completely off duty and it was via our private social media, nothing that would violate that policy.  I don't dispute that he hasn't

responded, since January, he hasn't. I think that it was just hard for him to step out into the dating world and that he is a shy person. I don't need to lose my job over it. I'm an adult and capable of being friends and for maybe arranging the schedule for us not to work together.

Q. How did you know about the Plenty of Fish profile?
NL: I suggested to him to do so, I thought it would be good for him. I told him to be careful. I didn't tell him to go online and create it so people could see his personal information. There are a lot of sickos out there.

Q. What did you mean when you said "Don't be a Matt"?
NL: Last year I was dating someone and before we had already met in person he was trying to get me to take his kids bra shopping. I was referring as to "not be Matt" as in not getting his kids involved. I wish you would have known the context of that. I could never hurt Barry. I did threaten to contact his ex-wife; I don't care that she committed adultery and that she was a bad mother. I care about her safety. I did follow through with it; I'm a feminist, what can I say? So I wrote the letter to his ex-wife and I sent it to his private e-mail and I said, "by the time you read this it would be too late." I was just joking when I said that he could file a harassment charge against me. I didn't mean to get the state involved. And then he filed a case against me.

Q. You sent the tracking number to his e-mail account, and you said you were joking about filing a grievance?

NL: Well, yeah. Of course I was joking. I know it wouldn't violate any workplace codes of conduct.

Q. You talk about how you were able to find out about his kids.

NL: That's what I was trying to warn him of. If I was a sicko I would be led right to his house. There are many sex offenders near his home. It's a waste of government resources to be here; and taking me off of the schedule is not in the best interest of the residents.

Q. I assure you, the residents are being taken care of. If you were actually looking up someone's children you couldn't see how that could be inappropriate?

NL: I care about her and their safety. She's a female and I'm looking out for all females.

Q. You wouldn't be concerned about prying into someone's personal life?

NL: He put it out there.

Q. Well, you looked it up.

NL: He put it online and as an example I was showing him. I told him to take it off there and he didn't take my advice as a friend. It's all a big misunderstanding and instead of wasting government resources we could have sat down as friends and rectified this. Am I concerned about his ex-wife; yes. I'm concerned about the any female living alone. He did take down his online profile I did notice over the weekend. So, he did take my advice.

Q. Sending the letter to his ex-wife and saying you can file a sexual harassment statement and using your work e-mail to send things to his work e-mail; that doesn't come across as intimidating to you?

NL: No, it doesn't. It's informative. He shouldn't be using his e-mail on the job. I tried to do the right thing and maybe I made a mistake and shouldn't have said anything. It's all a misunderstanding.

Q. How is it a misunderstanding?

NL: Because, I wanted to go on a date with him; now, he doesn't now, which is fine. It never had to get to this. When my daughter was a victim of domestic violence I can't even tell you how many letters I have sent. Letters are more powerful than fists.

Q. You told us in your own words that he stopped responding to you in early January, yet you continued to send an abundance of e-mails, many of them work-related, without ever getting another response. Why keep sending the messages?

NL: Actually, I can't answer that. Maybe it would have been helpful for someone to sit down with us as adults. I should have just backed off. I thought he was just shy to get back in the dating world and waiting for his divorce to be final. I thought wrong, obviously.

Q. You gave Mr. Raymond Hamm a grievance form regarding discrimination, is this correct?

NL: I never turned that in.

Q. What was your intention of that?

NL: This was when I was working on unit C and he said to me that I need to be in compliance with my med counts. I said that I was just doing it just the way it was oriented to me. I don't have a problem being in compliance; I was just doing it the way I was told. If you are going to make me be in compliance on that unit, you should make everyone be in compliance on all units. That's what that was about. Ray took this and it

wasn't supposed to go any further than him and I. Ray said it wasn't fair for him, so I never signed it; it was never turned in.

Q.  If it was a grievance against him, why would you take it to him?

NL:  Because he is my supervisor.

Q.  This is very intimidating and in a threatening manner. You are taking it to him and giving it to him and saying "what do you think about this"?

NL:  Well, I never filed it.

Q.  Could you understand how this could be intimidating and very inappropriate?

*Moment of silence

NL read the above mentioned document.

NL:  I'm sorry, I'm reading and I forgot all what I had written here.  I'm just reading through it. The other thing I was bringing to his attention was I didn't think they were deducting for fifteen minute pay breaks or time when nightshift A goes over and helps. A few weeks back I had mentioned it to another LPN about it.

Q.  "We cuddled for almost an hour", what did you mean?

NL:  What I meant was not cuddled actually, I meant talking as friends.  Maybe I used the wrong term.

Q.  Slay Nancy Flanigan?

NL:  Nancy Flanigan, from what I've heard, is telling Kim Horvath how to do the scheduling.  I guess this is what I get for caring too much.

Q.  Do you understand this type of behavior is inappropriate and threatening by giving him that document?  When you handed it to him did you feel that?

NL:  I thought Ray and I had verbally resolved it as friends.  I really didn't think it was going to come to this.  I didn't think it was intimidating, no; but I think that he should be aware.

Q.  Then why did you go on in your message to further say that you found yourself giggling about your allegations from Ray?

NL:  Because, it was funny that he was shocked and that he wasn't aware of it. And he kept saying that it wasn't fair to blame that on him.  And I said, "Well I'm just telling you." Like I said, if they are going to expect us to be compliant on one unit, then they

should expect everyone to be in compliance.  And anyone that says they are in compliance are lying.  When you have forty patients to pass pills to on an evening shift and doing everything by regs you can't be in compliance.  And deal with emergencies and everything else.

KW:  I would like to add; DOH came in on a complaint and did an investigation and we did meet our requirements for resident care.

Q.  Regarding your post recently on Facebook, after you received your suspension pending notice, information came to us that you posted you wondered if General Carelli knew about this.

NL:  I was upset that night.  I didn't even know what I had done wrong.  That was after the state vehicle pulled up to my house.

Q.  You also posted what appears to be a photo shopped picture of Barry and you.

NL:  Yes, I admit that. I don't deny any of this, and quite honestly, if I would have been an actual violent person, god forbid, what would have happened that night.  To serve a person papers saying you are suspended without pay; fortunately, I have access to funds that I could live on for about a year.  God forbid, though, this is not a good policy to have this happen.  I did contact the general to see if this could be resolved.  I did not feel it was in the best interest of the residents to be off the schedule.  This whole thing could have been resolved.

Q.  How could it have been resolved?

NL:  In hindsight, I shouldn't have cared I should have just kept to myself and coming in and doing a good job and do the best of my ability.  Don't worry about trying to make it a better place or being in compliance.  When Dawn was going through a hard time I set up a funding page and raised thousands of dollars.  I care about my co-workers.  I am a prior victim of domestic violence.  I'm done; you've insulted me enough. I'm done.

*NL stood up from her seat, tossed her PSSH name badge on the table and began gathering her belongings to leave.

KW:  Are you resigning?

NL:  What am I supposed to do?

Q. Do you have any other questions?

NL:  No, I don't.  Well, actually, when will I know?  I'm in the middle of buying a house, so I need to prove my sources of income.

Q.  We just need to compile and analyze.  You chose to end this conference prematurely…

NL:  No, no.  Please, keep going; ask me whatever you need to.

*NL put her belongings down, returned to her seat at the table and appeared to be ready for further questioning.

Q.  If you were a violent person?  Did you have any violent thoughts?

NL:  No, I did not have any violent thoughts, I was confused.  Am I an emotional person; yes.  Do I take these things seriously; I do.

Q.  You mentioned about getting a gun and shooting them.  Do you think that's appropriate thing to say in this day and age?

NL:  You'd have to know the context of that.  There was a supervisor there that was having a bad day and yelled at me and I felt as my supervisor Ray witnessed it and should have stepped in.

Q.  Do you think that was appropriate to state to a co-worker that you could go out to the vehicle and get a gun and shoot them and her?  You also stated that you have a diagnosis of PTSD.

NL: I do, I was a victim of domestic violence. If you are looking for an answer then probably not.  No; is that what you're looking for?

Q.  Would the Union like to add anything?

JD: I just wanted to know, like, are we offered a SEAP card?

NL: Yes, I was offered a SEAP card.

KW:  Ray Hamm gave Nancy a SEAP card.

No further questions.

Meeting adjourned at 1350.

# DEFENDANT - SMF
# EXHIBIT 13

Lewen PDC Minutes

3.10.16

Present: Brian Skinner, HR; Erika Seese, HR; Nancy Lewen, LPN; Jodie Dickey, Union Representative

PDC convened at 1300

Q. I would like you to talk freely about the discrimination with Ray Hamm.

NL: Actually, he had come over one night and told me I was not in compliance with my med pass. I said that if you are going to make me be in compliance with med pass then everyone should be. We had an informal talk about that and I didn't think it was going to go any further; obviously it did.

Q. So you did a statement and gave it to him. Was that an intention to intimidate him?

NL: Oh gosh, no. The intent was to bring it to his attention, because they were trying to say that they were sending the night shift CNA from C to A and B, and they were pinning that on him.

Q. Let me explain, that as supervisors, they can make arrangements and changes however they see fit and choose to. Why does that make you a victim of sexual discrimination? Did you know that making a serious statement and claim about such is a violation?

NL: The next night he did not pass the message along to John Slupski, okay? Like he should have. And as I said, I didn't sign a witness statement; we had friendly talk that night and I didn't sign the statement.

Q. Who is taking care of your residents while you are investigating all of this and who was notified of what?

NL: I was on unit E, and it was via telephone.

Q. The telephone? Is that a part of your work duties?

NL: I was on unit E. I was concerned that it was getting pinned on Ray.

Q. But I don't think you were because you said you found yourself giggling about it.

NL: Well, yes, I was thinking it was funny.

Q. You were not hired for anything of this. You are definitely out of your scope. If you have a problem with your supervisor where do you go? If there is a serious infraction of sexual harassment where would you go?

NL: I would go to my supervisor.

Q:  You would? If there is a serious infraction of sexual harassment, where would you go?

NL:  Well, I would go to his supervisor. What I don't understand is that Rhonda Wilkinson said that the last night I was here that it was her duty to make sure that the Commandant's sister and another employee not have sex on the job.  If she can do that, then why would I get in trouble for what I did?  Why is there a state vehicle pulled up outside my house to suspend me?

Q.  Those are serious allegations; how do you know that they are having sex on the job?

NL:  Because that's what Rhonda Wilkinson said.

Q.  These are serious allegations and some that we are going to have to investigate and that we may have to reconvene with you again.

NL:  That's what Rhonda said.  That her duties entailed making sure that they don't have sex on the job and how ridiculous that I was getting into trouble for what I did. I was also concerned because I showed Ray the interpretive guidelines for living situations and I felt that they were not calculating that well.

Q.  Is that your job? I haven't heard you say anything regarding your job as an LPN.

NL:  You're right, that's true.

Q.  I'm sure that the staff and supervisors at Erie PSSH are fully capable to assign people and successfully run their facility.

NL:  Well, I'm glad you have that confidence. When you leave out of there at 715 in the morning and these people are sitting there with no one to feed them.  I offered to stay here unpaid to help and I've been told I'm not allowed.  One of the most recent people I told that to Rhonda Wilkinson. That is my service to humanity.

Q.  We are paying you to be an LPN and that includes your service to the veterans. Let's get back to Barry, because I understand that you have no idea how this relates to one another.

NL:  I do not think I violated any workplace or that I have acted inappropriately.

Q.  Would you say you are fixated on Barry?

NL:  No, I would say that I tried helping him.

Q.  How is that your business as a coworker?

NL:  I was concerned about his ex-wife and his children's safety and because I wanted to go with him to the Cleveland Museum of Art. I have sufficiently answered any questions regarding everything with Barry and I with Facebook messenger.  I was advised by an attorney yesterday about that.

Q. That's fine, but I will continue my questioning and you can answer as you choose. Okay? Let's get back to Barry. You are confused about why this is a workplace issue. You admitted that you injected yourself in his life. In some of your posts you even admitted to Barry that you stalked him. We have a responsibility for the safety of all of our employees and our residents.

NL: You do not know my sense of humor though.

Q. This sense of humor is not appropriate for the workplace. In your messaging to Barry on February 21 you wrote to him, "I was stalking you, Barry" … (continues reading Facebook message to Barry) Do you understand that at work you acknowledge that you are stalking him. So, you continue to stalk this co-worker you wrote to him through your work e-mail.

NL: Yes, and I admit that I would cook chicken noodle soup, too. Come on now! Really, truly, you win the argument. Please, just give me my punishment.

Q. There is no argument to win. And this is a fact finding session.

NL: I admit to all the allegations regarding Facebook and messages that pertain to Barry Blasic.

Q. You also mentioned something about kicking Barry's ass.

NL: If you knew me I was figuratively speaking. I was involved with an intelligent man, but, yet he was naïve; stupid enough that in a matter of a week asked me to see if I was going to take his daughters bra shopping. I could have been a man or a pervert. I did not kick *his* ass. I did write a letter to his ex-wife.

Q. Why did you continue if he did not respond to your messages?

NL: Because I thought he was waiting for his divorce to be finalized.

Q. And why did you think that?

NL: Because that was the last message that he sent me.

Q. Do you understand that you brought this to the workplace?

NL: In hindsight, I would not have used my workplace e-mail account to send the tracking number letter to his email. I would not have done that.

Q. What was your intention on sending that tracking number to him?

NL: I wanted him to know that if she showed up at work that he would know. I made an error of judgment.

Q. If you did it all again, would you still send the letter to his ex-wife?

NL: Yes. Let me tell you that I am an overcomer of sexual and domestic violence. The things that I post on Facebook have quite a bit to do with empowering women.

Q. I read the letter to his ex-wife and it's kind of degrading and threatening. It was degrading her about adultery. You don't know the circumstances at all to pass judgments like that. How is that empowering women?

NL: You're right, I know that. But I was expressing concern and looking out for her and their safety.

Q. Is that in your position whatsoever? Barry is your coworker and is that any of your business? You did it for a reason. And you've admitted it; there was motive to get a date with Barry.

NL: I don't care anymore if I ever go on a date to the Cleveland Museum of Art with Barry. Okay?

Q. You are bringing everyone on your Facebook page that works at the Erie facility; you are bringing everyone into this now.

NL: I was confused when I was served (the papers) because I was confused about how I violated the workplace code. There were other ways that someone could have talked to me and resolved this. I think it's so unfair that Rhonda Wilkinson had the duty of making sure the Commandant's sister and Charles aren't having sex at the workplace, but I am getting in trouble for something like this.

Q. Again, we are here to talk about you, not Rhonda Wilkinson.

NL: And I have sought legal counsel and they advised me that I have answered all your questions that you have asked.

Q. You can have legal counsel between you and Barry Blasic, but your lawyer does not have a place in this meeting right now.

NL: I can see the writing on the wall. I can see where this is going. Can we please convene this and just get on with the punishment?

Q. Why did you send the Director of Nursing flowers?

NL: Because she is my Facebook friend and I appreciated that.

Q. Again, taking things like that from online and in personal life to work. Are you aware that violates workplace policy? Do you send everyone on your Facebook list flowers?

NL: She went out of her way to meet me. I don't think Barb Raymond would know me on the street. I'm the type of person that out of love I did that. Not intimidation, not at all. So I violated policy then. I have no desire to go through the stress to be railroaded out the door.

Q. Do you recall having a conversation with Ms. Kathy Wilcox on February 25 in her office?

NL: Yes.

Q. What did you discuss with her?

NL: More or less friendly conversation and she... I don't know; ask your questions, because I'm sure you have a question about it.

Q. Do you remember why you were in there talking to her?

NL: She had called me and asked me if we could talk because I had sent her a question regarding a policy involving urine collection. I thought that I had violated policy for not having a physician's order and I wanted a physician's order, and Kathy confirmed that. Gosh, I wish we could look at the email.

Q. Kathy asked you about filing a discrimination claim, is that correct?

NL: Oh. Yes, I said, "Kathy if you knew me you would know that my degree is in sociology and I post things about women's rights, equal rights." Then, after that, we did become friends and Facebook friends; I thought anyway.

Q. A lot of your answers are either "out of context" or "if you knew me" or "if you knew my personality", but, the problem is that you may have a circle of friends that know your personality, but your workplace friends do not know. It doesn't seem like a joke to us, or to anyone else.

NL: I know, that's why I said just convene this. There are other places to work. I would love to be here for the next 15 years. You know...

Q. Do you recall making a statement about people need to be careful who they are yelling at as one day someone could walk out to their car, get a gun and come back and shoot them?

NL: Yes, I did say that. Okay, first of all, let me say that when I first walked in PSSH I was screamed at from the nurse that was going to orient me. She was stressed and she screamed at me. She didn't mean to, but she was screaming at me. Fast forward to December; I had walked in the supervisor's office and a supervisor, the question that I had, I didn't want to put tape on a resident's legs because his skin was fragile. I didn't want to do it without a physician's order. Supervisor is Deb Cubero and she screamed at me when I walked in the door just to ask about the order for the tape. She screamed at me and called me stupid. Ray was standing there and had this shocked look. He was just as shocked as me. I walked out; didn't burst into tears or anything. Later, I did cry. Deb called me and asked me to come see her when I was done. She apologized and said I didn't mean to scream at you I meant to scream at Ray. I said to her I understand completely and I hugged her and I said I love you and I forgive you. Lots of it is age and being postmenopausal and hormonal and with stress. Everything rolls down. A woman of

domestic violence is also a child abuser. It's the pressure. It rolls down. I understand the
dynamics. I understand that level. I have 200 college credits with sociology. I forgave her. She
even said to me, "I called Kathy and told her one of your nurses is going to come in your office."
I felt that as though Ray should have stood up for me. He said, "I was so shocked and
dumbfounded that it happened so fast I didn't know what to say." I told him I cried. Anyways,
then… I lost my train of thought now. I did say that type of workplace, you get screamed at for
no just cause, you know, would cause workplace violence. That's what happens.

Q. Did you have workplace violence training?

NL: Yes. I would like to read this.

NL read an excerpt from the bible aloud in an attempt to explain her use of the word "slay" in
regards to Nancy Flanigan.

Q. Do you understand what slaying means?

NL: That's why I pulled this up. I did not mean it in a violent way.

Q. Well I looked up the word "slay" and it says 'to violently kill or murder someone.' There is
not context when you put it in writing.

Q. Why did you feel it was appropriate to make this comment to Ms. Wilcox?

NL: I think that people do need to be aware of the stress. Yes, I do think that's appropriate.
Because sometime that would happen.

Q. Do you think that it's appropriate that people would have that fear? You're intimidating the
entire facility now.

NL: I was just saying that if I was a different person. That's all I'm saying.

Q. To say someone was walked out and you felt it was unjust; you don't know that unless you
are involved in it. All of our employees are educated and trained in workplace violence. The
problem is that in this context this leads to you.

NL: I think there is no room in the workplace to be yelled or screamed at especially…

Q: Do you own, carry or transport a gun on yourself or in your vehicle?

NL: No, I don't, but that's not to say that other people don't. If my concerns are not warranted,
then praise god!

Q. Are you aware of others in the workplace carrying guns?

NL: No, I don't, but pick up the newspaper.

Q. That's why I'm asking these questions, because it's threatening to everyone.

NL: I wish you would just convene this meeting.

Q. Have you ever had thoughts of harming yourself, co-workers, residents or the general public?

NL: No, I have not.

Q. Have you ever made reference to someone coming in and shooting or inflicting harm on others in the building to anyone else?

NL: No, that was the only time I said that.  And if that's not a valid concern, then thank god for that.

Q. No, it really is a valid concern. Have you reached out to SEAP?

NL: I have reached out to the SIKH coalition. That's who put me in touch with the pro bono attorney yesterday.

Q. Were your civil rights violated?

NL: I don't know, because I don't know how this is going to end. As I've said before, I would probably contact my state rep. I don't know how it'll play out, but really, truly I don't want to go through this.  The schedule this Friday looks slim. I'd like to be there to help.

Q. Have you reached out to Barry since your last PDC?

NL: No, I have no reason to reach out to Barry. I'm not that hard up for a date.  I'm not fixated on Barry. I can go out with other men, trust me.

Q. I encourage you to contact SEAP, they are there 24/7. Do you have a SEAP card?

NL held up a SEAP card that was in her purse.

BS: She does have a SEAP card.

NL: You can paint me however you want.  Quite honestly, I feel you stand the better chance working with me than working with a revolving door.  There's such a turnover in staffing.  If I'm guilty of worrying about regulations and it's not my job, then fine.  I can find another job.  Let's bring the "kni…", should I say "knife"? Bring the knife, the *hammer* down and just get on with it.

Q. We agree we don't want to leave this ongoing.  We do like to wrap up our investigations.

NL:  I mean, honestly I hope that they are already looking for someone because the schedule is so slim. Be looking for someone to replace me now.  Be aware that you should do that now.

Q.  Please know that our supervisors do know how to adequately do staffing. Before you leave Brian will be giving you a witness statement to elaborate on Rhonda Wilkinson. You will be escorted off the property and you are not allowed to be here unless we call you back.  And make sure Brian has your keys and badge before you leave.

NL gave BS her badge; BS gave NL a Commonwealth Witness Statement to complete.

No further questions.

Meeting adjourned at 1355.