# DEFENDANT - SMF

# EXHIBIT 14

 **pennsylvania**
DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS

March 2, 2016

Nancy Lewen
                                                    Employee#: ████

Dear Ms. Lewen:

This is written confirmation of your suspension pending investigation from your Permanent, Civil Service Licensed Practical Nurse position at the Pennsylvania Soldiers' and Sailors' Home, effective March 2, 2016. We have made several unsuccessful attempts to verbally notify you of this leading to this letter being hand delivered to your home address. The period covered by this suspension cannot be charged to annual, sick, personal, compensatory or other leave.

This suspension without pay is pending further investigation into allegations of violating the DMVA Standards of Conduct and Work Rules, the Workplace Violence and Workplace Bullying Prevention Policy, Management Directive 205.33 (Workplace Violence). At the conclusion of this investigation appropriate action will be taken in accordance with the Commonwealth of Pennsylvania and Department of Military and Veteran's Affairs policies. You will be notified of any action taken.

You are directed to return all state property that is still in your possession to Brian Skinner, Facility HR Analyst. This includes any and all keys, records, tools, equipment, Emergency Response Card, reports, manuals, identification cards, etc. Please make arrangements for the return of these items by calling Brian Skinner at 814-878-4944.

**As a result of this suspension, you are not permitted to be on grounds at the Pennsylvania Soldiers and Sailors Home unless explicit permission is granted by the Commandant or the Human Resource Officer.** You may come on grounds to attend your Pre Disciplinary Conference, if and when you receive such a notice informing you of the time and date.

When the investigation has not revealed cause for disciplinary action, the suspension shall be retracted and expunged from all records, with the employee receiving back pay for the full period of suspension. When the investigation has revealed cause for disciplinary action, the suspension shall be converted, either in whole or in part, to a disciplinary action.

This action is being taken under Section 807 of the Civil Service Act, and can be appealed in writing within 20 days of the receipt of this letter on the grounds that this action has been taken in violation of the provisions of said act. Your rights in this personnel action are explained in Parts II and III of "Appeal Request", Form SCSC-4112, copies of which are attached.

 EXHIBIT
A

NOTE: An appeal may NOT be pursued simultaneously through the Civil Service Commission and your labor agreement's grievance procedure.

Since your position is covered by a recognized bargaining unit, whether or not you are a member of the union, you may appeal this action at the appropriate step of your labor agreement's grievance procedure.

In accordance with the provisions of the Patient Protection and Affordable Care Act of 2010, your Commonwealth-provided benefits will continue for 91 days from the first day of this suspension pending investigation, provided that you continue to make the required employee contribution. Should the suspension continue past 91 days, Commonwealth-provided benefits will end effective the following day. If you are enrolled in health benefits at that time, the Pennsylvania Employees Benefit Trust Fund will contact you regarding continuation of coverage under COBRA.

Should you have any questions or need additional information, please feel free to contact the Human Resource Office.

Sincerely,

Barbara L. Raymond, RN, NHA
Commandant
Pennsylvania Soldiers' and Sailors' Home

For:
Anthony J. Carrelli
Brigadier General, Pennsylvania
    Air National Guard
Acting Adjutant General

Hand Delivered
Original Sent Via Certified Mail

    cc:.    Director, AFSCME District Council #85
    President, AFSCME Local #2352
    SCSC
    Official Personnel Folder
    FITG Human Resources
    Supervisor

# DEFENDANT - SMF
# EXHIBIT 15

 **pennsylvania**
DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS

 **COPY**

March 14, 2016

Nancy Lewen
~~████████████~~
~~████████~~

Employee#: ~~██████~~

Ms. Lewen:

This letter is to notify you of your termination from Commonwealth employment as a Permanent, Civil Service, Licensed Practical Nurse (LPN) position at the Pennsylvania Soldiers' and Sailors' Home (PSSH). The termination action is effective immediately.

The reason for your termination is your violation of Executive Order 2002-4, Prohibition of Sexual Harassment in the Commonwealth, Management Directive 505.30 Prohibition of Sexual Harassment in Commonwealth Work Settings, Department of Military and Veterans Affairs (DMVA) Prohibition of Sexual Harassment, DMVA Workplace Violence and Workplace Bullying Prevention Policy, Management Directive 205.33 (Workplace Violence), Management Directive 205.34 (IT Acceptable Usage), and the Department's Standards of Conduct and Work Rules: Unauthorized Behavior. Specifically, you engaged in intimidating, threatening and inappropriate conduct and behavior towards your coworkers and your chain of command. Your conduct and behavior has created an intimidating and hostile work environment.

A Pre-Disciplinary Conference (PDC) was held with you on March 7, 2016 & March 10, 2016 and you failed to provide an acceptable explanation for your actions. You said that if given the opportunity you would do it all again. In addition, after the PDCs you sent correspondence to your chain of command indicating "bloodshed I fear may happen one day at PSSH."

Your previous discipline includes a written reprimand issued on February 24, 2016 and an oral reprimand issued on December 15, 2015.

Please immediately return any State property that is in your possession (including the following items: records; keys; tools; equipment; books; reports; manuals; Red Card; identification cards; etc.) to Brian Skinner in Human Resources by calling 878-4944 to make arrangements.

You may appeal the above action through your collective bargaining agreement, whether or not you are a member of the union. A grievance under your collective bargaining agreement must be filed, in writing, within the time limits established in your collective bargaining agreement.

This action is being taken under Section 807 of the Civil Service Act, and can be appealed in writing within 20 days of the receipt of this letter on the grounds that this action has been taken in violation of the provisions of said act. Your rights in this personnel action are explained in Parts II and III of "Appeal Request", Form SCSC-4112, copies of which are attached. Please

note that an appeal may NOT be pursued simultaneously through the Civil Service  and your labor agreement's grievance procedure.

Your group life insurance coverage ends immediately and, therefore, you will receive a conversion notice from the Prudential Life Insurance Company. You have a 31-day period following the date of termination or 15 days from the date of the conversion notice to apply for an individual policy of life insurance in an amount not to exceed the amount of insurance lost. You will not be required to have a medical examination. If you should die in the 31-day period, your Group Life Insurance will be paid to your beneficiary(es) as though your insurance had not terminated or been reduced. If you want to apply for conversion, contact your local Prudential Office for assistance.

Because of termination of service, you have the right, if desired, to make application at the Bureau of Employment Security Office for benefits under the Pennsylvania Unemployment Compensation Law. Determination of eligibility for benefits is the responsibility of your local Pennsylvania Job Center, which administers the Unemployment Compensation Fund. The attached UC-1609 Form, How to Apply for Unemployment Compensation (UC) Benefits, must be in your possession if you make application for benefits.

You will be contacted by the Pennsylvania Employees Benefit Trust Fund (PEBTF) regarding your continuation of medical benefits under COBRA. Any questions may be referred to PEBTF at 1-800-522-7279. Any earned, unused annual, personal, holiday or compensatory leave will be computed to the last day you are in compensable status and compensation therefore will be sent to you.

You should contact the SERS Regional Counseling Center at 1-800-633-5461 for information on your pension entitlement with the State Employees' Retirement System.

Should you have any questions or need additional information, please feel free to contact the Human Resource office.

Sincerely,

Barbara L. Raymond, RN, NHA
Commandant
Pennsylvania Soldiers' and Sailors' Home

For:
Anthony J. Carrelli
Brigadier General, Pennsylvania
    Air National Guard
Acting Adjutant General

**Certified Mail**
Original Sent Via Regular Mail



cc:     Director, AFSCME District Council #85
President, AFSCME Local #2352
Official Personnel Folder
SCSC
FITG Human Resources
Supervisor

# DEFENDANT - SMF

# EXHIBIT 16

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

INTERVIEWED: Ms. Nancy E. Lewen                    EMP. # ▓▓▓▓
INTERVIEWED BY: _____   ALSO PRESENT: _____
DATE: _2/22/2016_  TIME: 0400  LOCATION  Unit E.

## STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes including actions under the statutes of this Commonwealth just as though it had been sworn or affirmed before a court of law or formal arbitration panel:

My name is Nancy E. Lewen, LPN. I am employed as a full time LPN at the PA Soldiers' and Sailors' Home in Erie. I have been employed by the Commonwealth of PA for 1 1/2 years.

I believe that I have been a victim of harassment and gender discrimination by a supervisor, possibly under the direction of an Assistant Director of Nursing.

My immediate supervisor is Carolyn Williams, RNS, hereinafter referred to as "Carolyn." My complaint is not about Carolyn. I frequently also work under Raymond Hamm, RNS, hereinafter referred to as "Ray." My working relationship with my immediate supervisors had been good, but a problem has developed which threatens to disrupt my otherwise peaceful employment at the facility. This letter is regarding the recent behavior of Ray, who for some reason has singled me out to harass me, possibly in collusion with, or acting as agent for, our recently hired Assistant Director of Nurses, Kevin McLaughlin, RN, hereinafter referred to as "Kevin." Ray's behavior did in fact escalate to the point of verbal bullying on the morning of Saturday February 20, 2016. I will begin my complaint with the details from that incident.

Statement of Facts:

On the morning of Friday February 19, 2016, I was working on Unit C, completing my assignment exactly the way that I was trained during orientation to the unit by Christine Wills, LPN, hereinafter referred to as "Chris." At 0500, Ray came to the unit to collect the paperwork, as witnessed by Julie Richards, CNA, hereinafter referred to as "Julie." Ray looked around the unit for a few minutes, as if searching for something to find fault with, and with a look of disdain on his face, he pointed to my worksheets on the med carts and asked, "are these eleven residents whose names you have crossed off the residents who you have already given medicine to?" I nonchalantly replied, "yes." I treated Ray professionally and respectfully at all times, as witnessed by Julie.

The worksheet that I was using was the preprinted typewritten 11-7 worksheet that is provided by Chris for the other nurses to use, but is not an official DMVA or PSSH form. The eleven residents who had already come for their medicines had come of their own volition. I had not sent Julie to wake anybody up, and had not awakened anybody up myself. I was merely playing the role of Chris on her night off. Ray gave me a dirty look, as witnessed by Julie, and abruptly left the unit. I thought nothing more of the conversation until the next night when Ray telephoned me. In an unwitnessed telephone conversation, he claimed that he had not wanted to counsel me in front of Julie, but I was "way far out of compliance" with my medication administration. He read the policy to me, and sternly stated that according to policy, the window to give medications is "one hour earlier until one hour after the scheduled administration time." During that conversation, he also chastised me and insulted my intelligence regarding the care that I had provided the night before for a supposedly "suicidal" resident. He then raised his voice and threatened to "PDC" me if he caught me out of compliance with medication administration or any other policies ever again. He later came to the unit, gave me the suicide policy, and interrupted me to counsel me right in the middle of the very medication pass that he was threatening me to be in compliance with!

EXHIBIT

During the aforementioned telephone conversation, I calmly told Ray that I realized that I was technically out of compliance, but I also know that residents have rights to receive medication when the want to and that I had to start early to be finished in time to make it over the skilled side dining room by 0700. Furthermore, I was performing the medication administration in the exact same way that I had been orientated by Chris, and in the same exact way that all of the other nurses do the night shift med pass on Unit C. I furthermore stated in my defense that being out of compliance with medication administration is a common occurrence at PSSH on all shifts and all units due to minimal staffing levels, and that it was unfair for him to single me out and point a finger at me and nobody else.

Ray then made an audible snort type sound under his breath in a sarcastic manner. He then did say in a threatening voice that he was going to talk to the other nurses to see if what I was telling him was true. He rudely and unprofessionally hung the phone up without even saying goodbye to me. I have no witnesses to this bullying telephone conversation, but I did remain very emotionally upset for the rest of the shift, as witnessed by Penny King, CNA hereinafter referred to as "Penny."

It is unfair for Ray to single me out for the following reasons, which can be verified by other nurses:

     1) All of the other nightshift nurses who work Unit C alone begin the med pass early.

     2) Nightshift nurses on Units A and B begin passing their 0600 medications at 0430 when they are the only nurse scheduled.

     3) Dayshift nurses on all units routinely begin passing their 0900 medications at 0700. Nurses on Units A and B supposedly are often not finished passing their 0900 medications until noon.

     4) Evening shift nurses on Units A, B and C are often still passing their 2100 medications at 2300.

     5) Recently, when the "condensed schedule" nurses leave at 1945, (Barry Blasic LPN, hereinafter referred to as "Barry," and Dawn Zappas LPN, hereinafter referred to as "Dawn,") they have already passed out much of the 2100 medications, a med pass which should not even be started until 2000.

The next night, I worked on Unit E. John Shipski, LPN, hereinafter referred to as "John," worked on Unit C. I wondered if Ray's rules for me would also apply to John; in spite of the fact that John is also a male nurse like Ray and Kevin. My own female supervisor, Carolyn, was on duty that night. I asked Carolyn if Ray had left her a note to make sure that John was in compliance with the medication administration policy. Carolyn claimed that she had not been left a note by Ray, and stated that she had no idea what I was talking about until I relayed to her the events from the previous nights. She did agree that we should be in compliance with our medication administration at all times, but the way that she said it to me was very professional, and involved absolutely no hint of bullying or harassment.

The encounters I have had with Ray have been focused on my behavior while working as the charge nurse on Unit C. Ray places more importance on such things as the enforcement of "snack time rules" on Unit C than he does to abiding by Pennsylvania Assisted Living Regulations. Furthermore, although we are required by law to assist residents with their activities of daily living, including their personal hygiene and toileting needs, Ray is intent on jeopardizing the continence status and insulting the dignity of grown men, by strictly enforcing some unwritten "house rule" forbidding US Veterans in our care from using urinals.

Ray gets awful concerned about the med cart being unlocked, but does not care about safety of the mostly female 11-7 nursing staff who work on Unit C. God forbid if Ray should catch an LPN or CNA violating the parameters and making an assisted living resident a peanut butter and jelly sandwich after 9:00 pm, yet he sees nothing wrong with leaving a female LPN all alone on the unit for 2 ½ hours per night while the CNA takes his/her lawful breaks and helps do rounds on the skilled units. It is perfectly okay in Ray's opinion to leave the CNA all alone on the unit for 1 hour when the LPN takes his/her lawful breaks.

Many of the residents who populate Unit C are male veterans who were previously homeless, and many have mental health issues. There is history of frequent uncareplanned alcohol usage by these residents and history of unforeseen and uncareplanned violent encounters between the residents. As a safety measure, staff members from the skilled units should actually be pulled to Unit C to help out and relieve the Unit C direct care staff during their breaks. One staff member should never be left alone on the unit for such an extended period of time, in my opinion... and possibly in the opinion of state and federal law.

The next part of my complaint references Pennsylvania Assisted Living Regulations

§ 2800.57. Direct care staffing.

(a) At all times one or more residents are present in the residence, a direct care staff person who is 21 years of age or older shall be present in the residence. The direct care staff person may be the administrator if the administrator provides direct care services.

(b) Direct care staff persons shall be available to provide at least 1 hour per day of assisted living services to each mobile resident.

(c) Direct care staff persons shall be available to provide at least 2 hours per day of assisted living services to each resident who has mobility needs.

(d) At least 75% of the assisted living service hours specified in subsections (b) and (c) shall be available during waking hours.

Ray's harassment of me seems to coincide with the hiring of Kevin, and did also escalate a few weeks ago after I asked him a simple question involving the Unit C census and staffing and what I suspected was a math error in figuring the numbers. I'm not accusing Ray or anybody else of intentionally breaking the law. Therefore, I should not have had my intelligence insulted by Ray one night in January when I questioned direct care staffing in relation to the census. I merely pointed out to Ray the possibility of a math error resulting in what appears to be unlawful staffing ratio.

The schedulers seem to think that ten staff members per 24 hour period is sufficient. I suspect that the direct care staff 15 minute paid breaks are possibly inadvertently not being deducted, resulting in an innocent math error by the schedulers. I also suspect that the time is not being deducted for when the 11-7 staff leaves Unit C to help with rounds and in the dining room on the skilled units. I wasn't accusing Ray or anybody else of any intentional regulation violations.

The example that I gave to Ray during that particular conversation in January was a schedule that had ten direct care staff members during a 24 hour period, and a census of 82.  10 x 7.5 hours/shift = 75 direct care staff hours per day, minus 3 hours on night shift when the staff takes lawful breaks and leaves the unit to help out on the skilled unit = total of 72 direct care staff hours per 24 hour period. Doing the math, 72 hours divided by 82 residents equals  .88 direct care hours per resident, NOT the 1 hour per resident as required by Pennsylvania law, (assuming that all residents meet the regulatory definition of "mobile," and only require 1 hour per day of direct care (PA §2800.57 (b,) and are not entitled to 2 hours per day of direct care.  (PA §2800.57 (c.))   I alleged that with a census of 82, we would actually need 11.5 direct care staff members in a 24 hour period to be in compliance with Assisted Living direct care staffing regulations. When I told this to Ray, he acted like he didn't even hear me, and abruptly walked away.

I have never met the Assisted Living Director, Kim Horvath, hereinafter referred to as "Kim." A few weeks ago, following the dead end conversation with Ray, I did mention my concern about the census math to Nick Swantek LPN, hereinafter referred to as "Nick." I also mentioned to Nick that about ten years ago, while going to school for my Sociology degree, I was a part time LPN night shift weekend supervisor on the Skilled unit at Grove Manor Nursing Home in Grove City, PA. That facility has 59 residents, so an LPN can legally perform the role of house supervisor. That facility also had an assisted living facility attached to it by double doors, owned by the same church based organization. The administration was very strict that it was two separate entities and two separate funding sources, and we were not to breech the

double doors under any circumstances while on duty. The only exception they allowed was if there was a staff party on one side or the other, staff from the other side could go to the other unit on their lunch break only to make themselves a plate of food, and only if they had punched out and were off the clock. These rules were strictly enforced. We were told it would be "fraud" if we were caught helping the other entity. Nick said that he would mention my concerns to Kim. A few days later, Nick told me that he had supposedly spoken to Kim and that Kim was supposedly not even aware that the 11-7 shift staff was leaving the unit to provide help to the skilled units. I realize that "he said/she said" heresay isn't always reliable, and Nick may not have ever even spoken to Kim. Administration should make sure that Kim is aware that Ray pulls her 11-7 shift aide away from the assisted living unit for 1.5 hours most nights to help with the 0100 and 0300 rounds on the skilled units, and that supervisors pull the nurse and aide to leave the assisted living unit a few minutes before 0700 to be in the skilled unit dining room to help serve breakfast. If Ray tries to deny it, I'm sure it could be proven by security video tapes or if there is an electronic employee badge swipe record from the double doors that lead to Unit B and the skilled unit building. If such a record exists, it would prove that what I am saying is true.

In trying to pinpoint a possible cause or motive for Ray's hostile behavior, I suspect that it may be a male ego driven and completely unnecessary feeling of inadequacy on Ray's part and possibly Kevin's influence. Ray's behavior seems to suspiciously coincide with the hiring of Kevin. Since Kevin has come onto the scene, Ray has managed to consistently find some fault with me, usually while I am working on Unit C. It is simply not fair that Ray has singled me out to be in compliance with the medication administration policy, when all the other nurses get to violate that policy without being threatened with "PDC."

I do not face any such harassment from my actual supervisor, Carolyn. I have been left feeling emotionally hurt by Ray's attitude towards me, which has been causing me undue distress without just cause. If left unchecked, I fear this unjust harassment may affect the quality of my work. I've tried speaking openly to Ray on this issue. He denies any bullying or indifferent behavior towards me, and even went so far as to laugh in my face. I am forced to take this step in proceeding up the chain of command.

I am asking for Administration to help me sort out this issue with Ray, so that we may find a way to co-exist on those nights when he is on duty as my supervisor. I also ask that in future any counseling or disciplinary type intervention that I must receive I would like to receive directly from my own female supervisor, Carolyn, or in the alternative from any other female night shift RN in the building, who now possess the ability to discipline LPNs through a recent change in their position description. Being counseled and/or disciplined only by females should eliminate any possibility of future gender discrimination in the disciplinary process.

I am concerned that Administrator Kim Horvath may not be aware of some of the things that are happening in her Assisted Living Facility. I would like a response to my complaint within ten (10) business days, to determine whether or not Ray's behavior is condoned by Administration and what, if any, role Kevin plays in influencing Ray's actions. I will await a response before filing a complaint with the Equal Employment Opportunity Commission (EEOC.) I am aware of the availability of the union grievance procedure.

DATE _____  NAME (PRINTED) _____  SIGNATURE _____

DATE _____  NAME (PRINTED) INTERVIEWER _____  INTERVIEWER'S SIGNATURE _____

DATE _____  NAME (PRINTED) TYPIST _____  TYPIST'S SIGNATURE _____

# DEFENDANT - SMF

# EXHIBIT 17

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

INTERVIEWED: _____ EMP. #: _____
INTERVIEWED BY: _____ ALSO PRESENT: _____
/DATE: ___ TIME: _____ LOCATION _ _____

### STATEMENT
**The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes including actions under the statutes of this Commonwealth just as though it had been sworn or affirmed before a court of law or formal arbitration panel:**

My name is Kathy Wilcox. I am employed as DON at the PA Soldiers' and Sailors' Home in Erie. I have been employed by the Commonwealth of PA for 28 years.

On 2/25/16 @ 7:15am I met with Nancy Lewen LPN regarding a statement that she posted on face book (this fb post had been brought to my attention by another employee at our facility on 2/22/16 at 8:04pm). The statement read "Filing a Discrimination Claim PA Workplace Fairness." The following day on 2/23/16 I apprised Brian Skinner and Barb Raymond of this post. I had also e-mailed her supervisor Ray Hamm on 2/23/16 at 946am that I needed to speak to him about Ms. Lewen and that I may come in early the following day. Ray Hamm had called in sick on 2/24 so I met with him on 2/25 at approximately 545am. Ray had apprised me a few days earlier (approximately 2/23) that Ms. Lewen had a list of concerns she noted while working on PCU. Some of these concerns included our hppd (hour per patient day) and that a C.NA was being sent to the NCU during the night to assist with resident rounds and that the time away from PCU was not being subtracted from the hppd . Another concern was medication pass time was not being adhered to, that the nurse was starting med pass ½ hour earlier than the ordered time. Ray had also informed me that Ms. Lewen told him that she felt she was being treated unfairly by him and had a grievance written out that she had him read. This information from Ray Hamm and her face book post initiated my meeting Ms. Lewen on 2/25.

When Ms. Lewen entered my office she had stated she had never been in my office and that she heard good things about me. I proceeded to ask her about her face book post on filing a discrimination claim on workplace fairness as I heard she had brought some concerns to RNS Ray Hamm. She stated that it was only a repost and that she posts other things on face book such as discrimination, civil rights, health law and physics, NASA, stuff on Bill Gates wife, the royal family and menopausal brain fog (she had taken her phone out of her pocket at this point and did show me all of these posts). She proceeded to tell me that she is sociology major and that this kind of stuff interests her. Ms. Lewen verbalized concern regarding RNS Ray Hamm as she didn't want him to get in trouble for pulling staff from PCU to NCU for rounds and not accounting for employee breaks regarding the census as she is aware of the Regulations. Stated that Nick Swantek ( a 2nd shift LPN) told her that he had called Kim Horvath about this and that she was not aware that staff was being pulled for rounds. I explained to Ms. Lewen that we are following the regulations with staffing on PCU. She also brought up that some residents are not

allowed to have urinals that need them on PCU.  Ms. Lewen then stated  " I just think that this is an ego thing with some supervisors at times."  I asked who specifically needs a urinal and she told me Mr Mangel so I informed her that I would look into it as giving a urinal to a resident is a nursing measure and doesn't require a Drs. order.

Ms. Lewen had asked me if RNS Deborah Cubero (1st shift supervisor) had ever reported to me that she had apologized for yelling at her one morning. I informed Ms. Lewen that I couldn't recall but that many things are brought to my attention throughout the day. She stated that RNS Cubero told her that she meant to yell at RNS Hamm and apologized immediately and would report herself to me. Ms. Lewen then stated that she had never reported this incident to me as she accepted RNS Cubero's apology. She continued to say that people need to be careful who they are yelling at as one day someone could walk out to their car , get a gun , come back in and shot them. I informed Ms. Lewen that I would follow up with RNS Cubero.

I explained to Ms. Lewen that if she ever has complaints or issues that she would like to talk about to bring them to my attention before filing any type of complaint. Ms. Lewen stated that she would.  Our conversation ended.

| 2-25-16 | LaToy Wilcox | ~Jay Wilcox~ |
|---|---|---|
| DATE | NAME (PRINTED) | SIGNATURE |

| | | |
|---|---|---|
| DATE | NAME (PRINTED) INTERVIEWER | INTERVIEWER'S SIGNATURE |

| | | |
|---|---|---|
| DATE | NAME (PRINTED) TYPIST | TYPIST'S SIGNATURE |

NOTE:   This form is to be completed and signed by an employee who is a witness to an incident involving an employee of the Commonwealth.  If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee.  In the event the statement is typed, the party typing the statement must sign and date the document

# DEFENDANT - SMF

# EXHIBIT 18

# Veterans Affairs

The Office for Veterans Affairs mission is to provide advice and assistance to Pennsylvania's nearly 800,000 veterans and their families and to provide quality care to aging veterans. There are a wide range of federal, state and county benefits available to qualified veterans and their families and County Directors of Veterans Affairs(/veteransaffairs/Pages/Outreach-and-Reintegration/County-Directors.aspx) can be an excellent source of information and assistance when applying for these benefits. Below are some popular links:

### PA Veterans Registry

Visit (https://register.dmva.pa.gov/) to request assistance with obtaining veterans benefits and sign up to receive the DMVA DIGEST. (https://register.dmva.pa.gov/)

### Online Donation

Support Pennsylvania veterans by making an (https://donate.dmva.pa.gov/) .

Read out our most popular brochure:

Benefits and Services for Veterans and Their Beneficiaries (/veteransaffairs/Documents/Benefits-Booklet.pdf) (PDF).

### Forms and Publications

View out our most common (/Pages/Forms-and-Pubs.aspx) .

# Contact Us:

**Office of Veterans Affairs (OVA)**Bldg. 0-47, Fort Indiantown GapAnnville, PA 17003-5002Phone: 717-861-8910Fax: 717-861-9084Toll Free: 800-547-2838Email: RA-VA-Info@pa.gov (mailto:RA-VA-Info@pa.gov)

c

(/paveteranshomes/Pages/ BVHdefault.aspx)

**Philadelphia Field Office**Veterans Administration CenterP.O. Box 42938Philadelphia, PA 19101-2938Phone: 215-381-3040Fax: 215-381-3492Toll Free: 866-754-8637

**Pittsburgh Field Office**
William S. Moorhead Federal Building 1000 Liberty Ave., Suite 1612 Pittsburgh, PA 15222-4003 Phone: 412-395-6225 Fax: 412-395-6224 Toll Free: 866-754-8636