# DEFENDANT - SMF
# EXHIBIT 19



Page 1

1        IN THE UNITED STATES DISTRICT COURT

2     FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4             Civil Action No. 1:17-cv-148-SPB

5

6     ********************************

7     NANCY E. LEWEN,                      *

8             Plaintiff,                   *

9     v.                                   *

10    PENNSYLVANIA SOLDERS' AND            *

11    SAILORS' HOME (PSSH), et al.,        *

12            Defendants.                  *

13    ********************************

14

15

16                    TELEPHONIC DEPOSITION OF:

17        NANCY ELIZABETH LEWEN

18     CATUOGNO COURT REPORTING SERVICES, INC.

19        155 South Main Street, 2nd Floor

20        Providence, Rhode Island

21     December 23, 2019              9:54 a.m.

22

23             Ellen M. Muir

24             Court Reporter

Nancy Lewen
December 23, 2019

Page 2

1    APPEARANCES:

2

3    Representing the Plaintiff (pro se):

4        NANCY LEWEN

5        ~~blacked out~~

6        ~~blacked out~~

7        ~~blacked out~~

8

9    Representing the Defendants (via telephone):

10       OFFICE OF ATTORNEY GENERAL

11       1251 Waterfront Place

12       Mezzanine Level

13       Pittsburgh, PA 15222

14       BY:  YANA L. WARSHAFSKY, ESQ.

15       (Deputy Attorney General)

16       717.787.3391

17       ywarshafsky@attorneygeneral.gov

18

19

20

21

22

23

24

Nancy Lewen
December 23, 2019

Page 3

I N D E X

NANCY ELIZABETH LEWEN

1

2

3    WITNESS:

4                                              PAGE:

5    EXAMINATION BY:

6    Ms. Warshafsky                            4

7

8

9    EXHIBIT:                                  PAGE:

10   (None offered)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Nancy Lewen
December 23, 2019

Page 4

1          NANCY ELIZABETH LEWEN, Deponent, having first

2   been satisfactorily identified and duly sworn,

3   deposes and states as follows:

4          EXAMINATION BY MS. WARSHAFSKY:

5          Q.     Can everybody hear me okay?

6          A.     Yes.

7          Q.     Okay.  Good morning, Ms. Lewen, as you

8   know -- as you may remember my name is Yana

9   Warshafsky, and I represent the defendants in this

10  lawsuit, the only remaining defendant is Ms. Barbara

11  Raymond.  You have filed a complaint in the case of

12  Nancy Lewen versus Pennsylvania Soldiers' and

13  Sailors' Home, et al., which has been docketed in the

14  United States District Court for the Western District

15  of Pennsylvania, a Docket No. 171478.

16              As I mentioned a moment ago, I represent

17  Ms. Barbara Raymond, the only remaining defendant in

18  this case.  The remaining claims in this case are,

19  No. 1, First Amendment, freedom of speech; and No. 2,

20  First Amendment, retaliation claim under 1983 against

21  Ms. Raymond.  Before we begin this morning,

22  Ms. Lewen, I want to set forth some of the ground

23  rules for a deposition.  I will be asking you

24  questions about your lawsuit and the circumstances

Nancy Lewen
December 23, 2019

1  underlining your claims?

2        You have just been placed under oath.

3  The court reporter, who is sitting next to you, will

4  take down everything I say and everything you say, so

5  we'll have a transcript of this when we are finished.

6  The most important thing to remember is, especially

7  because we're doing this by phone, is that only one

8  person can speak at a time so the court reporter can

9  record everything that is said.  Does that make

10 sense?

11       A.    Yes, it does.

12       Q.    Okay.  Could you please state your name

13 for the record?

14       A.    Nancy Elizabeth Lewen.

15       Q.    Ms. Lewen, do you read, write and

16 understand the English language?

17       A.    Yes, I do.

18       Q.    Is there anything that would prevent you

19 from providing accurate testimony here today?

20       A.    No, not that I'm aware of.

21       Q.    Okay.  Are you taking any medication that

22 would prevent you from providing truthful or accurate

23 answers?

24       A.    I take a medication but I don't think

Nancy Lewen
December 23, 2019

Page 6

1    that it would prevent me from -- no, it wouldn't

2    prevent from me providing truthful answers.

3        Q.    Okay.  What about accurate answers?

4        A.    No, that wouldn't prevent me from

5    providing accurate answers.

6        Q.    Okay.  Very good.  Ms. Lewen, if you

7    provide an answer to a question that I have asked, I

8    will assume that you understood the question.  If you

9    don't understand a question that I ask, please ask me

10   to rephrase or clarify it.  Does that make sense?

11       A.    Yes.

12       Q.    Okay.  I don't anticipate this deposition

13   going very long.  But if you need to take a break at

14   any time, please let me and Ellen, the court

15   reporter, know so that we can accommodate your

16   request.  The only thing I ask is that if there is a

17   question pending, you answer that question before we

18   take a break.  Does that make sense?

19       A.    Yes.

20       Q.    Okay.  Do you have any questions about

21   the process before we begin?

22       A.    No.

23       Q.    Okay.  Ms. Lewen, have you ever been

24   deposed before?

Nancy Lewen
December 23, 2019

1   A.   No, I have not.

2   Q.   I do know that you have testified in

3   court proceedings before.  Other than the court

4   proceedings involved in this case, have you testified

5   in court in other instances?

6   A.   Yes, I have.

7   Q.   Can you describe those events?

8   A.   Child support hearings.

9   Q.   Anything else?

10   A.   No, I think that's all that I've actually

11   testified in.

12   Q.   And could you give me an approximate date

13   of when the child support hearings took place?

14   A.   From 1994 until 19 -- or until 2007.

15   Q.   Got you.  Okay.  Because I can't see you,

16   Ms. Lewen, did you bring anything with you this

17   morning?

18   A.   I brought just myself and my purse and my

19   coat, which is beside me.

20   Q.   Okay.  You don't have any documents in

21   front of you or anything?

22   A.   No, I don't.

23   Q.   What did you do to prepare for today's

24   deposition, Ms. Lewen?

Nancy Lewen
December 23, 2019

1    A.   I tried to read through a lot of the

2  different papers over the past few years.  I spent

3  the weekend looking at some things; there are so

4  many, but I tried my best to look at the pertinent

5  documents.

6    Q.   **You just mentioned papers and then you**

7  **mentioned pertinent documents.  Could you be a little**

8  **bit more specific about which documents you reviewed?**

9    A.   The Facebook messages.  The --

10   Q.   Is it the Facebook -- oh, I'm sorry, go

11 ahead.

12   A.   I read over the letter concerning patient

13 dignity issues.

14   Q.   **Are those the only two documents that you**

15 **reviewed?**

16   A.   No.  I read more than that but I don't

17 know the titles of them.  I read over the document

18 that I had written concerning facility contributory

19 neglect.

20   Q.   **Okay.  And that's the anonymous complaint**

21 **that you filed?**

22   A.   It wasn't anonymous, no.

23   Q.   **Did you have an opportunity to review**

24 **your complaint?**

Nancy Lewen
December 23, 2019

1       A.      No, I didn't.  I did not review my

2   complaint.

3       Q.      I will represent to you that in paragraph

4   18 of your complaint -- and since you don't have it

5   in front of you, it's difficult for me to show it to

6   you.  But I will represent that this is what your

7   complaint says, as I will be reading from it.

8               In paragraph 18, you allege "Plaintiff

9   countered the neglect of duty allegation with an

10  allegation of facility contributory neglect, then

11  filed a anonymous complaint with the Department of

12  Health in December 2015, which resulted in four more

13  deficiencies, including an       F-Tag 309.  Plaintiff

14  then filed an anonymous complaint of elder abuse and

15  neglect with the Pennsylvania Office of Attorney

16  General."

17              Ms. Lewen, are you testifying today that

18  those complaints that you described as anonymous in

19  your complaint were actually not anonymous?

20      A.      The one with the Department of Health was

21  anonymous, but if I remember correctly, I think that

22  the one to the attorney general's office -- well, I

23  do remember correctly -- that was not anonymous.

24  That was -- I gave my name with that and the criminal

Nancy Lewen
December 23, 2019

1    investigators called me in and interviewed me.

2         Q.    Why did you identify the complaint -- or

3    describe the complaint as anonymous in your federal

4    complaint?

5         A.    It was anonymous as far as I didn't tell

6    Barbara Raymond or any of the defendants that I had

7    filed it.  But as far as to the attorney general's

8    office -- to the Criminal Bureau of Criminal

9    Investigation at the attorney general's office, I

10   gave my name for that.

11        Q.    Okay.

12        A.    I didn't mean for -- the one for the

13   Department of Health was definitely filed anonymous.

14        Q.    What is your definition of anonymous?

15        A.    Not giving your name.

16        Q.    Okay.  So you used the anonymous to

17   describe the Department of Health complaint as well

18   as the Pennsylvania Office of Attorney General

19   complaint.  So did you or did you not give your name

20   in either of those two instances?

21        A.    I did not to the Department of Health.  I

22   did to the attorney general.

23        Q.    Okay.  So in paragraph 18 the portion

24   describing the anonymous complaint is wrong?

Nancy Lewen
December 23, 2019

1      A.    I guess, by my own definition, yeah, then

2    it was wrong.  I used the wrong word to classify

3    that.

4      Q.    Okay.  And, I'm sorry, I believe you

5    answered this but I just want to make sure.  You did

6    not review your federal complaint in preparation for

7    today's deposition, is that right?

8      A.    No, I did not.

9      Q.    Okay.  In addition to the documents you

10   just described to me, anything else that you did take

11   a look at over the weekend in preparation for today's

12   deposition?

13     A.    That was pretty much it.

14     Q.    Okay.  Ms. Lewen, what's your date of

15   birth?

16     A.    ████████████

17     Q.    Where were you born?

18     A.    Pittsburgh, Pennsylvania.

19     Q.    Did you graduate from high school?

20     A.    No, I did not.  I got a GED.

21     Q.    What year?

22     A.    I was supposed to graduate high school in

23   1984, but I got pregnant and I got married and moved

24   overseas to an airforce base, and I got my GED in the

Nancy Lewen
December 23, 2019

1    year 1991.

2         Q.    I'm not familiar with GED testing abroad?

3         A.    No, no -- I'm sorry.

4         Q.    Did you complete the requirements

5    stateside or were you still abroad?

6         A.    I was stateside.   It was in South

7    Carolina.

8         Q.    Did you attend college?

9         A.    Yes, I did.

10        Q.    Which college did you attend?

11        A.    I attended several colleges.   I attended

12   the -- the first one that I went to was Sumter County

13   Community College in South Carolina.   And I took some

14   courses at the University of South Carolina, and I

15   took -- I went to nursing school at Lamar University

16   in Texas, and I've attended -- I got a bachelor's

17   degree in sociology at Edinboro University of

18   Pennsylvania.

19        Q.    When did you graduate from Edinboro?

20        A.    2007.

21        Q.    When did you obtain your nursing degree?

22        A.    1995.

23        Q.    And that was in Texas?

24        A.    Yes.

```
 1        Q.    Okay.  Did you have to take licensing

 2   exams after you completed your nursing degree?

 3        A.    Yes.

 4        Q.    And what were those exams?

 5        A.    That was the NCLEX.

 6        Q.    I'm sorry, could you say that again?

 7        A.    NCLEX, N-C-L-E-X.

 8        Q.    Can you -- I assume that that is an

 9   acronym  for something?

10        A     Yes.  I'm trying to think of what   it

11   would be the National Council of Licensing Examiners,

12   or something like that.

13        Q.    Okay.  And were you -- after receiving

14   your nursing degree were you an LPN or an RN, or what

15   was your classification?

16        A.    In Texas I was an LVN, which is licensed

17   vocational nurse but that's the equivalent of an LPN,

18   which I was an LPN in Pennsylvania, and then also in

19   Rhode Island I was, a few years ago.

20        Q.    Okay.  So you graduated with your nursing

21   degree; you took the exam.  Did you pass them on the

22   first try?

23        A.    Yes.

24        Q.    And did you begin working as a licensed
```

Nancy Lewen
December 23, 2019

Page 14

1    vocational nurse in Texas?

2          A.    Yes.

3          Q.    How long did you work as a licensed

4    vocational nurse in Texas?

5          A.    For four years.  And then I moved to

6    Pennsylvania.

7          Q.    So from 1995 to 1999, you worked as an

8    LV -- vocational nurse in Texas?

9          A.    Yes.

10         Q.    Then in 1999 you moved to Pennsylvania?

11         A.    Yes.

12         Q.    And did you need to take any additional

13   licensing exam to be licensed in Pennsylvania?

14         A.    No.  It's the license by reciprocity.

15         Q.    Reciprocity?

16         A.    Yes.

17         Q.    And so in 1999 you began working as a

18   licensed practical nurse?

19         A.    Yes.

20         Q.    And where did you begin working in 1999?

21         A.    I worked at a nursing home in Greenville,

22   Pennsylvania called White Cliff Nursing Home.

23         Q.    And how long did you work there?

24         A.    About two years.

Nancy Lewen
December 23, 2019

1      Q.      **Where did you go from there?  So it would**

2   **be 2001.**

3      A.      From there I went to a nursing home

4   called Autumn Grove Care Center, which was in

5   Harrisburg, P-A -- or Harrisville P-A.

6      Q.      **Okay.  And how long did you remain there?**

7      A.      About two years.

8      Q.      **Where did you go in 2003?**

9      A.      Then I went to a nursing home called

10  Grove Manor Nursing Home.  And at that same time that

11  I was working there I also had gone back to school at

12  Edinboro University and worked towards my bachelor's

13  degree in sociology.

14     Q.      **The nursing degree that you obtained in**

15  **1995 was that a Bachelor's of Nursing or an**

16  **associate's degree?**

17     A.      Neither.  Actually, to be technical about

18  it, it's not actually a degree.  It's a diploma.

19     Q.      **Okay.  Could you please explain the**

20  **difference, because I was operating under the**

21  **assumption that you earned a degree in nursing?**

22     A.      No, I do not have a degree in nursing.  I

23  have a diploma in vocational nursing, which is the

24  same thing as practical nursing.

Nancy Lewen
December 23, 2019

1      Q.      How long was the program?

2      A.      A one-year program.

3      Q.      I see.  Okay.  In 1999 when you began

4  working at the nursing home -- I think you said

5  Greenville -- and then you switched in 2001, why did

6  you leave?  Why did you switch jobs?

7      A.      Higher pay and a little bit closer to the

8  home.

9      Q.      Okay.  And was that the same reason you

10 switched jobs again two years later?

11     A.      Yes.

12     Q.      Did you have any disciplinary issues

13 while working at any of those nursing homes that you

14 identified?

15     A.      No.

16     Q.      * Okay.  While you were in the nursing

17 home starting in 2003, when you began your bachelor's

18 degree at Edinboro University, did you work full time

19 and go to school full time?

20     A.      Yes, I worked -- I worked -- it wasn't

21 quite full-time hours.  They paid me -- I worked on

22 the weekend three, 12-hour shifts.  I was working as

23 a nightshift supervisor, actually, because they only

24 had 59 residents, so an LPN could be a supervisor.

Nancy Lewen
December 23, 2019

1  And -- I'm sorry, what was the question?  I lost my

2  train of thought.  What was the question?

3        Q.    That's okay.

4              MS. WARSHAFSKY:  Ellen, would you able to

5  read the question back to us.

6

7        *   (Question read)

8

9        A.    I was working 36 hours a week but getting

10  paid for 40, and then I was going to school 15

11  credits per week -- I mean, per semester, however

12  many hours that worked out to in a week was not a --

13  I mean, you know how -- I'm sure you are aware of how

14  college schedules work.  It's not a full, eight-hour

15  shift per day.

16        Q.    Sure.

17        A.    It was, you know, depending on what

18  courses I was taking, it would be maybe three or four

19  hours a day Monday through Friday.

20        Q.    Okay.  And you continued working at the

21  nursing home until you obtained your sociology degree

22  in 2007?

23        A.    Actually, the last year there I took off

24  and I just went to school.

1    Q.    Okay.  So you quit working at the nursing

2    home in --

3    A.    '6.

4    Q.    '6?

5    A.    Yes.

6    Q.    Okay.

7    A.    I think it was the wintertime of 2005,

8    slash, 2006.  I don't know the exact date, but it was

9    the wintertime of 2005 and 2006.

10    Q.    After obtaining you sociology degree at

11    Edinboro University what was your next employment?

12    A.    My next employment -- my parents were

13    declining in health.  I went for the summer to Texas,

14    and I worked for a staffing agency in Texas, Maximum

15    Healthcare Staffing Agency.  I worked in several

16    nursing homes that were recovering from the

17    hurricanes that had gone through there, Hurricane

18    Katrina and Hurricane Rita, and the staffing, you

19    know, a lot of the nurses had left the area.

20    So the nursing homes were being basically

21    run by staffing agencies trying to rebuild, and so I

22    did that.  And then, also, I worked in the Texas

23    State Penitentiary, staffing agency, and then I

24    returned to Pennsylvania to go to grad -- I attempted

Nancy Lewen
December 23, 2019

1  to go to grad school at Edinboro University to get a

2  master's degree.

3      Q.      Before we get back to the attempted grad

4  school, how long did you remain in Texas to take care

5  of your parents?

6      A.      For the summer.

7      Q.      So just the summer of 2007?

8      A.      Yes.

9      Q.      And you worked at all of those places

10  just in the course of three months?

11      A.      Yes.  It was staffing agency, sort of one

12  place this day; another place the next day.

13      Q.      Oh, so you were being staffed by a

14  staffing agency?

15      A.      Yes.  I was filling in.

16      Q.      I see.

17      A.      Nursing homes, home care as well, home

18  healthcare and then the Texas State Penitentiary.

19      Q.      So then you returned back to Pennsylvania

20  in the fall of 2007?

21      A.      Yes.

22      Q.      And please explain to me what you mean by

23  attempted to get into a master's program at Edinboro?

24      A.      Well, I was accepted for the master's

1    program and I went -- I was going to stay in the

2    dorms, but I had -- it was a .22 caliber target

3    shooting pistol that I knew I couldn't keep in the

4    dorms, so I tried to store it with the campus police,

5    which the first police officer that spoke to me said

6    it wasn't a problem; and he wrote down the

7    registration number and gave me a receipt for it and

8    sent me on my way.

9           And then later that night the campus

10   police chief, Chief Thomas Nelson, called me back in

11   and interrogated me about it and told me that I had

12   committed felonies and all kinds of stuff -- he and

13   another administrator named Kahan Sablo were there,

14   and they said if I just didn't say anything about it,

15   they would just let me leave.  And they paid for me

16   to spend the night in a motel off campus, which I

17   thought was very unprofessional, but, anyway, I did

18   that.

19           I just left and later I complained about

20   it and wrote letters and actually I tried to sue them

21   in federal court as well as for civil rights

22   violations; but I had waited too long to file it, so

23   it was dismissed on statute of limitations.

24      Q.    Okay.  What master's degree were you

Nancy Lewen
December 23, 2019

Page 21

1   attempting to pursue?

2        A.   The Master of Arts and Social Sciences,

3   M-A-S-S.

4        Q.   Okay.  Who was in Pennsylvania that

5   caused you to return back to Pennsylvania from Texas?

6        A.   My family.  My daughters and my

7   grandchildren.

8        Q.   Okay.  How many kids do you have?

9        A.   I have a total of three, but I haven't

10   seen my son since he was ten, and he's in his late

11   20s now.

12        Q.   Okay.  Ms. Lewen, are you currently

13   working in any capacity?

14        A.   No, I'm not.

15        Q.   Are you on disability?

16        A.   Yes, I am.

17        Q.   How long had you been on disability?

18        A.   Since last May.

19        Q.   And by last May we're talking about May

20   of 2018 or May of 2019?

21        A.   2019.

22        Q.   And what is the disability?

23        A.   Posttraumatic stress disorder.  And

24   because of my age, they used the grid system and

1  counted things like my old back injuries from

2  nursing, knee -- arthritis in my knees.

3      Q.   Okay.

4      A.   And my age, as I said, age and

5  educational level.  As you are aware I suffered a

6  nervous breakdown from these legal proceedings in the

7  year 2016, '17 and the attorney for the defendant

8  reported me to the Pennsylvania Board of Nursing, and

9  they punished me for having a nervous breakdown; and

10  my nursing license remains damaged forever with that.

11      Q.   What do you mean damaged?  Do you have an

12  active nursing license right now?

13      A.   No, it's suspended.

14      Q.   When was it suspended?

15      A.   I wish I had my paperwork in front of me.

16  It was suspended -- it was suspended twice actually.

17  Once was temporary and then I had to go see the

18  psychiatrist for the state, Dr. Robert Webstein, and

19  on his recommendation he said that he felt I couldn't

20  practice nursing competently because of having a

21  history of mental illness; and so they suspended it

22  the second time last wintertime -- I'm sorry, I'm not

23  trying to be deceptive.  I just don't remember the

24  dates.

Nancy Lewen
December 23, 2019

1      Q.     No, that's okay.  So it sounds to me like

2   it was temporarily suspended at some point in 2017?

3      A.     Yes.

4      Q.     And then permanently suspended -- you

5   were -- I guess, the suspension became permanent in

6   2018?

7      A.     2018 or -- I think the actual order

8   came -- it might have been 2019 by the time the

9   actual order came.  It's in --

10     Q.     And when you say the actual order, that

11  was the adjudication order from the...

12     A.     From the Board of Nursing.

13     Q.     Department of States?

14     A.     Right.  From the Board of Nursing.

15     Q.     And is that the one that you attempted to

16  appeal and it was affirmed?

17     A.     Right.  Yes.  My argument was because I

18  had never done anything wrong as a nurse, they

19  shouldn't have disciplined me based solely on the

20  history of mental illness.  But they said that --

21  they felt that the testimony -- their expert

22  witness's opinion was all the evidence that they

23  needed.  In his opinion, you know, I was not

24  competent or whatever.

Nancy Lewen
December 23, 2019

1    Q.    Have you attempted to obtain a nursing

2    license in Rhode Island since you've been living

3    there?

4         A.    No, I have not.  Honestly, I'm still

5    traumatized by what happened with this situation.  I

6    mean, even just thinking about it right now, the

7    thought of going and applying for a nursing license

8    and having any of this happen to me again, my palms

9    are sweating.  I have not attempted to -- I have no

10   desire to ever practice nursing again or even to try

11   to even attempt to get a nursing license.

12        Q.    Okay.  After being terminated from

13   Soldiers' and Sailors' on March 14, 2016, did you

14   apply for any positions, any other jobs?

15        A.    No, I did not.  I was trying really hard

16   to get my job back at the Soldiers' and Sailor's

17   Home.  And then I had a nervous breakdown, as I said,

18   pretty early into the legal proceedings.

19        Q.    I apologize for asking you about this,

20   but it is part of my job.  When you say "nervous

21   breakdown," could you explain to me what happened,

22   what resulted, if you went into a hospital facility

23   or just give me an understanding of what occurred, if

24   you can?

1    A.    Well, the stress, you know, I couldn't

2  believe that I was terminated and the stress of it

3  caused me to not be able to sleep at night. And when

4  I -- I get sleep deprivation psychosis, and it's

5  happened to me before during stressful legal

6  proceedings. Once was with -- when my son -- my son

7  was, for lack of a better word, abducted. My

8  ex-husband committed Interstate custody interference

9  and he hid him in Florida. I had sent him on his

10 visit to Texas, and he owed me about $50,000 in past

11 due child support so he took him and hid him in

12 Florida. And then I found him and tried to get him

13 charged with contempt of court -- a long story; but,

14 anyway, when I got wrapped up in that legal

15 situation, I also had had a nervous breakdown. And

16 then with the situation involving Edinboro University

17 when I was involved in that legal situation, I had a

18 nervous breakdown. And as I said, what happens to me

19 is I get sleep deprived and then I get sleep

20 depravation psychosis. And I had said to the

21 attorney for the DMVA, his name is Steven Bachinsky,

22 I offered to donate my case for research -- for

23 military research on the effects of bullying on

24 people who have PTSD, and they did not accept my

1    offer.  They just continued to bully me and referred

2    me to the board of discipline of my nursing license.

3        Q.   **When you say they continued to bully you,**

4    **who are you referring to?**

5        A.   The defendants.

6        Q.   **Specifically with regard to Ms. Raymond,**

7    **how did she bully you?**

8        A.   Actually, I don't think at that point she

9    was acting through her attorney.  But where the

10   bullying would come in at was at that point really

11   she should have entertained the idea of a settlement

12   agreement.  But she had the free attorneys defending

13   her and so she didn't entertain anything like that.

14       Q.   **When you say "at that point," what point**

15   **are you referring to?**

16       A.   At that point that was in the summer of

17   2016.

18       Q.   **So after your termination?**

19       A.   Yes.

20       Q.   **Okay.  So is it your testimony that she**

21   **wasn't bullying you, but you felt bullied by others?**

22       A.   Through the attorney that was defending

23   her, yes.

24       Q.   **Could you explain that to me.  I don't**

Nancy Lewen
December 23, 2019

1    understand that.

2         A.    Well, at the civil service hearing he

3    actually just -- and at the unemployment compensation

4    hearing, he was standing there yelling at me, or at

5    least that's how I perceived it as the person sitting

6    there, and I felt bullied; particularly, under the

7    circumstances when they had the evidence in their

8    possession showing that I had reported elder abuse.

9              I had reported some very serious things,

10   sexual assaults of elderly people in a nursing

11   facility.  I felt that they should not have

12   approached it like that.  There should have been a

13   settlement agreement early, early, early on in this.

14   But it was just piled on, one thing, you know -- and

15   all the state government agencies just helped to pile

16   it on.

17         Q.    Ms. Lewen, the elder abuse that you were

18   referring to is that the same as the facility

19   contributory neglect we talked about at the

20   beginning?

21         A.    No.  I had reported -- well, that I would

22   say is actually neglect, which is a part of elder --

23   it's a type of elder abuse, but what I was actually

24   referring to was the sexual assaults that I reported

Nancy Lewen
December 23, 2019

1   to the attorney general's office.

2        Q.   Okay.  And that was the conversation we

3   had in the beginning of the deposition about whether

4   it was anonymous or not anonymous, right?

5        A.   I guess.

6        Q.   Well, do you recall that we spoke about,

7   specifically, paragraph 18 of your federal complaint;

8   and I asked you about the anonymous complaint of

9   elder abuse and neglect with the Pennsylvania Office

10  of Attorney General, and then you explained to me

11  that it was actually not anonymous because you had

12  signed it with your name.  So is that the abuse

13  allegation we're talking about right now?

14       A.   Yes, I made one report to the attorney

15  general's office.

16       Q.   Do you recall an approximate date of when

17  you made that report?

18       A.   I just looked at that this weekend also.

19  It was around January of February of 2016, but they

20  didn't call me in to interview me until June of 2016.

21       Q.   Okay.

22       A.   The day after my Pennsylvania civil

23  service hearing was the day that I was interviewed by

24  the Attorney General Bureau of Criminal

1   Investigation.

2       Q.    Okay.   Do you recall what the outcome of

3   that investigation was?

4       A.    As far as I know the investigations is

5   still ongoing.   They have never contacted me and told

6   me that they've completed it.

7       Q.    Okay.   Let's go back to the time period

8   immediately following your departure from the

9   Soldiers' and Sailors' Home.   How long were you

10  employed there?

11      A.    I was employed there from the fall of

12  2014 until the spring of 2016, about a year and a

13  half.

14      Q.    Okay.   Did you have any retirement

15  benefits that vested during that period of time?

16      A.    Yes, I did.

17      Q.    Are you collecting those retirement

18  benefits right now?

19      A.    They send it to me as -- they

20  automatically deposited it, I believe it was, a long

21  time ago in 2016.

22      Q.    So was it the one-time payment?

23      A.    Yes.

24      Q.    Do you remember how much it was?

Nancy Lewen
December 23, 2019

Page 30

1    A.    Not exactly.  It was a few thousand

2  dollars.

3    Q.    Okay.  And what about a pension.  Did you

4  receive any pension benefits during your one and a

5  half years at the Soldiers' and Sailors' Home?

6    A.    That's what they -- that was included in

7  that.  I was vested for a pension, but I don't have

8  that now. They've refunded that, or they paid me for

9  that.

10   Q.    So the retirement and the pension are one

11  and the same?

12   A.    Yes.

13   Q.    And that was a one-time payment right

14  after you left?

15   A.    Within a few months after I left, yeah.

16   Q.    Okay.  I know that you had applied for

17  unemployment benefits and those were declined.  Did

18  you ever receive unemployment benefits?

19   A.    No.

20   Q.    Ms. Lewen, when you first started working

21  at the Pennsylvania Soldiers' and Sailors' Home in

22  2014, were you made aware of certain policies

23  regarding standards of  conduct and employee conduct?

24   A.    Yes.

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Nancy Lewen
December 23, 2019

1    Q.    More specifically, at the time that you

2  begin your employment with the Pennsylvania Soldiers'

3  and Sailors' Home, were you familiar with the DMVA

4  Standards of Conduct and Work Rules, the Workplace

5  Violence and Workplace Bullying Prevention Policy and

6  Management Directive, 205.33, which is workplace

7  violence.

8    A.    Yes, among others.  There was many, many

9  policies that they had you read and sign.

10   Q.    Okay.  Do you recall whether you read and

11  signed all of the ones that you were required to read

12  and sign?

13   A.    Yes, I did.

14   Q.    Did you read them to the point where you

15  had an understanding of them?

16   A.    I believe so, yes.

17   Q.    Okay.  Correct me if what I am about to

18  say is wrong.  On October 8, 2014, you completed

19  training in discrimination and sexual harassment

20  prevention, is that true or false?

21   A.    I would have to agree with you.  Without

22  seeing it in front me, I would have to just take your

23  word that it's something that I signed for.

24   Q.    Do you have an independent recollection

Nancy Lewen
December 23, 2019

1   of completing a training dealing with discrimination

2   and sexual harassment prevention?

3       A.   I have a recollection of completing all

4   of the required policy training.  There was a lot of

5   them, back injury prevention training, you know, the

6   standard things that you, you know, read and sign or

7   watch videos on when you're hired at a place.

8       Q.   Okay.  And those trainings include

9   Standards of Conduct and the Commonwealth IC,

10  Resource of Acceptable Use of Policy, things like

11  that as well?

12      A.   Yes.

13      Q.   When you began your employment at the

14  Pennsylvania Soldiers' and Sailors' Home, were you

15  provided with certain relevant policies and

16  handbooks?

17      A.   I don't actually remember being provided

18  with a handbook.  But I probably was because I

19  believe that they do give you a handbook when you're

20  hired.

21      Q.   If you recall, Ms. Lewen, did you sign

22  this particular handbook acknowledging your receipt

23  of it and your review of it?

24      A.   I don't recall doing that but I probably

Nancy Lewen
December 23, 2019

Page 33

1    did.

2          Q.    Were there subsequent verses of this

3    handbook that you had to review during your

4    one-and-a-half years of employment at the

5    Pennsylvania Soldiers' and Sailors' Home?

6          A.    I don't recall there being different

7    verses of it.  No, I don't recall.

8          Q.    Okay.  Ms. Lewen, when you first began

9    working at the Pennsylvania Soldiers' and Sailors'

10   Home in 2014, what was your title; what was your

11   position?

12         A.    Licensed practical nurse.

13         Q.    And what were your responsibilities?

14         A.    Supervision of nurse assistants, pass

15   medications, performing treatments, documentation of

16   the care provided; the standard things that a

17   licensed practical nurse does in a nursing home.

18         Q.    And were those the standard things that

19   you, as the licensed practical nurse, did at the

20   nursing home?

21         A.    Yes.

22         Q.    Who was your supervisor when you first

23   began working there?

24         A.    Raymond Ham.

Nancy Lewen
December 23, 2019

1    Q.    Did you receive any promotions while

2    employed at the Pennsylvania Soldiers' and Sailors'

3    Home?

4    A.    No.

5    Q.    Did you receive any demotions while you

6    were employed there?

7    A.    No.

8    Q.    Did your responsibilities change during

9    the year-and-a-half time that you spent working

10   there?

11   A.    No.

12   Q.    Okay.  In paragraph 17 of your complaint,

13   and again, I understand you did not review it and you

14   don't have it in front of you, but if you would just

15   take my word for it, you claim that you were accused

16   of, quote, neglect of duty."  Do you recall that in

17   your complaint?

18   A.    Yes.

19   Q.    Who accused you?

20   A.    It was the Department of Military and

21   Veterans Affairs and -- Barbara Raymond had -- I

22   assume she was the administrator of the facility, and

23   I know that in her answers to the interrogatories

24   she's tried to kind of shift the blame from herself

Nancy Lewen
December 23, 2019

1   on that.  But it was the administration, let's just

2   say, of the Soldiers' and Sailors' Home, involving an

3   incident where a woman -- when the state came in for

4   their information in November of 2015, the State

5   Department of Health, and there was an issue with

6   skin breakdown on a patient that they had discovered

7   that happened in August of 2015.  It was a skilled

8   unit, Unit B, that I didn't normally work on and --

9   but because of the fact that I had been one of the

10  nurses that had been involved in working on that unit

11  during a certain time period, I was one of the nurses

12  who was disciplined.  There was a bunch of nurses

13  that were disciplined; because of the fact that we

14  got cited, that was part of the administration's plan

15  of correction was to discipline nurses.

16       Q.    Do you remember what the citation was

17  for?

18       A.    The citation was because the woman's skin

19  had broken down and the particular night, it was the

20  night of -- the night that I worked -- Like I said, I

21  didn't normally work on that unit -- but the night

22  that I worked it was the night of August 31st going

23  into September 1st.

24       Q.    Of 2015?

Nancy Lewen
December 23, 2019

Page 36

1    A.    Yes.

2    Q.    **Okay.**

3    A.    And there was a patch on the woman's

4  buttocks that was supposed to have been checked or

5  changed that night and I missed it.  I didn't lie and

6  say that I did it and I didn't do it and not document

7  it.  I completely missed it, because I was quite

8  overwhelmed that night.  I had 75 patients as a

9  treatment nurse.  And it was also the night of the

10  changeover of -- the end of the month you change your

11  books over to the next month, and there's always a

12  lot of chaos on changeover night.

13          And then coupled with that -- on top of

14  that was the fact that I was working on a unit that I

15  wasn't familiar with, and I had 75 patients that I

16  was in charge of as a treatment nurse.  And so I just

17  missed it as a human error; and I felt, you know,

18  that's when I responded with the allegation of

19  facility contributory neglect because I felt like it

20  wasn't neglect on my part.

21          There was also -- some accountability for

22  that should be placed on administration for assigning

23  that type an assignment to a nurse.  I think the

24  other nurses all just took their discipline and

Nancy Lewen
December 23, 2019

Page 37

1   sucked it up, and they're probably still working

2   there, but I didn't.  I just felt like I couldn't

3   agree that I was the one that was guilty of neglect

4   that night.  I tried my best under the circumstances.

5        Q.    Okay.  And what was the nature of the

6   discipline that you received that day?

7        A.    Well, like I said, at first they tried to

8   say neglect.  They tried to charge all the nurses

9   with neglect of duty.  And then I responded with that

10  allegation of facility contributory neglect and then

11  they gave me a lesser discipline of oral reprimand.

12  I don't remember exactly how they worded it, but it

13  was like a lesser charge.

14       Q.    Okay.  Going back to my initial question

15  about this regarding who specifically accused you;

16  you said it was the administration.  Was there an

17  individual specifically that accused you?

18       A.    I don't remember.  But as I said it was

19  administration.  I don't know whose actual signature

20  was on that.

21       Q.    Okay.  Did anybody speak to you about

22  this?

23       A.    Again, I don't want to say -- if I

24  remember correctly, I think that the way that they

Nancy Lewen
December 23, 2019

Page 38

1  handled those things was that your immediate

2  supervisor signed it.  I think -- if I remember --

3  you know, my recollection, I don't know.  But I think

4  that that's why I remember that it was your immediate

5  supervisor that actually doled out the discipline

6  that had been determined by the administration.

7       Q.    Okay.  So that would have been Raymond

8  Ham?

9       A.    Raymond Ham or Carolyn Williams, if I

10 remember correctly.  As I said I don't really

11 remember whose signature was on it.  But whoever --

12 if it was a supervisor's signature, it wasn't just

13 some sort of a discipline that that supervisor had

14 decided to do.  It was because administration had

15 told them to do.

16      Q.    Okay.  In the next paragraph, we talked

17 about it in the beginning, that was paragraph 18, was

18 the anonymous and the confusion that we had with the

19 definition of the word?

20      A.    Uh-huh.

21      Q.    You indicated that you countered the

22 neglect of duty allegation with an allegation of

23 facility contributory neglect.  You mentioned in your

24 complaint -- you refer in your complaint that it was

1    an anonymous complaint that was made. Is it your

2    understanding that at some point the administration

3    found out that it was you who made this anonymous

4    complaint -- I'm sorry, anonymous claim of facility

5    contributory neglect?

6         A.    If I have heard that that was done

7    anonymously, I didn't mean to have -- I didn't do

8    that anonymously. I handed it to my supervisor,

9    Raymond Ham.

10        Q.    Okay. We need to clarify this. Because

11   in the beginning of this deposition, you confirmed

12   for me that the complaint filed with the Department

13   of Health on December 2015 alleging facility

14   contributory neglect was anonymous?

15        A.    I'm sorry, the complaint that I filed

16   with the Department of Health was not facility

17   contributory neglect. The complaint that I filed

18   with the Department of Health that resulted in the

19   four more citations it was on some things that had

20   happened involving neglect. And in one case I

21   believe one of the citations was, I reported because

22   blood had been withdrawn from the wrong patient, and

23   the family and the doctor had not been notified.

24             But the facility contributory neglect,

Nancy Lewen
December 23, 2019

Page 40

1   that's a typewritten document that I handed in to

2   Raymond Ham to the administration there, that wasn't

3   what I gave to the Health Department, that was

4   completely different.

5        Q.   Okay.  So the facility contributory

6   neglect was a document you handed to Raymond Ham,

7   your supervisor?

8        A.   Right.

9        Q.   That was known to be from you?

10       A.   Yes.

11       Q.   Okay.  So then there's an anonymous

12   complaint that you subsequently filed with the

13   Department of Health in December of 2015 that was, in

14   fact, anonymous?

15       A.   Yes, that was anonymous.

16       Q.   Okay.  Understood.  Thank you for

17   clarifying that, Ms. Lewen?

18       A.   You're welcome.

19       Q.   Ms. Lewen, in paragraph 26 of your

20   complaint, you claim that you were not offered

21   progressive disciplinary procedure.  Can you explain

22   to me what that means?

23       A.   As far as when I was terminated there was

24   no progressive discipline involved in that.

Nancy Lewen
December 23, 2019

Page 41

1   Q.   What does the phrase "progressive

2   discipline" mean?

3        A.   Like, three-strikes-you're-out-type

4   thing, you know, warn a person and then maybe give

5   them an oral warning and then give them a written

6   warning and then, you know, eventually there was no

7   more warnings; and you're terminated or whatever.

8   But there was nothing like that.  She just wanted me

9   out of there fast.

10       Q.   Why did you believe that you were

11  entitled to a three-strikes-you're-out approach?

12       A.   Common business courtesy.

13       Q.   You were terminated due to workplace

14  violence, is that correct?

15       A.   That's what they say, yes.  I had voiced

16  concerns about workplace violence, and they say that

17  I, myself, actually threatened workplace violence.

18       Q.   Do you recall during a PDC talking about

19  it not being out of the realm of possibility of

20  bringing a gun into the workplace?

21       A.   What I had said was -- I had been a

22  victim of workplace violence in the workplace.  And

23  what I had said was they should -- I'm just

24  paraphrasing this -- but what I had said was that

Nancy Lewen
December 23, 2019

1    they should be careful about the existence of

2    workplace violence there by supervisors, because

3    these are the types of situations -- rhetorically

4    speaking, hypothetically speaking -- these are the

5    types of situations where people go postal, is what I

6    said.  And, you know, from the get-go, because they

7    needed to come up with some sort of protectural (sic)

8    reason to terminate me, that was, you know, one of

9    the things that they said was that I had alledgedly

10   threatened to go get a gun and shoot people in the

11   workplace.  So -- go ahead.  I'm done.

12        Q.    No, please finish.

13        A.    I think I'm done actually.

14        Q.    Okay.  You said that you were subjected

15   to workplace violence.  Who subjected you to

16   workplace violence?

17        A.    There was a supervisor named Deborah

18   Cabreira, the day shift supervisor and right at shift

19   change at the end of the night shift going onto the

20   day shift, I had gone into the supervisor's office to

21   ask for an order for -- a patient's skin was

22   macerated -- actually, I think I answered this

23   already in the interrogatories that you had sent me.

24   But I'll answer it again, a shortened version of

Nancy Lewen
December 23, 2019

1   that.

2            I had gone into the office looking for an

3   order that I needed for a patient and the day shift

4   supervisor, Deborah Cabreira, screamed at me, you

5   know, and called me stupid -- and I don't even

6   remember what all -- but then within a few minutes or

7   so, maybe within a half an hour of that, she sought

8   me out and she apologized, and she said that it was

9   because of the stress of Barbara Raymond was coming

10  down on her, the stress of the facility atmosphere

11  following the Department of Health inspection that

12  had occurred in November.  She said that she didn't

13  mean to take it out on me and, you know, she

14  apologized.  It was just the stress level in the

15  facility.

16            So then after that was when I had said to

17  Barry Blazek, in the off-duty Facebook messages, I

18  said something to the effect of she apologized, but

19  this is something that they need to address in this

20  workplace.  When you have the supervisors going

21  around acting like this towards people --

22  rhetorically speaking, hypothetically speaking,

23  whatever -- this is the type of things that makes

24  employees go postal in the workplace.  This is

Nancy Lewen
December 23, 2019

Page 44

1   what -- they need to address this.

2       Q.    Do you remember when this event was with

3   Ms. Cabreira occurred?

4       A.    It was in December.  And those

5   interrogatories that you sent me that I answered I

6   put the exact date, because I looked it up.

7       Q.    And this is December of 2015?

8       A.    Yes.  I think it was the winter of 2015.

9   I believe, it was the December.

10      Q.    Tell me about the oral reprimands that

11  you received on December 15, 2015?

12      A.    That was stemming from that incident

13  where -- I would have to see it actually, because

14  there was some other thing that a lot of the nurses

15  had gotten disciplined about too.  It was an incident

16  that was stemming from those citations that we had

17  gotten by the state.

18      Q.    You had mentioned when we talked about

19  the citations earlier that the discipline was

20  lessened to an oral reprimand.  Do you think maybe

21  that is the oral reprimand?

22      A.    I do.  I think that was it.

23      Q.    Okay.

24      A.    I never got disciplined up until I, you

Nancy Lewen
December 23, 2019

Page 45

1    know, filed that allegation of facility contributory

2    neglect.  But I'm pretty sure that that was the same

3    incident.

4         Q.   Okay.  Could you please tell me about the

5    written reprimands that you received on February 24,

6    2015?

7         A.   I don't remember that, to be quite

8    honest.  I know that there was something.  And,

9    again, it was something that -- it wasn't just me

10   that was involved in the reprimand.  There was other

11   nurses as well, but I don't remember the exact

12   incident that it pertained to.

13        Q.   Okay.  Do you remember anything about

14   that written reprimand?

15        A.   I do vaguely remember it, yeah.  It

16   seemed to me that they were starting to try to

17   look -- they considered me a troublemaker at that

18   point because I was saying things about insufficient

19   staffing and the sexual assaults, dignity issues and

20   whatnot; and I really -- I do remember that but I

21   don't remember what it was about.

22        Q.   Okay.  And to whom are you making these

23   complaints about insufficient staffing and sexual

24   assault?

Nancy Lewen
December 23, 2019

1   A.   Well, the sexual -- the resident dignity

2   issues involving sexual relations, that was in an

3   e-mail that was distributed to all of the nursing

4   staff addressed to Kevin McGloughlin, the assistant

5   director of nurses.  What I was saying was that these

6   people -- they were trying to say that they were care

7   planned to be appropriate for having sexual relations

8   with each other or something, but I mentioned that

9   some of them I thought were actually victims of

10  sexual assault because they weren't cognitively able

11  to consent to sexual relations.

12        Q.   With other patients?

13        A.   With other patients, yes.

14        Q.   Did you receive a response to that

15  e-mail?

16        A.   No, Not directly.

17        Q.   What do you mean "not directly"?

18        A.   I think that the response that occurred

19  to all of my concerns was that she terminated me.

20  She, you know, fabricated these protectural (sic)

21  reasons.  She took advantage of a co-worker who was

22  going through a divorce, and he was missing a lot of

23  work.  I'm talking about  Barry Blazek.  She took

24  advantage of that situation and had him suddenly be

Nancy Lewen
December 23, 2019

1   her star witness in this thing to terminate me.

2          Q.     Who is she?

3          A.     Barbara.

4          Q.     Okay.  Did you send Barry Blazek Facebook

5   messages?

6          A.     Yes, I did.

7          Q.     Were there numerous messages that were

8   sent that he did not respond to?

9          A.     Yes, there were.

10         Q.     And when eventually he did respond, did

11  he indicate to you that he did not wish to

12  communicate with you anymore because he felt

13  uncomfortable?

14         A.     Well, what had -- he responded.  We had

15  said that we were going to go on an outing to the

16  Cleveland Museum of Art.  And then he did

17  conveniently respond and say that -- I guess, I used

18  the date word instead of saying calling it an outing

19  or something like that.  I used the date word, which

20  scared him.  As the way that he testified at the

21  civil service hearing, he said that that scared him

22  when I used the date word, so then that's when --

23  he wasn't involved -- he wasn't interested in going

24  on an outing anymore to the Cleveland Museum of Art.

**Nancy Lewen**
**December 23, 2019**

Page  48

1      Q.     Okay.  Were there other sexually explicit

2   messages that you sent to Mr. Blazek that he did not

3   respond to?

4      A.     No.  And I think that something that

5   needs to be put on the record, if you recall, and

6   maybe you don't recall, around that time period the

7   then adjutant general of the Department of Military

8   and Veterans Affairs' name was Joseph James or James

9   Joseph, one or the other.

10         And he had been suspended for an

11   anonymous letter alleging sexual assault against him

12   and then, eventually, he did resign; and that's when

13   Anthony Carrelli came in.  And in the workplace

14   because of that and then, also, because of these

15   sexual encounters between the residents going on, a

16   lot of the people in the workplace, not just me, were

17   making sexual innuendos, and I think --

18      Q.     To who?

19      A.     Just to each other, just about anything,

20   just sexual innuendos, you know.  So, you know, this

21   whole thing they tried to make it seem like I was

22   sexually harassing Barry Blazek.  If you read through

23   the Facebook messages, I never sexually harassed

24   Barry Blazek.

Nancy Lewen
December 23, 2019

1    Q.    Do you understand that he felt like you

2  may have sexually harassed him?

3    A.    I think that Barry -- first of all, you

4  would have to go back to what was going on in his

5  life as far as --

6    Q.    I understand that, Ms. Lewen, and I'm

7  sorry to interrupt you, but we're not talking about

8  what's going on in his life.  We're talking about

9  what went on in yours.

10    A.    But it's important for the context,

11  though.  It's important for the context.  He was all

12  over Facebook talking about how upset he was from --

13  his ex-wife had cheated on him and, you know, left

14  him for another man.  She committed adultery and he

15  was very upset.  And I was trying to tell him that,

16  you know, just because this woman hurt you that way,

17  you know, get over it, move on.  He's missing so much

18  work.  He was in trouble, you know, and I was trying

19  to raise his self-esteem.  I was trying to be helpful

20  to the man.

21    Q.    Were you friends with him before he

22  started experiencing marital troubles?

23    A.    Oh, yeah, we were friends.  I mean, I

24  would say worker friends.  We weren't best friends,

Nancy Lewen
December 23, 2019

Page 50

1  no, but we were co-worker friends.

2      Q.    Why did you think that sending him links

3  to websites showing different sexual positions was

4  going to help him deal with the adultery that his

5  wife allegedly committed?

6      A.    Actually, I'm going to object to that on

7  the grounds of relevance.

8      Q.    I appreciate the objection, but this is a

9  deposition and pretty much, if you can answer the

10  question, I would ask for you to answer the question.

11      A.    Again, that wasn't directed toward Barry

12  Blazek.  Okay, all of --

13      Q.    So the messages --

14      A.    Many of the people in the Soldiers' and

15  Sailors' workplace at that time were speaking to each

16  other in sexual innuendo's as a joke, maybe as a way

17  of coping with what was going on.  Many of us were

18  not happy with the fact that these, you know,

19  patients were being sexually assaulted and maybe, you

20  know, I don't know.  I don't really know what to say

21  to defend myself about that.  But I think as I said,

22  that's part of the protectural (sic) reason that were

23  given for terminating me.  The actual --

24      Q.    Ms. Lewen, but you're not disputing the

1  fact that you did indeed send him Facebook messages

2  with links to websites with images of the sexual

3  positions, right?

4      A.    Yes.  No, I'm not disputing that.  It's

5  the truth.

6      Q.    Okay.  And subsequent to that you

7  followed up with another message talking about a

8  particular sex position that you enjoyed, is that

9  correct?

10     A.    It was being on top.  You're exactly

11  right.  It was being on top.  And, again, I wasn't

12  really talking about the sexual position of being on

13  top.  I was talking, using an analogy of, you know,

14  it would be good for the workers there at that place

15  to be on top instead of being beaten down.

16     Q.    So the best analogy you could come up

17  with was an explicit sexual position?

18     A.    Well, because we were all speaking in the

19  workplace with sexual innuendos when our, you know,

20  the adjutant general had been suspended for sexual

21  harassment.

22     Q.    When did that suspension occur?

23     A.    I believe it was January or February,

24  something like that.

1     Q.    Of what year?

2     A.    Of 2016. And as I said I don't remember

3 if he was Joseph James or James Joseph. But he had

4 been only in that position for a few months and then

5 that's when he had the sexual harassment thing.

6     Q.    Did you send sexually explicit messages

7 to anybody else other than Barry Blazek?

8     A.    No.

9     Q.    Had you spoken with your colleagues in

10 this sexually explicit manner that you've said others

11 were engaged in?

12     A.    We all joked about -- I mean, we were

13 nightshift workers for one thing, you know, sleep

14 deprived half the time, working short staffed half

15 the time. And we did have comradery and we did joke

16 with each other. I mean, even for that matter my

17 supervisor, Raymond Ham, joked with me. I was, you

18 know, a single woman living at home, you know, alone.

19 And he joked with me that rather than looking for a

20 husband or a man to date or something, he joked with

21 me that I should just hire, put in a swimming pool

22 and hire a pool boy, or whatever -- it was a joke. I

23 took it as a joke. I considered it a joke.

24     Q.    So you did not feel --

Nancy Lewen
December 23, 2019

1    A.    I did not --

2    Q.    -- bullied by these comments?

3    A.    I did not feel intimidated.  I did not

4    feel bullied, harassed, sexually harassed, nothing

5    like that.  I thought it was funny.  The way that he

6    said it to me, I thought I was funny.

7    Q.    Did the fact that Barry Blazek did not

8    respond to numerous messages, including the 40 you

9    sent him in the course of 24 hours, did that make you

10   realize that perhaps your comments were not taken as

11   funny?

12   A.    At a certain point I realized they

13   weren't taken as funny -- and, obviously, I confided

14   in him that I had been the person to make the

15   anonymous complaint to the Department of Health; and

16   I confided in him that I had made the complaint to

17   the attorney's office.  And, obviously, at a certain

18   point I probably did realize that that was the person

19   that I should not have confided in.

20   Q.    What made you realize that?

21   A.    When I got terminated on a complaint, on

22   this trumped-up Barry Blazek -- and he, himself,

23   testified at the civil service and the unemployment

24   compensation hearing that he never actually

**Nancy Lewen**
**December 23, 2019**

Page 54

1    complained about my behavior to administration.

2          Q.    Ms. Lewen, you sent a letter to his

3    estranged wife.  I think it was in the beginning

4    of --

5          A.    Yes.

6          Q.    -- March of 2016?

7          A.    Right.  But I think it was actually

8    February of 2016, I think.

9          Q.    So you send his estranged wife a letter

10   with information about her soon to be ex-husband?

11         A.    Uh-huh.

12         Q.    Do you have any thoughts now that it's

13   been a few years since you did that as to how

14   inappropriate that was?

15         A.    First of all, I'm going to object to the

16   grounds of relevance because it happened off-duty,

17   but, no -- given time to think about it, no.  If I

18   ever saw a woman who might be in danger because of

19   something that her ex-husband was doing, I would

20   stand up and I would try to help that person again.

21   I don't regret trying to, you know, being concerned

22   about that.  I don't regret that at all.

23              And as I said, I was off-duty.  She never

24   complained.  He never complained, you know, it was

1  something that Barbara Raymond, you know, twisted

2  around to try and make it into some sort of workplace

3  violence, you know, policy violation to get me out of

4  there because of the fact that I was voicing too many

5  concerns about the elder abuse and neglect.

6      Q.    Do you see a problem with the fact that

7  you did an independent Internet research about

8  Mr. Blazek's children?

9      A.    It took about 30 seconds from the

10  information he had on his dating profile to see, you

11  know, that this was a single woman living at home

12  with two kids and the exact address of where she was

13  at.  I don't see a problem with that, no.  I don't

14  see a problem with that.

15      Q.    Okay.

16      A.    What I see a problem with and what I have

17  always seen a problem with was that these off-duty

18  things that were certainly my right to be expressing

19  concern for this person's well-being were twisted

20  around and used as protectural (sic) reasons to

21  terminate me from the workplace to get me out of

22  there, you know, swiftly, quickly, you know, and just

23  make an example of me.  You know, they made an

24  example of, this is what happens to people who voice

Nancy Lewen
December 23, 2019

Page 56

1    concerns about our abuse and neglect.  This is what

2    happens.

3         Q.    A few moments ago you had testified

4    that -- I believe, and I don't want to put words in

5    your mouth, that I think you said that Mr. Blazek

6    never complained about the messages that you sent

7    him, is that correct?

8         A.    Right.  He did not complain to the

9    administration at the Soldiers' and Sailors' Home.

10        Q.    Okay.  So do you disagree with the

11   following statement that "On or about March 7, 2016,

12   Blazek submitted a written complaint to the

13   appointing authority about appellant's Facebook

14   messages in her letter to his wife"?

15        A.    There was something that -- I don't know

16   if he actually -- I mean, he testified that he

17   submitted it, but that was after I was removed from

18   the workplace.  I was removed on March 2nd, and then

19   he had testified later that he had not actually

20   complained about me to them.  He had mentioned what

21   was going on to the co-worker and then that co-worker

22   went to, I guess, to HR or Barbara Raymond or

23   whatever.

24              But that thing that he allegedly

**Nancy Lewen**
**December 23, 2019**

1  submitted on March the 7th was just a few little

2  cherry-picked things from the Facebook messages, and

3  it wasn't signed by him and it was typewritten, and

4  then the typewritten name Barry Blazek and then later

5  he did say, yes, it was him.  How much of that was

6  truthful testimony on his part and how much of it was

7  just because he was trying to save his job,  I don't

8  know.

9          But going by what he said, he did type

10 that up myself and submitted it on March, whatever

11 the date was on it.  It was about a week after I

12 was -- after they suspended me prior to the formal

13 termination.

14      Q.    Okay.  **Why do you believe that he was**

15 **trying to save his job?**

16      A.    Because of excessive absences and -- I

17 believe there was also some other disciplinary

18 actions, but it was mainly excessive absenteeism.  As

19 I said it's important to know the context of what was

20 going on.  It was all over Facebook at the time how

21 his ex-wife wasn't cooperating with him with the

22 visitation of the kids, and it was almost as if she

23 was going out of her way to not be cooperative with

24 him; and so he was ending up calling off in order to

1  be able to visit with his children and he was in

2  trouble.

3      And, eventually, later that year he did

4  end up going to the Veteran's Administration, I

5  understand, from what I heard from someone else.  But

6  for that brief time period, he went from being

7  somebody with his head on the chopping block to being

8  Barbara Raymond's star witness in this termination of

9  me on these protectural (sic) reasons.

10      Q.   Did he confide in you about the issues of

11  visitation or did you learn of this by looking on his

12  Facebook page?

13      A.   He was just really blasting her on

14  Facebook.  He had copied some text messages between

15  himself and his ex-wife and posted them on Facebook.

16      Q.   So it was your assumption that he was

17  missing work because of his visitation; he never

18  actually told you that?

19      A.   I guess you would say it was an

20  assumption.  He was pretty open about it but, I

21  guess --

22      Q.   Ms. Lewen, I did say it was an

23  assumption.  Would you agree with me that it was an

24  assumption?

Nancy Lewen
December 23, 2019

1        A.    I guess I do.  I don't know that he did

2   actually specific say directly to my face -- no, I

3   take that back.  He did actually say to my face one

4   day when we had a face-to-face conversation on Unit D

5   of the nursing home.  He did say to my face that it

6   was because of what his ex-wife was doing.  I have no

7   proof to prove that conversation.

8        Q.    If you recall, what did he say to you?

9        A.    He said she was driving him crazy with

10  not cooperating with the visitation, with his work

11  schedule, not being flexible with the visitation

12  schedule in regards to his work schedule, and so

13  there was that conversation.  But then there were

14  also the things that he had posted on Facebook, you

15  know, publicly about how uncooperative she was being,

16  and the stress that it was causing on his life and

17  insomnia and other symptoms of stress.

18       Q.    Okay.  So he was posting this on a public

19  profile, but he wasn't confiding in you with regards

20  to these specific things, right?

21       A.    Well, that one conversation on Unit D

22  that was face-to-face that I don't have any evidence

23  of, you know, he did confide to me face-to-face.  He

24  confided to everybody in the workplace face-to-face.

Nancy Lewen
December 23, 2019

Page 60

1   He was very talkative about what was going on with

2   his ex-wife.

3           Q.    How many conversations, other than the

4   one that you just mentioned on Unit D, did you have

5   with   Barry Blazek?

6           A.    About what was going on with his ex-wife?

7           Q.    Yes.

8           A.    Two that I can remember.  The other one

9   was on Unit A, again a very brief conversation during

10  a shift change.

11          Q.    Okay.  So two brief conversations and

12  numerous, numerous Facebook messages that were not

13  responded to.  Do you see how that could create

14  hostility in the workplace?

15          A.    I don't think so, because we very rarely

16  saw each other, number 1; and Number 2, I think's

17  it's the type of thing to where -- again like a

18  progressive disciplinary action would have maybe

19  resulted in scheduling it to make sure that we never

20  crossed paths with each other; but instead -- you

21  know, the thing that never really sat well with me is

22  they took me off the schedule just so suddenly

23  leaving the place short staffed on a Friday night;

24  that wasn't in the best interest of those residents.

**Nancy Lewen**
**December 23, 2019**

1              This whole thing, you know, that was

2   between Barry Blazek and I off duty, you know, really

3   truly it could have been handled differently had they

4   wanted to handle it differently.  They didn't want to

5   handle it differently because they were looking for

6   protectural (sic) reasons to fire me because of the

7   fact that I had placed concerns about the elder abuse

8   and the elder neglect.  It could have been handled

9   much differently.  It should have been handled much

10  differently but it wasn't.

11       Q.    Okay.  We previously touched on the

12  comments about getting a gun and shooting somebody

13  and you had indicated that it was meant to present a

14  possibility, but it's not something that you would

15  do?

16       A.    Right.  I was voicing alarm.

17       Q.    But you understand that in today's

18  society that is an inappropriate analogy to make?

19       A.    No, I don't think that that's a very

20  inappropriate analogy to make.  I think that it's

21  important that we should possibly try to prevent

22  these situations from happening rather than reacting

23  to it afterwards.

24       Q.    Okay.

Nancy Lewen
December 23, 2019

1      A.    There is no place in today's society for

2  workplace violence by supervisors or administrators

3  or anybody else.

4      Q.    **Other than that one incident that you**

5  **mentioned with Mrs. Cabreira regarding the workplace**

6  **violence, are there other ones that we have not**

7  **touched on yet?**

8      A.    Other what?  Workplace violence?

9      Q.    **Examples of workplace violence, yes.**

10     A.    Involving me personally, no.  But I was

11  aware of a situation involving a nurse assistant -- I

12  can't even think of her name.  I think her last name

13  was Goodwine.  But I hate to even tell you that

14  because if you mention it to Barbara Raymond, she's

15  liable to be harassed again.  Let's just say that

16  there was a nurse assistant that they hounded and

17  hounded and hounded, really for no reason other than

18  because they were just -- Barbara Raymond and one of

19  the assistant director of nurse's named Nancy

20  Flannigan seemed to just kind of, like they had a

21  need to pick on people for --

22     Q.    **Were you present for any of the**

23  **interactions that they had with Ms. Goodwine?**

24     A.    I was present later on that night after

Nancy Lewen
December 23, 2019

Page 63

1    one of them had happened.  She had gone, apparently,

2    to a doctor's office visit with one of the residents

3    and --

4        Q.    Who?

5        A.    Ms. Goodwine.

6        Q.    Okay.  Can you tell me a date,

7    approximate date?

8        A.    I can't, no.

9        Q.    So it was at some point in the year and a

10   half that you worked --

11       A.    At some point, yeah.

12       Q.    And just to be clear, you did not

13   actually witness an interaction between Ms. Raymond

14   or Ms. --

15       A.    What I witnessed was the aftermath where

16   this nurse assistant was saying I guaranty you if

17   they talked like this to me off duty, I would -- I

18   mean, excuse my language but she would say, like, I

19   would beat their ass if they treated me like that,

20   you know, let's take this off the property, you know.

21   And I guess I just felt like, you know, they should

22   think about these things before they treat people

23   subhumanly.

24       Q.    Any other instances of workplace violence

Nancy Lewen
December 23, 2019

1    that you either observed or were a victim of?

2         A.    No, not that I can recall.

3         Q.    Okay.  Ms. Lewen, who was Rhonda

4    Wilkenson?

5         A.    She was an RN who worked at the Soldiers'

6    and Sailors' Home.

7         Q.    Is there anything that you can tell me

8    about her that pertains to your employment there or

9    your subsequent termination from there?

10        A.    I know that she had said to me fairly

11   shortly before I was terminated -- she was frustrated

12   one evening.  I had come on for the night shift and

13   she had been working the evening shift, and she was

14   frustrated because she had been told by the evening

15   shift supervisor that part of her responsibility was

16   to keep an eye on Barbara Raymond's sister, who was a

17   nurse assistant there, who allegedly she was in some

18   sort of a relationship with a male nurse assistant

19   and allegedly they would sometimes go off in

20   different places; and they would have sex on the job

21   but because she was the administrator's sister she,

22   you know, didn't get in trouble for it or whatever.

23              And Rhonda Wilkenson had told me on that

24   particular evening that she was just tired of, you

Nancy Lewen
December 23, 2019

1    know, that shouldn't be part of her responsibility to

2    babysit the administrator's sister to make sure she

3    wasn't having sex on the job with another nurse

4    assistant.

5         Q.    When did she tell you this?

6         A.    I don't know the date.  I actually had --

7    the day of my PDC I actually filled out a witness

8    statement and turned it in regarding what she had

9    said.

10        Q.    And that was a PDC that you chose not the

11   attend?

12        A.    No, that was the PDC that I attended, the

13   ones after -- surrounding my termination.  They

14   scheduled two PDCs and I attended both of them.  And

15   at one of them towards the end I had mentioned about

16   that, and they said fill out a witness statement and

17   turn it in; so I did.

18        Q.    Do you know if anything came of it?

19        A.    I have no idea.  I was terminated.

20        Q.    Okay.  Did you have any personal

21   knowledge  about these claims of having sexual

22   relations --

23        A.    No, I didn't --

24        Q.    One moment.  -- between Barbara Raymond's

Page 66

```
 1   sister and another employee?
 2        A.    No, other than just the rumors in the
 3   workplace.
 4        Q.    Other than Rhonda Wilkenson mentioning it
 5   to you, did you hear it from anybody else?
 6        A.    Oh, yeah, many people talked about it.  I
 7   can't really think of any particular names, but,
 8   yeah, it was pretty much common knowledge among
 9   certain people at least that there was a rumor of
10   that.  I don't know if they did -- apparently, from
11   what the rumor was, that they would go in some
12   stairway and they would have sex.
13        Q.    But you never saw it?
14        A.    I never saw it, no.  I don't really even
15   know those people.  I know who her sister is, but I
16   don't know, you know, I never really worked that
17   shift that much.
18        Q.    Okay.  I think we covered this, but I
19   just want to make sure that I have the dates
20   straight.  When did you contact the Department of
21   State regarding certain deficiencies at the
22   Pennsylvania Soldiers' and Sailors' Home?
23        A.    The Department of Health you mean?
24        Q.    The Department of Health, yes.
```

1      A.    I believe that was at the end, that was

2  in November.  And then they came in on my complaint

3  the first week of December of 2015.

4      Q.    **And you sent them a letter?**

5      A.    I did it online.  They have an online

6  recording system.

7      Q.    **Okay.  Before they came in in December of**

8  **2015, did you receive a response, either**

9  **automatically generated or a specific response?**

10     A.    From the Department of Health?

11     Q.    **Yes.**

12     A.    I don't want to swear to it, but I think

13  that they might have sent like an automated

14  response-type thing.  I don't want to swear to it.

15  After they came in they did send me a written

16  response saying that they had found four

17  deficiencies, and that was public knowledge anyway.

18  It was posted on the website.

19     Q.    **Did you tell anybody about the complaint**

20  **that you filed with the health department?**

21     A.    I told Barry Blazek in the Facebook.

22     Q.    **How soon after the filing of the**

23  **complaint in November of 2015 did you tell him in the**

24  **Facebook messages?**

Nancy Lewen
December 23, 2019

1       A.    I don't remember exactly, but it was

2   around that same time period.

3       Q.    Did he acknowledge receipt of the message

4   or respond in any way?

5       A.    No, not that I recall.

6       Q.    Were you interviewed as part of the

7   investigation conducted by the health department?

8       A.    No, I was not.

9       Q.    Ms. Lewen, if you recall, you sent me an

10  e-mail earlier in the month with some public Facebook

11  postings and discussions about ghosts, and you had

12  mentioned that, you know -- and I'm quoting from the

13  e-mail -- "believe me when I say that on a good day I

14  do notice ghosts; but when I get sleep deprived, I

15  have a unhealthy awareness of ghosts."

16      A.    Yes.

17      Q.    Could you explain to me the reason why

18  you sent me that e-mail so that I can have a better

19  understanding?

20      A.    Just to update you on my mental health

21  status, because nobody's really asked recently.

22  Even, you know, you're all aware of the fact that I

23  suffered a nervous breakdown in the year 2016 and

24  '17; no one's asked lately, you know, how's your

1    mental health status doing. And, again, that kind of

2    goes back to where, you know, originally I did

3    volunteer my situation as a nonviolent person.

4          I think hopefully the Commonwealth

5    Pennsylvania State Employees will learn from this

6    somehow, I would hope; that these legal situations,

7    you know, this is all just in a day's work for you,

8    but this does effect people's lives.

9         Q.    **Certainly. And I understand that it**

10   **does. The notion of seeing ghosts when did that**

11   **begin?**

12         A.    I don't see ghosts. I'm one of those

13    types of people where -- I'm sensitive. I don't have

14    a shingle hanging outside of my door that says

15    "psychic" or anything like that, but I've always been

16    sort of sensitive to spiritual things. Now, when I

17    get sleep deprived, I get hyper spiritual and in an

18    unhealthy way. I mean, it's certainly not something

19    that I enjoy but that's -- I was just trying to

20    explain that to you, that even on a good day I'm

21    aware of spiritual things.

22         But on, you know, let me get all stressed

23    out and sleep deprived and I think that that's --

24    personally, I think that that's what happens to a lot

**Nancy Lewen**
**December 23, 2019**

Page 70

1    these people and maybe that's something we could help

2    prevent in our society, exercise kindness.  And if

3    this situation had settled almost immediately after

4    it happened instead of going on four years now, you

5    know, maybe in certain situations it might prevent

6    violence in our society.

7         Q.    **What do you mean by that?**

8         A.    Well, I mean, as I said all along, use me

9    as an example, okay, of maybe some of the problems

10   within, you know, the litigation system of how rather

11   than trying to mitigate a person's mental health

12   issue, everything is litigated, you know.  I don't

13   know.  I don't really have anything more to say about

14   that.

15        Q.    **Okay.  You filed the federal complaint in**

16   **this particular case voluntarily, did you not?**

17        A.    Yes, I did.

18        Q.    **So you initiated the lawsuit?  Yes?**

19        A.    Yes, I did.  And, honestly, because of --

20   if you look back at what I found, because of the

21   conflict of interest involved, honestly, when I filed

22   this lawsuit in June of 2017, I really truly thought

23   that it would be settled almost immediately.

24              I had no concept that the Attorney

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Nancy Lewen
December 23, 2019

Page 71

1    General civil litigation side would defend so

2    vigorously, you know, a defendant who had retaliated

3    against a person, who had committed elder abuse and

4    neglect to the Pennsylvania Attorney General Criminal

5    Division.  You know, I just had no concept of that.

6    I really truly thought that by the end of the summer

7    of 2017 that we would be in settlement talks.  I had

8    no idea that it would going on almost on to the year

9    2020 now.  And I know you're new to the case.

10        Q.    I am familiar with the history of the

11   case.  But how -- strike that.  Why do you believe

12   that you were retaliated against by Barbara Raymond?

13        A.    Because of the --

14        Q.    Or was it even Barbara Raymond; was it

15   somebody else?

16        A.    No, Barbara Raymond and the other

17   administration that were involved in it.  But Barbara

18   Raymond.  Because of the proximity of me voicing my

19   concerns and then what happened there with the

20   termination.

21        Q.    I'm sorry, could you say that one more

22   time.  The proximity to what?

23        A.    The proximity of when I voiced my

24   concerns regarding the elder neglect and abuse to,

Nancy Lewen
December 23, 2019

Page 72

1   you know, then the subsequent employment termination.

2   It was a matter of just within a, you know, from

3   November to March 2nd, you know, it -- what is that,

4   three months?  It wasn't like it stretched out over a

5   year or two years or anything, you know, boom, I

6   voiced the complaints and within just a short period

7   of time, I was terminated.

8       Q.    How do you know that Ms. Raymond was

9   aware of the complaints that you voiced if some of

10  them were anonymous?

11      A.    Well, I would assume -- she testified

12  that she terminated me based on the content of

13  Facebook messages, that was the stated reason that

14  she gave.  There was no argument about that.  She

15  said -- when she testified at the unemployment

16  compensation hearing.  I would assume if she was any

17  kind of a prudent administrator, that she would have

18  read the entirety of what she was terminating me on.

19  You know, I would assume that she didn't just pick

20  and choose different pages to read but not, you know,

21  if you look through those interrogatories that I

22  answered, I said a lot to Barry Blazek about my

23  complaints to the regulatory authorities.  I think

24  it's hard to think that she didn't read those things.

1        Q.    So it is your belief that she found out

2  about the complaints through the Facebook messages?

3        A.    Through that and then also the one e-mail

4  that I had sent to Kevin McGloughlin about resident

5  dignity issues with the sexual relation.  That was

6  forward -- that was a group e-mail to all nursing

7  staff and then --

8        Q.    Is that the group e-mail that included

9  the phrase "bloodshed I fear might happen at one day

10  at PSSH"?

11        A.    No, that was in the Facebook messages to

12  Blazek, the off-duty Facebook messages.  The e-mail

13  to Kevin McGloughlin was distributed to all nursing

14  staff.  It was generated -- it was originated by him

15  and I responded to him about how some of these

16  residents -- I named actually one of them, I believe,

17  by name.  I felt that if they looked at how his -- he

18  had taken a cognitive status test that it was

19  probably administered by a psychologist.  I thought

20  that these people might actually be sexual assault

21  victims not able to consent to sexual relationships.

22  And, of course, the facility contributory neglect

23  thing that I submitted to my supervisor.  She didn't

24  deny that she read that.

1       **Q.      Who didn't deny?**

2       A.      Barbara Raymond.   Recently when sh

3   answered these two most recent interrogatories, she

4   said that she didn't respond to it because it wasn't

5   a complaint, but she didn't deny that she had read it

6   or that she knew of it's existence or whatever.   She

7   said that I had chosen not to go to my PDC and,

8   instead, I submitted that.

9       **Q.      Why did you choose not to go to your PDC?**

10      A.      Because I felt like I didn't really have

11  anything more to say about it.

12      **Q.      But you were aware that that was an**

13  **opportunity for you to present your case, correct?**

14      A.      Right.   But you have to realize that

15  these PDCs are held in the morning after you worked

16  all night long and, you know, I felt like there

17  wasn't really anything that I could say orally after

18  I had worked all night long that I couldn't better

19  say in writing.   And that's why I submitted that

20  instead of attending the PDC in person.

21      **Q.      Did you ask to have the PDC moved to a**

22  **day where you did not work the night before?**

23      A.      No, I did not.   As I said I thought that

24  that written submission would be sufficient.

1  don't know if you need to use the bathroom or get a

2  drink of water, but I'm going to place you on mute

3  for a few moments.  We're going to go off the record,

4  and then I'll come back and hopefully be done here

5  shortly.  Okay?

6      A.    Okay.

7      Q.    So it's 11:35 now.  How about we come

8  back at 11:40?

9      A.    Thank you very much.

10     Q.    I'm going to put you on mute and then

11 come back in five minutes.

12     A.    Okay.

13

14     (Five-minute break was taken)

15

16     Q.    I just have a few follow-up questions and

17 then we're going to be finished here for the day.

18 Going back a little bit to the Facebook messages

19 between you and      Mr. Blazek and you're perceived

20 understanding of why he was missing work and his

21 employment may have been jeopardized.

22     A.    Uh-huh.

23     Q.    Do you recall on February 29th he, he

24 being Mr. Blazek, sent you a message in which he says

Page 77

1   this ongoing one-sided relationship has become such a

2   distraction to me.  I can't allow it to continue.

3   That was part of a fairly long message that he sent

4   to you.  Do you recall this?

5        A.    Vaguely, yes.

6        Q.    Okay.  So would you agree with me that

7   his job may have been impacted by the constant

8   communication, the one-sided communication he

9   mentioned in this message?

10        A.    I actually disagree.  As you said you

11   know sometimes it's best to agree to disagree.  I

12   think that he did use me as a way to save his on job

13   until he could actually get out of there without

14   being terminated for his absenteeism.

15        Q.    He's no longer working at the home?

16        A.    No, he left around like December of 2016.

17        Q.    And how do you know that?

18        A.    Another person told me that, that I ran

19   into.

20        Q.    Who was this other person?

21        A.    Actually, quite honestly, I don't even

22   know her name.  It was a nurse assistant.  And,

23   apparently, he went to work at the VA.  It was a day

24   shift nurse assistant, but I don't know her name, to

Nancy Lewen
December 23, 2019

Page 78

1    be quite honest.

2        Q.    Did she volunteer the information or did

3    you seek it out?

4        A.    She volunteered it.

5        Q.    Where did you see her?

6        A.    At Wal-Mart.

7        Q.    Okay.  And when did you see her?

8        A.    Oh, that was a long time ago now, that

9    was in the year 2017.  I don't even know the date.

10       Q.    Okay.  Ms. Lewen, I want to thank you for

11   your time.  I think that's all the questions that

12   have.  So we are finished for today.

13       A.    Thank you.

14

15            (Deposition concluded at 11:43 a.m.)

16

17

18

19

20

21

22

23

24

**Nancy Lewen**
**December 23, 2019**

Page 79

1        I, ELLEN M. MUIR, a Commissioner of the State

2   of Rhode Island, do hereby certify that NANCY

3   ELIZABETH LEWEN came before me on the 23rd day of

4   December 2019, at CATUOGNO COURT REPORTING SERVICES,

5   INC., 155 South Main Street, 2nd Floor, Providence,

6   Rhode Island, and was by me duly sworn to testify to

7   the truth and nothing but the truth as to her

8   knowledge touching and concerning the matters in

9   controversy in this cause; that she was thereupon

10  examined upon her oath and said examination reduced

11  to writing by me; and that the statement is a true

12  record of the testimony given by the witness, to the

13  best of my knowledge and ability.

14        I further certify that I am not a relative or

15  employee of counsel/attorney for any of the parties,

16  nor a relative or employee of such parties, nor am I

17  financially interested in the outcome of the action.

18        WITNESS MY HAND this 12th day of January, 2020.

19

20

21

22  Ellen M. Muir                My Commission expires:

23  Commissioner of the          November 30, 2021

24  State of Rhode Island