THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY E. LEWEN,                          :
                                         :  Civil Action No. 1:17-cv-148-SPB
                    Plaintiff,           :
                                         :
        v.                               :
                                         :  Magistrate Judge
BARBARA RAYMOND,                         :  Susan Paradise Baxter
                                         :
                    Defendant.           :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :

RESPONSIVE CONCISE STATEMENT
PURSUANT TO FRCP 56 and LCvR 56 (C)(1)

Pursuant to Local Rule LCvR 56-1(C)(1),  Nancy E Lewen, Plaintiff, files the following

Responsive Concise Statement in support of her Opposition to the Motion for Summary Judgment.

These facts are followed by additional material facts and supporting evidence showing a genuine

issue of material fact in dispute.

Moving Party's Alleged Uncontested Facts

1.      Pennsylvania Sailors' and Soldiers' Home (hereinafter "PSSH") is a state veteran's home
that operates under the Department of Military and Veterans Affairs (hereinafter "DMVA").
(Exhibit 18). It provides medical and residential services to eligible veterans and their spouses.
(Exhibit 18).
**Response:      Undisputed**

2.      Plaintiff started working at PSSH as a licensed practical nurse (hereinafter "LPN") on
September 29, 2014. (Exhibit 1, Page 137). As an employee of PSSH, she was also a
Commonwealth of Pennsylvania employee. (Exhibit 1, Page 10).
**Response:      Undisputed**

1

3.      Plaintiff was suspended from PSSH on March 2, 2016 for violations of DMVA and Commonwealth of Pennsylvania policies. (Exhibit 14). After PSSH conducted an investigation into her conduct she was terminated on March 14, 2016. (Exhibit 15). Plaintiff's violations spanned the time period of October 2015 – March 2016. (See Paragraphs 12 – 61). The alleged protected speech occurred between January and February of 2016. (See Paragraphs 63 – 82).

**Response:**     **Undisputed**

4.      Defendant is employed as Commandant at PSSH. (Exhibit 1, Page 38). Specifically, she is the administrator of the facility where she supervises the entire campus of approximately 263 employees and in charge of resident care for approximately 207 veterans and their spouses. Id. In 2015, Defendant oversaw the entire operations of PSSH, including regulatory compliance and oversight. (Exhibit 28, Paragraph 2). Commonwealth of Pennsylvania and DMVA Employee Policies and Guidelines

**Response:**     **Undisputed**

5.      The Commonwealth of Pennsylvania and DMVA have established workplace policies and Plaintiff as an employee of PSSH was required to abide by both sets of policies. (Exhibit 1, Pages 9-12).

**Response:**     **Undisputed**

6.      Plaintiff was aware of the Commonwealth of Pennsylvania and DMVA workplace policies. (Exhibit 19, Pages 30-32; Exhibit 1, Pages 17-18).

**Response:**     **Undisputed**

7.      DMVA had a policy prohibiting "...inflicting bodily harm, threatening, intimidating, coercing, or interfering with fellow employees, supervisors, residents or the general public; threatening, intimidating, interfering with, or using abusive or profane language including ethnic slurs, towards fellow employees, subordinates, supervisors, residents or the general public, during working hours, or while on any Department property; and inappropriate conduct or behavior towards fellow employees, supervisors, residents or the general public, during working hours, or while on any Department property." (Exhibit 7, Page 4.) On December 20, 2014, Plaintiff acknowledged familiarity with this policy and that violations could result in disciplinary action. Id. at Page 5. 8. The Commonwealth of Pennsylvania and DMVA also had policies prohibiting sexual harassment. (Exhibits 2, 3). DMVA policy prohibited any "[u]nwelcome sexual advances, requests for sexual favors, and/or other verbal, visual, or physical conduct of a sexual nature where . . . [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment…" (Exhibit 3, Paragraph 2). An employee engaged in sexual harassment was subject to disciplinary action, including termination. Id. at Paragraph 3. On October 8, 2014, Plaintiff completed training in

discrimination and sexual harassment prevention. (Exhibit 19, Page 31). Sexual harassment was a violation of federal and state law and Commonwealth Policy. (Exhibit 3, Page 1).

**Response:**     **Undisputed**

9.      DMVA had a policy that prohibited behavior that included threats, intimidation, sexual harassment, and any other behavior affecting the psychological well-being of other employees, as well as "[v]erbal abuse or conduct which was threatening, humiliating and or intimidating." (Exhibit 4, Page 2, Paragraph 3, 4).

**Response:**     **Undisputed**

10.     The Commonwealth of Pennsylvania had a policy that prevented workplace violence, including behavior that results in physical harm to an individual or property, emotional harm to an individual, or the threat of such harm to an individual could result in termination. (Exhibit 5, Page 2, Paragraph f; Page 3 Paragraph b).

**Response:**     **Undisputed**

11.     Management Directive 205.34 addressed technology acceptable use policy. (Exhibit 6). The policy mandated that employees maintain professionalism in their email communications, and prohibited employees from harassing or threatening activities using employer IT resources. Id. at Page 5, I; Page 6, Paragraph G; Page 8. Plaintiff was on notice that violation could result in termination. Id. at Page 3, b. On December 20, 2014, Plaintiff signed Commonwealth IT resource acceptable use policy user-agreement. Id. at Page 10.

**Response:**     **Undisputed**

12.     Plaintiff and Barry Blasic (hereinafter "Blasic") were coworkers and LPNs at PSSH. (Exhibit 19, Page 49; Exhibit 1, Page 22.)

**Response:**     **Undisputed**

13.     In August of 2015, Plaintiff friend requested Blasic on Facebook. (Exhibit 8, Page 89). He accepted her invitation. Initial communications were limited to public posts. Id.; Exhibit 1, Page 2.)

**Response:**     **Undisputed**

14.     Starting at the beginning of September 2015, Plaintiff and Blasic engaged in private conversation through the forum of Facebook messages. (Exhibit 8, Page 90)

**Response:**     **Undisputed**

15.     Beginning in October of 2015, Plaintiff importuned Blasic for dates, sent him links to sexually-explicit websites, made sexual advances, asked him to move in, described past sexual experiences, and said she loved him.

**Response:**      **Dispute.  FRCP Rule 56(c)(2) Fact not supported by admissible evidence. FRE 1002  Not Original Writing  FRE 106 Incomplete Document taken out of context.**

16.      After learning Blasic had blocked Plaintiff, that same day, she wrote a letter to Blasic's wife, Jennifer:
**Response:**      **Undisputed.**

17.      On March 1, 2016, in an email to Blasic, Plaintiff wrote, "[i]f you feel the need to file an official sexual harassment complaint against me I would completely understand…" In addition, Plaintiff attached the letter she wrote to Jennifer Blasic. (Exhibit 10)
**Response:**      **Undisputed.**

18.      On March 2, 2016, Plaintiff emailed Blasic from her work email to his work email the tracking number of the letter she sent to Jennifer Blasic by registered mail. (Exhibit 11; Exhibit 8, Page 107).
**Response:**      **Undisputed.**

19.      Blasic's last message to Plaintiff was on January 16, 2016. (Exhibit 9, Line 13). He stopped responding to her messages because he did not share the same feelings towards her. (Exhibit 8, Page 92).
**Response:**      **Dispute.  FRE 608(a) Witness Credibility. FRE 801(c)(1)(2)  Hearsay**

20.      While these Facebook messages were occurring, Blasic told Plaintiff in person he did not want to be in a relationship. (Exhibit 8, Page 96). He thought this conversation would be enough to stop her conduct; however, Plaintiff refused to stop and continued the harassment. (Exhibit 30, Page 4, 97).
**Response:**      **Dispute.  FRCP Rule 56(c)(2)  Fact not supported by admissible evidence. FRE 608(a) Witness Credibility. FRE 801(c)(1)(2)  Hearsay**

21.      Plaintiff sent 154 Facebook messages between January 16, 2016 – February 29, 2016 (Blasic never responded to any of these messages). (Exhibit 9, Pages 1 – 29). 22.
**Response:**      **Dispute.  FRCP Rule 56(c)(2)  Fact not supported by admissible evidence. FRE 1002  Not Original Writing  FRE 106 Incomplete Document.**

22.      Plaintiff's Facebook messages caused Blasic extreme bouts of anxiety, difficulty sleeping and concentrating, and he feared for his safety. (Exhibit 1, Page 27)
**Response:**      **Dispute.  FRE Rule 608 Witness Credibility  FRE 801(c)(1)(2)  Hearsay**

23.      Blasic felt sexually harassed by Plaintiff. (Exhibit 8, Page 103).

**Response:       Dispute.  FRE Rule 608 Witness Credibility  FRE 801(c)(1)(2)  Hearsay**

24.     Plaintiff and Jennifer Blasic did not know each other. (Exhibit 1, Page 29).
**Response:       Undisputed.**

25.     Plaintiff knew Blasic was in the process of a contentious divorce with Jennifer Blasic
where there were issues with custody and property. (Exhibit 8, Pages 107, 111). Jennifer Blasic
was not happy at all with receiving the letter and became angry with Blasic. Id. at 111.
**Response:       Undisputed to the extent that Plaintiff knew Blasic was in the process of a
contentious divorce with Jennifer Blasic with custody and property. Dispute as to if Jennifer
Blasic was not happy and became angry.   FRE 801(c)(1)(2)  Hearsay**

26.     Blasic was extremely upset with the letter. (Exhibit 8, Pages 110-111). The letter caused
him fear for his personal safety and he believed Plaintiff cyber-stalked him. Id. at 113. 27.
**Response:       Dispute.  FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

27.     Plaintiff's actions affected his ability to perform his job. (Exhibit 8, Page 117). It caused
him so much anxiety and discomfort at work one day he asked to go home early. Id. at 118
**Response:       Dispute.  FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

28.     Blasic shared the letter with a co-worker at which point it was brought to the attention of
administration. (Exhibit 8, Page 115).
**Response:       Undisputed.**

29.     Blasic was asked at Plaintiff's Unemployment Compensation hearing what impact her
conduct had on him. He responded: I was already having some anxiety over what was going on
between us with the messages, the sexual content and again, compounded by the divorce, custody
and the upheaval that goes along with that…But after taking the time to kind of go back over a lot
of this information that's included here and realizing it was a lot more serious I think than I initially
thought it was because there, because of the sheer volume of the messages that I was receiving I
really didn't read all of them. …And then I went back and started to actually look at them and that
was when I saw the reference to the workplace violence issue and that was, that caused me a great
deal of anxiety… …Ms. Lewen …stated she had been yelled at by one of the Supervisors and
admitted to a second supervisor that she had a previous diagnosis with PTSD and that sometimes
when people with PTSD are yelled at they might go out to their car and get a gun and return and
shoot someone. (Exhibit 1, Pages 34-35)
**Response:       Dispute.  FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

30.     On March 7, 2016, Blasic provided a statement to administration with some of the Facebook messages from Plaintiff and expressed his fears and discomfort he was feeling. (Exhibit 30).

**Response:       Dispute.  FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

31.     Raymond Hamm (hereinafter "Hamm") held the position of Registered Nurse Supervisor at PSSH and as such supervised Plaintiff. (Exhibit 19, Page 33; Exhibit 1, page 148).

**Response:       Undisputed**

32.     Hamm and Plaintiff had a good working relationship. (Exhibit 16, Page 1, Paragraph 3; Exhibit 20, Page 1, Paragraph 1).

**Response:       Undisputed**

33.     On February 20, 2016, in a Facebook message from Plaintiff to Blasic she stated, …"got a counseling from Ray and policy education right in the middle of med pass…Ray pretty much ripped me a new one earlier for being out of compliance yesterday with my med pass…" (Exhibit 9, Lines 10-17)

**Response:       Undisputed**

34.     On February 21, 2016, in a Facebook message from Plaintiff to Blasic she stated, "I've got a five page typewritten gender discrimination complaint against Ray and Kevin…she goes on to state "I have no doubt that Ray will be able to defend himself against my harassment complaint." (Exhibit 9, 2-7).

**Response:       Undisputed.**

35.     On February 21, 2016, Plaintiff handed Hamm a grievance form that she planned to turn in but wanted him to read first. (Exhibit 1, Page 149). As he was reading it, Plaintiff started laughing. Id. at 149. Hamm told Plaintiff that the allegations were not true and Plaintiff responded it is your word against mine. Id. at 157. (*This is actually Exhibit 8, Page 149 and 157, not Exhibit 1.)

 **Response:       Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay.  Plaintiff told Hamm it was a joke.**

36.     Plaintiff wrote, …"this letter is regarding recent behavior of Ray…Ray's behavior did in fact escalate to the point of verbal bullying on the morning of Saturday February 20, 2016. (Exhibit 16, Page 1, Paragraph 3; Exhibit 20, Page 1, Paragraph 1). Ray told me I was "way far out of compliance" with my medication administration. (Exhibit 16, Page 1, Paragraph 5; Exhibit 20, Page 2, Paragraph 1). "He read the policy to me, and sternly stated that according to policy, the window to give medications is 'one hour earlier until one hour after the scheduled administration time." (Exhibit 16, Page 1, Paragraph 5; Exhibit 20, Page 3, Paragraph 2). "It is simply not fair that

Ray has singled me out to be in compliance with the medication administration policy, when all the other nurses get to violate that policy without being threatened with 'PDC.'" (Exhibit 16, Page 4, Paragraph 2; Exhibit 20, Page 4, Paragraph 2). "I would like a response to my complaint within ten (10) business days…I will await a response before filing a complaint with the Equal Employment Opportunity Commission (EEOC). (Exhibit 16, Page 4, Paragraph 5).

**Response:**     **Undisputed.**

37.     On February 22, 2016, in a Facebook message from Plaintiff to Blasic she stated, "Ray couldn't believe that I actually typed up a four page gender discrimination and harassment complaint against him and Kevin. We cuddled for almost an hour on Unit E. I forgave him. We're friends again…" (Exhibit 9, Lines 20 – 25).

**Response:**     **Undisputed.**

38.     On February 22, 2016, in a Facebook message from Plaintiff to Blasic, she stated … "I feel like I honestly wouldn't mind feeling how you feel sometime. I didn't feel that way last night with Ray when he was mind blown and defending himself against my allegations and I was giggling in the middle of the night with no witnesses. I felt devious, no doubt, but really didn't feel like feeling Ray to see how he felt…" (Exhibit 9, Lines 8-15).

**Response:**     **Undisputed.**

39. Hamm felt intimidated by the letter and that he was being bullied. (Exhibit 8, page 160).

**Response:**     **Dispute.  FRE Rule 608 Witness Credibility  801(c)(1)(2) Hearsay   Hamm did not say that he felt intimidated or bullied by the letter.  He answered "yes" to two leading questions asked by DMVA Attorney Bushinski during the Civil Service hearing.**

40. Plaintiff, through her own admission, wrote the letter as a joke. (Exhibit 1, Page 58).

**Response:**     **Undisputed**

41. In a letter to EEOC, after she was fired from PSSH, Plaintiff wrote: I am filing my first complaint for suspension and termination time period of March 2, 2016 through March 14, 2016, with four separate charges. Charge 1) DISCRIMINATION BASED ON RETALIATION against me for telling a supervisor in writing that I planned to file an EEOC complaint against him for harassment and gender discrimination. In an unsigned creative style document, I was actually joking with my former supervisor, who has a sarcastic sense of humor and is known to tell jokes on the job…[a]lthough I was actually joking with my supervisor…(Exhibit 21, Page 3). On December 7, 2015 at 7:35 pm in a Facebook message from Plaintiff to Blasic she states, …"I also like Ray for the most part…The point I was trying to make to him is you just might not know a person's history or what can of worms you may be opening when you start screaming at somebody unprovoked and calling them belittling names. I told him flat out that if he ever dares to scream at me and call

me name just for being a prudent nurse I will kick his ass. I am capable of fighting violence with violence…" (Exhibit 9, Lines 18-26).

**Response:       Undisputed to the extent Plaintiff filed the complaint with the EEOC. Dispute as to Facebook message. Not supported by admissible evidence.  FRCP Rule 56(c)(2) FRE 1002  Not Original Writing  FRE 106 Incomplete Document taken out of context.**

42. On December 7, 2015 at 2:53 pm in a Facebook message from Plaintiff to Blasic regarding a conversation she had with Hamm, Plaintiff stated, "At one time I actually had a diagnosis of PTSD from being married to a bully a few decades ago. So I mentioned to Lay last night that my brain sort of shut down the other morning. I told him that I don't plan to file a workplace violence complaint, but next time he just stands there with no balls and watches a bully scream at a person with PTSD, that person may go out to their vehicle and return with a gun and shoot him as well as her…He admitted that he was glad I cried and didn't go get a weapon from my car and shoot the place up or something. (Exhibit 9, Page 49, Lines 5-23).

**Response:       Undisputed.**

43. In February of 2016, Kathleen Wilcox (hereinafter "Wilcox"), Director of Nursing at PSSH, learned that Plaintiff had made a Facebook post where she alleged discrimination. (Exhibit 8, Page 172). On February 25, 2016, Wilcox and Plaintiff discussed the post and her concerns with Hamm. Id. at 173. Plaintiff at the meeting made no complaint of Hamm mistreating her. Id. at 173. Plaintiff indicated a dayshift supervisor yelled at her and that supervisors need to be careful "because anyone else could go to their vehicle and return with a gun and shoot them." Id. at 175. This concerned Wilcox enough to report it to Defendant. Id.

**Response:       Undisputed**

44. Blasic told a coworker about Plaintiff's actions, specifically the letter she sent to Jennifer Blasic the very day he received the letter. (Exhibit 1, Page 31). The coworker forwarded the letter to administration.  Blasic was then approached by PSSH to obtain more information.

**Response:       Undisputed**

45. Blasic wrote a letter to administration on March 7, 2016 describing Plaintiff's concerning and unwanted conduct. (Exhibit 30).

**Response:       Undisputed**

46. On March 2, 2016, Brian Skinner, Human Resource Analyst at PSSH, received Facebook messages from Blasic from the last ten days or so from Plaintiff. (Exhibit 25). Defendant was made aware of these messages on March 2, 2016. Id.

**Response:       Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

47. Bryan Bender (hereinafter "Bender"), employed by the DMVA in the Human Resource Department, was responsible for investigating allegations of employee misconduct. (Exhibit 8, Pages 21-23). Sometime in March of 2016, Bender was contacted by Defendant regarding Plaintiff's misconduct, specifically the letter she sent to Jennifer Blasic. Id. at 25, 26. Plaintiff was suspended. Id. at 27.

**Response:      Dispute. 801(c)(1)(2)  Hearsay**

48. PSSH's practice was to suspend employees pending investigations when it involved coworkers, especially when it involved sexual harassment, workplace violence, and hostile work environment. (Exhibit 1, Page 31).

**Response:      Unknown**

49. A pre-disciplinary conference (hereinafter "PDC hearing") is an investigation into allegations that an employee may have violated a policy. (Exhibit 1, Page 13).

**Response:      Undisputed**

50. On March 2, 2016, Plaintiff was notified that she was suspended from PSSH. (Exhibit 14).

**Response:      Undisputed**

51. PDC hearings occurred on March 7, 2016 and March 10, 2016. (Exhibit 1, Page 13). Plaintiff was present at both hearings and represented by a union representative.

**Response:      Undisputed**

52. On March 7, 2016 Plaintiff was questioned about her relationship with Blasic and the letter she sent to his wife. (Exhibit 12). Plaintiff indicated it was all a misunderstanding and that she misread Blasic. Id. The exchange included: Q. Sending the letter to his ex-wife and saying you can file a sexual harassment statement and using your work e-mail to send things to his work e-mail; that doesn't come across as intimidating to you? NL: No, it doesn't. It's informative. He shouldn't be using his e-mail on the job. I tried to do the right thing and maybe I made a mistake and shouldn't have said anything. It's all a misunderstanding. (Exhibit 12, Page 3).

**Response:      Dispute. 801(c)(1)(2)  Hearsay.  There was no stenographic recording of the meeting, just some informal notes.  (Exhibit 28)**

53. On or about March 7, 2016, Plaintiff was questioned about the allegations she made against Hamm. (Exhibit 16): Q. Do you understand this type of behavior is inappropriate and threatening by giving him that document? When you handed it to him did you feel that? NL: I thought Ray and I had verbally resolved it as friends. I really didn't think it was going to come to this. I didn't think it was intimidating, no; but I think that he should be aware. (Exhibit 12, Page 3).

**Response:        Dispute. 801(c)(1)(2)  Hearsay.  There was no stenographic recording of the meeting, just some informal notes.  (Exhibit 28)**

54. At the March 7, 2016 at the PDC hearing, Plaintiff was asked about when she referenced obtaining a gun to Hamm: Q. You mentioned about getting a gun and shooting them. Do you think that's appropriate thing to say in this day and age? NL: You'd have to know the context of that. There was a supervisor there that was having a bad day and yelled at me and I felt as my supervisor Ray witnessed it and should have stepped in. Q. Do you think that was appropriate to state to a co-worker that you could go out to the vehicle and get a gun and shoot them and her? You also stated that you have a diagnosis of PTSD. NL: I do, I was a victim of domestic violence. If you are looking for an answer then probably not. No; is that what you're looking for? (Exhibit 12, Page 5).

**Response:        Dispute. 801(c)(1)(2)  Hearsay.  There was no stenographic recording of the meeting, just some informal notes.  (Exhibit 28)**

55. At the March 10, 2016 PDC hearing Plaintiff again was questioned about her relationship with Blasic: Q. We are paying you to be an LPN and that includes your service to the veterans. Let's get back to Barry, because I understand that you have no idea how this relates to one another. NL: I do not think I violated any workplace or that I have acted inappropriately. Q. Would you say you are fixated on Barry? NL: No, I would say that I tried helping him. (Exhibit 13, Page 3).

**Response:        Dispute. 801(c)(1)(2)  Hearsay.  There was no stenographic recording of the meeting, just some informal notes.  (Exhibit 28)**

56. At the March 10, 2016 PDC hearing, Plaintiff again was asked about the gun: Q:Do you recall making a statement about people need to be careful who they are yelling at as one day someone could walk out to their car, get a gun and come back and shoot them? NL: Yes, I did say that. Okay, first of all, let me say that when I first walked in PSSH I was screamed at from the nurse that was going to orient me. She was stressed and she screamed at me. She didn't mean to, but she was screaming at me. Fast forward to December…Supervisor is Deb Cubero and she screamed at me when I walked in the door just to ask about the order for the tape. She screamed at me and called me stupid. Ray was standing there and had this shocked look. He was just as shocked as me. I walked out; didn't burst into tears or anything. Later, I did cry. Deb called me and asked me to come see her when I was done. She apologized and said I didn't mean to scream at you I meant to scream at Ray… I did say that type of workplace, you get screamed at for no just cause, you know, would cause workplace violence. That's what happens. (Exhibit 13, Pages 5-6).

**Response:        Dispute. 801(c)(1)(2)  Hearsay.  There was no stenographic recording of the meeting, just some informal notes.  (Exhibit 28)**

57. At the March 10, 2016 PDC hearing, Plaintiff was asked about her responses throughout the hearing: Q. A lot of your answers are either "out of context" or "if you knew me" or "if you knew my personality"… NL: I know, that's why I said just convene this…(Exhibit 13, Page 5).
**Response:      Dispute. 801(c)(1)(2)  Hearsay.  There was no stenographic recording of the meeting, just some informal notes.  (Exhibit 28)**

58. After the investigation it was agreed to terminate Plaintiff. The decision was based on her egregious conduct, the hostile work environment she created, and the harassment, intimidation, and bullying of her coworkers. (Exhibit 8, Pages 39-41).
**Response:      Dispute.  801(c)(1)(2)  Hearsay**

59. On March 14, 2016, Plaintiff was notified she was terminated for violations of DMVA and Commonwealth of Pennsylvania policies. (Exhibit 15). By way of further explanation, Plaintiff was terminated because she engaged in intimidating, threatening and inappropriate conduct and behavior towards coworkers and her chain of command which lead to an intimidating and hostile work environment. Id.
**Response:      Undisputed.**

60. On December 7, 2015 at 8:16 pm, Plaintiff sent a Facebook message to Blasic where she stated, "[c]all me warped, but I actually think it's kind of funny that the health dept was actually in the building last week on an anonymous complaint from an obviously disgruntled employee…Their response will be 'PDC' since pdc is the only three letters in PSSH administrators vocabulary." (Exhibit 9, Lines 2-6).
**Response:      Undisputed.**

61. Plaintiff filed an anonymous complaint, i.e. she did not provide her name, with the Department of Health (Exhibit 19, Pages 9-10).
**Response:      Undisputed**

62. On January 26, 2016 at 12:53 pm, Plaintiff sent a Facebook message to Blasic: …I did receive the phone call that I have been expecting today. (I was told in a letter last week to expect a phone call. I told Slupski about the letter.) Long story short, is it wrong for an inspector to call a nurse "dear" prior to hanging up the phone? Just wondering…They plan to come in on dayshift hours this week and they don't expect to find an unlawful staffing shortage. I did name names of where the quality of care problem lies, initials BR and NF…Destroy this text. Or don't destroy it so that you can one day pull it out to prove that you saw the news here first, before it was even news. (Exhibit 9, Page 23, lines 14-22).
**Response:      Undisputed.**

63. On January 28, 2016 at 2:26 pm, Plaintiff sent a Facebook message to Blasic: That said, I read the email from Tom B. about DOH coming in yesterday and not finding anything wrong yesterday. I also just got the phone call from DOH inspector explaining how they didn't find anything wrong yesterday. I didn't think that they would find anything wrong yesterday. It's going to be fun just to sit back now and watch how this unfolds. (Exhibit 9, Page 22, lines 5-8).

**Response:      Undisputed**

64. On February 2, 2016, Plaintiff sent a Facebook message to Blasic: I filled out a Pennsylvania elder abuse complaint form and mailed it to Harrisburg along with a two page typewritten factual letter. I didn't do it anonymously. Even as I type this, my complaint is in Harrisburg on its way to the Attorney General. I strongly suspect that Barb Raymond never did the mandatory reporting for the involuntary deviate sexual intercourse that was committed against (name redacted) over a year ago. There's a 12 year statute of limitation. (Exhibit 9, Lines 12-16).

**Response:      Undisputed.**

65. On or about February 1, 2016, Plaintiff filed a Complaint with the Pennsylvania Attorney General against Defendant and Nancy Flanigan. She stated there was concealed sexual assault by not reporting. She was "expressing concern as a nurse regarding a resident to resident sexual assault that occurred last year at the Pennsylvania Soliders and Sailors Home in Erie, PA (PSSH), and the failure to keep residents safe from potential further sexual abuse. (Exhibit 22, Paragraph 1).

**Response:      Undisputed.**

66. On June 17, 2016, Plaintiff was interviewed by Agent Gary Tallent regarding the complaint she filed, on or about February 1, 2016, at the PA Attorney General's Office. Lewen stated three of the six patients whom she listed in her complaint to the PA OAG, have since passed away…According to Lewen, the Administration responds to deficiencies cited the Inspectors, as being the staff's fault and disciplines the staff. Lewen also agreed that the DOH investigation resulted in 'no deficiencies' which is exactly the same complaint she filed with the PA OAG. Lewen could not provide any laws or statutes which she believed were violated by PA Soldiers and Sailors Home Administration. Lewen also acknowledged that the agents were looking for any violation of criminal acts and not violations of the PA Soliders and Sailors Home's policies. (Exhibit 23, paragraph 4).

**Response:      Undisputed.**

67. On August 12, 2012, Defendant was interviewed by Agent Gary Tallent regarding Plaintiff's Complaint. Defendant outlined the policies in place at PSSH on how staff is to handle sexual relationships between residences and patients. Policies also direct staff concerning residences/patients who are diagnosed with dementia, Alzheimer, or other brain injuries. Defendant

further provided a letter from DOH where they found no evidence of deficient practice. (Exhibit 24, Page 2-3).

**Response:      Undisputed**

68. Further in the interview Defendant stated Plaintiff's termination was solely based upon issues between Plaintiff and Blasic and references to physical violence in the workplace. (Exhibit 24, Page 2-3).

**Response:      Undisputed**

69. Plaintiff did not tell any of the Defendants that she had filed a Complaint with the Pennsylvania Office of Attorney General. (Exhibit 19, Page 10).

**Response:      Undisputed**

70. Bryan Bender had no knowledge of any of these complaints prior to Plaintiff's termination on March 14, 2016. (Exhibit 8, Pages 79-80).

**Response:      Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

71. Blasic never told anyone at PSSH that Plaintiff had made a referral of resident abuse or resident neglect to the Commonwealth Department of Health or the Commonwealth of Pennsylvania Office of the Attorney General. (Exhibit 8, Page 121); (Exhibit 1, Page 38).

**Response:      Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

72. Hamm had no knowledge of the complaint made to the Department of Health or the Attorney General's Office. (Exhibit 8, Page 161).

**Response:      Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay**

73. Defendant had no knowledge about Plaintiff's complaints until after she was terminated. (Exhibit 1, Page 39; Exhibit 26). In regards to knowledge of Plaintiff's complaints Defendant stated at Plaintiff's Unemployment hearing, "I found out after Ms. Lewen's verbal communication with you in an email that you Mr. Bushinski sent me." (Exhibit 1, Page 39). Further in an email exchange between Defendant and Mr. Bushinki dated April 20, 2016, she stated, "[w]ell at least now I know what Ms. Lewen has been referring to in her various emails regarding her statements of 'involuntary deviate sexual intercourse'— we actually had an anonymous complaint survey (we assumed was (name redacted) daughter) from DOH regarding this situation, they came in and investigated & the investigation showed no deficient practices." (Exhibit 26).

**Response:      Unknown as to what knowledge Defendant actually had.  Undisputed as to the Defendant's testimony and email exchange with Attorney Bushinski.**

74. Wilcox had no knowledge prior to March 14, 2016, that Plaintiff had made complaints to the Department of Health and the Attorney General's Office. (Exhibit 8, Page 179).

**Response:**      Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay

75. At the State Civil Service Hearing concerning Plaintiff's termination, Plaintiff provided the record of Facebook messages in their entirety. (Exhibit 8, Pages 14, 15). The attorney for DMVA was only in possession of several of the posts from Blasic. Id.

**Response:**      **Dispute in part.  The Facebook messages were printed out in their entirety only to the extent that they included the references to the complaints that Plaintiff had made to the DOH and OAG.   The document contained only the links to the Youtube videos and the date and times that pictures had been sent, but did not contain the actual pictures or Youtube videos which carried the storyline along.  Undisputed as to Blasic provided several of the posts to the DMVA attorney.**

76. Brian Skinner received Facebook messages from Blasic for the last ten days or so. (Exhibit 25).

**Response:**      Dispute. FRE Rule 608 Witness Credibility  801(c)(1)(2)  Hearsay

77. When a complaint is made at DOH, the name of the complainant is confidential unless the complainant states otherwise. The name is not shared with the facility during the survey. At no time is the complainant's name made public. (Exhibit 29).

**Response:**      **Undisputed**

78. In an email dated January 29, 2016, Plaintiff wrote an email to her co-workers asking if there is any possibility that we could "get a room" at PSSH for mentally competent residents. (Exhibit 27).

**Response:**      **Undisputed**

79. When DOH does site visits, it requires staff at the facility to comply with their requests on little to no notice. Specifically, PSSH staff has to pull a roster, provide information about patients, and turn over policies to DOH. After conducting their visit, DOH meets with the Administrator to review potential findings. Depending on the complaint this process takes the Administrators, Director of Nursing, Assistant Director of Nursing, and other staff members away from day to day duties and patient care. (Exhibit 28).

**Response:**      **Undisputed**

80. Plaintiff expressed that any discipline she received was at the direction of administration. (Exhibit 19, Pages 37 and 38).

**Response:**      **Undisputed**

81. On December 7, 2015 at 9:02 pm in a Facebook message to Blasic she stated, "I got up in arms over the one and only PDC that I got recently when they tried to say 'neglect of duty.'"(Exhibit 9,

Page 47, Lines 28-31)… "I don't agree that 'PDC' is the solution to the citations we got from the state. I suggest a little 'TLC.'" Id.
**Response:      Undisputed**

82. On November 25, 2015 Plaintiff had a scheduled PDC hearing that she failed to attend. She received an oral reprimand on December 15, 2015 for violation of the Department's Standards of Conduct and Work Rule, the facility Wound Care Policy and Department of Health Survey, item 483.25. 83. On February 24, 2016, Plaintiff received a written reprimand for violation of the Department's Standard of Conduct and Work Rules. Specifically, for failing to treat patients with respect or any action which puts a patient in possible harm and or violates the Department's Prevention of Resident Abuse Policy. (SMF at 32). A pre-disciplinary hearing occurred on January 10, 2016 and Plaintiff did not provide an acceptable response. Id.
**Dispute. I responded to the PDC on November 25, 2015 with a written witness statement and an allegation of "facility contributory neglect." (Exhibit 11)   I attended the PDC on January 10, 2016, but was crying the entire time.   I do not remember what my response was.  I remember that Ray Hamm and Scott Mohra were very kind to me.**


**Plaintiff also contends the following other material facts, which may be in dispute:**

1.      On January 29, 2016, there was no official PSSH or DMVA policy regarding resident

rights and dignity issues and resident-resident sexual activity.  **(Defendant's Exhibit 27)**

2.      Defendant doesn't appreciate nurses filing complaints of elder abuse or neglect with the

DOH for investigation because she believes that it "takes her and other administrators away from

resident care, and away from monitoring and improving resident care," when DOH inspectors

perform on site investigations of complaints.  **(Defendant's Exhibit 28)**

3.      **42 CFR §483.12(c), F608,609,610**  provides that in response to allegations of abuse,

neglect, exploitation, or mistreatment, the facility must:

(1) Ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of resident property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the

administrator of the facility and to other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with State law through established procedures.

(2) Have evidence that all alleged violations are thoroughly investigated.

(3) Prevent further potential abuse, neglect, exploitation, or mistreatment while the investigation is in progress.

(4) Report the results of all investigations to the administrator or his or her designated representative and to other officials in accordance with State law, including to the State Survey Agency, within 5 working days of the incident, and if the alleged violation is verified appropriate corrective action must be taken.  **(Exhibit 7 pages 25, 26)**

4.      **42 CFR §483.24, F309, Quality of Life** provides that each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care. **(Exhibit 7 page 40 )**

5.      **42 CFR 483.35(a), F353**, **Sufficient Staff**  determines whether the facility had qualified nursing staff in sufficient numbers to assure the resident was provided necessary care and services 24 hours a day, based upon the comprehensive assessment and care plan.  **(Exhibit 7 pages 47)**

6.      The following terms are defined by **42 CFR § 483.5:   (Exhibit 7 pages 2-6)**

*Abuse* is "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish. Abuse also includes the deprivation by an individual, including a caretaker, of goods or services that are necessary to attain or maintain physical, mental, and psychosocial well-being. Instances of abuse of all residents, irrespective of any mental or physical condition, cause physical harm, pain or mental anguish. It includes verbal abuse, sexual abuse, physical abuse, and mental abuse including abuse facilitated or enabled through the use of technology. *Willful,* as used in this definition of abuse, means the individual must have acted deliberately, not that the individual must have intended to inflict injury or harm.

*Adverse event.* An adverse event is an untoward, undesirable, and usually unanticipated event that causes death or serious injury, or the risk thereof.

*Neglect* is the failure of the facility, its employees or service providers to provide goods and services to a resident that are necessary to avoid physical harm, pain, mental anguish, or emotional distress.

*Sexual abuse* is non-consensual sexual contact of any type with a resident.

7.      **42 CFR §483.12 Freedom from abuse, neglect, and exploitation** provides that the resident has the right to be free from abuse, neglect, misappropriation of resident property, and exploitation as defined in this subpart. This includes but is not limited to freedom from corporal punishment, involuntary seclusion and any physical or chemical restraint not required to treat the resident's medical symptoms.  **(Exhibit 7 page 24)**

8.      The **Pennsylvania Criminal Code, Chapter 18 Section 3101,** defines "involuntary deviate sexual intercourse" as "sexual intercourse per os or per anus between human beings," where the "Per os" refers to the mouth which indicates that IDSI is rape that involves oral or anal penetration as opposed to vaginal.  **(Exhibit 8)**

9.      On January 25, 2015, a cognitively impaired resident was discovered to be raping (performing oral sex) on another cognitively impaired resident on a lockdown unit, Unit D. **(Defendant's Exhibit 23 and 24)**

10.      Following the incident, the resident perpetrator was moved out of the lockdown unit and placed on the skilled nursing Unit B, where he was free to roam amongst all residents on the skilled units A and B.  **(Defendant's Exhibit 23 and 24)**

11.      He then fondled some additional cognitively impaired residents. **(Defendant's Exhibit 23 and 24)**

12.      A brief period of 1:1 staff monitoring of the perpetrator resident was initiated, which was impossible to maintain due to lack of staff.  **(Defendant's Exhibit 23 and 24)**

13.      The perpetrator resident was then involuntarily secluded to a private room on Unit A for the sake of discipline and/or staff convenience.  **(Defendant's Exhibit 23 and 24)**

14.      The perpetrator resident did then possibly sexually assault "Mr. S." who tested 8 on one occasion and 11 on one occasion on the BIMS cognitive impairment screening tool, placing him in the "moderate" cognitive impairment range.  **(Defendant's Exhibit 23 and 24)**

15.      Resident-resident rape and sexual assaults are required to be self reported to the appropriate state and local authorities in a timely manner pursuant to **42 CFR §483.12(c).  (Exhibit 7)**

16.     The Defendant chose not to self report the rape for outside investigation. **(See absence of investigation on Pennsylvania Department of Health website**

**https://sais.health.pa.gov/commonpoc/nhlocatorie.asp)**

17.     The Defendant did provide documentation to agents from the OAG Bureau of Criminal Investigation when they eventually investigated in August 2016.  **(Defendant's Exhibit 24.)**

18.     The Plaintiff expressed concern "Mr. S." might be the victim of sexual assault up the chain of command to Assistant Director of Nursing, Kevin McLaughlin, and got no response from administration.  **(Defendant's Exhibit 27)**

19.     Some other state regulatory agencies, including the states of New York, Illinois and Georgia, do issue citations and hefty fines against long term care facilities who fail to self report in a timely manner to regulatory agencies in similar incidents involving resident-resident sexual assaults amongst dementia patients as required by **42 C.F.R. §483.12(c).   (Exhibit 9)**

20.     On the night of August 31, 2015-September 1, 2015, the Plaintiff failed to change a duoderm (type of bandage) on "Mrs A.'s" coccyx, (small bone at the base of the spinal column). The duoderm was ordered to be changed every five (5)  days.   The box for the Plaintiff's initials on Tuesday September 1, 2015 was empty.   **(Exhibit 10)**

21.     That night, the Plaintiff was working as the treatment nurse for both skilled nursing units, A and B, with a caseload of 75 patients.  It was also the end of month "changeover night," which required a heavier paperwork caseload than other nights of the month. There were also many "glitches" in the changeover due to switching to a new form of charting.  **(Exhibit 11 page 2; Exhibit 12 pages 4, 5, 6.)**

22.     The Plaintiff was not immediately disciplined for this oversight.

23.     The Duoderm was changed the next night, September 2, 2015, by a different nurse, who did not document any changes to the reddened area.   **(Exhibit 13)**

24.     On September 8, 2015 it was discovered that Mrs. A's stage 1 pressure ulcer (reddened area with skin intact) had worsened to Stage III full thickness tissue loss.  **(Exhibit 13)**

25.     "Neglect" is an adverse event that is required to be self-reported within 5 working days to the Pennsylvania Department of Health DOH pursuant to **42 CFR §483.12(c).**

26.     The Defendant chose not to self report this incident of neglect to the appropriate state and local authorities.

27.     The Defendant, or her agent, did provide documentation to DOH surveyors when they visited for a routine inspection on or about November 6, 2015. **(Exhibit 13)**

28.     In relation to the above referenced resident, "Mrs. A."   Medicaid Recertification, State Licensure and Civil Rights Compliance Survey determined that the Pennsylvania Soldiers and Sailor's Home was not in compliance with the following requirements of 42 CFR Part 483, Subpart B, Requirements for Long Term Care Facilities and the 28 PA Code, Commonwealth of Pennsylvania Long Term Care Licensure Regulations:   **483.25(c)** REQUIREMENT TREATMENT/SVCS TO PREVENT/HEAL PRESSURE SORES; **483.65** REQUIREMENT INFECTION CONTROL, PREVENT SPREAD, LINENS; **483.25** REQUIREMENT PROVIDE CARE/SERVICES FOR HIGHEST WELL BEING; **483.25(i)** REQUIREMENT MAINTAIN NUTRITION STATUS UNLESS UNAVOIDABLE; **483.75(l)(1)** REQUIREMENT RES RECORDS-COMPLETE/ACCURATE/ACCESSIBLE. **(Exhibit 13)**

29.     As part of the plan of correction to satisfy the Department of Health, the Plaintiff was notified over two months later that she was being charged with "Neglect of Duty."  **(Exhibit 14)**

30.      On 11/25/2015, the Plaintiff typed a Formal Commonwealth Employee Witness Statement alleging "Facility Contributory Neglect" as the actual cause for the above referenced adverse incident.   The Plaintiff gave the witness statement to Supervisor Raymond Hamm, who forwarded it via a group email on 11/25/2015 to <u>Barbara Raymond, Kathy Wilcox, and Bryan Skinner.</u> Skinner and Wilcox again forwarded the group email.  **(Exhibit 11)**

31.      Bryan Skinner commented in an email that he "appreciated the Plaintiff's admittance of the oversight, her attempt at root cause analysis and her personal plan of correction."  **(Exhibit 11)**

32.      The Department of Health conducted an investigation on December 4, 2015 in response to a complaint filed by the Plaintiff.  The complaint involved residents who had had blood drawn without a physician's order and who had lab work not performed as ordered.  The complaint also involved a resident on skilled nursing Unit B, "Mr. H." who had been neglected.  He had not gone to the wound clinic or had his leg bandages changed in <u>13 weeks</u>, when he was ordered to go to the wound clinic and have his leg bandages changed <u>every week</u>.   In response to this complaint, the facility was cited with the following four citations:    **483.25** REQUIREMENT PROVIDE CARE/SERVICES FOR HIGHEST WELL BEING;  **483.10(b)(11)** REQUIREMENT NOTIFY OF CHANGES (INJURY/DECLINE/ROOM, ETC);  **483.75(j)(1)** REQUIREMENT ADMINISTRATION;  **483.75(j)(2)(i)** REQUIREMENT LAB SVCS ONLY WHEN ORDERED BY PHYSICIAN**.   (Exhibit 15)**

33.      "Neglect," even without serious bodily injury, is required to be reported within 5 working days to the Pennsylvania Department of Health pursuant to **42 CFR §483.12(c).  (Exhibit 7)**

34.      The Defendant had chosen not to self report this incident of neglect to the appropriate state and local authorities for investigation.

35.     The Defendant, or her agent, provided documentation to Department of Health surveyors when they visited to investigate the complaint.  **(Exhibit 15)**

36.     On or about Christmas Day 2015, a veteran resident on the skilled nursing unit "B," "Mr. W." suffered a fractured femur (broken thigh bone) of unknown origin during Barry Blasic's 13 hour shift. **(Exhibit 12 pages 38-39)**

37.     Barry Blasic did not document or pass on information regarding this serious injury in the shift report. **(Exhibit 12 pages 38-39)**

38.     The femur fracture of unknown origin was discovered on a later shift.  **(Exhibit 12 pages 38-39)**

39.     A femur fracture of unknown origin is a serious injury that is required to be reported by the facility within 2 hours of discovery to the appropriate state and local authorities and to the DOH within 5 working days pursuant to **42 CFR §483.12(c).  (Exhibit 7)**

40.     Defendant  has no record of being on vacation in Florida at the time of the above adverse event.  **(Exhibit 12 pages 38-39)**

41.     Barry Blasic was the only licensed nurse on Unit B for a 13 hour shift on the day of the above referenced adverse event. **(Exhibit 12 pages 38, 39)**

42.     Unit B is a skilled nursing unit with a bed capacity of 38 patients, meaning that during Barry Blasic's 13 hour shift on Christmas day 2015 the nurse patient ratio was 1:38. One Licensed Practical Nurse to 38 skilled nursing patients, responsible for the duties described for job description 30250 Licensed Practical Nurse.  **(Exhibit 12 pages 42-45)**

43.      The Defendant chose not to report the above referenced serious injury of unknown origin to state or local authorities for outside investigation. Plaintiff did not file an anonymous complaint

and was not required to under 42 CFR 483.12(c).  **(See absence of visit on DOH website**

**https://sais.health.pa.gov/commonpoc/nhlocatorie.asp)**

44.      On November 1, 2019, the Defendant chose not to answer the Plaintiff's interrogatories involving this incident or provide evidence of fulfilling her obligation to report this adverse incident to outside regulatory authorities for investigation in a timely manner. **(Exhibit 12 pages 38, 39)**

45.      On December 27, 2015 at 7:22 pm, the Plaintiff made the following comment to Barry Blasic in the off duty Facebook text messages:  Here's the F tags and legal citations for the very vague Federal nursing home staffing requirements.  There are no specific numbers.  "Inadequate staffing" is proven by a demonstrated breakdown in quality of care.  F-309 42 CFR 483.25, Quality of Care F-353 42 CFR 483.30(a) Sufficient Staff.  **(Defendant's Exhibit 9 page 47)**

46.      On December 27, 2015 at 7:32 pm, the Plaintiff made the following comment to Barry Blasic in the off duty Facebook text messages:   I'm mentioning this because I heard that Mr. W. had a mysterious femur fracture, so it won't surprise me if the health dept visits again soon.  If they do happen to come in on a day when you're there, you need to "sing" about insufficient staffing and poor quality of care.  If quality of care doesn't seem to be affected, the only requirement is that they have an RN in the building.  It is ridiculous, and has been ridiculous for many years.  The PA Attorney General's office actually recently sued Golden Living Centers for insufficient staffing.  As long as these places can get away with it they do, and nurses are usually so scared of the state investigators and/or retaliation from administration that they "fake" that everything is ok if they get interviewed."**(Defendant's Exhibit 9 page 47)**

47.      In reaction to the citations that the facility received on November 6, 2015 involving Mrs. A and her Stage III pressure ulcer, the Defendant terminated one Registered Nurse, Karen Krahe, on

some date between December 15, 2015 and January 15, 2016.   Karen Krahe, RN was the

Treatment Nurse/Infection Control Nurse.   **(See PennWatch website.**

**http://pennwatch.pa.gov/employees/Pages/Employee-Salaries.aspx)**

48.     On January 9, 2016 at 5:15 am, the Plaintiff made the following comment to Barry Blasic

in the off duty Facebook text messages:   "I did Penny's job on C. tonight.  Next time you see me I

will most likely be doing something in the dining room that I think may not be lawful.  I'm not

sure.  Nick agreed with me when I mentioned it." At 5:17 am the Plaintiff sent Blasic a picture of

the Unit C hallway and a picture of her extra heavy duty bra strap.   At 7:26 am the Plaintiff said,

"I'm in the ASSisted living parking lot with my engine running if you'd like to talk. Or better yet,

go serve the coffee.[*In the skilled nursing facility dining room, which is a different funding source.*]

At the same time, the Plaintiff sent a Youtube video entitled, "Holy Grail. Killer Bunny.

**(Defendant's Exhibit 9 page 35.  Plaintiff's Exhibit 3 page 4  and Exhibit 5  page  32)**

49.     On January 11, 2016 at 5:09 pm  the Plaintiff said to Blasic in the Facebook messages, **"**If

you thoroughly understand what it is that you need to do at your PDC meeting, post this on

facebook."  And she simultaneously sent him a British humour YouTube video called  "Hale &

Pace. Operation."   **(Defendant's Exhibit 9 page 34 and Exhibit 5 page 33.)**

50.     On February 2, 2016 at 8:37 am, the Plaintiff made the following comments to Barry

Blasic in the off duty Facebook text messages: I filled out a Pennsylvania elder abuse complaint

form and mailed it to Harrisburg along with a two page typewritten factual letter.  I didn't do it

anonymously.   Even as I type this, my complaint is in Harrisburg on its way to the Attorney

General.    I strongly suspect that Barb Rayond never did the mandatory reporting for the

involuntary deviate sexual intercourse that was committed against ▮▮▮▮▮ over a year ago. There's a 12 year statute of limitations. **(Defendant's Exhibit 9 page 21)**

51.     On February 2, 2016 at 8:54 am, the Plaintiff made the following comment to Barry Blasic in the off duty Facebook text messages:   The Pennsylvania law is located at 15 PA Code §15.151-15.157.  Shit happens. As an administrator, you're always better to report things like that immediately than to conceal.   **(Defendant's Exhibit 9 page 21)**

52.     On February 2, 2016 at 12:22 pm, the Plaintiff made the following comment to Barry Blasic in the off duty Facebook text messages:   Here's the USPS tracking number, so somebody will have it just in case I explode.  9505521515916032000133 **(Defendant's Exhibit 9 page 20)**

53.     On February 4, 2016 at 7:52 am, the Plaintiff made the following comment to Barry Blasic in the off duty Facebook text messages: My elder abuse report did get delivered this am.  So now I'm fighting the primordial urge to feel like I'm about to get in huge trouble for "telling." …..Not sure when the OAG will come in to investigate. **(Defendant's Exhibit 9 page 19)**

54.     On February 23, 2016 at 7:07 am, the Plaintiff sent a Facebook message to Barry Blasic that said, "Ray agreed with me that going up the chain of command, Kevin is his immediate supervisor.  Furthermore, Kim Horvath's next step up is Barb Raymond. Nancy Flanigan has no authority to advise Kim Horvath to take urinals away from men on Unit C. And no authority to give any input at all on that unit."  The Plaintiff attached a drawing from "Men's Health UK" website entitled "Closed for Business. A variation of One Up." **(Exhibit 3 page 13,  Defendant's Exhibit 9 page 10.)**

55.     Defendant stated Plaintiff's termination was based solely upon issues between Plaintiff and Blasic and references to physical violence in the workplace. **(Defendant's Exhibit 24, Page 2-3).**

56.     Other than submitting the testimony and conclusory statements of Barry Blasic, the Defendant submitted no evidence that the Plaintiff's behavior actually caused a disruption in the workplace, or that it impeded her job performance or otherwise interfered with the operation of the facility or created an intimidating or hostile work environment.

57.     On March 2, 2016, there were official policies in place to guide the Defendant in how to deal with the Plaintiff.  Specifically, **Manual 505.3** State Employee Assistance Program , **Manual 505.6** An Agency Guide to Workplace Violence Prevention and Response, **Management Directiv**e **505.22** State Employee Assistance Program, **Management Directive 505.7** Personnel Rules, **Management Directive 205.33** Workplace Violence, **DMVA Workplace Violence and Workplace Bullying Prevention Policy**, and **DMVA Standards of Conduct and Work Rules.**

58.     **Manual 505.3 State Employee Assistance Program**  guided the Defendant to first try Employer based SEAP referrals including (1) Self-Disclosure Referral. (2) Independent Psychological Evaluation (IPE). (3) Licensed Professional Referral (LPR). (4) Condition of Continued Employment (COCE).  **(Exhibit 16 pages 18-30)**

59.     As soon as she became aware that the Plaintiff alleged to be a victim of workplace violence by a supervisor, **Manual 505.6 An Agency Guide to Workplace Violence Prevention and Response** guided the Defendant to initiate Incident Response and Stabilization procedures, Post Incident Response/ Normalization procedures, Investigation and Review of Events Leading to the Incident procedures.  **(Exhibit 17 pages 12-25)   Management Directive  505.22 State Employee Assistance Program** guided the Defendant to provide the Plaintiff with a Condition of Continued Employment (COCE) an employer based referral which is an agreement between the employer, employee and, as appropriate, the union representative, whereby the employee agrees to

25

participate in SEAP in lieu of termination or providing Critical Incident Stress Debriefing (CISD),

an educational session, led by a SEAP counselor, which is held for employees who have

experienced a traumatic event associated with the workplace to assist them in processing their

emotional reactions to the event.  **(Exhibit 18 page 2)**

60.     **Management Directive 505.7 Personnel Rules**  guided the Defendant to provide an

employee disciplinary action that was corrective and progressive in nature and designed to

encourage the employee to conform to established standards of performance or conduct.

**(Exhibit 19 page 107)**

61.     **Management Directive 205.33 Workplace Violence**  guided the Defendant to avoid

behavior that could result in emotional harm to an individual.  **(Exhibit 20 page 2)**

62.     **DMVA Workplace Violence and Workplace Bullying Prevention Polic**y guided the

Defendant to avoid intimidation and other behavior affecting the psychological well-being of

another employee, as well as exploiting a psychological vulnerability of an employee, and conduct

which was threatening, humiliating and intimidating.  **(Exhibit 21 Page 2.)**

63.     Defendant plotted against the Plaintiff by email, in violation **Management Directive**

**205.34   Commonwealth of Pennsylvania Information Technology Acceptable Use Policy**  by

using Commonwealth IT Resources in a manner that violated other Commonwealth directives and

policies, including Management Directive 505.7, Personnel Rules.  **(Exhibit 22 page 5)**

64.     **DMVA Standards of Conduct and Work Rules** guided the Defendant to avoid

intimidating and interfering with a fellow employee or subordinate during working hours and while

on any Department property;  and from performing actions which reflect unfavorably on or

discredit the Commonwealth or Department of Military and Veterans Affairs; and to deal with an

employee without regard to disability and not to commit acts of retaliation against a subordinate.

**(Exhibit 23 page 4)**

65.     Because the Plaintiff told Barry Blasic that a supervisor screaming at a person with PTSD

could lead to workplace violence involving a gun, Defendant insisted on purchasing a metal

detector for the Plaintiff's Civil Service Hearing.   **(Exhibit 24)**

66.     Supervisor Raymond Hamm thought that a suitable solution to the Plaintiff's concerns

could be found through a "meet and discuss."   **(Exhibit 25)**

67.     Raymond Hamm told the Plaintiff that she could turn in her grievances without fear of any

consequences.   **(Exhibit 25)**

68.     In the year 2011, Frederick Karsh RN was terminated from PSSH and filed a Civil Service

Appeal #26915, alleging "Sex Discrimination" against Raymond Hamm.  **(Exhibit 26)**

69.     Defendant works with a population of military veterans. **(Defendant's Exhibit 28)**

70.     In 2008, the RAND Corporation, Center for Military Health Policy Research, published a

population-based study that examined the prevalence of PTSD among previously deployed

Operation Enduring Freedom and Operation Iraqi Freedom (Afghanistan and Iraq)

Servicemembers.  Among the 1,938 participants, the prevalence of current PTSD was 13.8%.

**(Exhibit 27)**

71.     **42 C.F.R. § 483.25 (m)** provides that the facility must ensure that residents who are trauma

survivors receive culturally-competent, trauma-informed care in accordance with professional

standards of practice and accounting for residents' experiences and preferences in order to eliminate

or mitigate triggers that may cause re-traumatization of the resident.  **(Exhibit 7 page 45)**

72.     **42 C.F.R. §483.40 (b)(1)** provides that a resident who displays or is diagnosed with mental disorder or psychosocial adjustment difficulty, or who has a history of trauma and/or post-traumatic stress disorder, receives appropriate treatment and services to correct the assessed problem or to attain the highest practicable mental and psychosocial well-being. **(Exhibit 7 page 52)**

73.     Although there was no stenographic record, typewritten notes indicate that at a certain point, on March 7, 2016 during the pre disciplinary conference, the Plaintiff said, "I am a prior victim of domestic violence.  I'm done; you've insulted me enough. I'm done." Then she stood up from her seat, tossed her PSSH name badge on the table and began gathering her belongings to leave.  **(Exhibit 28 and Defendant's Exhibit 12 page 5.)**

74.     That same day, the questioner told the Plaintiff, "You also stated that you have a diagnosis of PTSD."  **(Defendant's Exhibit 12 page 6.)**

75.     On March 28, 2016, the Plaintiff offered to enter a settlement agreement, which was declined by the Defendant. **(Exhibit 29)**

76.     The Plaintiff mentioned the femur fracture of unknown origin incident involving "Mr. W." to DMVA Attorney Bushinski in an email on June 19, 2016, with a copy sent to Barry Blasic. **(Exhibit 30)**

77.     The Plaintiff then again mentioned the femur fracture of unknown origin to Attorney Bushinski in person on June 24, 2016, while they were discussing the case in the reception area prior to the Unemployment Compensation hearing.

78.     The Plaintiff followed up with an email to Attorney Bushinski on July 16, 2016 when she saw Mr. W's obituary in the newspaper.  **(Exhibit 30)**

79.     The Plaintiff followed up again with an email to Deputy Attorney General Michael Kennedy on July 17, 2019.  **(Exhibit 33.)**

80.     During the relevant time period, the Pennsylvania Soldiers and Sailors Home received $8,681,000 in federal funding.  **(Exhibit 31)**

81.     Long term care facilities wanting Medicare or Medicaid funding are required to abide by Federal long term care regulations and to provide services so that each resident can "attain and maintain their highest practicable physical, mental, and psychosocial well-being." **(Exhibit 32. Exhibit 7)**

82.     During the relevant time period, the schedule was routinely being arranged to ensure that the Commandant's own sister, Denise Bloeser, and her lover, Charles Evans, did not work together on Unit D due to rumors that the two had been having sex in the workplace, specifically in the Unit D Stairwell.  **(No evidence attached.  Sworn testimony would need to be obtained from the Defendant's sister, Denise Bloeser, and her lover, Charles Evans, to confirm or dispute this fact regarding the scheduling arrangements that were made during the relevant time period to ensure that they did not work together.)**

83.     Jennifer Blasic did not complain to PSSH administrators about the letter that the Plaintiff mailed to her on March 1, 2016, Defendant's Exhibit 10.  **(See lack of evidence.)**

84.     The Defendant suspended the Plaintiff within hours of learning about the letter that the Plaintiff said she mailed to Jennifer Blasic.

85.     In the letter that Plaintiff wrote to Jennifer Blasic, she said that she was "showing some unsolicited tough love and [metaphorically] bringing the mom hammer down on Barry's head." **(Defendant's Exhibit 10)**

86.     Jennifer Blasic appreciated it when Barry Blasic stopped publicly "spouting off" about her adultery and child custody/visitation issues on Facebook.  **(No evidence attached.  Sworn testimony would need to be obtained from Jennifer Blasic to confirm or dispute this fact.)**


Respectfully Submitted this 22nd day of July, 2020.


/s/ Nancy E. Lewen, Plaintiff, pro se
1837 State Hwy 285 Apt 2
Linesville, PA 16424