**Plaintiff's Exhibit 7**

**CFR Title 42 Chapter IV Part 483 Subpart B -**

**Requirements for Long Term Care Facilities**

**U.S. CODE OF FEDERAL REGULATIONS**
Regulations most recently checked for updates: Jul 15, 2020

Title 42 Chapter IV Part 483 Subpart B - Requirements for Long Term Care Facilities

§ 483.1 - Basis and scope.
§ 483.5 - Definitions.
§ 483.10 - Resident rights.
§ 483.12 - Freedom from abuse, neglect, and exploitation.
§ 483.15 - Admission, transfer, and discharge rights.
§ 483.20 - Resident assessment.
§ 483.21 - Comprehensive person-centered care planning.
§ 483.24 - Quality of life.
§ 483.25 - Quality of care.
§ 483.30 - Physician services.
§ 483.35 - Nursing services.
§ 483.40 - Behavioral health services.
§ 483.45 - Pharmacy services.
§ 483.50 - Laboratory, radiology, and other diagnostic services.
§ 483.55 - Dental services.
§ 483.60 - Food and nutrition services.
§ 483.65 - Specialized rehabilitative services.
§ 483.70 - Administration.
§ 483.73 - Emergency preparedness.
§ 483.75 - Quality assurance and performance improvement.
§ 483.80 - Infection control.
§ 483.85 - Compliance and ethics program.
§ 483.90 - Physical environment.
§ 483.95 - Training requirements.

**§ 483.1 - Basis and scope.**
(a) Statutory basis. (1) Sections 1819(a), (b), (c), (d), and (f) of the Act provide that -

(i) Skilled nursing facilities participating in Medicare must meet certain specified requirements; and

(ii) The Secretary may impose additional requirements (see section 1819(d)(4)(B)) if they are necessary for the health and safety of individuals to whom services are furnished in the facilities.

(2) Section 1861(l) of the Act requires the facility to have in effect a transfer agreement with a hospital.

(3) Sections 1919(a), (b), (c), (d), and (f) of the Act provide that nursing facilities participating in Medicaid must meet certain specific requirements.

(4) Sections 1128I(b) and (c) require that -

(i) Skilled nursing facilities or nursing facility have in operation a compliance and ethics program that is effective in preventing and detecting criminal, civil, and administrative violations.

(ii) The Secretary establish and implement a quality assurance and performance improvement program for facilities, including multi-unit chains of facilities.

(5) Section 1150B establishes requirements for reporting to law enforcement crimes occurring in federally funded LTC facilities.

(b) Scope. The provisions of this part contain the requirements that an institution must meet in order to qualify to participate as a Skilled Nursing Facility in the Medicare program, and as a nursing facility in the Medicaid program. They serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid.

[56 FR 48867, Sept. 26, 1991, as amended at 57 FR 43924, Sept. 23, 1992; 60 FR 50443, Sept. 29, 1995; 81 FR 68848, Oct. 4, 2016]


## § 483.5 - Definitions.

As used in this subpart, the following definitions apply:

*Abuse.* Abuse is the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish. Abuse also includes the deprivation by an individual, including a caretaker, of goods or services that are necessary to attain or maintain physical, mental, and psychosocial well-being. Instances of abuse of all residents, irrespective of any mental or physical condition, cause physical harm, pain or mental anguish. It includes verbal abuse, sexual abuse, physical abuse, and mental abuse including abuse facilitated or enabled through the use of technology. *Willful,* as used in this definition of abuse, means the individual must have acted deliberately, not that the individual must have intended to inflict injury or harm.

*Adverse event.* An adverse event is an untoward, undesirable, and usually unanticipated event that causes death or serious injury, or the risk thereof.

*Common area.* Common areas are areas in the facility where residents may gather together with other residents, visitors, and staff or engage in individual pursuits, apart from their residential rooms. This includes but is not limited to living rooms, dining rooms, activity rooms, outdoor areas, and meeting rooms where residents are located on a regular basis.

*Composite distinct part* - (1) Definition. A composite distinct part is a distinct part consisting of two or more noncontiguous components that are not located within the same campus, as defined in § 413.65(a)(2) of this chapter.

(2) Requirements. In addition to meeting the requirements of specified in the definition of "distinct part" of this section, a composite distinct part must meet all of the following requirements:

(i) A SNF or NF that is a composite of more than one location will be treated as a single distinct part of the institution of which it is a distinct part. As such, the composite distinct part will have only one provider agreement and only one provider number.

(ii) If two or more institutions (each with a distinct part SNF or NF) undergo a change of ownership, CMS must approve the existing SNFs or NFs as meeting the requirements before they are considered a composite distinct part of a single institution. In making such a determination, CMS considers whether its approval or disapproval of a composite distinct part promotes the effective and efficient use of public monies without sacrificing the quality of care.

(iii) If there is a change of ownership of a composite distinct part SNF or NF, the assignment of the provider agreement to the new owner will apply to all of the approved locations that comprise the composite distinct part SNF or NF.

(iv) To ensure quality of care and quality of life for all residents, the various components of a composite distinct part must meet all of the requirements for participation independently in each location.

(v) Use of composite distinct parts to segregate residents by payment source or on a basis other than care needs is prohibited.

*Distinct part* - (1) Definition. A distinct part SNF or NF is physically distinguishable from the larger institution or institutional complex that houses it, meets the requirements of this paragraph and of paragraph (2) of this definition, and meets the applicable statutory requirements for SNFs or NFs in sections 1819 or 1919 of the Act, respectively. A distinct part SNF or NF may comprise one or more buildings or designated parts of buildings (that is, wings, wards, or floors) that are: In the same physical area immediately adjacent to the institution's main buildings; other areas and structures that are not strictly contiguous with the main buildings but are located within close proximity to the main buildings; and any other areas that CMS determines on an individual basis, to be part of the institution's campus. A distinct part must include all of the beds within the designated area, and cannot consist of a random collection of individual rooms or beds that are scattered throughout the physical plant. The term "distinct part" also includes a composite distinct part that meets the additional requirements specified in the definition of "composite distinct part" of this section.

(2) Requirements. In addition to meeting the participation requirements for long-term care facilities set forth elsewhere in this subpart, a distinct part SNF or NF must meet all of the following requirements:

(i) The SNF or NF must be operated under common ownership and control (that is, common governance) by the institution of which it is a distinct part, as evidenced by the following:

(A) The SNF or NF is wholly owned by the institution of which it is a distinct part.

(B) The SNF or NF is subject to the by-laws and operating decisions of a common governing body.

(C) The institution of which the SNF or NF is a distinct part has final responsibility for the distinct part's administrative decisions and personnel policies, and final approval for the distinct part's personnel actions.

(D) The SNF or NF functions as an integral and subordinate part of the institution of which it is a distinct part, with significant common resource usage of buildings, equipment, personnel, and services.

(ii) The administrator of the SNF or NF reports to and is directly accountable to the management of the institution of which the SNF or NF is a distinct part.

(iii) The SNF or NF must have a designated medical director who is responsible for implementing care policies and coordinating medical care, and who is directly accountable to the management of the institution of which it is a distinct part.

(iv) The SNF or NF is financially integrated with the institution of which it is a distinct part, as evidenced by the sharing of income and expenses with that institution, and the reporting of its costs on that institution's cost report.

(v) A single institution can have a maximum of only one distinct part SNF and one distinct part NF.

(vi) (A) An institution cannot designate a distinct part SNF or NF, but instead must submit a written request with documentation that demonstrates it meets the criteria set forth above to CMS to determine if it may be considered a distinct part.

(B) The effective date of approval of a distinct part is the date that CMS determines all requirements (including enrollment with the fiscal intermediary (FI)) are met for approval, and cannot be made retroactive.

(C) The institution must request approval from CMS for all proposed changes in the number of beds in the approved distinct part.

*Exploitation.* Exploitation means taking advantage of a resident for personal gain through the use of manipulation, intimidation, threats, or coercion.

*Facility.* For purposes of this subpart, facility means a skilled nursing facility (SNF) that meets the requirements of sections 1819(a), (b), (c), and (d) of the Act, or a nursing facility (NF) that meets the requirements of sections 1919(a), (b), (c), and (d) of the Act. "Facility" may include a distinct part of an institution (as defined in paragraph (b) of this section and specified in § 440.40 and § 440.155 of this chapter), but does not include an institution for individuals with intellectual disabilities or persons with related conditions described in § 440.150 of this chapter. For Medicare and Medicaid purposes (including eligibility, coverage, certification, and payment), the "facility" is always the entity that participates in the program, whether that entity is comprised of all of, or a distinct part of, a larger institution. For Medicare, an SNF (see section 1819(a)(1) of the Act), and for Medicaid, an NF (see section 1919(a)(1) of the Act) may not be an institution for mental diseases as defined in § 435.1010 of this chapter.

*Fully sprinklered.* A fully sprinklered long term care facility is one that has all areas sprinklered in accordance with National Fire Protection Association 13 "Standard for the Installation of Sprinkler Systems" without the use of waivers or the Fire Safety Evaluation System.

*Licensed health professional.* A licensed health professional is a physician; physician assistant; nurse practitioner; physical, speech, or occupational therapist; physical or occupational therapy assistant; registered professional nurse; licensed practical nurse; or licensed or certified social worker; or registered respiratory therapist or certified respiratory therapy technician.

*Major modification* means the modification of more than 50 percent, or more than 4,500 square feet, of the smoke compartment.

*Misappropriation of resident property* means the deliberate misplacement, exploitation, or wrongful, temporary, or permanent use of a resident's belongings or money without the resident's consent.

*Mistreatment* means inappropriate treatment or exploitation of a resident.

*Neglect* is the failure of the facility, its employees or service providers to provide goods and services to a resident that are necessary to avoid physical harm, pain, mental anguish, or emotional distress.

*Nurse aide.* A nurse aide is any individual providing nursing or nursing-related services to residents in a facility. This term may also include an individual who provides these services through an agency or under a contract with the facility, but is not a licensed health professional, a registered dietitian, or someone who volunteers to provide such services without pay. Nurse aides do not include those individuals who furnish services to residents only as paid feeding assistants as defined in § 488.301 of this chapter.

*Person-centered care.* For purposes of this subpart, person-centered care means to focus on the resident as the locus of control and support the resident in making their own choices and having control over their daily lives.

*Resident representative*. For purposes of this subpart, the term resident representative means any of the following:

(1) An individual chosen by the resident to act on behalf of the resident in order to support the resident in decision-making; access medical, social or other personal information of the resident; manage financial matters; or receive notifications;

(2) A person authorized by State or Federal law (including but not limited to agents under power of attorney, representative payees, and other fiduciaries) to act on behalf of the resident in order to support the resident in decision-making; access medical, social or other personal information of the resident; manage financial matters; or receive notifications;

(3) Legal representative, as used in section 712 of the Older Americans Act; or.

(4) The court-appointed guardian or conservator of a resident.

(5) Nothing in this rule is intended to expand the scope of authority of any resident representative beyond that authority specifically authorized by the resident, State or Federal law, or a court of competent jurisdiction.

*Sexual abuse* is non-consensual sexual contact of any type with a resident.

*Transfer and discharge* includes movement of a resident to a bed outside of the certified facility whether that bed is in the same physical plant or not. Transfer and discharge does not refer to movement of a resident to a bed within the same certified facility.

[68 FR 46071, Aug. 4, 2003, as amended at 71 FR 39229, July 12, 2006; 71 FR 55340, Sept. 22, 2006; 79 FR 27155, May 12, 2014; 81 FR 68848, Oct. 4, 2016; 82 FR 32259, July 13, 2017]


**§ 483.10 - Resident rights.**
(a) Residents rights. The resident has a right to a dignified existence, self-determination, and communication with and access to persons and services inside and outside the facility, including those specified in this section.

(1) A facility must treat each resident with respect and dignity and care for each resident in a manner and in an environment that promotes maintenance or enhancement of his or her quality of life, recognizing each resident's individuality. The facility must protect and promote the rights of the resident.

(2) The facility must provide equal access to quality care regardless of diagnosis, severity of condition, or payment source. A facility must establish and maintain identical policies and practices regarding transfer, discharge, and the provision of services under the State plan for all residents regardless of payment source.

(b) Exercise of rights. The resident has the right to exercise his or her rights as a resident of the facility and as a citizen or resident of the United States.

(1) The facility must ensure that the resident can exercise his or her rights without interference, coercion, discrimination, or reprisal from the facility

(2) The resident has the right to be free of interference, coercion, discrimination, and reprisal from the facility in exercising his or her rights and to be supported by the facility in the exercise of his or her rights as required under this subpart.

(3) In the case of a resident who has not been adjudged incompetent by the state court, the resident has the right to designate a representative, in accordance with State law and any legal surrogate so designated may exercise the resident's rights to the extent provided by state law. The same-sex spouse of a resident must be afforded treatment equal to that afforded to an opposite-sex spouse if the marriage was valid in the jurisdiction in which it was celebrated.

(i) The resident representative has the right to exercise the resident's rights to the extent those rights are delegated to the resident representative.

(ii) The resident retains the right to exercise those rights not delegated to a resident representative, including the right to revoke a delegation of rights, except as limited by State law.

(4) The facility must treat the decisions of a resident representative as the decisions of the resident to the extent required by the court or delegated by the resident, in accordance with applicable law.

(5) The facility shall not extend the resident representative the right to make decisions on behalf of the resident beyond the extent required by the court or delegated by the resident, in accordance with applicable law.

(6) If the facility has reason to believe that a resident representative is making decisions or taking actions that are not in the best interests of a resident, the facility shall report such concerns in the manner required under State law.

(7) In the case of a resident adjudged incompetent under the laws of a State by a court of competent jurisdiction, the rights of the resident devolve to and are exercised by the resident representative appointed under State law to act on the resident's behalf. The court-appointed resident representative exercises the resident's rights to the extent judged necessary by a court of competent jurisdiction, in accordance with State law

(i) In the case of a resident representative whose decision-making authority is limited by State law or court appointment, the resident retains the right to make those decision outside the representative's authority.

(ii) The resident's wishes and preferences must be considered in the exercise of rights by the representative.

(iii) To the extent practicable, the resident must be provided with opportunities to participate in the care planning process.

(c) Planning and implementing care. The resident has the right to be informed of, and participate in, his or her treatment, including:

(1) The right to be fully informed in language that he or she can understand of his or her total health status, including but not limited to, his or her medical condition.

(2) The right to participate in the development and implementation of his or her person-centered plan of care, including but not limited to:

(i) The right to participate in the planning process, including the right to identify individuals or roles to be included in the planning process, the right to request meetings and the right to request revisions to the person-centered plan of care.

(ii) The right to participate in establishing the expected goals and outcomes of care, the type, amount, frequency, and duration of care, and any other factors related to the effectiveness of the plan of care.

(iii) The right to be informed, in advance, of changes to the plan of care.

(iv) The right to receive the services and/or items included in the plan of care.

(v) The right to see the care plan, including the right to sign after significant changes to the plan of care.

(3) The facility shall inform the resident of the right to participate in his or her treatment and shall support the resident in this right. The planning process must -

(i) Facilitate the inclusion of the resident and/or resident representative.

(ii) Include an assessment of the resident's strengths and needs.

(iii) Incorporate the resident's personal and cultural preferences in developing goals of care.

(4) The right to be informed, in advance, of the care to be furnished and the type of care giver or professional that will furnish care.

(5) The right to be informed in advance, by the physician or other practitioner or professional, of the risks and benefits of proposed care, of treatment and treatment alternatives or treatment options and to choose the alternative or option he or she prefers.

(6) The right to request, refuse, and/or discontinue treatment, to participate in or refuse to participate in experimental research, and to formulate an advance directive.

(7) The right to self-administer medications if the interdisciplinary team, as defined by § 483.21(b)(2)(ii), has determined that this practice is clinically appropriate.

(8) Nothing in this paragraph should be construed as the right of the resident to receive the provision of medical treatment or medical services deemed medically unnecessary or inappropriate.

(d) Choice of attending physician. The resident has the right to choose his or her attending physician.

(1) The physician must be licensed to practice, and

(2) If the physician chosen by the resident refuses to or does not meet requirements specified in this part, the facility may seek alternate physician participation as specified in paragraphs (d)(4) and (5) of this section to assure provision of appropriate and adequate care and treatment.

(3) The facility must ensure that each resident remains informed of the name, specialty, and way of contacting the physician and other primary care professionals responsible for his or her care.

(4) The facility must inform the resident if the facility determines that the physician chosen by the resident is unable or unwilling to meet requirements specified in this part and the facility seeks alternate physician participation to assure provision of appropriate and adequate care and treatment. The facility must discuss the alternative physician participation with the resident and honor the resident's preferences, if any, among options.

(5) If the resident subsequently selects another attending physician who meets the requirements specified in this part, the facility must honor that choice.

(e) Respect and dignity. The resident has a right to be treated with respect and dignity, including:

(1) The right to be free from any physical or chemical restraints imposed for purposes of discipline or convenience, and not required to treat the resident's medical symptoms, consistent with § 483.12(a)(2).

(2) The right to retain and use personal possessions, including furnishings, and clothing, as space permits, unless to do so would infringe upon the rights or health and safety of other residents.

(3) The right to reside and receive services in the facility with reasonable accommodation of resident needs and preferences except when to do so would endanger the health or safety of the resident or other residents.

(4) The right to share a room with his or her spouse when married residents live in the same facility and both spouses consent to the arrangement.

(5) The right to share a room with his or her roommate of choice when practicable, when both residents live in the same facility and both residents consent to the arrangement.

(6) The right to receive written notice, including the reason for the change, before the resident's room or roommate in the facility is changed.

(7) The right to refuse to transfer to another room in the facility, if the purpose of the transfer is:

(i) To relocate a resident of a SNF from the distinct part of the institution that is a SNF to a part of the institution that is not a SNF, or

(ii) to relocate a resident of a NF from the distinct part of the institution that is a NF to a distinct part of the institution that is a SNF.

(iii) solely for the convenience of staff.

(8) A resident's exercise of the right to refuse transfer does not affect the resident's eligibility or entitlement to Medicare or Medicaid benefits.

(f) Self-determination. The resident has the right to and the facility must promote and facilitate resident self-determination through support of resident choice, including but not limited to the rights specified in paragraphs (f)(1) through (11) of this section.

(1) The resident has a right to choose activities, schedules (including sleeping and waking times), health care and providers of health care services consistent with his or her interests, assessments, plan of care and other applicable provisions of this part.

(2) The resident has the right to make choices about aspects of his or her life in the facility that are significant to the resident.

(3) The resident has a right to interact with members of the community and participate in community activities both inside and outside the facility.

(4) The resident has a right to receive visitors of his or her choosing at the time of his or her choosing, subject to the resident's right to deny visitation when applicable, and in a manner that does not impose on the rights of another resident.

(i) The facility must provide immediate access to any resident by -

(A) Any representative of the Secretary,

(B) Any representative of the State,

(C) Any representative of the Office of the State long term care ombudsman, (established under section 712 of the Older Americans Act of 1965, as amended 2016 (42 U.S.C. 3001 et seq.),

(D) The resident's individual physician,

(E) Any representative of the protection and advocacy systems, as designated by the state, and as established under the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15001 et seq.),

(F) Any representative of the agency responsible for the protection and advocacy system for individuals with a mental disorder (established under the Protection and Advocacy for Mentally Ill Individuals Act of 2000 (42 U.S.C. 10801 et seq.), and

(G) The resident representative.

(ii) The facility must provide immediate access to a resident by immediate family and other relatives of the resident, subject to the resident's right to deny or withdraw consent at any time;

(iii) The facility must provide immediate access to a resident by others who are visiting with the consent of the resident, subject to reasonable clinical and safety restrictions and the resident's right to deny or withdraw consent at any time;

(iv) The facility must provide reasonable access to a resident by any entity or individual that provides health, social, legal, or other services to the resident, subject to the resident's right to deny or withdraw consent at any time; and

(v) The facility must have written policies and procedures regarding the visitation rights of residents, including those setting forth any clinically necessary or reasonable restriction or limitation or safety restriction or limitation, when such limitations may apply consistent with the requirements of this subpart, that the facility may need to place on such rights and the reasons for the clinical or safety restriction or limitation.

(vi) A facility must meet the following requirements:

(A) Inform each resident (or resident representative, where appropriate) of his or her visitation rights and related facility policy and procedures, including any clinical or safety restriction or limitation on such rights, consistent with the requirements of this subpart, the reasons for the restriction or limitation, and to whom the restrictions apply, when he or she is informed of his or her other rights under this section.

(B) Inform each resident of the right, subject to his or her consent, to receive the visitors whom he or she designates, including, but not limited to, a spouse (including a same-sex spouse), a domestic partner (including a same-sex domestic partner), another family member, or a friend, and his or her right to withdraw or deny such consent at any time.

(C) Not restrict, limit, or otherwise deny visitation privileges on the basis of race, color, national origin, religion, sex, gender identity, sexual orientation, or disability.

(D) Ensure that all visitors enjoy full and equal visitation privileges consistent with resident preferences.

(5) The resident has a right to organize and participate in resident groups in the facility.

(i) The facility must provide a resident or family group, if one exists, with private space; and take reasonable steps, with the approval of the group, to make residents and family members aware of upcoming meetings in a timely manner.

(ii) Staff, visitors, or other guests may attend resident group or family group meetings only at the respective group's invitation.

(iii) The facility must provide a designated staff person who is approved by the resident or family group and the facility and who is responsible for providing assistance and responding to written requests that result from group meetings.

(iv) The facility must consider the views of a resident or family group and act promptly upon the grievances and recommendations of such groups concerning issues of resident care and life in the facility.

(A) The facility must be able to demonstrate their response and rationale for such response.

(B) This should not be construed to mean that the facility must implement as recommended every request of the resident or family group.

(6) The resident has a right to participate in family groups.

(7) The resident has a right to have family member(s) or other resident representative(s) meet in the facility with the families or resident representative(s) of other residents in the facility.

(8) The resident has a right to participate in other activities, including social, religious, and community activities that do not interfere with the rights of other residents in the facility.

(9) The resident has a right to choose to or refuse to perform services for the facility and the facility must not require a resident to perform services for the facility. The resident may perform services for the facility, if he or she chooses, when -

(i) The facility has documented the resident's need or desire for work in the plan of care;

(ii) The plan specifies the nature of the services performed and whether the services are voluntary or paid;

(iii) Compensation for paid services is at or above prevailing rates; and

(iv) The resident agrees to the work arrangement described in the plan of care.

(10) The resident has a right to manage his or her financial affairs. This includes the right to know, in advance, what charges a facility may impose against a resident's personal funds.

(i) The facility must not require residents to deposit their personal funds with the facility. If a resident chooses to deposit personal funds with the facility, upon written authorization of a resident, the facility must act as a fiduciary of the resident's funds and hold, safeguard, manage, and account for the personal funds of the resident deposited with the facility, as specified in this section.

(ii) Deposit of funds. (A) In general: Except as set out in paragraph (f)(10)(ii)(B) of this section, the facility must deposit any residents' personal funds in excess of $100 in an interest bearing account (or accounts) that is separate from any of the facility's operating accounts, and that credits all interest earned on resident's funds to that account. (In pooled accounts, there must be a separate accounting for each resident's share.) The facility must maintain a resident's personal funds that do not exceed $100 in a non-interest bearing account, interest-bearing account, or petty cash fund.

(B) Residents whose care is funded by Medicaid: The facility must deposit the residents' personal funds in excess of $50 in an interest bearing account (or accounts) that is separate from any of the facility's operating accounts, and that credits all interest earned on resident's funds to that account. (In pooled accounts, there must be a separate accounting for each resident's share.) The facility must maintain personal funds that do not exceed $50 in a non-interest bearing account, interest-bearing account, or petty cash fund.

(iii) Accounting and records. (A) The facility must establish and maintain a system that assures a full and complete and separate accounting, according to generally accepted accounting principles, of each resident's personal funds entrusted to the facility on the resident's behalf.

(B) The system must preclude any commingling of resident funds with facility funds or with the funds of any person other than another resident.

(C) The individual financial record must be available to the resident through quarterly statements and upon request.

(iv) Notice of certain balances. The facility must notify each resident that receives Medicaid benefits -

(A) When the amount in the resident's account reaches $200 less than the SSI resource limit for one person, specified in section 1611(a)(3)(B) of the Act; and

(B) That, if the amount in the account, in addition to the value of the resident's other nonexempt resources, reaches the SSI resource limit for one person, the resident may lose eligibility for Medicaid or SSI.

(v) Conveyance upon discharge, eviction, or death. Upon the discharge, eviction, or death of a resident with a personal fund deposited with the facility, the facility must convey within 30 days the resident's funds, and a final accounting of those funds, to the resident, or in the case of death, the individual or probate jurisdiction administering the resident's estate, in accordance with State law.

(vi) Assurance of financial security. The facility must purchase a surety bond, or otherwise provide assurance satisfactory to the Secretary, to assure the security of all personal funds of residents deposited with the facility.

(11) The facility must not impose a charge against the personal funds of a resident for any item or service for which payment is made under Medicaid or Medicare (except for applicable deductible and coinsurance amounts). The facility may charge the resident for requested services that are more expensive than or in excess of covered services in accordance with § 489.32 of this chapter. (This does not affect the prohibition on facility charges for items and services for which Medicaid has paid. See § 447.15 of this chapter, which limits participation in the Medicaid program to providers who accept, as payment in full, Medicaid payment plus any deductible, coinsurance, or copayment required by the plan to be paid by the individual.)

(i) Services included in Medicare or Medicaid payment. During the course of a covered Medicare or Medicaid stay, facilities must not charge a resident for the following categories of items and services:

(A) Nursing services as required at § 483.35.

(B) Food and Nutrition services as required at § 483.60.

(C) An activities program as required at § 483.24(c).

(D) Room/bed maintenance services.

(E) Routine personal hygiene items and services as required to meet the needs of residents, including, but not limited to, hair hygiene supplies, comb, brush, bath soap, disinfecting soaps or specialized cleansing agents when indicated to treat special skin problems or to fight infection, razor, shaving cream, toothbrush, toothpaste, denture adhesive, denture cleaner, dental floss, moisturizing lotion, tissues, cotton balls, cotton swabs, deodorant, incontinence care and supplies, sanitary napkins and related supplies, towels, washcloths, hospital gowns, over the counter drugs, hair and nail hygiene services, bathing assistance, and basic personal laundry.

(F) Medically-related social services as required at § 483.40(d).

(G) Hospice services elected by the resident and paid for under the Medicare Hospice Benefit or paid for by Medicaid under a state plan.

(ii) Items and services that may be charged to residents' funds. Paragraphs (f)(11)(ii)(A) through (L) of this section are general categories and examples of items and services that the facility may charge to residents' funds if they are requested by a resident, if they are not required to achieve the goals stated in the resident's care plan, if the facility informs the resident that there will be a charge, and if payment is not made by Medicare or Medicaid:

(A) Telephone, including a cellular phone.

(B) Television/radio, personal computer or other electronic device for personal use.

(C) Personal comfort items, including smoking materials, notions and novelties, and confections.

(D) Cosmetic and grooming items and services in excess of those for which payment is made under Medicaid or Medicare.

(E) Personal clothing.

(F) Personal reading matter.

(G) Gifts purchased on behalf of a resident.

(H) Flowers and plants.

(I) Cost to participate in social events and entertainment outside the scope of the activities program, provided under § 483.24(c).

(J) Non-covered special care services such as privately hired nurses or aides.

(K) Private room, except when therapeutically required (for example, isolation for infection control).

(L) Except as provided in (e)(11)(ii)(L)(1) and (2) of this section, specially prepared or alternative food requested instead of the food and meals generally prepared by the facility, as required by § 483.60.

(1) The facility may not charge for special foods and meals, including medically prescribed dietary supplements, ordered by the resident's physician, physician assistant, nurse practitioner, or clinical nurse specialist, as these are included in accordance with § 483.60.

(2) In accordance with § 483.60(c) through (f), when preparing foods and meals, a facility must take into consideration residents' needs and preferences and the overall cultural and religious make-up of the facility's population.

(iii) Requests for items and services. (A) The facility can only charge a resident for any non-covered item or service if such item or service is specifically requested by the resident.

(B) The facility must not require a resident to request any item or service as a condition of admission or continued stay.

(C) The facility must inform, orally and in writing, the resident requesting an item or service for which a charge will be made that there will be a charge for the item or service and what the charge will be.

(g) Information and communication. (1) The resident has the right to be informed of his or her rights and of all rules and regulations governing resident conduct and responsibilities during his or her stay in the facility.

(2) The resident has the right to access personal and medical records pertaining to him or herself.

(i) The facility must provide the resident with access to personal and medical records pertaining to him or herself, upon an oral or written request, in the form and format requested by the individual, if it is readily producible in such form and format (including in an electronic form or format when such records are maintained electronically); or, if not, in a readable hard copy form or such other form and format as agreed to by the facility and the individual, within 24 hours (excluding weekends and holidays); and

(ii) The facility must allow the resident to obtain a copy of the records or any portions thereof (including in an electronic form or format when such records are maintained electronically) upon request and 2 working days advance notice to the facility. The facility may impose a reasonable, cost-based fee on the provision of copies, provided that the fee includes only the cost of:

(A) Labor for copying the records requested by the individual, whether in paper or electronic form;

(B) Supplies for creating the paper copy or electronic media if the individual requests that the electronic copy be provided on portable media; and

(C) Postage, when the individual has requested the copy be mailed.

(3) With the exception of information described in paragraphs (g)(2) and (g)(11) of this section, the facility must ensure that information is provided to each resident in a form and manner the resident can access and understand, including in an alternative format or in a language that the resident can understand. Summaries that translate information described in paragraph (g)(2) of this section may be made available to the patient at their request and expense in accordance with applicable law.

(4) The resident has the right to receive notices orally (meaning spoken) and in writing (including Braille) in a format and a language he or she understands, including;

(i) Required notices as specified in this section. The facility must furnish to each resident a written description of legal rights which includes -

(A) A description of the manner of protecting personal funds, under paragraph (f)(10) of this section;

(B) A description of the requirements and procedures for establishing eligibility for Medicaid, including the right to request an assessment of resources under section 1924(c) of the Social Security Act.

(C) A list of names, addresses (mailing and email), and telephone numbers of all pertinent State regulatory and informational agencies, resident advocacy groups such as the State Survey Agency, the State licensure office, the State Long-Term Care Ombudsman program, the protection and advocacy agency, adult protective services where state law provides for jurisdiction in long-term care facilities, the local contact agency for information about returning to the community and the Medicaid Fraud Control Unit; and

(D) A statement that the resident may file a complaint with the State Survey Agency concerning any suspected violation of state or federal nursing facility regulations, including but not limited to resident abuse, neglect, exploitation, misappropriation of resident property in the facility, non-compliance with the advance directives requirements and requests for information regarding returning to the community.

(ii) Information and contact information for State and local advocacy organizations, including but not limited to the State Survey Agency, the State Long-Term Care Ombudsman program (established under section 712 of the Older Americans Act of 1965, as amended 2016 (42 U.S.C. 3001 et seq.) and the protection and advocacy system (as designated by the state, and as established under the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15001 et seq.);

(iii) Information regarding Medicare and Medicaid eligibility and coverage;

(iv) Contact information for the Aging and Disability Resource Center (established under Section 202(a)(20)(B)(iii) of the Older Americans Act); or other No Wrong Door Program

(v) Contact information for the Medicaid Fraud Control Unit; and

(vi) Information and contact information for filing grievances or complaints concerning any suspected violation of state or federal nursing facility regulations, including but not limited to resident abuse, neglect, exploitation, misappropriation of resident property in the facility, non-compliance with the advance directives requirements and requests for information regarding returning to the community.

(5) The facility must post, in a form and manner accessible and understandable to residents, and resident representatives:

(i) A list of names, addresses (mailing and email), and telephone numbers of all pertinent State agencies and advocacy groups, such as the State Survey Agency, the State licensure office, adult protective services where state law provides for jurisdiction in long-term care facilities, the Office of the State Long-Term Care Ombudsman program, the protection and advocacy network, home and community based service programs, and the Medicaid Fraud Control Unit; and

(ii) A statement that the resident may file a complaint with the State Survey Agency concerning any suspected violation of state or federal nursing facility regulations, including but not limited to resident abuse, neglect, exploitation, misappropriation of resident property in the facility,

non-compliance with the advance directives requirements (42 CFR part 489 subpart I) and requests for information regarding returning to the community.

(6) The resident has the right to have reasonable access to the use of a telephone, including TTY and TDD services, and a place in the facility where calls can be made without being overheard. This includes the right to retain and use a cellular phone at the resident's own expense.

(7) The facility must protect and facilitate that resident's right to communicate with individuals and entities within and external to the facility, including reasonable access to:

(i) A telephone, including TTY and TDD services;

(ii) The internet, to the extent available to the facility; and

(iii) Stationery, postage, writing implements and the ability to send mail.

(8) The resident has the right to send and receive mail, and to receive letters, packages and other materials delivered to the facility for the resident through a means other than a postal service, including the right to:

(i) Privacy of such communications consistent with this section; and

(ii) Access to stationery, postage, and writing implements at the resident's own expense.

(9) The resident has the right to have reasonable access to and privacy in their use of electronic communications such as email and video communications and for Internet research.

(i) If the access is available to the facility

(ii) At the resident's expense, if any additional expense is incurred by the facility to provide such access to the resident.

(iii) Such use must comply with state and federal law.

(10) The resident has the right to -

(i) Examine the results of the most recent survey of the facility conducted by Federal or State surveyors and any plan of correction in effect with respect to the facility; and

(ii) Receive information from agencies acting as client advocates, and be afforded the opportunity to contact these agencies.

(11) The facility must -

(i) Post in a place readily accessible to residents, and family members and legal representatives of residents, the results of the most recent survey of the facility.

(ii) Have reports with respect to any surveys, certifications, and complaint investigations made respecting the facility during the 3 preceding years, and any plan of correction in effect with respect to the facility, available for any individual to review upon request; and

(iii) Post notice of the availability of such reports in areas of the facility that are prominent and accessible to the public.

(iv) The facility shall not make available identifying information about complainants or residents.

(12) The facility must comply with the requirements specified in 42 CFR part 489, subpart I (Advance Directives).

(i) These requirements include provisions to inform and provide written information to all adult residents concerning the right to accept or refuse medical or surgical treatment and, at the resident's option, formulate an advance directive.

(ii) This includes a written description of the facility's policies to implement advance directives and applicable State law.

(iii) Facilities are permitted to contract with other entities to furnish this information but are still legally responsible for ensuring that the requirements of this section are met.

(iv) If an adult individual is incapacitated at the time of admission and is unable to receive information or articulate whether or not he or she has executed an advance directive, the facility may give advance directive information to the individual's resident representative in accordance with State law.

(v) The facility is not relieved of its obligation to provide this information to the individual once he or she is able to receive such information. Follow-up procedures must be in place to provide the information to the individual directly at the appropriate time.

(13) The facility must display in the facility written information, and provide to residents and applicants for admission, oral and written information about how to apply for and use Medicare and Medicaid benefits, and how to receive refunds for previous payments covered by such benefits.

(14) Notification of changes. (i) A facility must immediately inform the resident; consult with the resident's physician; and notify, consistent with his or her authority, the resident representative(s), when there is -

(A) An accident involving the resident which results in injury and has the potential for requiring physician intervention;

(B) A significant change in the resident's physical, mental, or psychosocial status (that is, a deterioration in health, mental, or psychosocial status in either life-threatening conditions or clinical complications);

(C) A need to alter treatment significantly (that is, a need to discontinue or change an existing form of treatment due to adverse consequences, or to commence a new form of treatment); or

(D) A decision to transfer or discharge the resident from the facility as specified in § 483.15(c)(1)(ii).

(ii) When making notification under paragraph (g)(14)(i) of this section, the facility must ensure that all pertinent information specified in § 483.15(c)(2) is available and provided upon request to the physician.

(iii) The facility must also promptly notify the resident and the resident representative, if any, when there is -

(A) A change in room or roommate assignment as specified in § 483.10(e)(6); or

(B) A change in resident rights under Federal or State law or regulations as specified in paragraph (e)(10) of this section.

(iv) The facility must record and periodically update the address (mailing and email) and phone number of the resident representative(s).

(15) Admission to a composite distinct part. A facility that is a composite distinct part (as defined in § 483.5 must disclose in its admission agreement its physical configuration, including the various locations that comprise the composite distinct part, and must specify the policies that apply to room changes between its different locations under § 483.15(c)(9).

(16) The facility must provide a notice of rights and services to the resident prior to or upon admission and during the resident's stay.

(i) The facility must inform the resident both orally and in writing in a language that the resident understands of his or her rights and all rules and regulations governing resident conduct and responsibilities during the stay in the facility.

(ii) The facility must also provide the resident with the State-developed notice of Medicaid rights and obligations, if any.

(iii) Receipt of such information, and any amendments to it, must be acknowledged in writing;

(17) The facility must -

(i) Inform each Medicaid-eligible resident, in writing, at the time of admission to the nursing facility and when the resident becomes eligible for Medicaid of -

(A) The items and services that are included in nursing facility services under the State plan and for which the resident may not be charged;

(B) Those other items and services that the facility offers and for which the resident may be charged, and the amount of charges for those services; and

(ii) Inform each Medicaid-eligible resident when changes are made to the items and services specified in § 483.10(g)(17)(i)(A) and (B) of this section.

(18) The facility must inform each resident before, or at the time of admission, and periodically during the resident's stay, of services available in the facility and of charges for those services, including any charges for services not covered under Medicare/Medicaid or by the facility's per diem rate.

(i) Where changes in coverage are made to items and services covered by Medicare and/or by the Medicaid State plan, the facility must provide notice to residents of the change as soon as is reasonably possible.

(ii) Where changes are made to charges for other items and services that the facility offers, the facility must inform the resident in writing at least 60 days prior to implementation of the change.

(iii) If a resident dies or is hospitalized or is transferred and does not return to the facility, the facility must refund to the resident, resident representative, or estate, as applicable, any deposit or charges already paid, less the facility's per diem rate, for the days the resident actually resided or reserved or retained a bed in the facility, regardless of any minimum stay or discharge notice requirements.

(iv) The facility must refund to the resident or resident representative any and all refunds due the resident within 30 days from the resident's date of discharge from the facility.

(v) The terms of an admission contract by or on behalf of an individual seeking admission to the facility must not conflict with the requirements of these regulations.

(h) Privacy and confidentiality. The resident has a right to personal privacy and confidentiality of his or her personal and medical records.

(1) Personal privacy includes accommodations, medical treatment, written and telephone communications, personal care, visits, and meetings of family and resident groups, but this does not require the facility to provide a private room for each resident.

(2) The facility must respect the residents right to personal privacy, including the right to privacy in his or her oral (that is, spoken), written, and electronic communications, including the right to send

and promptly receive unopened mail and other letters, packages and other materials delivered to the facility for the resident, including those delivered through a means other than a postal service.

(3) The resident has a right to secure and confidential personal and medical records.

(i) The resident has the right to refuse the release of personal and medical records except as provided at § 483.70(i)(2) or other applicable federal or state laws.

(ii) The facility must allow representatives of the Office of the State Long-Term Care Ombudsman to examine a resident's medical, social, and administrative records in accordance with State law.

(i) Safe environment. The resident has a right to a safe, clean, comfortable and homelike environment, including but not limited to receiving treatment and supports for daily living safely. The facility must provide -

(1) A safe, clean, comfortable, and homelike environment, allowing the resident to use his or her personal belongings to the extent possible.

(i) This includes ensuring that the resident can receive care and services safely and that the physical layout of the facility maximizes resident independence and does not pose a safety risk.

(ii) The facility shall exercise reasonable care for the protection of the resident's property from loss or theft.

(2) Housekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior;

(3) Clean bed and bath linens that are in good condition;

(4) Private closet space in each resident room, as specified in § 483.90(e)(2)(iv);

(5) Adequate and comfortable lighting levels in all areas;

(6) Comfortable and safe temperature levels. Facilities initially certified after October 1, 1990 must maintain a temperature range of 71 to 81 °F; and

(7) For the maintenance of comfortable sound levels.

(j) Grievances. (1) The resident has the right to voice grievances to the facility or other agency or entity that hears grievances without discrimination or reprisal and without fear of discrimination or reprisal. Such grievances include those with respect to care and treatment which has been furnished as well as that which has not been furnished, the behavior of staff and of other residents; and other concerns regarding their LTC facility stay.

(2) The resident has the right to and the facility must make prompt efforts by the facility to resolve grievances the resident may have, in accordance with this paragraph.

(3) The facility must make information on how to file a grievance or complaint available to the resident.

(4) The facility must establish a grievance policy to ensure the prompt resolution of all grievances regarding the residents' rights contained in this paragraph. Upon request, the provider must give a copy of the grievance policy to the resident. The grievance policy must include:

(i) Notifying resident individually or through postings in prominent locations throughout the facility of the right to file grievances orally (meaning spoken) or in writing; the right to file grievances anonymously; the contact information of the grievance official with whom a grievance can be filed, that is, his or her name, business address (mailing and email) and business phone number; a reasonable expected time frame for completing the review of the grievance; the right to obtain a written decision regarding his or her grievance; and the contact information of independent entities with whom grievances may be filed, that is, the pertinent State agency, Quality Improvement Organization, State Survey Agency and State Long-Term Care Ombudsman program or protection and advocacy system;

(ii) Identifying a Grievance Official who is responsible for overseeing the grievance process, receiving and tracking grievances through to their conclusion; leading any necessary investigations by the facility; maintaining the confidentiality of all information associated with grievances, for example, the identity of the resident for those grievances submitted anonymously; issuing written grievance decisions to the resident; and coordinating with state and federal agencies as necessary in light of specific allegations;

(iii) As necessary, taking immediate action to prevent further potential violations of any resident right while the alleged violation is being investigated;

(iv) Consistent with § 483.12(c)(1), immediately reporting all alleged violations involving neglect, abuse, including injuries of unknown source, and/or misappropriation of resident property, by anyone furnishing services on behalf of the provider, to the administrator of the provider; and as required by State law;

(v) Ensuring that all written grievance decisions include the date the grievance was received, a summary statement of the resident's grievance, the steps taken to investigate the grievance, a summary of the pertinent findings or conclusions regarding the resident's concern(s), a statement as to whether the grievance was confirmed or not confirmed, any corrective action taken or to be taken by the facility as a result of the grievance, and the date the written decision was issued;

(vi) Taking appropriate corrective action in accordance with State law if the alleged violation of the residents' rights is confirmed by the facility or if an outside entity having jurisdiction, such as the State Survey Agency, Quality Improvement Organization, or local law enforcement agency confirms a violation of any of these residents' rights within its area of responsibility; and

(vii) Maintaining evidence demonstrating the results of all grievances for a period of no less than 3 years from the issuance of the grievance decision.

(k) Contact with external entities. A facility must not prohibit or in any way discourage a resident from communicating with federal, state, or local officials, including, but not limited to, federal and state surveyors, other federal or state health department employees, including representatives of the Office of the State Long-Term Care Ombudsman, and any representative of the agency responsible for the protection and advocacy system for individuals with mental disorder (established under the Protection and Advocacy for Mentally Ill Individuals Act of 2000 (42 U.S.C. 10801 et seq.), regarding any matter, whether or not subject to arbitration or any other type of judicial or regulatory action.

[81 FR 68849, Oct. 4, 2016, as amended at 82 FR 32259, July 13, 2017]


**§ 483.12 - Freedom from abuse, neglect, and exploitation.**
The resident has the right to be free from abuse, neglect, misappropriation of resident property, and exploitation as defined in this subpart. This includes but is not limited to freedom from corporal punishment, involuntary seclusion and any physical or chemical restraint not required to treat the resident's medical symptoms.

(a) The facility must -

(1) Not use verbal, mental, sexual, or physical abuse, corporal punishment, or involuntary seclusion;

(2) Ensure that the resident is free from physical or chemical restraints imposed for purposes of discipline or convenience and that are not required to treat the resident's medical symptoms. When the use of restraints is indicated, the facility must use the least restrictive alternative for the least amount of time and document ongoing re-evaluation of the need for restraints.

(3) Not employ or otherwise engage individuals who -

(i) Have been found guilty of abuse, neglect, exploitation, misappropriation of property, or mistreatment by a court of law;

(ii) Have had a finding entered into the State nurse aide registry concerning abuse, neglect, exploitation, mistreatment of residents or misappropriation of their property; or

(iii) Have a disciplinary action in effect against his or her professional license by a state licensure body as a result of a finding of abuse, neglect, exploitation, mistreatment of residents or misappropriation of resident property.

(4) Report to the State nurse aide registry or licensing authorities any knowledge it has of actions by a court of law against an employee, which would indicate unfitness for service as a nurse aide or other facility staff.

(b) The facility must develop and implement written policies and procedures that:

(1) Prohibit and prevent abuse, neglect, and exploitation of residents and misappropriation of resident property,

(2) Establish policies and procedures to investigate any such allegations, and

(3) Include training as required at paragraph § 483.95.

(4) Establish coordination with the QAPI program required under § 483.75.

(5) Ensure reporting of crimes occurring in federally-funded long-term care facilities in accordance with section 1150B of the Act. The policies and procedures must include but are not limited to the following elements.

(i) Annually notifying covered individuals, as defined at section 1150B(a)(3) of the Act, of that individual's obligation to comply with the following reporting requirements.

(A) Each covered individual shall report to the State Agency and one or more law enforcement entities for the political subdivision in which the facility is located any reasonable suspicion of a crime against any individual who is a resident of, or is receiving care from, the facility.

(B) Each covered individual shall report immediately, but not later than 2 hours after forming the suspicion, if the events that cause the suspicion result in serious bodily injury, or not later than 24 hours if the events that cause the suspicion do not result in serious bodily injury.

(ii) Posting a conspicuous notice of employee rights, as defined at section 1150B(d)(3) of the Act.

(iii) Prohibiting and preventing retaliation, as defined at section 1150B(d)(1) and (2) of the Act.

(c) In response to allegations of abuse, neglect, exploitation, or mistreatment, the facility must:

(1) Ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of resident property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the administrator of the facility and to other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with State law through established procedures.

(2) Have evidence that all alleged violations are thoroughly investigated.

(3) Prevent further potential abuse, neglect, exploitation, or mistreatment while the investigation is in progress.

(4) Report the results of all investigations to the administrator or his or her designated representative and to other officials in accordance with State law, including to the State Survey Agency, within 5 working days of the incident, and if the alleged violation is verified appropriate corrective action must be taken.

[81 FR 68855, Oct. 4, 2016]


**§ 483.15 - Admission, transfer, and discharge rights.**
(a) Admissions policy. (1) The facility must establish and implement an admissions policy.

(2) The facility must -

(i) Not request or require residents or potential residents to waive their rights as set forth in this subpart and in applicable state, federal or local licensing or certification laws, including but not limited to their rights to Medicare or Medicaid; and

(ii) Not request or require oral or written assurance that residents or potential residents are not eligible for, or will not apply for, Medicare or Medicaid benefits.

(iii) Not request or require residents or potential residents to waive potential facility liability for losses of personal property

(3) The facility must not request or require a third party guarantee of payment to the facility as a condition of admission or expedited admission, or continued stay in the facility. However, the facility may request and require a resident representative who has legal access to a resident's income or resources available to pay for facility care to sign a contract, without incurring personal financial liability, to provide facility payment from the resident's income or resources.

(4) In the case of a person eligible for Medicaid, a nursing facility must not charge, solicit, accept, or receive, in addition to any amount otherwise required to be paid under the State plan, any gift, money, donation, or other consideration as a precondition of admission, expedited admission or continued stay in the facility. However, -

(i) A nursing facility may charge a resident who is eligible for Medicaid for items and services the resident has requested and received, and that are not specified in the State plan as included in the term "nursing facility services" so long as the facility gives proper notice of the availability and cost of these services to residents and does not condition the resident's admission or continued stay on the request for and receipt of such additional services; and

(ii) A nursing facility may solicit, accept, or receive a charitable, religious, or philanthropic contribution from an organization or from a person unrelated to a Medicaid eligible resident or potential resident, but only to the extent that the contribution is not a condition of admission, expedited admission, or continued stay in the facility for a Medicaid eligible resident.

(5) States or political subdivisions may apply stricter admissions standards under State or local laws than are specified in this section, to prohibit discrimination against individuals entitled to Medicaid.

(6) A nursing facility must disclose and provide to a resident or potential resident prior to time of admission, notice of special characteristics or service limitations of the facility.

(7) A nursing facility that is a composite distinct part as defined in § 483.5 must disclose in its admission agreement its physical configuration, including the various locations that comprise the composite distinct part, and must specify the policies that apply to room changes between its different locations under paragraph (c)(9) of this section.

(b) Equal access to quality care. (1) A facility must establish, maintain and implement identical policies and practices regarding transfer and discharge, as defined in § 483.5 and the provision of services for all individuals regardless of source of payment, consistent with § 483.10(a)(2);

(2) The facility may charge any amount for services furnished to non-Medicaid residents unless otherwise limited by state law and consistent with the notice requirement in § 483.10(g)(18)(i) and (g)(4)(i) describing the charges; and

(3) The State is not required to offer additional services on behalf of a resident other than services provided in the State plan.

(c) Transfer and discharge - (1) Facility requirements - (i) The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless -

(A) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility;

(B) The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

(C) The safety of individuals in the facility is endangered due to the clinical or behavioral status of the resident;

(D) The health of individuals in the facility would otherwise be endangered;

(E) The resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility. Non-payment applies if the resident does not submit the necessary paperwork for third party payment or after the third party, including Medicare

or Medicaid, denies the claim and the resident refuses to pay for his or her stay. For a resident who becomes eligible for Medicaid after admission to a facility, the facility may charge a resident only allowable charges under Medicaid; or

(F) The facility ceases to operate.

(ii) The facility may not transfer or discharge the resident while the appeal is pending, pursuant to § 431.230 of this chapter, when a resident exercises his or her right to appeal a transfer or discharge notice from the facility pursuant to § 431.220(a)(3) of this chapter, unless the failure to discharge or transfer would endanger the health or safety of the resident or other individuals in the facility. The facility must document the danger that failure to transfer or discharge would pose.

(2) Documentation. When the facility transfers or discharges a resident under any of the circumstances specified in paragraphs (c)(1)(i)(A) through (F) of this section, the facility must ensure that the transfer or discharge is documented in the resident's medical record and appropriate information is communicated to the receiving health care institution or provider.

(i) Documentation in the resident's medical record must include:

(A) The basis for the transfer per paragraph (c)(1)(i) of this section.

(B) In the case of paragraph (c)(1)(i)(A) of this section, the specific resident need(s) that cannot be met, facility attempts to meet the resident needs, and the service available at the receiving facility to meet the need(s).

(ii) The documentation required by paragraph (c)(2)(i) of this section must be made by -

(A) The resident's physician when transfer or discharge is necessary under paragraph (c)(1)(A) or (B) of this section; and

(B) A physician when transfer or discharge is necessary under paragraph (c)(1)(i)(C) or (D) of this section.

(iii) Information provided to the receiving provider must include a minimum of the following:

(A) Contact information of the practitioner responsible for the care of the resident

(B) Resident representative information including contact information.

(C) Advance Directive information.

(D) All special instructions or precautions for ongoing care, as appropriate.

(E) Comprehensive care plan goals,

(F) All other necessary information, including a copy of the resident's discharge summary, consistent with § 483.21(c)(2), as applicable, and any other documentation, as applicable, to ensure a safe and effective transition of care.

(3) Notice before transfer. Before a facility transfers or discharges a resident, the facility must -

(i) Notify the resident and the resident's representative(s) of the transfer or discharge and the reasons for the move in writing and in a language and manner they understand. The facility must send a copy of the notice to a representative of the Office of the State Long-Term Care Ombudsman.

(ii) Record the reasons for the transfer or discharge in the resident's medical record in accordance with paragraph (c)(2) of this section; and

(iii) Include in the notice the items described in paragraph (c)(5) of this section.

(4) Timing of the notice. (i) Except as specified in paragraphs (c)(4)(ii) and (8) of this section, the notice of transfer or discharge required under this section must be made by the facility at least 30 days before the resident is transferred or discharged.

(ii) Notice must be made as soon as practicable before transfer or discharge when -

(A) The safety of individuals in the facility would be endangered under paragraph (c)(1)(i)(C) of this section;

(B) The health of individuals in the facility would be endangered, under paragraph (c)(1)(i)(D) of this section;

(C) The resident's health improves sufficiently to allow a more immediate transfer or discharge, under paragraph (c)(1)(i)(B) of this section;

(D) An immediate transfer or discharge is required by the resident's urgent medical needs, under paragraph (c)(1)(i)(A) of this section; or

(E) A resident has not resided in the facility for 30 days.

(5) Contents of the notice. The written notice specified in paragraph (c)(3) of this section must include the following:

(i) The reason for transfer or discharge;

(ii) The effective date of transfer or discharge;

(iii) The location to which the resident is transferred or discharged;

(iv) A statement of the resident's appeal rights, including the name, address (mailing and email), and telephone number of the entity which receives such requests; and information on how to obtain an appeal form and assistance in completing the form and submitting the appeal hearing request;

(v) The name, address (mailing and email) and telephone number of the Office of the State Long-Term Care Ombudsman;

(vi) For nursing facility residents with intellectual and developmental disabilities or related disabilities, the mailing and email address and telephone number of the agency responsible for the protection and advocacy of individuals with developmental disabilities established under Part C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (Pub. L. 106-402, codified at 42 U.S.C. 15001 et seq.); and

(vii) For nursing facility residents with a mental disorder or related disabilities, the mailing and email address and telephone number of the agency responsible for the protection and advocacy of individuals with a mental disorder established under the Protection and Advocacy for Mentally Ill Individuals Act.

(6) Changes to the notice. If the information in the notice changes prior to effecting the transfer or discharge, the facility must update the recipients of the notice as soon as practicable once the updated information becomes available.

(7) Orientation for transfer or discharge. A facility must provide and document sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility. This orientation must be provided in a form and manner that the resident can understand.

(8) Notice in advance of facility closure. In the case of facility closure, the individual who is the administrator of the facility must provide written notification prior to the impending closure to the State Survey Agency, the Office of the State Long-Term Care Ombudsman, residents of the facility, and the resident representatives, as well as the plan for the transfer and adequate relocation of the residents, as required at § 483.70(l).

(9) Room changes in a composite distinct part. Room changes in a facility that is a composite distinct part (as defined in § 483.5) are subject to the requirements of § 483.10(e)(7) and must be limited to moves within the particular building in which the resident resides, unless the resident voluntarily agrees to move to another of the composite distinct part's locations.

(d) Notice of bed-hold policy and return - (1) Notice before transfer. Before a nursing facility transfers a resident to a hospital or the resident goes on therapeutic leave, the nursing facility must provide written information to the resident or resident representative that specifies -

(i) The duration of the state bed-hold policy, if any, during which the resident is permitted to return and resume residence in the nursing facility;

(ii) The reserve bed payment policy in the state plan, under § 447.40 of this chapter, if any;

(iii) The nursing facility's policies regarding bed-hold periods, which must be consistent with paragraph (e)(1) of this section, permitting a resident to return; and

(iv) The information specified in paragraph (e)(1) of this section.

(2) Bed-hold notice upon transfer. At the time of transfer of a resident for hospitalization or therapeutic leave, a nursing facility must provide to the resident and the resident representative written notice which specifies the duration of the bed-hold policy described in paragraph (d)(1) of this section.

(e)(1) Permitting residents to return to facility. A facility must establish and follow a written policy on permitting residents to return to the facility after they are hospitalized or placed on therapeutic leave. The policy must provide for the following.

(i) A resident, whose hospitalization or therapeutic leave exceeds the bed-hold period under the State plan, returns to the facility to their previous room if available or immediately upon the first availability of a bed in a semi-private room if the resident

(A) Requires the services provided by the facility; and

(B) Is eligible for Medicare skilled nursing facility services or Medicaid nursing facility services.

(ii) If the facility that determines that a resident who was transferred with an expectation of returning to the facility cannot return to the facility, the facility must comply with the requirements of paragraph (c) as they apply to discharges.

(2) Readmission to a composite distinct part. When the facility to which a resident returns is a composite distinct part (as defined in § 483.5), the resident must be permitted to return to an available bed in the particular location of the composite distinct part in which he or she resided previously. If a bed is not available in that location at the time of return, the resident must be given the option to return to that location upon the first availability of a bed there.

[81 FR 68855, Oct. 4, 2016, as amended at 82 FR 32259, July 13, 2017]

## § 483.20 - Resident assessment.

The facility must conduct initially and periodically a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity.

(a) Admission orders. At the time each resident is admitted, the facility must have physician orders for the resident's immediate care.

(b) Comprehensive assessments - (1) Resident assessment instrument. A facility must make a comprehensive assessment of a resident's needs, strengths, goals, life history and preferences, using the resident assessment instrument (RAI) specified by CMS. The assessment must include at least the following:

(i) Identification and demographic information.

(ii) Customary routine.

(iii) Cognitive patterns.

(iv) Communication.

(v) Vision.

(vi) Mood and behavior patterns.

(vii) Psychosocial well-being.

(viii) Physical functioning and structural problems.

(ix) Continence.

(x) Disease diagnoses and health conditions.

(xi) Dental and nutritional status.

(xii) Skin condition.

(xiii) Activity pursuit.

(xiv) Medications.

(xv) Special treatments and procedures.

(xvi) Discharge planning.

(xvii) Documentation of summary information regarding the additional assessment performed on the care areas triggered by the completion of the Minimum Data Set (MDS).

(xviii) Documentation of participation in assessment. The assessment process must include direct observation and communication with the resident, as well as communication with licensed and nonlicensed direct care staff members on all shifts.

(2) When required. Subject to the timeframes prescribed in § 413.343(b) of this chapter, a facility must conduct a comprehensive assessment of a resident in accordance with the timeframes specified in paragraphs (b)(2) (i) through (iii) of this section. The timeframes prescribed in § 413.343(b) of this chapter do not apply to CAHs.

(i) Within 14 calendar days after admission, excluding readmissions in which there is no significant change in the resident's physical or mental condition. (For purposes of this section, "readmission" means a return to the facility following a temporary absence for hospitalization or for therapeutic leave.)

(ii) Within 14 calendar days after the facility determines, or should have determined, that there has been a significant change in the resident's physical or mental condition. (For purposes of this section, a "significant change" means a major decline or improvement in the resident's status that will not normally resolve itself without further intervention by staff or by implementing standard disease-related clinical interventions, that has an impact on more than one area of the resident's health status, and requires interdisciplinary review or revision of the care plan, or both.)

(iii) Not less often than once every 12 months.

(c) Quarterly review assessment. A facility must assess a resident using the quarterly review instrument specified by the State and approved by CMS not less frequently than once every 3 months.

(d) Use. A facility must maintain all resident assessments completed within the previous 15 months in the resident's active record and use the results of the assessments to develop, review, and revise the resident's comprehensive plan of care.

(e) Coordination. A facility must coordinate assessments with the preadmission screening and resident review (PASARR) program under Medicaid in subpart C of this part to the maximum extent practicable to avoid duplicative testing and effort. Coordination includes -

(1) Incorporating the recommendations from the PASARR level II determination and the PASARR evaluation report into a resident's assessment, care planning, and transitions of care.

(2) Referring all level II residents and all residents with newly evident or possible serious mental disorder, intellectual disability, or a related condition for level II resident review upon a significant change in status assessment.

(f) Automated data processing requirement - (1) Encoding data. Within 7 days after a facility completes a resident's assessment, a facility must encode the following information for each resident in the facility:

(i) Admission assessment.

(ii) Annual assessment updates.

(iii) Significant change in status assessments.

(iv) Quarterly review assessments.

(v) A subset of items upon a resident's transfer, reentry, discharge, and death.

(vi) Background (face-sheet) information, if there is no admission assessment.

(2) Transmitting data. Within 7 days after a facility completes a resident's assessment, a facility must be capable of transmitting to the CMS System information for each resident contained in the MDS in a format that conforms to standard record layouts and data dictionaries, and that passes standardized edits defined by CMS and the State.

(3) Transmittal requirements. Within 14 days after a facility completes a resident's assessment, a facility must electronically transmit encoded, accurate, and complete MDS data to the CMS System, including the following:

(i) Admission assessment.

(ii) Annual assessment.

(iii) Significant change in status assessment.

(iv) Significant correction of prior full assessment.

(v) Significant correction of prior quarterly assessment.

(vi) Quarterly review.

(vii) A subset of items upon a resident's transfer, reentry, discharge, and death.

(viii) Background (face-sheet) information, for an initial transmission of MDS data on a resident that does not have an admission assessment.

(4) Data format. The facility must transmit data in the format specified by CMS or, for a State which has an alternate RAI approved by CMS, in the format specified by the State and approved by CMS.

(5) Resident-identifiable information. (i) A facility may not release information that is resident-identifiable to the public.

(ii) The facility may release information that is resident-identifiable to an agent only in accordance with a contract under which the agent agrees not to use or disclose the information except to the extent the facility itself is permitted to do so.
(g) Accuracy of assessments. The assessment must accurately reflect the resident's status.

(h) Coordination. A registered nurse must conduct or coordinate each assessment with the appropriate participation of health professionals.

(i) Certification. (1) A registered nurse must sign and certify that the assessment is completed.

(2) Each individual who completes a portion of the assessment must sign and certify the accuracy of that portion of the assessment.

(j) Penalty for falsification. (1) Under Medicare and Medicaid, an individual who willfully and knowingly -

(i) Certifies a material and false statement in a resident assessment is subject to a civil money penalty of not more than $1,000 as adjusted annually under 45 CFR part 102 for each assessment; or

(ii) Causes another individual to certify a material and false statement in a resident assessment is subject to a civil money penalty of not more than $5,000 as adjusted annually under 45 CFR part 102 for each assessment.

(2) Clinical disagreement does not constitute a material and false statement.

(k) Preadmission screening for individuals with a mental disorder and individuals with intellectual disability. (1) A nursing facility must not admit, on or after January 1, 1989, any new resident with -

(i) Mental disorder as defined in paragraph (k)(3)(i) of this section, unless the State mental health authority has determined, based on an independent physical and mental evaluation performed by a person or entity other than the State mental health authority, prior to admission,

(A) That, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility; and

(B) If the individual requires such level of services, whether the individual requires specialized services; or

(ii) Intellectual disability, as defined in paragraph (k)(3)(ii) of this section, unless the State intellectual disability or developmental disability authority has determined prior to admission -

(A) That, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility; and

(B) If the individual requires such level of services, whether the individual requires specialized services for intellectual disability.

(2) Exceptions. For purposes of this section -

(i) The preadmission screening program under paragraph (k)(1) of this section need not provide for determinations in the case of the readmission to a nursing facility of an individual who, after being admitted to the nursing facility, was transferred for care in a hospital.

(ii) The State may choose not to apply the preadmission screening program under paragraph (k)(1) of this section to the admission to a nursing facility of an individual -

(A) Who is admitted to the facility directly from a hospital after receiving acute inpatient care at the hospital,

(B) Who requires nursing facility services for the condition for which the individual received care in the hospital, and

(C) Whose attending physician has certified, before admission to the facility that the individual is likely to require less than 30 days of nursing facility services.

(3) Definition. For purposes of this section -

(i) An individual is considered to have a mental disorder if the individual has a serious mental disorder as defined in § 483.102(b)(1).

(ii) An individual is considered to have an intellectual disability if the individual has an intellectual disability as defined in § 483.102(b)(3) or is a person with a related condition as described in § 435.1010 of this chapter.

(4) A nursing facility must notify the state mental health authority or state intellectual disability authority, as applicable, promptly after a significant change in the mental or physical condition of a resident who has a mental disorder or intellectual disability for resident review.

[56 FR 48871, Sept. 26, 1991, as amended at 57 FR 43924, Sept. 23, 1992; 62 FR 67211, Dec. 23, 1997; 63 FR 53307, Oct. 5, 1998; 64 FR 41543, July 30, 1999; 68 FR 46072, Aug. 4, 2003; 71 FR 39229, July 12, 2006; 74 FR 40363, Aug. 11, 2009; 81 FR 61563, Sept. 6, 2016; 81 FR 68857, Oct. 4, 2016]


**§ 483.21 - Comprehensive person-centered care planning.**
(a) Baseline care plans. (1) The facility must develop and implement a baseline care plan for each resident that includes the instructions needed to provide effective and person-centered care of the resident that meet professional standards of quality care. The baseline care plan must -

(i) Be developed within 48 hours of a resident's admission.
(ii) Include the minimum healthcare information necessary to properly care for a resident including, but not limited to:

(A) Initial goals based on admission orders.

(B) Physician orders.

(C) Dietary orders.

(D) Therapy services.

(E) Social services.

(F) PASARR recommendation, if applicable.

(2) The facility may develop a comprehensive care plan in place of the baseline care plan if the comprehensive care plan -

(i) Is developed within 48 hours of the resident's admission.

(ii) Meets the requirements set forth in paragraph (b) of this section (excepting paragraph (b)(2)(i) of this section).

(3) The facility must provide the resident and their representative with a summary of the baseline care plan that includes but is not limited to:

(i) The initial goals of the resident.

(ii) A summary of the resident's medications and dietary instructions.

(iii) Any services and treatments to be administered by the facility and personnel acting on behalf of the facility.

(iv) Any updated information based on the details of the comprehensive care plan, as necessary.

(b) Comprehensive care plans. (1) The facility must develop and implement a comprehensive person-centered care plan for each resident, consistent with the resident rights set forth at § 483.10(c)(2) and § 483.10(c)(3), that includes measurable objectives and timeframes to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment. The comprehensive care plan must describe the following:

(i) The services that are to be furnished to attain or maintain the resident's highest practicable physical, mental, and psychosocial well-being as required under § 483.24, § 483.25, or § 483.40; and

(ii) Any services that would otherwise be required under § 483.24, § 483.25, or § 483.40 but are not provided due to the resident's exercise of rights under § 483.10, including the right to refuse treatment under § 483.10(c)(6)

(iii) Any specialized services or specialized rehabilitative services the nursing facility will provide as a result of PASARR recommendations. If a facility disagrees with the findings of the PASARR, it must indicate its rationale in the resident's medical record.

(iv) In consultation with the resident and the resident's representative(s) -

(A) The resident's goals for admission and desired outcomes.

(B) The resident's preference and potential for future discharge. Facilities must document whether the resident's desire to return to the community was assessed and any referrals to local contact agencies and/or other appropriate entities, for this purpose.

(C) Discharge plans in the comprehensive care plan, as appropriate, in accordance with the requirements set forth in paragraph (c) of this section.

(2) A comprehensive care plan must be -

(i) Developed within 7 days after completion of the comprehensive assessment.

(ii) Prepared by an interdisciplinary team, that includes but is not limited to -

(A) The attending physician.

(B) A registered nurse with responsibility for the resident.

(C) A nurse aide with responsibility for the resident.

(D) A member of food and nutrition services staff.

(E) To the extent practicable, the participation of the resident and the resident's representative(s). An explanation must be included in a resident's medical record if the participation of the resident and their resident representative is determined not practicable for the development of the resident's care plan.

(F) Other appropriate staff or professionals in disciplines as determined by the resident's needs or as requested by the resident.

(iii) Reviewed and revised by the interdisciplinary team after each assessment, including both the comprehensive and quarterly review assessments.

(3) The services provided or arranged by the facility, as outlined by the comprehensive care plan, must -

(i) Meet professional standards of quality.

(ii) Be provided by qualified persons in accordance with each resident's written plan of care.

(iii) Be culturally-competent and trauma-informed.

(c) Discharge planning - (1) Discharge planning process. The facility must develop and implement an effective discharge planning process that focuses on the resident's discharge goals, the preparation of residents to be active partners and effectively transition them to post-discharge care, and the reduction of factors leading to preventable readmissions. The facility's discharge planning process must be consistent with the discharge rights set forth at § 483.15(b) as applicable and -

(i) Ensure that the discharge needs of each resident are identified and result in the development of a discharge plan for each resident.

(ii) Include regular re-evaluation of residents to identify changes that require modification of the discharge plan. The discharge plan must be updated, as needed, to reflect these changes.

(iii) Involve the interdisciplinary team, as defined by § 483.21(b)(2)(ii), in the ongoing process of developing the discharge plan.

(iv) Consider caregiver/support person availability and the resident's or caregiver's/support person(s) capacity and capability to perform required care, as part of the identification of discharge needs.

(v) Involve the resident and resident representative in the development of the discharge plan and inform the resident and resident representative of the final plan.

(vi) Address the resident's goals of care and treatment preferences.

(vii) Document that a resident has been asked about their interest in receiving information regarding returning to the community.

(A) If the resident indicates an interest in returning to the community, the facility must document any referrals to local contact agencies or other appropriate entities made for this purpose.

(B) Facilities must update a resident's comprehensive care plan and discharge plan, as appropriate, in response to information received from referrals to local contact agencies or other appropriate entities.

(C) If discharge to the community is determined to not be feasible, the facility must document who made the determination and why.

(viii) For residents who are transferred to another SNF or who are discharged to a HHA, IRF, or LTCH, assist residents and their resident representatives in selecting a post-acute care provider by using data that includes, but is not limited to SNF, HHA, IRF, or LTCH standardized patient assessment data, data on quality measures, and data on resource use to the extent the data is available. The facility must ensure that the post-acute care standardized patient assessment data,

data on quality measures, and data on resource use is relevant and applicable to the resident's goals of care and treatment preferences.

(ix) Document, complete on a timely basis based on the resident's needs, and include in the clinical record, the evaluation of the resident's discharge needs and discharge plan. The results of the evaluation must be discussed with the resident or resident's representative. All relevant resident information must be incorporated into the discharge plan to facilitate its implementation and to avoid unnecessary delays in the resident's discharge or transfer.

(2) Discharge summary. When the facility anticipates discharge a resident must have a discharge summary that includes, but is not limited to, the following:

(i) A recapitulation of the resident's stay that includes, but is not limited to, diagnoses, course of illness/treatment or therapy, and pertinent lab, radiology, and consultation results.

(ii) A final summary of the resident's status to include items in paragraph (b)(1) of § 483.20, at the time of the discharge that is available for release to authorized persons and agencies, with the consent of the resident or resident's representative.

(iii) Reconciliation of all pre-discharge medications with the resident's post-discharge medications (both prescribed and over-the-counter).

(iv) A post-discharge plan of care that is developed with the participation of the resident and, with the resident's consent, the resident representative(s), which will assist the resident to adjust to his or her new living environment. The post-discharge plan of care must indicate where the individual plans to reside, any arrangements that have been made for the resident's follow up care and any post-discharge medical and non-medical services.

[81 FR 68858, Oct. 4, 2016]


## § 483.24 - Quality of life.

Quality of life is a fundamental principle that applies to all care and services provided to facility residents. Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care.

(a) Based on the comprehensive assessment of a resident and consistent with the resident's needs and choices, the facility must provide the necessary care and services to ensure that a resident's abilities in activities of daily living do not diminish unless circumstances of the individual's clinical condition demonstrate that such diminution was unavoidable. This includes the facility ensuring that:

(1) A resident is given the appropriate treatment and services to maintain or improve his or her ability to carry out the activities of daily living, including those specified in paragraph (b) of this section,

(2) A resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene, and

(3) Personnel provide basic life support, including CPR, to a resident requiring such emergency care prior to the arrival of emergency medical personnel and subject to related physician orders and the resident's advance directives.

(b) Activities of daily living. The facility must provide care and services in accordance with paragraph (a) of this section for the following activities of daily living:

(1) Hygiene - bathing, dressing, grooming, and oral care,

(2) Mobility - transfer and ambulation, including walking,

(3) Elimination - toileting,

(4) Dining - eating, including meals and snacks,

(5) Communication, including

(i) Speech,

(ii) Language,

(iii) Other functional communication systems.

(c) Activities. (1) The facility must provide, based on the comprehensive assessment and care plan and the preferences of each resident, an ongoing program to support residents in their choice of activities, both facility-sponsored group and individual activities and independent activities, designed to meet the interests of and support the physical, mental, and psychosocial well-being of each resident, encouraging both independence and interaction in the community.

(2) The activities program must be directed by a qualified professional who is a qualified therapeutic recreation specialist or an activities professional who -

(i) Is licensed or registered, if applicable, by the State in which practicing; and

(ii) Is:

(A) Eligible for certification as a therapeutic recreation specialist or as an activities professional by a recognized accrediting body on or after October 1, 1990; or

(B) Has 2 years of experience in a social or recreational program within the last 5 years, one of which was full-time in a therapeutic activities program; or

(C) Is a qualified occupational therapist or occupational therapy assistant; or

(D) Has completed a training course approved by the State.

[81 FR 68859, Oct. 4, 2016]


## § 483.25 - Quality of care.

Quality of care is a fundamental principle that applies to all treatment and care provided to facility residents. Based on the comprehensive assessment of a resident, the facility must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices, including but not limited to the following:

(a) Vision and hearing. To ensure that residents receive proper treatment and assistive devices to maintain vision and hearing abilities, the facility must, if necessary, assist the resident -

(1) In making appointments, and

(2) By arranging for transportation to and from the office of a practitioner specializing in the treatment of vision or hearing impairment or the office of a professional specializing in the provision of vision or hearing assistive devices.

(b) Skin integrity - (1) Pressure ulcers. Based on the comprehensive assessment of a resident, the facility must ensure that -

(i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable; and

(ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

(2) Foot care. To ensure that residents receive proper treatment and care to maintain mobility and good foot health, the facility must -

(i) Provide foot care and treatment, in accordance with professional standards of practice, including to prevent complications from the resident's medical condition(s) and

(ii) If necessary, assist the resident in making appointments with a qualified person, and arranging for transportation to and from such appointments.

(c) Mobility. (1) The facility must ensure that a resident who enters the facility without limited range of motion does not experience reduction in range of motion unless the resident's clinical condition demonstrates that a reduction in range of motion is unavoidable; and

(2) A resident with limited range of motion receives appropriate treatment and services to increase range of motion and/or to prevent further decrease in range of motion.

(3) A resident with limited mobility receives appropriate services, equipment, and assistance to maintain or improve mobility with the maximum practicable independence unless a reduction in mobility is demonstrably unavoidable.

(d) Accidents.The facility must ensure that -

(1) The resident environment remains as free of accident hazards as is possible; and

(2) Each resident receives adequate supervision and assistance devices to prevent accidents.

(e) Incontinence. (1) The facility must ensure that a resident who is continent of bladder and bowel on admission receives services and assistance to maintain continence unless his or her clinical condition is or becomes such that continence is not possible to maintain.

(2) For a resident with urinary incontinence, based on the resident's comprehensive assessment, the facility must ensure that -

(i) A resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary;

(ii) A resident who enters the facility with an indwelling catheter or subsequently receives one is assessed for removal of the catheter as soon as possible unless the resident's clinical condition demonstrates that catheterization is necessary, and

(iii) A resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore continence to the extent possible.

(3) For a resident with fecal incontinence, based on the resident's comprehensive assessment, the facility must ensure that a resident who is incontinent of bowel receives appropriate treatment and services to restore as much normal bowel function as possible.

(f) Colostomy, urostomy, or ileostomy care. The facility must ensure that residents who require colostomy, urostomy, or ileostomy services, receive such care consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences.

(g) Assisted nutrition and hydration. (Includes naso-gastric and gastrostomy tubes, both percutaneous endoscopic gastrostomy and percutaneous endoscopic jejunostomy, and enteral fluids). Based on a resident's comprehensive assessment, the facility must ensure that a resident -

(1) Maintains acceptable parameters of nutritional status, such as usual body weight or desirable body weight range and electrolyte balance, unless the resident's clinical condition demonstrates that this is not possible or resident preferences indicate otherwise;

(2) Is offered sufficient fluid intake to maintain proper hydration and health; and

(3) Is offered a therapeutic diet when there is a nutritional problem and the health care provider orders a therapeutic diet.

(4) A resident who has been able to eat enough alone or with assistance is not fed by enteral methods unless the resident's clinical condition demonstrates that enteral feeding was clinically indicated and consented to by the resident; and

(5) A resident who is fed by enteral means receives the appropriate treatment and services to restore, if possible, oral eating skills and to prevent complications of enteral feeding including but not limited to aspiration pneumonia, diarrhea, vomiting, dehydration, metabolic abnormalities, and nasal-pharyngeal ulcers.

(h) Parenteral fluids. Parenteral fluids must be administered consistent with professional standards of practice and in accordance with physician orders, the comprehensive person-centered care plan, and the resident's goals and preferences.

(i) Respiratory care, including tracheostomy care and tracheal suctioning. The facility must ensure that a resident who needs respiratory care, including tracheostomy care and tracheal suctioning, is provided such care, consistent with professional standards of practice, the comprehensive person-centered care plan, the residents' goals and preferences, and § 483.65 of this subpart.

(j) Prostheses. The facility must ensure that a resident who has a prosthesis is provided care and assistance, consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences, to wear and be able to use the prosthetic device.

(k) Pain management. The facility must ensure that pain management is provided to residents who require such services, consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences.

(l) Dialysis. The facility must ensure that residents who require dialysis receive such services, consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences.

(m) Trauma-informed care. The facility must ensure that residents who are trauma survivors receive culturally-competent, trauma-informed care in accordance with professional standards of practice and accounting for residents' experiences and preferences in order to eliminate or mitigate triggers that may cause re-traumatization of the resident.

(n) Bed rails. The facility must attempt to use appropriate alternatives prior to installing a side or bed rail. If a bed or side rail is used, the facility must ensure correct installation, use, and maintenance of bed rails, including but not limited to the following elements.

(1) Assess the resident for risk of entrapment from bed rails prior to installation.

(2) Review the risks and benefits of bed rails with the resident or resident representative and obtain informed consent prior to installation.

(3) Ensure that the bed's dimensions are appropriate for the resident's size and weight.

(4) Follow the manufacturers' recommendations and specifications for installing and maintaining bed rails.

[81 FR 68860, Oct. 4, 2016]

## § 483.30 - Physician services.

A physician must personally approve in writing a recommendation that an individual be admitted to a facility. Each resident must remain under the care of a physician. A physician, physician assistant, nurse practitioner, or clinical nurse specialist must provide orders for the resident's immediate care and needs.

(a) Physician supervision. The facility must ensure that -

(1) The medical care of each resident is supervised by a physician; and

(2) Another physician supervises the medical care of residents when their attending physician is unavailable.

(b) Physician visits. The physician must -

(1) Review the resident's total program of care, including medications and treatments, at each visit required by paragraph (c) of this section;

(2) Write, sign, and date progress notes at each visit; and

(3) Sign and date all orders with the exception of influenza and pneumococcal vaccines, which may be administered per physician-approved facility policy after an assessment for contraindications.

(c) Frequency of physician visits. (1) The resident must be seen by a physician at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter.

(2) A physician visit is considered timely if it occurs not later than 10 days after the date the visit was required.

(3) Except as provided in paragraphs (c)(4) and (f) of this section, all required physician visits must be made by the physician personally.

(4) At the option of the physician, required visits in SNFs after the initial visit may alternate between personal visits by the physician and visits by a physician assistant, nurse practitioner, or clinical nurse specialist in accordance with paragraph (e) of this section.

(d) Availability of physicians for emergency care. The facility must provide or arrange for the provision of physician services 24 hours a day, in case of an emergency.

(e) Physician delegation of tasks in SNFs. (1) Except as specified in paragraph (e)(4) of this section, a physician may delegate tasks to a physician assistant, nurse practitioner, or clinical nurse specialist who -

(i) Meets the applicable definition in § 491.2 of this chapter or, in the case of a clinical nurse specialist, is licensed as such by the State;

(ii) Is acting within the scope of practice as defined by State law; and

(iii) Is under the supervision of the physician.

(2) A resident's attending physician may delegate the task of writing dietary orders, consistent with § 483.60, to a qualified dietitian or other clinically qualified nutrition professional who -

(i) Is acting within the scope of practice as defined by State law; and

(ii) Is under the supervision of the physician.

(3) A resident's attending physician may delegate the task of writing therapy orders, consistent with § 483.65, to a qualified therapist who -

(i) Is acting within the scope of practice as defined by State law; and

(ii) Is under the supervision of the physician.

(4) A physician may not delegate a task when the regulations specify that the physician must perform it personally, or when the delegation is prohibited under State law or by the facility's own policies.

(f) Performance of physician tasks in NFs. At the option of the State, any required physician task in a NF (including tasks which the regulations specify must be performed personally by the physician) may also be satisfied when performed by a nurse practitioner, clinical nurse specialist, or physician assistant who is not an employee of the facility but who is working in collaboration with a physician.

[56 FR 48875, Sept. 26, 1991, as amended at 67 FR 61814, Oct. 2, 2002. Redesignated and amended at 81 FR 68861, Oct. 4, 2016]


## § 483.35 - Nursing services.

The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at § 483.70(e).

(a) Sufficient staff. (1) The facility must provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans:

(i) Except when waived under paragraph (e) of this section, licensed nurses; and

(ii) Other nursing personnel, including but not limited to nurse aides.

(2) Except when waived under paragraph (c) of this section, the facility must designate a licensed nurse to serve as a charge nurse on each tour of duty.

(3) The facility must ensure that licensed nurses have the specific competencies and skill sets necessary to care for residents' needs, as identified through resident assessments, and described in the plan of care.

(4) Providing care includes but is not limited to assessing, evaluating, planning and implementing resident care plans and responding to resident's needs.

(b) Registered nurse. (1) Except when waived under paragraph (e) or (f) of this section, the facility must use the services of a registered nurse for at least 8 consecutive hours a day, 7 days a week.

(2) Except when waived under paragraph (e) or (f) of this section, the facility must designate a registered nurse to serve as the director of nursing on a full time basis.

(3) The director of nursing may serve as a charge nurse only when the facility has an average daily occupancy of 60 or fewer residents.

(c) Proficiency of nurse aides. The facility must ensure that nurse aides are able to demonstrate competency in skills and techniques necessary to care for residents' needs, as identified through resident assessments, and described in the plan of care.

(d) Requirements for facility hiring and use of nursing aides - (1) General rule. A facility must not use any individual working in the facility as a nurse aide for more than 4 months, on a full-time basis, unless -

(i) That individual is competent to provide nursing and nursing related services; and

(ii)(A) That individual has completed a training and competency evaluation program, or a competency evaluation program approved by the State as meeting the requirements of §§ 483.151 through 483.154; or

(B) That individual has been deemed or determined competent as provided in § 483.150(a) and (b).

(2) Non-permanent employees. A facility must not use on a temporary, per diem, leased, or any basis other than a permanent employee any individual who does not meet the requirements in paragraphs (d)(1) (i) and (ii) of this section.

(3) Minimum competency. A facility must not use any individual who has worked less than 4 months as a nurse aide in that facility unless the individual -

(i) Is a full-time employee in a State-approved training and competency evaluation program;

(ii) Has demonstrated competence through satisfactory participation in a State-approved nurse aide training and competency evaluation program or competency evaluation program; or

(iii) Has been deemed or determined competent as provided in § 483.150(a) and (b).

(4) Registry verification. Before allowing an individual to serve as a nurse aide, a facility must receive registry verification that the individual has met competency evaluation requirements unless -

(i) The individual is a full-time employee in a training and competency evaluation program approved by the State; or

(ii) The individual can prove that he or she has recently successfully completed a training and competency evaluation program or competency evaluation program approved by the State and has

not yet been included in the registry. Facilities must follow up to ensure that such an individual actually becomes registered.

(5) Multi-State registry verification. Before allowing an individual to serve as a nurse aide, a facility must seek information from every State registry established under sections 1819(e)(2)(A) or 1919(e)(2)(A) of the Act that the facility believes will include information on the individual.

(6) Required retraining. If, since an individual's most recent completion of a training and competency evaluation program, there has been a continuous period of 24 consecutive months during none of which the individual provided nursing or nursing-related services for monetary compensation, the individual must complete a new training and competency evaluation program or a new competency evaluation program.

(7) Regular in-service education. The facility must complete a performance review of every nurse aide at least once every 12 months, and must provide regular in-service education based on the outcome of these reviews. In-service training must comply with the requirements of § 483.95(g).

(e) Nursing facilities: Waiver of requirement to provide licensed nurses on a 24-hour basis. To the extent that a facility is unable to meet the requirements of paragraphs (a)(2) and (b)(1) of this section, a State may waive such requirements with respect to the facility if -

(1) The facility demonstrates to the satisfaction of the State that the facility has been unable, despite diligent efforts (including offering wages at the community prevailing rate for nursing facilities), to recruit appropriate personnel;

(2) The State determines that a waiver of the requirement will not endanger the health or safety of individuals staying in the facility;

(3) The State finds that, for any periods in which licensed nursing services are not available, a registered nurse or a physician is obligated to respond immediately to telephone calls from the facility;

(4) A waiver granted under the conditions listed in paragraph (c) of this section is subject to annual State review;

(5) In granting or renewing a waiver, a facility may be required by the State to use other qualified, licensed personnel;

(6) The State agency granting a waiver of such requirements provides notice of the waiver to the Office of the State Long-Term Care Ombudsman (established under section 712 of the Older Americans Act of 1965) and the protection and advocacy system in the State for individuals with a mental disorder who are eligible for such services as provided by the protection and advocacy agency; and

(7) The nursing facility that is granted such a waiver by a State notifies residents of the facility and their resident representatives of the waiver.

(f) SNFs: Waiver of the requirement to provide services of a registered nurse for more than 40 hours a week. (1) The Secretary may waive the requirement that a SNF provide the services of a registered nurse for more than 40 hours a week, including a director of nursing specified in paragraph (b) of this section, if the Secretary finds that -

(i) The facility is located in a rural area and the supply of skilled nursing facility services in the area is not sufficient to meet the needs of individuals residing in the area;

(ii) The facility has one full-time registered nurse who is regularly on duty at the facility 40 hours a week; and

(iii) The facility either -

(A) Has only patients whose physicians have indicated (through physicians' orders or admission notes) that they do not require the services of a registered nurse or a physician for a 48-hours period, or

(B) Has made arrangements for a registered nurse or a physician to spend time at the facility, as determined necessary by the physician, to provide necessary skilled nursing services on days when the regular full-time registered nurse is not on duty;

(iv) The Secretary provides notice of the waiver to the Office of the State Long-Term Care Ombudsman (established under section 712 of the Older Americans Act of 1965) and the protection and advocacy system in the State for individuals with developmental disabilities or mental disorders; and

(v) The facility that is granted such a waiver notifies residents of the facility and their resident representatives of the waiver.

(2) A waiver of the registered nurse requirement under paragraph (d)(1) of this section is subject to annual renewal by the Secretary.

(g) Nurse staffing information - (1) Data requirements. The facility must post the following information on a daily basis:

(i) Facility name.

(ii) The current date.

(iii) The total number and the actual hours worked by the following categories of licensed and unlicensed nursing staff directly responsible for resident care per shift:

(A) Registered nurses.

(B) Licensed practical nurses or licensed vocational nurses (as defined under State law).

(C) Certified nurse aides.

(iv) Resident census.

(2) Posting requirements. (i) The facility must post the nurse staffing data specified in paragraph (e)(1) of this section on a daily basis at the beginning of each shift.

(ii) Data must be posted as follows:

(A) Clear and readable format.

(B) In a prominent place readily accessible to residents and visitors.

(3) Public access to posted nurse staffing data. The facility must, upon oral or written request, make nurse staffing data available to the public for review at a cost not to exceed the community standard.

(4) Facility data retention requirements. The facility must maintain the posted daily nurse staffing data for a minimum of 18 months, or as required by State law, whichever is greater.

[56 FR 48873, Sept. 26, 1991, as amended at 57 FR 43925, Sept. 23, 1992; 70 FR 62073, Oct. 28, 2005. Redesignated and amended at 81 FR 68861, Oct. 4, 2016]


**§ 483.40 - Behavioral health services.**
Each resident must receive and the facility must provide the necessary behavioral health care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care. Behavioral health encompasses a resident's whole emotional and mental well-being, which includes, but is not limited to, the prevention and treatment of mental and substance use disorders.

(a) The facility must have sufficient staff who provide direct services to residents with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with § 483.70(e). These competencies and skills sets include, but are not limited to, knowledge of and appropriate training and supervision for:

(1) Caring for residents with mental and psychosocial disorders, as well as residents with a history of trauma and/or post-traumatic stress disorder, that have been identified in the facility assessment conducted pursuant to § 483.70(e), and

(2) Implementing non-pharmacological interventions.

(b) Based on the comprehensive assessment of a resident, the facility must ensure that -

(1) A resident who displays or is diagnosed with mental disorder or psychosocial adjustment difficulty, or who has a history of trauma and/or post-traumatic stress disorder, receives appropriate treatment and services to correct the assessed problem or to attain the highest practicable mental and psychosocial well-being;

(2) A resident whose assessment did not reveal or who does not have a diagnosis of a mental or psychosocial adjustment difficulty or a documented history of trauma and/or post-traumatic stress disorder does not display a pattern of decreased social interaction and/or increased withdrawn, angry, or depressive behaviors, unless the resident's clinical condition demonstrates that development of such a pattern was unavoidable; and

(3) A resident who displays or is diagnosed with dementia, receives the appropriate treatment and services to attain or maintain his or her highest practicable physical, mental, and psychosocial well-being.

(c) If rehabilitative services such as but not limited to physical therapy, speech-language pathology, occupational therapy, and rehabilitative services for mental disorders and intellectual disability, are required in the resident's comprehensive plan of care, the facility must -

(1) Provide the required services, including specialized rehabilitation services as required in § 483.65; or

(2) Obtain the required services from an outside resource (in accordance with § 483.70(g) of this part) from a Medicare and/or Medicaid provider of specialized rehabilitative services.

(d) The facility must provide medically-related social services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident.

[81 FR 68862, Oct. 4, 2016]


### § 483.45 - Pharmacy services.
The facility must provide routine and emergency drugs and biologicals to its residents, or obtain them under an agreement described in § 483.70(g). The facility may permit unlicensed personnel to administer drugs if State law permits, but only under the general supervision of a licensed nurse.

(a) Procedures. A facility must provide pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident.

(b) Service consultation. The facility must employ or obtain the services of a licensed pharmacist who -

(1) Provides consultation on all aspects of the provision of pharmacy services in the facility;

(2) Establishes a system of records of receipt and disposition of all controlled drugs in sufficient detail to enable an accurate reconciliation; and

(3) Determines that drug records are in order and that an account of all controlled drugs is maintained and periodically reconciled.

(c) Drug regimen review. (1) The drug regimen of each resident must be reviewed at least once a month by a licensed pharmacist.

(2) This review must include a review of the resident's medical chart.

(3) A psychotropic drug is any drug that affects brain activities associated with mental processes and behavior. These drugs include, but are not limited to, drugs in the following categories:

(i) Anti-psychotic;

(ii) Anti-depressant;

(iii) Anti-anxiety; and

(iv) Hypnotic.

(4) The pharmacist must report any irregularities to the attending physician and the facility's medical director and director of nursing, and these reports must be acted upon.

(i) Irregularities include, but are not limited to, any drug that meets the criteria set forth in paragraph (d) of this section for an unnecessary drug.

(ii) Any irregularities noted by the pharmacist during this review must be documented on a separate, written report that is sent to the attending physician and the facility's medical director and director of nursing and lists, at a minimum, the resident's name, the relevant drug, and the irregularity the pharmacist identified.

(iii) The attending physician must document in the resident's medical record that the identified irregularity has been reviewed and what, if any, action has been taken to address it. If there is to be

no change in the medication, the attending physician should document his or her rationale in the resident's medical record.

(5) The facility must develop and maintain policies and procedures for the monthly drug regimen review that include, but are not limited to, time frames for the different steps in the process and steps the pharmacist must take when he or she identifies an irregularity that requires urgent action to protect the resident.

(d) Unnecessary drugs - General. Each resident's drug regimen must be free from unnecessary drugs. An unnecessary drug is any drug when used -

(1) In excessive dose (including duplicate drug therapy); or

(2) For excessive duration; or

(3) Without adequate monitoring; or

(4) Without adequate indications for its use; or

(5) In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or

(6) Any combinations of the reasons stated in paragraphs (d)(1) through (5) of this section.

(e) Psychotropic drugs. Based on a comprehensive assessment of a resident, the facility must ensure that -

(1) Residents who have not used psychotropic drugs are not given these drugs unless the medication is necessary to treat a specific condition as diagnosed and documented in the clinical record;

(2) Residents who use psychotropic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs;

(3) Residents do not receive psychotropic drugs pursuant to a PRN order unless that medication is necessary to treat a diagnosed specific condition that is documented in the clinical record; and

(4) PRN orders for psychotropic drugs are limited to 14 days. Except as provided in § 483.45(e)(5), if the attending physician or prescribing practitioner believes that it is appropriate for the PRN order to be extended beyond 14 days, he or she should document their rationale in the resident's medical record and indicate the duration for the PRN order.

(5) PRN orders for anti-psychotic drugs are limited to 14 days and cannot be renewed unless the attending physician or prescribing practitioner evaluates the resident for the appropriateness of that medication.

(f) Medication errors. The facility must ensure that its -

(1) Medication error rates are not 5 percent or greater; and

(2) Residents are free of any significant medication errors.

(g) Labeling of drugs and biologicals. Drugs and biologicals used in the facility must be labeled in accordance with currently accepted professional principles, and include the appropriate accessory and cautionary instructions, and the expiration date when applicable.

(h) Storage of drugs and biologicals. (1) In accordance with State and Federal laws, the facility must store all drugs and biologicals in locked compartments under proper temperature controls, and permit only authorized personnel to have access to the keys.

(2) The facility must provide separately locked, permanently affixed compartments for storage of controlled drugs listed in Schedule II of the Comprehensive Drug Abuse Prevention and Control Act of 1976 and other drugs subject to abuse, except when the facility uses single unit package drug distribution systems in which the quantity stored is minimal and a missing dose can be readily detected.

[56 FR 48875, Sept. 26, 1991, as amended at 57 FR 43925, Sept. 23, 1992. Redesignated and amended at 81 FR 68861, 68863, Oct. 4, 2016; 82 FR 32259, July 13, 2017]


**§ 483.50 - Laboratory, radiology, and other diagnostic services.**
(a) Laboratory services. (1) The facility must provide or obtain laboratory services to meet the needs of its residents. The facility is responsible for the quality and timeliness of the services.

(i) If the facility provides its own laboratory services, the services must meet the applicable requirements for laboratories specified in part 493 of this chapter.

(ii) If the facility provides blood bank and transfusion services, it must meet the applicable requirements for laboratories specified in part 493 of this chapter.

(iii) If the laboratory chooses to refer specimens for testing to another laboratory, the referral laboratory must be certified in the appropriate specialties and subspecialties of services in accordance with the requirements of part 493 of this chapter.

(iv) If the facility does not provide laboratory services on site, it must have an agreement to obtain these services from a laboratory that meets the applicable requirements of part 493 of this chapter.

(2) The facility must:

(i) Provide or obtain laboratory services only when ordered by a physician; physician assistant; nurse practitioner or clinical nurse specialist in accordance with State law, including scope of practice laws.

(ii) Promptly notify the ordering physician, physician assistant, nurse practitioner, or clinical nurse specialist of laboratory results that fall outside of clinical reference ranges in accordance with facility policies and procedures for notification of a practitioner or per the ordering physician's orders.

(iii) Assist the resident in making transportation arrangements to and from the source of service, if the resident needs assistance; and

(iv) File in the resident's clinical record laboratory reports that are dated and contain the name and address of the testing laboratory.

(b) Radiology and other diagnostic services. (1) The facility must provide or obtain radiology and other diagnostic services to meet the needs of its residents. The facility is responsible for the quality and timeliness of the services.

(i) If the facility provides its own diagnostic services, the services must meet the applicable conditions of participation for hospitals contained in § 482.26 of this subchapter.

(ii) If the facility does not provide its own diagnostic services, it must have an agreement to obtain these services from a provider or supplier that is approved to provide these services under Medicare.

(2) The facility must:

(i) Provide or obtain radiology and other diagnostic services only when ordered by a physician; physician assistant; nurse practitioner or clinical nurse specialist in accordance with State law, including scope of practice laws.

(ii) Promptly notify the ordering physician, physician assistant, nurse practitioner, or clinical nurse specialist of results that fall outside of clinical reference ranges in accordance with facility policies and procedures for notification of a practitioner or per the ordering physician's orders.

(iii) Assist the resident in making transportation arrangements to and from the source of service, if the resident needs assistance; and

(iv) File in the resident's clinical record signed and dated reports of x-ray and other diagnostic services.

[81 FR 68863, Oct. 4, 2016, as amended at 82 FR 32259, July 13, 2017]

**§ 483.55 - Dental services.**
The facility must assist residents in obtaining routine and 24-hour emergency dental care.

(a) Skilled nursing facilities. A facility (1) Must provide or obtain from an outside resource, in accordance with § 483.70(g), routine and emergency dental services to meet the needs of each resident;

(2) May charge a Medicare resident an additional amount for routine and emergency dental services;

(3) Must have a policy identifying those circumstances when the loss or damage of dentures is the facility's responsibility and may not charge a resident for the loss or damage of dentures determined in accordance with facility policy to be the facility's responsibility;

(4) Must if necessary or if requested, assist the resident -

(i) In making appointments; and

(ii) By arranging for transportation to and from the dental services location; and

(5) Must promptly, within 3 days, refer residents with lost or damaged dentures for dental services. If a referral does not occur within 3 days, the facility must provide documentation of what they did to ensure the resident could still eat and drink adequately while awaiting dental services and the extenuating circumstances that led to the delay.

(b) Nursing facilities. The facility (1) Must provide or obtain from an outside resource, in accordance with § 483.70(g), the following dental services to meet the needs of each resident:

(i) Routine dental services (to the extent covered under the State plan); and

(ii) Emergency dental services;

(2) Must, if necessary or if requested, assist the resident -

(i) In making appointments; and

(ii) By arranging for transportation to and from the dental services locations;

(3) Must promptly, within 3 days, refer residents with lost or damaged dentures for dental services. If a referral does not occur within 3 days, the facility must provide documentation of what they did to ensure the resident could still eat and drink adequately while awaiting dental services and the extenuating circumstances that led to the delay;

(4) Must have a policy identifying those circumstances when the loss or damage of dentures is the facility's responsibility and may not charge a resident for the loss or damage of dentures determined in accordance with facility policy to be the facility's responsibility; and

(5) Must assist residents who are eligible and wish to participate to apply for reimbursement of dental services as an incurred medical expense under the State plan.

[56 FR 48875, Sept. 26, 1991, as amended at 81 FR 68864, Oct. 4, 2016]


## § 483.60 - Food and nutrition services.
The facility must provide each resident with a nourishing, palatable, well-balanced diet that meets his or her daily nutritional and special dietary needs, taking into consideration the preferences of each resident.

(a) Staffing. The facility must employ sufficient staff with the appropriate competencies and skills sets to carry out the functions of the food and nutrition service, taking into consideration resident assessments, individual plans of care and the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at § 483.70(e). This includes:

(1) A qualified dietitian or other clinically qualified nutrition professional either full-time, part-time, or on a consultant basis. A qualified dietitian or other clinically qualified nutrition professional is one who -

(i) Holds a bachelor's or higher degree granted by a regionally accredited college or university in the United States (or an equivalent foreign degree) with completion of the academic requirements of a program in nutrition or dietetics accredited by an appropriate national accreditation organization recognized for this purpose.

(ii) Has completed at least 900 hours of supervised dietetics practice under the supervision of a registered dietitian or nutrition professional.

(iii) Is licensed or certified as a dietitian or nutrition professional by the State in which the services are performed. In a state that does not provide for licensure or certification, the individual will be deemed to have met this requirement if he or she is recognized as a "registered dietitian" by the Commission on Dietetic Registration or its successor organization, or meets the requirements of paragraphs (a)(1)(i) and (ii) of this section.

(iv) For dietitians hired or contracted with prior to November 28, 2016, meets these requirements no later than 5 years after November 28, 2016 or as required by state law.

(2) If a qualified dietitian or other clinically qualified nutrition professional is not employed full-time, the facility must designate a person to serve as the director of food and nutrition services who -

(i) For designations prior to November 28, 2016, meets the following requirements no later than 5 years after November 28, 2016, or no later than 1 year after November 28, 2016 for designations after November 28, 2016, is:

(A) A certified dietary manager; or

(B) A certified food service manager, or

(C) Has similar national certification for food service management and safety from a national certifying body; or

(D) Has an associate's or higher degree in food service management or in hospitality, if the course study includes food service or restaurant management, from an accredited institution of higher learning; and

(ii) In States that have established standards for food service managers or dietary managers, meets State requirements for food service managers or dietary managers, and

(iii) Receives frequently scheduled consultations from a qualified dietitian or other clinically qualified nutrition professional.

(3) Support staff. The facility must provide sufficient support personnel to safely and effectively carry out the functions of the food and nutrition service.

(b) A member of the Food and Nutrition Services staff must participate on the interdisciplinary team as required in § 483.21(b)(2)(ii).

(c) Menus and nutritional adequacy. Menus must -

(1) Meet the nutritional needs of residents in accordance with established national guidelines.;

(2) Be prepared in advance;

(3) Be followed;

(4) Reflect, based on a facility's reasonable efforts, the religious, cultural, and ethnic needs of the resident population, as well as input received from residents and resident groups;

(5) Be updated periodically;

(6) Be reviewed by the facility's dietitian or other clinically qualified nutrition professional for nutritional adequacy; and

(7) Nothing in this paragraph should be construed to limit the resident's right to make personal dietary choices.

(d) Food and drink. Each resident receives and the facility provides -

(1) Food prepared by methods that conserve nutritive value, flavor, and appearance;

(2) Food and drink that is palatable, attractive, and at a safe and appetizing temperature;

(3) Food prepared in a form designed to meet individual needs;

(4) Food that accommodates resident allergies, intolerances, and preferences;

(5) Appealing options of similar nutritive value to residents who choose not to eat food that is initially served or who request a different meal choice; and

(6) Drinks, including water and other liquids consistent with resident needs and preferences and sufficient to maintain resident hydration.

(e) Therapeutic diets. (1) Therapeutic diets must be prescribed by the attending physician.

(2) The attending physician may delegate to a registered or licensed dietitian the task of prescribing a resident's diet, including a therapeutic diet, to the extent allowed by State law.

(f) Frequency of meals. (1) Each resident must receive and the facility must provide at least three meals daily, at regular times comparable to normal mealtimes in the community or in accordance with resident needs, preferences, requests, and plan of care.

(2) There must be no more than 14 hours between a substantial evening meal and breakfast the following day, except when a nourishing snack is served at bedtime, up to 16 hours may elapse between a substantial evening meal and breakfast the following day if a resident group agrees to this meal span.

(3) Suitable, nourishing alternative meals and snacks must be provided to residents who want to eat at non-traditional times or outside of scheduled meal service times, consistent with the resident plan of care.

(g) Assistive devices. The facility must provide special eating equipment and utensils for residents who need them and appropriate assistance to ensure that the resident can use the assistive devices when consuming meals and snacks.

(h) Paid feeding assistants - (1) State-approved training course. A facility may use a paid feeding assistant, as defined in § 488.301 of this chapter, if -

(i) The feeding assistant has successfully completed a State-approved training course that meets the requirements of § 483.160 before feeding residents; and

(ii) The use of feeding assistants is consistent with State law.

(2) Supervision. (i) A feeding assistant must work under the supervision of a registered nurse (RN) or licensed practical nurse (LPN).

(ii) In an emergency, a feeding assistant must call a supervisory nurse for help.

(3) Resident selection criteria. (i) A facility must ensure that a feeding assistant provides dining assistance only for residents who have no complicated feeding problems.

(ii) Complicated feeding problems include, but are not limited to, difficulty swallowing, recurrent lung aspirations, and tube or parenteral/IV feedings.

(iii) The facility must base resident selection on the interdisciplinary team's assessment and the resident's latest assessment and plan of care. Appropriateness for this program should be reflected in the comprehensive care plan.

(i) Food safety requirements. The facility must -

(1) Procure food from sources approved or considered satisfactory by federal, state, or local authorities;

(i) This may include food items obtained directly from local producers, subject to applicable State and local laws or regulations.

(ii) This provision does not prohibit or prevent facilities from using produce grown in facility gardens, subject to compliance with applicable safe growing and food-handling practices.

(iii) This provision does not preclude residents from consuming foods not procured by the facility.

(2) Store, prepare, distribute, and serve food in accordance with professional standards for food service safety.

(3) Have a policy regarding use and storage of foods brought to residents by family and other visitors to ensure safe and sanitary storage, handling, and consumption, and

(4) Dispose of garbage and refuse properly.

[81 FR 68864, Oct. 4, 2016]

## § 483.65 - Specialized rehabilitative services.

(a) Provision of services. If specialized rehabilitative services such as but not limited to physical therapy, speech-language pathology, occupational therapy, respiratory therapy, and rehabilitative services for a mental disorder and intellectual disability or services of a lesser intensity as set forth at § 483.120(c), are required in the resident's comprehensive plan of care, the facility must -

(1) Provide the required services; or

(2) In accordance with § 483.70(g), obtain the required services from an outside resource that is a provider of specialized rehabilitative services and is not excluded from participating in any federal or state health care programs pursuant to section 1128 and 1156 of the Act.

(b) Qualifications. Specialized rehabilitative services must be provided under the written order of a physician by qualified personnel.

[56 FR 48875, Sept. 26, 1991, as amended at 57 FR 43925, Sept. 23, 1992. Redesignated and amended at 81 FR 68861, 68865, Oct. 4, 2016]


## § 483.70 - Administration.

A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.

(a) Licensure. A facility must be licensed under applicable State and local law.

(b) Compliance with Federal, State, and local laws and professional standards. The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

(c) Relationship to other HHS regulations. In addition to compliance with the regulations set forth in this subpart, facilities are obliged to meet the applicable provisions of other HHS regulations, including but not limited to those pertaining to nondiscrimination on the basis of race, color, or national origin (45 CFR part 80); nondiscrimination on the basis of disability (45 CFR part 84); nondiscrimination on the basis of age (45 CFR part 91); nondiscrimination on the basis of race, color, national origin, sex, age, or disability (45 CFR part 92); protection of human subjects of research (45 CFR part 46); and fraud and abuse (42 CFR part 455) and protection of individually identifiable health information (45 CFR parts 160 and 164). Violations of such other provisions may result in a finding of non-compliance with this paragraph.

(d) Governing body. (1) The facility must have a governing body, or designated persons functioning as a governing body, that is legally responsible for establishing and implementing policies regarding the management and operation of the facility; and

(2) The governing body appoints the administrator who is -

(i) Licensed by the State, where licensing is required;

(ii) Responsible for management of the facility; and

(iii) Reports to and is accountable to the governing body.

(3) The governing body is responsible and accountable for the QAPI program, in accordance with § 483.75(f).

(e) Facility assessment. The facility must conduct and document a facility-wide assessment to determine what resources are necessary to care for its residents competently during both day-to-day operations and emergencies. The facility must review and update that assessment, as necessary, and at least annually. The facility must also review and update this assessment whenever there is, or the facility plans for, any change that would require a substantial modification to any part of this assessment. The facility assessment must address or include:

(1) The facility's resident population, including, but not limited to,

(i) Both the number of residents and the facility's resident capacity;

(ii) The care required by the resident population considering the types of diseases, conditions, physical and cognitive disabilities, overall acuity, and other pertinent facts that are present within that population;

(iii) The staff competencies that are necessary to provide the level and types of care needed for the resident population;

(iv) The physical environment, equipment, services, and other physical plant considerations that are necessary to care for this population; and
(v) Any ethnic, cultural, or religious factors that may potentially affect the care provided by the facility, including, but not limited to, activities and food and nutrition services.

(2) The facility's resources, including but not limited to,

(i) All buildings and/or other physical structures and vehicles;

(ii) Equipment (medical and non-medical);

(iii) Services provided, such as physical therapy, pharmacy, and specific rehabilitation therapies;

(iv) All personnel, including managers, staff (both employees and those who provide services under contract), and volunteers, as well as their education and/or training and any competencies related to resident care;

(v) Contracts, memorandums of understanding, or other agreements with third parties to provide services or equipment to the facility during both normal operations and emergencies; and

(vi) Health information technology resources, such as systems for electronically managing patient records and electronically sharing information with other organizations.

(3) A facility-based and community-based risk assessment, utilizing an all-hazards approach.

(f) Staff qualifications. (1) The facility must employ on a full-time, part-time or consultant basis those professionals necessary to carry out the provisions of these requirements.

(2) Professional staff must be licensed, certified, or registered in accordance with applicable State laws.

(g) Use of outside resources. (1) If the facility does not employ a qualified professional person to furnish a specific service to be provided by the facility, the facility must have that service furnished to residents by a person or agency outside the facility under an arrangement described in section 1861(w) of the Act or (with respect to services furnished to NF residents and dental services furnished to SNF residents) an agreement described in paragraph (g)(2) of this section.

(2) Arrangements as described in section 1861(w) of the Act or agreements pertaining to services furnished by outside resources must specify in writing that the facility assumes responsibility for -

(i) Obtaining services that meet professional standards and principles that apply to professionals providing services in such a facility; and

(ii) The timeliness of the services.

(h) Medical director. (1) The facility must designate a physician to serve as medical director.

(2) The medical director is responsible for -

(i) Implementation of resident care policies; and

(ii) The coordination of medical care in the facility.

(i) Medical records. (1) In accordance with accepted professional standards and practices, the facility must maintain medical records on each resident that are -

(i) Complete;

(ii) Accurately documented;

(iii) Readily accessible; and

(iv) Systematically organized.

(2) The facility must keep confidential all information contained in the resident's records, regardless of the form or storage method of the records, except when release is -

(i) To the individual, or their resident representative where permitted by applicable law;

(ii) Required by law;

(iii) For treatment, payment, or health care operations, as permitted by and in compliance with 45 CFR 164.506;

(iv) For public health activities, reporting of abuse, neglect, or domestic violence, health oversight activities, judicial and administrative proceedings, law enforcement purposes, organ donation purposes, research purposes, or to coroners, medical examiners, funeral directors, and to avert a serious threat to health or safety as permitted by and in compliance with 45 CFR 164.512.

(3) The facility must safeguard medical record information against loss, destruction, or unauthorized use;

(4) Medical records must be retained for -

(i) The period of time required by State law; or

(ii) Five years from the date of discharge when there is no requirement in State law; or

(iii) For a minor, 3 years after a resident reaches legal age under State law.

(5) The medical record must contain -

(i) Sufficient information to identify the resident;

(ii) A record of the resident's assessments;

(iii) The comprehensive plan of care and services provided;

(iv) The results of any preadmission screening and resident review evaluations and determinations conducted by the State;

(v) Physician's, nurse's, and other licensed professional's progress notes; and

(vi) Laboratory, radiology and other diagnostic services reports as required under § 483.50.

(j) Transfer agreement. (1) In accordance with section 1861(l) of the Act, the facility (other than a nursing facility which is located in a State on an Indian reservation) must have in effect a written transfer agreement with one or more hospitals approved for participation under the Medicare and Medicaid programs that reasonably assures that -

(i) Residents will be transferred from the facility to the hospital, and ensured of timely admission to the hospital when transfer is medically appropriate as determined by the attending physician or, in an emergency situation, by another practitioner in accordance with facility policy and consistent with state law; and

(ii) Medical and other information needed for care and treatment of residents and, when the transferring facility deems it appropriate, for determining whether such residents can receive appropriate services or receive services in a less restrictive setting than either the facility or the hospital, or reintegrated into the community, will be exchanged between the providers, including but not limited to the information required under § 483.15(c)(2)(iii).

(2) The facility is considered to have a transfer agreement in effect if the facility has attempted in good faith to enter into an agreement with a hospital sufficiently close to the facility to make transfer feasible.

(k) Disclosure of ownership. (1) The facility must comply with the disclosure requirements of §§ 420.206 and 455.104 of this chapter.

(2) The facility must provide written notice to the State agency responsible for licensing the facility at the time of change, if a change occurs in -

(i) Persons with an ownership or control interest, as defined in §§ 420.201 and 455.101 of this chapter;

(ii) The officers, directors, agents, or managing employees;

(iii) The corporation, association, or other company responsible for the management of the facility; or

(iv) The facility's administrator or director of nursing.

(3) The notice specified in paragraph (k)(2) of this section must include the identity of each new individual or company.

(l) Facility closure-Administrator. Any individual who is the administrator of the facility must:

(1) Submit to the State Survey Agency, the State LTC ombudsman, residents of the facility, and the legal representatives of such residents or other responsible parties, written notification of an impending closure:

(i) At least 60 days prior to the date of closure; or

(ii) In the case of a facility where the Secretary or a State terminates the facility's participation in the Medicare and/or Medicaid programs, not later than the date that the Secretary determines appropriate;

(2) Ensure that the facility does not admit any new residents on or after the date on which such written notification is submitted; and

(3) Include in the notice the plan, that has been approved by the State, for the transfer and adequate relocation of the residents of the facility by a date that would be specified by the State prior to closure, including assurances that the residents would be transferred to the most appropriate facility or other setting in terms of quality, services, and location, taking into consideration the needs, choice, and best interests of each resident.

(m) Facility closure. The facility must have in place policies and procedures to ensure that the administrator's duties and responsibilities involve providing the appropriate notices in the event of a facility closure, as required at paragraph (l) of this section.

(n) Binding arbitration agreements. If a facility chooses to ask a resident or his or her representative to enter into an agreement for binding arbitration, the facility must comply with all of the requirements in this section.

(1) The facility must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility and must explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility.

(2) The facility must ensure that:

(i) The agreement is explained to the resident and his or her representative in a form and manner that he or she understands, including in a language the resident and his or her representative understands;

(ii) The resident or his or her representative acknowledges that he or she understands the agreement;

(iii) The agreement provides for the selection of a neutral arbitrator agreed upon by both parties; and

(iv) The agreement provides for the selection of a venue that is convenient to both parties.

(3) The agreement must explicitly grant the resident or his or her representative the right to rescind the agreement within 30 calendar days of signing it.

(4) The agreement must explicitly state that neither the resident nor his or her representative is required to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility.

(5) The agreement may not contain any language that prohibits or discourages the resident or anyone else from communicating with federal, state, or local officials, including but not limited to, federal and state surveyors, other federal or state health department employees, and representatives of the Office of the State Long-Term Care Ombudsman, in accordance with § 483.10(k).

(6) When the facility and a resident resolve a dispute through arbitration, a copy of the signed agreement for binding arbitration and the arbitrator's final decision must be retained by the facility for 5 years after the resolution of that dispute on and be available for inspection upon request by CMS or its designee.

(o) Hospice services. (1) A long-term care (LTC) facility may do either of the following:

(i) Arrange for the provision of hospice services through an agreement with one or more Medicare-certified hospices.

(ii) Not arrange for the provision of hospice services at the facility through an agreement with a Medicare-certified hospice and assist the resident in transferring to a facility that will arrange for the provision of hospice services when a resident requests a transfer.

(2) If hospice care is furnished in an LTC facility through an agreement as specified in paragraph (o)(1)(i) of this section with a hospice, the LTC facility must meet the following requirements:

(i) Ensure that the hospice services meet professional standards and principles that apply to individuals providing services in the facility, and to the timeliness of the services.

(ii) Have a written agreement with the hospice that is signed by an authorized representative of the hospice and an authorized representative of the LTC facility before hospice care is furnished to any resident. The written agreement must set out at least the following:

(A) The services the hospice will provide.

(B) The hospice's responsibilities for determining the appropriate hospice plan of care as specified in § 418.112 (d) of this chapter.

(C) The services the LTC facility will continue to provide, based on each resident's plan of care.

(D) A communication process, including how the communication will be documented between the LTC facility and the hospice provider, to ensure that the needs of the resident are addressed and met 24 hours per day.

(E) A provision that the LTC facility immediately notifies the hospice about the following:

(1) A significant change in the resident's physical, mental, social, or emotional status.

(2) Clinical complications that suggest a need to alter the plan of care.

(3) A need to transfer the resident from the facility for any condition.

(4) The resident's death.

(F) A provision stating that the hospice assumes responsibility for determining the appropriate course of hospice care, including the determination to change the level of services provided.

(G) An agreement that it is the LTC facility's responsibility to furnish 24-hour room and board care, meet the resident's personal care and nursing needs in coordination with the hospice representative, and ensure that the level of care provided is appropriately based on the individual resident's needs.

(H) A delineation of the hospice's responsibilities, including but not limited to, providing medical direction and management of the patient; nursing; counseling (including spiritual, dietary, and bereavement); social work; providing medical supplies, durable medical equipment, and drugs necessary for the palliation of pain and symptoms associated with the terminal illness and related conditions; and all other hospice services that are necessary for the care of the resident's terminal illness and related conditions.

(I) A provision that when the LTC facility personnel are responsible for the administration of prescribed therapies, including those therapies determined appropriate by the hospice and delineated in the hospice plan of care, the LTC facility personnel may administer the therapies where permitted by State law and as specified by the LTC facility.

(J) A provision stating that the LTC facility must report all alleged violations involving mistreatment, neglect, or verbal, mental, sexual, and physical abuse, including injuries of unknown source, and misappropriation of patient property by hospice personnel, to the hospice administrator immediately when the LTC facility becomes aware of the alleged violation.

(K) A delineation of the responsibilities of the hospice and the LTC facility to provide bereavement services to LTC facility staff.

(3) Each LTC facility arranging for the provision of hospice care under a written agreement must designate a member of the facility's interdisciplinary team who is responsible for working with hospice representatives to coordinate care to the resident provided by the LTC facility staff and

hospice staff. The interdisciplinary team member must have a clinical background, function within their State scope of practice act, and have the ability to assess the resident or have access to someone that has the skills and capabilities to assess the resident. The designated interdisciplinary team member is responsible for the following:

(i) Collaborating with hospice representatives and coordinating LTC facility staff participation in the hospice care planning process for those residents receiving these services.

(ii) Communicating with hospice representatives and other healthcare providers participating in the provision of care for the terminal illness, related conditions, and other conditions, to ensure quality of care for the patient and family.

(iii) Ensuring that the LTC facility communicates with the hospice medical director, the patient's attending physician, and other practitioners participating in the provision of care to the patient as needed to coordinate the hospice care with the medical care provided by other physicians.

(iv) Obtaining the following information from the hospice:

(A) The most recent hospice plan of care specific to each patient.

(B) Hospice election form.

(C) Physician certification and recertification of the terminal illness specific to each patient.

(D) Names and contact information for hospice personnel involved in hospice care of each patient.

(E) Instructions on how to access the hospice's 24-hour on-call system.

(F) Hospice medication information specific to each patient.

(G) Hospice physician and attending physician (if any) orders specific to each patient.

(v) Ensuring that the LTC facility staff provides orientation in the policies and procedures of the facility, including patient rights, appropriate forms, and record keeping requirements, to hospice staff furnishing care to LTC residents.

(4) Each LTC facility providing hospice care under a written agreement must ensure that each resident's written plan of care includes both the most recent hospice plan of care and a description of the services furnished by the LTC facility to attain or maintain the resident's highest practicable physical, mental, and psychosocial well-being, as required at § 483.25.

(p) Social worker. Any facility with more than 120 beds must employ a qualified social worker on a full-time basis. A qualified social worker is:

(1) An individual with a minimum of a bachelor's degree in social work or a bachelor's degree in a human services field including, but not limited to, sociology, gerontology, special education, rehabilitation counseling, and psychology; and

(2) One year of supervised social work experience in a health care setting working directly with individuals.

(q) Mandatory submission of staffing information based on payroll data in a uniform format. Long-term care facilities must electronically submit to CMS complete and accurate direct care staffing information, including information for agency and contract staff, based on payroll and other verifiable and auditable data in a uniform format according to specifications established by CMS.

(1) Direct Care Staff. Direct Care Staff are those individuals who, through interpersonal contact with residents or resident care management, provide care and services to allow residents to attain or maintain the highest practicable physical, mental, and psychosocial well-being. Direct care staff does not include individuals whose primary duty is maintaining the physical environment of the long term care facility (for example, housekeeping).

(2) Submission requirements. The facility must electronically submit to CMS complete and accurate direct care staffing information, including the following:

(i) The category of work for each person on direct care staff (including, but not limited to, whether the individual is a registered nurse, licensed practical nurse, licensed vocational nurse, certified nursing assistant, therapist, or other type of medical personnel as specified by CMS);

(ii) Resident census data; and

(iii) Information on direct care staff turnover and tenure, and on the hours of care provided by each category of staff per resident per day (including, but not limited to, start date, end date (as applicable), and hours worked for each individual).

(3) Distinguishing employee from agency and contract staff. When reporting information about direct care staff, the facility must specify whether the individual is an employee of the facility, or is engaged by the facility under contract or through an agency.

(4) Data format. The facility must submit direct care staffing information in the uniform format specified by CMS.

(5) Submission schedule. The facility must submit direct care staffing information on the schedule specified by CMS, but no less frequently than quarterly.

[56 FR 48877, Sept. 26, 1991, as amended at 56 FR 48918, Sept. 26, 1991; 57 FR 7136, Feb. 28, 1992; 57 FR 43925, Sept. 23, 1992; 59 FR 56237, Nov. 10, 1994; 63 FR 26311, May 12, 1998; 68 FR 55539, Sept. 26, 2003; 74 FR 40363, Aug. 11, 2009; 76 FR 9511, Feb. 18, 2011; 78 FR

16805, Mar. 19, 2013; 78 FR 38605, June 27, 2013; 80 FR 46477, Aug. 4, 2015; 81 FR 64032, Sept. 16, 2016. Redesignated and amended at 81 FR 68861, 68865, Oct. 4, 2016; 82 FR 32259, July 13, 2017; 84 FR 34735, July 18, 2019]

## § 483.73 - Emergency preparedness.

The LTC facility must comply with all applicable Federal, State and local emergency preparedness requirements. The LTC facility must establish and maintain an emergency preparedness program that meets the requirements of this section. The emergency preparedness program must include, but not be limited to, the following elements:

(a) Emergency plan. The LTC facility must develop and maintain an emergency preparedness plan that must be reviewed, and updated at least annually. The plan must do all of the following:

(1) Be based on and include a documented, facility-based and community-based risk assessment, utilizing an all-hazards approach, including missing residents.

(2) Include strategies for addressing emergency events identified by the risk assessment.

(3) Address resident population, including, but not limited to, persons at-risk; the type of services the LTC facility has the ability to provide in an emergency; and continuity of operations, including delegations of authority and succession plans.

(4) Include a process for cooperation and collaboration with local, tribal, regional, State, or Federal emergency preparedness officials' efforts to maintain an integrated response during a disaster or emergency situation.

(b) Policies and procedures. The LTC facility must develop and implement emergency preparedness policies and procedures, based on the emergency plan set forth in paragraph (a) of this section, risk assessment at paragraph (a)(1) of this section, and the communication plan at paragraph (c) of this section. The policies and procedures must be reviewed and updated at least annually. At a minimum, the policies and procedures must address the following:

(1) The provision of subsistence needs for staff and residents, whether they evacuate or shelter in place, include, but are not limited to the following:

(i) Food, water, medical, and pharmaceutical supplies.

(ii) Alternate sources of energy to maintain -

(A) Temperatures to protect resident health and safety and for the safe and sanitary storage of provisions;

(B) Emergency lighting;

(C) Fire detection, extinguishing, and alarm systems; and

(D) Sewage and waste disposal.

(2) A system to track the location of on-duty staff and sheltered residents in the LTC facility's care during and after an emergency. If on-duty staff and sheltered residents are relocated during the emergency, the LTC facility must document the specific name and location of the receiving facility or other location.

(3) Safe evacuation from the LTC facility, which includes consideration of care and treatment needs of evacuees; staff responsibilities; transportation; identification of evacuation location(s); and primary and alternate means of communication with external sources of assistance.

(4) A means to shelter in place for residents, staff, and volunteers who remain in the LTC facility.

(5) A system of medical documentation that preserves resident information, protects confidentiality of resident information, and secures and maintains the availability of records.

(6) The use of volunteers in an emergency or other emergency staffing strategies, including the process and role for integration of State or Federally designated health care professionals to address surge needs during an emergency.

(7) The development of arrangements with other LTC facilities and other providers to receive residents in the event of limitations or cessation of operations to maintain the continuity of services to LTC residents.

(8) The role of the LTC facility under a waiver declared by the Secretary, in accordance with section 1135 of the Act, in the provision of care and treatment at an alternate care site identified by emergency management officials.

(c) Communication plan. The LTC facility must develop and maintain an emergency preparedness communication plan that complies with Federal, State, and local laws and must be reviewed and updated at least annually. The communication plan must include all of the following:

(1) Names and contact information for the following:

(i) Staff.

(ii) Entities providing services under arrangement.

(iii) Residents' physicians.

(iv) Other LTC facilities.

(v) Volunteers.

(2) Contact information for the following:

(i) Federal, State, tribal, regional, or local emergency preparedness staff.

(ii) The State Licensing and Certification Agency.

(iii) The Office of the State Long-Term Care Ombudsman.

(iv) Other sources of assistance.

(3) Primary and alternate means for communicating with the following:

(i) LTC facility's staff.

(ii) Federal, State, tribal, regional, or local emergency management agencies.

(4) A method for sharing information and medical documentation for residents under the LTC facility's care, as necessary, with other health care providers to maintain the continuity of care.

(5) A means, in the event of an evacuation, to release resident information as permitted under 45 CFR 164.510(b)(1)(ii).

(6) A means of providing information about the general condition and location of residents under the facility's care as permitted under 45 CFR 164.510(b)(4).

(7) A means of providing information about the LTC facility's occupancy, needs, and its ability to provide assistance, to the authority having jurisdiction or the Incident Command Center, or designee.

(8) A method for sharing information from the emergency plan that the facility has determined is appropriate with residents and their families or representatives.

(d) Training and testing. The LTC facility must develop and maintain an emergency preparedness training and testing program that is based on the emergency plan set forth in paragraph (a) of this section, risk assessment at paragraph (a)(1) of this section, policies and procedures at paragraph (b) of this section, and the communication plan at paragraph (c) of this section. The training and testing program must be reviewed and updated at least annually.

(1) Training program. The LTC facility must do all of the following:

(i) Initial training in emergency preparedness policies and procedures to all new and existing staff, individuals providing services under arrangement, and volunteers, consistent with their expected roles.

(ii) Provide emergency preparedness training at least annually.

(iii) Maintain documentation of the training.

(iv) Demonstrate staff knowledge of emergency procedures.

(2) Testing. The LTC facility must conduct exercises to test the emergency plan at least twice per year, including unannounced staff drills using the emergency procedures. The LTC facility must do the following:

(i) Participate in an annual full-scale exercise that is community-based; or

(A) When a community-based exercise is not accessible, conduct an annual individual, facility-based functional exercise.

(B) If the LTC facility experiences an actual natural or man-made emergency that requires activation of the emergency plan, the LTC facility is exempt from engaging its next required a full-scale community-based or individual, facility-based functional exercise following the onset of the emergency event.

(ii) Conduct an additional annual exercise that may include, but is not limited to the following:

(A) A second full-scale exercise that is community-based or an individual, facility-based functional exercise; or

(B) A mock disaster drill; or

(C) A tabletop exercise or workshop that is led by a facilitator includes a group discussion, using a narrated, clinically-relevant emergency scenario, and a set of problem statements, directed messages, or prepared questions designed to challenge an emergency plan.

(iii) Analyze the LTC facility's response to and maintain documentation of all drills, tabletop exercises, and emergency events, and revise the LTC facility's emergency plan, as needed.

(e) Emergency and standby power systems. The LTC facility must implement emergency and standby power systems based on the emergency plan set forth in paragraph (a) of this section.

(1) Emergency generator location. The generator must be located in accordance with the location requirements found in the Health Care Facilities Code (NFPA 99 and Tentative Interim Amendments TIA 12-2, TIA 12-3, TIA 12-4, TIA 12-5, and TIA 12-6), Life Safety Code (NFPA

101 and Tentative Interim Amendments TIA 12-1, TIA 12-2, TIA 12-3, and TIA 12-4), and NFPA 110, when a new structure is built or when an existing structure or building is renovated.

(2) Emergency generator inspection and testing. The LTC facility must implement the emergency power system inspection, testing, and maintenance requirements found in the Health Care Facilities Code, NFPA 110, and Life Safety Code.

(3) Emergency generator fuel. LTC facilities that maintain an onsite fuel source to power emergency generators must have a plan for how it will keep emergency power systems operational during the emergency, unless it evacuates.

(f) Integrated healthcare systems. If a LTC facility is part of a healthcare system consisting of multiple separately certified healthcare facilities that elects to have a unified and integrated emergency preparedness program, the LTC facility may choose to participate in the healthcare system's coordinated emergency preparedness program. If elected, the unified and integrated emergency preparedness program must do all of the following:

(1) Demonstrate that each separately certified facility within the system actively participated in the development of the unified and integrated emergency preparedness program.

(2) Be developed and maintained in a manner that takes into account each separately certified facility's unique circumstances, patient populations, and services offered.

(3) Demonstrate that each separately certified facility is capable of actively using the unified and integrated emergency preparedness program and is in compliance with the program.

(4) Include a unified and integrated emergency plan that meets the requirements of paragraphs (a)(2), (3), and (4) of this section. The unified and integrated emergency plan must also be based on and include -

(i) A documented community-based risk assessment, utilizing an all-hazards approach.

(ii) A documented individual facility-based risk assessment for each separately certified facility within the health system, utilizing an all-hazards approach.

(5) Include integrated policies and procedures that meet the requirements set forth in paragraph (b) of this section, a coordinated communication plan and training and testing programs that meet the requirements of paragraphs (c) and (d) of this section, respectively.

(g) The standards incorporated by reference in this section are approved for incorporation by reference by the Director of the Office of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain the material from the sources listed below. You may inspect a copy at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to:

http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. If any changes in this edition of the Code are incorporated by reference, CMS will publish a document in the Federal Register to announce the changes.

(1) National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02169, www.nfpa.org, 1.617.770.3000.

(i) NFPA 99, Health Care Facilities Code 2012 edition, issued August 11, 2011.

(ii) Technical interim amendment (TIA) 12-2 to NFPA 99, issued August 11, 2011.

(iii) TIA 12-3 to NFPA 99, issued August 9, 2012.

(iv) TIA 12-4 to NFPA 99, issued March 7, 2013.

(v) TIA 12-5 to NFPA 99, issued August 1, 2013.

(vi) TIA 12-6 to NFPA 99, issued March 3, 2014.

(vii) NFPA 101, Life Safety Code, 2012 edition, issued August 11, 2011.

(viii) TIA 12-1 to NFPA 101, issued August 11, 2011.

(ix) TIA 12-2 to NFPA 101, issued October 30, 2012.

(x) TIA 12-3 to NFPA 101, issued October 22, 2013.

(xi) TIA 12-4 to NFPA 101, issued October 22, 2013.

(xii) NFPA 110, Standard for Emergency and Standby Power Systems, 2010 edition, including TIAs to chapter 7, issued August 6, 2009.

(2) [Reserved]

[81 FR 64030, Sept. 16, 2016; 81 FR 80594, Nov. 16, 2016; 84 FR 51824, Sept. 30, 2019]
**§ 483.75 - Quality assurance and performance improvement.**
(a) Quality assurance and performance improvement (QAPI) program. Each LTC facility, including a facility that is part of a multiunit chain, must develop, implement, and maintain an effective, comprehensive, data-driven QAPI program that focuses on indicators of the outcomes of care and quality of life. The facility must -

(1) Maintain documentation and demonstrate evidence of its ongoing QAPI program that meets the requirements of this section. This may include but is not limited to systems and reports demonstrating systematic identification, reporting, investigation, analysis, and prevention of

adverse events; and documentation demonstrating the development, implementation, and evaluation of corrective actions or performance improvement activities;

(2) Present its QAPI plan to the State Survey Agency no later than 1 year after the promulgation of this regulation;

(3) Present its QAPI plan to a State Survey Agency or Federal surveyor at each annual recertification survey and upon request during any other survey and to CMS upon request; and

(4) Present documentation and evidence of its ongoing QAPI program's implementation and the facility's compliance with requirements to a State Survey Agency, Federal surveyor or CMS upon request.

(b) Program design and scope. A facility must design its QAPI program to be ongoing, comprehensive, and to address the full range of care and services provided by the facility. It must:

(1) Address all systems of care and management practices;

(2) Include clinical care, quality of life, and resident choice;

(3) Utilize the best available evidence to define and measure indicators of quality and facility goals that reflect processes of care and facility operations that have been shown to be predictive of desired outcomes for residents of a SNF or NF.

(4) Reflect the complexities, unique care, and services that the facility provides.

(c) Program feedback, data systems and monitoring. A facility must establish and implement written policies and procedures for feedback, data collections systems, and monitoring, including adverse event monitoring. The policies and procedures must include, at a minimum, the following:

(1) Facility maintenance of effective systems to obtain and use of feedback and input from direct care staff, other staff, residents, and resident representatives, including how such information will be used to identify problems that are high risk, high volume, or problem-prone, and opportunities for improvement.

(2) Facility maintenance of effective systems to identify, collect, and use data and information from all departments, including but not limited to the facility assessment required at § 483.70(e) and including how such information will be used to develop and monitor performance indicators.

(3) Facility development, monitoring, and evaluation of performance indicators, including the methodology and frequency for such development, monitoring, and evaluation.

(4) Facility adverse event monitoring, including the methods by which the facility will systematically identify, report, track, investigate, analyze and use data and information relating to

adverse events in the facility, including how the facility will use the data to develop activities to prevent adverse events.

(d) Program systematic analysis and systemic action. (1) The facility must take actions aimed at performance improvement and, after implementing those actions, measure its success, and track performance to ensure that improvements are realized and sustained.

(2) The facility will develop and implement policies addressing:

(i) How they will use a systematic approach to determine underlying causes of problems impacting larger systems;

(ii) How they will develop corrective actions that will be designed to effect change at the systems level to prevent quality of care, quality of life, or safety problems ; and

(iii) How the facility will monitor the effectiveness of its performance improvement activities to ensure that improvements are sustained.

(e) Program activities. (1) The facility must set priorities for its performance improvement activities that focus on high-risk, high-volume, or problem-prone areas; consider the incidence, prevalence, and severity of problems in those areas; and affect health outcomes, resident safety, resident autonomy, resident choice, and quality of care.

(2) Performance improvement activities must track medical errors and adverse resident events, analyze their causes, and implement preventive actions and mechanisms that include feedback and learning throughout the facility.

(3) As a part of their performance improvement activities, the facility must conduct distinct performance improvement projects. The number and frequency of improvement projects conducted by the facility must reflect the scope and complexity of the facility's services and available resources, as reflected in the facility assessment required at § 483.70(e). Improvement projects must include at least annually a project that focuses on high risk or problem-prone areas identified through the data collection and analysis described in paragraphs (c) and (d) of this section.

(f) Governance and leadership. The governing body and/or executive leadership (or organized group or individual who assumes full legal authority and responsibility for operation of the facility) is responsible and accountable for ensuring that -

(1) An ongoing QAPI program is defined, implemented, and maintained and addresses identified priorities.

(2) The QAPI program is sustained during transitions in leadership and staffing;

(3) The QAPI program is adequately resourced, including ensuring staff time, equipment, and technical training as needed;

(4) The QAPI program identifies and prioritizes problems and opportunities that reflect organizational process, functions, and services provided to resident based on performance indicator data, and resident and staff input, and other information.

(5) Corrective actions address gaps in systems, and are evaluated for effectiveness; and

(6) Clear expectations are set around safety, quality, rights, choice, and respect.

(g) Quality assessment and assurance. (1) A facility must maintain a quality assessment and assurance committee consisting at a minimum of:

(i) The director of nursing services;

(ii) The Medical Director or his or her designee;

(iii) At least three other members of the facility's staff, at least one of who must be the administrator, owner, a board member or other individual in a leadership role; and

(iv) The infection preventionist.

(2) The quality assessment and assurance committee reports to the facility's governing body, or designated person(s) functioning as a governing body regarding its activities, including implementation of the QAPI program required under paragraphs (a) through (e) of this section. The committee must:

(i) Meet at least quarterly and as needed to coordinate and evaluate activities under the QAPI program, such as identifying issues with respect to which quality assessment and assurance activities, including performance improvement projects required under the QAPI program, are necessary; and

(ii) Develop and implement appropriate plans of action to correct identified quality deficiencies; and

(iii) Regularly review and analyze data, including data collected under the QAPI program and data resulting from drug regimen reviews, and act on available data to make improvements.

(h) Disclosure of information. A State or the Secretary may not require disclosure of the records of such committee except in so far as such disclosure is related to the compliance of such committee with the requirements of this section.

(i) Sanctions. Good faith attempts by the committee to identify and correct quality deficiencies will not be used as a basis for sanctions.

[81 FR 68867, Oct. 4, 2016, as amended at 82 FR 32259, July 13, 2017]

**§ 483.80 - Infection control.**
The facility must establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infections.

(a) Infection prevention and control program. The facility must establish an infection prevention and control program (IPCP) that must include, at a minimum, the following elements:

(1) A system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals providing services under a contractual arrangement based upon the facility assessment conducted according to § 483.70(e) and following accepted national standards;

(2) Written standards, policies, and procedures for the program, which must include, but are not limited to:

(i) A system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility;

(ii) When and to whom possible incidents of communicable disease or infections should be reported;

(iii) Standard and transmission-based precautions to be followed to prevent spread of infections;

(iv) When and how isolation should be used for a resident; including but not limited to:

(A) The type and duration of the isolation, depending upon the infectious agent or organism involved, and

(B) A requirement that the isolation should be the least restrictive possible for the resident under the circumstances.

(v) The circumstances under which the facility must prohibit employees with a communicable disease or infected skin lesions from direct contact with residents or their food, if direct contact will transmit the disease; and

(vi) The hand hygiene procedures to be followed by staff involved in direct resident contact.

(3) An antibiotic stewardship program that includes antibiotic use protocols and a system to monitor antibiotic use.

(4) A system for recording incidents identified under the facility's IPCP and the corrective actions taken by the facility.

(b) Infection preventionist. The facility must designate one or more individual(s) as the infection preventionist(s) (IPs) who are responsible for the facility's IPCP. The IP must:

(1) Have primary professional training in nursing, medical technology, microbiology, epidemiology, or other related field;

(2) Be qualified by education, training, experience or certification;

(3) Work at least part-time at the facility; and

(4) Have completed specialized training in infection prevention and control.

(c) IP participation on quality assessment and assurance committee. The individual designated as the IP, or at least one of the individuals if there is more than one IP, must be a member of the facility's quality assessment and assurance committee and report to the committee on the IPCP on a regular basis.

(d) Influenza and pneumococcal immunizations - (1) Influenza. The facility must develop policies and procedures to ensure that -

(i) Before offering the influenza immunization, each resident or the resident's representative receives education regarding the benefits and potential side effects of the immunization;

(ii) Each resident is offered an influenza immunization October 1 through March 31 annually, unless the immunization is medically contraindicated or the resident has already been immunized during this time period;

(iii) The resident or the resident's representative has the opportunity to refuse immunization; and

(iv) The resident's medical record includes documentation that indicates, at a minimum, the following:

(A) That the resident or resident's representative was provided education regarding the benefits and potential side effects of influenza immunization; and

(B) That the resident either received the influenza immunization or did not receive the influenza immunization due to medical contraindications or refusal.

(2) Pneumococcal disease. The facility must develop policies and procedures to ensure that -

(i) Before offering the pneumococcal immunization, each resident or the resident's representative receives education regarding the benefits and potential side effects of the immunization;

(ii) Each resident is offered a pneumococcal immunization, unless the immunization is medically contraindicated or the resident has already been immunized;

(iii) The resident or the resident's representative has the opportunity to refuse immunization; and

(iv) The resident's medical record includes documentation that indicates, at a minimum, the following:

(A) That the resident or resident's representative was provided education regarding the benefits and potential side effects of pneumococcal immunization; and

(B) That the resident either received the pneumococcal immunization or did not receive the pneumococcal immunization due to medical contraindication or refusal.

(e) Linens. Personnel must handle, store, process, and transport linens so as to prevent the spread of infection.

(f) Annual review. The facility will conduct an annual review of its IPCP and update their program, as necessary.

(g) COVID-19 reporting. The facility must -

(1) Electronically report information about COVID-19 in a standardized format specified by the Secretary. This report must include but is not limited to -

(i) Suspected and confirmed COVID-19 infections among residents and staff, including residents previously treated for COVID-19;

(ii) Total deaths and COVID-19 deaths among residents and staff;

(iii) Personal protective equipment and hand hygiene supplies in the facility;

(iv) Ventilator capacity and supplies in the facility;

(v) Resident beds and census;

(vi) Access to COVID-19 testing while the resident is in the facility;

(vii) Staffing shortages; and

(viii) Other information specified by the Secretary.

(2) Provide the information specified in paragraph (g)(1) of this section at a frequency specified by the Secretary, but no less than weekly to the Centers for Disease Control and Prevention's National

Healthcare Safety Network. This information will be posted publicly by CMS to support protecting the health and safety of residents, personnel, and the general public.

(3) Inform residents, their representatives, and families of those residing in facilities by 5 p.m. the next calendar day following the occurrence of either a single confirmed infection of COVID-19, or three or more residents or staff with new-onset of respiratory symptoms occurring within 72 hours of each other. This information must -

(i) Not include personally identifiable information;

(ii) Include information on mitigating actions implemented to prevent or reduce the risk of transmission, including if normal operations of the facility will be altered; and

(iii) Include any cumulative updates for residents, their representatives, and families at least weekly or by 5 p.m. the next calendar day following the subsequent occurrence of either: Each time a confirmed infection of COVID-19 is identified, or whenever three or more residents or staff with new onset of respiratory symptoms occur within 72 hours of each other.

[81 FR 68868, Oct. 4, 2016, as amended at 85 FR 27627, May 8, 2020]

## § 483.85 - Compliance and ethics program.

(a) Definitions. For purposes of this section, the following definitions apply:

Compliance and ethics program means, with respect to a facility, a program of the operating organization that -

(1) Has been reasonably designed, implemented, and enforced so that it is likely to be effective in preventing and detecting criminal, civil, and administrative violations under the Act and in promoting quality of care; and

(2) Includes, at a minimum, the required components specified in paragraph (c) of this section.

High-level personnel means individual(s) who have substantial control over the operating organization or who have a substantial role in the making of policy within the operating organization.

Operating organization means the individual(s) or entity that operates a facility.

(b) General rule. Beginning November 28, 2019, the operating organization for each facility must have in operation a compliance and ethics program (as defined in paragraph (a) of this section) that meets the requirements of this section.

(c) Required components for all facilities. The operating organization for each facility must develop, implement, and maintain an effective compliance and ethics program that contains, at a minimum, the following components:

(1) Established written compliance and ethics standards, policies, and procedures to follow that are reasonably capable of reducing the prospect of criminal, civil, and administrative violations under the Act and promote quality of care, which include, but are not limited to, the designation of an appropriate compliance and ethics program contact to which individuals may report suspected violations, as well as an alternate method of reporting suspected violations anonymously without fear of retribution; and disciplinary standards that set out the consequences for committing violations for the operating organization's entire staff; individuals providing services under a contractual arrangement; and volunteers, consistent with the volunteers' expected roles.

(2) Assignment of specific individuals within the high-level personnel of the operating organization with the overall responsibility to oversee compliance with the operating organization's compliance and ethics program's standards, policies, and procedures, such as, but not limited to, the chief executive officer (CEO), members of the board of directors, or directors of major divisions in the operating organization.

(3) Sufficient resources and authority to the specific individuals designated in paragraph (c)(2) of this section to reasonably assure compliance with such standards, policies, and procedures.

(4) Due care not to delegate substantial discretionary authority to individuals who the operating organization knew, or should have known through the exercise of due diligence, had a propensity to engage in criminal, civil, and administrative violations under the Social Security Act.

(5) The facility takes steps to effectively communicate the standards, policies, and procedures in the operating organization's compliance and ethics program to the operating organization's entire staff; individuals providing services under a contractual arrangement; and volunteers, consistent with the volunteers' expected roles. Requirements include, but are not limited to, mandatory participation in training as set forth at § 483.95(f) or orientation programs, or disseminating information that explains in a practical manner what is required under the program.

(6) The facility takes reasonable steps to achieve compliance with the program's standards, policies, and procedures. Such steps include, but are not limited to, utilizing monitoring and auditing systems reasonably designed to detect criminal, civil, and administrative violations under the Act by any of the operating organization's staff, individuals providing services under a contractual arrangement, or volunteers, having in place and publicizing a reporting system whereby any of these individuals could report violations by others anonymously within the operating organization without fear of retribution, and having a process for ensuring the integrity of any reported data.

(7) Consistent enforcement of the operating organization's standards, policies, and procedures through appropriate disciplinary mechanisms, including, as appropriate, discipline of individuals responsible for the failure to detect and report a violation to the compliance and ethics program contact identified in the operating organization's compliance and ethics program.

(8) After a violation is detected, the operating organization must ensure that all reasonable steps identified in its program are taken to respond appropriately to the violation and to prevent further similar violations, including any necessary modification to the operating organization's program to prevent and detect criminal, civil, and administrative violations under the Act.

(d) Additional required components for operating organizations with five or more facilities. In addition to all of the other requirements in paragraphs (a), (b), (c), and (e) of this section, operating organizations that operate five or more facilities must also include, at a minimum, the following components in their compliance and ethics program:

(1) A mandatory annual training program on the operating organization's compliance and ethics program that meets the requirements set forth in § 483.95(f).

(2) A designated compliance officer for whom the operating organization's compliance and ethics program is a major responsibility. This individual must report directly to the operating organization's governing body and not be subordinate to the general counsel, chief financial officer or chief operating officer.

(3) Designated compliance liaisons located at each of the operating organization's facilities.

(e) Annual review. The operating organization for each facility must review its compliance and ethics program annually and revise its program as needed to reflect changes in all applicable laws or regulations and within the operating organization and its facilities to improve its performance in deterring, reducing, and detecting violations under the Act and in promoting quality of care.

[81 FR 68869, Oct. 4, 2016, as amended at 82 FR 32259, July 13, 2017]

### § 483.90 - Physical environment.
The facility must be designed, constructed, equipped, and maintained to protect the health and safety of residents, personnel and the public.

(a) Life safety from fire. (1) Except as otherwise provided in this section -

(i) The LTC facility must meet the applicable provisions and must proceed in accordance with the Life Safety Code (NFPA 101 and Tentative Interim Amendments TIA 12-1, TIA 12-2, TIA 12-3, and TIA 12-4.)

(ii) Notwithstanding paragraph (a)(1)(i) of this section, corridor doors and doors to rooms containing flammable or combustible materials must be provided with positive latching hardware. Roller latches are prohibited on such doors.

(2) In consideration of a recommendation by the State survey agency or Accrediting Organization or at the discretion of the Secretary, may waive, for periods deemed appropriate, specific provisions of the Life Safety Code, which would result in unreasonable hardship upon a long-term care facility, but only if the waiver will not adversely affect the health and safety of the patients.

(3) The provisions of the Life safety Code do not apply in a State where CMS finds, in accordance with applicable provisions of sections 1819(d)(2)(B)(ii) and 1919(d)(2)(B)(ii) of the Act, that a fire and safety code imposed by State law adequately protects patients, residents and personnel in long term care facilities.

(4) A long-term care facility may install alcohol-based hand rub dispensers in its facility if the dispensers are installed in a manner that adequately protects against inappropriate access.

(5) A long term care facility must:

(i) Install, at least, battery-operated single station smoke alarms in accordance with the manufacturer's recommendations in resident sleeping rooms and common areas.

(ii) Have a program for inspection, testing, maintenance, and battery replacement that conforms to the manufacturer's recommendations and that verifies correct operation of the smoke alarms.

(iii) Exception:

(A) The facility has system-based smoke detectors in patient rooms and common areas that are installed, tested, and maintained in accordance with NFPA 72, National Fire Alarm Code, for system-based smoke detectors; or

(B) The facility is fully sprinklered in accordance with NFPA 13, Standard for the Installation of Sprinkler Systems.

(6) A long term care facility must:
(i) Install an approved, supervised automatic sprinkler system in accordance with the 1999 edition of NFPA 13, Standard for the Installation of Sprinkler Systems, as incorporated by reference, throughout the building by August 13, 2013. The Director of the Office of the Federal Register has approved the NFPA 13 1999 edition of the Standard for the Installation of Sprinkler Systems, issued July 22, 1999 for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269.

(ii) Test, inspect, and maintain an approved, supervised automatic sprinkler system in accordance with the 1998 edition of NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems, as incorporated by reference. The Director of the Office of the Federal Register has approved the NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems, 1998 edition, issued January 16, 1998 for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269.

(iii) Subject to approval by CMS, a long term care facility may be granted an extension of the sprinkler installation deadline for a time period not to exceed 2 years from August 13, 2013, if the facility meets all of the following conditions:

(A) It is in the process of replacing its current building, or undergoing major modifications to improve the living conditions for residents in all unsprinklered living areas that requires the movement of corridor, room, partition, or structural walls or supports, in addition to the installation of a sprinkler system; or, has had its planned sprinkler installation so impaired by a disaster or emergency, as indicated by a declaration under section 319 of the Public Health Service Act, that CMS finds it would be impractical to meet the sprinkler installation due date.

(B) It demonstrates that it has made the necessary financial commitments to complete the building replacement or modification; or pursuant to a declared disaster or emergency, CMS finds it impractical to make reasonable and necessary financial commitments.

(C) Before applying for the deadline extension, it has submitted plans to State and local authorities that are necessary for approval of the replacement building or major modification that includes the required sprinkler installation, and has received approval of the plans from State and local authorities.

(D) It agrees to complete interim steps to improve fire safety, as determined by CMS.

(iv) An extension granted under paragraph (a)(8)(iii) of this section may be renewed once, for an additional period not to exceed 1 year, if the following conditions are met:

(A) CMS finds that extenuating circumstances beyond the control of the facility will prevent full compliance with the provisions in paragraph (a)(8)(i) of this section by the end of the first waiver period.

(B) All other conditions of paragraph (a)(8)(iii) of this section are met.

(7) Buildings must have an outside window or outside door in every sleeping room, and for any building constructed after July 5, 2016 the sill height must not exceed 36 inches above the floor. Windows in atrium walls are considered outside windows for the purposes of this requirement.

(8) When a sprinkler system is shut down for more than 10 hours, the LTC facility must:

(i) Evacuate the building or portion of the building affected by the system outage until the system is back in service, or

(ii) Establish a fire watch until the system is back in service.

(b) Standard: Building safety. Except as otherwise provided in this section, the LTC facility must meet the applicable provisions and must proceed in accordance with the Health Care Facilities Code (NFPA 99 and Tentative Interim Amendments TIA 12-2, TIA 12-3, TIA 12-4, TIA 12-5 and TIA 12-6).

(1) Chapters 7, 8, 12, and 13 of the adopted Health Care Facilities Code do not apply to a LTC facility.

(2) If application of the Health Care Facilities Code required under paragraph (b) of this section would result in unreasonable hardship for the LTC facility, CMS may waive specific provisions of the Health Care Facilities Code, but only if the waiver does not adversely affect the health and safety of residents.

(c) Emergency power. (1) An emergency electrical power system must supply power adequate at least for lighting all entrances and exits; equipment to maintain the fire detection, alarm, and extinguishing systems; and life support systems in the event the normal electrical supply is interrupted.

(2) When life support systems are used, the facility must provide emergency electrical power with an emergency generator (as defined in NFPA 99, Health Care Facilities) that is located on the premises.

(d) Space and equipment. The facility must -

(1) Provide sufficient space and equipment in dining, health services, recreation, and program areas to enable staff to provide residents with needed services as required by these standards and as identified in each resident's plan of care; and

(2) Maintain all essential mechanical, electrical, and patient care equipment in safe operating condition.

(e) Resident rooms. Resident rooms must be designed and equipped for adequate nursing care, comfort, and privacy of residents.

(1) Bedrooms must -

(i) Accommodate no more than four residents. For facilities that receive approval of construction or reconstruction plans by State and local authorities or are newly certified after November 28, 2016, bedrooms must accommodate no more than two residents.

(ii) Measure at least 80 square feet per resident in multiple resident bedrooms, and at least 100 square feet in single resident rooms;

(iii) Have direct access to an exit corridor;

(iv) Be designed or equipped to assure full visual privacy for each resident;

(v) In facilities initially certified after March 31, 1992, except in private rooms, each bed must have ceiling suspended curtains, which extend around the bed to provide total visual privacy in combination with adjacent walls and curtains;

(vi) Have at least one window to the outside; and

(vii) Have a floor at or above grade level.

(2) The facility must provide each resident with -

(i) A separate bed of proper size and height for the safety and convenience of the resident;

(ii) A clean, comfortable mattress;

(iii) Bedding appropriate to the weather and climate; and

(iv) Functional furniture appropriate to the resident's needs, and individual closet space in the resident's bedroom with clothes racks and shelves accessible to the resident.

(3) CMS, or in the case of a nursing facility the survey agency, may permit variations in requirements specified in paragraphs (d)(1) (i) and (ii) of this section relating to rooms in individual cases when the facility demonstrates in writing that the variations -

(i) Are in accordance with the special needs of the residents; and

(ii) Will not adversely affect residents' health and safety.

(f) Bathroom facilities. Each resident room must be equipped with or located near toilet and bathing facilities. For facilities that receive approval of construction from State and local authorities or are newly certified after November 28, 2016, each resident room must have its own bathroom equipped with at least a commode and sink.

(g) Resident call system. The facility must be adequately equipped to allow residents to call for staff assistance through a communication system which relays the call directly to a staff member or to a centralized staff work area from -

(1) Each resident's bedside; and

(2) Toilet and bathing facilities.

(h) Dining and resident activities. The facility must provide one or more rooms designated for resident dining and activities. These rooms must -

(1) Be well lighted;

(2) Be well ventilated;

(3) Be adequately furnished; and

(4) Have sufficient space to accommodate all activities.

(i) Other environmental conditions. The facility must provide a safe, functional, sanitary, and comfortable environment for the residents, staff and the public. The facility must -

(1) Establish procedures to ensure that water is available to essential areas when there is a loss of normal water supply;

(2) Have adequate outside ventilation by means of windows, or mechanical ventilation, or a combination of the two;

(3) Equip corridors with firmly secured handrails on each side; and

(4) Maintain an effective pest control program so that the facility is free of pests and rodents.

(5) Establish policies, in accordance with applicable Federal, State, and local laws and regulations, regarding smoking, smoking areas, and smoking safety that also take into account non-smoking residents.

(j) The standards incorporated by reference in this section are approved for incorporation by reference by the Director of the Office of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may inspect a copy at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. If any changes in this edition of the Code are incorporated by reference, CMS will publish a document in the Federal Register to announce the changes.

(1) National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02169, www.nfpa.org, 1.617.770.3000.

(i) NFPA 99, Standards for Health Care Facilities Code of the National Fire Protection Association 99, 2012 edition, issued August 11, 2011.

(ii) TIA 12-2 to NFPA 99, issued August 11, 2011.

(iii) TIA 12-3 to NFPA 99, issued August 9, 2012.

(iv) TIA 12-4 to NFPA 99, issued March 7, 2013.

(v) TIA 12-5 to NFPA 99, issued August 1, 2013.

(vi) TIA 12-6 to NFPA 99, issued March 3, 2014.

(vii) NFPA 101, Life Safety Code, 2012 edition, issued August 11, 2011;

(viii) TIA 12-1 to NFPA 101, issued August 11, 2011.

(ix) TIA 12-2 to NFPA 101, issued October 30, 2012.

(x) TIA 12-3 to NFPA 101, issued October 22, 2013.

(xi) TIA 12-4 to NFPA 101, issued October 22, 2013.

(2) [Reserved]

[56 FR 48876, Sept. 26, 1991, as amended at 57 FR 43925, Sept. 23, 1992; 68 FR 1386, Jan. 10, 2003; 69 FR 49268, Aug. 11, 2004; 70 FR 15238, Mar. 25, 2005; 71 FR 55340, Sept. 22, 2006; 73 FR 47091, Aug. 13, 2008; 79 FR 27155, May 12, 2014; 81 FR 26899, May 4, 2016; 81 FR 42548, June 30, 2016. Redesignated and amended at 81 FR 68861, 68870, Oct. 4, 2016; 82 FR 32259, July 13, 2017]

## § 483.95 - Training requirements.

A facility must develop, implement, and maintain an effective training program for all new and existing staff; individuals providing services under a contractual arrangement; and volunteers, consistent with their expected roles. A facility must determine the amount and types of training necessary based on a facility assessment as specified at § 483.70(e). Training topics must include but are not limited to -

(a) Communication. A facility must include effective communications as mandatory training for direct care staff.

(b) Resident's rights and facility responsibilities. A facility must ensure that staff members are educated on the rights of the resident and the responsibilities of a facility to properly care for its residents as set forth at § 483.10, respectively.

(c) Abuse, neglect, and exploitation. In addition to the freedom from abuse, neglect, and exploitation requirements in § 483.12, facilities must also provide training to their staff that at a minimum educates staff on -

(1) Activities that constitute abuse, neglect, exploitation, and misappropriation of resident property as set forth at § 483.12.

(2) Procedures for reporting incidents of abuse, neglect, exploitation, or the misappropriation of resident property.

(3) Dementia management and resident abuse prevention.

(d) Quality assurance and performance improvement. A facility must include as part of its QAPI program mandatory training that outlines and informs staff of the elements and goals of the facility's QAPI program as set forth at § 483.75.

(e) Infection control. A facility must include as part of its infection prevention and control program mandatory training that includes the written standards, policies, and procedures for the program as described at § 483.80(a)(2).

(f) Compliance and ethics. The operating organization for each facility must include as part of its compliance and ethics program, as set forth at § 483.85 -

(1) An effective way to communicate that program's standards, policies, and procedures through a training program or in another practical manner which explains the requirements under the program.

(2) Annual training if the operating organization operates five or more facilities.

(g) Required in-service training for nurse aides. In-service training must -

(1) Be sufficient to ensure the continuing competence of nurse aides, but must be no less than 12 hours per year.

(2) Include dementia management training and resident abuse prevention training.

(3) Address areas of weakness as determined in nurse aides' performance reviews and facility assessment at § 483.70(e) and may address the special needs of residents as determined by the facility staff.

(4) For nurse aides providing services to individuals with cognitive impairments, also address the care of the cognitively impaired.

(h) Required training of feeding assistants. A facility must not use any individual working in the facility as a paid feeding assistant unless that individual has successfully completed a State-approved training program for feeding assistants, as specified in § 483.160.

(i) Behavioral health. A facility must provide behavioral health training consistent with the requirements at § 483.40 and as determined by the facility assessment at § 483.70(e).

[81 FR 68870, Oct. 4, 2016]

**Plaintiff's Exhibit 8**

**Pennsylvania Criminal Code, Chapter 18 Section 3101**

**Subchapter**
A. General Provisions
B. Definition of Offenses
C. Loss of Property Rights

**Enactment.** Chapter 31 was added December 6, 1972, P.L.1482, No.334, effective in six months.
**Cross References.** Chapter 31 is referred to in sections 3104, 3502, 5743.1, 6301, 6318 of this title; section 3103 of Title 23 (Domestic Relations); sections 1726.1, 5750, 5920, 5985.1, 5987, 5993, 62A03, 9718.1, 9912 of Title 42 (Judiciary and Judicial Procedure); section 2303 of Title 44 (Law and Justice); section 3133 of Title 63 (Professions and Occupations (State Licensed)).

**SUBCHAPTER A**
GENERAL PROVISIONS

Sec.
3101. Definitions.
3102. Mistake as to age.
3103. Spouse relationships (Repealed).
3104. Evidence of victim's sexual conduct.
3105. Prompt complaint.
3106. Testimony of complainants.
3107. Resistance not required.

**§ 3101. Definitions.**
Subject to additional definitions contained in subsequent provisions of this chapter which are applicable to specific provisions of this chapter, the following words and phrases when used in this chapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section:
**"Complainant."** An alleged victim of a crime under this chapter.
**"Deviate sexual intercourse."** Sexual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal. The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures.
**"Forcible compulsion."** Compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied. The term includes, but is not limited to, compulsion resulting in another person's death, whether the death occurred before, during or after sexual intercourse.
**"Foreign object."** Includes any physical object not a part of the actor's body.
**"Indecent contact."** Any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person.
**"Serious bodily injury."** As defined in section 2301 (relating to definitions).
**"Sexual intercourse."** In addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight; emission is not required.
(Dec. 21, 1984, P.L.1210, No.230, eff. 60 days; Feb. 2, 1990, P.L.6, No.4, eff. 60 days; Mar. 31, 1995, 1st Sp.Sess., P.L.985, No.10, eff. 60 days; Dec. 9, 2002, P.L.1350, No.162, eff. 60 days; Dec. 16, 2002, P.L.1953, No.226, eff. 60 days; Dec. 18, 2013, P.L.1163, No.105, eff. Jan. 1, 2014)

**2013 Amendment.** Act 105 amended the def. of "indecent contact."
**2002 Amendments.** Act 162 added the def. of "serious bodily injury" and Act 226 added the def. of "serious bodily injury." The amendments by Acts 162 and 226 are identical and therefore have been merged.
**Cross References.** Section 3101 is referred to in sections 3133, 6312 of this title; sections 5533, 6302 of Title 42 (Judiciary and Judicial Procedure).

**§ 3102. Mistake as to age.**
Except as otherwise provided, whenever in this chapter the criminality of conduct depends on a child being below the age of 14 years, it is no defense that the defendant did not know the age of the child or reasonably believed the child to be the age of 14 years or older. When criminality depends on the child's being below a critical age older than 14 years, it is a defense for the defendant to prove by a preponderance of the evidence that he or she reasonably believed the child to be above the critical age.
(May 18, 1976, P.L.120, No.53, eff. 30 days; Mar. 31, 1995, 1st Sp.Sess., P.L.985, No.10, eff. 60 days)

**1995 Amendment.** Section 18 of Act 10, 1st Sp.Sess., provided that the amendment of section 3102 shall apply to offenses committed on or after the effective date of Act 10.
**Cross References.** Section 3102 is referred to in section 3018 of this title.

**§ 3103. Spouse relationships (Repealed).**

**1995 Repeal.** Section 3103 was repealed March 31, 1995, 1st Sp.Sess. (P.L.985, No.10), effective in 60 days.

**§ 3104. Evidence of victim's sexual conduct.**
**(a) General rule.**--Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.
**(b) Evidentiary proceedings.**--A defendant who proposes to offer evidence of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct and reputation evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).
**(c) Applicability.**--This section shall apply to prosecutions of any of the following offenses, including conspiracy, attempt or solicitation to commit any of the following offenses, enumerated in this title:

Chapter 27 (relating to assault).
        Chapter 29 (relating to kidnapping).
        Chapter 30 (relating to human trafficking).
        Chapter 31 (relating to sexual offenses).
        Section 4302 (relating to incest).
        Section 4304 (relating to endangering welfare of
    children), if the offense involved sexual contact with the
    victim.
        Section 6301(a)(1)(ii) (relating to corruption of
    minors).
        Section 6312(b) (relating to sexual abuse of children).
        Section 6318 (relating to unlawful contact with minor).
        Section 6320 (relating to sexual exploitation of
    children).
(May 18, 1976, P.L.120, No.53, eff. 30 days; June 28, 2019,
P.L.214, No.24, eff. 60 days)
**§ 3105.  Prompt complaint.**
    Prompt reporting to public authority is not required in a
prosecution under this chapter: Provided, however, That nothing
in this section shall be construed to prohibit a defendant from
introducing evidence of the complainant's failure to promptly
report the crime if such evidence would be admissible pursuant
to the rules of evidence.
(May 18, 1976, P.L.120, No.53, eff. 30 days; Mar. 31, 1995, 1st
Sp.Sess., P.L.985, No.10, eff. 60 days)

    **1995 Amendment.**  Section 18 of Act 10, 1st Sp.Sess.,
provided that the amendment of section 3105 shall apply to
offenses committed on or after the effective date of Act 10.
**§ 3106.  Testimony of complainants.**
    The credibility of a complainant of an offense under this
chapter shall be determined by the same standard as is the
credibility of a complainant of any other crime. The testimony
of a complainant need not be corroborated in prosecutions under
this chapter. No instructions shall be given cautioning the
jury to view the complainant's testimony in any other way than
that in which all complainants' testimony is viewed.
(May 18, 1976, P.L.120, No.53, eff. 30 days; Mar. 31, 1995, 1st
Sp.Sess., P.L.985, No.10, eff. 60 days)

    **1995 Amendment.**  Section 18 of Act 10, 1st Sp.Sess.,
provided that the amendment of section 3106 shall apply to
offenses committed on or after the effective date of Act 10.
    **Prior Provisions.**  Former section 3106, which related to the
same subject matter, was added December 6, 1972 (P.L.1482,
No.334), and repealed November 21, 1973 (P.L.339, No.115),
effective in 60 days.
**§ 3107.  Resistance not required.**
    The alleged victim need not resist the actor in prosecutions
under this chapter: Provided, however, That nothing in this
section shall be construed to prohibit a defendant from
introducing evidence that the alleged victim consented to the
conduct in question.
(May 18, 1976, P.L.120, No.53, eff. 30 days)

    **1976 Amendment.**  Act 53 added section 3107.


                            **SUBCHAPTER B**
                      DEFINITION OF OFFENSES

**Sec.**
3121.  Rape.
3122.  Statutory rape (Repealed).
3122.1. Statutory sexual assault.
3123.  Involuntary deviate sexual intercourse.
3124.  Voluntary deviate sexual intercourse (Repealed).
3124.1. Sexual assault.
3124.2. Institutional sexual assault.
3124.3. Sexual assault by sports official, volunteer or
        employee of nonprofit association.
3125.  Aggravated indecent assault.
3126.  Indecent assault.
3127.  Indecent exposure.
3128.  Spousal sexual assault (Repealed).
3129.  Sexual intercourse with animal.
3130.  Conduct relating to sex offenders.
3131.  Unlawful dissemination of intimate image.
3132.  Female mutilation.
3133.  Sexual extortion.
**§ 3121.  Rape.**
    **(a)  Offense defined.--**A person commits a felony of the
first degree when the person engages in sexual intercourse with
a complainant:
        (1)  By forcible compulsion.
        (2)  By threat of forcible compulsion that would prevent
    resistance by a person of reasonable resolution.
        (3)  Who is unconscious or where the person knows that
    the complainant is unaware that the sexual intercourse is
    occurring.
        (4)  Where the person has substantially impaired the
    complainant's power to appraise or control his or her
    conduct by administering or employing, without the knowledge
    of the complainant, drugs, intoxicants or other means for
    the purpose of preventing resistance.
        (5)  Who suffers from a mental disability which renders
    the complainant incapable of consent.
        (6)  (Deleted by amendment.)
    **(b)  Additional penalties.--**In addition to the penalty
provided for by subsection (a), a person may be sentenced to an
additional term not to exceed ten years' confinement and an
additional amount not to exceed $100,000 where the person
engages in sexual intercourse with a complainant and has
substantially impaired the complainant's power to appraise or
control his or her conduct by administering or employing,
without the knowledge of the complainant, any substance for the
purpose of preventing resistance through the inducement of
euphoria, memory loss and any other effect of this substance.
    **(c)  Rape of a child.--**A person commits the offense of rape
of a child, a felony of the first degree, when the person
engages in sexual intercourse with a complainant who is less
than 13 years of age.
    **(d)  Rape of a child with serious bodily injury.--**A person
commits the offense of rape of a child resulting in serious
bodily injury, a felony of the first degree, when the person
violates this section and the complainant is under 13 years of
age and suffers serious bodily injury in the course of the
offense.
    **(e)  Sentences.--**Notwithstanding the provisions of section
1103 (relating to sentence of imprisonment for felony), a
person convicted of an offense under:
        (1)  Subsection (c) shall be sentenced to a term of
    imprisonment which shall be fixed by the court at not more
    than 40 years.
        (2)  Subsection (d) shall be sentenced up to a maximum
    term of life imprisonment.
(Dec. 21, 1984, P.L.1210, No.230, eff. 60 days; Mar. 31, 1995,
1st Sp.Sess., P.L.985, No.10, eff. 60 days; Dec. 19, 1997,

P.L.621, No.65, eff. 60 days; Dec. 9, 2002, P.L.1350, No.162,
eff. 60 days; Dec. 16, 2002, P.L.1953, No.226, eff. 60 days)

**2002 Amendments.**  Act 226 overlooked the amendment by Act
162, but the amendments do not conflict in substance except
for the designation of the offenses in subsecs. (c) and (d) as
felonies of the first degree, as to which Act 162 has been
given effect) and both have been given effect in setting forth
the text of section 3121.
**Effective Date.**  After February 6, 2003, and before February
14, 2003, section 3121 will reflect only the amendment by Act
162, as follows:
**Cross References.**  Section 3121 is referred to in sections
1111, 2709.1, 2714, 3122.1, 3124.1, 3124.2, 3124.3, 3125, 3141,
5702, 5708, 6105, 9122, 9123 of this title; section 3304 of
Title 5 (Athletics and Sports); sections 4321, 5329, 6303,
6304, 6344, 6702, 6711 of Title 23 (Domestic Relations);
sections 5551, 5552, 6302, 6358, 6402, 6403, 9717, 9718,
9720.2, 9730.3, 9799.12, 9799.14, 9799.17, 9799.24 of Title 42
(Judiciary and Judicial Procedure); section 7122 of Title 61
(Prisons and Parole).
**§ 3122.  Statutory rape (Repealed).**

**1995 Repeal.**  Section 3122 was repealed March 31, 1995 (1st
Sp.Sess., P.L.985, No.10), effective in 60 days.
**§ 3122.1.  Statutory sexual assault.**
   **(a)  Felony of the second degree.--**Except as provided in
section 3121 (relating to rape), a person commits a felony of
the second degree when that person engages in sexual
intercourse with a complainant to whom the person is not
married who is under the age of 16 years and that person is
either:
      (1)  four years older but less than eight years older
   than the complainant; or
      (2)  eight years older but less than 11 years older than
   the complainant.
   **(b)  Felony of the first degree.--**A person commits a felony
of the first degree when that person engages in sexual
intercourse with a complainant under the age of 16 years and
that person is 11 or more years older than the complainant and
the complainant and the person are not married to each other.
(Mar. 31, 1995, 1st Sp.Sess., P.L.985, No.10, eff. 60 days;
Dec. 20, 2011, P.L.446, No.111, eff. 60 days)

**Cross References.**  Section 3122.1 is referred to in sections
3124.2, 3124.3, 3125, 3141, 9122 of this title; sections 4321,
5329, 6383, 6344 of Title 23 (Domestic Relations); sections
5551, 5552, 6302, 9730.3, 9799.13, 9799.14, 9802 of Title 42
(Judiciary and Judicial Procedure)
**§ 3123.  Involuntary deviate sexual intercourse.**
   **(a)  Offense defined.--**A person commits a felony of the
first degree when the person engages in deviate sexual
intercourse with a complainant:
      (1)  by forcible compulsion;
      (2)  by threat of forcible compulsion that would prevent
   resistance by a person of reasonable resolution;
      (3)  who is unconscious or where the person knows that
   the complainant is unaware that the sexual intercourse is
   occurring;
      (4)  where the person has substantially impaired the
   complainant's power to appraise or control his or her
   conduct by administering or employing, without the knowledge
   of the complainant, drugs, intoxicants or other means for
   the purpose of preventing resistance;
      (5)  who suffers from a mental disability which renders
   him or her incapable of consent; or
      (6)  (Deleted by amendment).
      (7)  who is less than 16 years of age and the person is
   four or more years older than the complainant and the
   complainant and person are not married to each other.
   **(b)  Involuntary deviate sexual intercourse with a child.--**A
person commits involuntary deviate sexual intercourse with a
child, a felony of the first degree, when the person engages in
deviate sexual intercourse with a complainant who is less than
13 years of age.
   **(c)  Involuntary deviate sexual intercourse with a child
with serious bodily injury.--**A person commits an offense under
this section with a child resulting in serious bodily injury, a
felony of the first degree, when the person violates this
section and the complainant is less than 13 years of age and
the complainant suffers serious bodily injury in the course of
the offense.
   **(d)  Sentences.--**Notwithstanding the provisions of section
1103 (relating to sentence of imprisonment for felony), a
person convicted of an offense under:
      (1)  Subsection (b) shall be sentenced to a term of
   imprisonment which shall be fixed by the court at not more
   than 40 years.
      (2)  Subsection (c) shall be sentenced up to a maximum
   term of life imprisonment.
   **(e)  Definition.--**As used in this section, the term
"forcible compulsion" includes, but is not limited to,
compulsion resulting in another person's death, whether the
death occurred before, during or after the sexual intercourse.
(Mar. 31, 1995, 1st Sp.Sess., P.L.985, No.10, eff. 60 days;
Dec. 9, 2002, P.L.1350, No.162, eff. 60 days; Dec. 16, 2002,
P.L.1953, No.226, eff. 60 days)

**2002 Amendments.**  Act 226 overlooked the amendment by Act
162, but the amendments do not conflict in substance (except
for the designation of the offenses in subsecs. (b) and (c) as
felonies of the first degree, as to which Act 162 has been
given effect) and both have been given effect in setting forth
the text of section 3123.
**Effective Date.**  After February 6, 2003, and before February
14, 2003, section 3123 will reflect only the amendment by Act
162, as follows:
**Cross References.**  Section 3123 is referred to in sections
1111, 2709.1, 2714, 3124.1, 3124.2, 3124.3, 3125, 3141, 5702,
5708, 6105, 9122, 9123 of this title; sections 5329, 6303,
6304, 6344, 6711 of Title 23 (Domestic Relations); sections
5551, 5552, 6302, 6358, 6402, 6403, 9717, 9718, 9720.2, 9730.3,
9799.12, 9799.14, 9799.17, 9799.24 of Title 42 (Judiciary and
Judicial Procedure); section 7122 of Title 61 (Prisons and
Parole).
**§ 3124.  Voluntary deviate sexual intercourse (Repealed).**

**1995 Repeal.**  Section 3124 was repealed March 31, 1995 (1st
Sp.Sess., P.L.985, No.10), effective in 60 days.
**§ 3124.1.  Sexual assault.**
   Except as provided in section 3121 (relating to rape) or
3123 (relating to involuntary deviate sexual intercourse), a
person commits a felony of the second degree when that person
engages in sexual intercourse or deviate sexual intercourse
with a complainant without the complainant's consent.
(Mar. 31, 1995, 1st Sp.Sess., P.L.985, No.10, eff. 60 days)

**1995 Amendment.** Act 10, 1st Sp.Sess., added section 3124.1. Section 18 of Act 10, 1st Sp.Sess., provided that section 3124.1 shall apply to offenses committed on or after the effective date of Act 10.

**Cross References.** Section 3124.1 is referred to in sections 3124.2, 3124.3, 3125, 3141, 5702, 5708, 9122 of this title; sections 4321, 5329, 6303, 6304, 6344 of Title 23 (Domestic Relations); sections 5551, 5552, 6302, 6307, 6308, 6358, 6402, 6403, 9730.3, 9799.14, 9799.24 of Title 42 (Judiciary and Judicial Procedure).

§ 3124.2. Institutional sexual assault.

(a) General rule.--Except as provided under subsection (a.1) and in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault) and 3125 (relating to aggravated indecent assault), a person who is an employee or agent of the Department of Corrections or a county correctional authority, youth development center, youth forestry camp, State or county juvenile detention facility, other licensed residential facility serving children and youth, or mental health or mental retardation facility or institution commits a felony of the third degree when that person engages in sexual intercourse, deviate sexual intercourse or indecent contact with an inmate, detainee, patient or resident.

(a.1) Institutional sexual assault of a minor.--A person who is an employee or agent of the Department of Corrections or a county correctional authority, youth development center, youth forestry camp, State or county juvenile detention facility, other licensed residential facility serving children and youth or mental health or mental retardation facility or institution commits a felony of the third degree when that person engages in sexual intercourse, deviate sexual intercourse or indecent contact with an inmate, detainee, patient or resident who is under 18 years of age.

(a.2) Schools.--

(1) Except as provided in sections 3121, 3122.1, 3123, 3124.1 and 3125, a person who is a volunteer or an employee of a school or any other person who has direct contact with a student at a school commits a felony of the third degree when he engages in sexual intercourse, deviate sexual intercourse or indecent contact with a student of the school.

(2) As used in this subsection, the following terms shall have the meanings given to them in this paragraph:

(i) "Direct contact." Care, supervision, guidance or control.

(ii) "Employee."

(A) Includes:

(I) A teacher, a supervisor, a supervising principal, a principal, an assistant principal, a vice principal, a director of vocational education, a dental hygienist, a visiting teacher, a home and school visitor, a school counselor, a child nutrition program specialist, a school librarian, a school secretary the selection of whom is on the basis of merit as determined by eligibility lists, a school nurse, a substitute teacher, a janitor, a cafeteria worker, a bus driver, a teacher aide and any other employee who has direct contact with school students.

(II) An independent contractor who has a contract with a school for the purpose of performing a service for the school, a coach, an athletic trainer, a coach hired as an independent contractor by the Pennsylvania Interscholastic Athletic Association or an athletic trainer hired as an independent contractor by the Pennsylvania Interscholastic Athletic Association.

(B) The term does not include:

(I) A student employed at the school.

(II) An independent contractor or any employee of an independent contractor who has no direct contact with school students.

(iii) "School." A public or private school, intermediate unit or area vocational-technical school.

(iv) "Volunteer." The term does not include a school student.

(a.3) Child care.--Except as provided in sections 3121, 3122.1, 3123, 3124.1 and 3125, a person who is a volunteer or an employee of a center for children commits a felony of the third degree when he engages in sexual intercourse, deviate sexual intercourse or indecent contact with a child who is receiving services at the center.

(b) Definitions.--As used in this section, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

"Agent." A person who is assigned to work in a State or county correctional or juvenile detention facility, a youth development center, youth forestry camp, other licensed residential facility serving children and youth or mental health or mental retardation facility or institution, who is employed by any State or county agency or any person employed by an entity providing contract services to the agency.

"Center for children." Includes a child day-care center, group and family day-care home, boarding home for children, a center providing early intervention and drug and alcohol services for children or other facility which provides child-care services which are subject to approval, licensure, registration or certification by the Department of Public Welfare or a county social services agency or which are provided pursuant to a contract with the department or a county social services agency. The term does not include a youth development center, youth forestry camp, State or county juvenile detention facility and other licensed residential facility serving children and youth.

(Dec. 21, 1998, P.L.1240, No.157, eff. 60 days; May 10, 2000, P.L.38, No.12, eff. imd.; Dec. 20, 2011, P.L.446, No.111, eff. 60 days)


**References in Text.** The Department of Public Welfare, referred to in this section, was redesignated as the Department of Human Services by Act 132 of 2014.

Section 27 of Act 16 of 2019 provided that a reference in statute or regulation to "area vocational-technical school" shall be deemed a reference to "area career and technical school," and a reference in statute or regulation to "vocational curriculums" shall be deemed a reference to "career and technical curriculums."

**Cross References.** Section 3124.2 is referred to in sections 4321, 5329, 6303 of Title 23 (Domestic Relations); sections 5551, 5552, 9730.3, 9799.14 of Title 42 (Judiciary and Judicial Procedure).

§ 3124.3. Sexual assault by sports official, volunteer or employee of nonprofit association.

(a) Sports official.--Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual

intercourse), 3124.1 (relating to sexual assault) and 3125
(relating to aggravated indecent assault), a person who serves
as a sports official in a sports program of a nonprofit
association or a for-profit association commits a felony of the
third degree when that person engages in sexual intercourse,
deviate sexual intercourse or indecent contact with a child
under 18 years of age who is participating in a sports program
of the nonprofit association or for-profit association.
    **(b)  Volunteer or employee of nonprofit association.**--Except
as provided in sections 3121, 3122.1, 3123, 3124.1 and 3125, a
volunteer or an employee of a nonprofit association having
direct contact with a child under 18 years of age who
participates in a program or activity of the nonprofit
association commits a felony of the third degree if the
volunteer or employee engages in sexual intercourse, deviate
sexual intercourse or indecent contact with that child.
    **(c)  Definitions.**--As used in this section, the following
words and phrases shall have the meanings given to them in this
subsection unless the context clearly indicates otherwise:
    **"Direct contact."**  Care, supervision, guidance or control.
    **"Nonprofit association."**  As defined in 42 Pa.C.S. § 8332.1
(relating to manager, coach, umpire or referee and nonprofit
association negligence standard).
    **"Sports official."**  A person who supervises children
participating in a sports program of a nonprofit association or
a for-profit association, including, but not limited to, a
coach, assistant coach, athletic trainer, team attendant, game
manager, instructor or a person at a sports program who
enforces the rules of a sporting event sponsored by a sports
program of a nonprofit association or a for-profit association,
including, but not limited to, an umpire or referee, whether
receiving remuneration or holding the position as a volunteer.
    **"Sports program."**  As defined in 42 Pa.C.S. § 8332.1.
(June 18, 2014, P.L.741, No.56, eff. 60 days)

    **2014 Amendment.**  Act 56 added section 3124.3.
**§ 3125.  Aggravated indecent assault.**
    **(a)  Offenses defined.**--Except as provided in sections 3121
(relating to rape), 3122.1 (relating to statutory sexual
assault), 3123 (relating to involuntary deviate sexual
intercourse) and 3124.1 (relating to sexual assault), a person
who engages in penetration, however slight, of the genitals or
anus of a complainant with a part of the person's body for any
purpose other than good faith medical, hygienic or law
enforcement procedures commits aggravated indecent assault if:
        (1)  the person does so without the complainant's
consent;
        (2)  the person does so by forcible compulsion;
        (3)  the person does so by threat of forcible compulsion
that would prevent resistance by a person of reasonable
resolution;
        (4)  the complainant is unconscious or the person knows
that the complainant is unaware that the penetration is
occurring;
        (5)  the person has substantially impaired the
complainant's power to appraise or control his or her
conduct by administering or employing, without the knowledge
of the complainant, drugs, intoxicants or other means for
the purpose of preventing resistance;
        (6)  the complainant suffers from a mental disability
which renders him or her incapable of consent;
        (7)  the complainant is less than 13 years of age; or
        (8)  the complainant is less than 16 years of age and
the person is four or more years older than the complainant
and the complainant and the person are not married to each
other.
    **(b)  Aggravated indecent assault of a child.**--A person
commits aggravated indecent assault of a child when the person
violates subsection (a)(1), (2), (3), (4), (5) or (6) and the
complainant is less than 13 years of age.
    **(c)  Grading and sentences.**--
        (1)  An offense under subsection (a) is a felony of the
second degree.
        (2)  An offense under subsection (b) is a felony of the
first degree.
(Feb. 2, 1990, P.L.6, No.4, eff. 60 days; Mar. 31, 1995, 1st
Sp.Sess., P.L.985, No.10, eff. 60 days; Dec. 9, 2002, P.L.1350,
No.162, eff. 60 days; Dec. 16, 2002, P.L.1953, No.226, eff. 60
days)

    **2002 Amendments.**  The amendments by Acts 162 and 226 are
identical and therefore have been merged.
    **Prior Provisions.**  Former section 3125, which related to
corruption of minors, was added December 6, 1972 (P.L.1482,
No.334), and repealed July 1, 1978 (P.L.573, No.104), effective
in 60 days.
    **Cross References.**  Section 3125 is referred to in sections
1111, 2714, 3124.2, 3124.3, 3141, 5702, 5708, 6105, 9122, 9123
of this title; sections 5329, 6303, 6304, 6344 of Title 23
(Domestic Relations); sections 5551, 5552, 6302, 6307, 6308,
6358, 6402, 6403, 9718, 9730.3, 9799.12, 9799.14, 9977.17,
9799.24 of Title 42 (Judiciary and Judicial Procedure); section
7122 of Title 61 (Prisons and Parole).
**§ 3126.  Indecent assault.**
    **(a)  Offense defined.**--A person is guilty of indecent
assault if the person has indecent contact with the
complainant, causes the complainant to have indecent contact
with the person or intentionally causes the complainant to come
into contact with seminal fluid, urine or feces for the purpose
of arousing sexual desire in the person or the complainant and:
        (1)  the person does so without the complainant's
consent;
        (2)  the person does so by forcible compulsion;
        (3)  the person does so by threat of forcible compulsion
that would prevent resistance by a person of reasonable
resolution;
        (4)  the complainant is unconscious or the person knows
that the complainant is unaware that the indecent contact is
occurring;
        (5)  the person has substantially impaired the
complainant's power to appraise or control his or her
conduct by administering or employing, without the knowledge
of the complainant, drugs, intoxicants or other means for
the purpose of preventing resistance;
        (6)  the complainant suffers from a mental disability
which renders the complainant incapable of consent;
        (7)  the complainant is less than 13 years of age; or
        (8)  the complainant is less than 16 years of age and
the person is four or more years older than the complainant
and the complainant and the person are not married to each
other.
    **(b)  Grading.**--Indecent assault shall be graded as follows:
        (1)  An offense under subsection (a)(1) or (8) is a
misdemeanor of the second degree.
        (2)  An offense under subsection (a)(2), (3), (4), (5)
or (6) is a misdemeanor of the first degree.
        (3)  An offense under subsection (a)(7) is a misdemeanor
of the first degree unless any of the following apply, in
which case it is a felony of the third degree:

        (i)  It is a second or subsequent offense.
        (ii)  There has been a course of conduct of indecent
assault by the person.
        (iii)  The indecent assault was committed by touching
the complainant's sexual or intimate parts with sexual
or intimate parts of the person.
        (iv)  The indecent assault is committed by touching
the person's sexual or intimate parts with the
complainant's sexual or intimate parts.
(May 18, 1976, P.L.120, No.53, eff. 30 days; Feb. 2, 1990,
P.L.6, No.4, eff. 60 days; Mar. 31, 1995, 1st Sp.Sess.,
P.L.985, No.10, eff. 60 days; Nov. 23, 2005, P.L.425, No.76,
eff. 60 days)

    **Cross References.**  Section 3126 is referred to in sections
2714, 3141, 9122 of this title; section 3304 of Title 5
(Athletics and Sports); sections 5329, 6303, 6304, 6344 of
Title 23 (Domestic Relations); sections 5552, 6302, 6358, 6402,
6403, 9730.3, 9799.13, 9799.14, 9799.24 of Title 42 (Judiciary
and Judicial Procedure); section 2303 of Title 44 (Law and
Justice); section 7122 of Title 61 (Prisons and Parole).
**§ 3127.  Indecent exposure.**
   **(a)  Offense defined.--**A person commits indecent exposure if
that person exposes his or her genitals in any public place or
in any place where there are present other persons under
circumstances in which he or she knows or should know that this
conduct is likely to offend, affront or alarm.
   **(b)  Grading.--**If the person knows or should have known that
any of the persons present are less than 16 years of age,
indecent exposure under subsection (a) is a misdemeanor of the
first degree. Otherwise, indecent exposure under subsection (a)
is a misdemeanor of the second degree.
(Mar. 31, 1995, 1st Sp.Sess., P.L.985, No.10, eff. 60 days)

    **1995 Amendment.**  Section 18 of Act 10, 1st Sp.Sess.,
provided that the amendment of section 3127 shall apply to
offenses committed on or after the effective date of Act 10.
    **Cross References.**  Section 3127 is referred to in sections
9122, 9122.1, 9122.3 of this title; sections 5329, 6303, 6304,
6344 of Title 23 (Domestic Relations); sections 5552, 9730.3 of
Title 42 (Judiciary and Judicial Procedure); section 2303 of
Title 44 (Law and Justice).
**§ 3128.  Spousal sexual assault (Repealed).**

    **1995 Repeal.**  Section 3128 was repealed March 31, 1995 (1st
Sp.Sess., P.L.985, No.10), effective in 60 days.
**§ 3129.  Sexual intercourse with animal.**
   A person who engages in any form of sexual intercourse with
an animal commits a misdemeanor of the second degree.
(June 18, 1999, P.L.67, No.8, eff. 60 days)

    **1999 Amendment.**  Act 8 added section 3129.
    **Cross References.**  Section 3129 is referred to in sections
9122.1, 9122.3 of this title; section 5329 of Title 23
(Domestic Relations); section 62A03 of Title 42 (Judiciary and
Judicial Procedure).
**§ 3130.  Conduct relating to sex offenders.**
   **(a)  Offense defined.--**A person commits a felony of the
third degree if the person has reason to believe that a sex
offender is not complying with or has not complied with the
requirements of the sex offender's probation or parole, imposed
by statute or court order, or with the registration
requirements of 42 Pa.C.S. Ch. 97 Subch. H (relating to
registration of sexual offenders) or I (relating to continued
registration of sexual offenders), and the person, with the
intent to assist the sex offender in eluding a law enforcement
agent or agency that is seeking to find the sex offender to
question the sex offender about, or to arrest the sex offender
for, noncompliance with the requirements of the sex offender's
probation or parole or the requirements of 42 Pa.C.S. Ch. 97
Subch. H or I:
    (1)  withholds information from or does not notify the
law enforcement agent or agency about the sex offender's
noncompliance with the requirements of parole, the
requirements of 42 Pa.C.S. Ch. 97 Subch. H or I or, if
known, the sex offender's whereabouts;
    (2)  harbors or attempts to harbor or assist another
person in harboring or attempting to harbor the sex
offender;
    (3)  conceals or attempts to conceal, or assists another
person in concealing or attempting to conceal, the sex
offender; or
    (4)  provides information to the law enforcement agent
or agency regarding the sex offender which the person knows
to be false.
   **(b)  Definition.--**As used in this section, the term "sex
offender" means a person who is required to register with the
Pennsylvania State Police pursuant to the provisions of 42
Pa.C.S. Ch. 97 Subch. H or I.
(Nov. 29, 2006, P.L.1567, No.178, eff. Jan. 1, 2007; Dec. 20,
2011, P.L.446, No.111, eff. one year; Feb. 21, 2018, P.L.27,
No.10, eff. imd.; June 12, 2018, P.L.140, No.29, eff. imd.)

    **2018 Amendment.**  Act 29 reenacted section 3130.
    **2006 Amendment.**  See the preamble to Act 178 in the appendix
to this title for special provisions relating to legislative
intent.
    **Cross References.**  Section 3130 is referred to in section
5329 of Title 23 (Domestic Relations).
**§ 3131.  Unlawful dissemination of intimate image.**
   **(a)  Offense defined.--**Except as provided in sections 5903
(relating to obscene and other sexual materials and
performances), 6312 (relating to sexual abuse of children) and
6321 (relating to transmission of sexually explicit images by
minor), a person commits the offense of unlawful dissemination
of intimate image if, with intent to harass, annoy or alarm a
current or former sexual or intimate partner, the person
disseminates a visual depiction of the current or former sexual
or intimate partner in a state of nudity or engaged in sexual
conduct.
   **(b)  Defense.--**It is a defense to a prosecution under this
section that the actor disseminated the visual depiction with
the consent of the person depicted.
   **(c)  Grading.--**An offense under subsection (a) shall be:
    (1)  A misdemeanor of the first degree, when the person
depicted is a minor.
    (2)  A misdemeanor of the second degree, when the person
depicted is not a minor.
   **(d)  Territorial applicability.--**A person may be convicted
under the provisions of this section if the victim or the
offender is located within this Commonwealth.
   **(e)  Nonapplicability.--**Nothing in this section shall be
construed to apply to a law enforcement officer engaged in the
performance of the law enforcement officer's official duties.
   **(f)  Concurrent jurisdiction to prosecute.--**In addition to
the authority conferred upon the Attorney General by the act of
October 15, 1980 (P.L.950, No.164), known as the Commonwealth
Attorneys Act, the Attorney General shall have the authority to

investigate and to institute criminal proceedings for any violation of this section or any series of violations involving more than one county of this Commonwealth or another state. No person charged with a violation of this section by the Attorney General shall have standing to challenge the authority of the Attorney General to investigate or prosecute the case, and, if a challenge is made, the challenge shall be dismissed, and no relief shall be made available in the courts of this Commonwealth to the person making the challenge.

**(g) Definitions.**--As used in this section, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

"**Law enforcement officer.**" Any officer of the United States, of the Commonwealth or political subdivision thereof, or of another state or subdivision thereof, who is empowered to conduct investigations of or to make arrests for offenses enumerated in this title or an equivalent crime in another jurisdiction, and any attorney authorized by law to prosecute or participate in the prosecution of such offense.

"**Minor.**" An individual under 18 years of age.

"**Nudity.**" As defined in section 5903(e).

"**Sexual conduct.**" As defined in section 5903(e).

"**Visual depiction.**" As defined in section 6321.

(July 9, 2014, P.L.1013, No.115, eff. 60 days)

**2014 Amendment.** Act 115 added section 3131.
**Cross References.** Section 3131 is referred to in section 8316.1 of Title 42 (Judiciary and Judicial Procedure).
**§ 3132. Female mutilation.**

**(a) Offense defined.**--A person commits the offense of female mutilation if the person:

    (1) knowingly circumcises, excises or infibulates the whole of any part of the genitalia of a minor;

    (2) is a parent of a minor and the parent knowingly consents or permits the circumcision, excision or infibulation of the whole or any part of the minor's genitalia; or

    (3) knowingly removes or permits the removal of a minor from this Commonwealth for the purpose of circumcising, excising or infibulating, in whole or in part, the genitalia of the minor.

**(b) Grading.**--Female mutilation is a felony of the first degree.

**(c) Exception.**--The provisions of subsection (a) shall not apply if the circumcision, excision or infibulation is:

    (1) necessary to the health of the minor on whom it is performed and either is performed by a physician or is performed in the presence of a physician by a person in training to become a physician in accordance with the act of October 5, 1978 (P.L.1109, No.261), known as the Osteopathic Medical Practice Act, or the act of December 20, 1985 (P.L.457, No.112), known as the Medical Practice Act of 1985; or

    (2) performed on a minor in labor or who has just given birth and is performed for medical reasons connected with that labor or birth by a physician or in the presence of a physician by a person in training to become a physician in accordance with the Osteopathic Medical Practice Act or the Medical Practice Act of 1985.

**(d) Custom or consent not a defense.**--It shall not be a defense to a prosecution under this section that:

    (1) the actor believed that the procedure was necessary or appropriate as a matter of custom, ritual or standard practice; or

    (2) the minor upon whom the circumcision, excision or infibulation was performed consented to the procedure or that the minor's parent consented to the procedure.

**(e) Definitions.**--As used in this section, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

"**Minor.**" A natural person who is a female under 18 years of age.

"**Parent.**" The term includes a natural parent, stepparent, adoptive parent, guardian or custodian of the minor.

(June 28, 2019, P.L.210, No.21, eff. 60 days)

**2019 Amendment.** Act 21 added section 3132.
**§ 3133. Sexual extortion.**

**(a) Offense defined.**--A person commits the offense of sexual extortion if the person knowingly or intentionally coerces or causes a complainant, through any means set forth in subsection (b), to:

    (1) engage in sexual conduct, the simulation of sexual conduct or a state of nudity; or

    (2) make, produce, disseminate, transmit or distribute any image, video, recording or other material depicting the complainant in a state of nudity or engaging in sexual conduct or in the simulation of sexual conduct.

**(b) Means of subjecting complainant to sexual extortion.**--A person subjects a complainant to sexual extortion through any of the following means:

    (1) Harming or threatening to harm the complainant or the property of the complainant, the reputation of the complainant or any other thing of value of the complainant.

    (2) Making, producing, disseminating, transmitting or distributing or threatening to make, produce, disseminate, transmit or distribute any image, video, recording or other material depicting the complainant in a state of nudity or engaged in sexual conduct or in the simulation of sexual conduct.

    (3) Exposing or threatening to expose any fact or piece of information that, if revealed, would tend to subject the complainant to criminal proceedings, a civil action, hatred, contempt, embarrassment or ridicule.

    (4) Holding out, withholding or threatening to withhold a service, employment, position or other thing of value.

    (5) Threatening to cause or causing a loss, disadvantage or injury, including a loss, disadvantage or injury to a family or household member.

**(c) Demanding property.**--A person commits the offense of sexual extortion if the person knowingly or intentionally:

    (1) solicits or demands the payment of money, property or services or any other thing of value from the complainant or a family or household member of the complainant in exchange for removing from public view or preventing the disclosure of any image, video, recording or other material obtained through a violation of subsection (a)(2); or

    (2) disseminates, transmits or distributes, or threatens to disseminate, transmit or distribute, an image, video, recording or other material depicting the complainant in a state of nudity or engaging in sexual conduct or the simulation of sexual conduct to another person or entity, including a commercial social networking site, and solicits or demands the payment of money, property or services or any other thing of value from the complainant or a family or household member of the complainant in exchange for removing from public view or preventing disclosure of the image, video, recording or other material.

**(d) Grading.**--

    (1)  Except as otherwise provided in paragraphs (2) and (3), a violation of this section shall constitute a misdemeanor of the first degree.

    (2)  A violation of this section shall constitute a felony of the third degree if the actor is at least 18 years of age and:

        (i)  the complainant is under 18 years of age;

        (ii)  the complainant has an intellectual disability; or

        (iii)  the actor holds a position of trust or supervisory or disciplinary power over the complainant by virtue of the actor's legal, professional or occupational status.

    (3)  A violation of this section shall constitute a felony of the third degree if:

        (i)  the violation is part of a course of conduct of sexual extortion by the actor; or

        (ii)  the actor was previously convicted or adjudicated delinquent of a violation of this section or of a similar offense in another jurisdiction.

**(e)  Sentencing.--**The Pennsylvania Commission on Sentencing, in accordance with 42 Pa.C.S. § 2154 (relating to adoption of guidelines for sentencing), shall provide for a sentence enhancement within its guidelines for an offense under this section when at the time of the offense the complainant is under 18 years of age or has an intellectual disability or the actor holds a position of trust or supervisory or disciplinary power over the complainant by virtue of the actor's legal, professional or occupational status.

**(f)  Venue.--**

    (1)  An offense committed under this section may be deemed to have been committed at either the place at which the communication was made or at the place where the communication was received.

    (2)  Acts indicating a course of conduct which occur in more than one jurisdiction may be used by any other jurisdiction in which an act occurred as evidence of a continuing pattern of conduct or a course of conduct.

**(g)  Territorial applicability.--**A person may be convicted under the provisions of this section if the complainant or the offender is located within this Commonwealth.

**(h)  Concurrent jurisdiction to prosecute.--**In addition to the authority conferred upon the Attorney General by the act of October 15, 1980 (P.L.950, No.164), known as the Commonwealth Attorneys Act, the Attorney General shall have the authority to investigate and to institute criminal proceedings for any violation of this section or any series of violations involving more than one county of this Commonwealth or another state. No person charged with a violation of this section by the Attorney General shall have standing to challenge the authority of the Attorney General to investigate or prosecute the case, and, if a challenge is made, the challenge shall be dismissed, and no relief shall be made available in the courts of this Commonwealth to the person making the challenge.

**(i)  Applicability.--**Nothing in this section shall be construed to apply to:

    (1)  A person who acts within the legitimate and lawful course of the person's employment.

    (2)  Works of public interest, including commentary, satire or parody.

**(j)  Definitions.--**As used in this section, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

**"Commercial social networking site."**  A business, organization or other similar entity that operates an Internet website and permits persons to become registered users for the purposes of establishing personal relationships with other users through direct or real-time communication with other users or the creation of web pages or profiles available to the public or to other users. The term does not include an electronic mail program or a message board program.

**"Course of conduct."**  A pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct.

**"Disseminate."**  To cause or make an electronic or actual communication from one place or electronic communication device to two or more other persons, places or electronic communication devices.

**"Distribute."**  To sell, lend, rent, lease, give, advertise, publish or exhibit in a physical or electronic medium.

**"Family or household member."**  As defined in section 2709.1(f) (relating to stalking).

**"Intellectual disability."**  Regardless of the age of the individual, significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; home living; social and interpersonal skills; use of community resources'; self-direction; functional academic skills; work; health; and safety.

**"Nudity."**  As defined in section 5903(c) (relating to obscene and other sexual materials and performances).

**"Sexual conduct."**  Any of the following:

    (1)  Intentional touching by the complainant or actor, either directly or through clothing, of the complainant's or actor's intimate parts. Sexual contact of the actor with himself must be in view of the complainant whom the actor knows to be present.

    (2)  Sexual intercourse as defined in section 3101 (relating to definitions), masturbation, sadism, masochism, bestiality, fellatio, cunnilingus or lewd exhibition of the genitals.

**"Simulation."**  Conduct engaged in that is depicted in a manner that would cause a reasonable viewer to believe was sexual conduct, even if sexual conduct did not occur.

**"Transmit."**  To cause or make an electronic or actual communication from one place or electronic communication device to another person, place or electronic communication device.
(Nov. 27, 2019, P.L.691, No.100, eff. 60 days)

    **2019 Amendment.**  Act 100 added section 3133.

**SUBCHAPTER C**
LOSS OF PROPERTY RIGHTS

**Sec.**
3141.  General rule.
3142.  Process and seizure (Repealed).
3143.  Custody of property (Repealed).
3144.  Disposal of property(Repealed).

    **Enactment.**  Subchapter C was added November 29, 2006, P.L.1567, No.178, effective January 1, 2007.
    **Special Provisions in Appendix.**  See the preamble to Act 178 of 2006 in the appendix to this title for special provisions relating to legislative intent.
**§ 3141.  General rule.**

A person:
    (1)  convicted under section 3121 (relating to rape),
3122.1 (relating to statutory sexual assault), 3123
(relating to involuntary deviate sexual intercourse), 3124.1
(relating to sexual assault), 3125 (relating to aggravated
indecent assault) or 3126 (relating to indecent assault); or
    (2)  required to register with the Pennsylvania State
Police under 42 Pa.C.S. Ch. 97 Subch. H (relating to
registration of sexual offenders) or I (relating to
continued registration of sexual offenders);
may be required to forfeit property rights in any property or
assets used to implement or facilitate commission of the crime
or crimes of which the person has been convicted. The
forfeiture shall be conducted in accordance with 42 Pa.C.S. §§
5803 (relating to asset forfeiture), 5805 (relating to
forfeiture procedure), 5806 (relating to motion for return of
property), 5807 (relating to restrictions on use), 5807.1
(relating to prohibition on adoptive seizures) and 5808
(relating to exceptions).
(Dec. 20, 2011, P.L.446, No.111, eff. one year; June 29, 2017,
P.L.247, No.13, eff. July 1, 2017; Feb. 21, 2018, P.L.27,
No.10, eff. imd.; June 12, 2018, P.L.140, No.29, eff. imd.)

    **2018 Amendment.**  Act 29 reenacted section 3141.
    **Cross References.**  Section 3141 is referred to in section
5803 of Title 42 (Judiciary and Judicial Procedure).
**§ 3142.  Process and seizure (Repealed).**

    **2017 Repeal.**  Section 3142 was repealed June 29, 2017,
P.L.247, No.13, effective July 1, 2017.
**§ 3143.  Custody of property (Repealed).**

    **2017 Repeal.**  Section 3143 was repealed June 29, 2017,
P.L.247, No.13, effective July 1, 2017.
**§ 3144.  Disposal of property (Repealed).**

    **2017 Repeal.**  Section 3144 was repealed June 29, 2017,
P.L.247, No.13, effective July 1, 2017.

**Plaintiff's Exhibit 9**

**News stories from Illinois, Georgia and New York**

**re: enforcement of 42 CFR 483.12**

TOP STORY

# Report: Albany nursing home fined $186K following unreported allegations of sexual abuse

Reports say resident with dementia was assaulting other patients with dementia



PruittHealth Palmyra in Albany. (Source: WALB)

By Emileigh Forrester | May 27, 2020 at 1:31 PM EDT - Updated May 27 at 3:56 PM

*WARNING: This story contains disturbing details of a sexual nature, but they are necessary to provide a full picture of what happened in this case.*

ALBANY, Ga. (WALB) - WALB discovered shocking allegations coming out of an Albany nursing home that has dealt with abuse allegations in the past.

A state health survey report showed that staff at PruittHealth Palmyra saw a man with dementia sexually abuse other nursing home residents with dementia last year.

The report, issued by the Georgia Healthcare Facility Regulation (HFR) division of the Georgia Department of Community Health (DCH), said the nursing home failed to properly report what happened.

The report was filed in October 2019.

In it, the state health surveyors detail sexually abusive incidents committed by a male resident with dementia over a period of 10 days, from Sept. 10-20, 2019.

According to the report, PruittHealth Palmyra staff members saw the man inappropriately touch two female residents, who also have dementia, multiple times and masturbate in front of other residents in the common day room.

This all took place in the nursing home's Memory Support Unit (MSU), the report stated.

On Sept. 16, six days after a staff member observed the first incident, a doctor ordered for the man two medications used to treat hypersexual behavior.

The report said that on both Sept. 19 and 20, a staff member saw the man inappropriately touching one of the women again.

On Oct. 2, state health surveyors started looking into complaints about the facility.

PruittHealth Palmyra then reported the sexual abuse allegations about the male resident to the state HFR division on Oct. 4, 24 days after the first incident.

According to both state and federal law, the nursing home should have done that within just two hours of the first time a staff member saw him inappropriately touch another resident.

The health survey report stated that the facility's director of health services told surveyors that they didn't report the behavior because they felt it wasn't intentionally abusing anyone because of the man's dementia.

The nursing home's administrator at the time said he was under the impression staff members intervened before the man actually touched the other residents.

The state report noted that the facility was cited for seven different violations in this case, including failure to report and investigate abuse allegations and failure to put protective measures into place to protect the women victimized and other residents.

On the date that report was concluded, the U.S. Center for Medicare and Medicaid Services reports that it fined PruittHealth Palmyra $186,564.

---

*Read the full October 2019 report below:*

Her state program advocates for residents in nursing homes across the state.

McNeil said she believed it was especially concerning that, according to the report, this abuse happened to some of the most vulnerable residents.

Melanie McNeil, Georgia's long-term care ombudsman. (Source: WALB)          Brian Lee, executive director of Families for Better Care. (Source: WALB)

"So troubling to read about a situation that wasn't reported," McNeil said. "Intervention didn't happen, and people continued to be at risk."

McNeil said she believes it's likely that if someone committing these acts isn't stopped, it will happen again.

"It just seems to me it's human nature," she said. "If you do something, and, well, nothing happens to you, you'll probably do it again, because nothing happens."

Lee said he believes the failure to report led to more abuse of residents.

McNeil said she believes situations like this raise other questions about what goes on in these types of facilities.

"This was one instance. Had they had others with other residents? If you don't have enough supervision, you don't know," she said.

Both said it is hard to know whether the $186,564 fine will keep this from happening again.

"When people are harmed, it's hard to put a price tag on that, but they do need to, you know, be sure that the next time, (they are) making sure that facility is doing what they're supposed to do, intervening," McNeil said.

Said Lee: "We're talking about the lives and the safety of our loved ones that are living in these places. We have trusted them to be cared for and to be safe within these homes."

### State health care association: Abuse in long-term care facilities is unacceptable and shouldn't be tolerated

The Georgia Health Care Association (GHCA) represents and lobbies for long-term care providers in Georgia.

While GHCA would not comment about this specific case, Devon Barill, GHCA's director of communications, issued a statement about the issue of abuse in nursing homes:

---

*"The safety and wellbeing of all those residing in a long term health care setting is our highest priority. While it would be inappropriate for the Association to comment or speculate on the precise nature of a specific allegation, any instance of abuse is unacceptable and should not be tolerated. Skilled nursing and assisted living centers comply with numerous regulations, along with state and federal laws, that protect their residents. GHCA works continuously with the GBI and our state partners and provides well-attended education for providers, law enforcement, and others related to abuse prevention, signs and symptoms of abuse, and abuse reporting."*

**Devon Barrill, GHCA director of communications**

---

WALB asked Barill what families of nursing home residents can do to protect their loved one's well-being.

"I think it is important to note that incidences of abuse are very rare in nursing centers and other long-term health care settings," Barill said. "Centers across the State are providing high-quality care and ensuring the safety and wellbeing of their residents. In fact, an independent national survey of over 17,000 Georgia nursing center residents and family members indicated that over 90 percent of respondents feel a high level of safety within their center."

Barrill went on to say that if someone has concerns about abuse possibly going unreported, they should file a complaint with the Department of Community Health Healthcare Facility Regulation Division.

### DCH: Families can learn about facilities and read inspection reports online

The Healthcare Facility Regulation division, which conducted the investigation into the case, is part of the Georgia Department of Community Health.

DCH also declined an interview in regards to this case.

However, DCH sent a statement:

---

*"The mission of the Department of Community Health's (DCH) Healthcare Facility Regulation (HFR) Division is always to help protect the residents of Georgia by supporting the delivery of safe, quality health care services through effective regulation and oversight activities. DCH provides a consumer-friendly, public online tool for families to learn more about facilities and review inspection reports. This tool makes searching and comparing health care facilities easier and more convenient, allowing consumers to make more informed decisions about health care options. We encourage families to use the tool when making decisions regarding the care of their family members."*

**Georgia Department of Community Health**

---

DCH said more information can be found here and here.

### Former employee arrested on assault charge in 2018

PruittHealth Palmyra has been affected by allegations of abuse in the past.

In 2018, the Albany Police Department (APD) arrested Angela Robinson who had been working at PruittHealth Palmyra at the time.

APD said in September 2018 that she had a warrant for aggravated assault on a person 65 or older.

The APD incident report showed that the nursing home's administrator at the time called police to report that a cell phone video showed a caregiver slapping, shoving her knee into the stomach and choking an elderly dementia patient who soiled himself.

According to court records, Robinson is still awaiting trial in Dougherty County.

There is also a civil lawsuit against Robinson and PruittHealth Palmyra pending in Dougherty County court.

It was filed anonymously in September 2018.

WTVM FCC PUBLIC FILE
PUBLICFILE@WTVM.COM
(334) 206-1400
EEO REPORT
CLOSED CAPTIONING

WXTX EEO REPORT
PUBLICFILE@WXTX.COM
(706)-494-5400
WXTX FCC PUBLIC FILE
CLOSED CAPTIONING

WTVM CAREERS
PRIVACY POLICY
TERMS OF SERVICE



A Gray Media Group, Inc. Station - © 2002-2020 Gray Television, Inc.

*On WALB NBC and ABC at 6 p.m., watch the full investigative story.*

*Copyright 2020 WALB. All rights reserved.*

RELATED CONTENT



▶ Wrong video conference help line routes to scammers



Dozens of nursing homes cited for infection-related deficiencies early this year now have COVID-19 cases



Watching Your Wallet: Scammers found infiltrating legitimate job po

1909 Wynnton Road
Columbus, GA 31906
(706) 494-5400

CONTACT US ▸



PruittHealth declined an interview for this story but issued a statement:

*"It is truly unfortunate that this incident occurred in the Memory Support Unit (MSU) at PruittHealth-Palmyra. The safety, well-being and dignity of patients are top priorities for PruittHealth, and for that reason, we always invite families to discuss questions or concerns directly with us. In this instance, in an abundance of caution, patients involved were thoroughly assessed and did not show evidence of physical injury or trauma. Likewise, the families were given the opportunity to discuss the events and to express any concerns. At that time, the staff was thanked for their quick response and for keeping residents safe. Out of respect for all involved, we will only discuss additional details directly with the families. We thank them for their compassion and understanding in this emotionally complex and challenging situation."*

**PruittHealth Communications Department**

A follow-up report from the state showed that PruittHealth Palmyra educated staff members and residents about abuse in October and planned to make it part of employee orientation.

That report said the facility had corrected its violations by December 12, 2019.

*Read the full follow-up report below:*

It is not clear whether the staff members involved still work at the facility.

According to inspection reports, the facility's administrator at the time of the allegations is no longer the administrator.

The circumstances around that change are unclear.

## Advocates for nursing home residents react

"My overall reaction: I was stunned. It's a very disturbing report," said Brian Lee, Families for Better Care executive director, which is a national watchdog group that Lee said works to protect the rights of residents in nursing homes.

Lee reviewed the report about the allegations against the resident with dementia and against PruittHealth Palmyra staff.

"If this was happening anywhere else, these would be criminal acts, would be sexual crimes," he said. "So, they should be treated as such in a nursing home. It's very disturbing and sad for the people who had to endure this, and it's heartbreaking for the families who know that their loved ones suffered through this painful abuse."

Melanie McNeil is Georgia's long-term care ombudsman.

Health Law & Business News

# Nursing Home's $83K Fine for Resident Sexual Activity Upheld

By Jacklyn Wille

Dec. 7, 2018, 3:22 PM

- Facility didn't fully investigate consent: court

- Higher penalty amount deemed reasonable

An Illinois skilled nursing facility was properly hit with an $83,800 penalty for failing to adequately address sexual activity among residents with dementia and Alzheimer's disease, the U.S. Court of Appeals for the Seventh Circuit held.

The Center for Medicare and Medicaid Services was right to cite Neighbors Rehabilitation Center LLC with penalties for putting residents in "immediate danger," the court said Dec. 7. The facility's practice of intervening in sexual encounters "only when outward signs of non-consent were displayed" wasn't sufficient to protect residents from nonconsensual sexual activity, the court said.

Neighbors failed to investigate whether the encounters were...

© 2020 The Bureau of National Affairs, Inc.   All Rights Reserved

SHARE THIS    💬 *0* comments

https://buffalonews.com/business/local/gowanda-nursing-home-fined-in-connection-with-sexual-assault/article_16809984-ebb...

# Gowanda nursing home fined in connection with sexual assault

By Mary B. Pasciak
Dec 3, 2019



Gowanda Rehabilitation and Nursing Center. (Google)

**A** Gowanda nursing home has been fined $10,000 by the state Health Department in connection with the sexual assault of an 88-year-old resident by another resident.

The Gowanda Rehabilitation and Nursing Center waited more than six hours to report the May 29 assault to police and destroyed possible evidence related to the assault, **the state Health Department concluded** this summer.

The penalty was noted on the department's website among information about fines issued in recent months. The fine was issued on Oct. 15, according to the website, in connection with "multiple deficiencies" found by the department in a report this summer.

A staff member heard the woman calling out, "No, no" in her room around 4:30 a.m. May 29 and found a 73-year-old resident on top of the woman in her bed, with his pants around his ankles, according to a Gowanda Police Department report. The woman's underwear was partially off and her gown was over her head.

Both residents have been diagnosed with dementia, according to the state Health Department's report. The woman also suffers from severe cognitive impairment and is not able to get out of bed without a mechanical lift.

SHARE THIS

 0 comments

A staff member checked on the woman and said she found no evidence of assault. A few hours later, another staff member cleaned the woman and changed her underwear.

It was not until nearly 10 a.m. that a physician assistant examined the woman and determined that she had been sexually assaulted and sent the woman to the hospital to be assessed, according to the Health Department report. About 25 minutes later, the nursing home contacted police.

The woman's daughter, who has power of attorney, filed a civil suit in September against the nursing home and its owners, Personal Healthcare, which is based in Tarrytown, and Ephraim B. Zagelbaum. The nursing home and its owners have denied responsibility in court papers filed Nov. 4 in response.

Jennifer M. Puglisi, the attorney representing the nursing home and its owners, could not be reached Monday for comment.

**Nursing home staff interrupts sexual assault of patient, waits to report it**

 *0* comments

## Most Popular

### Erie County Real Estate Transactions

Updated Jul 9, 2020



Following are real estate transactions over $5,000 as listed in records of the Erie County clerk's office for the week ending May 1. AKRON • 91 John St., Andrew J. Kelkenberg; Lily C. Kelkenberg to Ryan P. Buckley, $170,000. • 6 Fassett St., Daniel A. Borisov to Bethany E. Marshall; Bryan E. Marshall, $122,600. • 37 Bloomingdale, Anthony Cinotti



**Nursing Home Abuse Center**

Comprehensive information on nursing home abuse and neglect for nursing home
residents and their loved ones.
(TEL:+18665489636)

Home (https://www.nursinghomeabusecenter.org/) » Blog (https://www.nursinghomeabusecenter.org/blog/) » Nursing Home Fined for Failing to
Prevent Sexual Abuse

# Nursing Home Fined for Failing to Prevent Sexual Abuse



(https://www.nursinghomeabusecenter.org/wp-content/uploads/2019/08/sexual-abuse.jpg)

A nursing home in Illinois will pay a hefty fine after investigators determined the facility was at
fault for the sexual abuse of a resident.  The Illinois Department of Public Health (IDPH) reports
that the facility will pay $25,000 due to the resident-to-resident sexual assault
(https://www.nursinghomeabusecenter.org/sexual-abuse/).

A report from the IDPH says Dixon Rehabilitation and Healthcare Center
(https://www.saukvalley.com/2019/08/07/nursing-home-fined-after-rape-inquiry/apk3fyn/)
failed to adequately supervise a male resident with known tendencies to sexual aggression.
Further, the facility had a responsibility to prevent the resident from having access to female
residents in the dementia unit.

## Nursing Home Fails to Prevent Sexual Assault

The alleged perpetrator became a resident at Dixon in June, 2018.  He requires around-the-clock
care for diagnoses including frontal lobe dementia, delusional disorders, generalized anxiety
disorder, major depressive disorder, restlessness, and agitation.  He has a history of psychiatric
hospitalization due to altercations with other residents.

After a short stay in a psychiatric hospital, he was readmitted to Dixon in September.  Nursing
home staff created a care plan that called for monitoring certain behaviors and checking on this
resident every 15 minutes.

Over time, the residents behavior became more sexually aggressive.  He began making
inappropriate comments to female staff members and guests in the nursing home.  He expressed
his desire to have sexual activity with other residents to nurses and caregivers.

By October, his behavior had escalated and his care plan included increased behavioral
monitoring.  This was in response to his sitting on a couch next to a female resident and touching
her inappropriately.

In November, two certified nursing assistants (CNAs) responsible for monitoring the resident
were moving furniture around the facility.  The resident was seen pacing in a hallway.  When one
CNA returned from moving a chair to another room, the resident was missing from the hallway.
The CNAs then heard "that hurts" coming from another residents room.

When the CNAs entered the room, the male resident was standing over his victim pulling a
blanket back over her waist.  When staff members asked him what he was doing, he admitted in
vulgar language that he had digitally penetrated the other resident.  After this incident, the male
resident was discharged from the facility.

## Are Nursing Homes Responsible for the Actions of Residents?

Nursing home residents have the right to live in an environment free from abuse. This certainly
includes sexual abuse, harassment, or coercion of any kind.   Long-term care facilities and
nursing homes are responsible for fostering and maintaining this environment.

Resident-to-resident aggression sometimes happens, and nursing homes are responsible for
managing situations appropriately.  Sexually aggressive dementia patients need care in the same
way that all dementia patients do.  The patients themselves are not necessarily responsible for
their behavior, but the facilities who admit them are responsible for making sure that their
behavior doesn't cross the line and endanger innocent victims.

NURSING HOME ABUSE
MEDICAL MALPRACTICE

CALL TOLL FREE
**1-866-548-9636**

Award-Winning National
Nursing Home Abuse Law Firm

# FREE CONSULTATION

Complete the form below, and your case
will be reviewed within 24 hours

**YOUR NAME** *

**YOUR PHONE NUMBER** *

**YOUR EMAIL** *

**DESCRIBE WHAT HAPPENED** *

**IF WE NEED TO CONTACT YOU, WHAT
IS THE BEST WAY?** *

☐ **PHONE**

☐ **EMAIL**

☐ **TEXT**

**SE HABLA ESPAÑOL**

SEND REQUEST NOW

Search

How to Find the Right Nursing Home

Is My Loved One Ready for a Nursing Home
(https://www.nursinghomeabusecenter.org/finding-
a-home/is-my-loved-one-ready-for-a-
nursing-home/)

Determining What Type of Facility Your
Loved One Needs
(https://www.nursinghomeabusecenter.org/finding-
a-home/determining-what-type-of-facility-
your-loved-one-needs/)

Services Offered by Nursing Homes
(https://www.nursinghomeabusecenter.org/finding-
a-home/services-offered-by-nursing-homes/)

Identifying Possible Homes
(https://www.nursinghomeabusecenter.org/finding-
a-home/identifying-possible-homes/)

Narrowing Down the Options
(https://www.nursinghomeabusecenter.org/finding-
a-home/narrowing-down-the-options/)

Making the Best Decision
(https://www.nursinghomeabusecenter.org/finding-
a-home/making-the-best-decision/)

In the case discussed above, Dixon had a plan in place to monitor this resident. However, the IDPH clearly found it to be insufficient and not properly executed. The resident showed a pattern of increasingly aggressive instances of sexual abuse, but he still had access and opportunity.

The IDPH investigation apparently uncovered enough evidence to support the claim that Dixon failed to prevent the assault. The $25,000 fine shows that Dixon failed in their duty to protect not only the victim, but also the alleged perpetrator from being able to carry out his attack.

## Why Does Sexual Abuse Happen in Nursing Homes?

Sexual violence flourishes in an atmosphere of oppression. Many nursing home residents do feel oppressed because many nursing home care procedures derive from a medical model. Nursing home residents are sometimes treated more like patients than like people who are living out their day-to-day lives in a facility that assists them with their daily needs.

In such an environment, it's easier for victims voices to go unheard, and for their concerns to be dismissed. Nursing home residents, especially those with cognitive disabilities, are more likely to be victimized and less likely to experience justice than the general population.

Sexual abuse against nursing home residents may take one of the following forms:

- Staff to resident
- Resident to resident
- Family member to resident
- Other visitor to resident

Resident-to-resident abuse can describe five themes of unwanted and hostile interactions between nursing home residents in a community setting. The categories include inappropriate sexual behavior, roommate problems, invasion of privacy, hostile interpersonal reactions, and unprovoked actions. Among these categories, sexual abuse is the least frequent. Regardless, caregivers in nursing homes have a responsibility to minimize eliminate or prevent all types of abuse.

Sexual violence is not the most common form of sexual abuse nursing home residents experience from each other. Rather, intentional exposure of body parts is the most common form of sexual abuse. As many as 77 percent of CNAs have observed residents intentionally exposing themselves to an unwilling neighbor.

## Victims of Sexual Abuse in Nursing Homes

For many of the victims of sexual abuse in nursing homes, abuse will happen more than once. Perpetrators choose victims based on their real or perceived vulnerability and their likelihood of reporting the attack. This is perhaps why dementia patients and patients with developmental disabilities are some of the most frequent victims of sexual abuse.

In the general population:

- One in five women and one in 71 men will experience rape at some point in their lives.
- 91% of the victims are female, and 9% are male.
- In 80% of cases, the victim knows their attacker.

In one study (https://www.disabilityrightswa.org/reports/understanding-sexual-rights-sexual-assault-resident-advocacy/) of sexual abuse in nursing homes and long-term care facilities:

- Researchers counted 429 instances of sexual abuse over four years.
- The most commonly alleged perpetrators were male facility employees.
- About half of the victims required assistance with all activities of daily living.
- 64% had Alzheimer's type dementia.
- Disclosures of abuse ranged from non-contact offenses to instances of forced penetration.

There are indications that the elderly and people with disabilities are victims of sexual assault more frequently than other groups:

- As many as 83% of females and 32% of males with developmental disabilities are victims of sexual assault.
- 40% of women with physical disabilities have reported sexual assault.
- Disabled women report that their reliance on another person for daily activities results in situations with potential to turn into an attack.
- Among the people who abuse vulnerable adults, 33% are friends or acquaintances, 33% are members of the household, and 25% are caregivers.

## Getting Help with Sexual Abuse in a Nursing Home

It is hard to say that sexual abuse in nursing homes is rare because any instance is one too many. At Nursing Home Abuse Center (https://www.nursinghomeabusecenter.org/nursing-home-abuse-lawyer/), we have reported on several sexual abuse cases recently, which highlights the fact that it does occur. Families should be aware of the risk, and know how to get help.

If you have questions or concerns about sexual abuse in a nursing home, contact Nursing Home Abuse Center. Our team of legal professionals can help you understand your legal rights (https://www.disabilityrightswa.org/reports/understanding-sexual-rights-sexual-assault-resident-advocacy/), as well as that of loved ones in a nursing home. We can also offer advice on how to report possible abuse or neglect. To request a free attorney consultation, call 1-800-516-4783, or contact us (https://www.nursinghomeabusecenter.org/) online.

Sources:

- https://www.saukvalley.com/2019/08/07/nursing-home-fined-after-rape-inquiry/apk3fyn/ (https://www.saukvalley.com/2019/08/07/nursing-home-fined-after-rape-inquiry/apk3fyn/)
- http://eldermistreatment.usc.edu/wp-content/uploads/2016/10/RR-Aggression-Research-Brief.pdf (http://eldermistreatment.usc.edu/wp-content/uploads/2016/10/RR-Aggression-Research-Brief.pdf)
- https://www.disabilityrightswa.org/reports/understanding-sexual-rights-sexual-assault-resident-advocacy/ (https://www.disabilityrightswa.org/reports/understanding-sexual-rights-sexual-assault-resident-advocacy/)

Additional Resources

Links of Interest (https://www.nursinghomeabusecenter.org/resources/links-of-interest/)

Nursing Home Abuse News Archive (https://www.nursinghomeabusecenter.org/category/news/)

PREVIOUS POST

RN Arrested for Stealing Medication in Nursing Home (https://www.nursinghomeabusecenter.org/news/nursing-home-nurse-arrested-stealing-medication/)

NEXT POST

Does Your Nursing Home Have a Generator? (https://www.nursinghomeabusecenter.org/news/nursing-home-generator/)

**Financing Nursing Home Care**

- Insurance Options (https://www.nursinghomeabusecenter.org/financing-nursing-home-care/insurance-options/)
- Government Funding Options (https://www.nursinghomeabusecenter.org/financing-nursing-home-care/government-funding-options/)
- Funding Your Lawsuit (https://www.nursinghomeabusecenter.org/resources/funding-your-lawsuit/)
- Using Personal or Family Resources to Pay for Nursing Home Care (https://www.nursinghomeabusecenter.org/financing-nursing-home-care/personal-resources-nursing-home-care/)

**Resources**

- Talking About Abuse (/resources/talking-about-abuse/)
- Abuse in Assisted Living Facilities (/resources/abuse-in-assisted-living-facilities/)
- Advocacy and Government Agencies (/resources/advocacy-and-government-agencies/)
- Life After Nursing Home Abuse (/resources/life-after-nursing-home-abuse/)
- Abuse of Veterans (/resources/abuse-of-veterans/)

**What To Do (/what-to-do/)**

- File Nursing Home Abuse Complaint (/what-to-do/filing-a-complaint/)
- Legal Rights (/what-to-do/legal-rights/)
- Legal Action (/what-to-do/legal-action/)
- Speak Out (/resources/speak-out/)

**Get in Touch**



(https://www.facebook.com/nursinghomeabusecenter)

- Contact (mailto:info@nursinghomeabusecenter.org)
- About (/about-us/)

*Disclaimer: While we try to provide accurate information, nothing on this page is intended as legal advice. If you have questions or concerns about a particular matter, please request a free consultation with a lawyer. You can fill out the contact form on any page on this website, or call 1-866-548-9636 (tel:+18665489636) to get legal help.*

© 2020 **Nursing Home Abuse Center (https://www.nursinghomeabusecenter.org/)**          8 Things to do if you suspect nursing home abuse (/what-to-do/)

**Plaintiff's Exhibit 10**

**Mrs. A Treatment Flow Sheet**

September 2015

Administration Note:

Information:

| Order | Time | Tu 1 | W 2 | Th 3 | F 4 | Sa 5 | Su 6 | M 7 | Tu 8 | W 9 | Th 10 | F 11 | Sa 12 | Su 13 | M 14 | Tu 15 | W 16 | Th 17 | F 18 | Sa 19 | Su 20 | M 21 | Tu 22 | W 23 | Th 24 | F 25 | Sa 26 | Su 27 | M 28 | Tu 29 | W 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Change 60cc syringe daily. Once A Day 06/08/2015 - Open Ended | 1:00 AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cleanse coccyx with soap & water, pat dry. Apply duoderm to coccyx, check q shift, change Q 5 days & prn for prevention. Other change Q 5 days & prn 06/04/2015 - Open Ended | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline temperature per policy 97.9 08/13/2014 - Open Ended | FYI Only | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weekly Blood Pressure and Pulse on Thursday. Once A Day on Thu 08/13/2014 - Open Ended | 7:30 AM - 3:15 PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Check resident ID Band every day 3-11 Once A Day 12/04/2014 - Open Ended | 3:00 PM - 11:30 PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Skin and nail check with Bath on Tuesday & Friday. Once A Day on Tue, Fri 07/20/2015 - Open Ended | 3:15 PM - 11:30 PM Evening | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| bactracin [OTC] ointment; 500 unit/gram; topical Once A Day Apply to PEG Tube site with PEG Care daily 06/08/2015 - Open Ended | 11:00 PM - 7:30 AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

RE-EVALUATE IN 7 DAYS.

| Initials | Signature | Initials | Signature | Initials | Signature | Initials | Signature | Initials | Signature |
|---|---|---|---|---|---|---|---|---|---|

Physician: Mills, Eric  ph: (814) 878-4916

Resident: ▮

Admit Date: Jul 1 2014 12:01AM

Diagnoses:

August 2015

| MEDICATIONS | HOUR | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 |
|---|---|---|
| CHANGE 60CC SYRINGE DAILY | 02/06/ 11-7 | |
| LEANSE COCCYX WOUND WITH SOAP & WATE. PAT DRY. APPLY DUODERM. CHANGE EVERY 5 DAYS & AS NEEEDED FOR prevention | 03/10/ 7-7 8TH | |

| MEDICATIONS | HOUR | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 |
|---|---|---|

NURSE'S ORDERS, MEDICATION NOTES, AND INSTRUCTIONS ON REVERSE SIDE

| | | | | | |
|---|---|---|---|---|---|
| ING FOR | 08/01/15 | THROUGH | 08/31/15 | PAGE | |
| an | MILIE, ERIC | | Telephone No | | MEDICAL RECORD NO |
| sician | MILIE, ERIC | | Alt. Telephone | | |
| s | | | Rehabilitative Potential | | |
| sis | | | | | 03/18/14 |
| Number | Medicare Number | Complete Entries Checked By: | | | |
| T | A | | | Title | Date |
| | | | | PATIENT CODE ROOM NO | |

**Plaintiff's Exhibit 11**

**Skinner-Hamm-Wilcox-Raymond email.**

**Lewen witness statement**

| From: | Skinner, Brian |
|---|---|
| Sent: | Wednesday, November 25, 2015 9:54 AM |
| To: | Wilcox, Kathleen; Hamm, Raymond |
| Cc: | Raymond, Barbara |
| Subject: | RE: PDC |

correct

**From:** Wilcox, Kathleen
**Sent:** Wednesday, November 25, 2015 9:22 AM
**To:** Skinner, Brian; Hamm, Raymond
**Cc:** Raymond, Barbara
**Subject:** RE: PDC

Brian, By Ms Lewen not attending then we move forward with discipline correct?
**Kathy Wilcox RN** | Clinical Services Manager
PA Department of Military and Veterans Affairs | Bureau of Veterans Homes
560 East 3rd Street | Erie, PA 16507
Phone: 814.878.4929 | Fax: 814.878.4992
www.dmva.state.pa.us

**PRIVILEGED AND CONFIDENTIAL COMMUNICATION** The information transmitted is intended only for the person or entity to whom
it is addressed and may contain confidential and/or privileged material. Any use of this information other than by the intended recipient
is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all
computers. Unintended transmissions shall not constitute waiver of the attorney-client or any other privilege.

*E-Mail: kwilcox@pa.gov*

**From:** Skinner, Brian
**Sent:** Wednesday, November 25, 2015 8:54 AM
**To:** Hamm, Raymond
**Cc:** Raymond, Barbara; Wilcox, Kathleen
**Subject:** RE: PDC

Ms. Lewen is under no obligation to attend a PDC if she wants to waive her due process

I read her statement (she seriously missed her calling – she should have gone on to law school). While I cannot agree
with her "counter allegations" I can certainly appreciate her admittance of the oversight, her attempt at root cause
analysis, and her personal plan of correction ☺

**From:** Hamm, Raymond
**Sent:** Wednesday, November 25, 2015 5:41 AM
**To:** Skinner, Brian
**Cc:** Raymond, Barbara; Wilcox, Kathleen
**Subject:** PDC

Ms Lewen who was being PDC'd for Ms A▮▮▮ Duoderm patch (not signing Treatment record and not changing duoderm
when scheduled on 9/1) made up an elaborate witness statement that essentially states she made the error, gave some
reasons why she thinks the error happened, and stated she was sorry the error occurred. She said no disrespect, she
doesn't have anything else to say regarding this and would like to submit it and forgo the PDC process. That is OK
correct? I can forward her statement to you today, anything else you need let me know. Thanks

1

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

**INTERVIEWED:**                             **EMP. #:  714579**

**INTERVIEWED BY:** _____  **ALSO PRESENT:** _____

**DATE:** _11/25/2015_ **TIME:** _0600_____  **LOCATION:** Supervisor's Office_ _____

## STATEMENT

**The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes including actions under the statutes of this Commonwealth just as though it had been sworn or affirmed before a court of law or formal arbitration panel:**

My name is Nancy Elizabeth Lewen. I am employed as Licensed Practical Nurse (LPN) at the Department of Military and Veteran's Affairs Soldiers' and Sailors' Home in Erie, hereinafter referred to as "PSSH." I have been employed by the Commonwealth of PA for one (1) year. I am also educated at the Bachelor's Degree level in Sociology with a concentration in Gerontology.

Regarding the internal investigation of my conduct and the allegation of "Neglect of Duty or responsibility, failure to perform assigned tasks." Raymond Hamm RNS has satisfactorily proven to me that I did not initial the Treatment Administration Record, hereinafter referred to as the "TAR," and therefore presumably did not inspect a Duoderm on a resident's buttocks on Unit B on the last night of August, 2015. Almost three months later, I can only assume that I did not perform the task, since I did not initial that I did. I DO remember the specific night. I DO NOT remember inspecting any Duoderms on any resident's buttocks on that chaotic night. I admit that I most likely completely overlooked the treatment.

On the night in question, I was assigned as treatment nurse for approximately 75 patients on Units A and B. It was "changeover" night and the very first time of printing out the new TAR in the switch to the new "Matrix" computer system. The employer was well aware of many errors and Matrix glitches. Numerous nursing staff members had worked for many days, attempting to correct errors prior to changeover, but many errors remained. My duty assignment on that night entailed the additional responsibility of checking and correcting the TAR of 75 residents for accuracy, in addition to the usual treatment nurse assignment of actually performing the routinely prescribed treatments for a significant portion of those 75 residents.

I hereby contritely, and with great remorse and regret, admit that on the last night of August, 2015, I did fail to perform an assigned nursing task, but argue that I did not commit "neglect of duty." I do understand the legal definition and different grades of the very serious allegation of "neglect of duty" by a healthcare professional.

It is material to my defense against the allegation of "neglect of duty" to note for the record:

1) That my failure to inspect the patient's buttocks and the Duoderm was *NOT a willful act or omission*.

2) That it was *an unusually chaotic shift and abnormally heavy duty assignment* on that particular night.

3) That this inefficiency occurred as I *attempted in good faith to perform the duties of a nursing assignment that was abnormally heavy and overwhelming*.

4) That I *exercised the same prudence and same standard of care* as a Licensed Practical Nurse that would be given by any reasonable person faced by the same situation with the same duty assignment.

5) That I have never been oriented on Unit B, and have never actually worked on Unit B. I am therefore not as familiar as some nurses are with the treatments on Unit B. On the night in question I had recently gone from part time to full time employment at PSSH, and had worked only on Units A, D and E.

As rebuttal, I counter allege for the record:

1) That *the employer did not initiate disciplinary proceedings against me in a timely manner* for this oversight and/or omission. As a Licensed Practical Nurse employed by the Commonwealth of Pennsylvania Department of Military and Veteran's Affairs, disciplinary proceedings should have been brought against me by PSSH within a reasonable period of time.

2) That *the employer committed "contributory neglect,"* by knowing that an unusual amount of "glitches" and errors existed in the printed TAR on changeover night, yet the employer nevertheless overburdened me and expected me to perform an overwhelming, unrealistic and potentially unsafe assignment, contrary to the best interest of the elderly and debilitated residents who live on Units A and B at PSSH and depend on the employees of PSSH to care for them and to meet their most basic human needs.

I sincerely apologize for omitting the prescribed treatment. I humbly thank Raymond Hamm RNS for calling this oversight to my attention and counseling me accordingly. I tried my very best in a bad situation. I will honestly make a diligent attempt to improve my future conduct and performance.

I have never been disciplined for my conduct in my nursing career. I am aware of the availability of union representatives to assist me.

| 25 November 2015 | NANCY E. LEWEN, LPN | *Nancy E. Lewen* |
|---|---|---|
| **DATE** | **NAME (PRINTED)** | **SIGNATURE** |
| **DATE** | **NAME (PRINTED) INTERVIEWER** | **INTERVIEWER'S SIGNATURE** |
| **DATE** | **NAME (PRINTED) TYPIST** | **TYPIST'S SIGNATURE** |

**NOTE: This form is to be completed and signed by an employee who is a witness to an incident involving an employee of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document**

**Plaintiff's Exhibit 12**

**Interrogatories to Defendant**



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

November 1, 2019

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh PA, 15222

**Nancy Lewen**
**150 Chad Brown Street**
**Providence, RI 02908**

### *RE: Lewen v. Raymond 1:17-cv-148-SPB (Western District)*

Dear Ms. Lewen,

Enclosed please find Defendant's Responses to Plaintiff's First and Second Interrogatories, and Plaintiff's First Request for Production of Documents.

Sincerely yours,

*/s/ Yana L. Warshafsky*
Yana L. Warshafsky
Deputy Attorney General

Encl/KLS

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY E. LEWEN            :
                                  :   Civil Action No. 1:17-cv-148-SPB
            Plaintiff,       :
                                    :
      v.                               :
                                    :   Magistrate Judge Susan Paradise
BARBARA RAYMOND,        :   Baxter
               Defendant.      :

## **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTEROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

**Interrogatories**

1. Identify the specific activity or behavior that the Plaintiff engaged in which led you to terminate her from employment as a Licensed Practical Nurse at the Pennsylvania Soldiers and Sailors Home on March 2, 2016.

**ANSWER: See attached suspension letter dated 3/2/2016, and termination letter dated 3/14/2016. Plaintiff was terminated for the policy violations indicated in the termination letter.**


2. How did you learn about the Plaintiff's above mentioned activity or behavior?

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant, and not proportional to the needs of this lawsuit. Without waiver, this information was brought to my attention by HR.**

3. Identify all witnesses to the events leading up to your termination of the Plaintiff's employment from the Pennsylvania Soldiers and Sailors Home on March 2, 2016, and provide a brief summary of your understanding of what facts each witness is aware of.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. It is further objected to as it is unclear what is meant by "witnesses". By way of further response, a collective decision was made by HR and myself, and with approval from my Chain of Command and Labor Relations advisors, that sufficient evidence of several policy violations existed, and that Plaintiff should be terminated effective March 14, 2016.**

4. Identify any person, other than the Plaintiff, that you communicated with regarding the conduct and behavior of the Plaintiff which led to your decision to terminate her from employment at the Pennsylvania Soldiers and Sailors Home on March 2, 2016. Include the date or dates of communication, the method of communication, and a summary of the communication. If there are any documents, either email, letter, note, memo or otherwise that relate to such communication, please produce a copy.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is overbroad and largely irrelevant. Without waiver, I communicated with Barry Blasic, HR staff, and my chain of command, and collectively a decision was made to terminate Plaintiff. Note that Plaintiff was terminated on March 14, 2016.**

5. Identify how you communicated with the Plaintiff regarding the above mentioned activity or behavior. Include the date or dates of communication, the method of communication, and a summary of the communication. If there are any documents, either email, letter, note, memo or otherwise relating to the communication, please produce a copy

**ANSWER: Plaintiff was notified on 3/4/2016 of a pre-disciplinary conference (PDC) on 3/7/2016. Another PDC was held on 3/10/2016. See supporting documents, attached hereto.**

6. Identify the specific law, rules, regulations, guidelines, ordinances or policies you assert that the Plaintiff violated.

**ANSWER: Please refer to policy violations listed on Plaintiff's termination letter dated 3/14/2016.**

7. Identify the person or persons who informed you of the Plaintiff's Facebook text messages and interactions with Barry Blasic. Indicate when and how such person so advised.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, this information was brought to my attention by HR.**

8. Describe the staffing and workload environment at the Pennsylvania Soldiers and Sailors Home on the night of August 31, 2015, 11-7 shift, which was the shift that you later accused the Plaintiff of "neglect of duty" following a poor facility inspection by the Pennsylvania Department of Health on November 6, 2015. Identify how many skilled nursing home patients the Plaintiff was responsible for caring for as "Unit A and Unit B treatment nurse," or in what role the Plaintiff worked in that night if in any other than as the "Unit A and Unit B treatment nurse" as she alleges.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. By way of further response, this incident resulted in an oral reprimand on 12/15/2015 from HR; Defendant Raymond had no involvement in this incident, other than being informed of the actions taken and approving the discipline.**

9. Describe what other responsibilities the night shift nursing staff were responsible for on the monthly end of month "changeover" night, if any, on the night of August 31, 2015.

**ANSWER: OBJECTION. See response to Interrogatory 8.**

10. Please identify what exact date the Pennsylvania Soldiers and Sailors Home switched from an older method to using Treatment Administration Records generated through the Matrix Long Term Care software program, if it was a date other than September 1, 2015 as the Plaintiff alleges,

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, Matrix software was utilized in PSSH beginning February 25, 2015. New paper and new formatting, NOT new software, was used to print the Treatment Administration Records beginning September 1, 2015.**

11. Identify how many other facility nurses you also made allegations of "neglect of duty" against following the poor inspection by the Pennsylvania Department of Health on November 6, 2015.

ANSWER: **OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Furthermore, this Interrogatory potentially seeks identifying information about non-parties to this lawsuit. Moreover, the Pennsylvania Department of Health does not categorize inspections as "poor" or otherwise.**

12. You accused the Plaintiff of "Neglect of Duty," for failing to check the placement of a bandage on a patient's buttocks on the night of August 31, 2015. Identify how you responded to the Plaintiff's counter allegation of "Facility Contributory Neglect." Include the date or dates of communication, the method of communication, and a summary of the communication. If there are any documents, either email, letter, note, memo or otherwise that relate to such communication, please produce a copy.

**ANSWER:  I have no recollection of personally receiving anything from Plaintiff regarding a counter allegation of "facility contributory neglect".  However, Plaintiff opted not to attend her 11/20/2015 pre-disciplinary conference, which was scheduled to discuss the facility concern of her missed documentation on 9/1/2015; instead, Plaintiff wrote a 'witness statement' dated 11/25/2015 in which she counter-alleged contributory neglect by the facility (see attached).**

13. Identify what date Barry Blasic left employment at the Pennsylvania Soldiers and Sailors Home and under what circumstances. Did he quit or did you terminate him?

**ANSWER:  OBJECTION.  This Interrogatory is objected to as it is irrelevant, confidential, and not proportional to the needs of this lawsuit.**

14. At the Plaintiff's Unemployment Compensation hearing, you testified under oath that at the time that you terminated the Plaintiff, you did not know that she was the employee who had filed the anonymous elder abuse complaints to the Pennsylvania Department of Health on or about December 1, 2015 and the Pennsylvania Office of the Attorney General. Indicate what date you learned that she was the employee who had filed the anonymous elder abuse complaints.

**ANSWER: To this date, I still do not know who made the anonymous complaint to the Pennsylvania Department of Health (PADOH) on or about 12/1/2015. PADOH does not inform a facility who makes complaints. Rather, on 3/28/2016, I received an email from DMVA attorney Steve Bushinski, stating only that Plaintiff had called the PADOH; he did not however, give a date.**

15. What findings did the Pennsylvania Department of Health make from their visit to the Pennsylvania Soldiers and Sailors Home on December 4, 2015 as a result of the Plaintiff's anonymous complaint?

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, on this abbreviated survey the PA Department of Health identified that PSSH had four (4) areas of deficient practice.**

16. On what date did you learn that the visit from the Pennsylvania Department of Health on December 4, 2015 was in response to an anonymous employee complaint?

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit.**

17. Following the poor facility inspection by the Pennsylvania Department of Health in on November 6, 2015 and the Plaintiff's allegation of "Facility Contributory Neglect," indicate all steps you took to eliminate, reduce, draw attention to or otherwise address elder abuse, neglect and/or any other quality of care issues related to nurse staffing levels which might have contributed to patients receiving less than appropriate care.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, as Commandant, I ensure that the practice of PSSH is to uphold and maintain compliance with Federal and State regulations, and to make corrections to any known unsatisfactory practices.**

18. Following the Plaintiff's allegations that administrative bullying by a supervisor could lead to workplace violence at the Pennsylvania Soldiers and Sailors Home, indicate all steps you took to eliminate, reduce, draw attention to or otherwise address administrative bullying, whether real or perceived.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, see response to Interrogatory 17.**

**Request for Production of Documents**

1. Please produce a copy of all documents related to defendant's response to the Interrogatories;

**RESPONSE: See attached.**

2. Produces a copy of any emails that dealt with the issue of elder abuse, neglect or inadequate staffing levelss at PSSH, during Plaintiff's period of employment with PSSH;

**RESPONSE: OBJECTION. This request is objected to as it is overbroad, confidential, irrelevant, and not proportional to the needs of this lawsuit.**

3. Please produce a copy of any emails between yourself and any other person that commented upon favorably, unfavorably, or otherwise, the Plaintiff's performance of her work duties;

**RESPONSE: OBJECTION. This request is objected to as it is overbroad, irrelevant, and not proportional to the needs of this lawsuit. By way of further response, Plaintiff was not terminated due to unfavorable work performance; rather, she was terminated due to policy violations. Without waiver, after a search of my emails from January 2014 through March 14, 2016, I am not in possession of any emails which comment on Plaintiff's work performance.**

Sincerely,

**JOSH SHAPIRO**
**Attorney General**

YANA L. WARSHAFSKY
Deputy Attorney General
PA ID 312915

KAREN M. ROMANO
Acting Chief Deputy Attorney General
Litigation Section

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Date: November 1, 2019

# *Attachment to Interrogatory 1*



**pennsylvania**
DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS

March 14, 2016

Nancy Lewen
3342 West 12th Street
Erie, PA 16505

Employee#: 714579

Ms. Lewen:

This letter is to notify you of your termination from Commonwealth employment as a Permanent, Civil Service, Licensed Practical Nurse (LPN) position at the Pennsylvania Soldiers' and Sailors' Home (PSSH). The termination action is effective immediately.

The reason for your termination is your violation of Executive Order 2002-4, Prohibition of Sexual Harassment in the Commonwealth, Management Directive 505.30 Prohibition of Sexual Harassment in Commonwealth Work Settings, Department of Military and Veterans Affairs (DMVA) Prohibition of Sexual Harassment, DMVA Workplace Violence and Workplace Bullying Prevention Policy, Management Directive 205.33 (Workplace Violence), Management Directive 205.34 (IT Acceptable Usage), and the Department's Standards of Conduct and Work Rules: Unauthorized Behavior. Specifically, you engaged in intimidating, threatening and inappropriate conduct and behavior towards your coworkers and your chain of command. Your conduct and behavior has created an intimidating and hostile work environment.

A Pre-Disciplinary Conference (PDC) was held with you on March 7, 2016 & March 10, 2016 and you failed to provide an acceptable explanation for your actions. You said that if given the opportunity you would do it all again. In addition, after the PDCs you sent correspondence to your chain of command indicating "bloodshed I fear may happen one day at PSSH."

Your previous discipline includes a written reprimand issued on February 24, 2016 and an oral reprimand issued on December 15, 2015.

Please immediately return any State property that is in your possession (including the following items: records; keys; tools; equipment; books; reports; manuals; Red Card; identification cards; etc.) to Brian Skinner in Human Resources by calling 878-4944 to make arrangements.

You may appeal the above action through your collective bargaining agreement, whether or not you are a member of the union. A grievance under your collective bargaining agreement must be filed, in writing, within the time limits established in your collective bargaining agreement.

This action is being taken under Section 807 of the Civil Service Act, and can be appealed in writing within 20 days of the receipt of this letter on the grounds that this action has been taken in violation of the provisions of said act. Your rights in this personnel action are explained in Parts II and III of "Appeal Request", Form SCSC-4112, copies of which are attached. Please

note that an appeal may NOT be pursued simultaneously through the Civil Service Commission and your labor agreement's grievance procedure.

Your group life insurance coverage ends immediately and, therefore, you will receive a conversion notice from the Prudential Life Insurance Company. You have a 31-day period following the date of termination or 15 days from the date of the conversion notice to apply for an individual policy of life insurance in an amount not to exceed the amount of insurance lost. You will not be required to have a medical examination. If you should die in the 31-day period, your Group Life Insurance will be paid to your beneficiary(es) as though your insurance had not terminated or been reduced. If you want to apply for conversion, contact your local Prudential Office for assistance.

Because of termination of service, you have the right, if desired, to make application at the Bureau of Employment Security Office for benefits under the Pennsylvania Unemployment Compensation Law. Determination of eligibility for benefits is the responsibility of your local Pennsylvania Job Center, which administers the Unemployment Compensation Fund. The attached UC-1609 Form, How to Apply for Unemployment Compensation (UC) Benefits, must be in your possession if you make application for benefits.

You will be contacted by the Pennsylvania Employees Benefit Trust Fund (PEBTF) regarding your continuation of medical benefits under COBRA. Any questions may be referred to PEBTF at 1-800-522-7279. Any earned, unused annual, personal, holiday or compensatory leave will be computed to the last day you are in compensable status and compensation therefore will be sent to you.

You should contact the SERS Regional Counseling Center at 1-800-633-5461 for information on your pension entitlement with the State Employees' Retirement System.

Should you have any questions or need additional information, please feel free to contact the Human Resource office.

Sincerely,

Barbara L. Raymond, RN, NHA
Commandant
Pennsylvania Soldiers' and Sailors' Home

For:
Anthony J. Carrelli
Brigadier General, Pennsylvania
    Air National Guard
Acting Adjutant General

**Certified Mail**
Original Sent Via Regular Mail

cc: Director, AFSCME District Council #85
President, AFSCME Local #2352
Official Personnel Folder
SCSC
FITG Human Resources
Supervisor



**pennsylvania**
DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS

March 2, 2016

Nancy Lewen
3342 West 12th Street
Erie, PA 16505

Employee#: 714579

Dear Ms. Lewen:

This is written confirmation of your suspension pending investigation from your Permanent, Civil Service Licensed Practical Nurse position at the Pennsylvania Soldiers' and Sailors' Home, effective March 2, 2016. We have made several unsuccessful attempts to verbally notify you of this leading to this letter being hand delivered to your home address. The period covered by this suspension cannot be charged to annual, sick, personal, compensatory or other leave.

This suspension without pay is pending further investigation into allegations of violating the DMVA Standards of Conduct and Work Rules, the Workplace Violence and Workplace Bullying Prevention Policy, Management Directive 205.33 (Workplace Violence). At the conclusion of this investigation appropriate action will be taken in accordance with the Commonwealth of Pennsylvania and Department of Military and Veteran's Affairs policies. You will be notified of any action taken.

You are directed to return all state property that is still in your possession to Brian Skinner, Facility HR Analyst. This includes any and all keys, records, tools, equipment, Emergency Response Card, reports, manuals, identification cards, etc. Please make arrangements for the return of these items by calling Brian Skinner at 814-878-4944.

**As a result of this suspension, you are not permitted to be on grounds at the Pennsylvania Soldiers and Sailors Home unless explicit permission is granted by the Commandant or the Human Resource Officer.** You may come on grounds to attend your Pre-Disciplinary Conference, if and when you receive such a notice informing you of the time and date.

When the investigation has not revealed cause for disciplinary action, the suspension shall be retracted and expunged from all records, with the employee receiving back pay for the full period of suspension. When the investigation has revealed cause for disciplinary action, the suspension shall be converted, either in whole or in part, to a disciplinary action.

This action is being taken under Section 807 of the Civil Service Act, and can be appealed in writing within 20 days of the receipt of this letter on the grounds that this action has been taken in violation of the provisions of said act. Your rights in this personnel action are explained in Parts II and III of "Appeal Request", Form SCSC-4112, copies of which are attached.



NOTE: An appeal may NOT be pursued simultaneously through the Civil Service Commission and your labor agreement's grievance procedure.

Since your position is covered by a recognized bargaining unit, whether or not you are a member of the union, you may appeal this action at the appropriate step of your labor agreement's grievance procedure.

In accordance with the provisions of the Patient Protection and Affordable Care Act of 2010, your Commonwealth-provided benefits will continue for 91 days from the first day of this suspension pending investigation, provided that you continue to make the required employee contribution. Should the suspension continue past 91 days, Commonwealth-provided benefits will end effective the following day. If you are enrolled in health benefits at that time, the Pennsylvania Employees Benefit Trust Fund will contact you regarding continuation of coverage under COBRA.

Should you have any questions or need additional information, please feel free to contact the Human Resource Office.

Sincerely,

Barbara Raymond

Barbara L. Raymond, RN, NHA
Commandant
Pennsylvania Soldiers' and Sailors' Home

For:
Anthony J. Carrelli
Brigadier General, Pennsylvania
    Air National Guard
Acting Adjutant General

Hand Delivered
Original Sent Via Certified Mail

            cc:.    Director, AFSCME District Council #85
            President, AFSCME Local #2352
            SCSC
            Official Personnel Folder
            FITG Human Resources
            Supervisor

# *Attachment to Interrogatory 5*



**pennsylvania**
DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS

**DATE:** March 4, 2016

**SUBJECT:** PDC Notice

**TO:** Nancy Lewen, LPN


**FROM:** Brian Skinner HR Analyst

This is to inform you that an investigation is being conducted into allegations concerning your violations of the DMVA Standards of Conduct and Work Rules, DMVA Workplace Violence and Workplace Bullying Prevention Policy, Management Directive 205.33 (Workplace Violence), Information Technology acceptable use policy, Management Directive 205.34 (IT Acceptable Usage), DMVA Prohibition of Sexual Harassment, Management Directive 505.30 (Sexual Harassment) and Executive Order 2002-4
A conference with you has been scheduled for:

**DATE:** 03/07/2016

**TIME:** 1:00 PM

**PLACE:** Supervisors Office

The purpose of the conference is to present you with the opportunity to discuss the allegations and to respond in detail to the charges listed above. At the conference, you will be requested to provide your account of the incident being investigated. You will, at your request, be allowed union representation at this meeting. However, it is your obligation to obtain such representation.

Should you choose not to attend this conference, decisions concerning appropriate action that may be warranted will be made based on the information available.

Corrective action may or may not be imposed depending on the facts gathered during the investigation. You will be notified as soon as possible of the final outcome of the investigation, whether or not corrective action is taken.

If you have any questions concerning this meeting, please feel free to contact me at **(814)-878-4944**

Present: Brian Skinner, HR; Kathy Wilcox, DON; Erika Seese, HR; Nancy Lewen, LPN; Jodie Dickey, Union Representative

PDC convened at 1300

Q. Describe your relationship with Mr. Barry Blasic.

NL: Friends with him on the job. We used to work together on the night shift and after his wife committed adultery and left him I began to offer words of encouragement off duty, online, on Facebook messenger or e-mail. I tried to see if he would like to go on a date with me to the Cleveland Museum of Art.

Q. How did you communicate with him?
NL: On Facebook Messenger.

Q. When did he correspond with you last on Facebook?
NL: Gosh, I would say in January. At that point he was interested in going to the Cleveland Museum of Art with me. After that, I would say that he didn't respond with me. So at that point, it was maybe one sided. He had blocked me on Facebook. Actually I had contacted him because he had signed up for an online dating profile. I saw that he signed up and the information he gave, he wasn't careful, led to the address of the home where the children reside. There was correspondence last week. Jokingly, I said, "Feel free to file a formal harassment complaint if you'd like to." Never in a million years did I think that a state vehicle would pull up and serve me papers when I was babysitting my grandson.

Q. Previously, you sent quite a few messages to him.
NL: I know, I have sent him quite a bit of messages.

Q. Did he ever respond?
NL: In January, yes. It was close to his court hearing. The last thing he said was "Remind me".

NL showed a picture of a dog with flowers and a heart that was sent to her by Mr. Barry Blasic.

NL: I admit to that, I sent messages and it was completely off duty and it was via our private social media, nothing that would violate that policy. I don't dispute that he hasn't

responded, since January, he hasn't. I think that it was just hard for him to step out into the dating world and that he is a shy person. I don't need to lose my job over it. I'm an adult and capable of being friends and for maybe arranging the schedule for us not to work together.

Q. How did you know about the Plenty of Fish profile?
NL: I suggested to him to do so, I thought it would be good for him. I told him to be careful. I didn't tell him to go online and create it so people could see his personal information. There are a lot of sickos out there.

Q. What did you mean when you said "Don't be a Matt"?
NL: Last year I was dating someone and before we had already met in person he was trying to get me to take his kids bra shopping. I was referring as to "not be Matt" as in not getting his kids involved. I wish you would have known the context of that. I could never hurt Barry. I did threaten to contact his ex-wife; I don't care that she committed adultery and that she was a bad mother. I care about her safety. I did follow through with it; I'm a feminist, what can I say? So I wrote the letter to his ex-wife and I sent it to his private e-mail and I said, "by the time you read this it would be too late." I was just joking when I said that he could file a harassment charge against me. I didn't mean to get the state involved. And then he filed a case against me.

Q. You sent the tracking number to his e-mail account, and you said you were joking about filing a grievance?

NL: Well, yeah. Of course I was joking. I know it wouldn't violate any workplace codes of conduct.

Q. You talk about how you were able to find out about his kids.

NL: That's what I was trying to warn him of. If I was a sicko I would be led right to his house. There are many sex offenders near his home. It's a waste of government resources to be here; and taking me off of the schedule is not in the best interest of the residents.

Q. I assure you, the residents are being taken care of. If you were actually looking up someone's children you couldn't see how that could be inappropriate?

NL: I care about her and their safety. She's a female and I'm looking out for all females.

Q. You wouldn't be concerned about prying into someone's personal life?

NL: He put it out there.

Q. Well, you looked it up.

NL: He put it online and as an example I was showing him. I told him to take it off there and he didn't take my advice as a friend. It's all a big misunderstanding and instead of wasting government resources we could have sat down as friends and rectified this. Am I concerned about his ex-wife; yes. I'm concerned about the any female living alone. He did take down his online profile I did notice over the weekend. So, he did take my advice.

Q. Sending the letter to his ex-wife and saying you can file a sexual harassment statement and using your work e-mail to send things to his work e-mail; that doesn't come across as intimidating to you?

NL: No, it doesn't. It's informative. He shouldn't be using his e-mail on the job. I tried to do the right thing and maybe I made a mistake and shouldn't have said anything. It's all a misunderstanding.

Q. How is it a misunderstanding?

NL: Because, I wanted to go on a date with him; now, he doesn't now, which is fine. It never had to get to this. When my daughter was a victim of domestic violence I can't even tell you how many letters I have sent. Letters are more powerful than fists.

Q. You told us in your own words that he stopped responding to you in early January, yet you continued to send an abundance of e-mails, many of them work-related, without ever getting another response. Why keep sending the messages?

NL: Actually, I can't answer that. Maybe it would have been helpful for someone to sit down with us as adults. I should have just backed off. I thought he was just shy to get back in the dating world and waiting for his divorce to be final. I thought wrong, obviously.

Q. You gave Mr. Raymond Hamm a grievance form regarding discrimination, is this correct?

NL: I never turned that in.

Q. What was your intention of that?

NL: This was when I was working on unit C and he said to me that I need to be in compliance with my med counts. I said that I was just doing it just the way it was oriented to me. I don't have a problem being in compliance; I was just doing it the way I was told. If you are going to make me be in compliance on that unit, you should make everyone be in compliance on all units. That's what that was about. Ray took this and it

wasn't supposed to go any further than him and I. Ray said it wasn't fair for him, so I never signed it; it was never turned in.

Q. If it was a grievance against him, why would you take it to him?

NL: Because he is my supervisor.

Q. This is very intimidating and in a threatening manner. You are taking it to him and giving it to him and saying "what do you think about this"?

NL: Well, I never filed it.

Q. Could you understand how this could be intimidating and very inappropriate?

*Moment of silence

NL read the above mentioned document.

NL: I'm sorry, I'm reading and I forgot all what I had written here. I'm just reading through it. The other thing I was bringing to his attention was I didn't think they were deducting for fifteen minute pay breaks or time when nightshift A goes over and helps. A few weeks back I had mentioned it to another LPN about it.

Q. "We cuddled for almost an hour", what did you mean?

NL: What I meant was not cuddled actually, I meant talking as friends. Maybe I used the wrong term.

Q. Slay Nancy Flanigan?

NL: Nancy Flanigan, from what I've heard, is telling Kim Horvath how to do the scheduling. I guess this is what I get for caring too much.

Q. Do you understand this type of behavior is inappropriate and threatening by giving him that document? When you handed it to him did you feel that?

NL: I thought Ray and I had verbally resolved it as friends. I really didn't think it was going to come to this. I didn't think it was intimidating, no; but I think that he should be aware.

Q. Then why did you go on in your message to further say that you found yourself giggling about your allegations from Ray?

NL: Because, it was funny that he was shocked and that he wasn't aware of it. And he kept saying that it wasn't fair to blame that on him. And I said, "Well I'm just telling you." Like I said, if they are going to expect us to be compliant on one unit, then they

should expect everyone to be in compliance. And anyone that says they are in compliance are lying. When you have forty patients to pass pills to on an evening shift and doing everything by regs you can't be in compliance. And deal with emergencies and everything else.

KW: I would like to add; DOH came in on a complaint and did an investigation and we did meet our requirements for resident care.

Q. Regarding your post recently on Facebook, after you received your suspension pending notice, information came to us that you posted you wondered if General Carelli knew about this.

NL: I was upset that night. I didn't even know what I had done wrong. That was after the state vehicle pulled up to my house.

Q. You also posted what appears to be a photo shopped picture of Barry and you.

NL: Yes, I admit that. I don't deny any of this, and quite honestly, if I would have been an actual violent person, god forbid, what would have happened that night. To serve a person papers saying you are suspended without pay; fortunately, I have access to funds that I could live on for about a year. God forbid, though, this is not a good policy to have this happen. I did contact the general to see if this could be resolved. I did not feel it was in the best interest of the residents to be off the schedule. This whole thing could have been resolved.

Q. How could it have been resolved?

NL: In hindsight, I shouldn't have cared I should have just kept to myself and coming in and doing a good job and do the best of my ability. Don't worry about trying to make it a better place or being in compliance. When Dawn was going through a hard time I set up a funding page and raised thousands of dollars. I care about my co-workers. I am a prior victim of domestic violence. I'm done; you've insulted me enough. I'm done.

*NL stood up from her seat, tossed her PSSH name badge on the table and began gathering her belongings to leave.

KW: Are you resigning?

NL: What am I supposed to do?

Q. Do you have any other questions?

NL: No, I don't. Well, actually, when will I know? I'm in the middle of buying a house, so I need to prove my sources of income.

Q. We just need to compile and analyze. You chose to end this conference prematurely...

NL: No, no. Please, keep going; ask me whatever you need to.

*NL put her belongings down, returned to her seat at the table and appeared to be ready for further questioning.

Q. If you were a violent person? Did you have any violent thoughts?

NL: No, I did not have any violent thoughts, I was confused. Am I an emotional person; yes. Do I take these things seriously; I do.

Q. You mentioned about getting a gun and shooting them. Do you think that's appropriate thing to say in this day and age?

NL: You'd have to know the context of that. There was a supervisor there that was having a bad day and yelled at me and I felt as my supervisor Ray witnessed it and should have stepped in.

Q. Do you think that was appropriate to state to a co-worker that you could go out to the vehicle and get a gun and shoot them and her? You also stated that you have a diagnosis of PTSD.

NL: I do, I was a victim of domestic violence. If you are looking for an answer then probably not. No; is that what you're looking for?

Q. Would the Union like to add anything?

JD: I just wanted to know, like, are we offered a SEAP card?

NL: Yes, I was offered a SEAP card.

KW: Ray Hamm gave Nancy a SEAP card.

No further questions.

Meeting adjourned at 1350.

Lewen PDC Minutes

3.10.16

Present: Brian Skinner, HR; Erika Seese, HR; Nancy Lewen, LPN; Jodie Dickey, Union Representative

PDC convened at 1300

Q. I would like you to talk freely about the discrimination with Ray Hamm.

NL: Actually, he had come over one night and told me I was not in compliance with my med pass. I said that if you are going to make me be in compliance with med pass then everyone should be. We had an informal talk about that and I didn't think it was going to go any further; obviously it did.

Q. So you did a statement and gave it to him. Was that an intention to intimidate him?

NL: Oh gosh, no. The intent was to bring it to his attention, because they were trying to say that they were sending the night shift CNA from C to A and B, and they were pinning that on him.

Q. Let me explain, that as supervisors, they can make arrangements and changes however they see fit and choose to. Why does that make you a victim of sexual discrimination? Did you know that making a serious statement and claim about such is a violation?

NL: The next night he did not pass the message along to John Slupski, okay? Like he should have. And as I said, I didn't sign a witness statement; we had friendly talk that night and I didn't sign the statement.

Q. Who is taking care of your residents while you are investigating all of this and who was notified of what?

NL: I was on unit E, and it was via telephone.

Q. The telephone? Is that a part of your work duties?

NL: I was on unit E. I was concerned that it was getting pinned on Ray.

Q. But I don't think you were because you said you found yourself giggling about it.

NL: Well, yes, I was thinking it was funny.

Q. You were not hired for anything of this. You are definitely out of your scope. If you have a problem with your supervisor where do you go? If there is a serious infraction of sexual harassment where would you go?

NL: I would go to my supervisor.

Q: You would? If there is a serious infraction of sexual harassment, where would you go?

NL: Well, I would go to his supervisor. What I don't understand is that Rhonda Wilkinson said that the last night I was here that it was her duty to make sure that the Commandant's sister and another employee not have sex on the job. If she can do that, then why would I get in trouble for what I did? Why is there a state vehicle pulled up outside my house to suspend me?

Q. Those are serious allegations; how do you know that they are having sex on the job?

NL: Because that's what Rhonda Wilkinson said.

Q. These are serious allegations and some that we are going to have to investigate and that we may have to reconvene with you again.

NL: That's what Rhonda said. That her duties entailed making sure that they don't have sex on the job and how ridiculous that I was getting into trouble for what I did. I was also concerned because I showed Ray the interpretive guidelines for living situations and I felt that they were not calculating that well.

Q. Is that your job? I haven't heard you say anything regarding your job as an LPN.

NL: You're right, that's true.

Q. I'm sure that the staff and supervisors at Erie PSSH are fully capable to assign people and successfully run their facility.

NL: Well, I'm glad you have that confidence. When you leave out of there at 715 in the morning and these people are sitting there with no one to feed them. I offered to stay here unpaid to help and I've been told I'm not allowed. One of the most recent people I told that to Rhonda Wilkinson. That is my service to humanity.

Q. We are paying you to be an LPN and that includes your service to the veterans. Let's get back to Barry, because I understand that you have no idea how this relates to one another.

NL: I do not think I violated any workplace or that I have acted inappropriately.

Q. Would you say you are fixated on Barry?

NL: No, I would say that I tried helping him.

Q. How is that your business as a coworker?

NL: I was concerned about his ex-wife and his children's safety and because I wanted to go with him to the Cleveland Museum of Art. I have sufficiently answered any questions regarding everything with Barry and I with Facebook messenger. I was advised by an attorney yesterday about that.

Q. That's fine, but I will continue my questioning and you can answer as you choose. Okay? Let's get back to Barry. You are confused about why this is a workplace issue. You admitted that you injected yourself in his life. In some of your posts you even admitted to Barry that you stalked him. We have a responsibility for the safety of all of our employees and our residents.

NL: You do not know my sense of humor though.

Q. This sense of humor is not appropriate for the workplace. In your messaging to Barry on February 21 you wrote to him, "I was stalking you, Barry" ... (continues reading Facebook message to Barry) Do you understand that at work you acknowledge that you are stalking him. So, you continue to stalk this co-worker you wrote to him through your work e-mail.

NL: Yes, and I admit that I would cook chicken noodle soup, too. Come on now! Really, truly, you win the argument. Please, just give me my punishment.

Q. There is no argument to win. And this is a fact finding session.

NL: I admit to all the allegations regarding Facebook and messages that pertain to Barry Blasic.

Q. You also mentioned something about kicking Barry's ass.

NL: If you knew me I was figuratively speaking. I was involved with an intelligent man, but, yet he was naïve; stupid enough that in a matter of a week asked me to see if I was going to take his daughters bra shopping. I could have been a man or a pervert. I did not kick *his* ass. I did write a letter to his ex-wife.

Q. Why did you continue if he did not respond to your messages?

NL: Because I thought he was waiting for his divorce to be finalized.

Q. And why did you think that?

NL: Because that was the last message that he sent me.

Q. Do you understand that you brought this to the workplace?

NL: In hindsight, I would not have used my workplace e-mail account to send the tracking number letter to his email. I would not have done that.

Q. What was your intention on sending that tracking number to him?

NL: I wanted him to know that if she showed up at work that he would know. I made an error of judgment.

Q. If you did it all again, would you still send the letter to his ex-wife?

NL: Yes. Let me tell you that I am an overcomer of sexual and domestic violence. The things that I post on Facebook have quite a bit to do with empowering women.

Q. I read the letter to his ex-wife and it's kind of degrading and threatening. It was degrading her about adultery. You don't know the circumstances at all to pass judgments like that. How is that empowering women?

NL: You're right, I know that. But I was expressing concern and looking out for her and their safety.

Q. Is that in your position whatsoever? Barry is your coworker and is that any of your business? You did it for a reason. And you've admitted it; there was motive to get a date with Barry.

NL: I don't care anymore if I ever go on a date to the Cleveland Museum of Art with Barry. Okay?

Q. You are bringing everyone on your Facebook page that works at the Erie facility; you are bringing everyone into this now.

NL: I was confused when I was served (the papers) because I was confused about how I violated the workplace code. There were other ways that someone could have talked to me and resolved this. I think it's so unfair that Rhonda Wilkinson had the duty of making sure the Commandant's sister and Charles aren't having sex at the workplace, but I am getting in trouble for something like this.

Q. Again, we are here to talk about you, not Rhonda Wilkinson.

NL: And I have sought legal counsel and they advised me that I have answered all your questions that you have asked.

Q. You can have legal counsel between you and Barry Blasic, but your lawyer does not have a place in this meeting right now.

NL: I can see the writing on the wall. I can see where this is going. Can we please convene this and just get on with the punishment?

Q. Why did you send the Director of Nursing flowers?

NL: Because she is my Facebook friend and I appreciated that.

Q. Again, taking things like that from online and in personal life to work. Are you aware that violates workplace policy? Do you send everyone on your Facebook list flowers?

NL: She went out of her way to meet me. I don't think Barb Raymond would know me on the street. I'm the type of person that out of love I did that. Not intimidation, not at all. So I violated policy then. I have no desire to go through the stress to be railroaded out the door.

Q. Do you recall having a conversation with Ms. Kathy Wilcox on February 25 in her office?

NL: Yes.

Q. What did you discuss with her?

NL: More or less friendly conversation and she... I don't know; ask your questions, because I'm sure you have a question about it.

Q. Do you remember why you were in there talking to her?

NL: She had called me and asked me if we could talk because I had sent her a question regarding a policy involving urine collection. I thought that I had violated policy for not having a physician's order and I wanted a physician's order, and Kathy confirmed that. Gosh, I wish we could look at the email.

Q. Kathy asked you about filing a discrimination claim, is that correct?

NL: Oh. Yes, I said, "Kathy if you knew me you would know that my degree is in sociology and I post things about women's rights, equal rights." Then, after that, we did become friends and Facebook friends; I thought anyway.

Q. A lot of your answers are either "out of context" or "if you knew me" or "if you knew my personality", but, the problem is that you may have a circle of friends that know your personality, but your workplace friends do not know. It doesn't seem like a joke to us, or to anyone else.

NL: I know, that's why I said just convene this. There are other places to work. I would love to be here for the next 15 years. You know...

Q. Do you recall making a statement about people need to be careful who they are yelling at as one day someone could walk out to their car, get a gun and come back and shoot them?

NL: Yes, I did say that. Okay, first of all, let me say that when I first walked in PSSH I was screamed at from the nurse that was going to orient me. She was stressed and she screamed at me. She didn't mean to, but she was screaming at me. Fast forward to December; I had walked in the supervisor's office and a supervisor, the question that I had, I didn't want to put tape on a resident's legs because his skin was fragile. I didn't want to do it without a physician's order. Supervisor is Deb Cubero and she screamed at me when I walked in the door just to ask about the order for the tape. She screamed at me and called me stupid. Ray was standing there and had this shocked look. He was just as shocked as me. I walked out; didn't burst into tears or anything. Later, I did cry. Deb called me and asked me to come see her when I was done. She apologized and said I didn't mean to scream at you I meant to scream at Ray. I said to her I understand completely and I hugged her and I said I love you and I forgive you. Lots of it is age and being postmenopausal and hormonal and with stress. Everything rolls down. A woman of

domestic violence is also a child abuser. It's the pressure. It rolls down. I understand the dynamics. I understand that level. I have 200 college credits with sociology. I forgave her. She even said to me, "I called Kathy and told her one of your nurses is going to come in your office." I felt that as though Ray should have stood up for me. He said, "I was so shocked and dumbfounded that it happened so fast I didn't know what to say." I told him I cried. Anyways, then... I lost my train of thought now. I did say that type of workplace, you get screamed at for no just cause, you know, would cause workplace violence. That's what happens.

Q. Did you have workplace violence training?

NL: Yes. I would like to read this.

NL read an excerpt from the bible aloud in an attempt to explain her use of the word "slay" in regards to Nancy Flanigan.

Q. Do you understand what slaying means?

NL: That's why I pulled this up. I did not mean it in a violent way.

Q. Well I looked up the word "slay" and it says 'to violently kill or murder someone.' There is not context when you put it in writing.

Q. Why did you feel it was appropriate to make this comment to Ms. Wilcox?

NL: I think that people do need to be aware of the stress. Yes, I do think that's appropriate. Because sometime that would happen.

Q. Do you think that it's appropriate that people would have that fear? You're intimidating the entire facility now.

NL: I was just saying that if I was a different person. That's all I'm saying.

Q. To say someone was walked out and you felt it was unjust; you don't know that unless you are involved in it. All of our employees are educated and trained in workplace violence. The problem is that in this context this leads to you.

NL: I think there is no room in the workplace to be yelled or screamed at especially...

Q: Do you own, carry or transport a gun on yourself or in your vehicle?

NL: No, I don't, but that's not to say that other people don't. If my concerns are not warranted, then praise god!

Q. Are you aware of others in the workplace carrying guns?

NL: No, I don't, but pick up the newspaper.

Q. That's why I'm asking these questions, because it's threatening to everyone.

NL: I wish you would just convene this meeting.

Q. Have you ever had thoughts of harming yourself, co-workers, residents or the general public?

NL: No, I have not.

Q. Have you ever made reference to someone coming in and shooting or inflicting harm on others in the building to anyone else?

NL: No, that was the only time I said that. And if that's not a valid concern, then thank god for that.

Q. No, it really is a valid concern. Have you reached out to SEAP?

NL: I have reached out to the SIKH coalition. That's who put me in touch with the pro bono attorney yesterday.


Q. Were your civil rights violated?

NL: I don't know, because I don't know how this is going to end. As I've said before, I would probably contact my state rep. I don't know how it'll play out, but really, truly I don't want to go through this. The schedule this Friday looks slim. I'd like to be there to help.

Q. Have you reached out to Barry since your last PDC?

NL: No, I have no reason to reach out to Barry. I'm not that hard up for a date. I'm not fixated on Barry. I can go out with other men, trust me.

Q. I encourage you to contact SEAP, they are there 24/7. Do you have a SEAP card?

NL held up a SEAP card that was in her purse.

BS: She does have a SEAP card.

NL: You can paint me however you want. Quite honestly, I feel you stand the better chance working with me than working with a revolving door. There's such a turnover in staffing. If I'm guilty of worrying about regulations and it's not my job, then fine. I can find another job. Let's bring the "kni...", should I say "knife"? Bring the knife, the *hammer* down and just get on with it.

Q. We agree we don't want to leave this ongoing. We do like to wrap up our investigations.

NL: I mean, honestly I hope that they are already looking for someone because the schedule is so slim. Be looking for someone to replace me now. Be aware that you should do that now.

Q. Please know that our supervisors do know how to adequately do staffing. Before you leave Brian will be giving you a witness statement to elaborate on Rhonda Wilkinson. You will be escorted off the property and you are not allowed to be here unless we call you back. And make sure Brian has your keys and badge before you leave.

NL gave BS her badge; BS gave NL a Commonwealth Witness Statement to complete.

No further questions.

Meeting adjourned at 1355.

*Attachment to Interrogatory 12*

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

**INTERVIEWED:** _____        EMP. #: 714579

**INTERVIEWED BY:** _____  **ALSO PRESENT:** _____

**DATE:** 11/25/2015 **TIME:** 0600 **LOCATION:** Supervisor's Office _____

## STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes including actions under the statutes of this Commonwealth just as though it had been sworn or affirmed before a court of law or formal arbitration panel:

My name is Nancy Elizabeth Lewen. I am employed as Licensed Practical Nurse (LPN) at the Department of Military and Veteran's Affairs Soldiers' and Sailors' Home in Erie, hereinafter referred to as "PSSH." I have been employed by the Commonwealth of PA for one (1) year. I am also educated at the Bachelor's Degree level in Sociology with a concentration in Gerontology.

Regarding the internal investigation of my conduct and the allegation of "Neglect of Duty or responsibility, failure to perform assigned tasks." Raymond Hamm RNS has satisfactorily proven to me that I did not initial the Treatment Administration Record, hereinafter referred to as the "TAR," and therefore presumably did not inspect a Duoderm on a resident's buttocks on Unit B on the last night of August, 2015. Almost three months later, I can only assume that I did not perform the task, since I did not initial that I did. I DO remember the specific night. I DO NOT remember inspecting any Duoderms on any resident's buttocks on that chaotic night. I admit that I most likely completely overlooked the treatment.

On the night in question, I was assigned as treatment nurse for approximately 75 patients on Units A and B. It was "changeover" night and the very first time of printing out the new TAR in the switch to the new "Matrix" computer system. The employer was well aware of many errors and Matrix glitches. Numerous nursing staff members had worked for many days, attempting to correct errors prior to changeover, but many errors remained. My duty assignment on that night entailed the additional responsibility of checking and correcting the TAR of 75 residents for accuracy, in addition to the usual treatment nurse assignment of actually performing the routinely prescribed treatments for a significant portion of those 75 residents.

I hereby contritely, and with great remorse and regret, admit that on the last night of August, 2015, I did fail to perform an assigned nursing task, but argue that I did not commit "neglect of duty." I do understand the legal definition and different grades of the very serious allegation of "neglect of duty" by a healthcare professional.

It is material to my defense against the allegation of "neglect of duty" to note for the record:

1) That my failure to inspect the patient's buttocks and the Duoderm was *NOT a willful act or omission.*

2) That it was *an unusually chaotic shift and abnormally heavy duty assignment* on that particular night.

3) That this inefficiency occurred as I *attempted in good faith to perform the duties of a nursing assignment that was abnormally heavy and overwhelming.*

4) That I *exercised the same prudence and same standard of care* as a Licensed Practical Nurse that would be given by any reasonable person faced by the same situation with the same duty assignment.

5) That I have never been oriented on Unit B, and have never actually worked on Unit B. I am therefore not as familiar as some nurses are with the treatments on Unit B. On the night in question I had recently gone from part time to full time employment at PSSH, and had worked only on Units A, D and E.

As rebuttal, I counter allege for the record:

1) That *the employer did not initiate disciplinary proceedings against me in a timely manner* for this oversight and/or omission. As a Licensed Practical Nurse employed by the Commonwealth of Pennsylvania Department of Military and Veteran's Affairs, disciplinary proceedings should have been brought against me by PSSH within a reasonable period of time.

2) That *the employer committed "contributory neglect,"* by knowing that an unusual amount of "glitches" and errors existed in the printed TAR on changeover night, yet the employer nevertheless overburdened me and expected me to perform an overwhelming, unrealistic and potentially unsafe assignment, contrary to the best interest of the elderly and debilitated residents who live on Units A and B at PSSH and depend on the employees of PSSH to care for them and to meet their most basic human needs.

I sincerely apologize for omitting the prescribed treatment. I humbly thank Raymond Hamm RNS for calling this oversight to my attention and counseling me accordingly. I tried my very best in a bad situation. I will honestly make a diligent attempt to improve my future conduct and performance.

I have never been disciplined for my conduct in my nursing career. I am aware of the availability of union representatives to assist me.

| 25 November 2015 | NANCY E. LEWEN, LPN | *Nancy E. Lewen* |
|---|---|---|
| **DATE** | **NAME (PRINTED)** | **SIGNATURE** |

| | | |
|---|---|---|
| **DATE** | **NAME (PRINTED) INTERVIEWER** | **INTERVIEWER'S SIGNATURE** |

| | | |
|---|---|---|
| **DATE** | **NAME (PRINTED) TYPIST** | **TYPIST'S SIGNATURE** |

**NOTE:** This form is to be completed and signed by an employee who is a witness to an incident involving an employee of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document

## VERIFICATION

I, Barbara Raymond, hereby state that the foregoing ***Responses to Plaintiff's First Request for Interrogatories*** in ***Lewen v. Raymond 1:17-cv-148-SPB (Western District PA)*** is true and correct to the best of my personal knowledge or information and belief.

This statement and verification is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Date: _10/31/19_                    Signed: _Barbara Raymond_

## CERIFICATE OF SERVICE

I certify that on November 1, 2019, a true and correct copy of ***Defendant's Responses to Plaintiff's First Interrogatories and Request for Production of Documents*** was served upon the Plaintiff via email and U.S. mail:

lewennancy@gmail.com
150 Chad Brown St.
Providence, RI 02908


Yana L. Warshafsky
Deputy Attorney General

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY E. LEWEN :
         : Civil Action No. 1:17-cv-148-SPB
    Plaintiff,   :
         :
  v.      :
         : Magistrate Judge Susan Paradise
BARBARA RAYMOND, : Baxter
    Defendant.  :

## DEFENDANT'S RESPONSES TO PLAINTIFF'S
## SECOND SET OF INTEROGATORIES

   *Plaintiff's second set of Interrogatories contain 21 requests, in addition to the 18*

*requests in Plaintiff's first set of Interrogatories. Defendant Raymond hereby provides*

*responses to the first 7 Interrogatories in the second set. Requests 8-21 are not*

*responded to, as they exceed the limit of 25 Interrogatories permitted pursuant to*

*FRCP33.*

1. On or about Christmas 2015, a veteran resident on the skilled nursing unit "B" at the
Pennsylvania Soldiers and Sailors Home, "Mr. W." suffered a fractured femur (broken
thigh bone) of unknown origin. Mr. W. had been picked up and dropped off at the facility
by his family for a visit at home. Barry Blasic, LPN was working as the sole charge nurse
on a 13 hour shift on the skilled nursing unit "B." He did not assess Mr. W. upon his return
from the visit with his family. The fractured femur of unknown origin was later discovered
after Barry Blasic's shift. You were on vacation in Florida at the time. Please identify who
was the administrator in charge during your Florida vacation, and identify what outside
regulatory or law enforcement agency this fractured femur of unknown origin was reported
to for investigation. Include the date or dates of the report, the method of reporting, and a
summary of the investigation. If there are any documents relating to this investigation, please
redact Mr. W's identifying information and produce a copy.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is overbroad, irrelevant, and not proportional to the needs of this lawsuit. Furthermore, I have no record of being on vacation at the time of this incident.**

2. On what approximate date did you become aware of the above referenced femur fracture of unknown origin?

**ANSWER: OBJECTION. See answer to Interrogatory 1, herein.**

3. From whom did you learn about the above mentioned femur fracture of unknown origin?

**ANSWER: OBJECTION. See answer to Interrogatory 1, herein.**

4. Please describe what interfacility internal investigation was conducted to ensure that a fractured bone would not go unnoticed by the charge nurse in the future.

**ANSWER: OBJECTION. See answer to Interrogatory 1, herein.**

5. Identify all witnesses to the above referenced femur fracture of unknown origin and provide a brief summary of your understanding of what facts each witness is aware of.

**ANSWER: OBJECTION. See answer to Interrogatory 1, herein.**

6. Please identify how many skilled nursing patients Barry Blasic was responsible for as the sole charge nurse on Unit B on his 13 hour shift on the date of the above referenced femur fracture of unknown origin.

**ANSWER: OBJECTION. See answer to Interrogatory 1, herein.**

7. Please provide the official job description that was in place for December 2015 for a Licensed Practical Nurse in the charge nurse position at the Pennsylvania Soldiers and Sailors Home and/or the Pennsylvania Department of Military Affairs.

**ANSWER: OBJECTION. This Interrogatory is objected to as it irrelevant and not proportional to the needs of this lawsuit. Without waiver, please see attached job description of Licensed Practical Nurse (LPN) with the Commonwealth of PA. By way of further response, PSSH does not have a "charge nurse" position description.**

Sincerely,

**JOSH SHAPIRO**
**Attorney General**

YANA L. WARSHAFSKY
Deputy Attorney General
PA ID 312915

KAREN M. ROMANO
Acting Chief Deputy Attorney General
Litigation Section

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Date: November 1, 2019

# *Attachment to 2nd Interrogatory 7*

| Job Code | Pay Scale Group | Pay Scale Type | Bargaining Unit | Civil Service or Non-Civil Service | Executive Board Change | Last Change Effective |
|----------|-----------------|----------------|-----------------|-----------------------------------|------------------------|-----------------------|
| 30250    | 06              | ST             | N1              | C                                 | 999-99                 | 12/12/2010            |

Click on Job Code for current expanded information, on Pay Scale Type for current Pay Scale Type,
on Civil Service or Non-Civil Service to obtain the Evaluation Guide (if available), on Executive Board Change
to obtain the Executive Board amendment listed and on Last Change Effective to obtain history.

10/06/2001                                                          30250

LICENSED PRACTICAL NURSE

DEFINITION:  This is practical nursing work in the care and treatment of
individuals with a mental or physical injury or illness and/or developmental
disability or the care of individuals having difficulty meeting their daily
living activities at a Commonwealth facility.

An employee in this class implements nursing care plans by performing a
variety of practical nursing and individual/patient/resident/inmate care
duties including preparing, administering, and recording medications and
treatments prescribed by the physician and observing and reporting
changes in the physical and emotional behavior of
individuals/patients/residents/inmates with a mental or physical injury or
illness and/or developmental disability or individuals having difficulty
meeting their daily living activities.  Work also includes taking and
recording vital signs, collecting specimens and preparing and maintaining
progress notes and other administrative reports as required.  Work also
involves participation in carrying out the total treatment program to include
habilitation and rehabilitation programs as established by the
interdisciplinary treatment team and include daily living and leisure time
activities.  Work may also involve charge responsibility for a living or
patient care area, including responsibility for maintenance of prescribed
treatment and therapeutic regimens; overseeing unlicensed personnel;
and requesting professional evaluation, treatment or emergency care, as
needed. Work is performed in accordance with established laws, rules,
and regulations, and appropriate practical nursing standards and nursing
procedures.  Supervision may be received from a Licensed Practical
Nurse Supervisor however, by law, nursing duties which require licensure
are performed under the direction of a Registered Nurse or a Physician
who reviews the work in progress, through reports and by ward or living
area inspections and observations.

EXAMPLES OF WORK: Participates in practical nursing and other patient/
resident/inmate care duties for individuals who have a mental or physical
injury or illness and/or developmental disability in order to assure that the
emotional and physical needs of individuals /patients /residents/inmates
are met.

Prepares and administers medications ordered by the physician under the
direction of a Registered Nurse or Physician such as oral medications,
subcutaneous and intramuscular injections in order to carry out the
individual treatment programs.

Performs venipuncture and administers and withdraws intravenous fluids
in accordance with functions as defined in state law and established
agency/institution policies and procedures.

Administers immunizing agents and performs skin testing, such as tine
and PPD, and assesses and records results in accordance with functions

as defined in state law and established agency/institution policies and procedures.

Prepares and administers treatments ordered by the physician under the direction of a Registered Nurse or Physician such as enemas, special dressings, soaks and treatments involving the application of ointments and lotions, hot water bottles and ice packs in order to meet the physical needs of the individuals/ patients/residents/inmates.

Transcribes and puts physicians' orders into effect in accordance with policy and procedures to assure that medications and/or treatments are administered as ordered.

Provides inhalation and respiratory treatments, as prescribed in accordance with scope and extent of authorized functions and agency/institution policies and procedures.

Records the administration of medications and/or treatments and notes and records indicative signs and symptoms of the individuals'/patients'/residents'/ inmates' physical and mental condition in order to maintain accurate records.

Observes individuals/patients/residents/inmates for behavioral changes, responses to medication, side effects of medication, objective and subjective signs of physical illness or injury and reports findings to supervisor.

Prepares and maintains progress notes and summary reports on the individual/ patient/resident/inmate in order to summarize the care given and to insure complete and accurate records.

Gathers data, completes checklist and schedules physical therapy, occupational therapy and dietary consults.

Participates as a member of the interdisciplinary treatment team by providing input for the assessment of the nursing needs of each individual/patient/ resident/inmate and assists in the implementation of the individual treatment program plan in order to help the

individual/patient/resident/inmate reach their highest level of potential and independence.

Participates in quality assurance/improvement and risk management activities.

Promotes and maintains health through teaching, guidance and counseling on injections, medications, personal hygiene and health care to individuals/patients/residents/inmates in accordance with scope and extent of authorized functions and practice under the direction of a licensed professional nurse.

Assists the professional Registered Nurse or Physician during minor operations in clinics; prepares supplies, instruments and other items for sterilization; prepares the individual/patient/resident/inmate for minor surgery, as appropriate; assists in the preparation of operating rooms for surgery and serves as an assistant to a circulating nurse.

Schedules appointment for individuals/patients/residents/inmates such as chest x-rays, laboratory studies and EKGs.

Prepares individuals/patients/residents/ inmates for tests and x-rays, physical therapy, etc.

Escorts individuals/patients/residents/inmates to and from clinics, x-rays and other diagnostic services.

Takes and records temperature, pulse, respiration rate and blood pressure for the purpose of monitoring the day-to-day health care of the individual/patient/ resident/inmate.

Obtains sputum, urine, blood and other specimens as ordered; and labels and records appropriate information and sends for laboratory examination.

Guides and encourages individuals/patients/residents/inmates to participate in habilitation and rehabilitation programs.

Positions and/or lifts individuals/patients/residents/inmates with assistance, as required to assist with activities of daily living such as bathing, toileting and grooming and physical treatment activities.

Participates in housekeeping duties on the ward or living area to provide a comfortable, orderly, clean and safe environment.

Performs related work as required.

REQUIRED KNOWLEDGES, SKILLS, AND ABILITIES: Knowledge of practical nursing theory and practice, and of the materials used and practical nursing procedures involved in ward and living areas.

Knowledge of physical illnesses, injuries and/or developmental disabilities, including symptomatology, appropriate medical terminology, abbreviations and symbols.

Knowledge of medications prescribed, including calibration of dosage, expected effects, drug interactions, side effects and expected response to ensure that the individual/patient/resident/inmate receives safe administration of medication.

Ability to prepare ward, living area and individual/patient/resident/inmate care and treatment reports and to maintain appropriate records.

Ability to maintain a therapeutic attitude toward individuals with a mental or physical injury or illness and/or developmental disability and to maintain effective working relationships with professional and non-professional staff and the general public.

Ability to administer prescribed prescriptions and treatment and to observe, record and report symptoms, vital signs and response to health interventions provided.

Ability to implement nursing care and treatment plans for each individual/patient/ resident/ inmate.

Ability to understand and follow oral or written instructions.

Ability to communicate effectively, both orally and in writing.

Ability to position, lift and transfer non-ambulatory individuals/patients/residents/ inmates as needed.

NECESSARY SPECIAL REQUIREMENT: Possession of a current
Pennsylvania license as a Licensed Practice Nurse issued by the
Pennsylvania State Board of Nursing; or possession of a non-renewable
temporary practice permit issued by the Pennsylvania State Board of
Nursing.

CONDITION OF EMPLOYMENT: Employees possessing non-renewable
temporary practice permits must obtain licensure as a Licensed Practical
Nurse within the one (1) year period as defined by the Pennsylvania State
Board of Nursing.

## VERIFICATION

I, Barbara Raymond, hereby state that the foregoing ***Responses to Plaintiff's Second Request for Interrogatories*** in ***Lewen v. Raymond 1:17-cv-148-SPB (Western District PA)*** is true and correct to the best of my personal knowledge or information and belief.

This statement and verification is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Date: _10/31/19_                              Signed: _Barbara Raymond_

## CERIFICATE OF SERVICE

I certify that on November 1, 2019, a true and correct copy of ***Defendant's Responses to Plaintiff's Second Interrogatories*** was served upon the Plaintiff via email and U.S. mail:

lewennancy@gmail.com
150 Chad Brown St.
Providence, RI 02908

Yana L. Warshafsky
Deputy Attorney General



COMMONWEALTH OF PENNSYLVANIA
## OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

December 20, 2019

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh PA, 15222

**Nancy Lewen**
**150 Chad Brown Street**
**Providence, RI 02908**

### _RE: Lewen v. Raymond 1:17-cv-148-SPB (Western District)_

Dear Ms. Lewen,

Enclosed please find Defendant's Supplemental Responses to Plaintiff's First and Second Interrogatories, as directed by the Court on 12/5/2019 via telephonic conference.

Sincerely yours,

_/s/ Yana L. Warshafsky_
Yana L. Warshafsky
Deputy Attorney General

Encl/KLS

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY E. LEWEN              :
                               :   Civil Action No. 1:17-cv-148-SPB
            Plaintiff,         :
                                 :
       v.                      :
                                 :   District Judge Susan Paradise Baxter
BARBARA RAYMOND,        :
            Defendant.      :

## **DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES**

*On 12/5/2019 the Court held a telephonic motion hearing related to discovery, and directed Defendant to provide further responses to Plaintiff's discovery requests identified in ECF 97. Since the request for additional Interrogatories beyond the twenty-five (25) permitted pursuant to the Federal Rules of Civil Procedure regarding discovery was NOT granted to Plaintiff, the remaining supplemental discovery requested pertains to Interrogatories 17 and 18. Note that Plaintiff's reason for requesting supplemental responses to these Interrogatories is "to show that Defendant Raymond responded in any way other than employment termination to the Plaintiff's concerns of patient neglect, insufficient staffing and workplace violence in the form of administrative bullying" (ECF 97, Sec. A). Defendant hereby provides further response and clarification to those Interrogatories:*

17. Following the poor facility inspection by the Pennsylvania Department of Health in on November 6, 2015 and the Plaintiff's allegation of "Facility Contributory Neglect," indicate all steps you took to eliminate, reduce, draw attention to or otherwise address elder abuse, neglect and/or any other quality of care issues related to nurse staffing levels which might have contributed to patients receiving less than appropriate care.

**ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, as Commandant, I ensure that the practice of PSSH is to uphold and maintain compliance with Federal and State regulations, and to make corrections to any known unsatisfactory practices.**

**SUPPLEMENTAL ANSWER: It is important to note that the November 6, 2015 inspection by the Department of Health, and Plaintiff's written allegation of "facility contributory neglect", are entirely unrelated.**

**As to Plaintiff's written allegation of "facility contributory neglect", this was not treated as cause for an investigation. As explained in response to Interrogatory 12, Plaintiff received an oral reprimand for failure to check/change a duoderm patch on a resident on 9/1/2015. Plaintiff chose not to attend her scheduled PDC conference, and instead wrote a witness statement accepting responsibility for her actions but also counter-alleging that PSSH committed contributory neglect by its knowledge of the "glitches" on the printed Treatment Administration Record (TAR) on the night that a change to the paper and formatting of the TARs was scheduled. This allegation was written as a statement, not a complaint, and she did not utilize her PDC as an opportunity to address this allegation with her supervisors; therefore, no investigation was initiated. Furthermore, this allegation arose out of technical issues in the TAR software, NOT from concerns of patient neglect, insufficient staffing, and/or administrative bullying.**

As to the November 6, 2015 inspection by the Department of Health, PSSH received nine (9) citations. The average in Pennsylvania is also nine. NONE of the nine citations were for patient neglect, insufficient staffing, and/or administrative bullying. Furthermore, I reviewed our Department of Health surveys from January 2012 – present. NONE of the citations have ever been related to patient neglect, insufficient staffing, and/or workplace violence. Finally, as it pertains to staffing specifically, we have never, in my tenure, fallen below the PA state minimum of 2.7 hours of per patient care per day; in fact, PSSH's average currently, and during Plainitff's employment, was 4 hours of per patient care per day.

18. Following the Plaintiff's allegations that administrative bullying by a supervisor could lead to workplace violence at the Pennsylvania Soldiers and Sailors Home, indicate all steps you took to eliminate, reduce, draw attention to or otherwise address administrative bullying, whether real or perceived.

ANSWER: OBJECTION. This Interrogatory is objected to as it is irrelevant and not proportional to the needs of this lawsuit. Without waiver, see response to Interrogatory 17.

SUPPLEMENTAL ANSWER: From 2012-2016, PSSH, with the involvement of DMVA, investigated ten (10) allegations of workplace bullying/harassment/hostile work environment. None of these investigations were initiated by Plaintiff, and, with the exception of the complaint initiated by Mr. Blasic, Plaintiff was not involved in any of these investigations. All complainants received follow-up information and guidance during and after the completion of the respective allegations.

Sincerely,

**JOSH SHAPIRO**
**Attorney General**

YANA L. WARSHAFSKY
Deputy Attorney General
PA ID 312915

KAREN M. ROMANO
Chief Deputy Attorney General
Litigation Section

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Date: December 20, 2019

## VERIFICATION

I, Barbara Raymond, hereby state that the foregoing *Supplemental Responses to Plaintiff's First Request for Interrogatories* in <u>*Lewen v. Raymond 1:17-cv-148-SPB (Western District PA)*</u> is true and correct to the best of my personal knowledge or information and belief.

This statement and verification is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Date: ___12/2/19___          Signed: _Barbara Raymond_

## CERIFICATE OF SERVICE

I certify that on December 20, 2019, a true and correct copy of ***Defendant's***

***Supplemental Responses to Plaintiff's First Interrogatories*** was served upon the Plaintiff via

email and U.S. mail:

Nancy Lewen
lewennancy@gmail.com
150 Chad Brown St.
Providence, RI 02908

Yana L. Warshafsky
Deputy Attorney General



COMMONWEALTH OF PENNSYLVANIA
## OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

April 22, 2020

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh PA, 15222

**Nancy Lewen**
**1837 State Highway 285**
**Apt. 2**
**Espyville, PA 16424**

### RE: *Lewen v. Raymond 1:17-cv-148-SPB (Western District)*

Dear Ms. Lewen,

Enclosed please find Defendant's Responses to Plaintiff's Discovery Requests Identified in Plaintiff's Supplemental Filing (ECF No. 97).

Sincerely yours,

*/s/ Anna Zalewski*
Anna Zalewski
Deputy Attorney General

Encl.

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY E. LEWEN                          :
                                        :   Civil Action No. 1:17-cv-148-SPB
                    Plaintiff,          :
                                        :
            v.                          :
                                        :   District Judge Susan Paradise Baxter
BARBARA RAYMOND,                        :
                    Defendant.          :

## DEFENDANT'S RESPONSES TO PLAINTIFF'S DISCOVERY REQUESTS IDENTIFIED IN PLAINTIFF'S SUPPLEMENTAL FILING (ECF. No. 97).

In compliance with the Court's Order on December 5, 2019, Defendant, Barbara Raymond, by counsel, hereby responds to the remainder of Plaintiff's Interrogatories as set forth in ECF. No. 97. Defendant previously responded to Interrogatories 17 and 18 from the first set of interrogatories on December 20, 2019.

From Second Set of Interrogatories:

17. In the above referenced letter and witness statement, the Plaintiff expressed her concern that veteran assisted living residents were being told by the regularly assigned charge nurse to come to the nursing station beginning at 3:00 am to receive their morning medications to ensure that the charge nurse could complete her duties in time to help serve breakfast in the Unit A and Unit B skilled nursing dining room.

Identify how you responded to the Plaintiff regarding her above mentioned concerns for regulatory compliance. Include the date or dates of communication, the method of communication, and a summary of the communication. If there are any documents, either email, letter, note, memo or otherwise relating to the communication, please produce a copy.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that is overly broad and not proportional to the needs of the lawsuit. It is further objected to because it is unclear what time frame Plaintiff is referencing. Subject to and without waiving objections, Defendant has no recollection of receiving the referenced letter and witness statement that is the subject of this interrogatory prior to Plaintiff's suspension and termination. By way of further response, Pennsylvania Soliders' and Sailors' Home is a personal care boarding home and falls under the compliance of PA 2600 Regulations. It is not an Assisted Living Facility.

18. In the above referenced letter and witness statement, the Plaintiff expressed her concern that Unit C was not in compliance with Pennsylvania law regarding Direct Care Staffing.
Identify how you responded to the Plaintiff regarding her above mentioned concerns for regulatory compliance regarding direct care staffing.

Include the date or dates of communication, the method of communication, and a summary of the communication. If there are any documents, either email, letter, note, memo or otherwise relating to the communication, please produce a copy.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that is overly broad and not proportional to the needs of the lawsuit. It is further objected to because it is unclear what time frame Plaintiff is referencing.

Subject to and without waiving objections, Defendant has no recollection of receiving the referenced letter and witness statement that is the subject of this interrogatory prior to Plaintiff's suspension and termination. By way of further response, Pennsylvania Soliders' and Sailors' Home is a personal care boarding home and falls under the compliance of PA 2600 Regulations.

19. In the above referenced letter and witness statement, the Plaintiff expressed her concern that nurses throughout the facility were not in compliance with the applicable long term regulations regarding their medication administration. Specifically the Plaintiff alleged:

(1) all of the other nightshift nurses who work Unit C begin the med pass early.
(2) Nightshift nurses non Units A and B begin passing their 0600 medications at 0430 when they are the only nurse scheduled.
(3) Dayshift nurses on all units routinely begin passing their 0900 medications at 0700. Nurses on Units A and B supposedly are often not finished passing their 0900 medications until noon.
(4) Evening shift nurses on Units A, B, and C are often still passing their 2100 medications at 2300.
(5) Recently, when the "condensed schedule" nurses leave at 1945 (Barry Blasic LPM, hereinafter referred to as "Barry," and Dawn Zappas LPN, hereinafter referred to as "Dawn,") they have already passed out much of the 2100 medications, a med pass which should not even be started until 2000.

Identify how you responded to the Plaintiff regarding her above mentioned concerns for regulatory compliance regarding medication administration timeliness. Include the date or dates of communication, the method of communication, and a summary of the communication. If there are any documents, either email, letter, note, memo or otherwise relating to the communication, please produce a copy.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that is overly broad and not proportional to the needs of the lawsuit. It is further objected to because it is unclear what time frame Plaintiff is referencing.

Subject to and without waiving objections, Defendant has no recollection of receiving the referenced letter and

witness statement that is the subject of this interrogatory prior to Plaintiff's suspension and termination. By way of further response, as a practice, had Defendant even been aware of these concerns, Defendant never would have addressed individual employee findings with Plaintiff.

20.   In the above referenced letter and witness statement on February 22, 2016, the Plaintiff alleged that residents on Unit C were forbidden from asking for a peanut butter and jelly sandwich after 9:00 pm, and were forbidden from using a urinal if requested.

Identify how you responded to the Plaintiff regarding her above mentioned concerns for regulatory compliance in the areas of resident rights and dignity issues.  Include the date or dates of communications, the method of communication, and a summary of the communication.  If there are any documents, either email, letter, note, memo or otherwise relating to the communication, please produce a copy.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that is overly broad and not proportional to the needs of the lawsuit.  It is further objected to because it is unclear what time frame Plaintiff is referencing. Subject to and without waiving objections, Defendant has no recollection of receiving the referenced letter and witness statement that is the subject of this interrogatory prior to Plaintiff's suspension and termination. By way of further response, Pennsylvania Soliders' and Sailors' Home is a personal care boarding home and falls under the compliance of PA 2600 Regulations.  It is not an Assisted Living Facility.

From Third Set of Interrogatories:

1. The Plaintiff alleges that on 1/29/2016, she told Barry Blasic LPN in the off duty text messages that she had responded to Kevin McLaughlin RN, ADON in a group email entitled "Residents rights" that was distributed to all PSSH nursing staff expressing her concern about resident dignity and consent issues as related to sexual activity between the nursing home residents, particularly her concerns about cognitively impaired residents who might not be capable of giving consent. Specifically, on 1/29/2016, at 8:21 am, the Plaintiff told Barry Blasic via off duty Facebook text message, "Still, read the essay type response to Kevin work email I wrote entitled "resident rights." FYI- "Mr. S" only scored an 11 on the BIMS screening tool. He may not be a consenting adult. He's more likely a victim of sexual abuse." Upon reading the off-duty Facebook text messages prior to terminating the Plaintiff, what efforts did you make to ensure that no cognitively impaired residents of the Pennsylvania Soldiers and Sailors Home were victims of sexual assault?

Upon reading the off duty Facebook text messages prior to terminating the Plaintiff, what efforts did you make to ensure that no cognitively impaired residents of the Pennsylvania Soliders' and Sailors' Home were victims of sexual assault.

**Response.**  Defendant objects to this interrogatory on the grounds that the matter is not relevant to Plaintiff's claim, or defense, and is not proportional to the needs of the lawsuit.  This interrogatory is overly broad and vague.  And finally, this interrogatory is a leading question that assumes facts.

Subject to and without waiving said objections, Defendant has no recollection of seeing the off-duty Facebook messages about specific residents to date and certainly not before Plaintiff's suspension and termination.

3. On or about 2/2/2016, the Plaintiff provided a copy of the nurse's notes involving the above referenced sexual assault to the Pennsylvania Office of the Attorney General Bureau of Criminal Investigation. (On 2/4/2016 at 7:52 am, the Plaintiff told Barry Blasic via the off-duty Facebook text messages that her elder abuse report had been delivered to the OAG's office in Harrisburg that morning.)

Identify what outside regulatory or law enforcement agency you reported this act of involuntary deviate sexual intercourse to for investigation as required to under Pa 55 Code§ 2600.16. Reportable incidents and conditions. Include the date or dates of the report, the method of reporting, and a summary of the investigation.

**Response.** Defendant objects to this interrogatory as it is overly broad and vague. This interrogatory assumes facts that have not been established. This interrogatory is not relevant to Plaintiff's offer of proof in support of her defense.

Subject to and without waiving objections, the building cognitively impaired residents live do not fall under PA 55 Code 2600.16. Defendant has made reports of inappropriate touching to PSSH's licensing agency and/or law enforcement throughout my career. On August 12, 2016, two agents with the Attorney General Bureau of Criminal Investigation arrived at PSSH regarding Plaintiff's complaint. Defendant answered their questions and provided documentation requested.

11. Following the above referenced act of involuntary deviate sexual intercourse against a cognitively impaired resident on Unit D, a lockdown unit, the cognitively impaired resident perpetrator was moved out of the lock down unit and placed on the skilled nursing Unit B, where he was free to roam amongst all residents on the skilled Units B and A. Some additional cognitively impaired residents were then fondled by the perpetrator. The plaintiff provided the names and nurses notes involving those incidents to the Pennsylvania Office of the Attorney General Bureau of Criminal Investigation on or about 2/2/2016.

Identify what outside regulatory or law enforcement agency you reported these sexual assaults to for investigation as required to under Pa 55 Code § 2600.16. Reportable incidents and conditions. Include the date or dates of the report, the method of reporting, and a summary of the investigation.

**Response.** Defendant objects to this interrogatory as it is overly broad and vague. This interrogatory assumes facts that have not been established. This interrogatory is not relevant to Plaintiff's offer of proof in support of her defense.

Subject to and without waiving objections, the building cognitively impaired residents live do not fall under PA 55 Code 2600.16. Defendant has made reports of inappropriate touching to PSSH's licensing agency and/or

law enforcement throughout her career. On August 12, 2016, two agents with the Attorney General Bureau of Criminal Investigation arrived at the Pennsylvania Soldiers' and Sailors' Home regarding Plaintiff's complaint. Defendant answered their questions and provided documentation requested.

Sincerely,

JOSH SHAPIRO
Attorney General

/s/Anna Zalewski
Anna Zalewski
Deputy Attorney General
PA ID 312732

KAREN M. ROMANO
Chief Deputy Attorney General
Litigation Section

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Date: April 22, 2020

## <u>VERIFICATION</u>

I, Barbara Raymond, hereby state that the foregoing Defendant's Responses To Plaintiff's Discovery Requests Identified in Plaintiff's Supplemental Filing (ECF. No. 97 in ***<u>Lewen v. Raymond 1:17-cv-148-SPB</u>*** ***<u>(Western District PA)</u>*** is true and correct to the best of my personal knowledge or information and belief.

This statement and verification is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Date: 4/21/2020

Signed: Barbara Raymond

## <u>CERIFICATE OF SERVICE</u>

    I certify that on April 22, 2020 a true and correct copy of Defendant's Responses To Plaintiff's Discovery Requests Identified in Plaintiff's Supplemental Filing (ECF. No. 97) was served upon the Plaintiff via U.S. mail:

Nancy Lewen
lewennancy@gmail.com
1837 State Highway 285
Apt. 2
Espyville, PA 16424


*/s/ Anna Zalewski*
Anna Zalewski
Deputy Attorney General

**Plaintiff's Exhibit 13**

**Department of Health Investigation Results 11/6/2015**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0000 | INITIAL COMMENT<br><br>Based on a Medicaid Recertification, State Licensure and Civil Rights Compliance Survey completed on November 6, 2015, it was determined that the Pennsylvania Soldiers and Sailor's Home was not in compliance with the following requirements of 42 CFR Part 483, Subpart B, Requirements for Long Term Care Facilities and the 28 PA Code, Commonwealth of Pennsylvania Long Term Care Licensure Regulations. | F  0000 | | |

LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE                    TITLE:                    (X6) DATE:

Any deficiency statement ending with an asterisk (*) denotes a deficiency which may be excused from correction providing it is determined that other safeguards provide sufficient protection to the patients. The findings stated above are disclosable whether or not a plan of correction is provided. The findings are disclosable within 14 days after such information is made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

This form is a printed electronic version of the CMS 2567L. It contains all the information found on the standard document in much the same form. This electronic form once printed and signed by the facility administrator and appropriately posted will satisfy the CMS requirement to post survey information found on the CMS 2567L.

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253<br><br>SS=D | | F  0253 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253 SS=D | Continued from page 2 483.15(h)(2) HOUSEKEEPING & MAINTENANCE SERVICES The facility must provide housekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior. This REQUIREMENT is not met as evidenced by: | F 0253 | Room 102 will have the buildup of dirt & debris cleansed & removed Room 106 missing tiles were replaced 11/4/15 Room 107 missing tiles were replaced 11/4/15. Room 107 the buildup of dirt & debris in the corners and under sink area was cleaned & removed Room 107 will have the baseboards under the sink cleansed Room 108 will have the buildup of dirt and debris in the corners cleansed & removed Room 108 will have the baseboards under the sink cleansed Room 108 the area near the register by the sink was painted and repaired Room 108 will have the buildup of dirt and debris in the area under the sink cleansed Room 110 will have the scrape marks on the wall repaired Room 110 the buildup of dirt and debris in the area under the sink was cleaned & removed | Completion Date: **12/21/2015** Status: **APPROVED** Date: **11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253<br><br>SS=D | Continued from page 3 | F 0253 | Room 110 will have the baseboards under the sink cleansed<br><br>The call bell cord lying on the floor near the tub in the Central bath area was replaced with a longer cord and placed on the whirlpool tub for ease of reach<br><br>All resident rooms will be reviewed X1 for cleanliness of floor and baseboards near sink area with cleansing being completed as applicable by Housekeeping Supervisor/designee<br>All resident rooms will be reviewed X1 for wall and floor tile damage with repair as applicable by the Facility Maintenance Manager/designee<br>All tub rooms will be reviewed x1 to ensure proper call bell placement by Registered Nurse Supervisor/designee<br>Housekeeping staff will be re-educated on cleaning & waxing procedures by Housekeeping Supervisor/designee.<br>Housekeeping and Nursing Staff will be re-educated on work-order | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: ___00___<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253<br><br>SS=D | Continued from page 4 | F 0253 | submission for damaged walls & missing tiles by Staff Development Nurse/designee<br>Nursing Staff will be re-educated on proper call bell placement by Staff Development/designee<br><br>Audits of 25% resident rooms will be completed by the Deputy Commandant for cleanliness and repair concerns weekly x4, monthly x3 & quarterly x1.<br>Audits of all tub rooms will be completed by the Registered Nurse Supervisor for proper call bell placement weekly x4, monthly x3 & quarterly x1<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION: | (X3) DATE SURVEY COMPLETED: |
|---|---|---|---|
| | **39A434** | A. BLDG: __00__ <br> B. WING: _____ | **11/06/2015** |

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253 <br><br> SS=D | Continued from page 5 <br><br><br> Based on observations and staff interview, it was determined that the facility failed to maintain a sanitary environment on one of four units observed (Unit-A). <br><br> Findings include: <br><br> Observations of Unit-A on 11/03/15, from 1:45 p.m. through 2:30 p.m., revealed the following: <br> Room 102 - A build-up of dirt and debris in the corners. <br> Room 106 - Missing tiles on the floor near bed B. <br> Room 107 - A missing piece of tile in front of the A closet, a build-up of dirt and debris in the corners and under the sink area and discolored and dirty baseboards under the sink. <br> Room 108 - A  build-up of dirt and debris in the corners and a dirty base board under the sink, a brown substance and black scrape marks by the register located near the sink area, a build-up of dirt under the sink area and dirty baseboards under the sink area. | F  0253 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>39A434 | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00__<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253<br><br>SS=D | Continued from page 6<br><br>Room 110 - Scrape marks on the wall located on the right side of the room, a build-up of dirt and debris on the floor under the sink area and in the corners and a dirty baseboard near the sink area. A call bell cord laying on the floor near the tub area in the central bath area on Long Hall Unit-A.<br><br>During an interview on 11/03/15, at the time of the observations, Quality Assurance Coordinator Employee E7 confirmed the build-up of dirt and debris on the floor and in the corner areas, the dirty baseboards, the discolored baseboards, the scrape marks and the splash marks on the wall areas, the missing tiles and the pieces of tile in the room noted above and the call bell cord on the floor in the central bathing area on Long Hall Unit-A.<br><br>28 Pa. Code 201.18(b)(1)(3) Management.<br><br>28 Pa. Code 207.2(a) Administrator's responsibility. | F 0253 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST** **ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0253 SS=D | Continued from page 7 | F  0253 | | |
| F 0279 SS=D | | F  0279 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |

NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0279 SS=D | Continued from page 8

483.20(d), 483.20(k)(1) DEVELOP COMPREHENSIVE CARE PLANS

A facility must use the results of the assessment to develop, review and revise the resident's comprehensive plan of care.

The facility must develop a comprehensive care plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment.

The care plan must describe the services that are to be furnished to attain or maintain the resident's highest practicable physical, mental, and psychosocial well-being as required under §483.25; and any services that would otherwise be required under §483.25 but are not provided due to the resident's exercise of rights under §483.10, including the right to refuse treatment under §483.10(b)(4).

This REQUIREMENT is not met as evidenced by: | F 0279 | A Plan of Care addressing R6?s mood indicators and depression was completed

All residents? last Minimum Data Sets and most recent Plans of Care will be reviewed x1 ensure potential mood indicators and depression are properly addressed in the resident?s Plan of Care by the Social Service Director/designee

All Social Workers and Registered Nurse Assessment Coordinators will be re-educated on development of a comprehensive care plans in correlation with the Care Area Assessment Worksheet by the Staff Development Nurse/Designee.

25% of the Residents? Care Plans and Care Area Assessment Worksheets will be audited for compliance to ensure all triggered areas in need of a care plan are included in the comprehensive care plans weekly x 4, monthly x 3, and quarterly x 1 by the Registered Nurse Assessment Coordinator/Designee | Completion Date: **12/21/2015** Status: **APPROVED** Date: **11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00__<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0279<br><br>SS=D | Continued from page 9 | F  0279 | Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0279 SS=D | Continued from page 10

Based on clinical record review and staff interview, it was determined that the facility failed to develop a care plan to address mood and depression for one of 22 residents reviewed (Resident R6).

Findings include:

Resident R6 was admitted to the facility on 02/26/15. An initial admission Minimum Data Set assessment (MDS-a periodic assessment of resident care needs) completed on 03/04/15, identified Resident R6 with a mood severity score of eight that triggered for the facility to consider the development of a care plan to address mood indicators. The facility indicated that a care plan would be developed.

Review of facility Care Area Assessment Worksheet (used to determine areas of care triggered to write a plan of care) dated 03/05/15, referenced the mood score of eight with Resident R6's reports of "feeling depressed, having trouble falling asleep, feeling tired, and feeling bad...." | F 0279 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  **39A434** | (X2) MULTIPLE CONSTRUCTION:  A. BLDG: __00_____  B. WING: _____ | (X3) DATE SURVEY COMPLETED:  **11/06/2015** |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0279  SS=D | Continued from page 11  As of 11/05/15, Resident R6's clinical record lacked a care plan to address the mood indicators and depression.  During an interview on 11/05/15, at 3:00 p.m., Social Worker, Employee E4 confirmed that a care plan to address mood and depression had not been developed.  28 Pa. Code 211.5(f) Clinical records.  28 Pa. Code 211.11(d) Resident care plan.  28 Pa. Code 211.12(d)(5) Nursing services. Previously cited 12/11/14. | F 0279 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0279 SS=D | Continued from page 12 | F 0279 | | |
| F 0309 SS=D | | F 0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309<br><br>SS=D | Continued from page 13<br><br>**483.25 PROVIDE CARE/SERVICES FOR HIGHEST WELL BEING**<br><br>Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.<br><br>This REQUIREMENT is not met as evidenced by: | F 0309 | Resident R4 Medical Provider treatment orders were reviewed and updated to include a new treatment plan.<br><br>All residents? Treatment Administration Records will be reviewed x1 to ensure all treatments are being followed as per Physician Orders by the Registered Nurse Supervisor/designee<br><br>Nurses will be educated on proper documentation in the treatment record, proper inputting of Provider orders and appropriate following of Physician Orders by the Staff Development Nurse/designee<br><br>25% of residents? Treatment Administration Records will be audited by the Assistant Director of Nursing Services/designee to ensure compliance weekly x4, monthly x3 & quarterly x1<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings | Completion Date:<br>**12/21/2015**<br>Status:<br>**APPROVED**<br>Date:<br>**11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA 16512** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 SS=D | Continued from page 14 | F 0309 | to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 SS=D | Continued from page 15<br><br>Based on clinical record review and staff interview, it was determined that the facility failed to follow physician's orders regarding a skin treatment for one of 22 residents reviewed (Resident R4).<br><br>Findings include:<br><br>Resident R4 was admitted to the facility on 03/10/14, with diagnoses that included dementia (deterioration of mental functioning), thyroid disease (abnormal functioning of the thyroid organ) and stomach reflux (condition when stomach contents abnormally return into the esophagus-a canal from the mouth to the stomach).  Nurses' notes dated 05/26/15, identified Resident R4 with a Stage I (reddened area) pressure ulcer of the coccyx (small bone at the base of the spinal column).<br><br>Physician's orders dated 06/04/15, included an order to cleanse the coccyx with soap and water, pat dry, apply Duoderm (skin treatment with a patch over an area of skin) to coccyx, check every shift and change every five days and as needed for | F 0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309<br><br>SS=D | Continued from page 16<br><br>prevention.<br><br>Review of the Treatment Administration Records for August and September 2015, revealed that the Duoderm dressing was changed on 08/27/15, and not again until 09/02/15, a period of six days.<br><br>During an interview on 11/06/15, at 8:45 a.m., the Wound Team Registered Nurse confirmed that the Duoderm dressing for Resident R4 was not changed as ordered by the physician.<br><br>28 Pa. Code 211.12(d)(1)(5) Nursing services. Previously cited 12/11/14. | F 0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: <br><br> **39A434** | (X2) MULTIPLE CONSTRUCTION: <br><br> A. BLDG: __00_____ <br> B. WING: _____ | (X3) DATE SURVEY COMPLETED: <br><br> **11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: <br><br> **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** <br><br> STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: <br><br> **P O BOX 6239 560 EAST THIRD ST** <br> **ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 <br> SS=D | Continued from page 17 | F 0309 | | |
| F 0314 <br> SS=G | | F 0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED:  **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314 SS=G | Continued from page 18

483.25(c) TREATMENT/SVCS TO PREVENT/HEAL PRESSURE SORES

Based on the comprehensive assessment of a resident, the facility must ensure that a resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and a resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

This REQUIREMENT is not met as evidenced by: | F 0314 | Resident R4 Medical Provider treatment orders were reviewed and updated to include a new treatment plan.

All residents? skin was reviewed for skin integrity concerns and wounds, appropriate treatment plans were implemented as applicable.

All residents? Treatment Administration Records will be reviewed x1 to ensure all treatments, including skin checks are being followed as per Physician and Nursing Orders by the Registered Nurse Supervisor/designee

All residents with skin integrity concerns will be reviewed x1 by Medical Services and Wound Care Nurse, documentation of skin concerns and wound characteristics will be updated in the Medical Record as applicable

All residents with skin integrity concerns will be reviewed for appropriateness of a Wound Clinic | Completion Date: **12/08/2015** Status: **APPROVED** Date: **11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  **39A434** | (X2) MULTIPLE CONSTRUCTION:  A. BLDG: __00_____  B. WING: _____ | (X3) DATE SURVEY COMPLETED:  **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314  SS=G | Continued from page 19 | F 0314 | consult x1 by the Physician/designee  Documentation and Wound Care Policies will be updated to include ensuring reference to skin characteristics during weekly skin checks and observations of skin during wound care treatment changes.  Physician, Certified Registered Nurse Practitioner and Nurses will be re-educated on proper documentation and apprised on the Documentation and Wound Care Policy updates by the Staff Development Nurse/designee  Nursing will be re-educated on the Skin Monitoring Policy will which includes language of Weekly the nurse will fully review the resident?s skin for skin abnormalities, Skin Monitoring Policy will also be updated to include daily monitoring of skin by the licensed nursing staff of residents with pressure areas by the Staff Development | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314 SS=G | Continued from page 20 | F 0314 | Nurse/designee. Wound Care formulary and protocol, to include Wound Clinic consults as applicable, will be developed and implemented after education to Physician, Certified Registered Nurse Practitioner and Nurses. Appointment Scheduling Secretary will be re-educated to notify Registered Nurse Supervisor/designee if ordered consult appointments are unable to be scheduled within 10 days. Nursing Administration will be re-educated on the Skin Monitoring Policy, which includes weekly wound rounds with a Nursing Administration member, Wound Care Nurse, Dietician, Care Plan Coordinators, Therapy Services and Medical Services by the Commandant/designee. 10% of all residents? skin will be assessed by the Wound Care Nurse weekly x10, then 25% monthly x4, | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314 SS=G | Continued from page 21 | F 0314 | then 50% quarterly x2, then 100% quarterly x1 to ensure ongoing and sustained compliance. | |
| | | | 25% of residents with Wound care orders and 25% of residents? skin evaluation documentation will be audited by the Assistant Director of Nursing/designee to ensure ongoing and sustained compliance weekly x4, monthly x3 and quarterly x1. | |
| | | | 25% of residents? Wound Care progress notes will be audited by the Assistant Director of Nursing Services/designee to ensure ongoing and sustained compliance weekly x4, monthly x3 & quarterly x1 | |
| | | | 25% of Physician Orders will be audited for proper Wound Care Protocols and for follow up to Wound Clinic Appointments weekly x4, monthly x3, and quarterly x1 to ensure ongoing and sustained compliance by the Wound Care Nurse/designee. | |
| | | | Wound rounds will be monitored | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314<br><br>SS=G | Continued from page 22 | F 0314 | weekly x4, monthly x3 and quarterly x1 to ensure ongoing and sustained compliance by the Quality Assurance Coordinator<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314 SS=G | Continued from page 23

Based on review of facility policy, clinical records, facility documentation and staff interviews, it was determined that the facility failed to provide adequate interventions and monitoring for the prevention of pressure ulcers, resulting in actual harm for one of eight residents reviewed with pressure ulcers (Resident R4).
Findings include:

The "Skin Monitoring" policy dated March 2015, indicated, "CNAs (Certified Nurse Aide) will fully review the resident's skin for any redness, rashes, bruises, pressure areas or any other skin abnormality on the resident's bath days."

The Resident Admission Record revealed that Resident R4 was originally admitted to the facility on 03/10/14, with diagnoses that included dementia (deterioration of mental functioning), thyroid disorder (abnormal functioning of the thyroid organ), | F 0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: \_\_00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST<br>ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314<br><br>SS=G | Continued from page 24<br><br>and stomach reflux (condition when stomach contents abnormally return into the esophagus-a canal from the mouth to the stomach).  The Initial Comprehensive Minimum Data Set (MDS- periodic review of resident care needs) assessment, dated 3/17/14, revealed that Resident R4 was not at risk of developing a pressure ulcer.  The clinical record did not reveal any evidence of skin breakdown at that time.<br><br>Nurses' notes dated 05/26/15, revealed that Resident R4 was noted to have an approximate 3.0 cm (centimeter) in diameter size Stage I (persistent reddened area) pressure ulcer to the coccyx (small bone at the base of the spinal column) area. Physician's orders dated 06/01/15, revealed an order to cleanse the coccyx wound with soap and water, pat dry, apply Duoderm (skin treatment with a patch to cover an area of skin used for partial and full-thickness wounds) to the coccyx, check every shift, and change every five days and as needed. The nurses' note dated 06/04/15, indicated that the | F  0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314<br><br>SS=G | Continued from page 25<br><br>Stage I to the coccyx was no longer red but a bony prominence (projecting outward) remained.  A physician's order dated 06/04/15, indicated to continue the Duoderm as treatment for the coccyx area for prevention of further skin breakdown.<br><br>Resident R4's pressure ulcer care plan updated on 06/01/15, identified an intervention to keep the area clean and as dry as possible and to minimize skin exposure to moisture.<br><br>Review of the Treatment Administration Records for August and September 2015, revealed that Resident R4's Duoderm was changed on 08/28/15 and was not changed again until 09/02/15, a period of six days.<br><br>Resident R4's nursing and physician's notes from 06/04/15 through 09/08/15, lacked documentation regarding the skin condition over the coccyx with the Duoderm removals and the new dressing | F  0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION: | | (X3) DATE SURVEY COMPLETED: |
|---|---|---|---|---|
| | **39A434** | A. BLDG: ___00_____<br>B. WING: _____ | | **11/06/2015** |

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314<br><br>SS=G | Continued from page 26<br><br>applications.  Review of the Treatment Flowsheet for September 2015, revealed that Resident R4 did not have a skin check on 09/04/15, with their bath as scheduled.  There was no evidence that the coccyx area was assessed for any changes in skin integrity for a period of six days from 09/02/15 through 09/08/15.  On 09/08/15, the nurses' notes revealed that upon removal of the Duoderm to the coccyx area, a Stage III (full thickness tissue loss) pressure ulcer was discovered and measured approximately 3.0 cm length by 1.5 cm width.<br><br>Physician's orders dated 10/15/15, revealed that Resident R4 was ordered a Wound Clinic consult and was subsequently seen on 10/21/15, 43 days after the Stage III was discovered. The Wound Clinic classified the coccyx wound as a Stage III pressure ulcer with measurements of 2.0 cm length by 2.5 cm width by 1.0 cm depth with tunneling 2 cm deep. | F  0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  39A434 | (X2) MULTIPLE CONSTRUCTION:  A. BLDG: __00_____  B. WING: _____ | (X3) DATE SURVEY COMPLETED:  11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314  SS=G | Continued from page 27  During an interview on 11/05/15, at 1:30 p.m., the Certified Registered Nurse Practitioner from the consulted Wound Clinic indicated that:  1) Duoderm was discouraged for Stage I pressure ulcers as its use may increase risk for skin breakdown due to the entrapment of moisture underneath the dressing leading to erosion of the skin,  2) that the skin should be evaluated daily especially when a resident is at high risk for skin breakdown, and  3) it would be more appropriate to off-load pressure as prevention with a Stage I pressure ulcer to maintain skin integrity.  Facility wound observation notes dated 10/23/15, indicated that the coccyx wound had progressed from a Stage III to a Stage IV (full thickness tissue loss with exposed bone, tendon or muscle) pressure | F 0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>39A434 | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314<br><br>SS=G | Continued from page 28<br><br>ulcer with measurements of approximately 3.2 cm length by 2.0 cm width by 1.5 cm depth.<br><br>During an interview on 11/06/15, at 8:45 a.m., the Wound Team Registered Nurse, Employee E2, confirmed that Resident R4's skin integrity was not monitored upon removal and application of Duoderm skin treatments to identify the condition of the coccyx skin until 09/08/15, when the Stage III pressure ulcer was discovered and the treatment and interventions were not effective in preventing harm to Resident R4 in the development of a Stage III pressure ulcer that worsened to a Stage IV.<br><br>28 Pa. Code 201.14(a) Responsibility of licensee.<br><br>28 Pa. Code 201.18(b)(1)(e)(1) Management.<br><br>28 Pa. Code 211.5(f) Clinical records.<br><br>28 Pa. Code 211.12(d)(1)(5) Nursing services. | F  0314 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED:  **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0314  SS=G | Continued from page 29   Previously cited 12/11/14. | F 0314 | | |
| F 0315  SS=D | | F 0315 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  39A434 | (X2) MULTIPLE CONSTRUCTION:  A. BLDG: __00_____  B. WING: _____ | (X3) DATE SURVEY COMPLETED:  11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0315  SS=D | Continued from page 30  **483.25(d) NO CATHETER, PREVENT UTI, RESTORE BLADDER**  Based on the resident's comprehensive assessment, the facility must ensure that a resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary; and a resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible.  This REQUIREMENT is not met as evidenced by: | F  0315 | Resident R6 will be medically reviewed to determine cause of new incontinence  Resident R6 will be patterned to determine appropriate bowel and bladder program  All residents will be reviewed x1 for their bowel and bladder status, including possible medical interventions and appropriate bowel and bladder program placement.  Registered Nurse Assessment Coordinators will be educated to inform Restorative Nurse upon change in bowel and bladder status by Staff Development Nurse/designee  Nursing will be re-educated on the Bowel & Bladder Program and to inform the Restorative Nurse of changes in residents bowel and bladder status by Staff Development Nurse/designee  Restorative Nurse will be educated on bowel and bladder patterning, | Completion Date: **12/21/2015** Status: **APPROVED** Date: **11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0315<br><br>SS=D | Continued from page 31 | F  0315 | resident?s proper placement in bowel and bladder program and monitoring of nursing documentation related to bowel and bladder status by Staff Development Nurse/designee<br><br>25% of resident?s documentation on bowel and bladder status will be audited by the Assistant Director of Nursing Services/designee to ensure compliance weekly x4, monthly x3 & quarterly x1<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0315 SS=D | Continued from page 32

Based on facility policy and clinical record review and staff interview, it was determined that the facility failed to address a decline in bowel and bladder status for one of 22 residents reviewed (Resident R6).

Findings include:

The "Bowel and Bladder Program Policy" dated March 2015, indicated that all incontinent residents' bowel and bladder habits will be patterned on admission and with a change in their bowel and bladder incontinence, for seven days to establish potential patterns.  The restorative nurse and the interdisciplinary team will review the patterning record and the observation records to determine the appropriate bowel and bladder program.

Resident R6 was admitted to the facility on 02/26/15.  A quarterly Minimum Data Set assessment (MDS-a periodic assessment of resident care needs) completed on 05/29/15, identified Resident R6 as being continent of urine and bowel. | F 0315 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0315<br>SS=D | Continued from page 33<br><br>A quarterly MDS dated 08/21/15, identified Resident R6 as being frequently incontinent of both urine and bowel.<br><br>During an interview on 11/05/15, at 1:45 p.m., the Restorative Registered Nurse, Employee E2 was unaware of Resident R6's decline in bowel and bladder continence, and Resident R6's bowel and bladder habits had not been patterned and an appropriate bowel and bladder program had not been determined to address the change in Resident R6's toileting needs.<br><br>28 Pa. Code 211.5(f) Clinical records.<br><br>28 Pa. Code 211.12(d)(1)(2)(3)(5) Nursing services.<br>Previously cited 12/11/14. | F 0315 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0315<br><br>SS=D | Continued from page 34 | F  0315 | | |
| F 0323<br><br>SS=D | | F  0323 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
| --- | --- | --- | --- |

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
| --- | --- | --- | --- | --- |
| F 0323<br><br>SS=D | Continued from page 35<br><br>**483.25(h) FREE OF ACCIDENT HAZARDS/SUPERVISION/DEVICES**<br><br>The facility must ensure that the resident environment remains as free of accident hazards as is possible; and each resident receives adequate supervision and assistance devices to prevent accidents.<br><br>This REQUIREMENT is not met as evidenced by: | F 0323 | Storage area on neighborhood A was locked immediately<br><br>Storage areas for all hazardous substances in facility have been reviewed x1 to ensure areas are locked and secured by Fire Safety Manager<br><br>Nursing, Housekeeping, Maintenance and Security staff will be re-educated on proper locking and storage of hazardous substances by Staff Development Nurse/designee<br><br>All facility storage areas for hazardous substances will be audited by the Housekeeping Supervisor/designee daily x5, weekly x4, monthly x3 and quarterly x1 to ensure compliance<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | Completion Date:<br>**12/21/2015**<br>Status:<br>**APPROVED**<br>Date:<br>**11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION: | (X3) DATE SURVEY COMPLETED: |
|---|---|---|---|
| | **39A434** | A. BLDG: __00_____ <br> B. WING: _____ | **11/06/2015** |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0323 <br><br> SS=D | Continued from page 36 <br><br> Based on observations, facility policy and staff interview, it was determined that the facility failed to provide a safe environment in one of one common bathing area observed (Unit-A). <br><br> Findings include: <br><br> The "Storage and Use of Hazardous Substances" policy dated March 2015, revealed that employees will be educated upon hire, job orientation and annually regarding storage of cleaning agents and that items that are hazardous or potentially hazardous, that will be stored in resident care areas will be kept secure from residents. <br><br> Observations of Unit-A on 11/03/15, at 2:25 p.m., revealed a 64 fluid once bottle of Cid-A-L II, a disinfectant cleaner which contained the following cautionary warnings: "Keep out of reach of children, harmful if absorbed through skin and harmful if inhaled", and a two quart container of Master Care Bath Aire System Disinfectant, with the following | F  0323 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>39A434 | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00__<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0323<br><br>SS=D | Continued from page 37<br><br>cautionary warning: "Hazardous to humans and animals" was observed in an unlocked cabinet in the central bathing area on Unit-A.<br><br>During an interview on 11/03/15 at 2:25 p.m., Quality Assurance Coordinator, Employee E7 confirmed that the disinfectant cleaners were safety hazards and should not be left unattended and accessible to residents.<br><br>28 Pa. Code 201.18(b)(1) Management.<br><br>28 Pa. Code 211.10(d) Resident care policies.<br><br>28 Pa. Code 211.12(d)(1)(5) Nursing services. Previously cited 12/11/14. | F 0323 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0323<br><br>SS=D | Continued from page 38 | F  0323 | | |
| F 0325<br><br>SS=D | | F  0325 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0325 SS=D | Continued from page 39

483.25(i) MAINTAIN NUTRITION STATUS UNLESS UNAVOIDABLE

Based on a resident's comprehensive assessment, the facility must ensure that a resident -
(1) Maintains acceptable parameters of nutritional status, such as body weight and protein levels, unless the resident's clinical condition demonstrates that this is not possible; and
(2) Receives a therapeutic diet when there is a nutritional problem.

This REQUIREMENT is not met as evidenced by: | F 0325 | Resident R4 had a comprehensive review by the Registered Dietician to ensure caloric and protein needs are being met to ensure wound healing

All residents with skin integrity concerns will be reviewed x1 by the Registered Dietician to ensure caloric, nutritional and protein needs are being met to ensure wound healing
All residents receiving tube feeding will be reviewed x1 by the Registered Dietician to ensure proper caloric and nutritional needs are being met for individualized resident

The Registered Dietician will be educated on timely review for proper caloric & nutritional calculations for residents receiving tube feeding and for residents with skin integrity concerns by the Staff Development Nurse/designee

25% of residents on tube feeding and 25% of residents with skin integrity concerns will be reviewed monthly x4, quarterly x1 to ensure | Completion Date: **12/21/2015** Status: **APPROVED** Date: **11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
| --- | --- | --- | --- |

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
| --- | --- | --- | --- | --- |
| F 0325<br><br>SS=D | Continued from page 40 | F 0325 | proper caloric and nutritional needs are being met and reviewed timely for individualized needs by the Quality Assurance Coordinator/designee<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0325 SS=D | Continued from page 41 | F 0325 | | |

Based on review of facility policy and clinical record and staff interviews, it was determined that the facility failed to adequately address increased nutritional requirements relating to compromised skin condition for one of 22 residents reviewed (Resident R4).

Findings include:

The "Dietary Assessment" policy dated March 2015, indicated that nutritional interventions would be initiated when assessment indicates concerns such as weight loss and wound development.

The Resident Admission Record revealed that Resident R4 was admitted to the facility on 03/10/14, with diagnoses including thyroid disease (abnormal functioning of the thyroid organ), dementia (deterioration of mental functioning), and stomach reflux (condition when stomach contents abnormally return into the esophagus-a canal from the mouth to the stomach).

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION: | (X3) DATE SURVEY COMPLETED: |
|---|---|---|---|
| | **39A434** | A. BLDG: ___00___<br>B. WING: _____ | **11/06/2015** |

| NAME OF PROVIDER OR SUPPLIER: | STREET ADDRESS, CITY, STATE, ZIP CODE: |
|---|---|
| **PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | **P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0325<br><br>SS=D | Continued from page 42<br><br>Dietary progress notes revealed that Resident R4 had a history of being classified as underweight and was ordered a gastrostomy tube (tubing that provides nourishment into the stomach) with Jevity (type of liquid nutrition) 1.5 formula at a rate of 40 milliliters (ml) for 20 hours each day since February 2015, to meet their nutritional needs.<br><br>Nurses notes dated 09/08/15, revealed that Resident R4 was discovered with a Stage III (partial thickness skin loss) pressure ulcer on the coccyx (small bone at the base of the spinal column).<br><br>Registered Dietitian (RD) Employee E5's progress note dated 09/21/15, regarding Resident R4's significant change assessment relating to the development of a Stage III pressure ulcer to the coccyx, continued the same tube feeding rate and did not recommend nutritional interventions to provide Resident R4 with additional calories, protein, and/or vitamins/minerals to address their compromised state and aid with the skin healing process. | F 0325 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0325<br><br>SS=D | Continued from page 43<br><br>The Wound Team Nurses Note dated 10/15/15, indicated that Resident R4's Stage III pressure ulcer was deeper and was not responding to the current treatment, that the pressure ulcer measured approximately 2.0 centimeters (cm) length by 1.5 cm width by 0.3 cm depth and a referral to the wound clinic was made.  The Wound Team Nurses Note dated 10/23/15, indicated that Resident R4's Stage III pressure ulcer had worsened to a Stage IV (full thickness skin loss) with measurements approximately 3.2 cm length by 2.0 cm width by 1.5 cm depth with tunneling (a development of an abnormal channel into the skin) and had developed a Stage I (reddened area) to their right hip.<br><br>RD, Employee E6's progress note dated 10/27/15, indicated that Resident R4 developed a second pressure ulcer, a Stage I to their right hip and had an increased caloric requirement relating to the pressure ulcers.  Nutritional interventions to address Resident R4's pressure ulcers did not occur until 10/27/15, or a period of 49 days after the Stage III | F  0325 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0325 SS=D | Continued from page 44 | F 0325 | | |

pressure ulcer was initially discovered with an increase in the tube feeding rate and again on 11/05/15, 58 days after the Stage III pressure ulcer was discovered, with a protein supplement added to aid with skin healing.

During an interview on 11/06/15, at 11:45 a.m., RD Employees E5 and E6 confirmed that Resident R4 was not provided nutritional interventions for wound healing at the time Resident R4's Stage III pressure ulcer was discovered in September 2015.

28 Pa. Code 211.10(c)(d) Resident care policies.

28 Pa. Code 211.12(d)(5) Nursing services.
Previously cited 12/11/14.

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0325<br><br>SS=D | Continued from page 45 | F  0325 | | |
| F 0441<br><br>SS=F | | F  0441 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 SS=F | Continued from page 46

483.65 INFECTION CONTROL, PREVENT SPREAD, LINENS

The facility must establish and maintain an Infection Control Program designed to provide a safe, sanitary and comfortable environment and to help prevent the development and transmission of disease and infection.

(a) Infection Control Program
The facility must establish an Infection Control Program under which it -
(1) Investigates, controls, and prevents infections in the facility;
(2) Decides what procedures, such as isolation, should be applied to an individual resident; and
(3) Maintains a record of incidents and corrective actions related to infections.

(b) Preventing Spread of Infection
(1) When the Infection Control Program determines that a resident needs isolation to prevent the spread of infection, the facility must isolate the resident.
(2) The facility must prohibit employees with a communicable disease or infected skin lesions from direct contact with residents or their food, if direct contact will transmit the disease.
(3) The facility must require staff to wash their hands after each direct resident contact for which hand washing is indicated by accepted professional practice. | F 0441 | The glucometer machine for neighborhood A was cleansed according to facility policy

Top of medication cart for neighborhood A was cleaned the evening of 11/3/2015

All glucometer machines were cleaned according to facility policy x1 on 11/4/2015

All medication cart tops & area where glucometer machine is stored will be cleaned with a disinfectant x1

Nurses will be re-educated on the proper cleaning of the glucometer machine by the Staff Development Nurse/designee

25% of nurses will be audited for blood glucose cleansing technique weekly x4, monthly x4 and quarterly x1

Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings | Completion Date: **12/21/2015** Status: **APPROVED** Date: **11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: <br> A. BLDG: __00_____ <br> B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 <br><br> SS=F | Continued from page 47 <br><br> (c) Linens <br> Personnel must handle, store, process and transport linens so as to prevent the spread of infection. <br><br> This REQUIREMENT is not met as evidenced by: | F  0441 | to determine further actions as necessary. <br><br> The light switch string in Resident R4?s room was replaced <br><br> Resident R4 will be examined by Medical Provider to review for infection concerns. <br><br> All residents rooms will be deep cleaned according to Facility Cleaning Procedures  x1 by housekeeping services <br><br> All residents with skin integrity concerns will be evaluated by Medical Provider x1 to review for any infection concerns. <br><br> All residents with skin integrity concerns will have their treatment procedures observed by the Registered Nurse Supervisor/designee x1 to ensure proper infection control technique maintained. <br><br> Nurses will be re-educated on proper | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: <br><br> **39A434** | (X2) MULTIPLE CONSTRUCTION: <br> A. BLDG: __00_____ <br> B. WING: _____ | (X3) DATE SURVEY COMPLETED: <br><br> **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 <br><br> SS=F | Continued from page 48 | F 0441 | infection control techniques during wound care. <br><br> 25% of nurses will be reviewed by the Registered Nurse Supervisor/designee during wound care treatment of residents with skin integrity concerns weekly x4, monthly x3 and quarterly x1 to ensure proper infection control techniques are maintained. <br><br> Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. <br><br> Infections from the 3rd quarter (July 2015-September 2015) will be reviewed for trends and other areas of concerns.  Corrective plans will be implemented as applicable. <br><br> Monthly Infection Control Report Form will be reviewed to ensure appropriate infection control data is being obtained. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 SS=F | Continued from page 49 | F 0441 | Infection Control Nurse will be educated on proper monitoring of infections, rates, trending and corrective actions by the Staff Development Nurse/designee

Monthly Infection Control Report Form will audited by the Quality Assurance Coordinator/designee monthly x3 and quarterly x1 to ensure proper completion and monitoring is completed.

Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION: | (X3) DATE SURVEY COMPLETED: |
|---|---|---|---|
| | **39A434** | A. BLDG: __00__ <br> B. WING: _____ | **11/06/2015** |

| NAME OF PROVIDER OR SUPPLIER: | STREET ADDRESS, CITY, STATE, ZIP CODE: |
|---|---|
| **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** <br><br> STATE LICENSE NUMBER: **198202** | **P O BOX 6239 560 EAST THIRD ST** <br> **ERIE, PA  16512** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 <br><br> SS=F | Continued from page 50 <br><br> Based on observations, review of facility policies and infection control records, and staff interviews, it was determined that the facility failed to appropriately clean a blood glucose meter (BGM - a small, portable machine that's used to measure how much sugar is in the blood) after use for one of 23 residents; failed to maintain appropriate infection control measures during a dressing change for one of 23 residents; and failed to track and trend infection control data in a manner to enable timely identification of changes in infection rates throughout the facility. <br><br> Findings include: <br><br> The facility policy entitled, "Blood Glucose Monitoring," dated March 2015, revealed that following a blood glucose test, equipment coming in contact with the resident's person or belongings, including the bottom of the basket/container of supplies, would be wiped with a clean, lint-free cloth dampened with 10% bleach and water, or an | F  0441 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441<br><br>SS=F | Continued from page 51<br><br>Occupational Safety and Health Administration (OSHA) approved disinfectant, and returned to the proper location.<br>Resident R23's clinical record revealed an admission date of 05/21/13, and diagnoses of diabetes, obesity and a history of antibiotic resistant infections.<br>Physician's orders dated 10/28/15, included an order for Resident R23 to have a blood glucose test obtained daily before the evening meal.<br>During an observation of blood glucose testing on 11/03/15 at 4:00 p.m., Registered Nurse (RN), Employee E1 took the BGM (Blood Glucose Monitor) into Resident R23's room and placed it on the bedside stand.  After obtaining the blood sample, RN, Employee E1 exited the room and placed the BGM on the top of the clean medication cart, then returned it to the medication drawer without the benefit of disinfecting the device.<br>During an interview on 11/03/15 at 4:05 p.m., RN, Employee E1 confirmed the potential contamination | F  0441 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 SS=F | Continued from page 52<br><br>the BGM caused having been placed on the top of the clean medication cart, then returned to the medication drawer without the benefit of disinfecting.<br>The facility policy entitled, "Wound Care," dated March 2015, revealed that during a dressing change, hands are to be washed before and after the procedure and "as needed" during the procedure. Examples identified in the policy of "as needed" included after removal of the dressing.<br>Resident R4's clinical record revealed diagnoses of dementia (deterioration of mental functioning), the presence of a feeding tube (a tube placed through the abdominal wall into the stomach for the administration of nutritional supplements and medications) and a Stage III pressure ulcer (full thickness skin loss) to the coccyx (small bone at the base of the spinal column).  Current physician's orders dated 10/09/15, included a daily dressing change to Resident R4's pressure ulcer of the | F  0441 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 SS=F | Continued from page 53

coccyx.  The current order directed that the wound was to be cleansed with an antibacterial solution made of diluted sodium hypochlorite (bleach) and sodium bicarbonate (baking soda), packed with a medicated product to absorb fluid and prevent bacterial growth, and covered with a clean, dry dressing.

During an observation of the wound care to Resident R4's coccyx wound on 11/04/15 at 10:00 a.m., RN, Employee E3 gloved and proceeded to remove Resident R4's soiled dressing.  While still wearing the potentially contaminated gloves, RN, Employee E3 then proceeded to pull the light cord above the bed, before removing the gloves, completing hand hygiene and applying the dressing.

During an interview on 11/04/15 at 10:20 a.m., RN, Employee E3 confirmed that appropriate infection control measures were not maintained during the completion of Resident R4's dressing change.

The facility "Infection Control Program Overview" | F 0441 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 SS=F | Continued from page 54 dated March 2015, revealed that the facility would monitor for the occurrence of infections through ongoing monitoring of infections among residents and subsequent documentation of the infections that occur. Review of the facility "Monthly Infection Control Report Form" revealed sections of the form for completion related to identified "Healthcare Associated Infections" (urinary tract, skin, respiratory, gastrointestinal, intravenous site/blood and other categories); "Total for the Previous Month;" and "Infection Control Rates" for the current and previous month, including a calculation formula. The facility's current "Quarterly Infection Control Report" for the period of July 2015 - September 2015, lacked evidence of calculated monthly or quarterly infection rates. During an interview on 11/06/15 at 10:45 a.m., RN, Employee E2 confirmed that the rates of infections for the various categories identified on the monthly | F 0441 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441 SS=F | Continued from page 55

and quarterly infection control reports were not routinely calculated or tracked to identify changes in rates/trends.
28 Pa. Code 211.10(d) Resident care policies.


28 Pa. Code 211.12(d)(1)(3) Nursing services.
Previously cited 12/11/14. | F 0441 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0441<br><br>SS=F | Continued from page 56 | F 0441 | | |
| F 0514<br><br>SS=D | | F 0514 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0514<br><br>SS=D | Continued from page 57<br><br>483.75(l)(1) RES<br>RECORDS-COMPLETE/ACCURATE/ACCESSIBLE<br><br>The facility must maintain clinical records on each resident in accordance with accepted professional standards and practices that are complete; accurately documented; readily accessible; and systematically organized.<br><br>The clinical record must contain sufficient information to identify the resident; a record of the resident's assessments; the plan of care and services provided; the results of any preadmission screening conducted by the State; and progress notes.<br><br>This REQUIREMENT is not met as evidenced by: | F  0514 | Resident R4?s skin was reviewed by Physician; documentation in the Medical Record was updated to include wound appearance, size and characteristics.<br><br>All residents with skin integrity concerns will be reviewed x1 by Medical Services and Wound Care Nurse, documentation of skin concerns and wound characteristics will be updated in the Medical Record as applicable.<br><br>Documentation and Wound Care Policies will be updated to include ensuring reference to skin characteristics during weekly skin checks and observations of skin during wound care treatment changes.<br><br>Physician, Certified Registered Nurse Practitioner and Nurses will be re-educated on proper documentation and updated on the Documentation and Wound Care Policy updates by the Staff Development Nurse/designee. | Completion Date:<br>**12/21/2015**<br>Status:<br>**APPROVED**<br>Date:<br>**11/20/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 11/06/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: **PENNSYLVANIA SOLDIERS' & SAILORS' HOME** STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE: **P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0514 SS=D | Continued from page 58 | F 0514 | 25% of residents with Wound care orders and 25% of residents? skin evaluation documentation will be audited by the Assistant Director of Nursing/designee to ensure compliance weekly x4, monthly x3 and quarterly x1. Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>39A434 | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>11/06/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST<br>ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0514<br><br>SS=D | Continued from page 59<br><br>Based on clinical record review and staff interview, it was determined that the facility failed to adequately document skin condition for one of 22 residents reviewed (Resident R4).<br><br>Findings include:<br><br>Resident R4 was admitted to the facility on 03/10/14, with diagnoses including thyroid disease (abnormal functioning of the thyroid organ), dementia (deterioration of mental functioning), and stomach reflux (condition when stomach contents abnormally return into the esophagus-a canal from the mouth to the stomach).<br><br>Nurses' notes dated 05/26/15, identified Resident R4 with a Stage I (reddened area) pressure ulcer of the coccyx (small bone at the base of the spinal column).  A physician's order dated 06/04/15, was for Duoderm (skin treatment with patch to cover an area of skin) to the coccyx and to change every five days and as needed for prevention of further skin breakdown. | F  0514 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0514<br><br>SS=D | Continued from page 60<br><br>Review of the Treatment Administration Records for August and September 2015, revealed that upon the removal of the Duoderm skin dressings on 08/02/15, 08/08/15, 08/12/15, 08/17/15, 08/20/15, 08/22/15, 08/24/15, 08/27/15, 09/02/15, and 09/05/15, there was no documentation regarding the skin condition underneath the Duoderm dressing prior to the application of the next dressing.<br><br>During an interview on 11/05/15 at 1:45 p.m., Registered Nurse Employee E2 confirmed that there was no documentation regarding Resident R4's skin condition under the Duoderm dressing patch upon each removal.<br><br>28 Pa. Code 211.5(f) Clinical records.<br><br>28 Pa. Code 211.12(d)(1)(5) Nursing services. Previously cited 12/11/14. | F 0514 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0514<br><br>SS=D | Continued from page 61 | F 0514 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST<br>ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| P 1600 | § 209.8(b) Fire Drills.<br><br>  (b)   A written report shall be maintained of each fire drill which includes date, time required for evacuation or relocation, number of residents evacuated or moved to another location and number of personnel participating in a fire drill.<br><br>This REGULATION is not met as evidenced by: | P  1600 | Fire Drills over the past 12 months were conducted with no resident injuries<br><br>Proper documentation format will be updated for Fire Drill Logs to ensure compliance<br>All fire drills forward will include proper documentation of resident and staff participation numbers<br><br>Fire Safety Manager, Security Guards and Facility Maintenance Manager will be educated on ensuring proper documentation is included in Fire Drill logs by Staff Development Nurse/designee<br><br>Fire Drill Logs will be audited to ensure compliance of proper documentation monthly x3 and quarterly x1 by the Deputy Commandant/designee<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | Completion Date:<br>**12/21/2015**<br>Status:<br>**APPROVED**<br>Date:<br>**11/20/2015** |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE: | (X6) DATE: |
|---|---|---|

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**11/06/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| P 1600 | Continued from page 1<br><br>Based on review of the facility's fire drill logs and staff interviews, it was determined that the facility failed to maintain written fire drill reports that addressed the number of residents evacuated or moved to another location during a fire drill for 12 of 12 reports.<br><br>Findings include:<br><br>Review of the monthly fire drills from 12/30/14 through 10/28/15, revealed that there was no documentation to indicate the individual number of residents evacuated or moved to another location during a fire drill.<br><br>During an interview on 11/06/15 at 11:15 a.m., the Security Officer and Assistant Commandant confirmed that there was no documentation to indicate the number of residents that were evacuated or moved to another location during a fire drill. | P 1600 | | |

Pennsylvania Department of Health

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  **39A434** | (X2) MULTIPLE CONSTRUCTION: <br> A. BLDG: __00_____ <br> B. WING: _____ | (X3) DATE SURVEY COMPLETED:  **11/06/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| P 1600 | Continued from page 2 | P 1600 | | |



# Certified End Page

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

**STATE LICENSE NUMBER: 198202**

**SURVEY EXIT DATE: 11/06/2015**

**I Certify This Document to be a True and Correct Statement of Deficiencies and Approved Facility Plan of Correction for the Above-Identified Facility Survey**

*Susan Coble*
*Deputy Secretary for Quality Assurance*

*Rachel L. Levine, MD*
*Secretary of Health*



THIS IS A CERTIFICATION PAGE

## PLEASE DO NOT DETACH

THIS PAGE IS NOW PART OF THIS SURVEY

**Plaintiff's Exhibit 14**

**Notice of Pre-Disciplinary Conference 11/20/2015**

DATE:        11/20/15

SUBJECT:     Written Notice of Pre-Disciplinary Conference


TO:     Nancy Lewen  LPN


FROM: Raymond Hamm, RNS


        This is to advise you that this facility is conducting an investigation into allegations concerning your conduct as an employee of this organization. Specifically but not solely

        Following the DMVA standards of conduct and work rules: Neglect of Duty or responsibility, failure to perform assigned tasks.

        DATE:     11/25/15

        TIME:     0600

        PLACE:    Supervisor Office

        The purpose of the conference is to present you with the opportunity to discuss the allegations and to respond in detail to the charges listed above. At the conference, you will be requested to provide your account of the incident being investigated. You will, at your request, be allowed union representation at the meeting.

        Corrective actions may or may not be imposed depending on the facts gathered during the investigation.

        You will be notified as soon as possible of the final outcome of the investigation, whether or not corrective action is taken.

        If you have any questions concerning this meeting contact me at extension 878-4963.

**Plaintiff's Exhibit 15**

**Department of Health Investigation Results 12/4/2015**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: ___00___ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER: PENNSYLVANIA SOLDIERS' & SAILORS' HOME | STREET ADDRESS, CITY, STATE, ZIP CODE: P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512 |
|---|---|
| STATE LICENSE NUMBER: 198202 | |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0000 | INITIAL COMMENT<br><br>Based on an Abbreviated Survey in response to a complaint completed on December 4, 2015, at Pennsylvania Soldiers' and Sailors' Home, it was determined that deficiencies were identified under the requirements of 42 CFR Part 483, Subpart B, Requirements for Long Term Care Facilities and the 28 Pa Code, Commonwealth of Pennsylvania Long Term Care Licensure Regulations as they relate to the Health portion of the survey process. | F  0000 | | |
| F 0157<br><br>SS=D | | F  0157 | | |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE: | (X6) DATE: |
|---|---|---|

Any deficiency statement ending with an asterisk (*) denotes a deficiency which may be excused from correction providing it is determined that other safeguards provide sufficient protection to the patients. The findings stated above are disclosable whether or not a plan of correction is provided. The findings are disclosable within 14 days after such information is made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

This form is a printed electronic version of the CMS 2567L. It contains all the information found on the standard document in much the same form. This electronic form once printed and signed by the facility administrator and appropriately posted will satisfy the CMS requirement to post survey information found on the CMS 2567L.

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0157 SS=D | Continued from page 1 | F 0157 | | |

**483.10(b)(11) NOTIFY OF CHANGES (INJURY/DECLINE/ROOM, ETC)**

A facility must immediately inform the resident; consult with the resident's physician; and if known, notify the resident's legal representative or an interested family member when there is an accident involving the resident which results in injury and has the potential for requiring physician intervention; a significant change in the resident's physical, mental, or psychosocial status (i.e., a deterioration in health, mental, or psychosocial status in either life threatening conditions or clinical complications); a need to alter treatment significantly (i.e., a need to discontinue an existing form of treatment due to adverse consequences, or to commence a new form of treatment); or a decision to transfer or discharge the resident from the facility as specified in §483.12(a).

The facility must also promptly notify the resident and, if known, the resident's legal representative or interested family member when there is a change in room or roommate assignment as specified in §483.15(e)(2); or a change in resident rights under Federal or State law or regulations as specified in paragraph  (b)(1) of this section.

The facility must record and periodically update the address and phone number of the resident's legal representative or interested family member.

This REQUIREMENT is not met as evidenced by:

Resident R6?s lab values were reviewed by Physician Services. Resident R6?s responsible party will be updated on bloodwork being performed without a physician order and on subsequent lab results.

All resident lab results over the last quarter will be reviewed x1 to ensure appropriate physician orders and proper physician and responsible party notification has occurred.

Nurses will be re-educated on proper following of physician orders and proper incident reporting by Staff Development/designee.

25% of lab orders and results will be monitored monthly x4 and quarterly x1 to ensure compliance by Registered Nurse Supervisor/designee

Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary.

Completion Date:
**12/21/2015**
Status:
**APPROVED**
Date:
**12/07/2015**

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0157<br><br>SS=D | Continued from page 2 | F  0157 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION: | (X3) DATE SURVEY COMPLETED: |
|---|---|---|---|
| | **39A434** | A. BLDG: __00_____ <br> B. WING: _____ | **12/04/2015** |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0157 <br><br> SS=D | Continued from page 3 <br><br><br> Based on review of the clinical record, facility policy and staff interview, it was determined that the facility failed to notify the responsible party of blood tests being obtained without a physician's order for one of eight residents (Resident R6). <br><br> Findings include: <br><br> The "Notification of change" policy, dated 3/15, revealed that a resident's responsible party will be notified timely of any changes of condition to include any lab values that are out of parameter. <br><br> The resident admission record face sheet revealed that Resident R6 was admitted to the facility on 1/06/15. The resident diagnosis sheet revealed that Resident R6 had diagnosis that included high blood pressure, Parkinson's disease, anemia and heart failure. <br><br> Review of the clinical record revealed that on 10/02/15, Resident R6 had Laboratory tests | F 0157 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0157 SS=D | Continued from page 4

performed for the following:
Comprehensive Metabolic Panel (blood test that measures glucose level, fluid balance, kidney and liver function-CMP).
Complete Blood Count (measures the number of red and white blood cells and the amount of hemoglobin in the blood-CBC),
Lipid Panel (to help determine an individual's risk of heart disease).
Vitamin D, 25-Hydroxy Level

Review of the clinical record revealed that there was no physician's order for the 10/02/15 CMP, CBC, Lipid Profile or Vitamin D Level blood tests and there was no documented evidence that the responsible party was notified of the blood tests.

During an interview on 12/02/15, at 1:50 p.m., the Director of Nursing confirmed that the responsible party had not been notified that Resident R6 had blood testing performed without a physician's order.

28 Pa. code 211.5(f) Clinical records. | F 0157 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0157<br><br>SS=D | Continued from page 5<br><br><br>Previously cited 11/06/15<br><br><br>28 Pa. Code 211.12(d)(1)(3)(5) Nursing services.<br>Previously cited 11/06/15. | F  0157 | | |
| F 0309<br><br>SS=E | | F  0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 SS=E | Continued from page 6

483.25 PROVIDE CARE/SERVICES FOR HIGHEST WELL BEING

Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.

This REQUIREMENT is not met as evidenced by: | F  0309 | Resident R4 was scheduled for and attended a Wound Clinic appointment on December 1, 2015 with no change to the current treatment of Unnaboots and weekly follow up.  Resident R4 is now scheduled for weekly follow up appointments to the Wound Clinic. Next follow up appointment is scheduled for 12/8/2015.

All residents will have their physician orders and consults reviewed to ensure all orders are being followed.

Nurses will be re-educated on proper review and notification of attending physician and notification of resident responsible party regarding consultations by Staff Development/designee.

Nurses and Ward Clerks will be re-educated on proper notation of medical orders by Staff Development/designee.

Nurses will be re-educated on proper | Completion Date: **12/21/2015** Status: **APPROVED** Date: **12/07/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 SS=E | Continued from page 7 | F 0309 | following of physician orders by Staff Development/designee.<br><br>25% New Physician orders and 25% of consults will be reviewed weekly x4, monthly x3 and quarterly x1 by the Registered Nurse Supervisor/designee.<br>Resident R5 and Resident R7?s physician/s and responsible parties will be notified of the untimely laboratory testing.<br><br>All resident lab results over the last quarter will be reviewed x1 to ensure appropriate physician orders and proper physician and responsible party notification has occurred.<br><br>Nurses will be re-educated on proper following of physician orders and proper incident reporting by Staff Development/designee.<br><br>25% of lab orders and results will be monitored monthly x4 and quarterly x1 to ensure compliance by Registered Nurse Supervisor/designee | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 SS=E | Continued from page 8 | F  0309 | Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309<br><br>SS=E | Continued from page 9<br><br>Based on review of clinical records and facility policy and staff interview, it was determined that the facility failed to follow physician's orders for three of eight residents (Resident R4, R5 and R7).<br><br>Findings include:<br><br>The facility "Medical Provider Orders" policy, dated 3/2015, stated that "Physician orders are carried out in accordance with the written or verbal orders of the attending medical provider."<br><br>The face sheet revealed that Resident R4 was admitted to the facility on 7/10/15, with diagnoses that included but were not limited to venous insufficiency (a problem with the blood flow to the legs) and depression.<br><br>The physician orders, dated 11/06/15, revealed an order for Unna boots (used to treat venous insufficiency) to both legs "changed weekly at wound clinic,"  with an original order date of 8/31/15. | F  0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION:<br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED: **12/04/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309<br><br>SS=E | Continued from page 10<br><br>The wound clinic report, dated 8/31/15, indicated that the next appointment would be "next week." There were no further wound clinic reports until 12/01/15, a total of 13 weeks later.<br><br>Clinical record documentation, dated 11/29/15, stated that the Unna boots were to be changed weekly in wound clinic and that the last noted Unna boot change was on 8/31/15.<br><br>During an interview on 12/02/15, at 1:40 p.m., the Director of Nursing (DON) confirmed that there was no evidence that Resident R4 attended wound clinic weekly as ordered by the physician from 8/31/15 through 12/01/15, a total of 12 missed weekly appointments.  The DON additionally confirmed that the Unna boots were not removed or changed weekly as ordered from 8/31/15 until 11/29/15, a total of 12 weeks and 6 days.<br><br>The resident admission record face sheet revealed that Resident R5 was admitted to the facility on | F  0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA  16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309<br><br>SS=E | Continued from page 11<br><br>4/01/15 with diagnosis of heart disease and high blood pressure.<br>Physician's order dated 11/09/15, indicated that resident R5 was to have a Complete Blood Count (measures the number of red and white blood cells and the amount of hemoglobin in the blood-CBC), Comprehensive Metabolic Panel (blood test that measures glucose level, fluid balance, kidney and liver function-CMP), Vitamin D 25-Hydroxy Level and Lipid Panel (to help determine an individual's risk of heart disease) completed on the first Friday of October (10/02/15) with an original order date of 8/27/15.<br>Nurses progress notes dated 11/19/15, revealed that a lab error had occurred and that the blood tests were not drawn on 10/02/15.<br>Physician's order dated 11/19/15, indicated that the CBC, CMP, Vitamin D and Lipid Panel were due on 10/02/15 and not obtained until 11/20/15, 49 days later.<br>During an interview on 12/02/15, at 2:05 p.m., the Director of Nursing confirmed that blood tests for Resident R5 were not as physician ordered. | F 0309 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
HEALTH CARE FINANCING ADMINISTRATION

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
| --- | --- | --- | --- |

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512** |
| --- | --- |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
| --- | --- | --- | --- | --- |
| F 0309<br><br>SS=E | Continued from page 12<br><br><br>The resident admission record face sheet revealed that Resident R7 was admitted to the facility on 5/09/14.  The resident diagnosis sheet revealed that Resident R7 had diagnosis that included high blood pressure, retention of urine, edema (an abnormal excess accumulation of fluid) and atrial fibrillation (very rapid uncoordinated contractions of the heart resulting in a lack of synchronism between heartbeat and pulse beat).<br>Physician's order dated 10/26/15 revealed that Resident R7 had a change in medication which resulted in an increase to their Lasix (water pill that eliminates excess water from the body) dosage. Physician's order dated 10/26/15, indicated that Resident R7 was to have a Basic Metabolic Panel (a group of blood tests that provides information about your body's metabolism-BMP) blood test performed on 11/02/15.<br><br>Documentation revealed that the BMP blood test was drawn on 10/27/15 six days prior to the date it was ordered. | F  0309 | | |

| CMS-2567L | DH9711 | IF CONTINUATION SHEET Page 13 of 24 |
| --- | --- | --- |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309<br><br>SS=E | Continued from page 13<br><br><br>During an interview on 12/02/15, at 2:05 p.m., the Director of Nursing confirmed that blood tests for Resident R7 were not performed as physician ordered.<br><br>483.25 Repeat deficiency 11/06/15.<br><br>28 Pa. Code 211.12(c)(d)(1)(3)(5) Nursing services. | F 0309 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0309 SS=E | Continued from page 14 | F  0309 | | |
| F 0502 SS=D | | F  0502 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  39A434 | (X2) MULTIPLE CONSTRUCTION:  A. BLDG: __00_____  B. WING: _____ | (X3) DATE SURVEY COMPLETED:  12/04/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0502 SS=D | Continued from page 15<br><br>483.75(j)(1) ADMINISTRATION<br><br>The facility must provide or obtain laboratory services to meet the needs of its residents.  The facility is responsible for the quality and timeliness of the services.<br><br>This REQUIREMENT is not met as evidenced by: | F  0502 | Resident R5 and Resident R7?s physician/s and responsible parties will be notified of the untimely laboratory testing.<br><br>All resident lab results over the last quarter will be reviewed x1 to ensure appropriate physician orders and proper physician and responsible party notification has occurred.<br><br>Nurses will be re-educated on proper following of physician orders and proper incident reporting by Staff Development/designee.<br><br>25% of lab orders and results will be monitored monthly x4 and quarterly x1 to ensure compliance by Registered Nurse Supervisor/designee<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | Completion Date:<br>**12/21/2015**<br>Status:<br>**APPROVED**<br>Date:<br>**12/07/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00__ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0502 SS=D | Continued from page 16<br><br>Based on facility policy, clinical records and staff interviews, it was determined that the facility failed to obtain laboratory test results in a timely manner for two of eight residents (Resident R5 and R7).<br><br>Findings include:<br><br>The "Diagnostic Services" policy, dated 3/15, revealed that orders for diagnostic services will be promptly carried out as instructed by the physician's order.<br><br>The resident admission record face sheet revealed that Resident R5 was admitted to the facility on 4/01/15 with diagnosis of heart disease and high blood pressure.<br>Physician's order dated 11/09/15, indicated that resident R5 was to have a Complete Blood Count (measures the number of red and white blood cells and the amount of hemoglobin in the blood-CBC), Comprehensive Metabolic Panel (blood test that measures glucose level, fluid balance, kidney and | F 0502 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: **39A434** | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: **12/04/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0502 SS=D | Continued from page 17

liver function-CMP), Vitamin D 25-Hydroxy Level and Lipid Panel (to help determine an individual's risk of heart disease) completed on the first Friday of October (10/02/15) with an original order date of 8/27/15.
Nurses progress notes dated 11/19/15, revealed that a lab error had occurred and that the blood tests were not drawn on 10/02/15.
Physician's order dated 11/19/15, indicated that the CBC, CMP, Vitamin D and Lipid Panel were due on 10/02/15 and not obtained until 11/20/15, 49 days later.
During an interview on 12/02/15, at 2:05 p.m., the Director of Nursing confirmed that blood tests for Resident R5 were not performed timely as physician ordered.

The resident admission record face sheet revealed that Resident R7 was admitted to the facility on 5/09/14.  The resident diagnosis sheet revealed that Resident R7 had diagnosis that included high blood pressure, retention of urine, edema (an abnormal excess accumulation of fluid) and atrial fibrillation | F 0502 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 39A434 | (X2) MULTIPLE CONSTRUCTION: A. BLDG: __00_____ B. WING: _____ | (X3) DATE SURVEY COMPLETED: 12/04/2015 |

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0502 SS=D | Continued from page 18<br><br>(very rapid uncoordinated contractions of the heart resulting in a lack of synchronism between heartbeat and pulse beat).<br>Physician's order dated 10/26/15 revealed that Resident R7 had a change in medication which resulted in an increase to their Lasix (water pill that eliminates excess water from the body).  Physician's order dated 10/26/15, indicated that Resident R7 was to have a Basic Metabolic Panel (a group of blood tests that provides information about your body's metabolism-BMP) blood test performed on 11/02/15.<br><br>Documentation revealed that the BMP blood test was drawn on 10/27/15 six days prior to the date it was ordered.<br><br>During an interview on 12/02/15, at 2:05 p.m., the Director of Nursing confirmed that blood tests for Resident R7 were not performed timely as physician ordered.<br><br>28 Pa. Code 211.12(d)(1)(3)(5) Nursing services. | F 0502 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0502<br><br>SS=D | Continued from page 19<br><br>Previously cited 11/06/15. | F 0502 | | |
| F 0504<br><br>SS=D | | F 0504 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: ___00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER:<br><br>**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**<br><br>STATE LICENSE NUMBER: **198202** | STREET ADDRESS, CITY, STATE, ZIP CODE:<br><br>**P O BOX 6239 560 EAST THIRD ST**<br>**ERIE, PA 16512** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0504<br><br>SS=D | Continued from page 20<br><br><br>483.75(j)(2)(i) LAB SVCS ONLY WHEN ORDERED BY PHYSICIAN<br><br>The facility must provide or obtain laboratory services only when ordered by the attending physician.<br><br>This REQUIREMENT is not met as evidenced by: | F 0504 | Resident R6?s lab values were reviewed by Physician Services.<br><br>All resident labs over the last quarter will be reviewed x1 to ensure appropriate physician orders are present.<br><br>Nurses will be re-educated on proper following of physician orders and proper incident reporting by Staff Development/designee.<br><br>25% of lab orders and results will be monitored monthly x4 and quarterly x1 to ensure compliance by Registered Nurse Supervisor/designee<br><br>Results of the audits will be reviewed at the Quality Assurance & Performance Improvement meetings to determine further actions as necessary. | Completion Date:<br>**12/21/2015**<br>Status:<br>**APPROVED**<br>Date:<br>**12/07/2015** |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br>A. BLDG: ___00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0504<br><br>SS=D | Continued from page 21<br><br><br>Based on review of the facility policy, clinical record and staff interview, it was determined that the facility obtained laboratory tests without a physician's order for one of eight residents (Resident R6).<br><br>Findings include:<br><br>The "Diagnostic Services" policy, dated 3/15, revealed that a physician order should be obtained in the resident's medical record for diagnostic tests to be conducted.<br><br>The resident admission record face sheet revealed that Resident R6 was admitted to the facility on 1/06/15. The resident diagnosis sheet revealed that Resident R6 had diagnosis that included high blood pressure, Parkinson's disease, anemia and heart failure.<br><br>Laboratory test results revealed that Resident R6 had blood drawn for the following:<br>Complete Blood Count (measures the number of | F 0504 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>39A434 | (X2) MULTIPLE CONSTRUCTION:<br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>12/04/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:

**P O BOX 6239 560 EAST THIRD ST
ERIE, PA  16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0504<br><br>SS=D | Continued from page 22<br><br>red and white blood cells and the amount of hemoglobin in the blood-CBC),<br>Comprehensive Metabolic Panel (blood test that measures glucose level, fluid balance, kidney and liver function-CMP).<br>Vitamin D 25-Hydroxy Level<br>Lipid Panel (to help determine an individual's risk of heart disease).<br>Review of the clinical record revealed that there was no physician order for the 10/02/15 CBC, CMP, Vitamin D 25-Hydroxy Level or Lipid Panel blood tests.<br><br>During an interview on 12/02/15, at 1:50 p.m., the Director of Nursing confirmed that there was no corresponding physician's order for the laboratory tests above to be performed on resident R6.<br><br>28 Pa. Code 211.12(d)(1)(3)(5) Nursing services.<br>Previously cited 11/06/15. | F  0504 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION (POC) | (XI) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**39A434** | (X2) MULTIPLE CONSTRUCTION:<br><br>A. BLDG: __00_____<br>B. WING: _____ | (X3) DATE SURVEY COMPLETED:<br><br>**12/04/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER:
**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

STATE LICENSE NUMBER: **198202**

STREET ADDRESS, CITY, STATE, ZIP CODE:
**P O BOX 6239 560 EAST THIRD ST**
**ERIE, PA 16512**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE | (X5) COMPLETE DATE |
|---|---|---|---|---|
| F 0504<br><br>SS=D | Continued from page 23 | F 0504 | | |



# Certified End Page

**PENNSYLVANIA SOLDIERS' & SAILORS' HOME**

**STATE LICENSE NUMBER: 198202**

**SURVEY EXIT DATE: 12/04/2015**

**I Certify This Document to be a True and Correct Statement of Deficiencies and Approved Facility Plan of Correction for the Above-Identified Facility Survey**

*Susan Coble*
*Deputy Secretary for Quality Assurance*

*Rachel L. Levine, MD*
*Secretary of Health*



THIS IS A CERTIFICATION PAGE

## PLEASE DO NOT DETACH

THIS PAGE IS NOW PART OF THIS SURVEY