## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY E. LEWEN, | ) | |
| | ) | |
| **Plaintiff,** | ) | **C.A. No. 17-148 Erie** |
| v. | ) | |
| | ) | |
| BARBARA RAYMOND, | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

Plaintiff Nancy Lewen ("Lewen") brought this *pro se* civil action after being terminated from her job as a Licensed Practical Nurse ("LPN") at the Pennsylvania Soldiers' and Sailors' Home ("PSSH") in Erie, Pennsylvania. At this juncture, her only remaining claim is against Defendant Barbara Rayment ("Raymond") for the alleged violation of her First Amendment rights. Raymond has filed a motion for summary judgment on the First Amendment claim. Relatedly, Lewen has filed two motions styled as "motions *in limine*," which seek to define certain aspects of the summary judgment record.

For the reasons that follow, the Lewen's motions will be granted in limited part, and will otherwise be denied. Raymond's motion for summary judgment will be granted.[1]

---

[1] On July 23, 2024, Lewen filed a document styled as a "Current Status Update and Request for Status Conference After November 5, 2024." ECF No. 151. Therein, she acknowledges this Court's involvement in certain election-related cases which, she posits, "should be delegated more of this Court's resources at this time," while her own case "remain[s] on the back burner..." *Id.* at 2. Lewen proposes that this Court hold a pretrial conference in the instant action at some point after the upcoming presidential election when the Court's resources are "freed up enough to dispose of this case once and for all." *Id.* at 6. Although the Court appreciates Lewen's sentiments, it declines to delay its ruling further, given the age of this case and the need for final resolution of the pending motions.

I.       **Standard of Review**

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Thus, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claims elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of

material fact, the nonmoving party must go beyond their pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp.*, 477 U.S. at 324.  In this respect, "summary judgment is essentially 'put up or shut up' time for the nonmoving party." *NRV Inc. v. Majestic Hills*, LLC, 2023 WL 3043780, at *3 (W.D. Pa. Apr. 21, 2023) (quoting *Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

## II.     Scope of Review/ Plaintiff's Motions at ECF Nos. 123 and 124

As an initial matter, some discussion is warranted concerning the scope of the Court's review as it relates to the evidentiary record.  In support of her motion for summary judgment, Raymond has submitted -- among other things -- the following evidentiary items:

1. the transcript from Lewen's unemployment compensation hearing (Def.'s Ex. 1), *see* ECF No. 113-4;

2. the transcript from Lewen's state civil service hearing (Def.'s Ex. 8), *see* ECF Nos. 115-1 and 115-2;

3. a series of Facebook messages between Lewen and her co-worker, Barry Blasic (Def.'s Ex. 9), *see* Ex. 115-3;

4. the transcript from Lewen's pre-disciplinary conference on March 7, 2016 (Def.'s Ex. 12), *see* ECF No. 115-4;

5. the transcript from Lewen's continued pre-disciplinary conference on March 10, 2016 (Def.'s Ex. 13), *see* ECF No. 115-4; and

6. a written statement generated by Barry Blasic on March 7, 2016 (Def.'s Ex. 30), *see* ECF No. 115-8.

Lewen has filed two motions concerning these exhibits, which she has erroneously styled as "motions *in limine*."[2] *See* ECF Nos. 123 and 124.  The Court will address each motion in turn.

(i)        *The Motion Filed at ECF No. 123*

Lewen's first motion, filed at ECF No. [123], concerns Defense Exhibit 9, which is a printout of Facebook messages sent between Lewen and her co-worker, Barry Blasic.  *See* ECF No. 115-3.  Raymond has claimed that some of Lewen's messages amounted to harassment and constituted a basis for her termination.  Lewen originally produced the printout of messages in connection with her post-termination hearings before the Pennsylvania Civil Service Commission and the unemployment compensation judge, and the printout was introduced at both hearings as a joint exhibit.  *See* ECF No. 125 at 2-3; *see also* ECF No. 113-4 at 21-23; ECF No. 115-1 at 15-19.  Although Lewen contends that the document is incomplete, she does not appear to take issue with the accuracy of the printed messages.

Instead, Lewen has expressed concern that the printout does not include certain images and Youtube video links which were part of the original messaging.  She states that

> Defendant's Exhibit 9 is an incomplete portion of an artistic work that was a satirical, parodical and allegorical creative writing story, which also contained symbolism and metaphors. The Youtube videos and pictures are what carried the storyline and are necessary to provide the context of the writing. Taking them out of context creates a misleading impression. The Plaintiff has attempted to recreate the writing as best as she possibly can with what she still has available, but [she] requires the images to make the writing complete.

ECF No. 125 at 4.

---

[2] "[A] motion *in limine* "is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions. *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).  Given the posture of this case, it is premature for the Court to consider any motions *in limine*. However, the Court will construe Plaintiff's motions based on the relief requested.

Lewen appears to be asking the Court to do two things as it relates to Defense Exhibit 9. First, she asks that the Court "read the Facebook messages and simultaneously read [the] Supplement" that she has filed at ECF No. 123-6, "which contains information from the Youtube links contained in [Defense Exhibit 9] that carried the storyline along." ECF No. 125 at 6. Second, because Lewen no longer has access to the original Facebook account and cannot access all of the photos that were originally included in the Facebook messages, she asks that Raymond be required "to obtain the rest of the images from Barry Blasic so that the Defendant's exhibit 9 creative writing can be repaired to its original state." *Id.* at 7.

To the extent Lewen is requesting leave to supplement the summary judgment record with the evidentiary items appended to her motion at ECF No. 123, including the "supplement" filed at ECF No. 123-6, that aspect of her motion is granted. Accordingly, for purposes of determining whether there is a genuine issue of material fact in this case, the Court has reviewed and considered the entirety of Lewen's Rule 56 submissions, including her "supplement" at ECF No. 123-6.

On the other hand, the Court will deny Lewen's motion to compel the production of any additional images or video links. The central issue is whether there is evidence to show that Raymond acted with an unlawful retaliatory motive in dismissing Lewen from her job. On that point, the Court's focus is necessarily on the information that was known to Raymond at the time of the adverse employment decision. Here, Raymond expressly denies any prior knowledge of the material that Lewen has produced, for the first time, in her motion at ECF No. 123, *see* ECF No. 137 at 1-2, and nothing in the record contradicts her representation. Moreover, to the extent Lewen is suggesting that her romantic overtures to Blasic were a form of protected speech for which she was unlawfully terminated, that argument fails as a matter of law for the reasons

5

discussed herein.  Accordingly, additional images or videos will not materially aid the Court's analysis.  Lewen's request for the production of additional images or videos will therefore be denied.

*(ii)      The Motion Filed at ECF No. 124*

In her motion filed at ECF No. [124], Lewen asks the Court to exclude the witness testimony from her state civil service and unemployment compensation hearings, as set forth in Defendant's Exhibits 1 and 8.  ECF No. 124 at 1.  In her supporting memorandum, she expands her request to include Defense Exhibits 12, 13, and 30 as well.  ECF No. 126.  She reasons that "[a]ny remarks, testimony or questions from any party other than the Plaintiff or the Defendant in this case should be excluded as evidence because those persons are not witnesses in this case. The Defendant has not proven that they are unavailable as witnesses in this case and they have not given depositions in this or any other case."  *Id.* at 1-2.

Lewen's motion at ECF No. 124 will be denied as it relates to Defense Exhibit 1 (the transcript from Lewen's unemployment compensation hearing), Defense Exhibit 8 (the transcript from Lewen's state civil service hearing), and Defense Exhibit 30 (Barry Blasic's March 7, 2016 statement).[3]  In assessing the Rule 56 evidentiary record, this Court may consider hearsay information if such information is reducible to an admissible form of evidence at trial.  *See Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 222–23 n. 2 (3d Cir. 2000); *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989).  Here, the Court deems the prior testimony of Barry Blasic, Bryan Skinner, Brian Bender, Kathy Wilcox,

---

[3] No stenographic recording was made of Plaintiff's Pre-disciplinary Conference; instead, there is only a "transcript" consisting of typewritten and handwritten notes.  *See* ECF No. 129-5.  Accordingly, the Court's analysis will not rely on the substance of that unofficial transcript, as set forth in Defendant Exhibits 12 and 13.

and Raymond Hamm to be competent evidence for purposes of its Rule 56 review because such statements are reducible to a form that would be admissible in evidence.  Raymond has indicated that, if this case were to proceed to trial, she would call each of the aforementioned individuals as witnesses.  *See* ECF No. 137 at 3.  These individuals would be competent to testify at a jury trial regarding any relevant matters set forth in the transcripts of the state civil service or unemployment compensation proceedings, including relevant interactions that the witness had with Plaintiff, statements Plaintiff made in their presence,[4] Facebook messages or other writings they received from Plaintiff, documents they themselves generated in connection with the underlying employment dispute, applicable workplace policies, and the like.  To the extent any of these witnesses was deemed "unavailable" within the meaning of Federal Rule of Evidence 804(a), that witness's sworn testimony before the Civil Service Commission hearing officer or the state unemployment compensation judge would be admissible under Rule 804(b)(1).

With these principles in mind, the Court sets forth the relevant factual background below.  These facts are derived from the Defendant's Concise Statement of Undisputed Material Facts, ECF No. 119, Plaintiff's Responsive Concise Statement, ECF No. 129, and the relevant exhibits submitted as part of the Rule 56 evidentiary record.[5]  Unless otherwise indicated, the background facts set forth herein are undisputed.[6]  Where disputed, the Court construes the facts and any reasonable inferences arising therefrom in favor of Plaintiff, who is the non-moving party.

---

[4] Such testimony would not be considered hearsay pursuant to Federal Rule of Evidence 801(d)(2)(A).

[5] Throughout this Memorandum Opinion, the Court's citation to specific pagination refers to the page number in the ECF/CM header, as opposed to the original pagination of the document in question.

[6]   In her responses to the Defendant's Concise Statement of Material Facts, Lewen purports to dispute many factual assertions that Raymond has proffered on the basis of a particular witness's uncontroverted testimony. *See, e.g.,* ECF No. 129 at pp. 1-14, ¶¶ 19, 20 22, 23, 26, 27, 29, 30, 39, 46, 70, 71, 72, 74, 76.  Lewen frequently cites, as a basis for disputing the fact: "FRE 608 Witness Credibility." *See id.*  To be clear, Plaintiff's citation to Rule 608 does not alone give rise to a genuinely disputed issue of fact.

7

### III.     Background Facts

The Pennsylvania Sailors' and Soldiers' Home (hereinafter "PSSH") is a state veteran's home that operates under the Commonwealth's Department of Military and Veterans Affairs ("DMVA"). ECF No. 129 at 1, ¶1. The PSSH provides medical and residential services to eligible veterans and their spouses. *Id.*

At all times relevant to this litigation, employees at the PSSH were subject to certain policies of the Commonwealth of Pennsylvania and the DMVA governing workplace conduct. D5-11. This included, among other things, the DMVA's policies against sexual harassment, workplace violence and workplace bullying, the Commonwealth's policies against sexual harassment and workplace violence, and the Commonwealth's directive governing acceptable use of information technology. *See* ECF Nos. 115-1 through 115-7; ECF No. 129 at 2-3, ¶¶5-11.

Raymond served as Commandant at PSSH during the time period at issue in this case. In that capacity, she supervised more than 250 employees and was in charge of resident care for some 207 veterans and their spouses. As Commandant, Raymond oversaw the entire operations of PSSH, including regulatory compliance and oversight. ECF No. 129 at 2, ¶4.

---

The rule in this circuit is that a non-moving party "cannot survive summary judgment simply by asserting that the factfinder might disbelieve the testimony of [the movant's] witnesses on [a] potentially dispositive issue[.]" *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990); *see also Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120, 130 (3d Cir.1998) ("[I]f a moving party has demonstrated the absence of a genuine issue of material fact — meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole — concerns regarding the credibility of witnesses cannot defeat summary judgment."). "Instead, the nonmoving party must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 256–57). Accordingly, when assessing the Rule 56 evidentiary record, this Court may accept a witness's uncontroverted assertions of fact. *See Burkhart v. Allstate Ins. Co.*, No. CIV.A. 04-4651, 2005 WL 856908, at *1 (E.D. Pa. Apr. 12, 2005) (court did not improperly make a "credibility" determination at the Rule 56 stage by failing to disbelieve the uncontroverted testimony of two defense witnesses, because "in the absence of any contrary evidence, it is entirely appropriate to credit such testimony when considering a motion for summary judgment").

Lewen started working at PSSH as a licensed practical nurse ("LPN") on September 29, 2014. As an employee of PSSH, Lewen was also an employee of the Commonwealth of Pennsylvania, which made her subject to all of the aforementioned workplace policies. ECF No. 129 at 1-3, ¶¶2, 5-8, 11.

A.  Events Concerning Barry Blasic

During her tenure at PSSH, Lewen worked with Barry Blasic, a fellow LPN.  ECF No. 129 at 3, ¶12.  In August 2015, Lewen sent a "friend" request to Blasic on Facebook, which Blasic accepted.  *Id.*, ¶13. Thereafter, Lewen and Blasic began communicating, initially via public posts, then privately through Facebook messenger.  *Id.*, ¶¶13-14.  Eventually, Lewen began to express romantic feelings toward Blasic.  In various messages dating from October 2015 through February 2016, Plaintiff importuned Blasic for dates, made sexual references or comments, invited him to move into her house, and told him she loved him.  *See generally* ECF No. 115-3.[7]

---

[7] Plaintiff purports to dispute many assertions regarding her Facebook messages to Blasic on the grounds that: (1) the facts are not supported by admissible evidence, (2) the exhibit is not the original writing, and (3) the "[d]ocument [is] taken out of context." *See, e.g.,* ECF No. 129, ¶¶ 15, 21, 41. Under Federal Rule of Civil Procedure 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." But here, Plaintiff's objections are not well taken. First, there is no indication that Blasic would be unavailable to testify at trial and, if so called, he would be competent to testify concerning the content of the messages he received from Plaintiff.  Second, it appears that the printout of Facebook messages which Raymond submitted as her Exhibit 9 was originally produced and authenticated by Lewen herself in connection with her post-termination administrative proceedings. *See* ECF No. 115-1 at 15-21; ECF No. 113-4 at 21-23.  Notably, Plaintiff does not contest the accuracy of any particular message reflected in the printout; instead, she claims that the messages must be viewed in the context of accompanying images and video links.  To that end, the Court has viewed and considered Plaintiff's supplemental evidence. Third, regarding the issue of completeness, the Court finds that any missing images and/or video links are ultimately irrelevant to its retaliation analysis because they would not materially change the Court's "protected speech" analysis and, in any event, it appears they were not known or available to Raymond at the time she made her decision to terminate Plaintiff's employment.  Lastly, the messages are not necessarily being offered for the truth of the matters asserted therein, but rather as evidence of a course of conduct toward Blasic, which were perceived as a form of harassment.

Blasic's last response to Lewen on Facebook messages occurred on January 16, 2016.

ECF No. 115-3 at 30.  Blasic later testified at Lewen's post-termination hearings that he stopped

responding to her messages because he did not share the same romantic feelings towards her.

ECF No. 122 at 28; ECF No. 115-1 at 93, 97.  Blasic also told Lewen in person that he did not

want to be in a relationship with her, but she continued to repeatedly message him in the same

manner as before.  ECF No. 122 at 29; ECF No. 115-1 at 97-98.  Between January 16 and

February 29, 2016, Lewen sent Blasic approximately 154 Facebook messages. ECF No. 115-3 at

pp. 2-30.  Blasic testified that, as a result of Lewen's conduct, he experienced extreme bouts of

anxiety, had difficulty sleeping and concentrating, lost time from work, and felt unsafe.  ECF No.

122 at 29.

Much of Lewen's messaging to Blasic in the latter part of February 2016 concerned the

mundane details of her personal and work life, but on numerous occasions, her messages delved

into highly personal and/or sexual matters.  On February 21, 2016, Lewen wrote:

> I was stalking you this morning for about ten seconds on my way out the door.
> OMG Barry that was long enough you sexy thing you.  Honest to God, from the
> first time I ever saw you sick, I have always thought that you have the most sexiest
> sick voice I have ever heard in my entire life.  If you were my sweetheart, I would
> have immediately had that pressure cooker whipped out and some deliciously
> healing homemade chicken noodle soup right in your mouth faster than your runny
> nose could have ran away and hid from me.  During the impressively speedy
> cooking time, I would have carried you to bed, stripped you to your undies,
> slathered your entire body with Vicks Vapo Rub and smashed your face into my
> matronly bosom to feel your head to test for fever.  Resistance on your part would
> have been futile.  If you even opened up your mouth to protest, I would have thrown
> a cough drop in from my own personal stash of Halls.  You're not my sweetheart
> through.  And besides, I'm working on Unit E this weekend, have no social life at
> home, and have some typing work to do.  Sucks to be you Barry. Hope you feel
> better. Seriously. Stay hydrated.

ECF No. 115-3 at 13:16-27.  On February 23, 2016, Lewen sent Blasic links to two articles from

Men's Health discussing sex positions.  *Id.* at 12:3-6.  On February 24, 2016, Lewen messaged

10

Blasic that she was "wondering when your divorce will be final so we can go to the Cleveland Museum of Art." *Id.* at 10:20-21. On February 26 she commented, "When I saw you, I wanted so badly to hand you a cup of coffee, hug you good morning, kiss you on the neck, whisper 'I love you' in your ear, wipe the stain from your scrub pants and offer to strip you to your undies and rub lotion all over every itchy spot on your entire body. I'm proud of me for not succumbing to the temptation." *Id.* at 8:11-14. At various times on February 27, Lewen commented on her old boyfriend "Matt." She disclosed numerous details about their time together, including that "likes to take a shower together before having sex, sort of like a ritual." *Id.* at 6:26-27. She recounted an incident where she "sternly lectured Matt and almost kicked his ass for telling too much about his teenage daughters to strange women on the internet," *id.* at 6:15-16, then wrote a letter about it to Matt's ex wife, whom she had never met. *Id.* at 6:19-21.

On February 28, 2016, Lewen sent dozens of messages to Blasic. ECF No. 115-3 at pp. 2-5. She messaged Blasic shortly after 8:00 a.m. to advise him of the number of registered sex offenders living in the vicinity of his home. *Id.* at 5:24-26. Minutes later, she wrote:

> Without even being facebook friends with Barry Blasic, I know that he has a pretty cute looking son named [REDACTED] and a blond daughter named [REDACTED]. I can't tell who is living in the marital home at [REDACTED], whether it's Barry Blasic or his ex wife Jennifer Gervasi Blasic, who is a real cute blond that might like a new boyfriend if I was a sex offender.

*Id.* at 5:19-22. Lewen then messages again with the unsolicited advice: "'Don't be a Matt.' I would hate to have to kick your ass or notify your ex wife that you're [sic] online dating habits are endangering her and your children." *Id.* at 5:14-15. In a separate message, she wrote: "I don't know exactly how old your daughter is or when her birthday is, but based on this picture I know that in May she will be 16 years old, and is probably still a cute blond." *Id.* at 4:29-30. At

other times during the day, she sent messages commenting on her prior relationship with "Matt," including the rooms in her house where she and Matt had had sex.

On, February 29, 2016, Blasic blocked Lewen on Facebook and sent the following message to notify her:

> Due to frequency and sheer volume of messaging I decided it's time to block you. I'm frustrated and confused by your rapid escalation of intended affection. I was concerned that I had somehow given you the wrong impression but I'm fairly certain I did not. Facebook is all about sharing, what you're doing, where you are, who you're with, how you feel and of course what you're eating. I am not one to share a lot. You on the other hand are. That's fine. However I'm not very interested in viewing links people post. Not interested in listening to their music. Not interested in hearing how great their lives are or who they hate today. Not interested in what rooms of which house you and Matt had sex in. Not interested in much of anything right now that doesn't pertain to my children and bettering their lives. This ongoing one-sided relationship has become such a distraction to me and I can't allow it to continue. This has certainly been an eye opening experience. I wish you the best. I will not shun you or avoid you in any way and we can continue to Interact on a friendly and professional level. Sorry I allowed it to get to this before addressing it.

ECF No. 115-3 at 2:3-14.

That same day, Lewen composed a letter addressed to Blasic's ex-wife, Jennifer. ECF No. 129 at 4, ¶16. Although Lewen had never met Jennifer Blasic, Lewen was aware that the Blasics were in the process of a contentious divorce involving disputes over child custody and property. ECF No. 129 at 5, ¶¶24-25. In her letter, Lewen purported to advise Jennifer Blasic about her husband's online dating profile which, according to Lewen, placed their children and Jennifer in potential danger. Lewen indicated her "dismay and anger" at the fact that Blasic had failed to pay for an "upgrade" on the dating site and had been "naive enough" to provide his email address and post pictures of two of the Blasics' children. ECF No. 115-4 at 2. In the letter, Lewen laid out numerous personal details about Jennifer Blasic and her children, which Lewen claimed to have discovered with "five minutes of sleuthing on the internet." *Id.* She accused Blasic of being "unethical" and using a picture of his children "while marketing himself

online for a booty call." Lewen further stated that she was providing a printout of the various registered sex offenders reportedly living in the area. *Id.* She noted, "If you look at the pictures, I think you will agree that these are not the type of men who you would appreciate showing up in your bedroom in the middle of the night to have forced sex with you or your daughter, having been led there by your ex husband's 'cheapness' and stupidity with online dating." *Id.* Lewen offered to "show some unsolicited tough love" by "bringing the mom hammer down on Barry's head as a voluntary advocate for your safety ...regardless of the fact that you broke his heart." *Id.*

On March 1, 2016, the day after composing her letter to Jennifer Blasic, Lewen sent Blasic an email with the subject line "Thank you and letter to Jennifer." ECF No. 115-4 at 2. After "thanking" Blasic for blocking her on Facebook, Lewen wrote, in relevant part:

> Since we hardly ever see each other at work, I'm sure that we can remain friendly and professional. If you feel the need to file an official sexual harassment complaint against me I would completely understand. I'm quite certain that if you just wanted to complain unofficially about me you could talk to Ray about it and he would be willing to unofficially fix the schedule so that our paths would never cross. He sort of owes me a favor anyway.
>
>                                                   \*\*\*
>
> I remain concerned that you blew me off about putting your email address with your name on POF online dating site. I still need to put my shoes and coat on and grab my grandson from the school bus, but by the time you read this email, it will be too late to stop me from mailing a letter to your ex wife, expressing my concern for her safety. . . .

*Id.* Included in the email was a cut-and-pasted version of the letter Lewen had sent to Jennifer Blasic. *Id.*

The following day, March 2, 2016, Lewen utilized the PSSH email system to contact Blasic again. In her email to Blasic, she posted the tracking number of her letter to Jennifer, along with a link and a notation that the "[e]xpected delivery date is Friday March 4, 2016. (My birthday.)" ECF No. 115-4 at 5.

Blasic informed a co-worker about Lewen sending the letter to his ex-wife the same day that he received it. The coworker then forwarded the letter to PSSH's administration, which reached out to Blasic for additional information.  ECF No. 129 at 5, ¶28; *id.* at 8, ¶44.  Brian Skinner, the Human Resource Analyst at PSSH, emailed Raymond on March 2, 2016 to advise that Blasic had provided messages received from Lewen "from the last ten days or so."  ECF No. 115-7 at 30.  Raymond was made aware of those messages, *id.* at 29-30, and reached out to Bryan Bender, a labor relations analyst with the DMVA in Annville, Pennsylvania. ECF No. 115-1 at 22-28.  Following discussions among Raymond, Bender, and Bender's supervisor, a decision was reached to suspend Lewen, effective March 2, 2016, pending further investigation into her possible violation of workplace conduct standards against violence and bullying. ECF No. 115-5 at 2; ECF No. 115-1 at 27-28.

On March 7, 2016, as part of the ongoing investigation, Blasic provided a statement to administrators describing Lewen's conduct.  ECF No. 129 at 8, ¶45; ECF No. 115-8 at 18-22. The statement included content from some of Lewen's private messages, including her references to going around the house "bra less" and "wearing a bra with extra heavy duty reinforced straps."  ECF No. 115-8 at 18-22.  Blasic reported that Lewen had engaged in "over the top flirting" and had sent him links with images "showing illustrations of [her] favored sexual positions, innuendos, etc."  *Id.*  He described speaking to Lewen in person on January 9, 2016 and telling Lewen that the two of them were "'not on the same page' as far as dating," believing this would be enough to "clarify [his] feelings." *Id.*  He explained that, notwithstanding this conversation, Lewen had continued to message him until he blocked her on February 29, 2016.  Blasic further explained that he had received some 60 messages from Lewen between February 27-28 and "felt that it was time to stop."  *Id.*  He reported:

The next day I received the e-mail stating [Lewen] was notifying my ex-wife regarding my "dangerous" on-line dating habits. [Lewen] went so far as to search for information regarding my ex-wife, and all three children, two [of] whom are minors. The number of sexual offenders in the area of my marital home.

I found this behavior unsettling. As I began to talk with others they expressed concern for my personal safety and that of my children and ex-wife. I realized this was far more serious than I had initially thought. I began to look through older messages [Lewen] had sent. I found one dated 12/7/2015 that made reference to getting a gun from a vehicle in the parking lot and shooting someone.[8] I immediately forwarded this to my [Director of Nursing].

*Id.*

B. <u>Events Concerning Ray Hamm</u>

As the investigation into Lewen's conduct with Blasic unfolded, the administration began looking into other allegations, including a separate incident involving Lewen and Raymond Hamm ("Hamm"). ECF No. 115-1 at 31. During times relevant to these proceedings, Hamm

---

[8] Lewen's December 7, 2015 message to Blasic references her then supervisor, Raymond Hamm, and reads:

I had a nice heart to heart talk with [Ray] last night and gave him some food for thought. At one time I actually had a diagnosis of PTSD from being married to a bully a few decades ago. I don't associate with violent bullies anymore, so it's not really a problem these days unless somebody in the workplace suddenly flips out, screams at me and calls me "stupid." So I mentioned to [Ray] last night that my brain sort of shut down the other morning. I told him that I don't plan to file a workplace violence complaint, but next time he just stands there with no balls and watches a bully scream at a person with PTSD, that person may go out to their vehicle and return with a gun and shoot him as well as her. He cringed when I said he had no balls, and hadn't thought about it like that. I have the same fear for generic "male staff" like you and John who get the job of walking out terminated employees for no reason than because you're men. To me that's gender discrimination. Anyway, I thanked [Ray] for never screaming at me even if he has no balls. He laughed and sincerely thanked me for the food for thought. He didn't realize that I have a history of PTSD and said he never would have known that I cried if I hadn't mentioned it last night. He admitted that he was glad that I cried and didn't go get a weapon from my car and shoot the place up or something. . . .

ECF No. 115-3 at 51:5-18. In a subsequent message that same day, Lewen wrote:

I don't plan on leaving. I also like Ray for the most part. My first marriage was a long time ago. The point I was trying to make to him is you just might not know a person's history or what can of worms you may be opening when you start screaming at somebody unprovoked and calling them belittling names. I told him flat out that if he ever ever ever dares to scream at me and call me names just for being a prudent nurse I will kick his ass. I am capable of fighting violence with violence if I choose to, but as a civilized person I chose not to with Deb. I've heard stories about her temper, but never saw it, and always figured the people must have done something to provide her. Ray agreed that she has a problem, but I think when it comes down to it he just doesn't want to deal with doing anything to try to put her in her place. . . .

ECF No. 115-3 at 50:18-26.

served as a Registered Nurse Supervisor at PSSH and had supervisory authority over Lewen. ECF No. 129 at 6, ¶31.  Lewen agrees that she and Hamm generally had a good working relationship.  *Id.* ¶32.

Nevertheless, on February 20, 2016, in a Facebook message from Lewen to Blasic, Lewen remarked that she "got a counseling from Ray and policy education right in the middle of med pass" and "Ray pretty much ripped me a new one earlier for being out of compliance yesterday with my med pass."  ECF No. 129 at 6, ¶33; *see* ECF No. 115-3 at 14:11-12, 15-16.

The following day (February 21, 2016), Lewen messaged Blasic to tell him that she had written a "five page typewritten gender discrimination complaint against Ray and Kevin," while also noting that she had "no doubt that Ray will be able to defend himself against my harassment complaint."  ECF No. 129 at 6, ¶34; *see* ECF No. 115-3 at 13:2, 7.  During her shift that day, Lewen presented Hamm with a four-page Commonwealth Employee Witness Statement that set forth her grievance against him, which she wanted him to read.  ECF No. 115-2 at 46-49; ECF No. 115-5.  The document stated, among other things:

- "This letter is regarding recent behavior of Ray … Ray's behavior did in fact escalate to the point of verbal bullying on the morning of Saturday February 20, 2016." ECF No. 115-5 at 9.

- "In an unwitnessed telephone conversation, he claimed that he had not wanted to counsel me in front of Julie, but I was 'way far out of compliance' with my medication administration." ECF No. 115-5 at 9.

- "He read the policy to me, and sternly stated that according to policy, the window to give medications is 'one hour earlier until one hour after the scheduled administration time.'" ECF No. 115-5 at 9.

- "It is simply not fair that Ray has singled me out to be in compliance with the medication administration policy, when all the other nurses get to violate that policy without being threatened with 'PDC.'" ECF No. 115-5 at 12.

16

- "I would like a response to my complaint within ten (10) business days…I will await a response before filing a complaint with the Equal Employment Opportunity Commission (EEOC)." ECF No. 115-5 at 12.

*See* ECF No. 129 at 6-7, ¶36.

Hamm later testified that Lewen began laughing as he was reading her statement, commenting on "the look on [Hamm's] face." ECF No. 115-2 at 49. When Hamm remarked that her allegations were untrue, Lewen shrugged and said, "My word against yours." *Id.* For her part, Lewen admits that she wrote the document as a joke and claims that she that told Hamm so. ECF No. 129 at 6, ¶35; *id.* at 7, ¶40.

On February 22, 2016, Lewen sent a Facebook message to Blasic stating, "Ray couldn't believe that I actually typed up a four page gender discrimination and harassment complaint against him and Kevin. We cuddled for almost an hour on Unit E. I forgave him. We're friends again…" ECF No. 129 at 7, ¶37. In a second message to Blasic that day, she commented on Hamm being "mind blown and defending himself against my allegations and I was giggling in the middle of the night with no witnesses. I felt devious . . . ." *Id.*, ¶38.

This incident with Hamm apparently led to Lewen creating a Facebook post in which she referenced workplace discrimination. When Kathleen Wilcox (hereinafter "Wilcox"), then the Director of Nursing at PSSH, learned of the Facebook post, she arranged to meet with Lewen on February 25, 2016 to discuss the post and Lewen's supposed concerns about Hamm. ECF No. 129 at 8, ¶43. During the meeting, Lewen made no complaint of Hamm mistreating her. *Id.* Lewen did, however, indicate that a female supervisor had yelled at her; she then remarked that supervisors need to be careful "because anyone else could go to their vehicle and return with a gun and shoot them." *Id.* This remark concerned Wilcox enough that she reported it to Raymond. *Id.*

17

C.  Lewen's Dismissal

On March 14, 2016, following the completion of the administrative investigation and two pre-disciplinary conferences, Lewen was notified of her dismissal.  ECF No. 129 at 9, ¶51; *id.* at 11, ¶ 59.  The termination letter was signed by Raymond and cited Lewen's "intimidating, threatening and inappropriate conduct and behavior towards [Lewen's] coworkers and [her] chain of command," which had "created an intimidating and hostile work environment."  *Id; see also* ECF No. 115-5 at 5.  The letter further indicated that Lewen had "failed to provide an acceptable explanation" for her actions during the Pre-Disciplinary Conference (PDC) and had sent correspondence to her chain of command after the PDC hearings indicating "bloodshed I fear may happen one day at PSSH."  *Id.*[9]

Lewen unsuccessfully appealed the termination decision to the Pennsylvania Civil Service Commission.  She also applied for, but was denied, unemployment compensation benefits.  In both post-termination proceedings, Lewen maintained that she was a whistleblower who was fired because of certain reports she had made concerning patient neglect or abuse at PSSH.  These reports are discussed below.

D.  Lewen's Whistleblower Complaints

(i)   *Lewen's Complaint to the Pennsylvania Department of Health*

In December 2015, Lewen filed an anonymous complaint with the Pennsylvania Department of Health concerning alleged staffing deficiencies at PSSH.  ECF No. 129 at 11, ¶61; ECF No. 115-6 at 10.  Lewen's messages to Blasic indicate that she informed him about this

---

[9] To this Court's knowledge, the correspondence referenced in Lewen's termination letter is not part of the evidentiary record.  During Lewen's hearing before the Pennsylvania Civil Service Commission, Bryan Bender testified that Lewen made the "bloodshed" comment during her pre-disciplinary conference. ECF No. 115-1 at 73.

complaint. On December 7, 2015 she wrote: "Call me warped, but I actually think it's kind of funny that the health dept was actually in the building last week on an anonymous complaint from an obviously disgruntled employee. . . . Their response will be "PDC"[10] since pdc is [sic] the only three letters in PSSH administers [sic] vocabulary."  ECF No. 129 at 11, ¶60; ECF No. 115-3 at 50:2-6.

The following month, Plaintiff sent Blasic two more Facebook messages concerning her DOH complaint.  On January 26, 2016, she noted (in part):

> They plan to come in on dayshift hours this week and they don't expect to find an unlawful staffing shortage.  I did name names of where the quality of care problem lies, initials BR and NF. That's inside info from one grandma type to another. Destroy this text.  Or don't destroy it so that you can one day pull it out to prove that you saw the news here first, before it was even news.

ECF No. 129 at 11, ¶62; ECF No. 115-3 at 24:14-22.  On January 28, 2016, Lewen wrote:

> I read the email from Tom B. about DOH coming in yesterday and not finding anything wrong yesterday.  I also just got the phone call from DOH inspector explaining how they didn't find anything wrong yesterday.  I didn't think that they would find anything wrong yesterday.  It's going to be fun just to sit back now and watch how this unfolds.

ECF No. 129 at 12, ¶63; ECF No. 115-3 at 23:5-8.

### (ii)    *Lewen's Complaint to the Pennsylvania Attorney General*

Lewen also filed a complaint with the Pennsylvania Attorney General's office on or around February 1, 2016, in which she accused Raymond and another official of failing to report a prior incident involving resident-on-resident sexual abuse.  ECF No. 129 at 12, ¶65; ECF No. 115-7 at 15-19.  Although Lewen signed the complaint, she specifically requested that the investigators "DO NOT reveal [her] identity to Nursing Home Administrator/ Commandant

---

[10] The Court assumes this is a reference to "Pre-Disciplinary Conference."

Barbara Raymond, RN, or Assistant Director of Nurses Nancy Flanigan, RN." ECF No. 115-7 at

17.

As with the DOH complaint, Lewen discussed her complaint to the Attorney General in

her private messages to Blasic. On February 2, 2016, Plaintiff wrote:

> I filled out a Pennsylvania elder abuse complaint form and mailed it to Harrisburg
> along with a two page typewritten factual letter. I didn't do it anonymously. Even
> as I type this, my complaint is in Harrisburg on its way to the Attorney General. I
> strongly suspect that Barb Raymond never did the mandatory reporting for the
> involuntary deviate sexual intercourse that was committed . . . over a year ago.
> There's a 12 year statute of limitations.

ECF No. 129 at 12, ¶64; ECF No. 115-3 at 22:12-16. On February 4, 2016, Lewen informed

Blasic that:

> My elder abuse report did get delivered this am. So now I'm fighting the primordial
> urge to feel like I'm about to get in huge trouble for "telling." . . . Not sure when
> the OAG will come in to investigate. . . .

ECF No. 115-3 at 21:1-5.

E. The Current Litigation

Lewen filed this lawsuit in the wake of her termination, initially naming a host of

Defendants and asserting nine causes of action. At this juncture, her only remaining claim is a

First Amendment claim against Defendant Raymond for alleged retaliation. On that point,

Lewen claims she was fired not because of workplace policy violations but because she voiced

concerns about perceived elder abuse and neglect at PSSH.

Raymond has moved for summary judgment on the remaining First Amendment claim.

ECF Nos. 113, 114, 115, 119, 122, 135. In support of her motion, Raymond argues that Lewen's

speech was not constitutionally protected, that Lewen cannot demonstrate a causal link between

any protected speech and her termination, and that PSSH would have taken the same action to terminate Lewen's employment irrespective of any protected speech.  ECF No. 114.

Lewen has filed a brief in opposition to Raymond's motion, as well as a responsive statement of facts, and an appendix of exhibits in support of her own position.  ECF No. 129, 130, 131.  As discussed above, the Court has also reviewed Lewen's motions styled as motions *in limine*, ECF Nos. 123 and 124, and all filings related thereto.  *See* ECF Nos. 123, 124, 125, 126, 137, 138, 139, 140.  The Court's analysis follows.

**IV.    Discussion**

Plaintiff's legal claims are asserted under 42 U.S.C. §1983, which provides a private right of action as against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States."  In order to establish a valid claim under this statute, a plaintiff must show that the defendant, while acting under color of state law, violated one or more of her federal constitutional or statutory rights.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).  In this case, there is no question that Raymond acted under color of state law.  The only question is whether Raymond violated Lewen's federal rights – specifically, her First Amendment right to engage in protected speech.

A. Governing Legal Principles

To prevail on her First Amendment retaliation claim, Lewen must prove (1) that she engaged in constitutionally protected conduct, (2) that Raymond engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising her constitutional rights, and (3)

21

that a causal link existed between the constitutionally protected activity and the retaliatory action. *Dennison v. Indiana Univ. of Pa.*, No. 22-2649, 2023 WL 8595426, at *4 (3d Cir. Dec. 12, 2023); *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 863 (3d Cir. 2019). If Lewen satisfies this initial burden, Raymond can still prevail if she establishes that she would have undertaken the same employment decision irrespective of any constitutionally protected activity. *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015); *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008).

Importantly, public employees like Lewen do not surrender their First Amendment rights by virtue of their government employment, but they do necessarily "accept certain limitations on [their] freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006); *Dennison*, 2023 WL 8595426, at *4. Accordingly, special considerations apply when First Amendment claims arise in the context of government employment. In such cases, the employee's speech is deemed protected if (a) the employee spoke as a citizen; (b) the statement involved a matter of public concern; and (c) the government employer lacked "an adequate justification for treating the employee differently from any other member of the general public based on its needs as an employer." *Dennison*, 2023 WL 8595426, at *4 (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019)). Whether a public employee's speech is protected by the First Amendment is a question of law for the court to decide. *Munroe*, 805 F.3d at 466; *Miller*, 544 F.3d at 548.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421; *see De Ritis v. McGarrigle*, 861 F.3d 444, 453 (3d Cir. 2017). Courts must engage in a "practical

22

inquiry, . . . and assess whether the speech at issue is itself ordinarily within the scope of an employee's duties." *De Ritis*, 861 F.3d at 453 (quoting *Garcetti*, 547 U.S. at 424, and *Lane v. Franks*, 573 U.S. 228, 240 (2014)). If it is, then it is employee speech and receives no First Amendment protection. *Id.* "[T]hough speech may be protected even if it concerns information related to or learned through public employment, . . . an employee does not speak as a citizen if the mode and manner of [her] speech were possible only as an ordinary corollary to [her] position as a government employee." *Id.* at 454 (citations and internal quotation marks omitted).

"Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller*, 544 F.3d at 548. By contrast, "speech that relates solely to mundane employment grievances does not implicate a matter of public concern." *Munroe*, 805 F.3d at 467; *see also Palardy v. Twp. of Milburn*, 906 F.3d 76, 83 (3d Cir. 2018) ("Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest ... are matters more immediately concerned with the self-interest of the speaker as employee.").

If Lewen spoke as a private citizen on matters of public concern, the Court must then balance her interest in engaging in such speech with her employer's countervailing interests. *Miller*, 544 F.3d at 548. Those countervailing interests include PSSH's prerogative of removing employees whose conduct impairs performance as well as its concerns for the morale of the workplace, harmonious relationships among co-workers, and the regular operation of the enterprise. *Id.* This balancing exercise involves a fact-intensive inquiry that requires consideration of the entire record. *Id.*

B. <u>Analysis</u>

23

In this case, none of the communications or conduct cited as grounds for Lewen's termination qualifies as protected activity.[11]  In her March 14, 2016 termination letter, Raymond referenced Lewen's violation of numerous workplace policies, and her "intimidating, threatening and inappropriate conduct and behavior" toward her coworkers and chain of command, which had created an "intimidating and hostile work environment."  ECF No. 115-5.  According to Bryan Bender, who drafted the letter for Raymond to sign, it was Lewen's harassing actions toward Blasic and Hamm that formed the basis for her termination, in addition to Lewen's references to workplace shootings.  *See generally* ECF 115-1 at 42-76.

### 1.   *Speech Directed at Blasic and His Ex-Wife*

Lewen's numerous messages to Blasic discussing the mundane details of her personal and work life are not protected speech, because they do not implicate matters of public concern. *See Palardy,* 906 F.3d at 83 ("Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . are matters more immediately concerned with the self-interest of the speaker as employee.").  And more relevantly, Lewen's messages to Blasic involving romantic overtures, sexual innuendos, comments about his family or the like plainly did not involve matters of public concern.  The same is true of Lewen's March 1 and 2, 2016 emails to Blasic, and the letter directed to his ex-wife, all of which centered around Lewen's supposed concerns about Blasic's online dating profile and the harm it might cause to Blasic's family.

---

[11] For this reason, Lewen cannot establish a viable First Amendment claim predicated on the alleged suppression of constitutionally protected speech, to the extent she is asserting this type of claim as distinguished from her retaliation claim.

Lewen contends that her romantic messages to Blasic have been taken out of context and that they were actually part of a satirical or creative storyline, which was a means of helping her (and Blasic) cope with emotional trauma.  But regardless of Lewen's intent, it does not transform her messages into constitutionally protected speech.  As a public employee, Lewen's speech was protected only to the extent it involved "matter[s] of political, social, or other concern to the community." *Miller*, 544 F.3d at 548.  Courts must make this determination based on the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  Speech touches on matters of public concern if it "generally addresses a social or political concern of the community" or "relate[s] to broad social or policy issues." *Borden v. Sch. Distr. of Tsp of E. Brunswick*, 523 F.3d 153, 169-70 (3d Cir. 2008).  Moreover, "[t]he forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern." *Corlew v. Borough*, No. 3:22-CV-01990, 2024 WL 1051980, at *5 (M.D. Pa. Mar. 11, 2024) (citing *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (3d Cir. 2011)).

Here, Lewen's private Facebook messages to Blasic focused on the minutiae of her personal life and "did not seek to communicate to the public" a matter of broader community concern. *See Corlew v. Borough,* No. 3:22-CV-01990, 2024 WL 1051980, at *7 (M.D. Pa. Mar. 11, 2024) (holding that plaintiff's internal grievance letter "did not seek to communicate to the public or to advance a political or social point of view beyond the employment context," and therefore could not form the predicate for a First Amendment retaliation claim); *cf. Swineford v. Snyder Cty. Pa.*, 15 F.3d 1258, 1272 (3d Cir. 1994) (plaintiff's complaints to commissioners, the press, and investigatory agencies had a "public mien" and touched on matters of public concern). In addition, the record shows that Lewen's communications to Blasic were unwelcome not just

25

because of their content but because of their "frequency and sheer volume." ECF No. 115-3 at 2. For all of these reasons, the Court concludes that Lewen's speech directed at Blasic and his ex-wife is not constitutionally protected speech.

### 2. Speech Concerning Hamm

Similarly, Lewen's communications to and about Hamm did not constitute protected speech. Under Third Circuit law, "an employee does not speak as a citizen if the mode and manner of [her] speech were possible only as an ordinary corollary to [her] position as a government employee." *De Ritis*, 861 F.3d at 454 (citing authority). Here, the record shows that, on or about February 21, 2016, Lewen presented Hamm with an unsigned "Commonwealth Employee Witness Statement" alleging, among other things, that he had "singled her out" when he counseled her about her noncompliant administration of medication, and that his behavior had "escalate[d] to the point of verbal bullying." ECF No. 115-5 at 9. Lewen later discussed this incident with Wilcox during a meeting on February 25, 2016. Because these communications were possible only as an ordinary corollary to Lewen's position at PSSH, they did not constitute private citizen speech. *See, e.g., De Ritis,* 861 F.3d at 454 (where the plaintiff had the opportunity to speak in court to other attorneys and judges only as an ordinary corollary to his position as an Assistant Public Defendant, his speech in that role was not citizen speech); *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 243-44 (3d Cir. 2016) (plaintiff's objections to police department policies by means of "police department counseling forms" were not protected speech, since "[c]itizens do not complete internal police counseling forms").

In addition, the clear focus of Lewen's "witness statement" was her personal grievance with Hamm, rather issues of community concern. As discussed, the "public or nonpublic nature

of an employee's speech" is determined by reference to its "'content, form, and context,' . . . which encompasses 'the employee's motivation as well as whether it is important to our system of self-government that the expression take place.'" *De Ritis,* 861 F.3d at 455 (citations omitted). "[I]f a discrete unit of speech addresses only the employee's own problems, and even if those problems 'brush . . . against a matter of public concern' by virtue of that employee's public employment, then that speech is merely a 'personal grievance.'" *Id.* (quoting *Miller,* 544 F.3d at 551) (ellipsis in the original).

Relevantly, Lewen's "witness statement" is laden with repeated references to alleged misconduct on the part of Hamm that is allegedly directed against Lewen personally. *See* ECF No. 115-5 at 9 ("I have been a victim of harassment and gender discrimination"); *id.* ("a problem has developed which threatens to disrupt my otherwise peaceful employment"); *id.* ("Ray . . . for some reason has singled me out to harass me"); *id.* at 10 ("it was unfair for [Hamm] to single me out and point a finger at me and nobody else"); *id.* ("He rudely and unprofessionally hung the phone up without even saying goodbye to me."); *id.* (The encounters I have had with Ray have been focused on my behavior while working as the charge nurse on Unit C."); *id.* at 11 ("When I told this to Ray, he acted like he didn't even hear me, and abruptly walked away."); *id.* at 12 ("It is simply not fair that Ray has singled me out"). The statement expresses Lewen's theory that Hamm's alleged bullying may have been "in collusion with" PSSH's then-newly hired male Assistant Director of Nurses ("Kevin"). ECF No. 115-5 at 9; *see also id.* at 12 ("In trying to pinpoint a possible cause or motive for Ray's hostile behavior, I suspect that it may be a male ego driven and completely unnecessary feeling of inadequacy on Ray's part and possibly Kevin's influence."); *id.* ("Since Kevin has come onto the scene, Ray has managed to consistently find some fault with me, usually while I am working on Unit C."). Lewen's

statement includes a request "for Administration to help me sort out this issue with Ray, so that we may find a way to co-exist on those nights when he is on duty as my supervisor." *Id.* To that end, she asks for a response, "within ten (10) business days, to determine whether or not Ray's behavior is condoned by Administration and what, if any, role Kevin plays in influencing Ray's action." *Id.*

The clear thrust of Lewen's "witness statement" concerns her putative complaints about Hamm, rather than a "matter of political, social, or other concern to the community." *Miller,* 544 F.3d at 548. And although the statement includes criticisms of certain workplace practices at PSSH, this Court must "not cherry pick something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed." *Miller,* 544 F.3d at 550. Instead, "[o]ur inquiry must also consider the form and circumstances of the speech in question." *Id.* Additionally, as noted, "[t]he forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern." *Corlew,* 2024 WL 1051980, at *5.

In this case, the circumstances of Lewen's "witness statement" do not suggest that the document was a serious attempt on her part to correct putative workplace violations, even though it may have contained information that "brushed against" matters of public concern. Instead, as discussed, her statement was primarily focused on alleged acts of misconduct by Hamm against her personally. In addition, the statement was unsigned and was not forwarded by Lewen to others in her chain of command. Lewen did not file an employment discrimination complaint with the EEOC prior to her termination, nor did her statement otherwise display a "public mien." *De Ritis,* 861 F.3d at 456. On the contrary, it is undisputed that Lewen presented the statement to Hamm as a joke. *See* ECF No. 129, ¶40; ECF No. 115-7 at 12. Thus, her "internal grievance

28

simply 'did not seek to communicate to the public or to advance a political or social point of view beyond the employment context.'" *Corlew*, 2024 WL 1051980, at *7. To the extent Lewen expressed work-related criticisms in her statement, they were extensions of her mundane employment grievance. Because the overall form and circumstances of the statement focused on matters of personal interest to Lewen rather than issues of public concern, the statement did not constitute constitutionally protected speech. *See Kowalewski v. Susquehanna Cnty.,* No. 17-CV-01182, 2018 WL 656011, at *3 (M.D. Pa. Feb. 1, 2018) ("Courts routinely find an absence of public interest where public employees level personalized complaints against their employers.") (collecting cases).

### 3.   *Speech Concerning Workplace Violence*

Lewen's remarks about workplace violence also fall outside the ambit of constitutionally protected speech. Here, the record reflects that, on at least two occasions, Lewen broached the subject of an employee obtaining a firearm and shooting coworkers -- once in her December 7, 2015 message to Blasic (in which she recounted making such comments to Hamm) and again during her February 25, 2016 meeting with Wilcox. *See* ECF No. 129 at ¶¶42-43. In both situations, Lewen's comments about workplace shootings arose in the context of her complaints about the way she had been treated by a supervisor at PSSH. To reiterate, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . are matters more immediately concerned with the self-interest of the speaker as employee." *Palardy*, 906 F.3d at 83. Thus, Lewen's references to workplace shootings "did not seek to communicate to the public or to advance a political or social point of view beyond the employment context," *Corlew*, 2024 WL 1051980, at *7 (M.D. Pa. Mar. 11, 2024); instead, the comments were merely part and parcel of her own private work grievances.

4. *Balancing of Interests*

In any event, to the extent any aspect of the foregoing speech could be construed as private citizen speech touching on matters of public concern, the Court finds that Raymond had "adequate justification" for treating Lewen "differently than the general public based on [PSSH's] needs as an employer." *Munroe*, 805 F.3d at 466. As noted, the third step of the protected speech analysis requires the Court to balance the employee's interests, "as a citizen, in commenting upon matters of public concern" with "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (citing *Pickering v. Board of Board of Education*, 391 U.S. 563, 568 (1968)). Our Court of Appeals has explained that:

> "On the employee's side of the scale, we must consider the interests of both [the employee] and the public in the speech at issue." ... On the other side of the *Pickering* balancing test, the Court must address "the government's legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" ... The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech. ... While the inquiry varies given the nature of the speech at issue, courts typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprise's regular operations. ... "The balancing we must undertake is a fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." ... In short, the inquiry "involves a sliding scale," in which "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." ...

*Id.* at 472 (internal citations omitted). If the employer's interest is "significantly greater" than the employee's interest in contributing to public debate, then the employee's speech is not protected. *De Ritis*, 861 F.3d at 456-57 (citing *Pickering*, 391 U.S. at 573). That is plainly the situation here.

30

As noted, Lewen has posited that her messages to Blasic were part of a satirical or creative exercise, but any First Amendment interest Lewen could have had in that regard is weak, at best, under the circumstances of this case. By any reasonable reading of the record, Lewen's messages to Blasic were excessive and intrusive to the point of constituting harassment, particularly when considered in conjunction with her letter to Blasic's ex-wife.

Similarly, Lewen's interest in commenting on workplace shootings receives little weight. As discussed, Lewen's remarks were made not as a commentary on an issue of public interest but in response to being reprimanded by her supervisor. According to Bryan Bender, Lewen was questioned about these comments during her pre-disciplinary conference, and her description of the event caused him "great concern" for him and the staff because it raised questions in his mind whether Lewen "was capable of inflicting any type of harm" to herself or others. ECF No. 115-1 at 84. Given the overall context in which these comments occurred, including Lewen's strange behavior toward Blasic and Hamm, Raymond had an objectively reasonable basis for construing them in a threatening manner.

For her part, Lewen strongly denies that she ever personally threatened violence. Rather, she claims she merely meant to convey that supervisors should be thoughtful about the manner in which they address their fellow employees, because they do not know how an employee might respond to harsh criticism or perceived bullying. But even accepting this as true, Lewen's remarks were, at best, an extension of her own private workplace grievances, rather than speech on a matter of weighty "political, social, or other concern to the community." *Miller,* 544 F.3d at 548. As such, Lewen's interest in this speech is limited.

Finally, Lewen's interest in producing her "Employee Witness Statement" about Hamm is accorded little weight. "Although 'the public has a significant interest in encouraging

31

legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of public officials, . . . it has little interest in speech that 'brush[es] ever so gently against a matter of public concern' but nonetheless remains 'focused upon [the employee's] private grievances as an employee.'" *De Ritis*, 861 F.3d at 457 (citations omitted).  Here, for the reasons discussed, Lewen's putative complaint against Hamm was not even a sincere employee grievance but was done as a joke.  *See* ECF No. 129, ¶40; ECF No. 115-7 at 12.  And regardless how it was intended, Hamm apparently did not welcome this incident and felt that Lewen was attempting to intimidate and bully him.  ECF No. 115-2 at 53.[12]  Moreover, to the extent Lewen's "witness statement" commented on perceived staffing violations at PSSH, the record suggests that Lewen's criticism was unfounded and was predicated on a misunderstanding about the governing regulations.  *See* ECF No. 115-5 at 14; ECF No. 115-2 at 76-77.  Accordingly, Lewen's "witness statement" is accorded relatively little weight.  *See De Ritis,* 861 F.3d at 456 (assigning the plaintiff's recklessly false statements on matters of public concern less weight at the third step of the protected speech analysis).

On the other hand, PSSH had a substantial interest in protecting workplace morale, maintaining harmonious relationships among its co-workers, and removing an employee whose conduct impaired performance and was potentially threatening.  *Miller,* 544 F.3d at 548; *Munroe*, 805 F.3d at 472.  Here, the record shows that Lewen's conduct toward Blasic caused him anxiety and impaired his performance and attendance at work.  Lewen's Employee Witness Statement

---

[12] Lewen disputes this assertion, stating that Hamm's testimony on this point, given to the state civil service commission, was the result of leading questions and involves matters of credibility and hearsay.  *See* ECF No. 129 at 7, ¶39.  These objections are not well-taken, as Hamm's uncontroverted testimony was competent and admissible for purposes of the state hearing and would be reducible to an admissible form of evidence at any future trial.  When assessing the Rule 56 record, the Court may accept a witness's uncontroverted assertion of fact.  *See Burkhart*, 2005 WL 856908, at *1.  Further, a plaintiff cannot overcome summary judgment merely by arguing that a jury might choose to believe a witness's otherwise uncontroverted testimony.  *Hozier*, 908 F.2d at 1165; *Burkhart, supra,* at *1.

purported to accuse Hamm of various forms of misconduct, and thus "impugned the integrity" of Lewen's direct supervisor with allegations that Lewen apparently knew were unfounded. *See De Ritis*, 861 F.3d at 457-58. Both Blasic and Wilcox felt uncomfortable enough about Lewen's allusions to workplace shootings that they brought them to the attention of PSSH's administration. Bender also became concerned about Lewen's remarks when she was questioned about them at her pre-disciplinary hearing. In short, Lewen's conduct and speech clearly had a detrimental impact on the morale and working relationships of PSSH's staff. Her conduct also undermined PSSH's interest in "promoting workplace efficiency and avoiding workplace disruption." *Baloga*, 927 F.3d at 756 (citation and internal quotation marks omitted). And as Raymond observes, had she not terminated Lewen, this may have exposed PSSH to liability for sexual harassment or a potential violence. Because PSSH's interests as a public employer significantly outweigh any interest that Lewen (or the public) may have had in the aforementioned speech, it follows that her speech was not protected as a matter of law. *De Ritis,* 861 F.3d at 456-57.

### 5.  *Alleged Retaliation*

In her Amended Complaint, Lewen claims that the "actual cause" of her termination was not the grounds cited by Raymond, but rather "'unlawful whistleblower retaliation' . . . for reporting elder abuse, elder neglect and quality of care issues to the Pennsylvania Department of Health and the Pennsylvania Office of Attorney General[.]" ECF No. 31, ¶5. Assuming, then, that Lewen's reports to the DOH and AG constitute a form of protected speech, Lewen can establish a First Amendment retaliation claim if she adduces evidence of a causal link between her constitutionally protected conduct and the retaliatory action. *Dennison*, 2023 WL 8595426, at *4; *Javits*, 940 F.3d at 863. Here, however, she has failed to do so.

33

As discussed above, Lewen filed an anonymous complaint with the DOH in December 2015 concerning alleged staffing deficiencies at PSSH.  ECF No. 129 at 11, ¶61; ECF No. 115-6 at 10.  Pursuant to DOH policy, the name of the complainant is generally kept confidential and is not shared with the facility during the "survey." ECF No. 115-2 at 72; ECF No. 115-8.

Subsequently, on or around February 1, 2016, Lewen filed a complaint with the Pennsylvania Office of Attorney General ("OAG") accusing Raymond and another official of failing to report a prior incident of resident-on-resident abuse. ECF No.129, ¶65.  Although Lewen signed her name to the latter complaint, she expressly requested that her identity **not** be revealed to Raymond or the other subject of her complaint. ECF No. 115-7 at 17.  Lewen acknowledges that she never informed Raymond or any of the defendants that she had filed it. ECF No. 115-6 at 11.  Raymond was eventually interviewed in August 2016 by an OAG agent in reference to Lewen's complaint, *after* Lewen has been discharged.

Here, there is no evidence in the record to suggest that, at the time she issued her termination letter, Raymond was aware of -- much less motivated by -- Lewen's involvement in filing the DOH or OAG complaints.  Lewen theorizes that, because she mentioned her DOH and OAG complaints in her Facebook messages to Blasic, he must have passed that information along to PSSH's administration, and it must have informed the termination decision.  But the record fails to support such an inference.  In his March 2, 2016 email to Raymond, Skinner noted that Blasic had provided him messages "from the last ten days or so," which would have been from approximately February 21, 2016 onward, but none of Lewen's messages during that timeframe referenced her DOH or OAG complaints.  Blasic's March 7, 2016 statement to PSSH's administrators also did not reference the DOH or OAG complaints.  Further, at Lewen's post-termination hearing before the Civil Service Commission, Bushinski indicated on the record

34

that PSSH had only partial printout of Lewen's Facebook messages to Blasic.  ECF No. 115-1 at

15-16.  Blasic expressly denied ever reporting to anyone in his chain of command that Lewen

had filed complaints with the DOH and OAG.  ECF No. 113-4 at 40.  Hamm and Wilcox both

denied that Blasic or anyone else ever informed them, prior to Lewen's termination, that she had

made complaints to those agencies.  ECF No. 115-2 at 55, 71-72.  Bender and Raymond

similarly denied any awareness, as of March 14, 2016, that Lewen had filed complaints with the

DOH or OAG.  ECF No. 113-4 at 41; ECF No. 115-1 at 80-81.  On the contrary, Raymond

testified that she found out about Lewen's activity only after the termination occurred and,

therefore, Lewen's complaints to the DOH and OAG were not a factor in her discharge.  *Id.*

This is borne out in a post-termination email exchange between PSSH's attorney and

Raymond, which transpired on April 20, 2016, after Lewen was already fired.  ECF No. 135.  On

that date, Lewen emailed PSSH's attorney, Stephen Bushinski, Esq., printouts of several

Facebook messages she had sent to Blasic in January and February 2016, discussing her

complaints to the DOH and OAG; Bushinski then forwarded the email and messages to

Raymond.  *Id.*  In replying to Bushinski's email, Raymond recalled that PSSH had been

investigated at one point regarding an anonymous complaint of involuntary deviate sexual

intercourse and "the investigation showed no deficient practice," but Raymond had assumed the

anonymous complainant was the daughter of a patient.  *Id.*

Ultimately, Lewen's assertion that she was fired as a result of protected whistleblower

activity is founded on mere speculation.  Thus, even construing the record in the light most

favorable to Lewen, a reasonable jury could not conclude that her complaints to the DOH or

OAG were a "substantial or motivating factor" in Raymond's decision to terminate her

employment.  *Munroe,* 805 F.3d at 466.  Because Lewen has failed to adduce evidence sufficient

to support a reasonable finding that Raymond acted with retaliatory motives relative to her reports of elder abuse, elder neglect and/or quality of care issues, her First Amendment claim fails as a matter of law.

### 6. Raymond's Affirmative Defense

Finally, even if a factfinder could infer that Raymond was aware, as of March 14, 2016, of Lewen's allegations relative to quality of care issues and/or elder abuse or neglect, this record nevertheless compels the conclusion that Raymond would have discharged Lewen irrespective of such speech. The evidence shows that Lewen engaged in a course of conduct that violated numerous workplace policies at PSSH. *See* ECF No. 115-1 at 45-79. As discussed above, Lewen's messages to Blasic were excessive and intrusive to the point of constituting harassment, particularly when considered in conjunction with her letter to Blasic's ex-wife. Her written complaint against Hamm was perceived as an attempt at bullying. Her remarks about workplace violence were concerning in the eyes of both staff and administrators. The uncontradicted evidence shows that it was these issues that motivated the collective decision by Raymond, Bender, and Bender's supervisor, to terminate Lewen's employment. ECF No. 115-1 at 39-43. When the record is viewed as a whole, even in the light most favorable to Lewen, a reasonable factfinder would be compelled to conclude that Raymond would have terminated Lewen's employment, irrespective of any protected speech, based on Lewen's inappropriate conduct toward Blasic and Hamm, as well as her comments about workplace shootings. On this basis as well, Lewen's First Amendment claim fails as a matter of law.

## V.     Conclusion

For the reasons set forth above, the Plaintiff's motions "*in limine*" will be granted in part as set forth herein and otherwise denied.  Defendant's motion for summary judgment will be granted as to Plaintiff's First Amendment retaliation claim.

An appropriate Order follows.


SUSAN PARADISE BAXTER
United States District Judge